# **EXHIBIT B**

**Stalking Horse APA**

**ASSET PURCHASE AGREEMENT**

**Dated as of December 7, 2017**

**by and among**

**BOSTON HERALD, INC., HERALD INTERACTIVE INC., HERALD MEDIA, INC.,**

**and**

**HERALD MEDIA HOLDINGS, INC.,**

**as SELLERS,**

**and**

**GATEHOUSE MEDIA MASSACHUSETTS I, INC., as BUYER**

06018

# TABLE OF CONTENTS

**Page**

Article I DEFINITIONS; CONSTRUCTION ........................................................................ 1

Section 1.1  Definitions ............................................................................. 1
Section 1.2  Rules of Construction. ........................................................... 7

Article II TRANSFER OF ASSETS .................................................................................. 7

Section 2.1  Purchase and Sale of the Purchased Assets ......................... 7
Section 2.2  Excluded Assets. ................................................................... 10
Section 2.3  Instruments of Transfer ....................................................... 10

Article III CONSIDERATION ......................................................................................... 10

Section 3.1  Purchase Price. ..................................................................... 10
Section 3.2  Assumed Liabilities; Excluded Liabilities. .......................... 11

Article IV CLOSING TRANSACTIONS; .......................................................................... 11

Section 4.1  Closing. ................................................................................. 11
Section 4.2  Closing Date. ......................................................................... 11
Section 4.3  Sellers' Deliveries to Buyer at Closing. ............................... 12
Section 4.4  Buyer's Deliveries to Sellers at Closing. .............................. 13
Section 4.5  Prorations ............................................................................. 13
Section 4.6  Transfer Taxes. ..................................................................... 14
Section 4.7  Possession ............................................................................. 14

Article V CONDITIONS PRECEDENT TO CLOSING ....................................................... 14

Section 5.1  Conditions to Sellers' Obligations ...................................... 14
Section 5.2  Conditions to Buyer's Obligations ...................................... 15
Section 5.3  Waiver .................................................................................. 15
Section 5.4  Termination .......................................................................... 15

Article VI  SELLERS' REPRESENTATIONS AND WARRANTIES .................................... 16
Section 6.1  Validity of Agreement ......................................................... 16
Section 6.2  Organization, Standing and Power ...................................... 16
Section 6.3  No Violation; Third Party Consents .................................... 17
Section 6.4  Title to Purchased Assets .................................................... 17
Section 6.5  No Litigation ........................................................................ 18
Section 6.6  Intellectual Property ............................................................ 18
Section 6.7  Material Agreements and Licenses ..................................... 18
Section 6.8  Employee Matters ................................................................ 18
Section 6.9  Permits and Licenses ........................................................... 19
Section 6.10  Brokers ................................................................................. 19

Article VII BUYER'S REPRESENTATIONS AND WARRANTIES .................................... 19

Section 7.1  Validity of Agreement ......................................................... 19
Section 7.2  Organization, Standing and Power ...................................... 19
Section 7.3  No Violation; Third Party Consents .................................... 19

Section 7.4        Financing ........................................................................................ 20
Section 7.5        "As Is" Transaction ....................................................................... 20

Article VIII BROKERS ................................................................................................... 21

Section 8.1        Brokers ........................................................................................... 21

Article IX CONDUCT PRIOR TO CLOSING .............................................................. 21

Section 9.1        Conduct Prior to Closing ............................................................... 21
Section 9.2        Preservation of the Purchased Assets Pending Closing ............... 21
Section 9.3        Transferred Employees .................................................................. 21
Section 9.4        Bankruptcy Court Approvals ......................................................... 21

Article X INDEMNIFICATION ...................................................................................... 26

Section 10.1       Indemnification of Buyer ............................................................... 26
Section 10.2       Indemnification of Sellers ............................................................. 26

Article XI MISCELLANEOUS ....................................................................................... 54

Section 11.1       Post-Closing Reasonable Access to Records and Certain Personnel ......................... 27
Section 11.2       Notices ............................................................................................ 28
Section 11.3       Entire Agreement ........................................................................... 28
Section 11.4       Amendment ..................................................................................... 29
Section 11.5       Closing Date ................................................................................... 29
Section 11.6       Severability .................................................................................... 29
Section 11.7       Further Assurances ......................................................................... 29
Section 11.8       Waiver ............................................................................................ 29
Section 11.9       Payment of Fees and Expenses ...................................................... 29
Section 11.10      No Survival ..................................................................................... 29
Section 11.11      No Assignment; No Third Party Beneficiaries .............................. 29
Section 11.12      Binding Effect ................................................................................ 30
Section 11.13      Applicable Law and Jurisdiction ................................................... 30
Section 11.14      Counterparts ................................................................................... 30
Section 11.15      Confidentiality; Publicity .............................................................. 30

06018

Exhibit A – Form of Assignment and Assumption Agreement
Exhibit B – Form of Assignment of Proprietary Rights
Exhibit C – Form of Bill of Sale
Exhibit D – Form of Officer's Certificate (Sellers)
Exhibit E – Form of Sale Approval Order
Exhibit F – Form of Assignment of Lease
Exhibit G – Form of Officer's Certificate (Buyer)
Exhibit H – Form of Sale Procedures Order
Exhibit I – Principal Terms and Conditions of DIP Agreement

Schedules

06018

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is made and entered into as of this 7th day of December, 2017, by and among GATEHOUSE MEDIA MASSACHUSETTS I, INC. ("Buyer"), and, BOSTON HERALD, INC., HERALD INTERACTIVE INC., HERALD MEDIA, INC., and HERALD MEDIA HOLDINGS, INC. (each, individually, a "Seller", and, collectively, "Sellers").

## RECITALS

WHEREAS, Sellers own and operate a media business (the "Business"), which business includes the publication, sale and distribution of the Boston Herald newspaper and related website, digital news and sports apps, and an internet radio platform (collectively, the "Media Assets") and other business ventures related thereto;

WHEREAS, as promptly as practicable following the execution and delivery hereof (but in no event more than three (3) Business Day(s) after the date of this Agreement), each of Sellers plans on filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (as defined herein) commencing cases (collectively, the "Bankruptcy Case") in the United States Bankruptcy Court for _the District of Delaware (the "Bankruptcy Court"), and Sellers will request that their cases be jointly administered by the Bankruptcy Court;

WHEREAS, Buyer desires to purchase from Sellers and Sellers desire to sell to Buyer the Purchased Assets all upon the terms and subject to the conditions set forth herein and with the approval of the Bankruptcy Court pursuant to the Bankruptcy Code;

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      Definitions and Rules of Construction.

    1.1      Definitions.

        1.1.1      "Affiliate" means, with respect to any Person, (a) any other Person directly or indirectly Controlling, Controlled by or under common Control with, such Person, (b) any other Person that owns or Controls 10% or more of any class of equity securities (including any equity securities issuable upon the exercise of any option or convertible security) of such Person or any of its Affiliates, or (c) any director, partner, member, officer, manager, agent, employee or relative of such Person.

        1.1.2      "Agreement" has the meaning set forth in the preamble.

        1.1.3      "Assignment and Assumption Agreement" has the meaning set forth in Section 3.2.

        1.1.4      "Assignment of Proprietary Rights" has the meaning set forth in Section 4.3.2.

        1.1.5      "Assumed Liabilities" has the meaning set forth in Section 3.2.

        1.1.6      "Auction" has the meaning set forth in Section 9.4.1.

1.1.7    "Bankruptcy Case" has the meaning set forth in the recitals.

1.1.8    "Bankruptcy Code" means the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. as the same may be amended from time to time.

1.1.9    "Bankruptcy Court" has the meaning set forth in the recitals.

1.1.10    "Bill of Sale" has the meaning set forth in Section 4.3.3.

1.1.11    "Break-Up Fee" has the meaning set forth in Section 9.4.1.

1.1.12    "Business" has the meaning set forth in the recitals.

1.1.13    "Business Day" means any day other than a Saturday, Sunday, Federal holiday or other day that banks in the State of New York are required or permitted by Law to be closed.

1.1.14    "Buyer" has the meaning set forth in the preamble.

1.1.15    "Buyer Indemnitees" has the meaning set forth in Section 10.1.

1.1.16    "Closing" has the meaning set forth in Section 4.1.

1.1.17    "Closing Balance Sheet" has the meaning set forth in Section 3.3.2.

1.1.18    "Closing Date" has the meaning set forth in Section 4.2.

1.1.19    "Closing Net Working Capital Amount" has the meaning set forth in Section 3.3.2.

1.1.20    "Closing Statement" has the meaning set forth in Section 3.3.2

1.1.21    "Collective Bargaining Agreement" shall mean any oral or written agreement with any union, works council, or other Person purporting to act as exclusive bargaining representative of any Employees with respect to wages, hours, or other terms and conditions of employment.

1.1.22    "Contracts" has the meaning set forth in Section 2.1.10.

1.1.23    "Control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with") means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

1.1.24    "Copyrights" has the meaning set forth in Section 2.1.4.

1.1.25    "Cure Amounts" has the meaning set forth in Section 3.1.3.

1.1.26    "DIP Agreement" has the meaning set forth in Section 9.4.4.

1.1.27    "DIP Loan" has the meaning set forth in Section 9.4.4.

06018

1.1.28    "Employees" has the meaning set forth in Section 6.8.1.

1.1.29    "Employee Benefit Plan" has the meaning set forth in Section 6.8.2

1.1.30    "Encumbrance" means any lien (statutory or otherwise), claim, hypothecation, Liability, security interest, interest, mortgage, pledge, restriction, charge, instrument, preference, priority, security agreement, easement, covenant, encroachment, option, right of recovery, Tax (including foreign, federal, state and local Tax), or encumbrance, of any kind or nature (including without limitation (a) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (b) any assignment or deposit arrangement in the nature of a security device, and (c) any leasehold interest or other right, in favor of a third party, to use any portion of the Purchased Assets) whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or nonmaterial, known or unknown.

1.1.31    "Estimated Closing Balance Sheet" has the meaning set forth in Section 3.3.1.

1.1.32    "Estimated Net Working Capital Amount" has the meaning set forth in Section 3.3.1.

1.1.33    "Excluded Assets" has the meaning set forth in Section 2.2.

1.1.34    "Excluded Liabilities" has the meaning set forth in Section 3.2.

1.1.35    "Expense Reimbursement Amount" has the meaning set forth in Section 9.4.1.

1.1.36    "Final Order" shall mean that an Order entered by the Bankruptcy Court has not been reversed or stayed, and as to which Order no appeal or motion, petition, or writ seeking reversal, reconsideration, reargument, rehearing, certiorari, amendment, modification, stay or similar relief is pending, and the time to file any such appeal, motion, petition or writ has expired.

1.1.37    "GAAP" shall mean United States generally accepted accounting principles as in effect from time to time, consistently applied

1.1.38    "Governmental Authority" means any U.S. federal, state, foreign or local government, any court, tribunal, administrative agency or commission, or any other governmental, enforcement or other regulatory authority, body or agency, with jurisdiction over the matter in question.

1.1.39    "Independent CPA" has the meaning set forth in Section 3.1.4.

1.1.40    "Intellectual Property" means all Copyrights (as defined in Section 2.1.4), all Trademarks (as defined in Section 2.1.16), all trade secrets, customer lists, know how, commercial, marketing and other information, data and material of the kind normally considered to be confidential or proprietary in nature, including  without limitation computer source code, financial information, customer lists, product documentation, lead lists, know-how and trade secrets, and all items of intangible personal property commonly referred to as intellectual property and all rights therein, whether common law, statutory or otherwise, domestic and foreign, and all registrations and registration applications for any such rights owned by Sellers.

-4-

06018

1.1.41    "Internal Revenue Code" means the Internal Revenue Code of 1986, as amended, any successor statute thereto and the rules and regulations promulgated thereunder.

1.1.42    "Law" means all federal, state, local and foreign laws, statutes, ordinances, rules or regulations, legally binding administrative policies or guidance documents, orders, injunctions, decrees and administrative rulings promulgated by any court or other Governmental Authority.

1.1.43    "Liability" means any indebtedness, obligation or other liability (whether absolute, accrued, matured, contingent, known or unknown, fixed or otherwise, or whether due or to become due), including, without limitation, any fine, penalty, judgment, award or settlement respecting any judicial, administrative or arbitration proceeding, damage, loss, claim or demand with respect to any Law or governmental order.

1.1.44    "Material Adverse Effect" means any change or effect that is or would reasonably be expected to be materially adverse to the Business (including, without limitation, changes in relationships with customers and suppliers), assets, operations, financial condition or results of operations of the Business, taken as a whole, except for any such changes or effects resulting directly or indirectly from (i) the financial condition of any of Sellers, (ii) the Bankruptcy Case or matters related thereto, (iii) the transactions contemplated by this Agreement, (iv) the announcement or other disclosure of the transactions contemplated by this Agreement or (v) an event or circumstance or series of events or circumstances affecting (A) the Business generally or the particular segments thereof in which the Business operates in any location in which the Business operates or (B) the United States economy generally.

1.1.45    "Media Assets" has the meaning set forth in Schedule 2.1.1.

1.1.46    [Intentionally Omitted.]

1.1.47    "New Plans" has the meaning set forth in Section 9.3.1.

1.1.48    "NWC Date" has the meaning set forth in Section 3.3.1.

1.1.49    "Outside Date" has the meaning set forth in Section 4.2.

1.1.50    "Permitted Encumbrances" means (a) any Assumed Liability, and (b) Encumbrances for Taxes which are not yet due and payable.

1.1.51    "Person" means a natural person, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, any other business entity, or a governmental entity (or any department, agency, or political subdivision thereof).

1.1.52    "Petition Date" - means the date on which the Bankruptcy Case is commenced.

1.1.53    "PTO" has the meaning set forth in Section 3.2.

1.1.54    "Purchased Assets" has the meaning set forth in Section 2.1.

-5-

1.1.55    "Purchase Price" has the meaning set forth in Section 3.1.1.

1.1.56    "Purchase Price Allocation" has the meaning set forth in Section 3.1.4.

1.1.57    "Purchase Price Deposit" has the meaning set forth in Section 3.1.2.

1.1.58    "Purchased Avoidance Actions" has the meaning set forth in Section 2.1.21

1.1.59    "Real Property Leases" has the meaning set forth in Section 2.1.9.

1.1.60    "Receivables" has the meaning set forth in Section 2.1.7.

1.1.61    "Rejected Contracts" shall mean any contracts or agreements to which any one or more Sellers is a party that are not assumed and assigned to Buyer under Section 2.1.10 hereof.

1.1.62    "Resolution Period" has the meaning set forth in Section 3.3.7.

1.1.63    "Review Period" has the meaning set forth in Section 3.3.3.

1.1.64    "Sale Approval Hearing" has the meaning set forth in Section 9.4.1.

1.1.65    "Sale Approval Order" has the meaning set forth in Section 4.3.6.

1.1.66    "Sale Motion" means that certain Debtors' Motion for Orders: (A)(I) Approving Auction Procedures and Related Bid Protections; (II) Scheduling a Hearing to Consider the Sale of the Debtors' Assets; and (B) Authorizing and Approving (I) the Sale of the Debtors' Assets Free and Clear of Liens, Claims, and Encumbrances; (II) the Assumption of Certain Executory Contracts and Unexpired Leases; and (III) Granting Related Relief which Sellers will file with the Bankruptcy Court within three (3) Business Days of the Petition Date and which shall be in form and substance reasonably acceptable to Buyer.

1.1.67    "Sale Procedures" means the sale procedures approved by the Bankruptcy Court.

1.1.68    "Sale Procedures Order" has the meaning set forth in Section 4.4.6.

1.1.69    "Section 365 Contracts" has the meaning set forth in Section 9.4.2.

1.1.70    "Seller Claim" has the meaning set forth in Section 10.2.1.

1.1.71    "Seller Indemnitees" has the meaning set forth in Section 10.2.

1.1.72    "Sellers" has the meaning set forth in the preamble.

1.1.73    "Sellers' Knowledge" shall mean the actual knowledge of Patrick J. Purcell or Jeffrey W. Magram.

1.1.74    "Success Fee" shall mean any success fee payable pursuant to and as defined in the Application for Order Authorizing the Retention and Employment of Dirks Van Essen &

-6-

Murray as of the Petition Date, as Investment Banker to the Debtors Pursuant to Bankruptcy Code Sections 327, 328, 330 and 331, Fed. R. Bankr. P. 2014(a) and 2016, and Local Bankruptcy Rules 2014-1 and 2016-1, to be filed by Sellers within three (3) Business Days of the Petition Date.

        1.1.75   "Tax" means any federal, state, county, provincial, local or foreign income, gross receipts, sales, use, ad valorem, employment, severance, transfer, gains, profits, excise, franchise, property, capital stock, premium, minimum and alternative minimum or other taxes, fees, levies, duties, assessments or charges of any kind or nature whatsoever imposed by any Governmental Authority (whether payable directly or by withholding), together with any interest, penalties (civil or criminal), additions to or additional amounts imposed by, any Governmental Authority with respect thereto.

        1.1.76   "Trademarks" has the meaning set forth in Section 2.1.16.

        1.1.77   "Transferred Employees" has the meaning set forth in Section 9.3.1.

    1.2     <u>Rules of Construction</u>.

        1.2.1    When the context in which words are used in this Agreement indicates that such is the intent, words used in the singular shall have a comparable meaning when used in the plural, and vice versa; pronouns stated in the masculine, feminine or neuter shall include each other gender.

        1.2.2    The Section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the Parties and shall not in any way affect the meaning or interpretation of this Agreement.

        1.2.3    The term "including" is not limiting and means "including, without limitation."

        1.2.4    Unless otherwise expressly provided herein, (i) references to agreements (including this Agreement) and other contractual instruments shall be deemed to include all subsequent amendments and other modifications thereto, (ii) references to any statute or regulation shall be construed as including all statutory and regulatory provisions amending, replacing, supplementing or interpreting such statute or regulation, except that for purposes of determining the accuracy of any representation, such reference shall only be to such statute or regulation as in effect on the date the representation was made and (iii) references to "Sections," "Schedules" or "Exhibits" are to sections, schedules or exhibits, as applicable, of this Agreement.

        1.2.5    Unless otherwise expressly provided herein, "dollars" or "$" means the currency of the U.S. that, as at the time of payment, is legal tender for the payment of public and private debts.

        1.2.6    This Agreement is between financially sophisticated and knowledgeable parties and is entered into by such parties in reliance upon the economic and legal bargains contained herein. The language used in this Agreement has been negotiated by the parties and their representatives and shall be interpreted and construed in a fair and impartial manner without regard to such factors as the party who prepared, or caused the preparation of, this Agreement or the relative bargaining power of the parties.

06018

2.        Transfer of Assets.

        2.1        Purchase and Sale of Assets. On the Closing Date, in consideration of the Purchase Price and the covenants, representations and obligations of Buyer hereunder, and subject to the conditions hereinafter set forth, Sellers shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Sellers free and clear of all Encumbrances (other than Permitted Encumbrances) to the extent permitted under Sections 105(a), 363 and 365 of the Bankruptcy Code as of the Closing Date, all of Sellers' right, title and interest in and to the Business and all of Sellers' right, title and interest in the assets used or held for use in connection with, or otherwise related to, the Business, wherever located, excluding, however, the Excluded Assets (collectively, the "Purchased Assets"), including the following (in each case to the extent transferable):

        2.1.1        Media Assets. All of Sellers' right, title and interest in the publications published by Sellers, including without limitation the publications referred to in Schedule 2.1.1, and all of Sellers' rights to prepare, publish, sell and distribute such publications and any other publications, extensions (including website and social media domain names and content) or spinoffs derived from such publications or related thereto in all languages (collectively, the "Publications");

        2.1.2        Inventories. All inventories of back and current issues of the Publications; editorial material, work in process, finished goods, manuscripts, notes and drafts, graphic artwork, cuts, photographs and negatives owned by Sellers; promotional materials, inserts, and direct mail materials owned by Sellers; stationery, supplies, purchase orders, forms, labels, shipping materials and catalogs owned by Sellers; and all lists owned by Sellers of contributors, authors, correspondents, reviewers, photographers, illustrators and editors who contribute or have contributed to any of the Publications or otherwise to the Business;

        2.1.3        Circulation Information. All circulation, delivery and mailing lists and carrier routes maintained by Sellers, all data related to such lists, all circulation readership studies, audience surveys and research owned by Sellers, and all other mailing lists, together with all records, reports and tapes of computer data owned by Sellers;

        2.1.4        Copyrights. All of Sellers' right, title and interest in any copyrights (the "Copyrights"), whether registered or unregistered, in published works and unpublished works, and pending applications to register the same, including all copyrights covering each issue of each of the Publications, and the contents and components thereof;

        2.1.5        Advertising Materials. All lists, files, books and records of Sellers to the extent they relate to the advertisers of, for or in any of the Publications, including, but not limited to, rate cards, verification cards, advertising insertion orders, specimen copies of all advertisements carried in any of the Publications, and copies of current price lists, discount lists, catalogs, public relations materials, sales correspondence, call reports, call books and sales promotion lists;

        2.1.6        Advertising and other Revenue Generating Agreements. All of Sellers' agreements for advertising contracts, space reservations, insertion orders and all lists of, files, books and records of Sellers related thereto, including prospect lists for advertising in any of the Publications;

        2.1.7        Receivables. All accounts and other amounts receivable and all Sellers' other rights to payment, causes of action, claims and rights of recovery to the extent they relate to the Publications or the Business, whether arising or accruing prior to, on or after the Closing Date, whether in respect of advertising, subscriptions, mailing lists or newsstand orders or otherwise, including those

06018

accounts and other amounts receivable set forth on <u>Schedule 2.1.7</u> to be delivered at the Closing (collectively, the "<u>Receivables</u>");

2.1.8    Personal Property. All fixed and tangible personal property, including furniture, fixtures and equipment of Sellers (in addition to property otherwise identified in this Section 2.1), and including those items identified in <u>Schedule 2.1.8;</u>

2.1.9    Leases. All rights, title and interest under those real property leases described on <u>Schedule 2.1.9</u> (collectively, the "<u>Real Property Leases</u>") and all leasehold improvements and fixtures on the premises leased pursuant to the Real Property Leases set forth on <u>Schedule 2.1.9;</u>

2.1.10    Contracts. Those contracts, agreements and leases to which any Seller is or Sellers are a party, which are specifically identified in <u>Schedule 2.1.10</u>, as it may be updated from time to time at any time prior to the Sale Approval Hearing (the "Contracts").  All Contracts, agreements and leases not included in the Purchased Assets, specifically including but not limited to any Collective Bargaining Agreement and the agreements with the Boston Globe for printing, insertion and distribution (collectively, the "Globe Agreements"), shall be collectively referred to as the "Rejected Contracts";

2.1.11    Books and Records. All other books (except for Sellers' corporate minute books and similar legal records of corporate existence and affairs, as opposed to their business operations), financial and personnel records, invoices, shipping records, supplier lists and other documents, records, data files and service manuals owned by Sellers;

2.1.12    Software.  All of Sellers' right, title and interest in and to all computer software and programs used in the conduct of the Business and any rights thereto, except those that by their terms are not transferable;

2.1.13    Claims.  All claims, causes of action, rights of recovery and rights of set-off of any kind (including, without limitation, rights under and pursuant to all warranties, representations and guarantees made by suppliers of products, materials or equipment, or components thereof) of Sellers related to the Business;

2.1.14    Goodwill. The goodwill of or pertaining to the Business, Purchased Assets and Publications;

2.1.15    Insurance Claims and Proceeds. Except for Sellers' policies of director and officer liability insurance, all claims under insurance policies, and all proceeds from claims under such insurance policies;

2.1.16    Trademarks. All of Sellers' right, title and interest in and to all trademarks, service marks, logos, trademark registrations or applications, service mark registrations or applications, trade names, domain names and brand names owned and used by Sellers in connection with any of the Publications and the Business (collectively, the "<u>Trademarks</u>") and the goodwill related thereto;

2.1.17    Subscriber Information. The names and addresses of all Subscribers to any of the Publications, all data to the extent it relates to such subscribers, and all rights to own, manage, use and rent the names and addresses of all subscribers to any of the Publications to the full extent that such information and data could be used by Sellers;

06018

2.1.18   Prepaid Expenses. All security deposits, prepaid expenses and charges paid by Sellers or their Affiliates prior to the Closing Date in respect of the Business and pertaining to periods after the Closing Date, including those described on Schedule 2.1.18;

2.1.19   Other Intangibles. All telephone numbers, websites and URLs owned, licensed or otherwise used by Sellers in connection with the Business;

2.1.20   Warranties.   All currently effective warranties and guaranties, if any, given to any Seller by any contractor, supplier or manufacturer which has provided or is providing services or goods in connection with the Business; and

2.1.21   Purchased Avoidance Actions.  All avoidance claims or causes of action available to Sellers or their estates under chapter 5 of the Bankruptcy Code, including Sections 544, 545, 547, 548, 549, 550 and 553, or similar state laws, against customers or other counterparties to the Contracts or the Real Property Leases or against Transferred Employees to the extent such avoidance claims or causes of action relate to any Contract, Real Property Lease or seek relief as to any Transferred Employee (collectively, "Purchased Avoidance Actions").

2.2   Excluded Assets. Anything in this Agreement to the contrary notwithstanding, the Purchased Assets shall not include the following (collectively, the "Excluded Assets"): (i) any cash, cash collateralizing letters of credit, bank or other financial accounts of Sellers and all rights, claims and causes of action relating to any of the foregoing; (ii) all preference, and fraudulent conveyance claims of Sellers or their estates arising under part V of the Bankruptcy Code or similar state laws (other than Purchased Avoidance Actions); (iii) Sellers' rights under this Agreement and all cash and non-cash consideration payable or deliverable to Sellers pursuant to the terms and provisions hereof; (iv) insurance proceeds, claims and causes of action with respect to or arising in connection with (A) any contract which is not included within the Purchased Assets including but not limited to the Collective Bargaining Agreements and the Globe Agreements and all other Rejected Contracts, (B) any item of tangible or intangible property not included within the Purchased Assets, or (C) any Excluded Liability; (v) any tax attribute of Sellers, including any right to any tax refund or net operating loss; (vi) any professional retainer paid by Sellers, (vii) any intercompany obligations owing to Sellers, (viii) any and all of Sellers' right, title and interest in and to any and all real property (other than with respect to the Real Property Leases), (ix) Sellers' policies of directors and officers liability insurance and all premiums, claims and rights thereunder or relating thereto: (x) Sellers' corporate records, journals, ledgers and books of original entry, all of Sellers' internal audit, evaluation and assessment reports, all of Sellers' tax records and all of those documents and other records which any of Sellers may be required to maintain by Law, or may be maintained by any of Sellers with respect to its Employee Benefit Plans, or with respect to other Excluded Assets; and (xi) any other item set forth on Schedule 2.2 hereof.

2.3   Instruments of Transfer. The sale, assignment, transfer, conveyance and delivery of the Purchased Assets to Buyer and the assumption of the Assumed Liabilities provided herein by Buyer shall be made by assignments, bills of sale, and other instruments of assignment, transfer and conveyance provided for herein and such other instruments as may reasonably be requested by Buyer or Sellers in each case naming the appropriate Seller or Sellers to which such instrument pertains. None of the foregoing documents shall amend or expand in any way the obligations imposed or rights conferred by this Agreement upon Sellers or Buyer.

3.   Consideration.

3.1   Purchase Price.

-10-

3.1.1    The total aggregate consideration for the Purchased Assets shall be (a) Four Million Five Hundred Thousand Dollars ($4,500,000.00), (the "Purchase Price"), (b) the Closing Net Working Capital Amount (as determined in accordance with Section 3.3 below), (c) the Assumed Liabilities, and (d) the Cure Amounts.

3.1.2    As of the date hereof, Buyer has deposited into escrow with Sellers an earnest money deposit (the "Purchase Price Deposit") in the amount of Four Hundred Fifty Thousand Dollars ($450,000) as security for the performance of Buyer's obligations under this Agreement.  The Purchase Price Deposit shall be kept in a segregated account not used for any other purpose (and Buyer shall have information access to such account) and shall be applied against the Purchase Price at Closing.  Except as set forth in Section 10.2.1, if this Agreement shall be terminated pursuant to Section 5.4, the Purchase Price Deposit, together with any interest earned thereon, shall be delivered to Buyer.

3.1.3    On the Closing Date, Buyer shall (i) pay the Purchase Price (less the Purchase Price Deposit) and the Estimated Net Working Capital Amount (as determined in accordance with Section 3.3) to Sellers by wire transfer in immediately available funds and (ii) deliver to Sellers in accordance with such instructions provided by Sellers to Buyer prior to the Closing Date, by wire transfer in immediately available funds, all cure amounts owing under any of the Contracts and Real Property Leases as of the Closing Date pursuant to an order of the Bankruptcy Court to be paid as a condition to Sellers' assignment to Buyer of any Contracts and Real Property Leases (collectively, the "Cure Amounts").

3.1.4    (a) Buyer shall prepare and deliver to Sellers within 60 calendar days after the Closing Date a schedule setting forth the allocation of the Purchase Price and any other relevant items among the Purchased Assets for all Tax purposes (the "Purchase Price Allocation").  The allocation shall be considered final and binding on the parties, unless, within 30 calendar days after the delivery of the Purchase Price Allocation by Buyer, Sellers notify Buyer that they have a good faith objection to the allocation set forth in the Allocation Schedule.  If Sellers timely make such an objection, Buyer and Sellers shall work in good faith to resolve such dispute within 20 calendar days form the date Sellers deliver the objection to Buyer.  In the event that Buyer and Sellers are unable to resolve such dispute within the 20 calendar day period, the issue(s) in dispute will be submitted to an independent accounting firm, Gray, Gray & Gray, LLP (the "Independent CPA") for resolution.  The determination of the independent accounting firm shall be final, binding, and conclusive on the parties.  Buyer, on the one hand, and Sellers, on the other hand, shall each bear fifty (50%) of the fees and expenses of the independent accounting firm.  In the event of any adjustments to the Purchase Price, the parties hereto shall cooperate to adjust the Purchase Price Allocation.

(b) Buyer and Sellers each shall report all Taxes and file all Tax Returns (including amended Tax Returns and claims for refund) consistent with the Purchase Price Allocation, and shall take no position contrary thereto or inconsistent therewith (including, in any audits or examinations by any taxing authority or any other proceedings), unless, and then only to the extent, required by a final determination.  Buyer and Sellers shall exchange completed and executed forms with respect to the allocation (including Internal Revenue Service Form 8594 and any comparable forms required to be filed for state or local Tax purposes) at least 30 calendar days prior to the due date for filing such forms and shall cooperate in the filing of any forms (including Form 8594) with respect to such Purchase Price Allocation, including any amendments to such forms required with respect to any adjustment to the Purchase Price, pursuant to this Agreement.  Notwithstanding any other provisions of this Agreement, the foregoing agreement shall survive the Closing Date without limitation.

3.2    Assumed Liabilities; Excluded Liabilities.

-11-

06018

3.2.1    Effective as of the Closing Date, Buyer shall assume and perform (and indemnify and hold Sellers harmless against in accordance with Section 10.2): (a) an amount not to exceed the greater of (i) Five Hundred Thousand Dollars ($500,000.00) and (ii) the total accrued paid time off ("PTO") owed by the Sellers to  Transferred Employees (which will be offered to such Transferred Employees under Buyer's employee policies and procedures) (such greater amount, the "Accrued Amount"); (b) all liabilities and obligations arising or related to the ownership, use and operation of the Purchased Assets and accruing on or after the Closing Date and all liabilities and obligations for which Buyer is responsible pursuant to Section 4.4; (c) all liabilities and obligations arising and accruing on or after the Closing Date to Transferred Employees as a result of such Transferred Employees' employment with Buyer; and (d) all liabilities and obligations accruing on or after the Closing Date under the Contracts and Real Property Leases (collectively, "Assumed Liabilities"), and shall execute and deliver an assignment and assumption agreement substantially in the form annexed hereto as Exhibit A with respect thereto (the "Assignment and Assumption Agreement").

3.2.2    Buyer shall not assume or be obligated to pay, perform, discharge or in any way be responsible for any Liabilities other than the Assumed Liabilities, and specifically shall not assume or be obligated to perform or otherwise be responsible for any obligations under any Collective Bargaining Agreement or the Globe Agreements, any liabilities under any pension plan (including without limitation any past, present or future withdrawal liability under any such plan) or other Employee Benefit Plan of the Sellers, any Liabilities for severance/retention, any Liabilities for PTO in excess of the Accrued Amount or any Liabilities incurred pursuant to any DIP Agreement (collectively, the "Excluded Liabilities").  Employee Benefit Plans and any Liabilities relating thereto (including, but not limited to, withdrawal liability under any multiemployer plan within the meaning of Section 3(37) of ERISA) are Excluded Liabilities. Buyer shall cooperate in all reasonable respects in connection with proceedings to obtain an Order of the Bankruptcy Court to assign all Contracts and Real Property Leases to Buyer and otherwise gain approval for the transactions contemplated by this Agreement, including reasonable efforts to demonstrate that Buyer provides "adequate assurance of Buyer's future performance" of such Contracts and Real Property Leases to the full extent required for assignment thereof required by the Bankruptcy Code.

3.3    Determination of Net Working Capital.

3.3.1    At least two (2) business days prior to the Closing, Sellers will furnish to Buyer (A) a certificate (the "Estimated Closing Balance Sheet") setting forth a good faith estimate of the Closing Net Working Capital Amount (the "Estimated Net Working Capital Amount") as of the Sunday immediately preceding the Closing Date (the "NWC Date").

3.3.2    Not later than sixty (60) days after the Closing Date, Sellers shall prepare and deliver to Buyer (a) a balance sheet (the "Closing Balance Sheet") which shall reflect the net book value of both the current assets included among the Purchased Assets and the current liabilities (other than accrued PTO being assumed pursuant to Section 3.2(a) above) included among the Assumed Liabilities as of the NWC Date; and (b) a statement (the "Closing Statement") indicating the difference between the net book value of the current assets included among the Purchased Assets as of the NWC Date and the net book value of the current liabilities (other than  the Accrued Amount being assumed pursuant to Section 3.2(a) above)  included among the Assumed Liabilities as of the NWC Date (the "Closing Net Working Capital Amount"). The Closing Balance Sheet and the Closing Statement shall be prepared in accordance with GAAP and, to the extent not inconsistent with GAAP, on a basis consistent with the preparation of the historical consolidated audited financial statements of Sellers as set forth in Schedule 3.3.2.

-12-

3.3.3    Following receipt of the Closing Balance Sheet and the Closing Statement, Buyer will be afforded a period of twenty (20) calendar days (the "Review Period") to review the Closing Balance Sheet, and the Closing Statement.  During such Review Period, Buyer and Buyer's accountants will be afforded reasonable access to the records, work papers, trial balances and similar materials prepared by Sellers or Sellers' accountants in connection with the preparation or certification of the Closing Balance Sheet and Closing Statement.  At or before the end of the Review Period, Buyer will either (a) accept the Closing Balance Sheet and the Closing Statement, in their entirety, in which case the Closing Net Working Capital Amount will be deemed to be as set forth on the Closing Statement and the Closing Balance Sheet and Closing Statement shall become final, binding and conclusive on Sellers and Buyer, or (b) deliver to Sellers a written notice in accordance with Section 3.3.7 disputing the Closing Balance Sheet and the Closing Statement.

3.3.4    In the event that the Closing Net Working Capital Amount is greater than the Estimated Net Working Capital Amount, then within ten (10) days following the later of (a) the date the Closing Balance Sheet and the Closing Statement are accepted by Buyer or (b) the final, binding and conclusive determination of any dispute with respect to the Closing Balance Sheet, or the Closing Statement as provided in Section 3.3.7, Buyer shall pay to Sellers by federal funds wire transfer in immediately available funds an amount equal to such excess.

3.3.5    In the event that the Closing Net Working Capital Amount is less than the Estimated Net Working Capital Amount, then within ten (10) days following the later of (a) the date the Closing Balance Sheet and the Closing Statement are accepted by Buyer or (b) the final, binding and conclusive determination of any dispute with respect to the Closing Balance Sheet or the Closing Statement as provided in Section 3.3.7, Sellers shall repay to Buyer by federal funds wire transfer in immediately available funds an amount equal to such shortage.

3.3.6    In the event that the Closing Net Working Capital is equal to the Estimated Net Working Capital Amount, then there shall be no post closing adjustment pursuant to this Section 3.3.

3.3.7    In the event that any dispute shall arise as to the manner of preparation or the accuracy of the Closing Balance Sheet or the Closing Statement prior to the expiration of the Review Period, Buyer shall provide Sellers with written notice of each disputed item.  In the event of such a dispute, Buyer and Sellers shall attempt to reconcile in good faith their differences as to such items within twenty (20) calendar days (the "Resolution Period") of Sellers' receipt of such notice, and any resolution by them as to any disputed items shall be final, binding and conclusive on Buyer and Sellers.  If Buyer and Sellers are unable to reach a resolution with such effect within the Resolution Period, Buyer and Sellers shall submit the dispute to the Independent CPA.  The determination of such dispute by the Independent CPA shall be final, binding and conclusive on the parties.  The fees and expenses of the Independent CPA shall be split and assessed by the Independent CPA equally between Buyer, on the one hand, and Sellers, on the other.

4.    Closing Transactions.

4.1    Closing. The closing of the transactions provided for herein (the "Closing") shall take place at the offices of Brown Rudnick LLP, One Financial Center, Boston MA 02111 or in such other manner to which the parties agree.

4.2    Closing Date. The Closing shall be held within five Business Days after satisfaction or waiver of the conditions to closing contained in Section 5 (the "Closing Date") but in no

-13-

event later than March 28, 2018 (the "Outside Date"); provided, however, that the Outside Date shall automatically be extended at Sellers' election for consecutive 30-day periods, not to exceed an aggregate period of six months from the initial Outside Date, if the only conditions remaining to be satisfied are specified in any of Sections 5.1.4, 5.1.5 and 5.2.3. In the event the conditions to Closing (other than the conditions specified in Sections 5.1.4, 5.1.5 and 5.2.3) have not been satisfied or waived on or before the Outside Date, then any party who is not in default hereunder may terminate this Agreement by delivering to the other party written notice of termination. Alternatively, the parties may mutually agree to an extended Outside Date. Until this Agreement is either terminated or the transactions contemplated hereby have been consummated, the parties shall diligently continue to work to satisfy all conditions to Closing. The Closing shall be effective at 11:59 p.m. Eastern Time on the Closing Date.

       4.3     <u>Sellers' Deliveries to Buyer at Closing</u>. On the Closing Date, subject to satisfaction of the conditions precedent set forth in Section 5.1, Sellers shall make the following deliveries to Buyer:

       4.3.1     An Assignment and Assumption Agreement duly executed by Sellers;

       4.3.2     An Assignment of Proprietary Rights, substantially in the form annexed hereto as Exhibit B, duly executed by Sellers (the "<u>Assignment of Proprietary Rights</u>");

       4.3.3     A Bill of Sale in substantially the form annexed hereto as Exhibit C, duly executed by Sellers (the "<u>Bill of Sale</u>");

       4.3.4     An officer's certificate from each Seller, substantially in the form attached hereto as Exhibit D, duly executed by an authorized officer of such Seller, which shall certify as to (a) the satisfaction of the conditions set forth in Section 5.2, (b) each Seller's non- foreign status, in compliance with the requirements of Section 1445 of the Internal Revenue Code, and (c) the resolutions adopted by the Board of Directors or such other governing body or manager of each Seller evidencing its authorization to execute and deliver this Agreement and the ancillary agreements contemplated hereunder, and the consummation of the transactions contemplated hereby and thereby;

       4.3.5     Copies of the waivers, consents and approvals set forth on <u>Schedule 4.3.5</u> if such consents and approvals are required to be obtained by Sellers to validly transfer and assign any Contract, Real Property Lease or business license in accordance with its terms after giving effect to the relevant provisions of the Bankruptcy Code, the Sale Procedures Order and the Sale Approval Order;

       4.3.6     A copy of the Sale Approval Order in the form attached as Exhibit E (the "<u>Sale Approval Order</u>"), which Sale Approval Order shall provide that it shall be effective immediately upon entry pursuant to Rule 7062 and 9014 of the Federal Rules of Bankruptcy Procedure, and that no automatic stay of execution, pursuant to Rule 62(a) of the Federal Rules of Civil Procedure, or Rule 6004(g) or 6006(d) of the Federal Rules of Bankruptcy Procedure shall apply with respect the Sale Approval Order;

       4.3.7     An assignment of lease with respect to the real property located at Seaport Center, Suite 600, 70 Fargo Street, Boston, Massachusetts, in substantially the form annexed hereto as Exhibit F, duly executed by the applicable Seller;

       4.3.8     All passwords and other similar information necessary to ensure that Buyer has full access to and ability to use all Media Assets and Intellectual Property; and

-14-

06018

4.3.9    Such other documents related to the transactions contemplated by this Agreement that Buyer may reasonably request.

4.4    <u>Buyer's Deliveries to Sellers at Closing</u>. On the Closing Date, subject to satisfaction of the conditions precedent set forth in <u>Section 5.2</u>, Buyer shall make or cause to be made the following deliveries to Sellers:

4.4.1    The Purchase Price to be delivered to Sellers at the Closing in accordance with Section 3.1.1 (provided, however, that the Cure Amounts shall be delivered as directed by the Bankruptcy Court);

4.4.2    The Assignment and Assumption Agreement duly executed by Buyer;

4.4.3    The Assignment of Proprietary Rights Agreement duly executed by Buyer;

4.4.4    An officer's certificate, substantially in the form attached hereto as Exhibit G, duly executed by Buyer, which shall certify as to (a) the satisfaction of the conditions set forth in Section 5.1, and (b) the resolutions adopted by the Board of Directors (or members or managers, as applicable) of Buyer evidencing its authorization to execute and deliver this Agreement and the ancillary agreements contemplated hereunder, and the consummation of the transactions contemplated hereby and thereby;

4.4.5    All other instruments and certificates of assumption, novation and release as Sellers may reasonably request in order to effectively make Buyer responsible for all Assumed Liabilities and release Sellers therefrom to the fullest extent permitted under applicable Law;

4.4.6    Copies of the waivers, consents and approvals set forth on <u>Schedule 4.4.6</u> if such consents and approvals are required to be obtained by Buyer after giving effect to the relevant provisions of the Bankruptcy Code, a Sales Procedures Order substantially in the form attached hereto as Exhibit H (the "Sale Procedures Order") and the Sale Approval Order;

4.4.7    Such other documents related to the transactions contemplated by this Agreement that Sellers may reasonably request.

4.5    <u>Prorations</u>. Post-petition rent, utilities, current taxes (other than income taxes) and other similar post-petition items of expense (including, without limitation, any prepaid insurance under the Contracts and Real Property Leases) relating to or attributable to the Purchased Assets or Assumed Liabilities, shall be prorated between Sellers and Buyer as of the Closing Date so that Sellers shall bear such post-petition costs and expenses for the period up to the Closing Date and Buyer shall bear such costs and expenses for the period from and including the Closing Date. All Assumed Liabilities shall be paid in full or otherwise satisfied by Buyer.  Post-petition rent shall be prorated on the basis of a thirty (30) day month.

4.6    <u>Transfer Taxes</u>. Intentionally deleted.

4.7    <u>Possession</u>. Right to possession of the Purchased Assets shall transfer to Buyer on the Closing Date. Sellers shall transfer and deliver to Buyer on the Closing Date such keys, lock and safe combinations and other similar items as Buyer shall require to obtain immediate and full occupation

-15-

and control of Purchased Assets, and shall also make available to Buyer at Sellers' then existing locations all documents in Sellers' possession that are required to be transferred to Buyer by this Agreement.

5.     Conditions Precedent to Closing.

5.1     Conditions to Sellers' Obligations. Sellers' obligation to make the deliveries of Sellers set forth in Section 4.3 on the Closing Date, and otherwise to close the transaction, shall be subject to the satisfaction or waiver by Sellers of each of the following conditions on or prior to the Closing Date:

5.1.1     All of the representations and warranties of Buyer contained in Section 7 shall continue to be true and correct as of the Closing Date in all material respects, all covenants and obligations to be performed by Buyer on or prior to the Closing Date shall have been performed in all material respects, and Buyer shall have certified the foregoing to Sellers in writing;

5.1.2     Buyer shall have delivered to Sellers the items set forth in Section 4.4;

5.1.3     Sellers shall have received the total Purchase Price in immediately available funds;

5.1.4     No action, suit or other proceedings shall be pending before any court, tribunal or other Governmental Authority seeking or threatening to restrain or prohibit the consummation of the transactions contemplated by this Agreement, or seeking to obtain damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any Law, decree or regulation of any Governmental Authority having appropriate jurisdiction; and

5.1.5     The Bankruptcy Court shall have entered the Sale Approval Order not later than [March 16, 2018] in form and content reasonably satisfactory to Buyer and in accordance with Section 9.4.2 below; and provided, further, that neither the Sale Procedures Order nor the Sale Approval Order shall have been amended, modified or supplemented without the written consent of Buyer, and no stay shall be in effect with respect to either order.

5.2     Conditions to Buyer's Obligations. Buyer's obligation to make the deliveries of Buyer set forth in Section 4.4 on the Closing Date, and otherwise to close the transaction, shall be subject to the satisfaction or waiver by Buyer of each of the following conditions on or prior to the Closing Date:

5.2.1     All of the representations and warranties of Sellers contained in Section 6 shall continue to be true and correct on the Closing Date in all material respects, all covenants and obligations to be performed by Sellers on or prior to the Closing Date shall have been performed in all material respects, and Sellers shall have certified the foregoing to Buyer in writing;

5.2.2     Sellers shall have delivered to Buyer the items set forth in Section 4.3;

5.2.3     No action, suit or other proceedings shall be pending before any court, tribunal or other Governmental Authority seeking or threatening to restrain or prohibit the consummation of the transactions contemplated by this Agreement, or seeking to obtain damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any Law, decree or regulation of any Governmental Authority having appropriate jurisdiction;

-16-

5.2.4    On the Closing Date there shall not be existing a Material Adverse Effect;

5.2.5    Sellers shall have released (in form, substance and manner satisfactory to Buyer) all Employees to be hired by Buyer from any competitive or other contractual provision which would restrict or prohibit such Employee from working or performing services for Buyer in any manner;

5.2.6    The Bankruptcy Court shall have entered the Sale Approval Order substantially in the form attached as Exhibit E and submitted to the Bankruptcy Court in accordance with Section 9.4.2 below; and provided, further, that each of the Sale Procedures Order and the Sale Approval Order shall be entered as a Final Order without having been amended, modified or supplemented without the written consent of Buyer, and no stay shall be in effect with respect to either order; and

5.3    <u>Waiver</u>. Nothing in Section 5.1, Section 5.2 or any other section of this Agreement shall preclude Sellers or Buyer from consummating the transactions contemplated herein if either Buyer or Sellers waive, by written notice to the other, any condition to its or their respective obligation to close the transactions hereunder.

5.4    <u>Termination</u>. This Agreement and the transactions contemplated hereby may be terminated and abandoned:

5.4.1    by either Sellers or Buyer at any time prior to the Closing with the written consent of the other party hereto and the prior approval of the Bankruptcy Court;

5.4.2    unless the Closing has not occurred as a result of a breach of this Agreement by the party seeking such termination, by either Sellers or Buyer, if the Closing has not occurred on or prior to the Outside Date;

5.4.3    by either Sellers or Buyer if any Governmental Authority with jurisdiction over such matters shall have issued a final and nonappealable governmental order permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement; provided, however, that neither Sellers nor Buyer may terminate this Agreement pursuant to this Section 5.4.3 unless the party seeking to terminate this Agreement has used commercially reasonable efforts to oppose any such governmental order or to have such governmental order vacated or made inapplicable to the transactions contemplated by this Agreement;

5.4.4    by Sellers (provided that no Seller nor any Affiliate thereof is in breach of any of the representations, warranties, covenants or other agreements contained herein), but only if Buyer shall have breached, in any material respect, any representation or warranty or any covenant or other agreement to be performed by it contained herein, and such breach is incapable of being cured or is not cured within twenty (20) days of receipt of written notice to cure from Sellers;

5.4.5    by Buyer (provided that Buyer or any Affiliate thereof is not in breach of any of the representations, warranties, covenants or other agreements contained herein), but only if Sellers shall have breached, in any material respect, any representation or warranty or any covenant or other agreement to be performed by them contained herein, and such breach is incapable of being cured or is not cured within twenty (20) days of receipt of written notice to cure from Buyer.

5.4.6    Notwithstanding anything in this Section 5.4.6 to the contrary, by either Buyer or Sellers, if the Bankruptcy Court has issued an order approving the sale of any or all of the

-17-

Purchased Assets to another party in accordance with the Procedure Order; or if Sellers have effected some other alternate transaction, with the approval of the Bankruptcy Court, including a plan of reorganization or liquidation (including a Chapter 7 liquidation), resulting in the disposition to someone other than Buyer of any or all of the Purchased Assets.

6.    Sellers' Representations and Warranties. Each Seller hereby makes the following representations and warranties on behalf of itself to Buyer:

6.1    Validity of Agreement. Upon obtaining the Sale Approval Order, all action on the part of such Seller necessary for the authorization, execution, delivery and performance of this Agreement by such Seller, including, but not limited to, the performance of such Seller's obligations hereunder, will have been duly taken, and this Agreement, when executed and delivered by Sellers, shall constitute the valid and binding obligation of such Seller enforceable in accordance with its terms.

6.2    Organization, Standing and Power. Such Seller is duly organized or incorporated, as applicable, validly existing and in good standing under the Law of the jurisdiction set forth opposite such Seller's name on Schedule 6.2. Subject to the applicable provisions of the Bankruptcy Code, such Seller has all requisite power and authority to own, lease and operate its properties, to carry on its business as now being conducted and, subject to Sellers' obtaining the Sale Procedures Order and the Sale Approval Order, to execute, deliver and perform this Agreement and all writings relating hereto.

6.3    No Violation; Third Party Consents.

6.3.1    Assuming the receipt of all necessary approvals of the Bankruptcy Court and assuming that all consents, waivers, approvals, orders and authorizations set forth in Schedule 6.3.1 have been obtained and all registrations, qualifications, designations, declarations or filings with any Governmental Authorities set forth in Schedule 6.3.2 have been made, the execution and delivery by such Seller of this Agreement and the ancillary agreements contemplated hereunder, the performance by such Seller of its obligations hereunder and thereunder, and the consummation by such Seller of the transactions contemplated hereby and thereby, will not conflict with or violate, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, give rise to any right of termination, amendment, modification, acceleration or cancellation of any obligation or loss of any benefit under, result in the creation of any Encumbrance on any of the Purchased Assets pursuant to, or require such Seller to obtain any consent, waiver, approval or action of, make any filing with, or give any notice to any Person as a result of or under, the terms and provisions of (a) the Certificate of Incorporation, Certificate of Formation, Bylaws or Limited Liability Company Agreement, as applicable, of Seller, (b) any currently enforceable Contract and Real Property Lease to which such Seller is a party or by which any of the Purchased Assets are bound or (c) any Law applicable to such Seller or any of the Purchased Assets, or any governmental order by which such Seller or any of the Purchased Assets is in any way bound or obligated, except, in the case of clauses (b) and (c) of this Section 6.3.1, as would not have a material adverse effect on the ability of Sellers to perform (i) their obligations under this Agreement or to consummate on a timely basis the transactions contemplated hereby, or (ii) the obligations under any ancillary agreement contemplated hereunder or to consummate on a timely basis the transactions contemplated thereby.

6.3.2    No consent, waiver, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any Governmental Authority is required on the part of such Seller in connection with (x) the execution and delivery by such Seller of this Agreement, the performance by such Seller of its obligations hereunder, and the consummation by such Seller of the transactions contemplated hereby, or (y) the execution and delivery by such Seller of the ancillary

-18-

agreements contemplated hereunder, the performance by such Seller of its obligations contemplated thereby, and the consummation by such Seller of the transactions contemplated thereby, except (a) as set forth in Schedule 6.3.2, (b) all applicable approvals of the Bankruptcy Court, and (c) where the failure to obtain such consent, waiver, approval, order or authorization, or to make such registration, qualification, designation, declaration or filing, would not, as of the date hereof, give rise to a Material Adverse Effect.

6.4     Title to Purchased Assets.

6.4.1     Personal Property. Except as disclosed in Schedule 6.4.1, as of the date hereof, Sellers have good, valid and marketable title to the Purchased Assets (other than the Real Property), free and clear of all Encumbrances, except for Permitted Encumbrances and those Encumbrances that will be removed, released or otherwise rendered unenforceable at or prior to Closing.

6.4.2     Transfer Free and Clear. Upon the sale of the Purchased Assets on the Closing Date, Buyer shall be the owner thereof free and clear of all Encumbrances (other than Permitted Encumbrances) and other liabilities, other than Assumed Liabilities as permitted under Section 363 of the Bankruptcy Code.

6.5     No Litigation. Except for the Bankruptcy Case and as may be set forth in Schedule 6.5, there is no action, suit or proceeding at Law or in equity by any Person, or any arbitration or any administrative or other proceeding, or to Sellers' Knowledge, any investigation by, any Governmental Authority, pending or threatened with respect to such Seller, any of the officers or directors of such Seller (in their capacities as such) or such Seller's properties or rights, which could have a Material Adverse Effect. Such Seller is not subject to any judgment, order or decree entered in any lawsuit, proceeding or arbitration, other than any of the same that were disclosed in Schedule 6.5 or that arose from or were related to the Bankruptcy Case.

6.6     Intellectual Property. Sellers are the exclusive owners of the Intellectual Property free and clear of any Encumbrances. Sellers own or have a valid and enforceable license to use all Intellectual Property necessary or material for the conduct of the Business as and where conducted on the Closing Date and to Sellers' Knowledge, the Business does not infringe upon the intellectual property rights of any third person. No application to register, or any registration of, Sellers' Intellectual Property used in the Business has lapsed, expired or been abandoned or canceled, or is subject to any injunction, judgment, order, decree, ruling or charge or is subject to any pending or threatened oppositions, cancellations, interferences or other proceedings before the United States Patent and Trademark Office, the Trademark Trials and Appeals Board, the United States Copyright Office or in any comparable regulatory authority of a foreign jurisdiction.  Schedule 6.6 includes a true and complete list of all registered Intellectual Property.  Seller has taken all commercially reasonable steps necessary to maintain the validity of the Intellectual Property, including paying all necessary fees and making all necessary filings with the appropriate government entity.  Except as set forth at Schedule 6.6, Seller has not licensed any Intellectual Property to any person.

6.7     Material Agreements and Licenses. Schedule 6.7.1 contains a list of the currently existing agreements to which a Seller or more than one Seller is a party, which agreements are material to the operation of the Business. For purposes of this Section 6.7 only, "material agreements" means contracts and agreements to which a Seller is a party or by which it is bound and which has involved payments or liabilities in excess of Fifty-Five Thousand Dollars ($55,000) during the last twelve (12) months. Sellers own or possess all right, title and interest in and to all material business licenses which are necessary as of the date hereof to conduct the Business substantially as currently conducted. Not later than fifteen (15) Business Days prior to the Closing, the Sellers shall supplement Schedule 6.7.2

-19-

to include a list of all the currently existing executory contracts and unexpired leases, whether or not material agreements, and the associated cure (past due/default) amount for each such contract and lease.

6.8     Employee Matters.

6.8.1     Employees.    In order to facilitate Buyer's interviews of Sellers' Employees as contemplated in Section 9.1 hereof, no later than December 31, 2017, Sellers shall provide Buyer with a true and complete list of the names, home addresses and current annual base compensation rates of all permanent salaried and hourly employees currently employed in connection with the operation of the Business as of November 20, 2017 (the "Employees").    Whether or not Buyer offers employment to any Employee, or any Employee becomes an employee of Buyer, and whether or not Sellers  terminate the employment of any Employee prior to the Closing Date or any other time, Sellers shall be solely responsible for any liabilities or obligations resulting from such Employees' employment with Sellers and separation from employment by Sellers, and Buyer shall not assume or be assessed any such liability,   except only as otherwise expressly set forth in Section 3.2.1 in connection with the Accrued Amount.

6.8.2     Employee Benefits. Set forth on Schedule 6.8.2 hereto is a true and complete list of each "employee benefit plan", as defined in Section 3(3) of ERISA, that is subject to ERISA and that Sellers or any of their Affiliates maintain or contribute to, or are required to contribute to, by for the benefit of any Employees or former Employees of the Business, any other employee benefit plan, program, policy, promise or arrangement of any kind that Sellers or any of their ERISA Affiliates maintains or contributes to, or with respect to which any of Sellers or their Affiliates may have Liability, in each case with respect to any Employee or former  Employee of the Business ("Employee Benefit Plan").   Except as set forth in Schedule 6.8.2, Sellers are not in default of any obligations under any Employee Benefit Plan, and there is no funding deficiency under any Employee Benefit Plan within the meaning of the Internal Revenue Code or ERISA.  Within the three (3) year period prior to the Closing Date, no Seller has maintained, sponsored or contributed to any multiemployer plan, as that term is defined in ERISA, nor have they incurred any material liability, including without limitation, withdrawal liability, with respect to any such plan, except as set forth in Schedule 6.8.2.

6.8.3     Except as set forth in Schedule 6.8.3, no Seller is a party to any Collective Bargaining Agreement and there are no labor unions or organizations representing any employee of any Seller.

6.8.4     Except as set forth in Schedule 6.8.4, there are no labor unions or organizations that have filed a petition with the NLRB or any other Government Entity seeking certification as the collective bargaining representative of any employee of any Seller, and to the Sellers' Knowledge, no labor union or organization is engaged in any organizing activity with respect to any employee of any Seller.

6.8.5     No labor union or other organization has made any claim that any Seller jointly employs the employees of any third party.

6.8.6     Except as set forth on Schedule 6.8.6, Seller is presently in compliance with in all material respects all applicable contracts and Collective Bargaining Agreements.

6.8.7     Except as set forth on Schedule 6.8.7, no Seller is under investigation and is not a defendant or respondent or potential defendant or respondent and there are no charges, complaints, investigations or allegations pending of which any Seller has notice or to Sellers' Knowledge

-20-

is threated, before any administrative agency, including but not limited to the NLRB, the DOL, the EEOC, and OFCCP, or any other government entity, administrative complaints, or lawsuits or pending grievances or arbitration under any Collective Bargaining Agreement alleging that any Seller is not in compliance with any Collective Bargaining Agreement or applicable laws and regulations regarding labor, employment, occupational safety and health or other rights of any employees.

      6.8.8    Except as set forth in Schedule 6.8.8, there are no retired employees, officers, or directors of either Seller, or their dependents, receiving benefits or scheduled to receive benefits from any Seller in the future.

      6.9    <u>Permits and Licenses</u>. Sellers are conducting the Business and its operations in compliance with all business licenses, in all material respects, and all such licenses are in full force and effect and no suspension or cancellation of any of them is threatened.

      6.10    <u>Brokers</u>. No person has acted as a broker on behalf of any Seller in connection with the consummation of the transaction contemplated by this Agreement other than Dirks, Van Essen & Murray. Sellers shall solely be responsible for the Success Fee, any other brokerage fees, commissions and/or expenses due to Dirks, Van Essen & Murray in connection with the negotiation and execution of this Agreement and the consummation of the transactions contemplated hereby.

      6.11    <u>Environmental Matters</u>.

Sellers are in compliance in all material respects with all applicable environmental laws, Sellers possess all environmental permits required under any environmental laws for the conduct of the Business, are in compliance in all material respects with the terms and conditions thereof, and all such permits are in full force and effect and contain no restrictions on the transfer of any such permit to a subsequent owner or operator of the Business. Schedule 6.11.1 sets forth a complete list of all such environmental permits.

There are no claims under any environmental laws pending or, to Sellers' Knowledge, threatened against or by any Seller, or affecting any Seller or any of the Business or Purchased Assets, and no Seller has received no communication from any government entity or other person alleging any material liability under any environmental law.

Within five (5) days of the date of this Agreement, Sellers will make available to Buyer all material written environmental assessments, audits, investigations, studies, reports or other documents (including written correspondence with government entities) in its possession or control relating to all properties currently owned or leased by any Seller.

      6.12    <u>Financial Statements</u>.    Sellers' year-end financial statements for the fiscal years for 2014, 2015 and 2016 (the "<u>Financial Statements</u>") are set forth on <u>Schedule 6.12</u> hereto.    The Financial Statements have been prepared in accordance with GAAP applied on a consistent basis throughout the period involved.    The Financial Statements are based on the books and records of the Business, and fairly represent in all material respects the financial condition of Sellers as of the respective dates they were prepared and the results of the operation of the Business for the periods indicated.

      7.    <u>Buyer's Representations and Warranties</u>. Buyer hereby makes the following representations and warranties to Sellers:

      7.1    <u>Validity of Agreement</u>. All action on the part of Buyer necessary for the authorization, execution, delivery and performance of this Agreement by Buyer, including, but not

-21-

limited to, the performance of Buyer's obligations hereunder, has been duly taken. This Agreement, when executed and delivered by Buyer, shall constitute the valid and binding obligation of Buyer enforceable in accordance with its terms, except to the extent that enforceability thereof may be limited by general equitable principles or the operation of bankruptcy, insolvency, reorganization, moratorium or similar Law.

7.2    Organization, Standing and Power. Buyer is a corporation duly organized, validly existing and in good standing under the Law of the State of Delaware.  Buyer has all requisite corporate power and authority to own, lease and operate its properties, to carry on its business as now being conducted and to execute, deliver and perform this Agreement and all writings relating hereto.

7.3    No Violation; Third Party Consents.

7.3.1    Assuming that all consents, waivers, approvals, orders and authorizations set forth in Schedule 7.3.1 have been obtained and all registrations, qualifications, designations, declarations or filings with any Governmental Authorities set forth in Schedule 7.3.2 have been made, the execution and delivery by Buyer of this Agreement and the ancillary agreements contemplated hereunder, the performance by Buyer of its obligations hereunder and thereunder, and the consummation by Buyer of the transactions contemplated hereby and thereby, will not conflict with or violate, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, give rise to any right of termination, amendment, modification, acceleration or cancellation of any obligation or loss of any benefit under, result in the creation of any Encumbrance on any of the assets or properties of Buyer pursuant to, or require Buyer to obtain any consent, waiver, approval or action of, make any filing with, or give any notice to any Person as a result of or under, (a) the terms or provisions of the organizational documents of Buyer, (b) any currently enforceable contract to which Buyer is a party or is bound or (c) any Law applicable to Buyer or any governmental order by which Buyer is in any way bound or obligated, except, in the case of clauses (b) and (c) of this Section 7.3.1, as would not have a material adverse effect on the ability of Buyer to perform its obligations under this Agreement and the ancillary agreements contemplated hereunder, or to consummate on a timely basis the transactions contemplated hereby or thereby.

7.3.2    No consent, waiver, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any Governmental Authority is required on the part of Buyer in connection with the execution and delivery by Buyer of this Agreement and the ancillary agreements contemplated hereunder, the performance by Buyer of its obligations hereunder and thereunder, and the consummation by Buyer of the transactions contemplated hereby and thereby, except (a) as set forth in Schedule 7.3.2 and (b) where the failure to obtain such consent, waiver, approval, order or authorization, or to make such registration, qualification, designation, declaration or filing, would not have a material adverse effect on the ability of Buyer to perform its obligations under this Agreement and the ancillary agreements contemplated hereunder, or to consummate on a timely basis the transactions contemplated hereby or thereby.

7.4    Financing. Buyer has sufficient funds available to consummate the transactions contemplated hereby, and without limiting the conditions to Buyer's obligations set forth herein. THERE IS NO FINANCING CONTINGENCY WITH RESPECT TO BUYER'S OBLIGATIONS IN CONNECTION WITH THIS TRANSACTION.

7.5    "AS IS" Transaction. BUYER HEREBY ACKNOWLEDGES AND AGREES THAT EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH

06018

RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS INCLUDING, WITHOUT LIMITATION, INCOME TO BE DERIVED OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE PURCHASED ASSETS, SELLERS' HISTORICAL FINANCIAL OR OPERATIONAL PERFORMANCE, THE PHYSICAL CONDITION OF ANY OF THE PURCHASED ASSETS OR THE SUBJECT OF ANY CONTRACT OR REAL PROPERTY LEASE TO BE ASSUMED BY BUYER AT THE CLOSING, THE ENVIRONMENTAL CONDITION OR OTHER MATTERS RELATING TO THE PHYSICAL CONDITION OF ANY SUCH REAL PROPERTY OR IMPROVEMENTS, THE ZONING OF ANY SUCH REAL PROPERTY OR IMPROVEMENTS, THE VALUE OF THE PROPERTY (OR ANY PORTION THEREOF), THE TRANSFERABILITY OF THE PURCHASED ASSETS, THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES, THE TITLE OF THE PURCHASED ASSETS (OR ANY PORTION THEREOF), THE MERCHANTABILITY OR FITNESS OF THE PURCHASED ASSETS FOR ANY PARTICULAR PURPOSE OR ANY OTHER MATTER OR THING RELATING TO THE PURCHASED ASSETS.

WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLERS HEREBY DISCLAIM ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY OF THE PURCHASED ASSETS. BUYER FURTHER ACKNOWLEDGES THAT BUYER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE PURCHASED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE PURCHASED ASSETS AS BUYER DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE PURCHASED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN SECTION 6, BUYER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. ACCORDINGLY, BUYER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

8.    <u>Brokers</u>. All negotiations relative to this Agreement and the transactions contemplated hereby have been carried out by Buyer directly with Sellers or with Dirks, Van Essen & Murray without the intervention of any Person on behalf of Buyer in such manner as to give rise to any valid claim by any Person against Sellers for a finder's fee, brokerage commission or similar payment. Buyer shall be exclusively obligated to resolve or pay any claim made by any broker, finder or similar person claiming by or through Buyer or under a purported arrangement with Buyer.

9.    <u>Conduct Prior to Closing</u>.

9.1    <u>Access to Records and the Purchased Assets of Sellers</u>. From and after the date of this Agreement until the Closing Date, (a) Sellers shall, upon reasonable advance notice, afford to Buyer's officers, independent public accountants, counsel, lenders, consultants and other representatives reasonable access during normal business hours to the Purchased Assets and all records pertaining to the Purchased Assets or the Business, and (b), but only after January 1, 2018, Sellers shall facilitate Buyer's interviews of Sellers' Employees to permit Buyer to evaluate whether or not to make offers of employment to those persons. Buyer, however, shall not be entitled to have access to any materials containing privileged communications or information about Employees, disclosure of which might violate an Employee's reasonable expectation of privacy, but Sellers shall sufficiently identify such information to Buyer to enable Buyer to determine to its reasonable satisfaction the materiality of such information.

06018

9.2     Preservation of the Purchased Assets Pending Closing. Unless Buyer otherwise consents, during the period prior to the Closing Date, subject to the orders and direction of the Bankruptcy Court, Sellers shall, taking into account Sellers' financial situation and the current operating status of the Purchased Assets, use commercially reasonable efforts to maintain and preserve the Purchased Assets, except as otherwise may be appropriate in the operation of the Business in the ordinary course of business, including the borrowing and the repayment of funds in connection with the operation of the Business pursuant to the DIP Agreement. Prior to the Closing, Sellers shall not settle, compromise, or modify any Receivables, and shall not seek collection of Receivables except in a manner consistent with Sellers' ordinary course of business and subject to the orders and direction of the Bankruptcy Court.

9.3     Transferred Employees.

9.3.1   Not later than fifteen (15) Business Days prior to the Closing Date, Buyer shall provide offers of employment, on such terms as Buyer may elect, to be effective as of the Closing Date if accepted by midnight on the day before the Closing Date, to approximately 175 Employees of Sellers and shall provide Sellers with a list of those Employees to whom such offers of employment have been extended.  Such list shall be appended to this Agreement as Schedule 9.3.1.  Those Employees who accept such offer of employment, with Buyer before the Closing Date are referred to as "Transferred Employees."  Nothing in this Section 9.3, expressed or implied, shall confer upon any of the Employees any right to employment or continued employment for any specified period, of any nature or kind whatsoever under or by reason of this Agreement.  It is further understood that Buyer may put conditions and restrictions on the use of PTO assumed hereunder in accordance with Buyer policies.

9.3.2   From and after the Closing, Buyer shall, provide all Transferred Employees with credit for service with Sellers earned prior to the Closing for eligibility and vesting purposes in each case under any benefit or compensation plan, program, agreement or arrangement in which the Transferred Employees participate on or after the Closing (collectively, the "New Plans"), except as would result in a duplication of benefits and except for equity incentive plans.  In addition, Buyer shall cause to be waived all pre-existing condition exclusions and actively at-work requirements and similar limitations, eligibility waiting periods and evidence of insurability requirements under any New Plans to the extent waived or satisfied by a Transferred Employee under any comparable Employee Benefit Plan as of the date on which commencement of participation in such New Plan begins.

9.3.3   Except as prohibited by applicable Law, Sellers shall provide to Buyer all information reasonably necessary to permit Buyer to perform its obligations under this Section 9.3, including such information as may be reasonably requested by Buyer following the Closing.

9.4     Bankruptcy Court Approvals.

9.4.1   Commencement of Bankruptcy Cases; Bankruptcy Court Approval of Sale Procedures.  Within three (3) Business Days of the Petition Date, Sellers shall file a motion with the Bankruptcy Court requesting the entry of Sale Procedures Order and a hearing to be held on such proposed Sale Procedures on or before January 5, 2018, which order shall provide, among other things, in form and content reasonably satisfactory to Buyer:

(i)     fix the  time and date and location of a hearing (the "Sale Approval Hearing") to approve Sellers' consummation of this Agreement (and Sellers shall request the same to be no more than seven (7) days after the Auction);

-24-

06018

(ii)    fix the time and date of an auction (the "Auction") preceding the Approval Hearing to be held at the Boston offices of Brown Rudnick LLP, at which higher and better offers to purchase the Purchased Assets may be presented to Sellers (and Sellers shall request the Auction to be conducted within thirty to forty (30 to 40) days after the Bankruptcy Court enters the Sale Procedures Order);

(iii)    establish bidding procedures reasonably acceptable to Buyer;

(iv)    provide that if Buyer is not the successful bidder to purchase the Purchased Assets at the Auction, and the offer of a third party offer accepted at the Auction is subsequently approved by the Bankruptcy Court and closes as provided by its terms, then Buyer will be entitled to receive from Sellers, without deduction or offset of any nature, Buyer's reasonable and necessary due diligence and legal expenses (not to exceed $100,000 in the aggregate) (the "Expense Reimbursement Amount") incurred in connection with its bid, including all fees and expenses incurred prior to the Petition Date, plus a flat fee payment (not dependent on amounts actually expended or incurred by Buyer) in immediately available funds in the amount of $200,000 (the "Break-Up Fee"), without any deduction or offset of any nature, which payments shall be made to Buyer concurrently with the consummation of such third party sale;

(v)    provide that (a) Buyer's claim to payment of the Break-Up Fee and Expense Reimbursement Amount shall be entitled to superpriority administrative expense treatment in the Bankruptcy Case, senior to all other superpriority claims and administrative expenses, other than (x) superpriority claims granted to the DIP Lender, and (y) administrative expense claims included within the "Carve-out" in the Order to which the DIP Lender's claims are subject; and (b) that the funds with which such expenses and the Break-Up Fee are paid shall not be subject to any pre-petition or post-petition lien that may be asserted by or held by any entity against Sellers or the Purchased Assets, other than liens granted to the DIP Lender under the DIP Agreement;

(vi)    provide that a prospective purchaser will not be permitted to bid at the Auction unless such party has been deemed "financially qualified" by Sellers, in accordance with objective criteria set forth in the Sale Procedures Order which at a minimum shall require any such prospective purchaser to provide documentation establishing that such prospective purchaser has sufficient cash on hand or a binding financial commitment from an established financial institution to ensure such prospective purchaser's ability to meet its commitments pursuant to its bid;

(vii)    provide that no prospective purchaser who bids for the Purchased Assets at the Auction shall be entitled to purchase the Purchased Assets unless such prospective purchaser submits to Sellers in writing three Business Days prior to the Auction a bid at least equal to $100,000, in addition to the Break-Up Fee and the Expense Reimbursement Amount, greater than the consideration set forth in this Agreement (including all cash, non-cash consideration and assumed liabilities) for the initial bid, and then $100,000 greater for any additional incremental bid, accompanied by a commitment to proceed to a closing on contractual terms which are in the aggregate at least as favorable to Sellers as those set forth in this Agreement and a cash deposit in the amount of $450,000;

(viii)    establish a deadline of 5:00 p.m. two (2) Business Days before the Auction by which competing bids must be submitted, and providing that neither Sellers nor the Bankruptcy Court will consider, or be required to consider, any bid submitted after such deadline;

-25-

(ix)    establish a deadline of 24 hours before the scheduled start of the Auction by which Sellers must determine and inform Buyer and all other parties who submitted a bid whether any competing bid has been deemed qualified to participate in the Auction;

(x)    provide that any holder of an allowed secured claim that is authorized to credit bid under Section 363(k) of the Bankruptcy Code must agree in writing to pay at the Closing, if it is the successful bidder, an amount in cash equal to the Break-Up Fee, the Expense Reimbursement Amount and the Success Fee (in addition to the amount of its credit bid);

(xi)    require Sellers to provide to Buyer, upon Sellers' receipt thereof, a copy of any bid received by it, except not including any materials related to such bidder which Sellers are prohibited from disclosing by the terms of a valid confidentiality agreement and also not including any financial or proprietary information submitted by such bidder;

(xii)    providing that the Sale Procedures Order shall be effective immediately upon entry; and

(xiii)    contain such other provisions as are reasonably acceptable to Buyer.

The Sale Procedures Order shall not have been amended, modified, or supplemented without the written consent of Buyer. Should overbidding take place, Buyer shall have the right, but not the obligation, to participate in the overbidding and to be approved as the overbidder at the Sale Approval Hearing based upon any such overbid, provided, however, that Buyer shall receive a credit against any additional incremental bid in an amount equal to the Break-Up Fee and the Expense Reimbursement Amount, such that the amount of any competing bid shall at all times exceed the amount of Buyer's bid by at least the total of the Break-Up Fee plus the Expense Reimbursement Amount plus $100,000. Sellers shall use reasonable efforts to obtain the Sale Procedures Order in form and content as provided for herein or otherwise reasonably satisfactory to Buyer. Sellers' obligations to consummate the transactions contemplated herein which Buyer and Sellers may hereafter enter into shall be conditioned upon the Bankruptcy Court's entry of the Sale Procedures Order with terms consistent with those provide for in this Section 9.4.1, including without limitation, approval of the Break-Up Fee and the Expense Reimbursement Amount, and such Order being a Final Order.

9.4.2    Bankruptcy Court's Approval of Sale. Contemporaneously with the filing of the motion with the Bankruptcy Court requesting the entry of the Sale Procedures Order as described in Section 9.4.1, Sellers shall file a motion with the Bankruptcy Court (the "Sale Motion") requesting entry of the Sale Approval Order which order shall, among other things:

(i)    determine that this Agreement was proposed by Buyer and Sellers in good faith and represents the highest and best offer for the Purchased Assets and should be approved;

(ii)    determine that Buyer is a good faith purchaser under and entitled to the protections of Section 363(m) of the Bankruptcy Code, and that the provisions of Section 363(n) of the Bankruptcy Code have not been violated by Buyer;

(iii)    (A) approve the sale of all of the Purchased Assets to Buyer free and clear of any and all Encumbrances of any nature whatsoever, whether known or unknown, pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code (except as otherwise expressly agreed by Buyer under this Agreement); (B) authorize Sellers pursuant to Sections 105(a), 363(b) and 363(f) of the Bankruptcy Code

-26-

to convey to Buyer all of its right, title, and interest in and to all of the Purchased Assets free and clear of any such Encumbrances; and (C) provide that all Encumbrances with respect to the Purchased Assets shall attach solely to the proceeds of the sale under Section 363 of the Bankruptcy Code;

(iv)     authorize each Seller to execute, deliver, perform, consummate, and implement this Agreement and all additional instruments and documents, that may be reasonably necessary or desirable to implement the foregoing;

(v)     require each Seller (or any trustee(s) in bankruptcy that may be appointed for Sellers) to deliver to Buyer any Purchased Asset which comes into the possession, custody or control of Sellers or such trustee(s), and to cooperate with Buyer in compelling or obtaining the turnover or deliver to Buyer of any Purchased Assets;

(vi)     reserve and retain jurisdiction in the Bankruptcy Court to interpret, enforce and effectuate the Sale Approval Order and this Agreement, and to resolve any disputes arising thereunder or hereunder upon motion by any party;

(vii)     provide that the Sale Approval Order is self-executing and effective immediately upon entry, and waive the stays under Rules 6004(h) and 6006(g) of the Federal Rules of Bankruptcy Procedure;

(viii)     approve the assumption by Sellers and assignment to Buyer of the assignment of the explicitly assumed pre-petition Contracts and Real Property Leases (collectively, the "Section 365 Contracts") pursuant to Sections 363 and 365 of the Bankruptcy Code, and orders Buyer, as part of the Purchase Price as provided in Sections 3.1.1 and 3.1.2, to pay any Cure Amounts, payable to the other parties to the Section 365 Contracts as a condition to such assignment;

(ix)     approve the rejection of the Rejected Contracts pursuant to Section 365 and 1113 and 1114 (as applicable) of the Bankruptcy Code;

(x)     establish a deadline by which each Non-debtor party to a Rejected Contract must file a proof of claim for damages arising by reason of the rejection;

(xi)     provide that Buyer does not assume, and shall have no costs, expenses, liability or obligations of any nature whatsoever for, or with respect to, any liability or obligation of any Seller of any nature whatsoever that is not expressly assumed by Buyer in writing pursuant to this Agreement and the Sale Approval Order;

(xii)     require any Person(s) having notice or knowledge of the Sale Approval Order and who is in possession of any property of a Seller that constitutes a Purchased Asset to immediately deliver such property to Buyer and account to Buyer for such property (other than possessory lienholders);

(xiii)     enjoin, prohibit and restrain any Person(s) having notice or knowledge of the Sale Approval Order from possessing or using any Purchased Assets without the prior written consent of Buyer (other than possessory lienholders), exercising any control or dominion over any Purchased Assets without the prior written consent of Buyer, or interfering with the Closing or with the rights of Buyer or its successors under this Agreement or under the Sale Approval Order with respect to the acquisition, use, exploitation and/or further disposition of the Purchased Assets, and/or from commencing, continuing

-27-

or otherwise pursuing or enforcing any remedy, claim, cause of action or encumbrance against Buyer related thereto;

     (xiv)   determine that Buyer does not constitute a successor to any Seller or the bankruptcy estate of any Seller, provide that Buyer shall not incur any liability as a successor to Sellers or the Business (other than the Assumed Liabilities) and determine that Buyer is not a successor to Sellers or otherwise liable for any of the Excluded Liabilities; and

     (xv)   contain such other provisions as are reasonably satisfactory to Buyer.

Following the filing of the Sale Motion, Sellers shall use reasonable efforts to obtain entry of the Sale Approval Order. The Sale Approval Order shall not have been amended, modified, or supplemented without the written consent of Buyer.

Sellers' obligations to consummate the transactions contemplated herein which Buyer and Sellers may hereafter enter into shall be conditioned upon the Bankruptcy Court's entry of the Sale Approval Order in form and content satisfactory to Buyer, and such Order being a Final Order on or before March 28, 2018.

     9.4.3   <u>Notices of Sale</u>. Sellers shall have used their best efforts to send adequate notice of the Sale Approval Hearing to all holders of Encumbrances with respect to the Purchased Assets, all counter-parties to the Contracts and the Rejected Contracts, and all counter-parties to any other contracts or obligations of Sellers that will not be assumed by Buyer. Such efforts shall include, without limitation: (i) compliance with Rules 2002(a)(2), 6004, and 6006 of the Federal Rules of Bankruptcy Procedure and all related Local Bankruptcy Rules of the Bankruptcy Court; (ii) notice to all Governmental Authorities as is required to comply with the Federal Rules of Bankruptcy Procedure and applicable local laws relating to the issuance or transfer of any governmental licenses or permits or the issuance of any required license or permit from a Governmental Authority; (iii) notice to all Employees and former employees and others receiving any benefits under any pension or Employee Benefit Plan; (iv) notice to all known creditors of any of the Sellers; and (v) publication, at Sellers' sole expense, not less than once in the journal, *Editor and Publisher,* or such other publication as the parties may mutually agree, of notice of the Sale Approval Hearing, in form and content reasonably satisfactory to Buyer and Sellers and approved by the Bankruptcy Court, which shall include particularized notice of the proposed sale of the Purchased Assets free and clear of all Encumbrances other than Permitted Encumbrances, and giving notice, and the opportunity for holders of any Encumbrances with respect to the Purchased Assets to appear and be heard.

     9.4.4   <u>DIP Agreement</u>. At Sellers' request, Buyer has agreed to provide Sellers with a post-Petition Date loan (a "DIP Loan") up to a maximum principal amount of Five Hundred Thousand Dollars ($500,000.00), under a DIP Agreement (the "DIP Agreement"), the principal terms and conditions for which are set forth in the attached <u>Exhibit I</u>. On or at any time after the Petition Date, Sellers may file a motion seeking entry of an order authorizing the Sellers to enter into and perform their obligations under the DIP Agreement, which motion and order shall be in form and substance reasonably acceptable to Buyer. In the event that the Bankruptcy Court does not approve the DIP Loan or the DIP Agreement for any reason, (i) all other terms of this Agreement shall continue in full force and effect and shall be binding on the Parties in all respects, and (ii) in such event, neither Sellers nor Buyer shall have any obligations relating to the DIP Loan or the DIP Agreement.

     9.4.5   <u>No Successor Liability</u>. The parties intend that, upon Closing, Buyer shall not be deemed to: (a) be the successor of or successor employer to Sellers for any purpose or under any theory, including as described under COBRA and applicable regulations thereunder, including with

06018

respect to any collective bargaining agreement and any Employee Benefit Plans, (b) have, de facto or otherwise, merged with or into Sellers; (c) be a mere continuation or substantial continuation of Sellers, the Business, or Sellers' enterprise(s); or (d) be liable for any acts or omissions of Sellers in the conduct of the Business or arising under or related to the Purchased Assets or the Assumed Liabilities.  Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, the parties intend that Buyer shall not be liable for any Encumbrances against any Seller or any of its Affiliates, and that Buyer shall no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date or whether fixed or contingent, existing or hereafter arising, with respect to the Business, the Purchased Assets or any Liabilities of any Seller arising on or prior to the Closing Date. The parties agree that a provision substantially in the form of, and with comparable effect to, this Section 9.4.4 shall be reflected in the Sale Approval Order.

      9.4.6   <u>Sellers' Additional Bankruptcy Procedure Covenants</u>.  Sellers, at their sole expense, shall promptly make any filings, take all actions, and use their commercially reasonable efforts to obtain any and all other approvals and orders necessary or appropriate for consummation of the sale of the Purchased Assets, subject to its obligations to comply with any order of the Bankruptcy Court. In the event an appeal is taken, or a stay pending appeal is requested, from any of the foregoing orders of the Bankruptcy Court, Sellers shall immediately notify Buyer of such appeal or stay request and, upon Buyer's request, shall provide to Buyer within three Business Days after Sellers' receipt thereof a copy of the related notice of appeal or order of stay. Sellers shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from any of such orders.

     10.    Reimbursement and Indemnification.

      10.1   <u>Reimbursement and Indemnification of Buyer</u>. If Buyer terminates this Agreement pursuant to Section 5.4.5, Sellers, jointly and severally, hereby agree to reimburse Buyer for the Expense Reimbursement Amount.  Sellers, jointly and severally, also hereby agree defend, indemnify, and hold harmless Buyer, each of its Affiliates, and each of their respective officers, directors, stockholders, employees, representatives, agents, successors and assigns (individually, and collectively, the "<u>Buyer Indemnitees</u>") against and in respect of with losses, liabilities, damages, actions, suits, proceedings, claims, demands, orders, assessments, amounts paid in settlement (if approved by Sellers as provided below), fines, costs or deficiencies, including, without limitation, interest, penalties and attorneys fees and costs, including the cost of seeking to enforce this indemnity to the extent such enforcement is successful, caused by or resulting or arising from, or otherwise with respect to the Excluded Liabilities.  Notwithstanding anything to the contrary herein, since the representations, warranties and covenants of Sellers under this Agreement will lapse and be of no further force or effect after the Closing, Sellers shall not have any liability or obligation under this Section 10.1 with respect to any breach or asserted breach by Sellers of any representation, warranty or covenant under this Agreement following the Closing Date.

      10.1.1   <u>Notification of Circumstance Giving Rise to Claim for Indemnification by Buyer Indemnitees</u>. Buyer and Buyer Indemnitees hereby agree that promptly after any of them becomes aware of any circumstance which might reasonably be expected to become the subject matter of a claim for indemnification to be made by any of them against Sellers (a "<u>Buyer Claim</u>"), they will advise Sellers of such circumstance, and that they will afford Sellers from time to time, such information as Sellers shall reasonably request in connection therewith. Buyer shall have the right to employ separate counsel in any action brought in respect of any matter that is or may be the subject of a Buyer Claim hereunder, and shall have the right to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of Buyer. Buyer shall have exclusive control and discretion in the conduct of the defense of any such matter. Sellers shall not be required to make any indemnification hereunder

with respect to any amounts paid in settlement except to the extent that Sellers have approved the terms thereof.

      10.2      Terms of Deposit; Indemnification of Sellers.

          10.2.1  If Sellers terminate this Agreement pursuant to Section 5.4.4, the Purchase Price Deposit shall be retained by Sellers as liquidated damages and not as a penalty.  If, however, this Agreement is terminated for any other reason, including without limitation, because a sale to a competing bidder is approved by the Bankruptcy Court, the Purchase Price Deposit shall be returned to Buyer in its entirety, together with any interest earned thereon, within three (3) Business Days of such termination.

          10.2.2  Notwithstanding any provisions of this Agreement to the contrary, Sellers acknowledge and agree that Sellers' sole and exclusive remedy against Buyer for any claim or cause of action arising in connection with this Agreement shall be limited to the Purchase Price Deposit plus recovery of actual damages suffered by Buyer in an amount not to exceed (a) one million dollars ($1,000,000.00) less (b) the amount of the Purchase Price Deposit.

          10.2.3  Buyer also hereby agrees to defend, indemnify, and hold harmless Sellers and each of their representatives, agents, successors and assigns (individually, and collectively, the "Seller Indemnitees") against and in respect of any and all losses, liabilities, damages, actions, suits, proceedings, claims, demands, orders, assessments, amounts paid in settlement (if approved by Buyer as provided below), fines, costs or deficiencies, including, without limitation, interest, penalties and attorneys fees and costs, including the cost of seeking to enforce this indemnity to the extent such enforcement is successful, caused by or resulting or arising from, or otherwise with respect to the Assumed Liabilities.  Notwithstanding anything to the contrary herein, since the representations, warranties and covenants of Buyer under this Agreement will lapse and be of no further force or effect after the Closing, Buyer shall not have any liability or obligation under this Section 10.2 with respect to any breach or asserted breach by Buyer of any representation, warranty or covenant under this Agreement following the Closing Date.

          10.2.4  Notification of Circumstance Giving Rise to Claim for Indemnification by a Seller Indemnitee. Sellers and the Seller Indemnitees hereby agree that promptly after any of them becomes aware of any circumstance which might reasonably be expected to become the subject matter of a claim for indemnification to be made by any of them against Buyer Indemnitees under this Agreement (a "Seller Claim"), they will advise Buyer of such circumstance, and that they will afford Buyer, from time to time, such information as Buyer shall reasonably request in connection therewith. Each Seller shall have the right to employ separate counsel in any action brought in respect of any matter that is or may be the subject of a Seller Claim, and shall have the right to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Seller. Sellers shall have exclusive control and discretion in the conduct of the defense of any such matter. Buyer shall not be required to make any indemnification hereunder with respect to any amounts paid in settlement except to the extent that Buyer has approved the terms thereof.

     11.      Miscellaneous.

      11.1      Post-Closing Reasonable Access to Records and Certain Personnel.

          11.1.1  Access to Buyer. Subsequent to the Closing Date, so long as the Bankruptcy Case is pending, and following reasonable written request by Sellers to Buyer, (i) Buyer shall

permit Sellers' counsel and other professionals employed in the Bankruptcy Case reasonable access to the financial and other books and records relating to the Purchased Assets, the Excluded Assets or the Business (whether in documentary or data form) for the purpose of (a) performing its undertakings and obligations under this Agreement and (b) the continuing administration of the Bankruptcy Case (including, without limitation, the pursuit of any reserved avoidance, preference or similar action), which access shall include (x) the right of such professionals to use computer hardware and software systems included among the Purchased Assets to access data that may constitute Purchased Assets or Excluded Assets in furtherance of the purposes described above, or (y) the right of such professionals to copy, at Sellers' expense, such documents and records as they may request in furtherance of the purposes described above, and Buyer's copying and delivering to Sellers or their professionals such documents or records as they may request (but only to the extent Sellers or their professionals furnish Buyer with reasonably detailed written descriptions of the materials to be so copied and Sellers reimburse Buyer for the reasonable costs and expenses thereof), (ii) Buyer shall provide Sellers and such professionals (at no cost to Sellers) with reasonable access to senior members of management of the Business during regular business hours to assist Sellers in the continuing administration of the Bankruptcy Case, provided that such access does not unreasonably interfere with Buyer's business operations, and (iii) Buyer shall  (A) retain all books and records with respect to the Business for at least forty-eight (48) months and thereafter (B) give Sellers reasonable written notice prior to destroying or discarding any such books and records and in such case, if Sellers so request, Buyer shall allow Sellers to take possession of such books and records.

    11.1.2   Access to Sellers. Subsequent to the Closing Date, so long as the Bankruptcy Case is pending and following reasonable written request by Buyer to Sellers (i) Sellers shall permit Buyer's management personnel reasonable access to the financial and other books and records relating to the Purchased Assets, or the Business (whether in documentary or data form) for the purpose of assisting Buyer in the operation of the Business, which access shall include (a) the right of such personnel to copy, at Buyer's expense, such documents and records as they may request in furtherance of the purposes described above, and (b) Sellers' copying and delivering to Buyer or its personnel such documents or records as they may request, but only to the extent Buyer or its personnel furnishes Sellers with reasonably detailed written descriptions of the materials to be so copied and Buyer reimburses Sellers for the reasonable costs and expenses thereof, (ii) Sellers shall provide Buyer and such personnel (at no cost to Buyer) with reasonable access to senior members of management of Sellers during regular business hours to assist Buyer in the operation of the Business, provided that such access does not unreasonably interfere with Sellers' operations and shall be provided only if and so long as such personnel are retained and employed by Sellers, and (iii) Sellers shall either (A) retain all books and records with respect to the Business or (B) give Buyer reasonable written notice prior to destroying or discarding any such books and records and in such case, if Buyer so requests, Sellers shall allow Buyer to take possession of such books and records.

    11.2   Notices. Unless otherwise provided herein, any notice, tender, or delivery to be given hereunder by either party to the other may be effected by personal delivery in writing or by electronic-mail or facsimile, or by overnight package delivery service or registered or certified mail, postage prepaid, return receipt requested, and shall be deemed communicated as of the date delivered. Mailed notices shall be addressed as set forth below, but each party may change its address by written notice in accordance with this paragraph.

    To Sellers:    Boston Herald, Inc.
             Seaport Center
             70 Fargo Street, Suite 600

06018

Boston, Massachusetts 02210
Attn: Patrick J. Purcell
Email: ppurcell@bostonherald.com
Fax: (617) 619-6551

With copies to:      Brown Rudnick LLP
One Financial Center
Boston, Massachusetts 02111
Attn:   William R. Baldiga, Esq.
Email:  WBaldiga@brownrudnick.com
Fax: (617) 289-0583

And                Paul J. Hartnett, Jr.
One Raeburn Terrace
Newton, Massachusetts 02461
Email:  paul.hartnett91@gmail.com
Fax: (617)964-7001

To Buyer:         GateHouse Media Massachusetts I, Inc.
175 Sully's Trail
Pittsford, New York 14534
Attn:  Polly Grunfeld Sack
Email: psack@gatehousemedia.com
Fax: (585) 248-2631

With a copy to:      Thacker Robinson Zinz LPA
Attn: Lynn Rowe Larsen, Esq.
2330 One Cleveland Center
1375 E. 9th St.
Cleveland, Ohio  44114
Email: llarsen@trzlaw.com
Telephone: (216) 456-3840

11.3    <u>Entire Agreement</u>. This Agreement and the documents to be executed pursuant hereto among the parties contain the entire agreement between the parties relating to the sale of the Purchased Assets.

11.4    <u>Amendment</u>. This Agreement may be modified, amended or supplemented only by a written instrument duly executed by all the parties hereto; provided, however, that prior to the Closing Date, Buyer shall have the unilateral right to: (a) delete from <u>Schedule 2.1.9</u> such Real Property Leases as Buyer determines; and (b) delete from <u>Schedule 2.1.10,</u> such Contracts as Buyer determines.

11.5    <u>Closing Date</u>. All actions to be taken at the Closing pursuant to this Agreement shall be deemed to have occurred simultaneously, and no act, document or transaction shall be deemed to have been taken, delivered or effected until all such actions, documents and transactions have been taken, delivered or effected.

11.6    <u>Severability</u>. If in any jurisdiction any term or provision hereof is determined to be invalid or unenforceable, (a) the remaining terms and provisions hereof shall be unimpaired, (b) any

06018

such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction, and (c) the invalid or unenforceable term or provision shall, for purposes of such jurisdiction, be deemed replaced by a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision.

11.7    Further Assurances. The parties hereto will execute, acknowledge and deliver any further assurance, documents and instruments reasonably requested by any other party hereto for the purpose of giving effect to the transactions contemplated herein. After the Closing, if Sellers receive any payment on account of any Receivables conveyed under this Agreement, Sellers shall remit the proceeds of such payment, without any deduction or offset of any nature, to Buyers within five (5) Business Days after receipt. The proceeds of such receipts shall be deemed to be held in trust by Sellers for the sole benefit of Buyer, and such proceeds shall not constitute property of Sellers' estate(s) under the Bankruptcy Code.

11.8    Waiver. No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of other provisions, whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver shall be binding unless executed in writing by the party making the waiver.

11.9    Payment of Fees and Expenses. Except as expressly provided herein, each party to this Agreement shall be responsible for, and shall pay, all of its own fees and expenses, including those of its counsel, incurred in the negotiation, preparation and consummation of this Agreement and the transactions contemplated hereby.

11.10    No Survival. The respective representations and warranties of Sellers and Buyer set forth in Sections 6 and 7 hereof shall not survive the Closing, and, upon the Closing, shall be of no force or effect whatsoever, and the covenants and agreements of Sellers and Buyer herein, or in any certificates or other documents delivered prior to or at the Closing, shall not survive the Closing, provided, however that Sellers' indemnity obligations under Section 10.1 of this Agreement and Buyer's indemnity obligations under Section 10.2 of this Agreement shall survive closing.

11.11    No Assignment; No Third Party Beneficiaries. Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned or delegated by Sellers or Buyer without the prior written consent of the other parties hereto and any purported assignment or delegation in violation hereof shall be null and void; provided that Buyer may assign any of its rights and obligations hereunder to any one or more Persons which are Affiliates of Buyer in its sole discretion. This Agreement is not intended to, and shall not, confer upon any other Person except the parties hereto any rights or remedies hereunder.

11.12    Binding Effect. This Agreement shall inure to the benefit of, and be binding upon, the parties and their respective heirs, legal representatives, successors and permitted assigns. Nothing in this Agreement, express or implied, is intended to or shall confer upon any Person other than the parties, and their respective heirs, legal representatives, successors and permitted assigns, any rights, remedies, obligations or liabilities under, in connection with or by reason of this Agreement.

11.13    Applicable Law and Jurisdiction. This Agreement shall be governed by and construed in accordance with the Law of the State of Delaware without regard to the Law of the conflicts of Law of such State. THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO (i) THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT OR ANY ANCILLARY DOCUMENT EXECUTED

-33-

PURSUANT HERETO; AND/OR (ii) THE PURCHASED ASSETS AND/OR THE ASSUMED LIABILITIES, AND THE PARTIES EXPRESSLY CONSENT TO AND AGREE NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION.

11.14   Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same document. Delivery of an executed copy hereof by facsimile or email shall for all purposes be agreed to constitute such delivery of an executed copy.

11.15   Confidentiality; Publicity.

11.15.1   Subject to Section 9.4 and the requirements of the Bankruptcy Code and the Bankruptcy Court and except as otherwise explicitly provided in this Agreement, from the date hereof until the earlier of Closing Date or the date on which this Agreement is terminated, Buyer agrees that it shall, and shall cause its employees, officers, directors and Affiliates to, keep confidential all information (whether written or otherwise) provided to it by Sellers or Sellers' agents and representatives, except that Buyer may provide such information to its financial advisors, legal counsel and other consultants assisting Buyer, provided that such advisors, counsel and consultants agree to become bound by the terms of this Section 11.15.1. In the event this Agreement is terminated prior to Closing, Buyer shall return to Sellers all information provided to it by or on behalf of Sellers or shall provide Sellers with evidence reasonably satisfactory to Sellers that Buyer has destroyed such information. Buyer's obligations under this Section 11.15.1 shall not extend to information which (a) has been in the possession of or known by Buyer on a non-confidential basis prior to the receipt thereof from Sellers or its agents or representatives, (b) has become generally available to the public other than as a result of disclosure by Buyer or its agents or representatives, (c) has become available to Buyer on a non-confidential basis from a third party not prohibited from making such disclosure to Buyer, or (d) is required to be disclosed to comply with any applicable Law, provided that before Buyer makes such disclosure that Buyer use reasonable efforts to give Sellers prompt notice of the requirement or request for disclosure and use reasonable efforts to cooperate with Sellers in securing a protective order or other arrangement to limit disclosure of such confidential information only to parties agreeing to be bound by the terms of the protective order or other arrangement.

11.15.2    From and after the date hereof, Sellers shall not, without the prior written consent of Buyer, and Buyer shall not (and shall cause its Affiliates not to) without the prior written consent of Sellers, issue or permit to be issued any media, newspaper, wire service, trade journal or any other public statement, in each case concerning the transactions contemplated herein, without the approval of the other party, except as otherwise provided herein or as may be required by applicable Law, stock exchange rule or other applicable disclosure obligations, in which case the issuing party shall provide the other party, in writing, no less than one Business Day prior to such proposed statement, the content of the proposed statement and an opportunity to comment on the statement.

*[Signature page follows]*

-34-

IN WITNESS WHEREOF, the parties hereto have executed this Asset Purchase Agreement as of the day and year first above written.

**BUYER**:

GATEHOUSE MEDIA MASSACHUSETTS I, INC.

By: _____

Name: Kirk A. Davis

Title:   President, Chief Executive Officer and
          Chief Operating Officer

**SELLERS**:

| | |
|---|---|
| BOSTON HERALD, INC. | HERALD MEDIA HOLDINGS, INC. |
| By: _____ | By: _____ |
| Name: _____ | Name: _____ |
| Title: _____ | Title: _____ |

| | |
|---|---|
| HERALD INTERACTIVE, INC. | HERALD MEDIA, INC. |
| By: _____ | By: _____ |
| Name: _____ | Name: _____ |
| Title: _____ | Title: _____ |

*Signature Page to Asset Purchase Agreement*

IN WITNESS WHEREOF, the parties hereto have executed this Asset Purchase Agreement as of the day and year first above written.

**BUYER**:

GATEHOUSE MEDIA MASSACHUSETTS I, INC.

By:_____

Name: _____

Title: _____

**SELLERS**:

BOSTON HERALD, INC.

By: _____

Name: PATRICK J PURCELL

Title: PRESIDENT

HERALD MEDIA HOLDINGS, INC.

By: _____

Name: PATRICK J PURCELL

Title: PRESIDENT

HERALD INTERACTIVE, INC.

By: _____

Name: PATRICK J PURCELL

Title: PRESIDENT

HERALD MEDIA, INC.

By: _____

Name: PATRICK J. PURCELL

Title: PRESIDENT

*Signature Page to Asset Purchase Agreement*

**EXHIBIT A**

**FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT**

This ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is made as of this ____ day of November, 2017, by and among GATEHOUSE MEDIA MASSACHUSETTS I, INC. ("Assignee"), and BOSTON HERALD, INC., HERALD INTERACTIVE INC., HERALD MEDIA, INC., and HERALD MEDIA HOLDINGS, INC. (each, individually, a "Assignor", and, collectively, "Assignors"). Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed thereto in the Asset Purchase Agreement (as hereinafter defined).

WHEREAS, Assignors and Assignee have executed and delivered an Asset Purchase Agreement dated as of December 7, 2017 (the "Asset Purchase Agreement") pursuant to which Assignee will purchase Assignors' publishing business, which business includes the preparation, publication, sale and distribution of each of the Publications (as defined therein) and other business ventures related thereto; and

WHEREAS, pursuant to the Asset Purchase Agreement, Assignors have agreed to assign certain rights and obligations to Assignee, and Assignee has agreed to assume certain rights and obligations of Assignors, as set forth in the Asset Purchase Agreement;

NOW, THEREFORE, for and in consideration of the premises and the mutual covenants contained herein, and for other good and valuable consideration, the receipt, adequacy and legal sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, do hereby agree as follows:

1. <u>Assignment and Assumption</u>. Effective on the date hereof (the "<u>Effective Date</u>"), subject to the terms, conditions and limitations set forth in the Asset Purchase Agreement, Assignors hereby assign, sell, transfer and set over (collectively, the "<u>Assignment</u>") to Assignee all of the Purchased Assets. Assignee hereby accepts the Assignment and assumes and agrees to observe and perform all of the duties, obligations, terms, provisions and covenants and to pay and discharge all of the liabilities and obligations of Assignors comprising the Assumed Liabilities to be observed, performed, paid, or discharged from and after the Effective Date.

2. <u>Terms of the Asset Purchase Agreement</u>. The terms of the Asset Purchase Agreement, including but not limited to Assignors' representations, warranties, covenants, agreements and indemnities relating to the Assumed Liabilities, are incorporated herein by this reference. Assignors and Assignee acknowledge and agree that the terms and conditions contained in the Asset Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Asset Purchase Agreement and the terms hereof, the terms of the Asset Purchase Agreement shall govern.

3. Further Actions. Each of the parties hereto covenants and agrees, at its own expense, to execute and deliver, at the request of the other party hereto, such further instruments and to take such other action as such other party may reasonably request to more effectively consummate

the assignments and assumptions contemplated by this Agreement.

4.        Counterparts. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. The parties acknowledge and agree that executed signature pages delivered by facsimile or electronic mail shall for all purposes constitute original signature pages.

5.        Governing Law and Jurisdiction. This Agreement shall be governed by and construed in accordance with the Laws of the State of Delaware without regard to the Law of the conflicts of Law of such State. THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO (i) THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT OR ANY ANCILLARY DOCUMENT EXECUTED PURSUANT HERETO; AND/OR (ii) THE PURCHASED ASSETS AND/OR ASSUMED LIABILITIES, AND THE PARTIES EXPRESSLY CONSENT TO AND AGREE NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION.

6.        No Assignment; No Third Party Beneficiaries. Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned or delegated by Assignors nor Assignee without the prior written consent of the other parties hereto and any purported assignment or delegation in violation hereof shall be null and void; provided that Assignee may assign any of its rights and obligations hereunder to any one or more persons that are under the Control (as defined in the Asset Purchase Agreement) of Assignee without any such assignment releasing Assignee from any of its obligations under this Agreement. This Agreement is not intended to, and shall not, confer upon any other person except the parties hereto any rights or remedies hereunder.

7.        Entire Agreement. This Agreement together with the Asset Purchase Agreement contains the entire agreement and understanding of the parties with respect to the subject matter hereof, and supersedes all prior agreements, negotiations, representations and proposals, written and oral, relating thereto.

*[Signature page follows]*

IN WITNESS WHEREOF, Assignors and Assignee have executed this Assignment and Assumption Agreement as of the date first above written.

**ASSIGNEE:**

**GATEHOUSE MEDIA MASSACHUSETTS I, INC.**

By: _____
    Name:
    Title:

**ASSIGNORS:**

**BOSTON HERALD, INC.**

By: _____
    Name:
    Title:

**HERALD INTERACTIVE, INC.**

By: _____
    Name:
    Title:

**HERALD MEDIA, INC.**

By: _____
    Name:
    Title:

**HERALD MEDIA HOLDINGS, INC.**

By: _____
    Name:
    Title:

**EXHIBIT B**

**FORM OF
ASSIGNMENT OF PROPRIETARY RIGHTS AGREEMENT**

_____, 2017

THIS ASSIGNMENT OF PROPRIETARY RIGHTS AGREEMENT (this "Assignment Agreement") is entered into by and among GATEHOUSE MEDIA MASSACHUSETTS I, INC. ("Assignee"), and BOSTON HERALD, INC., HERALD INTERACTIVE INC., HERALD MEDIA, INC., and HERALD MEDIA HOLDINGS, INC. (each, individually, a "Assignor", and, collectively, "Assignors").and is effective as of the date set forth above. Capitalized terms used but not otherwise defined shall have the meanings ascribed to them in the Asset Purchase Agreement (as defined below).

WHEREAS, Assignors have entered into an Asset Purchase Agreement (the "Asset Purchase Agreement") dated _____, 2017 with Assignee pursuant to which Assignee will purchase Assignor's publishing business, which business includes the preparation, publication, sale and distribution of each of the Publications and other business ventures related thereto;

WHEREAS, Assignors are the record owners of all right, title and interest in and to the trademark registrations set forth on the attached Attachment 1 and the copyright registrations set forth on the attached Attachment 2;

WHEREAS, Assignors desire and have agreed to assign all Intellectual Property owned by them to Assignee; and

WHEREAS, Assignee desires and has agreed to accept such assignment;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged:

Assignors hereby sell, assign, transfer and convey to Assignee, its successors, legal representatives and assigns, all of Assignors' right, title, and interest in and to the Intellectual Property and to the goodwill related thereto, forever and throughout the world, including without limitation, the right to petition, sue or otherwise seek and recover damages, profits and any other remedy (monetary, injunctive, declaratory or other), for any past, present or future infringement, dilution, conversion or misappropriation of, or other injury, offense, violation, breach of duty or wrong in relation to any of the Intellectual Property and the goodwill related thereto, or any license, agreement, contract or other matter relating thereto, worldwide and forever. The foregoing assignment includes all of Assignors' right, title, and interest in and to the trademark registrations set forth on Attachment 1 and the copyright registrations set forth on Attachment 2.

Assignors for themselves, their successors and assigns agree to execute and deliver, or cause to be executed and delivered, to Assignee or Assignee's legal representatives, any other or additional assignments, powers and other appropriate documentation, and to take all additional actions, necessary to effectuate, validate and record the assignment set forth herein, including, without limitation, to execute one or more further assignments in a form acceptable for recordation in the United States Patent & Trademark Office, the United States Copyright Office and in any foreign intellectual property offices in which the assignment may be recorded.

This Assignment Agreement and the covenants and agreements contained herein shall be binding upon Assignors, their survivors and assigns and shall inure to the benefit of Assignee, its successors and assigns.

This Assignment Agreement does not limit the rights, obligations, representations, warranties and/or indemnifications provided in the Asset Purchase Agreement. Notwithstanding anything to the contrary set forth herein, if there is any conflict between the terms and conditions of this Assignment Agreement and the terms and conditions of the Asset Purchase Agreement, the terms of the Asset Purchase Agreement shall control.

This Assignment Agreement shall be governed by, construed and enforced in accordance with the laws of the State of New York (without application of principles of conflict of laws) and the federal laws of the United States.

This Assignment Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

[Signature Page Attached]

**ASSIGNEE:**

**GATEHOUSE MEDIA MASSACHUSETTS I, INC.**

By: _____
    Name:
    Title:

**ASSIGNORS:**

**BOSTON HERALD, INC.**                    **HERALD INTERACTIVE, INC.**

By: _____          By: _____
    Name:                                      Name:
    Title:                                     Title:

**HERALD MEDIA, INC.**                     **HERALD MEDIA HOLDINGS, INC.**

By: _____          By: _____
    Name:                                      Name:
    Title:                                     Title:

ATTACHMENT 1

TRADEMARK REGISTRATIONS

REGISTERED TRADEMARKS

| Mark | Reg. No. | Jurisdiction | Registration date |
|------|----------|--------------|-------------------|
|      |          |              |                   |

ATTACHMENT 2

COPYRIGHT REGISTRATIONS

See attached.

**EXHIBIT C**

**FORM OF BILL OF SALE**

This BILL OF SALE (the "Bill of Sale"), dated as of _____, 2017, is by and among GATEHOUSE MEDIA MASSACHUSETTS I, INC. ("Buyer"), and BOSTON HERALD, INC., HERALD INTERACTIVE INC., HERALD MEDIA, INC., and HERALD MEDIA HOLDINGS, INC. (each, individually, a "Seller", and, collectively, "Sellers").

W I T N E S S E T H

WHEREAS, pursuant to that certain Asset Purchase Agreement, dated as of November, 2017 (the "Asset Purchase Agreement"), by and among Sellers and Buyer, Sellers have agreed to sell, convey, transfer, assign and deliver all of their respective right, title and interest in and to the Purchased Assets, as identified and described in the Asset Purchase Agreement, to Buyer, and Buyer has agreed to purchase and acquire such Purchased Assets from the Sellers, all as more fully described in the Asset Purchase Agreement;

WHEREAS, the Asset Purchase Agreement and the transactions contemplated thereby were duly authorized and approval by an order of the United States Bankruptcy Court for the _____, entered on _____, 2017 ("Sale Approval Order") in the jointly-administered cases for the Sellers under the caption _____, Case No. _____ (____), the terms of which order are incorporated herein by reference; and

WHEREAS, pursuant to the Asset Purchase Agreement, Sellers and Buyer have agreed to enter into this Bill of Sale pursuant to which the Purchased Assets will be conveyed to Buyer in accordance with the Asset Purchase Agreement and the Sale Approval Order;

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.          Defined Terms. Capitalized terms which are used but not defined in this Bill of Sale shall have the meanings ascribed to such terms in the Asset Purchase Agreement and the Sale Approval Order if not otherwise defined in the Asset Purchase Agreement. This is the "Bill of Sale" referred to in the Asset Purchase Agreement.

2.          Assignment. Subject to the terms and conditions of the Asset Purchase Agreement and the Sale Approval Order, for, and in consideration of the payment of the Purchase Price, the receipt and sufficiency of which are hereby acknowledged, Sellers do hereby sell, convey, transfer, assign and deliver to Buyer all of the Sellers' respective right, title and interest in and to all of the Purchased Assets, and Buyer does hereby purchase and accept from Sellers the conveyance, transfer, assignment and delivery of all of the Sellers' respective right, title and interest in and to all of the Purchased Assets.

3.          Condition of the Assets. Except as set forth in the Asset Purchase Agreement, Sellers do not make any express or implied representations, statements, warranties or conditions

of any kind or nature whatsoever concerning the Purchased Assets being sold, conveyed, transferred, assigned and delivered hereunder.

4.        Binding Effect; Assignment. This Bill of Sale and all of the provisions hereof shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

5.        Governing Law. This Bill of Sale shall be governed by and construed in accordance with the Laws of the State of New York without regard to the Law of the conflicts of Law of such State. THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO (i) THE INTERPRETATION AND ENFORCEMENT OF THIS BILL OF SALE OR ANY ANCILLARY DOCUMENT EXECUTED PURSUANT HERETO; AND/OR (ii) THE PURCHASED ASSETS AND/OR ASSUMED LIABILITIES, AND THE PARTIES EXPRESSLY CONSENT TO AND AGREE NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION.

6.        Construction. This Bill of Sale is delivered pursuant to and is subject to the Asset Purchase Agreement and the Sale Approval Order. In the event of any conflict between the terms of the Asset Purchase Agreement and the terms of this Bill of Sale, the terms of the Asset Purchase Agreement and the Sale Approval Order shall prevail.

7.        No Assignment; No Third Party Beneficiaries. Neither this Bill of Sale nor any of the rights, interests or obligations hereunder may be assigned or delegated by Sellers nor Buyer without the prior written consent of the other parties hereto and any purported assignment or delegation in violation hereof shall be null and void; provided that Buyer may assign any of its rights and obligations hereunder to any one or more persons that are under the Control (as defined in the Asset Purchase Agreement) of Buyer without any such assignment releasing Buyer from any of its obligations under this Bill of Sale. This Bill of Sale is not intended to, and shall not, confer upon any other person except the parties hereto any rights or remedies hereunder.

8.        Counterparts. This Bill of Sale may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. The parties acknowledge and agree that executed signature pages delivered by facsimile or electronic mail shall for all purposes constitute original signature pages.

IN WITNESS WHEREOF, this Bill of Sale has been duly executed and delivered by the duly authorized officer of the parties hereto as of the date first above written.

**BUYER:**

**GATEHOUSE MEDIA MASSACHUSETTS I, INC.**

By: _____
    Name:
    Title:

**SELLERS:**

| | |
|---|---|
| **BOSTON HERALD, INC.** | **HERALD INTERACTIVE, INC.** |
| | |
| By: _____ | By: _____ |
|     Name: |     Name: |
|     Title: |     Title: |
| | |
| **HERALD MEDIA, INC.** | **HERALD MEDIA HOLDINGS, INC.** |
| | |
| By: __ _____ | By: _____ |
|     Name: |     Name: |
|     Title: |     Title: |

**EXHIBIT D**

**FORM OF OFFICER'S CERTIFICATE OF
SELLER**

Reference is hereby made to that certain Asset Purchase Agreement, dated as of December 7, 2017 (the "Asset Purchase Agreement"), by and among GATEHOUSE MEDIA MASSACHUSETTS I, INC. ("Buyer"), and BOSTON HERALD, INC., HERALD INTERACTIVE INC., HERALD MEDIA, INC., and HERALD MEDIA HOLDINGS, INC. (BOSTON HERALD, INC. and HERALD MEDIA HOLDINGS, INC. (each, individually, a "Seller", and, collectively, "Sellers") and the order of the United States Bankruptcy Court for the _____, entered on _____, 2017 ("Sale Approval Order") in the jointly-administered cases for the Sellers under the caption _____, Case No. _____ (___). Capitalized terms used below but not defined herein shall have the meanings ascribed to them in the Asset Purchase Agreement and the Sale Approval Order if not otherwise defined in the Asset Purchase Agreement.

This certificate is being delivered to Buyer pursuant to Section 4.3.4 of the Asset Purchase Agreement. The undersigned, in his capacity as a [_____] of [_____ _____], a Seller, hereby certifies as follows:

1.        All conditions precedent contained in Section 5.1 of the Asset Purchase Agreement have been satisfied.

2.        [      ], a Seller, is not a foreign person (as defined in the Internal Revenue Code) for purposes of Section 1445 of the Internal Revenue Code.

3.        Attached hereto as Exhibit 1 are true, correct and complete resolutions adopted by Seller's directors and shareholders authorizing the execution, delivery and performance of the Asset Purchase Agreement and the other agreements, documents and instruments contemplated by the Assert Purchase Agreement and the Sale Approval Order, and the consummation of the transactions contemplated by the Asset Purchase Agreement and the Sale Approval Order; and such resolutions have not been modified, amended, rescinded or revoked and are in full force and effect as of the date hereof.

[Signature Page Follows]

IN WITNESS WHEREOF, the undersigned has executed this certificate as of this _____ day of_____. 2017.


By: _____
    Name:
    Title:

**EXHIBIT 1**

**RESOLUTIONS ADOPTED BY SELLER'S DIRECTORS AND SHAREHOLDERS**

**See attached.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re*: <br><br> HERALD MEDIA HOLDINGS, INC., et al.[1], <br><br> Debtors | Chapter 11 <br><br> Case No. 17-_____ <br><br> Joint Administration Requested |

**ORDER (A) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (B) AUTHORIZING AND APPROVING THE DEBTORS' PERFORMANCE UNDER THE ASSET PURCHASE AGREEMENT; (C) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN OF THE DEBTORS' EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO; AND (D) GRANTING RELATED RELIEF**

This matter is before the Court on the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (the "Debtors") for the entry of an order pursuant to sections 105(a), 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended from time to time, the "Bankruptcy Rules"), and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedures of the Bankruptcy Court for the District of Delaware (the "Local Rules") (i)(a) approving and authorizing certain bidding procedures in connection with the sale of substantially all of the Debtors' assets (the "Bidding Procedures"); (b) approving and authorizing the Break-Up Fee and Expense Reimbursement; (c) scheduling the related auction and hearing to consider approval of sale; (d) approving procedures related to the assumption and assignment of

---

[1]     The Debtors in these Chapter 11 Cases and the last four digits of each Debtor's taxpayer identification number are as follows: Herald Media Holdings, Inc. (5048); Herald Media, Inc. (1468); Boston Herald, Inc. (5341) and Herald Interactive, Inc. (2359).  The Debtors' headquarters are located at 70 Fargo Street, Suite 600, Boston, MA  02210.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the APA (as defined below).

certain of the Debtors' executory contracts and unexpired leases; (e) approving the form and manner of notice thereof; and (f) granting related relief; and (ii)(a) authorizing the sale of such assets free and clear of liens, claims, encumbrances, and other interests, except as provided by the APA (defined below); (b) approving the assumption and assignment of certain of the Debtors' executory contracts and unexpired leases related thereto; and (c) granting related relief; the Court having entered an order approving the Bidding Procedures and granting certain related relief on _____ [Docket No. __] (the "Sale Procedures Order"); and an auction (the "Auction") having been held on _____ in accordance with the Sale Procedures Order; and _____ (the "Buyer") having been deemed the Successful Bidder (as defined in the Bidding Procedures) by the Debtor pursuant to the Sale Procedures Order; and the Court having conducted a hearing on the Motion on _____ (the "Sale Hearing") at which time all interested parties were offered an opportunity to be heard with respect to the Motion; and the Court having reviewed and considered the Motion, declarations and other evidence submitted in support thereof, the Asset Purchase Agreement, dated as of December 7, 2017 by and among the Debtors and the Buyer (as amended, supplemented or otherwise modified, together with all exhibits and annexes thereto, the "APA"),[3] the Sale Procedures Order, and the record of the hearing before the Court on _____; and having heard statements of counsel and the evidence presented in support of the relief requested in the Motion at the Sale Hearing; and due notice of the Motion, the Asset Purchase Agreement, the Sale Procedures Order and the Auction having been provided; and having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their stakeholders and all other parties in interest; and the Court having jurisdiction over this matter; and the legal and factual bases set forth in the Motion

---

[3]    A copy of the APA is attached hereto as Exhibit 1.

and at the Sale Hearing establishing just cause for the relief granted herein; and after due deliberation thereon,

THE COURT HEREBY FINDS AND DETERMINES THAT:

**I.    Jurisdiction, Final Order and Statutory Predicates**

A.    The Court has jurisdiction to hear and determine the Motion pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(a) and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated as of February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O). Venue is proper in this District and in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    This order (the "Sale Order") constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, and expressly directs entry of judgment as set forth herein.

C.    The statutory predicates for the relief requested in the Motion are sections 105(a), 363(b), (f), and (m), and 365 of the Bankruptcy Code and Bankruptcy Rules 2002(a)(2), 6004(a), (b), (c), (e), (f) and (h), 6006(a), (c) and (d), 9007 and 9014.

D.    The findings of fact and conclusions of law set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

E.    To the extent any of the following findings of fact constitute conclusions of law, they are hereby adopted as such. To the extent any of the following conclusions of law

3

constitute findings of fact, they are hereby adopted as such. Any findings of fact or conclusions

of law stated by the Court on the record at the Sale Hearing are hereby incorporated, to the extent

they are not inconsistent herewith.

        F.     The Buyer will be acting in good faith pursuant to section 363(m) of the

Bankruptcy Code in closing the transaction contemplated by the APA (the "<u>Sale</u>") at any time on

or after entry of this Sale Order.

## II.      Notice of the Sale, Auction and the Cure Amounts

        A.     Actual written notice of the Sale Hearing, the Auction, the Motion, the

Sale, the assumption, assignment and sale of the executory contracts and unexpired leases to be

assigned to the Buyer pursuant to APA (which are identified on <u>Exhibit 2</u> hereto; such executory

contracts and such unexpired leases (the "<u>Assumed Contracts</u>") provided a reasonable

opportunity to object or be heard with respect to the Motion and the relief requested therein has

been afforded to all known interested persons and entities, including, but not limited to the

following parties (the "<u>Notice Parties</u>"): (a) the Office of the United States Trustee for the

District of Delaware; (b) the Office of the United States Attorney for the District of Delaware;

(c) counsel to any statutory committee appointed in the above-captioned jointly administered

chapter 11 cases (together, the "<u>Chapter 11 Cases</u>"), (d) the Internal Revenue Service; (e)

counsel to the Debtors' prepetition and postpetition lenders, (f) counsel to the Lead Buyer; (g) all

persons known by the Debtors to have expressed an interest to the Debtors in a transaction with

respect to the Debtors' assets during the previous six months; (h) all entities known by the

Debtors that may have a lien, claim, encumbrance, or other interest in the Debtors' assets (for

which identifying information and addresses are available to the Debtors); (i) all non-Debtor

parties to the Assumed Contracts; (j) all of the Debtors' known creditors, (k) all Employees and

former employees and any others receiving benefits under any pension or Employee Benefit Plan; (l) the Pension Benefit Guaranty Corporation; (m) any governmental unit known to the Debtors to have a claim in these Chapter 11 Cases; (n) the Office of the Attorney General in each state in which the Debtors operate; (o) the Office of the Delaware Secretary of State; and (p) all parties that have requested notice in these Chapter 11 Cases under Bankruptcy Rule 2002.

B.    In accordance with the provisions of the Sale Procedures Order, the Debtors have served the Cure Notice and Supplemental Cure Notice (each as defined in the Sale Procedures Order) upon the Buyer and the Contract Counterparties: (i) that the Debtors seek to assume and assign the Assumed Contracts on the Closing Date; and (ii) of the relevant cure amounts. Pursuant to Bankruptcy Rule 6006(c), the Court finds that the service of such Cure Notice was good, sufficient and appropriate under the circumstances and no further notice need be given in respect of establishing a cure amount for the Assumed Contracts. Buyer and the Contract Counterparties have had an opportunity to object to the cure amounts set forth in the Cure Notice.

C.    The Debtors' Sale Notice (as defined in the Sale Procedures Order) provided all interested parties with timely and proper notice of the Sale, Sale Hearing and Auction.

D.    The Cure Notice provided Buyer and the Contract Counterparties with proper notice of the potential assumption and assignment of the Assumed Contracts and any cure amount relating thereto, and the procedures set forth therein with regard to any such cure amount to satisfy the provisions of section 365 of the Bankruptcy Code and Bankruptcy Rule 6006.

E.    As evidenced by the affidavits of service previously filed with the Court, proper, timely, adequate, and sufficient notice of the Motion, Auction, Sale Hearing, and Sale

has been provided in accordance with sections 102(1), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002,6004,6006 and 9014. The Debtors also have complied with all obligations to provide notice of the Auction, Sale Hearing, and Sale required by the Sale Procedures Order. The notices described in paragraphs A to E of this Section II were good, sufficient and appropriate under the circumstances, and no other or further notice of the Motion, Auction, Sale Hearing, Sale, or assumption, assignment and sale of the Assumed Contracts is required.

F.     The disclosures made by the Debtors concerning the Motion, APA, Auction, Sale, and Sale Hearing were good, complete and adequate.

## III.    Good Faith of Buyer

A.     The Buyer is not an "insider" of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.

B.     Buyer is purchasing the Purchased Assets in good faith and is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to the full protection of that provision, and otherwise has proceeded in good faith in all respects in connection with this proceeding in that, *inter alia*: (a) Buyer recognized that the Debtors were free to deal with any other party interested in acquiring the Purchased Assets following and pursuant to the terms of the Sale Procedures Order, the Bidding Procedures and the APA; (b) Buyer complied with all provisions in the Sale Procedures Order; (c) Buyer agreed to subject its bid to the competitive bidding procedures set forth in the Sale Procedures Order; (d) all payments to be made by the Buyer and other agreements or arrangements entered into by the Buyer in connection with the Sale have been disclosed; (e) Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction; (f) no common identity of directors or

controlling stockholders exists between the Buyer and any of the Debtors; (g) Buyer in no way

caused the chapter 11 filing by the Debtors; and (h) the negotiation and execution of the APA

and any other agreements or instruments related thereto were at arms' length and in good faith.

## IV.    Highest and Best Offer

A.    Prior to selecting Buyer as the stalking horse bidder, the Debtors solicited

offers to acquire the Purchased Assets from a wide variety of parties. In addition to such

solicitations, the Debtors also conducted the bid and auction process in accordance with the

provisions of the Sale Procedures Order and the Debtor has otherwise complied with the Sale

Procedures Order in all material respects. The bid and auction process conducted pursuant to the

Sale Procedures Order afforded a full, fair and reasonable opportunity for any person or entity to

make a higher or otherwise better offer to purchase the Purchased Assets. Such process was duly

noticed and conducted in a noncollusive, fair and good faith manner and a reasonable

opportunity has been given to any interested party to make a higher and better offer for the

Purchased Assets.

B.    The consideration provided by Buyer under the APA, including the

assumption of the Assumed Liabilities, constitutes the highest or best offer for the Purchased

Assets, and will provide a greater recovery for the Debtors' estate than would be provided by any

other available alternative. The Debtors' determination that the APA constitutes the highest and

best offer for the Purchased Assets constitutes a valid and sound exercise of the Debtors'

business judgment consistent with their fiduciary duties.

C.    The APA represents a fair and reasonable offer to purchase the Purchased

Assets under the circumstances of these Chapter 11 Cases. No other person or entity or group of

entities has offered to purchase the Purchased Assets for greater economic value to the Debtors' estate than the Buyer.

D.      Approval of the Motion and the APA and the consummation of the transactions contemplated thereby is in the best interests of the Debtors, their creditors, their estates and other parties in interest.

E.      The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the Sale prior to, and outside of, a plan of reorganization.

**V.      No Fraudulent Transfer; No Successor Liability**

A.      The APA was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia (including, without limitation, the Uniform Fraudulent Conveyance Act and the Uniform Fraudulent Transfer Act). The consideration provided by the Buyer pursuant to the APA is fair and adequate and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia (including, without limitation, the Uniform Fraudulent Conveyance Act and the Uniform Fraudulent Transfer Act).

B.      By virtue of the consummation of the Sale, (i) Buyer is not a continuation of the Debtors or their respective estates, there is no continuity between Buyer and the Debtors, there is no common identity between the Debtors and Buyer, there is no continuity of enterprise between the Debtors and Buyer, and Buyer is not a mere continuation of the Debtors or their estates, (ii) Buyer is not holding itself out to the public as a continuation of the Debtors or their respective estates and (iii) the Sale does not amount to a consolidation, merger or de facto

consolidation or merger of Buyer and the Debtors and/or the Debtors' estates. Accordingly, Buyer is not and shall not be deemed a successor to Debtors, for any purpose or under any theory, as a result of the consummation of the Sale contemplated by the APA.

        C.     The Debtors have been authorized, pursuant to sections 1113 and 1114 of the Bankruptcy Code, to reject all collective bargaining agreements and modify all retiree medical obligations (together, the "Labor and Legacy Obligations") to the extent necessary to comply with their obligations under the APA. The Labor and Legacy Obligations have been rejected and/or terminated to the extent required under the APA. The Buyer has purchased the Subject Assets free and clear of the Labor and Legacy Obligations and is not a successor with respect to the Labor and Legacy Obligations.

        D.     Notwithstanding the foregoing, no employee of the Debtors as of the Closing who becomes an employee of the Buyer immediately following the Closing may be considered to have experienced an employment loss for purposes of any statute or contract requiring prior notice and/or payment of severance benefits in the event of employment loss.

## VI.    Validity of Transfer

        A.     The Debtors and Buyer have full corporate power and authority to execute and deliver the APA and all other documents contemplated thereby, and no further consents or approvals are required for the Debtors or Buyer to consummate the transactions contemplated by the APA, except as otherwise set forth in the APA.

        B.     The Purchased Assets constitute property of the Debtors' estates and title thereto is presently vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code. The transfer of each of the Purchased Assets to the Buyer will be as of the Closing Date a legal, valid, and effective transfer of such assets, and vests or will vest the Buyer

with all right, title, and interest of the Debtors to the Purchased Assets free and clear of all (a) Liens, (b) claims, including, without limitation, all "claims" within the meaning of sections 101(5) and 102(2) of the Bankruptcy Code and all interests, encumbrances, rights of setoff, recoupment, netting and deductions ("Claims"), and (c) Liabilities, whether imposed by agreement, understanding, law, equity or otherwise and whether known or unknown, fixed or contingent or arising prior to or subsequent to the commencement of the Chapter 11 Cases (each of the foregoing described in clauses (a), (b) and (c) collectively or individually, the "Adverse Interests"), except for any Permitted Liens and Assumed Liabilities.

## VII.    Section 363(f) Is Satisfied

A. The Buyer would not have entered into the APA and would not consummate the transactions contemplated thereby (by paying the cash payment and the other payments contemplated by the APA and assuming the Assumed Liabilities) if the sale of the Purchased Assets to the Buyer, and the assumption, assignment and sale of the Assumed Contracts to the Buyer, were not, except as otherwise provided in the APA with respect to the Assumed Liabilities and Permitted Liens, free and clear of all Adverse Interests of any kind or nature whatsoever, or if the Buyer would, or in the future could be liable for any of such Adverse Interests, including, but not limited to, Adverse Interests in respect of the following: (1) all mortgages, deeds of trust and security interests; (2) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of any Debtor; (3) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil

Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Worker Adjustment and Retraining Act of 1988, (g) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (h) the Americans with Disabilities Act of 1990, (i) the Consolidated Omnibus Budget Reconciliation Act of 1985, (j) state discrimination laws, (k) state unemployment compensation laws or any other similar state laws, or (1) any other state or federal benefits or claims relating to any employment with any of the Debtors or any of their respective predecessors; (4) any bulk sales or similar law; (5) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; (6) any Environmental Law(s); and (7) any theories of successor or transferee liability.

B. The Debtors may sell the Purchased Assets free and clear of all Adverse Interests against the Debtors, their estates or any of the Purchased Assets (except for any Assumed Liabilities and Permitted Liens under the APA) because, in each case, one or more of the standards set forth in section 363(f)(l)-(5) of the Bankruptcy Code has been satisfied. Those holders of Adverse Interests against or in the Debtors, their estates or any of the Purchased Assets who did not object, or who withdrew their objections, to the Sale or the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of such Adverse Interests who did object fall within one or more of the other subsections of section 363(f) and are adequately protected by having their Adverse Interests, if any, in each instance against the Debtors, their estates or any of the Purchased Assets, attach to the net cash proceeds of the Sale ultimately attributable to the Purchased Assets in which such creditor or interest holder alleges an interest, in the same order of priority, with the same validity, force and

effect that such creditor or interest holder had prior to the Sale, subject to any claims and defenses the Debtors and their estates may possess with respect thereto.

## VIII.   Assumption and Assignment of the Assumed Contracts

A. The assumption and assignment of the Assumed Contracts pursuant to the terms of this Sale Order is integral to the APA and is in the best interests of the Debtors and their estates, creditors, interest holders and other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtors.

B.      The amount set forth on Exhibit 2 annexed hereto are the sole amounts necessary under sections 365(b)(1)(A) and (B) and 365(f)(2)(A) of the Bankruptcy Code to cure all monetary defaults and pay all actual pecuniary losses under the Assumed Contracts (the "Cure Amounts").

C.      Pursuant to the terms of the APA, Buyer and/or the Debtors have: (i) cured and/or provided adequate assurance of cure of any defaults existing prior to the Closing Date under any of the Assumed Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code; and (ii) provided compensation or adequate assurance of compensation to any party for actual pecuniary loss to such party resulting from a default prior to the Closing Date under any of the Assumed Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code, Buyer provided adequate assurance of its future performance under the relevant Assumed Contracts within the meaning of sections 365(b)(1)(C), 365(b)(3) (to the extent applicable) and 365(f)(2)(B) of the Bankruptcy Code.

D.      No default exists in the Debtors' performance under the Assumed Contracts as of the Closing Date other than the failure to pay Cure Amounts or defaults that are not required to be cured as contemplated in section 365(b)(1)(A) of the Bankruptcy Code.

**IX. Compelling Circumstances for an Immediate Sale**

A. To maximize the value of the Debtors' assets, it is essential that the Sale of the Purchased Assets occur within the time constraints set forth in the APA. The consummation of the Sale is necessary both to preserve and maximize the value of the Debtors' assets for the benefit of the Debtors, their estates, their creditors, interest holders and all other parties in interest in the Chapter 11 Cases, and to provide the means for the Debtors to maximize creditor recoveries.

B. The consummation of the transaction is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b) and 365(f), and all of the applicable requirements of such sections have been complied with in respect of the transaction.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

**General Provisions**

1.      The relief requested in the Motion is granted and approved, and the Sale contemplated thereby and by the APA is approved as set forth in this Sale Order.

2.      This Court's findings of fact and conclusions of law, set forth in the Sale Procedures Order, are incorporated herein by reference.

3.      All objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court, and all reservations of rights included therein, are hereby overruled on the merits or the interests of such objections have been otherwise satisfied or adequately provided for.

**Approval of the APA**

4.      The APA and all other ancillary documents, and all of the terms and conditions thereof, are hereby approved as set forth herein.

5.      Pursuant to section 363(b) of the Bankruptcy Code, the Debtors are authorized and empowered to take any and all actions necessary or appropriate to (i) consummate the Sale of each of the Purchased Assets to the Buyer pursuant to and in accordance with the terms and conditions of the APA, (ii) close the Sale as contemplated in the APA and this Sale Order, and (iii) execute and deliver, perform under, consummate, implement and close fully the APA, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the APA and the Sale, including the Escrow Agreement and any other ancillary documents, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the APA and such other ancillary documents.

6.      This Sale Order shall be binding in all respects upon the Debtors, including the Debtors' estates, all holders of equity interests in any Debtor, all holders of any Claim(s) (whether known or unknown) against any Debtor, any holders of Adverse Interests against or on all or any portion of the Purchased Assets, all Contract Counterparties, the Buyer and all successors and assigns of the Buyer, the Purchased Assets and any trustees, if any, subsequently appointed in any of the Debtors' Chapter 11 Cases or upon a conversion to chapter 7 under the Bankruptcy Code of any of the Debtors' Chapter 11 Cases. This Sale Order and the APA shall inure to the benefit of the Debtors, their estates, their creditors, the Buyer and their respective successors and assigns.

7.      Any amounts payable by the Debtors under the APA or any of the documents delivered by the Debtors in connection with the APA, including without limitation, any allowed

claims for breach thereof and the purchase price adjustment amount, if any, shall be paid in the manner provided in the APA without further order of the Bankruptcy Court, shall be an allowed administrative claim in an amount equal to such payments in accordance with sections 503(b) and 507(a)(2) of the Bankruptcy Code with priority over any and all administrative expense claims other than (x) superpriority claims granted pursuant to the DIP Financing Order to the provider of debtor-in-possession financing and (y) administrative expense claims included within the "Carve- Out" in the DIP Financing Order to which the DIP Lender's claims are subject, and such claims shall not be discharged, modified or otherwise affected by any reorganization plan for the Debtors, except by written agreement with the Buyer or its successors or assigns (such agreement to be provided in the Buyer's or its successors' or assigns' respective sole discretion).

**Transfer of the Purchased Assets**

8.      Pursuant to sections 105(a), 363(b), 363(f), 365(b) and 365(f) of the Bankruptcy Code, the Debtors are authorized to transfer the Purchased Assets on the Closing Date. Such Purchased Assets shall be transferred to the Buyer upon and as of the Closing Date and such transfer shall constitute a legal, valid, binding and effective transfer of such Purchased Assets and shall be free and clear of all Adverse Interests, except Assumed Liabilities and Permitted Liens under the APA. Upon the Closing, the Buyer shall take title to and possession of the Purchased Assets subject only to the Assumed Liabilities and Permitted Liens. Pursuant to section 363(f) of the Bankruptcy Code, the transfer of title to the Purchased Assets and the Assumed Contracts shall, except for Assumed Liabilities and Permitted Liens, be free and clear of all Adverse Interests; including, without limitation, any and all claims relating to the Debtors' pension plans, severance obligations, employee benefit plans, and other employee related liabilities of the Debtors, based on any theory, including without limitations any successor or

successor-in-interest liability theory. Adverse Interests shall attach solely to the net cash proceeds of the Sale with the same validity, priority, force and effect that they now have as against the Purchased Assets, subject to any claims and defenses the Debtors and their estates may possess with respect thereto. On the Closing Date, contemporaneously with the transfer of the Purchased Assets to the Buyer, the Debtors will cause the indefeasible payment in full of all obligations due and owing to the DIP Lender under the DIP Financing Order from the proceeds of the Sale.

9.      Except as expressly provided by the APA with respect to Assumed Liabilities and Permitted Liens, all persons and entities holding Adverse Interests in all or any portion of the Purchased Assets arising under or out of, in connection with, or in any way relating to the Debtors, the Purchased Assets, the operation of the Debtors' business prior to the Closing Date or the transfer of the Purchased Assets to the Buyer, hereby are forever barred, estopped and permanently enjoined from asserting against the Buyer or its successors or assigns, their property or the Purchased Assets, such persons' or entities' Adverse Interests in and to the Purchased Assets. On the Closing Date, each creditor (and, the Buyer, on behalf of each creditor) is authorized to execute such documents and take all other actions as may be deemed by the Buyer to be necessary or desirable to release Liens or Claims on the Purchased Assets, if any, as provided for herein, as such Liens or Claims may have been recorded or may otherwise exist.

10.     All persons and entities that are in possession of some or all of the Purchased Assets on the Closing Date are directed to surrender possession of such Purchased Assets to the Buyer or its assignee as of the Closing Date.

16

11.    A certified copy of this Sale Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel any of applicable Adverse Interests and encumbrances of record.

12.    If any person or entity which has filed statements or other documents or agreements evidencing Adverse Interests in, all or any portion of the Purchased Assets shall not have delivered to the Debtors prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary or desirable to the Buyer for the purpose of documenting the release of all Adverse Interests (other than Assumed Liabilities or Permitted Liens), which the person or entity has or may assert with respect to all or any portion of the Purchased Assets, the Buyer and the Debtors are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Purchased Assets.

13.    This Sale Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA.

**Assumed and Rejected Contracts**

14.     Upon the Closing of the Sale, the Debtors are authorized and directed to reject all of the Rejected Contracts (including but not limited to any collective bargaining agreements and required modifications of retiree benefits plans, to the extent permitted by prior order of the Court) and assume and assign the Assumed Contracts to the Buyer free and clear of all Adverse Interests, as described herein. The payment of the applicable Cure Amounts (if any) by the Buyer or Debtors, as applicable and as required by the APA shall (a) effect a cure of all defaults existing thereunder as of the Closing Date, (b) compensate for any actual pecuniary loss to such non-Debtor party resulting from such default, and (c) together with the assignment by the Debtors to and the assumption of the Assumed Contracts by the Buyer, constitute adequate assurance of future performance thereof. The Debtors shall then have assumed the Assumed Contracts and shall have assigned the Assumed Contracts to Buyer. Pursuant to section 365(f) of the Bankruptcy Code, the assignment by the Debtors of the Assumed Contracts shall not be a default thereunder. After the payment of the relevant Cure Amounts by the Buyer or Debtors, as applicable and as required by the Asset Purchase Agreement, neither the Debtors nor the Buyer shall have any further liabilities to the Contract Counterparties other than the Buyer's obligations under the Assumed Contracts that accrue and become due and payable on or after the Closing Date.

15.     Any provisions in any Assumed Contract that prohibits or conditions the assignment of such Assumed Contract or allows the party to such Assumed Contract to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term

or condition upon the assignment of such Assumed Contract, constitute unenforceable anti-assignment provisions that are void and of no force and effect. All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Buyer of the Assumed Contracts have been satisfied. Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested with all right, title and interest of the Debtors under the Assumed Contracts.

16.     Upon the Closing and the payment of the relevant Cure Amounts, if any, the Buyer shall be deemed to be substituted for the Debtors as a party to the applicable Assumed Contracts and the Debtors shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability under the Assumed Contracts.

17.     Upon the payment of the applicable Cure Amount, if any, the Assumed Contracts will remain in full force and effect, and no default shall exist under the Assumed Contracts nor shall there exist any event or condition which, with the passage of time or giving of notice, or both, would constitute such a default.

18.     There shall be no rent accelerations, assignment fees, increases (including advertising rates) or any other fees charged to Buyer or the Debtors as a result of the assumption and assignment of the Assumed Contracts.

19.     Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, all Contract Counterparties are forever barred and permanently enjoined from raising or asserting against Buyer any assignment fee, default, breach or claim or pecuniary loss, or condition to assignment, arising under or related to the Assumed Contracts existing as of the Closing Date or arising by reason of the Closing.

**Other Provisions**

20.    Effective upon the Closing Date and except as otherwise provided by stipulations filed with or announced to the Court with respect to a specific matter or as set forth in the APA with respect to Permitted Liens and Assumed Liabilities, all persons and entities are forever prohibited and permanently enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against the Buyer, its successors and assigns, or the Purchased Assets, with respect to any (a) Adverse Interests arising under, out of, in connection with or in any way relating to the Debtors, the Buyer, the Purchased Assets, or the operation of the Purchased Assets prior to the Closing of the Sale, or (b) successor liability, including, without limitation, the following actions: (i) commencing or continuing in any manner any action or other proceeding against the Buyer, its successors or assigns, assets or properties; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Buyer, its successors or assigns, assets or properties; (iii) creating, perfecting or enforcing any Adverse Interests against the Buyer, its successors or assigns, assets or properties; (iv) asserting any setoff, right of subrogation or recoupment of any kind against any obligation due the Buyer or its successors or assigns; (v) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Sale Order or other orders of the Court, or the agreements or actions contemplated or taken in respect thereof; or (vi) revoking, terminating or failing or refusing to renew any license, permit or authorization to operate any of the Purchased Assets or conduct any of the businesses operated with the Purchased Assets.

21.    Except for the Assumed Liabilities, Permitted Liens or as otherwise expressly set forth in the APA, the Buyer shall not have any liability or other obligation of the Debtors arising under or related to any of the Purchased Assets or the APA or the transactions related thereto. Without limiting the generality of the foregoing, and except for the Assumed Liabilities or Permitted Liens provided in the APA, the Buyer shall not be liable for any Claims or any other Adverse Interests against the Debtors or any of its predecessors or affiliates, and the Buyer shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor or transferee liability, labor law, *de facto* merger or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of any of the Purchased Assets prior to the Closing. The Buyer has given substantial consideration under the APA for the benefit of the holders of any Adverse Interests. The consideration given by the Buyer shall constitute valid and valuable consideration for the releases of any potential claims of successor liability of the Buyer, which releases shall be deemed to have been given in favor of the Buyer by all holders of Adverse Interests against or interests in the Debtors or any of the Purchased Assets.

22.    The transactions contemplated by the APA are undertaken by the Buyer without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including the assumption and assignment of the Assumed Contracts), unless such authorization and such Sale are duly stayed

pending such appeal. The Buyer is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

23.     Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in (i) these Chapter 11 Cases, (ii) any subsequent chapter 7 case into which any such Chapter 11 Case may be converted, or (iii) any related proceeding subsequent to entry of this Sale Order, shall conflict with or derogate from the provisions of the APA or the terms of this Sale Order.

24.     As provided in the APA, this Sale Order approves and provides for the transfer to Buyer of all Purchased Avoidance Actions (whether under chapter 5 of the Bankruptcy Code or otherwise) of the Debtors' estates.

25.     Within one (1) Business Day of the occurrence of the Closing of the Sale, the Debtors shall file and serve a notice of same, substantially in the form attached hereto as Exhibit 3 (the "Notice of Sale Closing and Effective Date of Amendment of Case Caption"). Upon the filing of the Notice of Sale Closing and Effective Date of Amendment of Case Caption, the Debtors' case caption shall be amended to be in the form as set forth on such notice.

26.     No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale.

27.     The failure specifically to include any particular provision of the APA in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA be authorized and approved in its entirety.

28.     The APA and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court.

29.     The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order and the APA, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are a party, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale.

30.     Notwithstanding the possible applicability of Bankruptcy Rules 6004, 6006, 7062, 9014 or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable.

31.     All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

32.     To the extent that this Sale Order is inconsistent with any prior order or pleading with respect to the Motion in these Chapter 11 Cases, the terms of this Sale Order shall govern.

Dated: _____
Wilmington, Delaware

_____
United States Bankruptcy Judge

**<u>EXHIBIT 1</u>**

**APA**

## **EXHIBIT 2**

**Cure Amounts**

(To be attached)

## **EXHIBIT 3**

**Notice of Sale Closing and Effective Date of Amendment of Case Caption**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| *In re*: | Chapter 11 |
| HERALD MEDIA HOLDINGS, INC., et al.[1], | |
| Debtors | Case No. 17-_____ |
| | Joint Administration Requested |

## NOTICE OF SALE CLOSING AND EFFECTIVE DATE
## OF AMENDMENT OF CASE CAPTION

**PLEASE TAKE NOTICE** that, on _____, the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") entered the *Order (A) Authorizing the Sale of Substantially All of the Debtors ' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests; (B) Authorizing and Approving the Debtors ' Performance Under the Asset Purchase Agreement; (C) Approving the Assumption and Assignment of Certain of the Debtors ' Executory Contracts and Unexpired Leases Related Thereto; and (D) Granting Related Relief* [Docket No.] (the "Sale Order"),[2] which approved the sale (the "Sale") of substantially all of the assets of the above-captioned debtors and debtors-in-possession (the "Debtors") to _____ (together with its permitted designees, successors and permitted assigns in accordance with the Asset Purchase Agreement, the "Buyer").

PLEASE **TAKE FURTHER NOTICE** that the Sale Order provided that, upon the Closing of the Sale of the Debtors' assets to the Buyer and the filing of this notice with the Bankruptcy Court, the caption for the Debtors' chapter 11 cases shall be amended as set forth below.

PLEASE **TAKE FURTHER NOTICE** that, on _____, the Closing occurred.

PLEASE **TAKE FURTHER NOTICE** that, pursuant to the Sale Order, the case captions in each of the Debtors' jointly administered chapter 11 cases are amended as follows:

---

[1]    The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Herald Media Holdings, Inc. (5048); Herald Media, Inc. (1468); Boston Herald, Inc. (5341) and Herald Interactive, Inc. (2359).  The Debtors' headquarters are located at 70 Fargo Street, Suite 600, Boston, MA  02210.

[2]    Unless otherwise stated, all capitalized terms not defined herein shall have the meaning set forth in the Sale Order.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT DELAWARE

_____
                                                    )
In re                                               )          Chapter 11
                                                    )
_____, et. al.,[1]                  )          Case No. _____
                                                    )
                    Debtors.                        )          (Jointly Administered)
                                                    )
_____)


*[Rest of Page Intentionally Left Blank]*

---

[1]    The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Herald Media Holdings, Inc. (5048); Herald Media, Inc. (1468); Boston Herald, Inc. (5341) and Herald Interactive, Inc. (2359).  The Debtors' headquarters are located at 70 Fargo Street, Suite 600, Boston, MA  02210.

2

Dated: December __, 2017
   Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

Curtis S. Miller (No. 4583)
Tamara K. Minott (No. 5643)
Jose F. Bibiloni (No. 6261)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
cmiller@mnat.com
tminott@mnat.com
jbibiloni@mnat.com

and

**BROWN RUDNICK LLP**
William R. Baldiga (*pro hac vice* pending)
Sunni P. Beville (*pro hac vice* pending)
Tristan G. Axelrod (*pro hac vice* pending)
One Financial Center
Boston, Massachusetts 02111
(617) 856-8200
wbaldiga@brownrudnick.com
sbeville@brownrudnick.com
taxelrod@brownrudnick.com

*Proposed Co-Counsel to the Debtors*

## EXHIBIT F

**FORM OF ASSIGNMENT AND ASSUMPTION OF LEASE AGREEMENTS**

This **ASSIGNMENT AND ASSUMPTION OF LEASE AGREEMENTS** (this "Assignment") is made as of the [ ● ] [ ● ], 2017, by and between Herald Media, Inc. ("Assignor") and GateHouse Media Massachusetts I, Inc. ("Assignee"). All capitalized terms used herein but not otherwise defined shall have the respective meanings ascribed to them in the Purchase Agreement (as defined below).

**WHEREAS**, Assignor entered into those certain lease agreements as more particularly described on Exhibit A attached hereto and made a part hereof (collectively referred to herein as the "**Leases**");

**WHEREAS**, Assignor and Assignee entered into that certain Asset Purchase Agreement, dated December 7, 2017 (the "**Purchase Agreement**"), pursuant to which Assignee will purchase Assignor's publishing business, which business includes the preparation, publication, sale and distribution of each of the Publications (as defined therein) and other business ventures related thereto; and

**WHEREAS**, in connection with the Purchase Agreement, Assignor desires to assign and transfer to Assignee all of Assignor's right, title and interest in and to the Leases and Assignee desires to accept said assignment and assume the obligations of Assignor under said Leases upon the terms, covenants and conditions set forth in this Assignment.

**NOW, THEREFORE,** in consideration of the covenants and agreements contained in this Assignment and other good and valuable consideration, and intending to be legally bound, Assignor and Assignee agree as follows:

1.     Assignment.  Assignor assigns, transfers and sets over unto Assignee, on an "as, is, where is" basis, with all faults, and, except as otherwise set forth herein or in the Purchase Agreement, without recourse, all of Assignor's right, title and interest in and to the Leases.

2.     Assumption.  Assignee hereby accepts said assignment and assumes all agreements, covenants, liabilities, obligations and duties on the part of the "Tenant" under the Leases arising on or after the Effective Date.

3.     Leases.

A true and correct description of the Leases, and all modifications, amendments, renewals and extensions thereto are attached hereto as Exhibit A.

4.     Counterparts.  This Assignment may be executed in two or more counterparts, each of which shall be deemed and original, but all of which taken together shall constitute one and the same instrument.  Delivery of an executed signature page of this Assignment by facsimile or other customary means of electronic submission (e.g., .pdf) shall be deemed binding for all purposes hereof, without delivery of an original signature page being thereafter required.

5.      <u>Binding Effect</u>.  This Assignment shall inure to the benefit of, and be binding upon, each of the parties hereto and their respective successors and assigns.

6.      <u>Governing Law</u>.   This Assignment shall be governed by and construed in accordance with the Laws of the State of Delaware without regard to the Law of the conflicts of Law of such State. THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO (i) THE INTERPRETATION AND ENFORCEMENT OF THIS ASSIGNMENT OR ANY ANCILLARY DOCUMENT EXECUTED PURSUANT HERETO; AND/OR (ii) THE PURCHASED ASSETS AND/OR ASSUMED LIABILITIES, AND THE PARTIES EXPRESSLY CONSENT TO AND AGREE NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION.

7.      <u>Entire Agreement</u>.   This Assignment contains the final and entire agreement among the parties with respect to the subject matter hereof and are intended to be an integration of all prior negotiations and understandings. No change, amendment or modification to this Assignment shall be valid unless the same is in writing and signed by the parties to this Assignment.

*[Signatures on the next page]*

**IN WITNESS WHEREOF**, Assignor and Assignee have executed this Assignment and Assumption of Lease Agreements on the day and year first above written.

<u>**Assignor**</u>:

Herald Media, Inc.

By: _____

Name: _____

Title: _____

<u>**Assignee**</u>:

GateHouse Media Massachusetts I, Inc.

By: _____

Name: _____

Title: _____

**EXHIBIT A**

**DESCRIPTION OF THE LEASES**

Tenant:        Herald Media, Inc.

Landlord:      RP Beal One Owner, LLC

Premises:      70 Fargo Street, South Boston, MA

An area of approximately 25,408 rentable square feet on the fifth (5th) floor of the building and an area of approximately 25,346 rentable square feet on the sixth (6th) floor of the building.

**EXHIBIT G**

**FORM OF OFFICER'S CERTIFICATE OF
BUYER**

Reference is hereby made to that certain Asset Purchase Agreement, dated as of November ____, 2017 (the "Asset Purchase Agreement"), by and among GATEHOUSE MEDIA MASSACHUSETTS I, INC. ("Buyer"), and BOSTON HERALD, INC., HERALD INTERACTIVE INC., HERALD MEDIA, INC., and HERALD MEDIA HOLDINGS, INC. (each, individually, a "Seller", and, collectively, "Sellers") and the order of the United States Bankruptcy Court for the _____, entered on _____, 2017 ("Sale Approval Order") in the jointly-administered cases for the Sellers under the caption _____, Case No. _____ (____). Capitalized terms used below but not defined herein shall have the meanings ascribed to them in the Asset Purchase Agreement and the Sale Approval Order if not otherwise defined in the Asset Purchase Agreement.

This certificate is being delivered to Seller pursuant to Section 4.3.4 of the Asset Purchase Agreement. The undersigned, in his capacity as a [_____] of [_____ _____], a Buyer, hereby certifies as follows:

4.      All conditions precedent contained in Section 5.2 of the Asset Purchase Agreement have been satisfied.

5.      [      ], a Buyer, is not a foreign person (as defined in the Internal Revenue Code) for purposes of Section 1445 of the Internal Revenue Code.

6.      Attached hereto as Exhibit 1 are true, correct and complete resolutions adopted by Buyer's directors and shareholders authorizing the execution, delivery and performance of the Asset Purchase Agreement and the other agreements, documents and instruments contemplated by the Assert Purchase Agreement and the Sale Approval Order, and the consummation of the transactions contemplated by the Asset Purchase Agreement and the Sale Approval Order; and such resolutions have not been modified, amended, rescinded or revoked and are in full force and effect as of the date hereof.

[Signature Page Follows]

IN WITNESS WHEREOF, the undersigned has executed this certificate as of this ____ day of_____. 2017.


By: _____
    Name:
    Title:

**EXHIBIT H**

**ORDER APPROVING BID PROCEDURES**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re*: | Chapter 11 |
| HERALD MEDIA HOLDINGS, INC., *et al*., | Case No. 17-_____ (___) |
| Debtors.[1] | Joint Administration Requested |
| | RE D.I. ____ |

**ORDER GRANTING MOTION OF THE DEBTORS AND DEBTORS IN POSSESSION
PURSUANT TO SECTIONS 105(a), 363 AND 365 OF THE BANKRUPTCY CODE FOR
AN ORDER (A) APPROVING AND AUTHORIZING BIDDING PROCEDURES IN
CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL THE ASSETS,
(B) APPROVING AND AUTHORIZING THE BID PROTECTIONS; (C) SCHEDULING
THE RELATED AUCTION AND HEARING TO CONSIDER APPROVAL OF THE
SALE; (D) APPROVING PROCEDURES RELATED TO THE
ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES; (E) APPROVING THE FORM
AND MANNER OF NOTICE THEREOF; AND (F) GRANTING RELATED RELIEF**

This matter coming before the Court on the motion (the "Motion")[2] of the
above-captioned debtors and debtors in possession (each a "Debtor", and collectively, the
"Debtors") for the entry of an order pursuant to sections 105(a), 363 and 365 of title 11 of the
United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007 and 9014 of the
Federal Rules of Bankruptcy Procedure (as amended from time to time, the "Bankruptcy
Rules"), and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedures of the

---

[1]     The Debtors in these Chapter 11 Cases and the last four digits of each Debtor's taxpayer identification
number are as follows: Herald Media Holdings, Inc. (5048); Herald Media, Inc. (1468); Boston Herald,
Inc. (5341) and Herald Interactive, Inc. (2359).  The Debtors' headquarters are located at 70 Fargo
Street, Suite 600, Boston, MA  02210.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in
the Motion or Asset Purchase Agreement, as appropriate.

Bankruptcy Court for the District of Delaware (the "Local Rules") (i)(a) approving and authorizing certain bidding procedures in connection with the sale (the "Sale") of substantially all of the Debtors' assets (as attached hereto as **Exhibit 1**, the "Bidding Procedures"); (b) approving and authorizing the Break-Up Fee and Expense Reimbursement (collectively, the "Bid Protections"); (c) scheduling the related auction and hearing to consider approval of sale; (d) approving procedures related to the assumption and assignment of certain of the Debtors' executory contracts and unexpired leases; (e) approving the form and manner of notice thereof; and (f) granting related relief (collectively, the "Bidding Procedures Relief"); and (ii)(a) authorizing the sale of such assets free and clear of liens, claims, encumbrances, and other interests, except as provided by the Stalking Horse APA (as defined below); (b) approving the assumption and assignment of certain of the Debtors' executory contracts (each, an "Executory Contract") and unexpired leases (each, an "Unexpired Lease") related thereto (any such Executory Contract or Unexpired Lease designated by the Purchaser to be assumed and assigned pursuant to the Sale (as defined below) an "Assumed Contract," and collectively, the "Assumed Contracts"); and (c) granting related relief; the Court having reviewed the Motion and the Court having found that (i) the Court has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012; (ii) venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409; (iii) this is a core proceeding pursuant to 28 U.S.C. § 157(b); (iv) notice of the Motion was sufficient under the circumstances and complied with all applicable requirements of the Bankruptcy Code, Bankruptcy Rules, and Local Rules; and after due deliberation the Court having determined that

the relief requested in the Motion is in the best interests of the Debtors, their estates and their creditors; and good and sufficient cause having been shown;

**AND IT IS FURTHER FOUND AND DETERMINED THAT:**

A.      The Debtors have demonstrated good and sufficient reasons for, and the best interests of their estates, creditors, and other parties in interest will be served by, this Court granting, to the extent provided herein, the relief requested in the Motion relating to the bidding process, including approval of (1) the Bidding Procedures, (2) the Bid Protections provided for in the asset purchase agreement, by and between the Debtors and Gatehouse Media Massachusetts I, Inc. (the "Stalking Horse Bidder"), dated as of December 7, 2017 (including all exhibits, schedules and ancillary agreements related thereto, and as may be amended, supplemented or modified pursuant to its terms, the "Stalking Horse APA"), which contemplates the Sale of the Purchased Assets to the Stalking Horse Bidder, (3) the procedures described below for the determination of the amounts necessary to cure defaults under the Assumed Contracts so as to permit the assumption and assignment under section 365 of the Bankruptcy Code of the Assumed Contracts that may be assumed and assigned to the Stalking Horse Bidder, and (4) the forms of the Sale Notice and Cure Notice attached to the Motion as **Exhibit D** and **Exhibit E**, respectively.

B.      The Stalking Horse APA and its terms were negotiated by the Debtors and the Stalking Horse Bidder in good faith and at arms-length.

C.      The Debtors have demonstrated good and sufficient reasons for, and the best interests of their estates will be served by, this Court scheduling a Sale Hearing to consider granting the other relief requested in the Motion, including approval of the Sale and the transfer of the Purchased Assets to the Successful Bidder (as defined in the Bidding Procedures) free and

clear of all liens, claims, encumbrances and other interests pursuant to section 363(f) of the Bankruptcy Code.

      D.      The Bid Protections as set forth in Section 9.4.1 of the Stalking Horse APA required to be paid under the circumstances described therein to the Stalking Horse Bidder are: (1) an actual and necessary cost of preserving the Debtors' estates within the meaning of sections 503(b) and 507(a) of the Bankruptcy Code; (2) commensurate to the real and substantial benefits conferred upon the Debtors' estates by the Stalking Horse Bidder; (3) reasonable and appropriate in light of the size and nature of the proposed Sale and comparable transactions, the commitments that have been made, the condition of the Purchased Assets, and the efforts that have been and will be expended by the Stalking Horse Bidder; and (4) a condition to and necessary to induce the Stalking Horse Bidder to continue to pursue the Sale and to continue to be bound by the Stalking Horse APA.

      E.      Unless it is assured that the Bid Protections will be available, the Stalking Horse Bidder is unwilling to remain obligated to consummate the Sale or otherwise be bound under the Stalking Horse APA (including the obligations to maintain its committed offer while such offer is subject to higher or otherwise better offers as contemplated by the Bidding Procedures). The Bid Protections induced the Stalking Horse Bidder to submit a bid that will serve as a minimum or floor bid for the Purchased Assets on which the Debtors, their creditors and other bidders can rely, and which encourages and facilitates the Auction process. The Stalking Horse Bidder has thus provided a material benefit to the Debtors and their creditors by increasing the likelihood that the best possible purchase price for the Purchased Assets will be realized. Accordingly, the Bid Protections are reasonable and appropriate and represent the best method for maximizing value for the benefit of the Debtors' estates.

F.     The Bidding Procedures are fair, reasonable, and appropriate and are designed to maximize the recovery from the Sale of the Purchased Assets.

G.     The process for submitting Qualified Bids is fair, reasonable, and appropriate and is designed to maximize recoveries for the benefit of the Debtors' estates, creditors, and parties in interest.

H.     The Sale Notice and Cure Notice (each as defined below) are appropriate and reasonably calculated to provide all interested parties with timely and proper notice of this Order, the Bidding Procedures, the Sale, the Sale Hearing, and any and all objection deadlines related thereto, including with respect to cure amounts and the assumption and assignment of Executory Contracts and Unexpired Leases, and no other or further notice is required of the foregoing.

I.     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

J.     The entry of this Order (the "Sale Procedures Order") is in the best interests of the Debtors, their estates, their creditors, and other parties-in-interest.

IT IS HEREBY ORDERED THAT:

1.     The Bidding Procedures Relief is GRANTED as set forth herein.

2.     All objections to the relief requested in the Motion that have not been withdrawn, waived or settled are overruled on the merits.

3.     The Bidding Procedures attached hereto as **Exhibit 1** are APPROVED and shall govern all bids and bid proceedings relating to the sale of the Purchased Assets.

4.     The Debtors may proceed with the Sale in accordance with the Bidding Procedures and are authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures (subject to the terms thereof) in accordance with the following timeline:

| Proposed Sale Timeline | |
|---|---|
| Deadline to Serve Sale Notice and Cure Notice | January 10, 2018<br><br>(two (2) Business Days after entry of the Sale Procedures Order)[3] |
| Cure Objection Deadline and Assignment Objection Deadline | January 22, 2018<br><br>(ten (10) days after service of Cure Notice) |
| Sale Objection Deadline | February 2, 2018<br><br>(twenty-five (25) Business Days after entry of Sale Procedures Order) |
| Bid Deadline | February 6, 2018, 5:00 p.m. (prevailing Eastern time)<br><br>(two (2) Business Days prior to the Auction) |
| Deadline to Notify Qualified Bidders | February 7, 2018<br><br>(twenty-four (24) hours prior to Auction) |
| Auction | February 8, 2018<br><br>(within thirty to forty (30 to 40) days after entry of Sale Procedures Order) |
| Notice of Successful Bidder | February 9, 2018<br><br>(one (1) Business Days after Auction) |
| Sale Reply Deadline | February 10, 2018 |

---

[3]     As used herein, "Business Day" means any day other than Saturday, Sunday, or other day on which commercial banks in the City of Boston are authorized or required by law to remain closed.

| | (two (2) days prior to Sale Hearing) |
|---|---|
| Sale Hearing | February 12, 2018 |
| | (no later than six (6) Business Days after Bid Deadline) |
| Sale Closing | On or before March 28, 2018 |

5.      The Bid Protections are APPROVED and the Debtors are required, subject to paragraph 6 below, to pay the Bid Protections when and as set forth in the Stalking Horse APA as administrative claims of the estate, which Bid Protections shall survive termination of the Stalking Horse APA and shall be binding and enforceable against each Debtor and its respective estates, any trustee, examiner or other representative of the Debtors' estates.  The Debtors shall comply with the Bidding Procedures and Bid Protections approved hereby and as set forth in the Stalking Horse APA and, until the termination thereof, such other covenants and obligations set forth therein.  The Bid Protections will constitute, pursuant to section 503 of the Bankruptcy Code, a superpriority administrative expense claim in each of the Debtors' bankruptcy estates with priority over any and all administrative expense claims other than superpriority claims granted pursuant to any order approving debtor-in-possession financing (a "DIP Financing Order") to the provider of debtor-in-possession financing (the "DIP Lender").  Any Bid Protections payable pursuant to the terms of the Stalking Horse APA shall be payable without any further order of the Bankruptcy Court.

6.      For the avoidance of doubt, if the Stalking Horse Bidder is entitled to the Expense Reimbursement, (i) such Expense Reimbursement shall be limited to reasonable, actual, and documented out-of-pocket fees and expenses not to exceed $100,000.00, and (ii) the Stalking Horse Bidder shall submit an invoice (the "Invoice") to the Debtors, the U.S. Trustee, and, if applicable, the statutory committee appointed in these cases (the "Committee") evidencing such

fees and expenses, which Invoice may be redacted for privileged information.  If either the Debtors, the Committee, or the U.S. Trustee (together with the Stalking Horse Bidder, the "Service Parties") objects for any reason to the payment of all or any portion of the Expense Reimbursement, such party must file and serve an objection so as to be received by the other Service Parties no later than ten (10) days after the submission of the Invoice.  If no party objects to the Expense Reimbursement within such ten-day period, it shall be payable as provided for pursuant to the terms of the Stalking Horse APA.  Any portion of the Expense Reimbursement that is the subject of an objection will not be payable unless consensually resolved by the parties or determined by the Court, and any portion of the Expense Reimbursement that is not subject to an objection shall be paid ten (10) days after submission of the invoice.

7.      Only holders of allowed valid secured claims are permitted to submit a credit bid at the Auction.  To that end, unless expressly consented to in writing by the Debtors after consultation with the Committee in advance of the Bid Deadline, no party shall be permitted or entitled to credit bid, or attempt to credit bid, any alleged obligation of the Debtors, or any affiliate or subsidiary of the Debtors, relating to (i) any alleged fees and/or penalties, (ii) alleged damages, including damages relating to or arising in connection with any prepetition activity of the Debtors, or (iii) any other claim (as that term is defined in the Bankruptcy Code) that the Debtors assert constitutes, or will constitute at some point, a contingent, unliquidated or disputed claim against the Debtors or any subsidiaries or affiliates of the Debtors.  Furthermore, any credit bid must provide for (w) payment in cash at the closing of the Break-Up Fee and/or Expense Reimbursement to the extent the Break-Up Fee and/or Expense Reimbursement is required to be paid, (x) payment in cash at closing, and/or the assumption of, unpaid administrative expense claims of the Debtors incurred from the Petition Date through and including the date on which

the closing of the Sale occurs, (y) payment in cash at the closing of the amount required to be paid by the Debtors, if any, on account of cure accounts that the Debtors believe must be paid to cure all defaults under the leases and contracts proposed to be assumed and assigned to the party that submitted the credit bid and (z) payment in cash at closing of all claims that are senior to the claims of the party that submitted the credit bid.  Notwithstanding anything to the contrary in this Sale Procedures Order or the Bidding Procedures, the Debtors' rights to contest the propriety of any credit bid pursuant to sections 363(k) and 105 of the Bankruptcy Code are expressly reserved.

8.      The Debtors shall have the exclusive right, in consultation with their advisors and the Committee, to determine whether a bid is a Qualified Bid and shall notify Potential Bidders, and the Service Parties whether any bids have been recognized as such no later than twenty-four (24) hours prior to the Auction; provided, however, that the Stalking Horse Bidder is hereby deemed a Qualified Bidder, and the Stalking Horse APA submitted to the Debtors by the Stalking Horse Bidder and appended to the Motion as **Exhibit B**, is deemed a Qualified Bid, for all purposes in connection with the Bidding Process, the Auction, and the Sale.  The Stalking Horse Bidder shall not be required to take any further action in order to participate in the Auction (if any) or, if the Stalking Horse Bidder is the Successful Bidder, to be named the Successful Bidder at the Sale Hearing.

9.      Any disputes as to the selection of a Qualified Bid shall be resolved by this Court.

10.     The Debtors are authorized to conduct an Auction if they receive one or more Qualified Bids in addition to the Stalking Horse APA.  The Auction, if necessary, shall be held at _____ (prevailing Eastern Time) on _____, at the offices of Brown Rudnick LLP, One

Financial Center, Boston, MA 02110, or such other location as shall be timely communicated to all Qualified Bidders. If no other Qualifying Bid is received, no Auction shall be necessary.

11.    The Debtors shall arrange for the bidding at the Auction to be transcribed by a court reporter. Each Qualified Bidder shall be required to confirm its bid on the record at the Auction and confirm that it has not engaged in any collusion with respect to the bidding or the sale.

12.    If the Auction is held, the Debtors shall file with the Court notice of the Successful Bid(s) and Successful Bidder(s) on or before one (1) Business Day after the Auction.

13.    The Sale Hearing shall be held on _____ at _____ (prevailing Eastern Time) before this Court, the U.S. Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, Delaware 19801, __th Floor, Courtroom __. Any objections to the Sale must (a) be in writing, (b) state the basis of such objection with specificity, (c) conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the United States Bankruptcy Court for the District of Delaware and (d) be filed with the Bankruptcy Court and served in accordance with the rules of the Bankruptcy Court upon: (i) counsel to the Debtors: Brown Rudnick LLP, One Financial Center, Boston, MA 02110 (Attn: Sunni P. Beville, Esq. (sbeville@brownrudnick.com)) and Morris, Nichols, Arsht & Tunnell LLP, 1201 N. Market Street, 16th Floor, Wilmington, Delaware 19801, Attn: Curtis S. Miller (cmiller@mnat.com)) so as to be received by the Debtors not later than _____ on _____; (ii) counsel to the Stalking Horse Bidder: Thacker Robinson Zinz, LPA, 2330 One Cleveland Center, 1375 E. 9th St., Cleveland, OH 44114 (Attn: Lynn Rowe Larsen, Esq. (llarsen@trzlaw.com)); (iii) counsel to the Committee: _____; and (iv) the Office of the United States Trustee for the District of Delaware.

14.     The following forms of notice are approved: (a) Notice of Sale Procedures, Auction Date, Objection Deadline, and Sale Hearing, in the form substantially similar to that attached to the Motion as **Exhibit D** (the "Sale Notice") and (b) the Notice to Counterparties to Executory Contracts and Unexpired Leases of the Debtors That May Be Assumed and Assigned (the "Cure Notice"), in the form substantially similar to that attached to the Motion as **Exhibit E**.

15.     The Debtors shall, on or before _____, serve a copy of the Sale Notice and this Sale Procedures Order by first class mail, postage prepaid on, as extant: (a) the Office of the United States Trustee for the District of Delaware; (b) the Office of the United States Attorney for the District of Delaware; (c) counsel to the Committee: _____; (d) the Internal Revenue Service; (e) counsel to the Debtors' prepetition and post-petition lenders; (f) counsel to the Stalking Horse Bidder; (g) all persons known by the Debtors to have expressed an interest to the Debtors in a transaction with respect to the Assets during the previous six months; (h) all entities known by the Debtors that may have a lien, claim, encumbrance, or other interest in the Assets (for which identifying information and addresses are available to the Debtors); (i) all non-Debtor parties to the Executory Contracts and Unexpired Leases; (j) all of the Debtors' known creditors; (k) all Employees and former employees and any others receiving any benefits under any pension or Employee Benefit Plan; (l) the Pension Benefit Guaranty Corporation; (m) any governmental unit known to the Debtors to have a claim in these cases; (n) the Office of the Attorney General in each state in which the Debtors operate; (o) the Office of the Delaware Secretary of State; and (p) all parties that have requested notice in these cases under Bankruptcy Rule 2002.

16.     The Debtors shall, on or before _____, serve the Cure Notice upon each non-Debtor counterparty to each Executory Contract and Unexpired Lease and their counsel (if

known) and the United States Department of Justice, Civil Division, if the non-Debtor counterparty is a department agency or instrumentality of the United States. The Cure Notice shall state the date, time and place of the Sale Hearing, whether such Executory Contract or Unexpired Lease is designated to be assumed and assigned to the Stalking Horse Bidder, as well as the date by which any objection to the assumption and assignment of such Executory Contract or Unexpired Lease must be filed and served. The Cure Notice also will identify the amounts, if any, that the Debtors believe are owed to each counterparty to an Executory Contract or Unexpired Lease in order to cure any defaults that exist under such contract or lease (the "Cure Amounts") pursuant to section 365 of the Bankruptcy Code. The Cure Notice does not constitute an admission that an Executory Contract or Unexpired Lease is in fact an executory contract or unexpired lease, and the Debtors reserve any and all rights with respect to the Executory Contracts and Unexpired Leases.

17.     If any counterparty to an Executory Contract or Unexpired Lease objects for any reason to the Cure Amounts set forth in the Cure Notice, such counterparty must file with the Court a written objection (a "Cure Amount Objection") and serve such Cure Amount Objection so as to be received by the Service Parties by no later than _____ at _____ (prevailing Eastern Time) (the "Cure Objection Deadline").

18.     If, at any time after the entry of this Sale Procedures Order, the Debtors or any Qualified Bidder identify additional executory contracts or unexpired leases to be assumed and assigned as Assumed Contracts (whether before or after the closing of the sale), as applicable, the Debtors shall serve a supplemental Cure Notice (the "Supplemental Cure Notice") by facsimile, electronic transmission, hand delivery or overnight mail on the applicable non-debtor counterparty and its counsel (if known) and the United States Department of Justice, Civil

Division, if the non-Debtor counterparty is a department agency or instrumentality of the United States, no later than ten (10) days before the proposed effective date of the assignment. Each Supplemental Cure Notice shall (i) state the date, time and place of the Sale Hearing, (ii) state the date by which any objection to the assumption and assignment of such Assumed Contract must be filed and served, and (iii) identify the Cure Amount.

19.    Unless the non-debtor counterparty properly files and serves an objection to the Supplemental Cure Notice (the "Supplemental Cure Amount Objection") on or before ten (10) days after the date the Supplemental Cure Notice (the "Supplemental Cure Objection Deadline"), the Debtors shall be authorized to assume and assign the Executory Contract or Unexpired Lease, subject to the occurrence of the Closing without further notice or order of the Court.

20.    Each Cure Amount Objection and Supplemental Cure Amount Objection must set forth with specificity each and every asserted default in any Executory Contract or Unexpired Lease and the monetary cure amount asserted by such counterparty to the extent it differs from the amount, if any, specified by the Debtors in the Cure Notice or Supplemental Cure Notice, as applicable.

21.    In the event that the Debtors and the non-debtor party cannot resolve the Cure Amount Objection or Supplemental Cure Amount Objection, disputed Cure Amounts ("Disputed Cure Amounts") shall not be paid until the resolution of any such disputes by the Court or mutual agreement of the Debtors, the Successful Bidder and the objecting party. Cure Amount Objections may be resolved by the Court at the Sale Hearing, or at a separate hearing either before or after the Sale Hearing. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely file and serve a Cure Amount Objection or Supplemental Cure Amount Objection shall be forever barred from asserting that a Cure Amount is owed in an amount in

excess of that set forth in the Cure Notice or Supplemental Cure Notice.  If no timely Cure Objection or Supplemental Cure Amount Objection is filed and served with respect to an Assumed Contract, the Cure Amount identified in the Cure Notice or Supplemental Cure Notice with respect to such Assumed Contract will be the only amounts necessary under section 365(b) of the Bankruptcy Code to cure all monetary defaults under such Assumed Contract if the Stalking Horse Bidder (or other Successful Bidder) ultimately decides to have the applicable Assumed Contract assumed and assigned to it.  Any party failing to timely file a Cure Amount Objection or Supplemental Cure Amount Objection shall be forever barred from objecting to the Cure Amounts and from asserting any additional cure or other amounts against the Debtors, their estates or the Successful Bidder.

22.     If an Executory Contract or Unexpired Lease is assumed and assigned pursuant to Court Order, then except for any such Assumed Contract that is subject to Disputed Cure Amounts, the Assumed Contract counterparty shall be paid the Cure Amount, if any, as set forth in the Cure Notice or Supplemental Cure Notice, as applicable, with payment to be made pursuant to the terms of the Successful Bidder's Stalking Horse APA.

23.     If any counterparty to an Executory Contract or Unexpired Lease objects for any reason to the assumption and assignment of such Executory Contract or Unexpired Lease with respect to the Stalking Horse Bidder (other than a Cure Amount Objection, an "Assignment Objection"), such counterparty must file and serve such Assignment Objection so as to be received by the Service Parties by no later than (the "Assignment Objection Deadline"): (i) _____ (prevailing Eastern Time) on _____; or (ii) the date otherwise specified in the Cure Notice (or, alternatively, the date set forth in the motion to assume such Assumed Contract if such contract is to be assumed and assigned after the Sale Hearing); provided that, if

the Successful Bidder is not the Stalking Horse Bidder the Assignment Objection Deadline shall be one (1) day prior to the Sale Hearing.  The Court shall make any and all determinations concerning adequate assurance of future performance under the Assumed Contracts pursuant to sections 365(b) and (f)(2) of the Bankruptcy Code at the Sale Hearing.

24.     Except to the extent otherwise provided in the Successful Bidder's asset purchase agreement, the Debtors and the Debtors' estates shall be relieved of all liability accruing or arising after the assumption and assignment of the Assumed Contracts pursuant to section 365(k) of the Bankruptcy Code.

25.     Notwithstanding any provision in this Sale Procedures Order, the Stalking Horse APA or the Bidding Procedures, this Sale Procedures Order does not satisfy, and the Court has not yet determined if the Debtors have satisfied, the requirements of section 365 of the Bankruptcy Code for any particular Assumed Contract, including those relating to the cure of any existing default or providing adequate assurance of future performance.  No Assumed Contract will be deemed assumed and assigned until the later of (a) the date the Court has entered an order authorizing the assumption and assignment of a particular Assumed Contract or (b) the date the Sale is closed.  The Successful Bidder will have no rights in and to any particular Assumed Contract until such time as the particular Assumed Contract is assumed and assigned to the Successful Bidder.

26.     Subject to the terms of the Stalking Horse APA and the Bidding Procedures, the Debtors are authorized to take such actions as may be necessary or appropriate to implement and affect the terms and requirements of this Sale Procedures Order, including, but not limited to, expending such funds or taking such action as may be necessary or appropriate to comply with the Bidding Procedures.

27.     To the extent the provisions of this Sale Procedures Order are expressly inconsistent with the provisions of any Exhibit referenced herein, including the Bidding Procedures, or with the Motion, the provisions of this Order shall control.

28.     The Court shall retain jurisdiction over all matters arising from or related to the interpretation and implementation of this Order.

29.     Notwithstanding the possible applicability of Bankruptcy Rules 6004, 6006, 7062, or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable.

Dated:_____, 2017
            Wilmington, Delaware


_____
UNITED STATES BANKRUPTCY JUDGE

## Exhibit 1

**Bidding Procedures**

# BIDDING PROCEDURES

Set forth below are the bidding procedures (the "Bidding Procedures") for the proposed sale of all or substantially all of the assets and assumption of certain liabilities of Herald Media Holdings, Inc., Herald Media, Inc., Boston Herald, Inc., and Herald Interactive, Inc. (collectively, the "Debtors" or the "Sellers"), in connection with the jointly administered chapter 11 cases pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), lead case number _____.

The Sellers entered into that certain asset purchase agreement, dated December 7, 2017 between the Sellers on the one hand and Gatehouse Media Massachusetts I, Inc. (the "Stalking Horse Bidder"), pursuant to which the Stalking Horse Bidder has agreed to acquire the purchased assets (the "Purchased Assets") and has agreed to assume certain specified liabilities on the terms and conditions specified therein (together with the schedules and related documents thereto, and as may be amended, supplemented or otherwise modified, the "Stalking Horse APA").

The Stalking Horse Bidder has submitted, in the form of the Stalking Horse APA, a Qualified Bid (as defined below) consisting of (a) the assumption of the Assumed Liabilities and (b) a cash payment equal to the sum of (i) $4,500,000.00 and (ii) the Cure Amounts.[10]

The sale transaction pursuant to the Stalking Horse APA is subject to competitive bidding as set forth herein. Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Motion for the approval of the Bidding Procedures (the "Approval Motion") [Docket No. __].

## A.    ASSETS TO BE SOLD

The Sellers seek to complete a sale of the Purchased Assets and the assumption of the Assumed Liabilities described in Articles 2 and 3 respectively of the Stalking Horse APA. Except as otherwise provided in the Stalking Horse APA or such other approved purchase agreement of the Successful Bidder (as defined below), all of the Sellers' right, title and interest in and to each Purchased Asset to be acquired shall be sold free and clear of all liens, claims, interests, charges, restrictions and encumbrances of any kind or nature thereon and there against (collectively, the "Liens"), such Liens to attach solely to the net proceeds of the sale of such Purchased Assets.

## B.    THE BID PROCEDURES

To ensure that the Sellers receive the maximum value for the Purchased Assets, the Stalking Horse APA is subject to higher or otherwise better offers, and, as such, the Stalking Horse APA will serve as the "stalking-horse" bid for the Purchased Assets.

1.    Provisions Governing Qualifications of Bidders

---

[10]    Capitalized terms used but not otherwise defined in this paragraph shall have the meanings ascribed to such terms in the Asset Purchase Agreement.

18

In order to participate in the bidding process, prior to the Bid Deadline (defined below), each person other than the Stalking Horse Bidder who wishes to participate in the bidding process (a "<u>Potential Bidder</u>") must deliver the following to the Notice Parties (as defined below):

a.   a written disclosure of the identity of each entity including all affiliates, equity sources or other parties that will be or is associated with bidding for the Purchased Assets or otherwise participating in connection with such bid and the complete terms of any such participation; and

b.   an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in form and substance satisfactory to the Sellers, in substantially the same form as signed by the Stalking Horse Bidder and which shall inure to the benefit of any purchaser of the Purchased Assets; without limiting the foregoing, each confidentiality agreement executed by a Potential Bidder shall contain standard non-solicitation provisions.

A Potential Bidder that delivers the documents and information described above and that the Sellers determine in their reasonable business judgment, after consultation with their advisors and, if applicable, the statutory committee appointed in these cases (the "<u>Committee</u>"), is likely (based on availability of committed capital, experience and other considerations) to submit a bona fide offer and be able to consummate the sale including without limitation obtaining all required regulatory or government agency approvals, will be deemed a "<u>Qualified Bidder</u>."  The Sellers will limit access to due diligence to those parties they believe, in the exercise of their reasonable judgment, are pursuing the transaction in good faith.

As promptly as practicable after a Potential Bidder delivers all of the materials required above (and in any event no later than one (1) business day thereafter), the Sellers will determine, after consultation with the Committee, and will notify the Potential Bidder, the Stalking Horse Bidder and the Notice Parties if such Potential Bidder is a Qualified Bidder.

2.     Due Diligence

Until the day of the Auction, or the Bid Deadline if a Potential Bidder shall not have submitted a Qualified Bid by the Bid Deadline, the Debtors will afford any Potential Bidder that the Debtors determine in their discretion after consultation with the Committee to be reasonable and appropriate under the circumstances.  All due diligence requests shall be directed to counsel to the Debtors: Brown Rudnick LLP, One Financial Center, Boston, MA 02110 (Attn: Sunni P. Beville, Esq. (sbeville@brownrudnick.com)).   The Debtors shall coordinate all reasonable requests for additional information and due diligence access from Potential Bidders.

The Sellers will afford any Qualified Bidder with (a) an electronic copy of the Stalking Horse APA, (b) access information for a confidential electronic data room concerning such assets of the Debtors as the Debtors may determine in consultation with the Committee (the "<u>Data Room</u>"), and (c) such due diligence access or additional information as the Sellers, in consultation with their advisors, and the Committee, deem appropriate, in their reasonable

discretion, subject to contractual obligations to limit access to certain proprietary information; provided, however, the Sellers will, in their reasonable discretion, make reasonable commercial efforts to provide Qualified Bidders with the same information provided to the Stalking Horse Bidder. The Sellers must promptly advise the Stalking Horse Bidder and the Committee in the event any other Qualified Bidder receives diligence the Stalking Horse Bidder has not previously received and shall promptly provide the Stalking Horse Bidder with access to such diligence materials.

The due diligence period shall end on the Bid Deadline, and the Sellers shall not furnish any due diligence information to any Qualified Bidder (other than the Successful Bidder) after the Bid Deadline. For the avoidance of doubt, neither the Sellers nor any of their respective representatives shall be obligated to furnish any due diligence information to any person other than a Qualified Bidder.

3.      Provisions Governing Qualified Bids

A bid submitted will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder and complies with all of the following (a "Qualified Bid"):

    a.      it fully discloses the identity of the Qualified Bidder;

    b.      it states that the applicable Qualified Bidder offers to purchase the Purchased Assets upon terms and conditions that the Sellers reasonably determine, after consultation with the Committee, are at least as favorable to the Sellers as those set forth in the Stalking Horse APA, and it provides a description of any anticipated regulatory or governmental approvals necessary to consummate the bid;

    c.      it includes a signed writing that the Qualified Bidder's offer is irrevocable until the selection of the Successful Bidder, provided that if such bidder is selected as the Successful Bidder its offer shall remain irrevocable until the earlier of (a) the closing of the sale to the Successful Bidder, and (b) sixty (60) days after entry of the Sale Order. Such writing shall guaranty performance of the Qualified Bidder by its parent entities, if any, or provide such other guaranty of performance acceptable to Sellers in their reasonable discretion;

    d.      confirmation that all necessary internal and shareholder approvals have been obtained prior to the bid;

    e.      it includes a duly authorized and executed copy of an asset purchase agreement, including as applicable the purchase price for the Purchased Assets expressed in U.S. Dollars, together with all exhibits and schedules thereto, together with copies marked to show any amendments and modifications to the Stalking Horse APA (together with exhibits, schedules, and marked copies, the "Proposed Stalking Horse APA") and the proposed form of sale approval order to approve the sale by the

Bankruptcy Court, together with a copy marked to show amendments and modifications to the proposed form of sale approval order attached to the Approval Motion; provided however, that such Proposed Stalking Horse APA shall not include any financing or diligence conditions;

f.  it includes written evidence of sufficient cash on hand to fund the purchase price or sources of immediately available funds that are not conditioned on third party approvals or commitments, that will allow the Sellers to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Proposed Stalking Horse APA; such written evidence shall include the most current audited and the most current unaudited financial statements, or such other financial information as may be acceptable to the Sellers in their reasonable discretion after consultation with the Committee (collectively, the "Financials") of the Qualified Bidder, or, if the Qualified Bidder is an entity formed for the purpose of acquiring the Purchased Assets, the Financials of the Qualified Bidder's equity holder(s) or other financial backer(s) that are guaranteeing the Qualified Bidder's performance;

g.  it provides for a purchase price that exceeds the aggregate consideration to be paid to or for the benefit of the Sellers' estates set forth in the Stalking Horse APA by at least $400,000.00, which represents the sum of (A) the amount of the Break-Up Fee (as defined below) of $200,000.00, plus (B) the maximum amount of the Expense Reimbursement (as defined below) of $100,000.00, plus (C) $100,000.00 and otherwise has a value to the Sellers, in the Sellers' exercise of their reasonable business judgment, after consultation with their advisors, that is greater or otherwise better than the value offered under the Stalking Horse APA including impact of the liabilities assumed in the Stalking Horse APA;

h.  it is accompanied by a cash deposit in the amount of 10% of the cash purchase price of the bid (the "Deposit");

i.  it does not entitle the Qualified Bidder to any break-up fee, termination fee or similar type of payment or reimbursement and confirms that, by submitting a bid, the Qualified Bidder waives the right to pursue a substantial contribution claim under 11 U.S.C. § 503 related in any way to the submission of its bid;

j.  it identifies with particularity which executory contracts and unexpired leases the Qualified Bidder wishes to assume and provides details of the Qualified Bidder's proposal for the treatment of related cure costs;

k.  it includes an acknowledgement and representation that the Qualified Bidder: (A) has had an opportunity to conduct any and all required due diligence regarding the Purchased Assets prior to making its offer; (B) has relied solely upon its own independent review, investigation and/or

inspection of any documents and/or the Purchased Assets in making its bid; (C) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Purchased Assets or the completeness of any information provided in connection therewith or with the Auction (defined below), except as expressly stated in the Proposed Stalking Horse APA; and (D) is not entitled to any expense reimbursement, break-up fee, or similar type of payment in connection with its bid;

l.      it includes evidence, in form and substance reasonably satisfactory to the Sellers, of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Proposed Stalking Horse APA;

m.     it contains a detailed description of how the Qualified Bidder intends to treat current employees of the Sellers;

n.      it contains sufficient information concerning the Qualified Bidder's ability to provide adequate assurance of performance with respect to executory contracts and unexpired leases to be assumed and assigned;

o.      it states that the Qualified Bidder consents to the jurisdiction of the Bankruptcy Court;

p.      it contains such other information reasonably requested by the Sellers;

q.      it complies with all requirements of the Sale Procedures Order; and

r.      it is received, along with the Deposit, on or prior to the Bid Deadline.

Notwithstanding anything in these Bidding Procedures to the contrary, the Stalking Horse Bidder is deemed to be a Qualified Bidder, the Stalking Horse APA is deemed to constitute a Qualified Bid for all purposes in connection with the Bidding Procedures, the Auction, and the Sale, and the Stalking Horse Bidder shall not be required to take any further action in order to participate in the Auction (if any) or, if the Stalking Horse Bidder is the Successful Bidder, to be named the Successful Bidder at the Sale Hearing (as defined below).

The Sellers shall notify the Stalking Horse Bidder, all Qualified Bidders, and the Notice Parties in writing as to whether or not any bids constitute Qualified Bids (and, with respect to each Qualified Bidder that submitted a bid other than the Stalking Horse Bidder, whether such Qualified Bidder's bid constitutes a Qualified Bid) promptly after, and in any event on the same day as, the notification to any Qualified Bidder that their bid constitutes a Qualified Bid; provided, however, that such notification shall not be given later than twenty-four (24) hours prior to the Auction.

4.      Bid Deadline

A Qualified Bidder that desires to make a bid will deliver written copies of its bid to the following parties (collectively, the "Notice Parties"): (i) counsel to the Sellers: Brown Rudnick LLP, One Financial Center, Boston, MA 02110 (Attn: Sunni P. Beville, Esq. (sbeville@brownrudnick.com)) and Morris, Nichols, Arsht & Tunnell LLP, 1201 N. Market Street, 16th Floor, Wilmington, Delaware 19801, Attn: Curtis S. Miller (cmiller@mnat.com)); (ii) counsel to the Stalking Horse Bidder: Thacker Robinson Zinz, LPA, 2330 One Cleveland Center, 1375 E. 9th St., Cleveland, OH 44114 (Attn: Lynn Rowe Larsen, Esq. (llarsen@trzlaw.com)); and (iii) counsel to the Committee: _____; so as to be received by the Notice Parties not later than 5:00 p.m. (prevailing Eastern Time) on _____ (the "Bid Deadline").

5.      Evaluation of Competing Bids

A Qualified Bid will be valued based upon several factors including, without limitation, (1) the amount of such bid (including value provided by the assumption of liabilities), (2) the risks and timing associated with consummating such bid, (3) any proposed revisions to the Stalking Horse APA (including any additional conditions to closing), and (4) any other factors deemed relevant by the Sellers in their reasonable discretion (after consultation with the Committee).

6.      No Qualified Bids

If the Sellers do not receive any Qualified Bids other than the Stalking Horse APA, the Sellers will not hold an auction and the Stalking Horse Bidder will be named the Successful Bidder on the Bid Deadline.

7.      Auction Process.

If the Sellers receive one or more Qualified Bids in addition to the Stalking Horse APA, the Sellers will conduct an auction (the "Auction") of the Purchased Assets, which shall be transcribed, at _____ (prevailing Eastern Time) on _____ at the offices of Brown Rudnick LLP, One Financial Center, Boston, MA 02110, or such other location as shall be timely communicated to all entities entitled to attend the Auction. The Auction shall be conducted in accordance with the following procedures:

        a.      Only the Sellers, the Notice Parties, the members of the Committee, the Stalking Horse Bidder, any other Qualified Bidders that have submitted Qualified Bids, and/or other party as the Sellers may determine to include in their discretion, in each case along with their representatives and advisors, shall be entitled to attend the Auction (such attendance to be in person); if a party that is a creditor of the Debtors, other than those listed above, would like to attend the Auction, such party shall make a request to attend the Auction in writing (which writing may be in the form of an electronic mail) and serve such request on the Notice Parties no later than

23

12:00 p.m. (prevailing Eastern Time) two (2) business days prior to the date of the Auction;

b.     only the Stalking Horse Bidder and such other Qualified Bidders that have submitted Qualified Bids on or prior to the Bid Deadline will be entitled to make any subsequent bids at the Auction; provided that all such Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attending the Auction in person;

c.     each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale;

d.     at least one (1) business day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Sellers whether it intends to attend the Auction; provided that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until (a) the date of the selection of the Successful Bidder at the conclusion of the Auction, or (b) if selected as the Successful Bidder, until (1) the closing of the sale to the Successful Bidder, and (2) sixty (60) days after entry of the Sale Order.  Prior to the start of the Auction, the Sellers will provide copies of the Qualified Bid which the Sellers believe, in their reasonable discretion, is the highest or otherwise best offer (the "Starting Bid") to the Stalking Horse Bidder and all other Qualified Bidders;

e.     all Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction and the actual identity of each Qualified Bidder will be disclosed on the record at the Auction;

f.     the Sellers, after consultation with their advisors and the Committee, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction, provided that such rules are (i) not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Court entered in connection herewith, and (ii) provide that bids be made and received on an open basis, with all material terms of each bid to be fully disclosed to all other Qualified Bidders at the Auction and (iii) are disclosed to each Qualified Bidder at the Auction; and

g.     bidding at the Auction will begin with the Starting Bid and continue in bidding increments (each a "Subsequent Bid") providing a net value to the estate of at least an additional $100,000.00 above the prior bid.  After the first round of bidding and between each subsequent round of bidding, the Sellers, after consultation with counsel to the Committee, shall announce the bid (including the identity of that bidder and the value of such bid) that

it believes to be the highest or otherwise best offer (the "Highest Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Highest Bid. Each Qualified Bidder shall either elect to provide a higher bid or withdraw from the Auction. Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Stalking Horse Bidder), the Sellers will give effect to the Break-Up Fee and Expense Reimbursement payable to the Stalking Horse Bidder under the Stalking Horse APA as well as any additional liabilities to be assumed by a Qualified Bidder and any additional costs which may be imposed on the Sellers. If the Stalking Horse Bidder bids at the Auction, the Stalking Horse Bidder will be entitled to a "credit" for the Break-Up Fee and Expense Reimbursement. To the extent a Subsequent Bid has been accepted entirely or in part because of the addition, deletion or modification of a provision or provisions in the applicable Proposed Stalking Horse APA or the Stalking Horse APA, the Sellers will identify such added, deleted or modified provision or provisions.

8.      Selection of Successful Bid

Prior to the conclusion of the Auction, the Sellers, in consultation with their advisors and the Consultation Parties, will review and evaluate each Qualified Bid in accordance with the procedures set forth herein and determine which offer is the highest or otherwise best offer from among the Qualified Bidders (including the Stalking Horse Bidder) submitted at or prior to the Auction by a Qualified Bidder (such bid, the "Successful Bid" and the bidder making such bid, the "Successful Bidder") and communicate to the Stalking Horse Bidder and the other Qualified Bidders the identity of the Successful Bidder and the details of the Successful Bid. The determination of the Successful Bid by the Sellers at the conclusion of the Auction shall be final, subject only to approval by the Bankruptcy Court.

Within two (2) business days after adjournment of the Auction, the Successful Bidder shall complete and execute all agreements, contracts, instruments and other documents evidencing and containing the terms and conditions upon which the Successful Bid was made. Within one (1) business day after adjournment of the Auction, the Sellers shall file a notice identifying the Successful Bidder with the Bankruptcy Court.

The Sellers will sell the Purchased Assets to the Successful Bidder pursuant to the terms of the Successful Bid upon the approval of such Successful Bid by the Bankruptcy Court at the Sale Hearing.

C.      THE BID PROTECTIONS

In recognition of the expenditure of time, energy, and resources, and because the agreement to make payment thereof is necessary to preserve the value of the Sellers' estates, the Sellers have agreed that, among other triggering events, if the Stalking Horse Bidder is not the Successful Bidder, the Sellers will pay the Stalking Horse Bidder (i) an aggregate fee of

$200,000.00 as more fully described in the Stalking Horse APA (the "Break-Up Fee"), plus (ii) an amount in cash equal to the Expense Reimbursement (as such term is defined in the Stalking Horse APA, the "Expense Reimbursement") not to exceed $100,000.00, whether incurred prior to or after the Petition Date.  The Break-Up Fee and Expense Reimbursement shall be payable as provided for pursuant to the terms of the Stalking Horse APA and nothing herein shall be deemed to limit or otherwise modify the terms thereof, including other circumstances pursuant to which the Breakup-Up Fee and Expense Reimbursement may be payable.  For the avoidance of doubt, if the Stalking Horse Bidder is entitled to the Expense Reimbursement, (i) such Expense Reimbursement shall be limited to reasonable, actual, and documented out-of-pocket fees and expenses, and (ii) the Stalking Horse Bidder shall submit an invoice (the "Invoice") to the Debtors, the Committee and U.S. Trustee (together with the Stalking Horse Bidder, the "Service Parties") evidencing such fees and expenses.  If either the Debtors, the Committee or the U.S. Trustee objects for any reason to the payment of all or any portion of the Expense Reimbursement, such party must file and serve an objection so as to be received by the other Service Parties no later than ten (10) days after the submission of the Invoice.  If no party objects to the Expense Reimbursement within such ten-day period, it shall be payable as provided for pursuant to the terms of the Stalking Horse APA.  Any portion of the Expense Reimbursement that is the subject of an objection will not be payable unless consensually resolved by the Parties or determined by the Court.

The Sellers have further agreed that their obligation to pay the Break-Up Fee and Expense Reimbursement pursuant to the Stalking Horse APA shall survive termination of the Stalking Horse APA and shall constitute a superpriority administrative expense claim under section 503(b) of the Bankruptcy Code, junior in right of payment to, as applicable, outstanding superpriority claims granted under the DIP Financing Order to the provider of DIP financing (to the extent such financing is permitted under the Stalking Horse APA), but senior to any other secured or unsecured creditors, and shall be payable under the terms and conditions of the Stalking Horse APA and the Sale Procedures Order.

D.      SALE HEARING

The Sellers will seek entry of an order from the Bankruptcy Court at a hearing (the "Sale Hearing") to begin at _____ (prevailing Eastern Time) on _____ to approve and authorize the sale transaction to the Successful Bidder on terms and conditions determined in accordance with the Bidding Procedures.

E.      MISCELLANEOUS

The Auction and the Bidding Procedures are solely for the benefit of the Sellers and the Stalking Horse Bidder, and nothing contained in the Sale Procedures Order or the Stalking Horse APA or the Bidding Procedures shall create any rights in any other person or bidder (including without limitation rights as third party beneficiaries or otherwise) other than the rights expressly granted to a Successful Bidder under the Sale Procedures Order.

In the event the Stalking Horse Bidder is not the Successful Bidder, the Stalking Horse Bidder shall have standing to object to the sale of the Purchased Assets or any portion thereof at the Sale Hearing to the extent such objection is related to the terms of the Stalking Horse APA

(including the failure to adhere to such terms) or the conduct of the Auction and interpretation of these bidding procedures.

The Sellers, after consultation with the Committee, if any, may modify the rules, procedures and deadlines set forth herein, or adopt new rules, procedures and deadlines that, in their reasonable discretion, will better promote the goals of these procedures, namely, to maximize value for the estates; provided that all modifications and additional rules, procedures and deadlines will be non-material, may in no event extend the dates specified in Sale Procedures Order, including permitting the submission of Qualified Bids after the close of the Auction and otherwise not conflict with these Bidding Procedures or the Sale Procedures Order.  All such modifications and additional rules will be communicated to each of the Notice Parties, Potential Bidders and Qualified Bidders.

The Bankruptcy Court shall retain jurisdiction to hear and determine all matters arising from or relating to the implementation of the Sale Procedures Order.

**EXHIBIT 1**

**RESOLUTIONS ADOPTED BY BUYER'S DIRECTORS AND SHAREHOLDERS**

**See attached.**

**EXHIBIT I**

**PRINCIPAL TERMS AND CONDITIONS**
**OF**
**DIP AGREEMENT**

BOSTON HERALD, INC., et al.

$500,000.00 DEBTOR-IN-POSSESSION FACILITY

Summary of Principal Terms and Conditions

---

This Summary of Principal Terms and Conditions outlines certain key terms of a proposed DIP Facility by and among the Loan Parties and DIP Lender, each as described below. This Term Sheet ("Term Sheet") is not binding on any party and does not contain all of the terms, conditions and other provisions of the transactions contemplated hereby. As such, the terms and conditions set forth in this Term Sheet are to be used solely as a basis for continued discussions and do not constitute a commitment to make loans or provide financial accommodations of any sort or to prepare, negotiate, execute or deliver such a commitment. All figures, terms, and conditions are subject to parties reaching a final agreement and is subject to the execution of definitive documents acceptable to the parties in their sole discretion (collectively, the "DIP Documentation"). This Term Sheet does not constitute an offer or a legally binding obligation of the DIP Lender or any other party in interest.

**I.  Parties**

*Borrowers:*        Boston Herald, Inc., Herald Interactive Inc., Herald Media, Inc. and Herald Media Holdings, Inc. as debtors and debtors-in-possession in a bankruptcy case (collectively the, "Borrowers") in jointly administered cases under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, et seq. commenced in the District of Delaware (collectively, such cases, the "Cases").

*DIP Lender:*       Gatehouse Media Massachusetts I, Inc.

**II.  DIP Facility**

*Type and Amount:*  The total DIP Facility shall consist of senior secured, super-priority loans to be advanced and made available to the Borrowers in the aggregate maximum principal amount of $500,000.00 (such amount, the "Committed Amount"; such facility, the "DIP Facility") (the "DIP Loan(s)", and together with all other obligations under the DIP Facility, the "DIP Obligations").

*Funding:*    After the entry of a final order approving the DIP Facility, which shall be in form and substance acceptable to DIP Lender in its sole and absolute discretion (the "Final DIP Order") and subject to the terms and conditions of the DIP Documentation, the Borrowers may make draws on the DIP Facility in an aggregate principal amount not to exceed the principal amount of the Committed Amount (collectively, the "Draw Term Loan(s)") subject to the conditions for funding. The Draw Term Loans will be made within three (3) business days upon receipt of a written request of the Borrowers to the DIP Lender, provided that no such request may be made under after entry of the Final DIP Order and each such request shall be subject to the conditions for funding. Any amounts paid or repaid on account of the DIP Loans cannot be reborrowed.

*Conditions to Funding:*    Certain customary and other conditions precedent to extensions of credit, including, among other things, (a) execution of final loan documents in form and substance in all respects acceptable to DIP Lender, (b) entry of the Final DIP Order, (c) entry of the Final Sale Procedures Order; (d)payment of certain fees required by the DIP Credit Agreement, (e) DIP Lender's receipt and approval of an Approved Budget in form and substance acceptable to the DIP Lender in its sole and absolute discretion; (f) each Draw Term Loan shall be limited to, and not inconsistent with, the Approved Budget; and (g) no Default or Event of Default, as defined in the DIP Documentation, shall have occurred or be existing (collectively, the "Closing Conditions"). Closing to occur upon satisfaction of the Closing Conditions.

*DIP Maturity Date:*    Except as provided herein to the contrary, the DIP Loans and all other DIP Obligations shall be repaid in full in cash on the earliest to occur of: (i) delivery of a Default Notice of the occurrence of an Event of Default; (ii) conversion of any of the Cases to a chapter 7 case; (iii) the consummation of a sale of all or substantially all of the Debtors' assets pursuant to Section 363 of the Bankruptcy Code (including the Bankruptcy Sale); (iv) the effective date of a plan of reorganization or liquidation in the Cases; (v) the date of filing or support by the Borrowers of a plan of reorganization that does not provide for the indefeasible payment in full in cash of all DIP Loans and all other DIP Obligations, or (vi) June 30, 2018 (the "Maturity Date").

*Use of Proceeds:*    The proceeds of the DIP Loans shall be used (a) to provide

2

working capital and other general business expenses of the Borrower consistent with and within the limits of the Approved Budget, (b) for payment of costs and administration (including, the payment of professional fees and adequate protection obligations) of the Cases, and (c) for the payment of such other prepetition obligations as the DIP Lender shall reasonably agree and the Bankruptcy Court shall approve, in each case, in accordance with an Approved Budget (hereinafter defined).

**III.    Certain Economic Provisions**

*Interest Rate:*        The outstanding DIP Obligations shall bear interest at a rate equal to six (6%) percent per annum, payable at the Maturity Date.

*Default Interest Rate:*    An additional fixed rate of interest equal to four (4%) percent per annum.

*Commitment Fee:*     In connection with the DIP Facility, the DIP Lender shall be entitled to receive a Commitment Fee (the "Commitment Fee") of $25,000.00 in the aggregate.  Such Commitment Fee shall be earned in full on the DIP Closing Date, and shall be payable in cash to the DIP Lender on the Maturity Date.

**IV.    Priority**        To the extent the DIP Facility Liens do not satisfy the DIP Obligations, the DIP Lender will be granted allowed super-priority administrative claims pursuant to Bankruptcy Code § 364(c)(1), which claims shall have priority in right of payment over any and all other obligations, liabilities and indebtedness of the Debtors, now in existence or hereafter incurred by the Debtors and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, *inter alia,* Bankruptcy Code §§ 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), and/or 364(c)(1) (the "Super-Priority Claims"), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall be payable from and have recourse to all pre- and post-petition property of the Debtors and all proceeds thereof, provided, however, that the Super-Priority Claims shall exclude proceeds of avoidance actions under chapter 5 of the Bankruptcy Code ("Avoidance Actions") which shall not be made available to pay the Super-Priority Claims.

3

| | |
|---|---|
| **V.   <u>Collateral</u>** | As security for the DIP Obligations, the DIP Lender will be granted the DIP Facility Liens in the following DIP Collateral: |

(a)  pursuant to Bankruptcy Code § 364(c)(2), valid, perfected, enforceable and non-avoidable first priority liens on and security interests, in all now owned or hereafter acquired assets and property of the Debtors, excluding, Avoidance Actions and proceeds of Avoidance Actions upon entry of the Final DIP Order; and

(b)  pursuant to Bankruptcy Code § 364(c)(3), valid, perfected, enforceable and non- avoidable second priority or other junior liens on and security interests in all now owned or hereafter acquired assets and property of the Debtors that are subject to  specified permitted liens, to be set forth on a Schedule to the DIP Credit Agreement (the "<u>Permitted Liens</u>") or to valid liens in existence on the Petition Date that are perfected subsequent to such commencement as permitted by Bankruptcy Code § 546(b).

DIP Collateral shall also include any and all rents, issues, products, offspring, proceeds and profits generated by any item of DIP Collateral, without the necessity of any further action of any kind or nature by the DIP Lender in order to claim or perfect such rents, issues, products, offspring, proceeds and/or profits.

**VI.   <u>Certain Documentation Matters and Other Matters</u>**

| | |
|---|---|
| *Approved Budget* | The Approved Budget will be a cash forecast for the period from the Petition Date through the scheduled Maturity Date setting forth projected cash flows and disbursements, on a weekly basis in form and substance in all respects acceptable to DIP Lender in its sole and absolute discretion. |
| *Reporting Information* | The Borrowers shall provide (i) no later than the date which is 14 days after the close of each fiscal month of Borrowers, (each a "<u>Reporting Period</u>"), a report, in form and detail reasonably acceptable to the DIP Lender, showing Borrowers' management-prepared draft financial statements for such fiscal month, including balance sheet, statement of operations and summary of cash activity for such month, (ii) on the Thursday following each week, a report of the actual performance to the Approved Budget for the prior week, and (iii) such other information (including access to the Debtors' books, records, personnel and advisors) as the DIP Lender may reasonably request. |
| *Milestones:* | The DIP Documentation shall require the Debtors to comply with the following restructuring milestones (the |

4

"Case Milestones");

(i) Within three Business Days of the Petition Date, file the (a) the motion to conduct the sale of all or substantially all of the Debtors' assets (the "Sale Motion") and the motion to approve bidding procedures for the sale of all or substantially all of the Debtors' assets (the "Bid Procedures");

(ii) Obtain court approval of (x) the Bid Procedures within thirty (30) days of the Petition Date, and (y) the Final DIP Order within forty five (45) days of the Petition Date;

(iii) Obtain court approval of the Sale Motion no later than sixty (60) days after entry of approval of the Bid Procedures; and

(iv) Close the sale of the Collateral and indefeasibly and finally pay the DIP Facility Obligations in full, in cash, at the closing of the Sale, no later than June 30, 2018.

| | |
|---|---|
| *Representations, Warranties, Covenants, Events of Default:* | The DIP Documentation shall contain representations, warranties, covenants and events of default customary for financings of this type. |
| *Expenses:* | In addition to the Commitment Fee, the Loan Parties shall pay all reasonable out-of-pocket expenses of the DIP Lender associated with the preparation, execution, delivery and administration of the DIP Documentation and any amendment or waiver with respect thereto (including the reasonable fees, disbursements and other charges of counsel) not to exceed $25,000 in the aggregate. |
| *Governing Law:* | State of New York, except as governed by the Bankruptcy Code. |

*[Signatures appear on following page.]*

WHEREFORE, each of the undersigned parties agrees and consents to this Term Sheet as of the date set forth below.

Agreed and consented to by:

BOSTON HERALD, INC., as Borrower

By: _____

Name: _____
Jeffrey W. Magram

Title: _____
Chief Operating Officer

Date: _____
12/8/2017

HERALD INTERACTIVE INC., as
Borrower

By:

Name:
Jeffry W. Magram

Title:
Chief Operating Officer

Date:
12/8/2017


HERALD MEDIA, INC., as Borrower

By:

Name:
Jeffry W. Magram

Title:
Chief Operating Officer

Date:
12/8/2017


HERALD MEDIA HOLDINGS, INC., as
Borrower

By:

Name:
Jeffry W. Magram

Title:
Chief Operating Officer

Date:
12/8/2017


*[Signatures continued on following page.]*

7

Agreed and consented to by:

GATEHOUSE MEDIA
MASSACHUSETTS I, INC., as DIP Lender

By: _____

Name: _Kirk Davis_____

Title: _CEO_____

Date: _12·8·17_____

## SCHEDULES TO ASSET PURCHASE AGREEMENT

These Schedules to Asset Purchase Agreement are provided, and should be read, in connection with the provisions of that certain Asset Purchase Agreement dated as of December 7, 2017 (the "Agreement") by and among Boston Herald, Inc., Herald Interactive Inc., Herald Media, Inc., and Herald Media Holdings, Inc., as Sellers, and Gatehouse Media Massachusetts I, Inc., as Buyer. These Schedules are arranged in sections and subsections corresponding to the numbered sections and subsections contained in the Agreement. However, the disclosures in any section or subsection of these Schedules shall also qualify other sections or subsection of the Agreement to the extent that it is reasonably evident from a reading of the disclosure that such disclosure also qualifies or applies to such other section or subsection, the absence of a specific cross-reference notwithstanding.

All capitalized terms used in these Schedules and not otherwise defined herein shall have the same respective meanings as those terms as defined in the Agreement.

<u>Schedule 1.1.36</u>

<u>Motor Vehicles</u>

1993 Mercedes Benz SL500
Approx. 80,500 miles
Net Book Value $0.00

Schedule 2.1.1

Media Assets – Publications

1.    Boston Herald print and digital newspaper.

2.    Boston Herald Radio.

3.    Publications on Bostonherald.com

4.    Content disseminated on Boston Herald news and sports apps and on the Boston
      Herald social media pages.

Schedule 2.1.7

Receivables

See attached.

Herald Media Holdings, Inc.
Consolidated Aging Summary
As of October 29, 2017

APA Schedule 2.1.7

| | | Gross | Specific Reserve | General Reserve | Net | |
|---|---|---|---|---|---|---|
| Boston Herald | Print | Advertising | 1,054,351.92 | (36,659.60) | (58,309.07) | 959,383.25 | |
| Boston Herald | Print | Advertising not yet Charged | 48,974.90 | | - | 48,974.90 | Classified advt not billed until expiration |
| Boston Herald | Print | Circulation | 1,839,115.62 | | (334,019.61) | 1,505,096.01 | Includes bad debt and returns reserves |
| Herald Interactive | Digital | Advertising | 363,806.95 | (29,000.00) | (39,020.15) | 295,786.80 | |
| Payment | Print | Credit Card in process | (5,657.15) | | - | (5,657.15) | Timing of credit card payment |
| Variance | | Misc | (1,078.92) | | | (1,078.92) | |
| Total | | | 3,299,513.32 | (65,659.60) | (431,348.83) | 2,802,504.89 | |

**Boston Herald**
**Advertising Aging**
**As of October 29, 2017**
**APA Schedule 2.1.7**

| Acct# | Name | Total | 10/01/17 | 09/01/17 | 08/01/17 | 07/01/17 | +07/01/17 | Reserved | NET |
|---|---|---|---|---|---|---|---|---|---|
| 78184340014 | QUIRK AUTO DEALERSHI | 45,540.00 | 45,540.00 | | | | | | 45,540 |
| 86773101010008 | HERB CHAMBERS DODGE | 45,300.00 | 21,600.00 | 23,700.00 | | | | | 45,300 |
| 623472 | WEINSTEIN COMPANY | 36,659.60 | | 21,684.23 | 14,975.37 | | | (36,659.60) | - |
| 673879333 | COMM OF MASS TREASUR | 31,786.25 | 25,250.00 | 6,536.25 | | | | | 31,786 |
| 2184 | KOHLS | 25,568.79 | 8,101.78 | 7,581.14 | 9,885.87 | | | | 25,569 |
| 75580650 0L0 | HARMON LAW OFFICES P | 23,302.69 | 23,302.69 | | | | | | 23,303 |
| 75803925 | METLIFE | 18,000.00 | 18,000.00 | | | | | | 18,000 |
| 176272 0004 | SUBARU OF NEW ENGLAN | 16,575.00 | 7,800.00 | 8,775.00 | | | | | 16,575 |
| 83293 | MICHAELS STORES | 15,972.41 | 8,307.96 | 7,664.45 | | | | | 15,972 |
| 8732 | MATTRESS FIRM BEDQUA | 14,560.52 | 10,500.00 | 7,000.00 | (2,939.48) | | | | 14,561 |
| 67422 0003PM | PRIDE MOTOR GROUP | 13,250.00 | 10,400.00 | 2,850.00 | | | | | 13,250 |
| 19683 | TARGET STORES | 12,596.82 | 6,318.90 | 5,018.24 | | | | 1,259.68 | 12,597 |
| 193521201 | LAWLESS CHRYSLER JEE | 12,300.00 | 4,300.00 | 8,000.00 | | | | | 12,300 |
| 391 | BAYSTATE AUCTION CO. | 12,052.80 | 12,052.80 | | | | | | 12,053 |
| 10352 | WALGREENS | 11,544.98 | 5,804.82 | 4,572.73 | 1,167.43 | | | | 11,545 |
| 88228 80007 | KELLY INFINITI | 11,000.00 | 11,000.00 | | | | | | 11,000 |
| 55851 | CVS PHARMACY | 10,991.02 | 6,142.94 | 4,848.08 | | | | | 10,991 |
| 796400 0500 | COMMONWEALTH AUCTION | 10,912.00 | 10,912.00 | | | | | | 10,912 |
| 615283 02500 | LANDMARK AUCTION CO. | 10,810.80 | 6,879.60 | 3,931.20 | | | | | 10,811 |
| 13:2 | INSPECTIONAL SERVICE | 9,829.42 | 9,829.42 | | | | | | 9,829 |
| 176354777 L0 | LIBERTY CHEVROLET | 9,690.00 | 4,845.00 | 4,845.00 | | | | | 9,690 |
| 174220003 LC | MASSDOT HIGHWAY | 9,466.83 | 3,274.08 | 6,192.75 | | | | | 9,467 |
| 79737543 L0 | MIRACLE EAR | 9,000.00 | 5,000.00 | 4,000.00 | | | | | 9,000 |
| 99969 | SEARS PREPRINT | 8,888.52 | 3,051.72 | 2,418.89 | 3,417.91 | | | | 8,889 |
| R409725 | PAUL E SAPERSTEIN CO | 8,862.75 | 8,862.75 | | | | | | 8,863 |
| 372276 55300 | SULLIVAN COMPANIES | 8,854.00 | 5,334.30 | 3,519.70 | | | | | 8,854 |
| 37350 7700 | GRAVA CHRYSLER/JEEP/ | 8,800.00 | 8,800.00 | | | | | | 8,800 |
| 71391895001 | KORDE & ASSOCIATES | 8,594.46 | 8,594.46 | | | | | | 8,594 |
| 282561500 L0 | MACROMARK | 8,417.61 | 1,870.58 | 3,741.16 | 2,805.87 | | | | 8,418 |
| 283042 | ADNET | 8,155.40 | 3,878.10 | 4,277.30 | | | | | 8,155 |
| 258731 6400 | MOHEGAN SUN | 8,100.00 | - | 4,050.00 | 4,050.00 | | | | 8,100 |
| 3433 | MODELL'S | 7,931.92 | - | 2,000.00 | 5,931.92 | | | | 7,932 |
| 03050 | JUDGE ROTENBERG EDUC | 7,854.73 | 7,854.73 | | | | | | 7,855 |
| 845 | PARKER PROFL DS | 7,711.01 | 3,725.96 | 3,985.05 | | | | | 7,711 |
| 8541 1238PP | JACK MADDEN FORD | 7,700.00 | 3,500.00 | 4,200.00 | | | | | 7,700 |
| 78176242 0001 | MASSPORT CAPITAL ACC | 7,560.54 | 5,557.32 | 2,003.22 | | | | | 7,561 |
| 67973568 1LO | MICHAUD MITSUBISHI | 7,500.00 | 3,200.00 | 4,300.00 | | | | | 7,500 |
| 674220 003MM | CITY OF LYNN | 7,500.00 | 3,000.00 | 4,500.00 | | | | | 7,500 |
| 125106 | GREYHOUND LINES INC. | 7,248.75 | 5,385.00 | 1,863.75 | | | | | 7,249 |
| 2122284 4017 | PRIORITY CHRYSLER JE | 7,200.00 | 4,500.00 | 2,700.00 | | | | | 7,200 |
| 617422 0003CJ | BOSTON VOLKSWAGEN | 7,000.00 | 7,000.00 | | | | | | 7,000 |
| 617783 130002 | NATIONAL WHOLESALE L | 6,829.08 | 2,276.36 | 2,276.36 | 2,276.36 | | | | 6,829 |

# Boston Herald
## Advertising Aging
### As of October 29, 2017
### APA Schedule 2.1.7

| Acct# | Name | Total | 10/01/17 | 09/01/17 | 08/01/17 | 07/01/17 | +07/01/17 | Reserved | NET |
|---|---|---|---|---|---|---|---|---|---|
| R247040 | MACY'S | 6,465.35 | 6,465.35 | - | - | - | - | - | 6,465 |
| 80570 | DICK'S SPORTING GOOD | 6,447.69 | 2,547.20 | 3,056.00 | 844.49 | - | - | - | 6,448 |
| 1935700001 | COLONIAL CADILLAC | 6,300.00 | 2,100.00 | 4,200.00 | - | - | - | - | 6,300 |
| 163919 | AETNA INC | 6,255.98 | 6,255.98 | - | - | - | - | - | 6,256 |
| 138420 | SULLIVAN TIRE COMPAN | 6,000.00 | 6,000.00 | - | - | - | - | - | 6,000 |
| 1786412STL0 | MASS HOUSING FINANCE | 5,895.50 | 1,475.49 | 4,420.01 | - | - | - | - | 5,896 |
| 083678180000 | DRUG ENFORCEMENT AGE | 5,800.00 | 5,800.00 | - | - | - | - | - | 5,800 |
| 1395530000 | COLONIAL NISSAN / ME | 5,800.00 | 5,800.00 | - | - | - | - | - | 5,800 |
| 86270 | WINDOW WORLD | 5,775.00 | 2,970.00 | 2,805.00 | - | - | - | - | 5,775 |
| 124630 | RAGGED MOUNTAIN RESO | 5,746.30 | 3,046.30 | 2,700.00 | - | - | - | - | 5,746 |
| 31850 | SYNCHRONY BANK | 5,600.00 | 1,400.00 | 2,800.00 | 1,400.00 | - | - | - | 5,600 |
| 33388 | DIRECT FEDERAL CREDI | 5,512.50 | 5,512.50 | - | - | - | - | - | 5,513 |
| 1773101015 | HERB CHAMBERS KIA | 5,500.00 | 2,400.00 | 3,100.00 | - | - | - | - | 5,500 |
| 1237355304 | COLONIAL BUICK PONTI | 5,400.00 | 5,400.00 | - | - | - | - | - | 5,400 |
| 5437 | DELL COMPUTER | 5,239.24 | 2,000.44 | 2,159.20 | 1,079.60 | - | - | - | 5,239 |
| 7065 | VISIT FLORIDA | 5,000.00 | 5,000.00 | - | - | - | - | - | 5,000 |
| 796964EL0 | DEPT OF SOCIAL SERVI | 4,950.00 | 4,950.00 | - | - | - | - | - | 4,950 |
| 1738190000 | HONDA CARS OF BOSTON | 4,925.00 | 1,400.00 | 3,525.00 | - | - | - | - | 4,925 |
| 763538801 | DEPT NEIGHBORHOOD DE | 4,868.04 | 4,868.04 | - | - | - | - | - | 4,868 |
| 3835 | AARP | 4,800.00 | 2,400.00 | 2,400.00 | - | - | - | - | 4,800 |
| 13897 | AMAZON CORPORATE LLC | 4,750.00 | 4,719.60 | 4,750.00 | - | - | - | - | 4,750 |
| 1331830GD | GOOD BROTHERS DODGE | 4,719.60 | 1,080.00 | - | - | - | - | - | 4,720 |
| 83299 | MCKINNONS MARKET-DAV | 4,660.00 | 4,633.20 | 3,580.00 | - | - | - | - | 4,660 |
| 1944460000 | IRVING SHECTMAN CO | 4,633.20 | 4,500.00 | 4,633.20 | - | - | - | - | 4,633 |
| 3492 | DULUTH TRADING COMPA | 4,500.00 | 2,250.00 | 4,500.00 | - | - | - | - | 4,500 |
| 80430 | CENTURY BANK | 4,500.00 | - | 2,250.00 | - | - | - | - | 4,500 |
| 13240 | AMERICAN CONSUMER SH | 4,405.01 | 4,405.01 | 4,405.01 | - | - | - | - | 4,405 |
| 453 | USADWEB LLC | 4,367.58 | 4,367.58 | - | - | - | - | - | 4,368 |
| 6DN124035 | VALASSIS PREPRINTS | 4,351.91 | 4,480.00 | - | - | - | (128.09) | - | 4,352 |
| 51208 | MASSPORT | 4,260.00 | 4,260.00 | - | - | - | - | - | 4,260 |
| 383835320FE | FED EX GROUND | 4,250.00 | 2,125.00 | 2,125.00 | - | - | - | - | 4,250 |
| 3623203000 | SPAULDING REHAB HOSP | 4,250.00 | 1,275.00 | 2,975.00 | - | - | - | - | 4,250 |
| 7733 | FOCUS FEATURES | 4,237.79 | 1,883.46 | 2,354.33 | - | - | - | - | 4,238 |
| 371224210 | GUAETTA & BENSON | 4,156.50 | 4,156.50 | - | - | - | - | - | 4,157 |
| 411282Z7 | WINGATE/SRC | 4,038.75 | - | 3,888.75 | 150.00 | - | - | - | 4,039 |
| 129059 | LUMBER LIQUIDATORS | 4,000.00 | 1,000.00 | 1,000.00 | 2,000.00 | - | - | - | 4,000 |
| 195221202 | LAWLESS RAM | 4,000.00 | - | 4,000.00 | - | - | - | - | 4,000 |
| 184350000L0 | MARCUS ERRICO EMMER | 3,831.97 | - | 3,831.97 | - | - | - | - | 3,832 |
| R292310 | MCKINNONS BUTCHER SH | 3,800.00 | 1,800.00 | 2,000.00 | - | - | - | - | 3,800 |
| 133953 | CONVENTION & VISITOR | 3,750.00 | 3,750.00 | - | - | - | - | - | 3,750 |
| 1724260000L0 | MASS WATER RESOURCES | 3,661.80 | 3,661.80 | - | - | - | - | - | 3,662 |
| 128747 | METRO CREDIT UNION | 3,600.00 | 1,800.00 | - | 1,800.00 | - | - | - | 3,600 |

# Boston Herald
## Advertising Aging
### As of October 29, 2017
### APA Schedule 2.1.7

| Acct# | Name | Total | 10/01/17 | 09/01/17 | 08/01/17 | 07/01/17 | +07/01/17 | Reserved | NET |
|---|---|---|---|---|---|---|---|---|---|
| 61797375431L2 | MASS DEPT OF TRANSPO | 3,575.64 | 3,457.17 | 1,981.68 | 1,593.96 | - | - | - | 3,576 |
| 61722756601L0 | MICHENZIE & SAWIN L | 3,457.17 | 3,457.17 | - | - | - | - | - | 3,457 |
| 133628 | PHRMA | 3,368.50 | - | 3,368.50 | - | - | - | - | 3,369 |
| L3890 | VICTREN | 3,308.19 | 1,102.73 | 2,205.46 | - | - | - | - | 3,308 |
| 79691381L0 | BARR & COLE ATTORNE | 3,263.31 | 3,263.31 | - | - | - | - | - | 3,263 |
| 136909900 | HELPING HANDS OF AME | 3,234.00 | 3,234.00 | - | - | - | - | - | 3,234 |
| 17864590002 | CAMBRIDGE HONDA / CH | 3,200.00 | 1,600.00 | 1,600.00 | - | - | - | - | 3,200 |
| 64918600086 | BETH ISRAEL - NEEDHA | 3,193.69 | 1,133.33 | 1,030.18 | 1,030.18 | - | - | - | 3,194 |
| 79897000L0 | BOSTON WATER & SEWER | 3,090.99 | 3,090.99 | - | - | - | - | - | 3,091 |
| C08L435002 | SUFFOLK DOWNS | 3,000.00 | - | 750.00 | 2,250.00 | - | - | - | 3,000 |
| 61773101000S | HERB CHAMBERS COMPAN | 3,000.00 | 1,800.00 | 1,200.00 | - | - | - | - | 3,000 |
| L4594 | BROADWAY IN BOSTON | 3,000.00 | - | 3,000.00 | - | - | - | - | 3,000 |
| 132225 | MATTRESS SUPERSTORE | 3,000.00 | - | 3,000.00 | - | - | - | - | 3,000 |
| 78N303350 | MOHEGAN SUN | 2,849.89 | 1,518.75 | 1,518.75 | - | - | - | - | 2,850 |
| 17569604400 | CENTURY 21/MARIO REA | 2,700.00 | 2,700.00 | - | - | - | - | - | 2,700 |
| 67717 | SIGMA MECHANICAL SER | 2,658.10 | 396.72 | 2,261.38 | - | - | - | - | 2,658 |
| 74490895L0 | PRESERVE AFFORDABLE | 2,627.88 | 2,627.88 | - | - | - | - | - | 2,628 |
| 17436882900 | AVENUE AUCTION SALES | 2,574.00 | 2,574.00 | - | - | - | - | - | 2,574 |
| 4012721400L0 | SHECHTMAN HALPERIN S | 2,520.18 | - | 2,520.18 | - | - | - | - | 2,520 |
| 57662600L0 | FRANK N DARDENO LAW | 2,520.18 | - | 2,520.18 | - | - | - | - | 2,520 |
| 133969 | MACY'S | 2,500.00 | 2,500.00 | - | - | - | - | - | 2,500 |
| 29382 | MASS STATE LOTTERY | 2,500.00 | - | 2,500.00 | - | - | - | - | 2,500 |
| D7269160000 | JOHN F O'BRIEN FUNER | 2,450.70 | 2,450.70 | - | - | - | - | - | 2,451 |
| 131024 | LAFORCE REALTY | 2,417.50 | 450.00 | 1,967.50 | - | - | - | - | 2,418 |
| 914147552007 | COLONIAL VOLKSWAGEN | 2,400.00 | 1,200.00 | 1,200.00 | - | - | - | - | 2,400 |
| 41393989900 | KNEELAND CONSTRUCTIO | 2,368.00 | 1,184.00 | 1,184.00 | - | - | - | - | 2,368 |
| 18433 78300 | ARBOUR HEALTH SYSTEM | 2,287.50 | 500.00 | 787.50 | 1,000.00 | - | - | - | 2,288 |
| 15991200 08 | PRIDE MOTOR GROUP-KI | 2,000.00 | 1,000.00 | 1,000.00 | - | - | - | - | 2,000 |
| 6720720900 | AMERICAN AUCTIONS | 1,918.80 | 959.40 | 959.40 | - | - | - | - | 1,919 |
| 13208050L0 | NEW ENGLAND NEWSPAPE | 1,915.00 | 1,915.00 | - | - | - | - | - | 1,915 |
| 17265984000 | JAMES A. MURPHY & SO | 1,890.40 | 1,343.50 | 546.90 | - | - | 1,915.20 | - | 1,890 |
| 31248 | BANECARE MANAGEMENT | 1,823.34 | 911.67 | 911.67 | - | - | - | - | 1,823 |
| 654777869L0 | STOX POSTING & PUBL | 1,816.54 | 1,816.54 | - | - | - | - | - | 1,817 |
| C08839700100 | NORTHEAST HOME AND E | 1,800.00 | 1,800.00 | - | - | - | (187.61) | - | 1,800 |
| 81963190001 | TOWNE AUCTION | 1,778.40 | 1,778.40 | - | - | - | - | - | 1,778 |
| 61759867 00L0 | DONOGHUE BARRETT & S | 1,755.12 | 1,755.12 | - | - | - | - | - | 1,755 |
| 133657 | BOSTON BREAKERS | 1,750.00 | - | - | 750.00 | - | - | - | 1,750 |
| 97839660 0000 | NORTH READING SUBARU | 1,693.93 | 1,693.93 | 1,000.00 | - | - | - | - | 1,694 |
| 78194449 00 | AUSTIN PREPATORY SCH | 1,687.50 | 1,687.50 | - | - | - | - | - | 1,688 |
| 617635450 5L0 | CITY OF BOSTON | 1,647.81 | 818.52 | 829.29 | - | - | - | - | 1,648 |
| 6178541257L1 | MASS HOUSING FINANCE | 1,637.04 | - | 1,637.04 | - | - | - | - | 1,637 |
| 129015 | BEST BUY | 1,633.58 | - | - | 1,633.58 | - | - | - | 1,634 |

Boston Herald
Advertising Aging
As of October 29, 2017
APA Schedule 2.1.7

| Acct# | Name | Total | 10/01/17 | 09/01/17 | 08/01/17 | 07/01/17 | +07/01/17 | Reserved | NET |
|---|---|---|---|---|---|---|---|---|---|
| 128180 | SEAGATE HOSPITALITY | 1,620.00 | 1,620.00 | - | - | - | - | - | 1,618 |
| 8282111430S | OPTUM SERVICES INC | 1,618.21 | 1,618.21 | - | - | - | - | - | 1,618 |
| 8742200031M | LIBERTY MAZDA | 1,615.00 | - | 1,615.00 | - | - | - | - | 1,615 |
| 73488550002 | COMMONWEALTH OF MASS | 1,608.32 | 1,608.32 | - | - | - | - | - | 1,608 |
| 52242 | DOLLAR TREE STORE | 1,567.97 | 1,567.97 | - | - | - | - | - | 1,568 |
| 514143804901 | STONEHAM FORD | 1,550.00 | 1,550.00 | - | - | - | - | - | 1,550 |
| 12619 | THE HOME DEPOT | 1,544.00 | 1,544.00 | - | - | - | - | - | 1,544 |
| 491860000TP | TAKEDA PHARMACEUTICA | 1,541.76 | - | 1,541.76 | - | - | - | - | 1,542 |
| 63232 | BIG Y FOODS INC | 1,500.00 | 1,500.00 | - | - | - | - | - | 1,500 |
| 7300424700 | STATE LINE PET SUPPL | 1,500.00 | 1,500.00 | - | - | - | - | - | 1,500 |
| 133907 | WGBH | 1,500.00 | 1,500.00 | - | - | - | - | - | 1,500 |
| 733957 | HOLLISTER STAFFING | 1,500.00 | 1,500.00 | - | - | - | - | - | 1,500 |
| 73127 | BOURNEWOOD HEALTH SY | 1,500.00 | 1,500.00 | - | - | - | - | - | 1,500 |
| 733956 | NESN | 1,500.00 | 1,500.00 | - | - | - | - | - | 1,500 |
| 733959 | WEGMANS FOOD MARKETS | 1,500.00 | 1,500.00 | - | - | - | - | - | 1,500 |
| 733950 | BROOKLINE BANK | 1,500.00 | 1,500.00 | - | - | - | - | - | 1,500 |
| 73958 | SALEM FIVE | 1,500.00 | 1,500.00 | - | - | - | - | - | 1,500 |
| 5083628171000 | JJ MANNING | 1,474.20 | 982.80 | 491.40 | - | - | - | - | 1,474 |
| 278454918900 | HARKINS REAL ESTATE | 1,450.80 | 795.60 | 655.20 | - | - | - | - | 1,451 |
| 3771922600LO | BACK BAY DEVELOPMENT | 1,443.18 | 1,443.18 | - | - | - | - | - | 1,443 |
| 7541389000LO | MADISON PARK DEVELOP | 1,421.64 | 1,421.64 | - | - | - | - | - | 1,422 |
| 63048 | FOXWOODS RESORT CASI | 1,420.00 | 710.00 | 710.00 | - | - | - | - | 1,420 |
| 03580096LO | FIRSTLIGHT FIBER | 1,400.10 | - | 1,400.10 | - | - | - | - | 1,400 |
| 7817625900002 | CADILLAC OF NORWOOD | 1,400.00 | 1,400.00 | - | - | - | - | - | 1,400 |
| 33932 | PARTY CITY | 1,397.90 | 1,397.90 | - | - | - | - | - | 1,398 |
| 198525456LO | CLOUGH HARBOUR & ASS | 1,378.56 | 1,378.56 | - | - | - | - | - | 1,379 |
| 2821114311 | DICKS SPORTING GOODS | 1,375.00 | - | - | 1,375.00 | - | - | - | 1,375 |
| 3733523800 | AARON POSNIK & COMPA | 1,358.00 | 679.00 | 679.00 | - | - | - | - | 1,358 |
| 7696118000 | TRAVERSE REAL ESTATE | 1,358.00 | 1,358.00 | - | - | - | - | - | 1,358 |
| 7926515500 | MOODY STREET FINANCI | 1,354.16 | 1,354.16 | - | - | - | - | - | 1,354 |
| 2228940OAB | ACADEMY BUS | 1,338.75 | 1,338.75 | - | - | - | - | - | 1,339 |
| 491860000TA | TARGET | 1,338.75 | 1,338.75 | - | - | - | - | - | 1,339 |
| 82905 | EAST CAMBRIDGE SAVIN | 1,300.00 | 1,800.00 | - | (500.00) | - | - | - | 1,300 |
| 1270400307 | KEOLIS COMMUTER SERV | 1,275.00 | 1,275.00 | - | - | - | - | - | 1,275 |
| 78187888801 | MIDWAY AUTO | 1,275.00 | 1,275.00 | - | - | - | - | - | 1,275 |
| 781292479000 | THE BOSTON CONSORTIU | 1,250.00 | 1,250.00 | - | - | - | - | - | 1,250 |
| 133817 | VNA CARE | 1,250.00 | - | - | 1,250.00 | - | - | - | 1,250 |
| 124768 | MUSEUM OF FINE ARTS | 1,250.00 | 1,250.00 | - | - | - | - | - | 1,250 |
| 131402 | COMMONWEALTH OF MASS | 1,250.00 | 1,250.00 | - | - | - | - | - | 1,250 |
| 6172612261LO | HINES | 1,249.32 | 1,249.32 | - | - | - | - | - | 1,249 |
| 78132639610LO | JDMD OWNER LLC | 1,206.24 | - | 1,206.24 | - | - | - | - | 1,206 |
| 121474 | AGGANIS ARENA AT BOS | 1,200.00 | 1,200.00 | - | - | - | - | - | 1,200 |

# Boston Herald
## Advertising Aging
### As of October 29, 2017
#### APA Schedule 2.1.7

| Acct# | Name | Total | 10/01/17 | 09/01/17 | 08/01/17 | 07/01/17 | +07/01/17 | Reserved | NET |
|---|---|---|---|---|---|---|---|---|---|
| 132832 | IMPLANT DENTISTRY OF | 1,200.00 | - | 600.00 | 600.00 | - | - | - | 1,200 |
| 428853 | WHEELS FOR WISHES | 1,160.00 | 1,160.00 | | | | | | 1,160 |
| 3756842741L0 | EAST BOSTON SAVINGS | 1,152.00 | 1,152.00 | | | | | | 1,152 |
| 2725 | MURRAY PAVING | 1,150.00 | - | 1,150.00 | | | | | 1,150 |
| 2929220NF | NATIONAL UNION FIRE | 1,146.82 | 458.74 | 688.08 | | | | | 1,147 |
| 1491886000SL | SUN LIFE FINANCIAL | 1,146.82 | | | 1,146.82 | | | | 1,147 |
| 7625432000 | GEORGE L DOHERTY FUN | 1,136.80 | 1,136.80 | | | | | | 1,137 |
| 763538880L0 | DEPT NEIGHBORHOOD DE | 1,130.85 | | 1,130.85 | | | | | 1,131 |
| 5264 | HANNAH KRISPIN LAW O | 1,129.32 | 704.58 | 424.74 | | | | | 1,129 |
| 7293430 | NEURO QUELI/MACROMAR | 1,102.73 | | 1,102.73 | | | | | 1,103 |
| 733647 | WANG CENTER PERFORMI | 1,100.00 | 1,100.00 | | | | | | 1,100 |
| 1773144500 | STANLEY J PAINE | 1,088.10 | 1,088.10 | | | | | | 1,088 |
| 74512770L0 | METROPOLITAN AREA PL | 1,077.00 | 1,077.00 | | | | | | 1,077 |
| 7284337600 | PAUL BUONFIGLIO FUNE | 1,073.70 | 390.60 | 683.10 | | | | | 1,074 |
| 985411238AG | AIRGAS | 1,070.29 | | 1,070.29 | | | | | 1,070 |
| 77887450L0 | COMM OF MASS - LAND | 1,069.82 | 775.44 | 294.38 | | | | | 1,070 |
| 7282556400 | JOHN J O'CONNOR & SO | 1,050.90 | 1,050.90 | | | | | | 1,051 |
| 733858 | BLUE DIAMOND REAL ES | 1,050.00 | | 1,050.00 | | | | | 1,050 |
| 741380370000 | FRANK RONNE & ASSOC | 1,047.60 | 1,047.60 | | | | | | 1,048 |
| 315921600L0 | QROE PRESERVATION DE | 1,012.38 | | 1,012.38 | | | | | 1,012 |
| 177869001600 | NE TRACTOR TRAILER S | 1,003.94 | 1,003.94 | | | | | | 1,004 |
| 3602 | ACCENTURE FEDERAL SE | 1,000.00 | 1,000.00 | | | | | | 1,000 |
| 3872 | NEW HAMPSHIRE MOTOR | 1,000.00 | - | 1,000.00 | | | | | 1,000 |
| 119736 | OLD TOWN TROLLEY | 1,000.00 | 1,000.00 | | | | | | 1,000 |
| 773101009 | HERB CHAMBERS TOYOTA | 1,000.00 | 1,000.00 | | | | | | 1,000 |
| 773101012 | HERB CHAMBERS HYUNDA | 1,000.00 | 500.00 | 500.00 | | | | | 1,000 |
| 731010002 | HERB CHAMBERS FORD | 1,000.00 | 1,000.00 | | | | | | 1,000 |
| 3960 | MASS CONVENTION CENT | 1,000.00 | 1,000.00 | | | | | | 1,000 |
| 3930 | SONIC | 1,000.00 | 1,000.00 | | | | | | 1,000 |
| 3122370002 | 128 SAAB VOLVO | 1,000.00 | 1,000.00 | | | | | | 1,000 |
| 3862 | EASTERN SHED COMPANY | 1,000.00 | 1,000.00 | | | | | | 1,000 |
| 362418180 | JAMES ST JEAN AUCTIO | 982.80 | 982.80 | | | | | | 983 |
| 3779005L0 | SIMPLY SELF STORAGE | 969.30 | 646.20 | 323.10 | | | | | 969 |
| 33882 | FONTBONNE ACADEMY | 937.50 | 937.50 | | | | | | 938 |
| 6173424000L1 | FOLEY & LARDNER LLP | 909.87 | | | 909.87 | | | | 910 |
| 13894 | INCYTE | 906.78 | 906.78 | | | | | | 907 |
| 83183 | FAMILY LIVES | 905.16 | 905.16 | | | | | | 905 |
| 5086983034L0 | WESTON & SAMPSON | 904.68 | | 904.68 | | | | | 905 |
| 29893 | THE SAGE SCHOOL | 900.00 | 900.00 | | | | | | 900 |
| 124359 | SACRED HEART | 900.00 | 900.00 | | | | | | 900 |
| 132102 | BU SCHOOL OF MEDICIN | 896.00 | 896.00 | | | | | | 896 |
| 97864978800 | ANIE PUBLISHING CORP | 894.70 | 577.30 | 317.40 | | | | | 895 |

Boston Herald
Advertising Aging
As of October 29, 2017
APA Schedule 2.1.7

Case 17-12881-LSS   Doc 13-2   Filed 12/08/17   Page 137 of 223

| Acct# | Name | Total | 10/01/17 | 09/01/17 | 08/01/17 | 07/01/17 | *07/01/17 | Reserved | NET |
|---|---|---|---|---|---|---|---|---|---|
| 61730S3500L0 | DEPT PUBLIC UTILITIE | 893.91 | | 893.91 | | | | | 894 |
| 64918600MP | MILLENNIUM PHARMACEU | 891.95 | 891.95 | | | | | | 892 |
| 61748272111L0 | KROKIDAS & BLUESTEIN | 884.74 | 884.74 | - | | | | | 885 |
| DL71190 | HOTLINE LISTS | 878.71 | 175.00 | 703.71 | | | | | 879 |
| 57452140 | TWENTIETH CENTURY FO | 877.20 | | 877.20 | | | | | 877 |
| 196341900 | CARTWRIGHT FUNERAL H | 867.00 | 867.00 | | | | | | 867 |
| 51817 | PETCO | 862.01 | 862.01 | | | | | | 862 |
| 77847480L0 | AXIS ENGINEERING GRO | 861.60 | 861.60 | | | | | | 862 |
| 53886 | THE ROXBURY LATIN SC | 843.75 | 843.75 | | | | | | 844 |
| 27810 | CATHOLIC MEMORIAL | 843.00 | 843.00 | | | | | | 843 |
| 26203 | RAYMOUR & FLANIGAN | 838.84 | 418.97 | 418.97 | 0.90 | | | | 839 |
| 61772243011L0 | BOSTON REDEVELOPMENT | 818.52 | 818.52 | | | | | | 819 |
| 6383639000 | AUCTION MARKETING GR | 814.80 | 814.80 | | | | | | 815 |
| 397 | COMFORT SIT & SLEEP | 800.00 | | 800.00 | | | | | 800 |
| 13496 | ADVOCATES | 787.50 | | 787.50 | | | | | 788 |
| 9853187Z2VN | VNA CARE NETWORK | 787.50 | | 787.50 | | | | | 788 |
| 66579714L0 | GCG ASSOCIATES INC. | 786.21 | | 786.21 | | | | | 786 |
| 6089762111L0 | CLARK - BALBON & GI | 775.44 | 775.44 | | | | | | 775 |
| 7348885004 | COMMONWEALTH OF MASS | 775.44 | 1,550.88 | | (775.44) | | | | 775 |
| 78681420L0 | MCPHAIL ASSOCIATES I | 764.67 | 764.67 | | | | | | 765 |
| 5280 | PAN & ASSOCIATES | 764.54 | 764.54 | | | | | | 765 |
| 7268193000 | JOS CASPER & SONS FU | 754.20 | 754.20 | | | | | | 754 |
| 9667 | NEW ENGLAND BALLISTI | 750.00 | 750.00 | | | | | | 750 |
| 130170 | KRAFT SOCCER LLC | 750.00 | | 750.00 | | | | | 750 |
| 5763596000I | BOSTON PUBLIC SCHOOL | 750.00 | 750.00 | | | | | | 750 |
| 5788272300 | FRANK A WELSH & SONS | 726.30 | 726.30 | | | | | | 726 |
| 123735 | FOODS PLUS | 720.00 | 720.00 | | | | | | 720 |
| 6365433100 | GEORGE HILL ORCHARDS | 720.00 | 360.00 | 360.00 | | | | | 720 |
| 61762048200 | KRAW-KORNACK FUNERAL | 710.70 | 710.70 | | | | | | 711 |
| 131680 | DISCOVER ALASKA | 701.48 | | 350.74 | 350.74 | | | | 701 |
| 6178787815OO | DONOVAN AUFIERO FUNE | 695.80 | 695.80 | | | | | | 696 |
| 68430105000 | DANIEL P MCLAUGHLIN | 690.30 | 690.30 | | | | | | 690 |
| 81396770000 | GAFFEY FUNERAL SERVI | 687.70 | 504.10 | 183.60 | | | | | 688 |
| 61772740003L0 | COMM OF MASS DCAM | 678.51 | 678.51 | | | | | | 679 |
| 78157519110 | MBTA | 678.51 | 678.51 | | | | | | 679 |
| 61746641870 | CITY OF CHELSEA | 667.74 | 667.74 | | | | | | 668 |
| 61755759000L0 | ROBINSON & COLE | 667.74 | 667.74 | | | | | | 668 |
| 61724215090O | FRANK H CARR FUNERAL | 664.20 | 664.20 | | | | | | 668 |
| 6179247770L0 | VANASSE HANGEN BRUST | 656.97 | 441.57 | 215.40 | | | | | 657 |
| 9787445211O0 | TACHE AUCTIONS & SAL | 655.20 | 655.20 | | | | | | 655 |
| 61756147330O | J.M. MECHANICAL SERV | 653.44 | 653.44 | | | | | | 653 |
| 133328 | ST. ANTHONY SHRINE | 650.00 | 650.00 | | | | | | 650 |

# Boston Herald
## Advertising Aging
### As of October 29, 2017
### APA Schedule 2.1.7

| Acct# | Name | Total | 10/01/17 | 09/01/17 | 08/01/17 | 07/01/17 | +07/01/17 | Reserved | NET |
|---|---|---|---|---|---|---|---|---|---|
| 781930400000 | LYNCH-CANTILLON FUNE | 648.30 | 648.30 | - | - | - | - | - | 648 |
| 7774245000L0 | WINN DEVELOPMENT | 624.66 | 624.66 | - | - | - | - | - | 625 |
| 7779944750L0 | RELATED BEAL | 624.66 | - | 624.66 | - | - | - | - | 625 |
| 619603220L0 | MARATHON MOVING COMP | 624.66 | - | - | 624.66 | - | - | - | 625 |
| 128477560L0 | VERTUCCIO FUNERAL HO | 613.00 | 613.00 | - | - | - | - | - | 613 |
| 123541000L0 | GEORGE F DOHERTY FUN | 609.40 | 609.40 | - | - | - | - | - | 609 |
| 73384343L0 | BIG NIGHT ENTERTAINM | 603.12 | - | - | 603.12 | - | - | - | 603 |
| 76354904L1 | CITY OF BOSTON/PUBLI | 603.12 | - | 603.12 | - | - | - | - | 603 |
| 765206700L0 | HAYCON BUILDING LLC | 603.12 | - | 603.12 | - | - | - | - | 603 |
| 7727560000L0 | DEPT OF MENTAL HEALT | 603.12 | 603.12 | - | - | - | - | - | 603 |
| 74113 | ISABELLA STEWART GAR | 600.00 | - | 600.00 | - | - | - | - | 603 |
| 71255 | LEAF GUARD | 600.00 | 600.00 | - | - | - | - | - | 600 |
| 17217274000 | OLYMPIC SYSTEMS CORP | 600.00 | - | 600.00 | - | - | - | - | 600 |
| 33856 | STELIOS FAMILY RESTA | 600.00 | - | - | 600.00 | - | - | - | 600 |
| 13566 | PEABODY ESSEX MUSEUM | 600.00 | - | - | 600.00 | - | - | - | 600 |
| 11103 | SHELBURNE FARM | 600.00 | 600.00 | - | - | - | - | - | 600 |
| 741188259L0 | NEIGHBORHOOD OF AFFO | 581.58 | 581.58 | - | - | - | - | - | 582 |
| 78122184000L0 | SIENA ENGINEERING | 581.58 | 581.58 | - | - | - | - | - | 582 |
| 684000292L0 | NATIONAL GRID | 581.58 | - | - | 581.58 | - | - | - | 582 |
| 762456772L0 | DEPT OF PUBLIC HEALT | 576.00 | 576.00 | - | - | - | - | - | 576 |
| 76354904L0 | CITY OF BOSTON/PUBLI | 576.00 | 288.00 | 288.00 | - | - | - | - | 576 |
| 222894000PP | PAYPAL INC. | 572.96 | 572.96 | - | - | - | - | - | 573 |
| 7323860000 | W J GORMLEY FUNERAL | 567.30 | 567.30 | - | - | - | - | - | 567 |
| 675690990000 | RUGGIERO MAZZARELLA | 565.90 | 565.90 | - | - | - | - | - | 566 |
| 744581500L0 | J.B. JOHNSON FUNERAL | 562.80 | 429.90 | 132.90 | - | - | - | - | 563 |
| 743603030L0 | KEOHANE COMPANY | 560.04 | - | - | 560.04 | - | - | - | 560 |
| 184348013 | QUIRK PREOWNED | 560.00 | 560.00 | - | - | - | - | - | 560 |
| 727783000 | LEVINE CHAPELS | 558.40 | 558.40 | - | - | - | - | - | 558 |
| 9867578400 | GEORGE A COLLIAS | 549.80 | 549.80 | - | - | - | - | - | 550 |
| 884264000 | ZEKOS GROUP | 543.20 | 543.20 | - | - | - | - | - | 543 |
| 224101950L0 | OFFICE OF VERMONT A. | 538.50 | - | 538.50 | - | - | - | - | 539 |
| 292922000MC | MCKINSEY & CO | 535.19 | 535.19 | - | - | - | - | - | 535 |
| 735770441L0 | FORT POINT ASSOCIATE | 527.73 | 527.73 | - | - | - | - | - | 528 |
| 33935 | CLASSIC PIZZA | 524.70 | 524.70 | - | - | - | - | - | 525 |
| AN5T401590 | SONY THEATRES | 522.55 | 522.55 | - | - | - | - | - | 523 |
| 6731052941L0 | GREENBERG TRAURIG LL | 516.96 | 516.96 | - | - | - | - | - | 517 |
| 978897710L0 | EPSILON ASSOCIATES | 516.96 | 516.96 | - | - | - | - | - | 517 |
| 617387312000 | CAFASSO FUNERAL HOME | 507.60 | 507.60 | - | - | - | - | - | 508 |
| 617282115000 | J. FREEMAN | 506.16 | 506.16 | - | - | - | - | - | 506 |
| 16782 | CRUISE TRAVEL OUTLET | 500.00 | 500.00 | - | - | - | - | - | 500 |
| 133949 | THE GREATER BOSTON F | 500.00 | 500.00 | - | - | - | - | - | 500 |
| R426470 | SPORTS ETC. | 500.00 | 500.00 | - | - | - | - | - | 500 |

Boston Herald
Advertising Aging
As of October 29, 2017
APA Schedule 2.1.7

| Acct# | Name | Total | 10/01/17 | 09/01/17 | 08/01/17 | 07/01/17 | +07/01/17 | Reserved | NET |
|---|---|---|---|---|---|---|---|---|---|
| 617731010019 | HERB CHAMBERS LAND R | 500.00 | - | 500.00 | | | | | 500 |
| 617731010003 | HERB CHAMBERS HONDA | 500.00 | - | 500.00 | | | | | 500 |
| 617731010024 | HERB CHAMBERS LEXUS | 500.00 | 500.00 | | | | | | 500 |
| L0831 | NEUROMODULATION LAB | 500.00 | 500.00 | | | | | | 500 |
| 3909 | CAMBRIDGE SDA CHURCH | 500.00 | 500.00 | | | | | | 500 |
| 57840 | STOWE AREA ASSOCIATI | 500.00 | - | 500.00 | | | | | 500 |
| 3142 | OTTO'S CONES POINT | 500.00 | - | 500.00 | | | | | 500 |
| 53974 | SMUGGLERS NOTCH RESO | 500.00 | - | 500.00 | | | | | 500 |
| 3141 | KILLINGTON RESORT | 500.00 | - | 500.00 | | | | | 500 |
| 733861 | BENNINGTON CENTER FO | 500.00 | - | 500.00 | | | | | 500 |
| 733123 | SOUTHERN VERMONT COL | 500.00 | - | 500.00 | | | | | 500 |
| 733863 | THE SKINNY PANCAKE | 500.00 | - | 500.00 | | | | | 500 |
| 500029 | STOWEFLAKE MOUNTAIN | 500.00 | - | 500.00 | | | | | 500 |
| 522287 | STOWE MOUNTAIN LODGE | 500.00 | - | 500.00 | | | | | 500 |
| CT2N178500 | FRANCISCAN MISSION | 500.00 | - | 500.00 | | | | | 500 |
| 1025 | CAPTAIN MARDEN'S SEA | 499.65 | 499.65 | | | | | | 500 |
| 618746503300 | J MICHAEL DUNPHY | 491.40 | 491.40 | | | | | | 491 |
| 6178259867L0 | CHEVY AUTO BODY INC | 484.65 | 484.65 | | | | | | 485 |
| 23968 | STOWE FARM | 480.00 | 360.00 | 120.00 | | | | | 480 |
| 61742708280O | RIDLEY MEMORIAL INC. | 476.70 | 476.70 | | | | | | 477 |
| 61742756250O | RILEY FUNERAL HOME | 476.70 | 164.10 | 312.60 | | | | | 477 |
| 61772232341O | MASS BAY TRANS AUTHO | 466.70 | 466.70 | | | | | | 467 |
| 3588014110 | MASS MUNICIPAL WHOLE | 463.11 | 236.94 | 226.17 | | | | | 463 |
| 2129292200TE | TEL EPION INC | 458.74 | 458.74 | | | | | | 459 |
| 575222424L1 | JACKSON SQ PARTNERS | 452.34 | 452.34 | | | | | | 452 |
| L797375431.4 | MASS DOT | 452.34 | 452.34 | | | | | | 452 |
| 163075 | AMERICAN COLLECTIBLE | 450.00 | 450.00 | | | | | | 450 |
| 33324 | NEW ENGLAND PHILHARM | 450.00 | - | 450.00 | | | | | 450 |
| 618256647200 | HARVEY ROBBINS PRODU | 450.00 | 450.00 | | | | | | 450 |
| 2929220OAI | AIG PC GLOBAL SERVIC | 445.99 | - | 445.99 | | | | | 446 |
| 608422444 | WEITBRECHT AUCTIONEE | 443.20 | 443.20 | | | | | | 443 |
| 75741485L0 | SCD DRYDOCK Q1 LLC | 441.57 | | | 441.57 | | | | 442 |
| 7567095500 | DIPIETRO & VAZZA FUN | 433.50 | | | 433.50 | | | | 434 |
| L748217760 | GOULSTON & STORRS | 430.80 | | | 430.80 | | | | 431 |
| 91537 | ELITE ENTERTAINMENT. | 425.00 | 425.00 | | | | | | 425 |
| 617387418000 | SALVATORE ROCCO & SO | 424.80 | 319.80 | 105.00 | | | | | 425 |
| 617567091000 | MAGRATH FUNERAL HOME | 417.90 | 417.90 | | | | | | 418 |
| 508653434200 | EVERETT & SON FUNERA | 413.70 | 413.70 | | | | | | 414 |
| 617536411000 | BOSTON HARBORSIDE HO | 410.10 | 410.10 | | | | | | 410 |
| 781272005000 | ED V SULLIVAN FUNERA | 410.10 | 410.10 | | | | | | 410 |
| R100230 | COMMERCIAL LOBSTER | 400.00 | 400.00 | | | | | | 400 |
| 133900 | BERKSHIRE HATHAWAY | 400.00 | - | 400.00 | | | | | 400 |

Boston Herald
Advertising Aging
As of October 29, 2017
APA Schedule 2.1.7

| Acct# | Name | Total | 10/01/17 | 09/01/17 | 08/01/17 | 07/01/17 | +07/01/17 | Reserved | NET |
|---|---|---|---|---|---|---|---|---|---|
| 973689595200 | VERRILL FARM | 400.00 | 400.00 | - | - | - | - | - | 400 |
| 429761 | HERB CHAMBERS CJD OF | 396.00 | - | 396.00 | - | - | - | - | 396 |
| 429762 | HERB CHAMBERS OF MIL | 396.00 | - | 396.00 | - | - | - | - | 396 |
| 129755 | CENTRAL CJD | 395.00 | 395.00 | - | - | - | - | - | 395 |
| 078838340500 | KELLY E RIOUY | 395.00 | 395.00 | - | - | - | - | - | 395 |
| 47298343201 | GEORGE LOPES FUNERAL | 382.80 | - | 382.80 | - | - | - | - | 383 |
| 508653800710 | IRWIN ENGINEERS | 376.95 | 376.95 | - | - | - | - | - | 377 |
| 2428 | MASS GENERAL HOSPITA | 375.00 | 375.00 | - | - | - | - | - | 375 |
| 835634200 | WHITTIER-PORTER FUNE | 370.80 | 370.80 | - | - | - | - | - | 371 |
| 617964809010 | WILSON-MARINO & BON | 370.00 | - | - | 370.00 | - | - | - | 370 |
| 72949 | GABRIEL'S AUCTION/AP | 362.70 | 362.70 | - | - | - | - | - | 363 |
| 895 | D L SAUNDERS REAL ES | 360.00 | 120.00 | 240.00 | - | - | - | - | 360 |
| 3638 | LAER REALTY | 360.00 | 120.00 | 240.00 | - | - | - | - | 360 |
| 8746223100 | DAVIS FUNERAL & CREM | 355.20 | 355.20 | - | - | - | - | - | 355 |
| 123030000 | PORCELLA FUNERAL HOM | 351.60 | 351.60 | - | - | - | - | - | 352 |
| 1322083400 | WEIR FUNERAL HOME | 351.60 | 351.60 | - | - | - | - | - | 352 |
| 747491000 | FLAVIN & FLAVIN | 345.00 | 345.00 | - | - | - | - | - | 345 |
| 132383 | DARRYL'S CORNER BAR | 336.00 | - | 336.00 | - | - | - | - | 336 |
| 855781500LO | WOODARD & CURRAN INC | 333.87 | - | - | 333.87 | - | - | - | 334 |
| 194028400 | DOUGLASS FUNERAL HOM | 332.10 | - | 332.10 | - | - | - | - | 332 |
| 325046100 | FOLSOM FUNERAL HOME | 328.20 | 328.20 | - | - | - | - | - | 328 |
| 1438013500 | ANDERSON-BRYANT FUNE | 328.20 | 328.20 | - | - | - | - | - | 328 |
| 754717110 | MIDDLESEX SHERIFF'S | 327.60 | 327.60 | - | - | - | - | - | 328 |
| 150154000 | THE JUMPP CO | 327.60 | 327.60 | - | - | - | - | - | 328 |
| 524086100 | BRADY & FALLON FUNER | 320.40 | 320.40 | - | - | - | - | - | 320 |
| 1782100000 | LEHMAN-REEN-MCNAMARA | 313.20 | 313.20 | - | - | - | - | - | 313 |
| 6215 | TEWKSBURY FUNERAL HO | 308.40 | 308.40 | - | - | - | - | - | 308 |
| 893963 | NEWTON ROOFING RESID | 308.22 | 308.22 | - | - | - | - | - | 308 |
| 20514 | LAW OFFICES OF WEI J | 304.82 | 304.82 | - | - | - | - | - | 305 |
| 163964 | LYRIC STAGE COMPANY | 300.00 | 300.00 | - | - | - | - | - | 300 |
| 1828721600 | TUFTS UNIV SCHOOL OF | 300.00 | - | 300.00 | - | - | - | - | 300 |
| 787864704700 | SHARON MEMORIAL PARK | 300.00 | 300.00 | - | - | - | - | - | 300 |
| 814470017000 | A. J. SPEARS FUNERAL | 297.00 | 297.00 | - | - | - | - | - | 297 |
| 508428570400 | BLANCHARD FUNERAL HO | 293.70 | 293.70 | - | - | - | - | - | 294 |
| 132169 | JOHN LAWRENCE FUNERA | 288.90 | 288.90 | - | - | - | - | - | 289 |
| 617423454585 | HIMALAYAN BISTRO | 288.00 | - | 144.00 | 144.00 | - | - | - | 287 |
| 212289400TT | BANKRATE LLC | 286.76 | - | - | 286.80 | - | (0.04) | - | 287 |
| 781933670200 | TTEC CONSULTING INC. | 280.36 | 280.36 | - | - | - | - | - | 280 |
| 617282716510 | PREFERRED ELECTRICAL | 280.33 | - | 280.33 | - | - | - | - | 280 |
| 133223 | A & B TOWING | 280.02 | - | 280.02 | - | - | - | - | 280 |
| 133829 | MICHELLE VARANO | 280.00 | 280.00 | - | - | - | - | - | 280 |
| | PHYSICIANS MUTUAL | 275.68 | - | - | 275.68 | - | - | - | 276 |

# Boston Herald
## Advertising Aging
### As of October 29, 2017
### APA Schedule 2.1.7

| Acct# | Name | Total | 10/01/17 | 09/01/17 | 08/01/17 | 07/01/17 | +07/01/17 | Reserved | NET |
|---|---|---|---|---|---|---|---|---|---|
| 138801 | AMERICAN ADHESIVES C | 271.00 | 271.00 | - | - | - | - | - | 271 |
| 37878896400 | ROGERS FUNERAL HOME | 265.80 | 265.80 | - | - | - | - | - | 266 |
| 83385711600 | DOANE BEAL & AMES FU | 261.60 | 261.60 | - | - | - | - | - | 262 |
| H81878092000 | SULLIVAN FUNERAL HOM | 261.60 | 261.60 | - | - | - | - | - | 262 |
| 88752657L0 | CDW CONSULTANTS INC | 258.48 | 258.48 | - | - | - | - | - | 258 |
| 73435600L0 | BOSTON POLICE DEPART | 258.48 | - | 258.48 | - | - | - | - | 258 |
| 3840 | SHEET METAL WORKERS | 241.50 | 241.50 | - | - | - | - | - | 242 |
| 3096 | COLDWELL BANKER HUNN | 240.00 | 120.00 | 120.00 | - | - | - | - | 240 |
| 31342 | PAUL KENNEDY | 240.00 | 240.00 | - | - | - | - | - | 240 |
| 5082958005L0 | ATLANTIC BOATS INC | 236.94 | 236.94 | - | - | - | - | - | 237 |
| 67451130L0 | DIV SUMNER STREET LL | 236.94 | - | 236.94 | - | - | - | - | 237 |
| 846654400L0 | HUGHES ENVIRONMENTAL | 236.94 | 236.94 | 236.94 | - | - | - | - | 237 |
| 03424530 | GEORGE R. RIVET FUNE | 234.30 | 234.30 | - | - | - | - | - | 234 |
| 706672040L0 | ENVIRONMENTAL CORP O | 229.76 | 229.76 | - | - | - | - | - | 230 |
| 1745110118L0 | KYLE ZICK LANDSCAPE | 226.17 | 226.17 | - | - | - | - | - | 226 |
| 75678200L0 | COASTAL MARINE MGMT | 226.17 | 226.17 | - | - | - | - | - | 226 |
| 772778241L0 | DEPT OF HOUSING & C | 226.17 | - | 226.17 | - | - | - | - | 226 |
| 617775430L0 | CHUGANI VENTURES | 226.17 | - | 226.17 | - | - | - | - | 226 |
| 391441824710 | BSC GROUP | 226.17 | 226.17 | - | - | - | - | - | 226 |
| 33520 | EVERSOURCE ENERGY | 226.17 | 226.17 | - | - | - | - | - | 226 |
| 83130 | JOHN L REED | 225.00 | 225.00 | - | - | - | - | - | 225 |
| 69634 | ROCCOS CUCINA AND BA | 225.00 | 225.00 | - | - | - | - | - | 225 |
| 133860 | ST. MICHAEL CEMETERY | 225.00 | 225.00 | - | - | - | - | - | 225 |
| 57435615001 | FOWLER HOUSE CAFE | 225.00 | 225.00 | - | - | - | - | - | 225 |
| 4196320400L0 | INTERNATIONAL BROTHE | 219.22 | 219.22 | - | - | - | - | - | 219 |
| 737322401L0 | HURLEY FUNERAL HOME | 218.70 | 218.70 | - | - | - | - | - | 219 |
| 0-32999 | CONWAY- CAHILL - BRO | 218.70 | 218.70 | - | - | - | - | - | 219 |
| 7885174110 | NORTHEASTERN UNIVERS | 215.40 | - | - | 215.40 | - | - | - | 215 |
| 6977 | O'NEILL FUNERAL HOME | 214.80 | 214.80 | - | - | - | - | - | 215 |
| 3302 | FARMER & DEE FUNERAL | 214.80 | - | 214.80 | - | - | - | - | 215 |
| 37879243800 | NEW ENGLAND SPORTS T | 202.86 | 202.86 | - | - | - | - | - | 203 |
| 37877790000 | BOSTON CATHOLIC CEME | 200.00 | 200.00 | - | - | - | - | - | 200 |
| 5087862230L0 | STANTON FUNERAL HOME | 196.30 | 196.30 | - | (6.80) | - | - | - | 196 |
| 61724203400 | C R LYONS & SONS FUN | 195.30 | 195.30 | 203.10 | - | - | - | - | 195 |
| 78184318780-0 | TETRA TECH INC | 193.86 | 193.86 | - | - | - | - | - | 194 |
| 133444 | EATON & MACKAY FUNER | 187.50 | 187.50 | - | - | - | - | - | 188 |
| 121406 | CARTWRIGHT-VENUTI FU | 187.50 | 187.50 | - | - | - | - | - | 188 |
| 113522 | MARGARET VARKAS | 180.00 | 180.00 | - | - | - | - | - | 180 |
| 781335004500 | EDWARD S. MALLORY | 180.00 | 180.00 | - | - | - | - | - | 180 |
| 6172882010000 | MAGGIACOMO, CARMEN | 180.00 | 180.00 | - | - | - | - | - | 180 |
| | MCDONALD FUNERAL HOM | 179.70 | 179.70 | - | - | - | - | - | 180 |
| | BOSTON FIREFIGHTERS | 178.71 | 178.71 | - | - | - | - | - | 179 |

# Boston Herald
## Advertising Aging
### As of October 29, 2017
### APA Schedule 2.1.7

| Acct# | Name | Total | 10/01/17 | 09/01/17 | 08/01/17 | 07/01/17 | +07/01/17 | Reserved | NET |
|---|---|---|---|---|---|---|---|---|---|
| 61792434500 | DEVITO FUNERAL HOME | 175.80 | 175.80 | - | - | - | - | - | 176 |
| 28132488000 | A J SPADAFORA FUNERA | 175.80 | 175.80 | - | - | - | - | - | 176 |
| 77272795L0 | COMMONWEALTH OF MASS | 172.32 | 172.32 | - | - | - | - | - | 172 |
| 09152835502L0 | DEPT OF CHILDREN YOU | 170.00 | 170.00 | - | - | - | - | - | 170 |
| 68186612181L0 | ATTY ROBERT J. DILIB | 170.00 | 170.00 | - | - | - | - | - | 170 |
| 907 | BRASCO & SON MEMORIA | 168.60 | 543.60 | - | - | - | - | - | 169 |
| 61769642000 | ALFRED D THOMAS FUNE | 168.00 | 168.00 | (375.00) | - | - | - | - | 168 |
| 61788929000 | TORF FUNERAL SERVICE | 168.00 | 168.00 | - | - | - | - | - | 168 |
| 61732393000 | IUOE LOCAL 4 | 164.22 | 164.22 | - | - | - | - | - | 164 |
| 61866799340 | SWEENEY FUNERAL HOME | 160.20 | 160.20 | - | - | - | - | - | 160 |
| 50847302250 | EDWARDS FUNERAL HOME | 156.30 | 156.30 | - | - | - | - | - | 156 |
| 61166519490 | GATELY FUNERAL HOME | 156.30 | 156.30 | - | - | - | - | - | 156 |
| 58583727200 | WAITT FUNERAL HOME | 152.40 | 152.40 | - | - | - | - | - | 152 |
| 61729980110 | JAMES W DOLAN FUNERA | 152.40 | 152.40 | - | - | - | - | - | 152 |
| 610378220010 | WEBSTER BANK | 150.78 | 150.78 | - | - | - | - | - | 151 |
| 61732336900 | W C CANNIFF & SONS I | 150.00 | 150.00 | - | - | - | - | - | 150 |
| 62190 | CEDAR GROVE GARDENS | 150.00 | 150.00 | - | - | - | - | - | 150 |
| 5762 | PATRICIA DAHL | 150.00 | 150.00 | - | - | - | - | - | 150 |
| 33132600740O | HOLDEN DUNN IRVINE & | 148.50 | 148.50 | - | - | - | - | - | 149 |
| 61728874100O | ROOFERS UNION LOCAL | 135.24 | 135.24 | - | - | - | - | - | 135 |
| 61782555000O | CARL MICCI & CO | 126.00 | 126.00 | - | - | - | - | - | 126 |
| 61726808500O | SPENCER FUNERAL HOME | 121.20 | 121.20 | - | - | - | - | - | 121 |
| 61053 | GRANITE STATE MORTGA | 120.00 | - | - | - | - | - | - | 120 |
| 125468 | CASTONGUAY, PAULINE | 120.00 | - | 120.00 | - | - | - | - | 120 |
| 533961 | JP GALLAGHER CONSTRU | 120.00 | 120.00 | - | - | - | - | - | 120 |
| 61843278200 | LAURIA REAL ESTATE | 120.00 | 120.00 | - | - | - | - | - | 120 |
| 15453 | HASSEY LANDSCAPING | 118.72 | - | - | - | - | 118.72 | - | 119 |
| 61772887000O | BOARD OF BAR OVERSEE | 114.88 | 114.88 | - | - | - | - | - | 115 |
| 591779 | BRIGHAM & WOMENS HOS | 112.00 | 112.00 | - | - | - | - | - | 112 |
| 153853 | BONAPITA | 112.00 | - | 112.00 | - | - | - | - | 112 |
| 61773741001L0 | FAN PIER DEVELOPMENT | 107.70 | - | 107.70 | - | - | - | - | 108 |
| 32803 | GREATER BOSTON MANAG | 104.50 | - | - | - | 104.50 | - | - | 105 |
| 61772243021L0 | BOSTON CIVIC DESIGN | 100.52 | 100.52 | - | - | - | - | - | 101 |
| 61849555510 | MASS STATE LOTTERY C | 100.52 | 100.52 | 100.52 | - | - | - | - | 101 |
| 50838963000L0 | COMM OF MASSACHUSETT | 93.34 | - | 93.34 | - | - | - | - | 93 |
| 61742345547 | BANKRATE LLC | 93.12 | - | - | 93.12 | - | - | - | 93 |
| 61747944001 | GIGGLES COMEDY CLUB | 65.00 | - | 300.00 | - | - | - | - | 65 |
| 61534862041L0 | ABCD INC- LAVETTE SE | 50.26 | 50.26 | - | (235.00) | - | - | - | 50 |
| 78127068890O | LITCHFIELD COMPANY | 48.00 | 48.00 | - | - | - | - | - | 48 |
| 133917 | JP KNIT AND STITCH | 45.00 | 45.00 | - | - | - | - | - | 45 |
| 133914 | PHILLIPS ACADEMY | 45.00 | 45.00 | - | - | - | - | - | 45 |
| 51637422821I | INGENIERIA DE SOFTWA | - | - | - | - | - | - | - | - |

# Boston Herald
## Advertising Aging
### As of October 29, 2017
### APA Schedule 2.1.7

| Acct# | Name | Total | 10/01/17 | 09/01/17 | 08/01/17 | 07/01/17 | +07/01/17 | Reserved | NET |
|---|---|---|---|---|---|---|---|---|---|
| 5163743282MM | MEDIAMATH INC | - | - | - | - | - | - | - | |
| 7330807200 | COLLIERS INTERNATIO | - | - | - | - | - | - | - | |
| 7364239801 | BAY STATE SCHOOL OF | - | - | - | - | - | - | - | |
| 7531083OLO | DEWBERRY | - | - | - | - | - | - | - | |
| 7626125OLO | COMMONWEALTH OF MASS | - | - | - | - | - | - | - | |
| 7635496BLO | BOSTON PUBLIC WORKS | - | - | - | - | - | - | - | |
| 763591335LO | BOSTON SCHOOL COMMIT | - | - | - | - | - | - | - | |
| 7722430OLO | BOSTON REDEVELOPMENT | - | - | - | - | - | - | - | |
| 7773355100 | KEOHANE FUNERAL HOME | - | - | - | - | - | - | - | |
| 7859459OLO | JOAN C. GREEN ATTY A | - | - | - | - | - | - | - | |
| 7796505000 | ASSET PROTECTION GRO | - | - | - | - | - | - | - | |
| 7796526892LO | HARVCO AUCTIONEERS | - | - | - | - | - | - | - | |
| 7979840BLO | MASS GAMING COMMISSI | - | - | - | - | - | - | - | |
| 7984810OLO | CLIFTON LARSON ALLEN | - | - | - | - | - | - | - | |
| 8063056528 | ORACLE | - | - | - | - | - | - | - | |
| 8480 | A. L. PRIME ENERGY | - | - | - | - | - | - | - | |
| 7813982000 | FOLSOM FUNERAL SERVI | - | - | - | - | - | - | - | |
| 7821749031000 | DELLO RUSSO FUNERAL | - | - | - | - | - | - | - | |
| 77707822LO | PYNE FUNERAL HOME | - | - | - | - | - | - | - | |
| 8067720668LO | WYNN DESIGN & DEVELO | - | - | - | - | - | - | - | |
| 0459769030LO | BENDETT & MCHUGH PC | - | - | - | - | - | - | - | |
| 853897370O | CBRE INC | - | - | - | - | - | - | - | |
| 617635417OLO | MICHAEL PURCELL | (5.00) | - | (5.00) | - | - | - | - | (5) |
| 964 | LICENSE BOARD | (10.00) | - | - | (10.00) | - | - | - | (10) |
| 834745B9300 | ANN RODWELL | (30.00) | (30.00) | - | - | - | - | - | (30) |
| 16426 | ROBERT T. ROSIE | (30.00) | (30.00) | - | - | - | - | - | (30) |
| 63951 | GEORGE MCLAUGHLIN | (42.00) | (42.00) | - | - | - | - | - | (42) |
| 12605 | EDOUARDO ROGRIGUES | (42.00) | (42.00) | - | - | - | - | - | (42) |
| 7255 | HANSON, CYNTHIA | (42.00) | (42.00) | - | - | - | - | - | (42) |
| 13916 | MONIQUE LEMAY | (42.00) | (42.00) | - | - | - | - | - | (42) |
| 3955 | JAMES CRAIG | (42.00) | (42.00) | - | - | - | - | - | (42) |
| 3777 | CORT DIXON | (42.00) | (42.00) | - | - | - | - | - | (42) |
| 22723 | JENNA JOHNSON | (42.00) | (42.00) | - | - | - | - | - | (42) |
| 508746216200 | ROBERTA STAVROS | (42.00) | - | - | - | (42.00) | - | - | (42) |
| 6175223S3400 | CARTMELL FUNERAL HOM | (42.70) | - | - | - | - | (42.70) | - | (43) |
| 133943 | NANCY DOHERTY | (44.00) | (44.00) | - | - | - | - | - | (44) |
| 125822 | LYNNE R. JENKINS | (44.00) | (44.00) | - | - | - | - | - | (44) |
| 125649 | NICOLE JONES | (44.00) | (44.00) | - | - | - | - | - | (44) |
| 9788515580 | WOGHIREN, OSAZEE | (45.00) | 315.00 | - | - | - | (360.00) | - | (45) |
| 5082787777500 | COMPETITIVE EDGE REA | (53.00) | (53.00) | - | - | - | - | - | (53) |
| 133977 | SONDRA BRETNA | (53.00) | (53.00) | - | - | - | - | - | (53) |
| | SAM MELO | (53.00) | (53.00) | - | - | - | - | - | (53) |

# Boston Herald
## Advertising Aging
### As of October 29, 2017
### APA Schedule 2.1.7

| Acct# | Name | Total | 10/01/17 | 09/01/17 | 08/01/17 | 07/01/17 | +07/01/17 | Reserved | NET |
|---|---|---|---|---|---|---|---|---|---|
| 133965 | CRYSTAL PERKINS | (53.00) | (53.00) | | | | | | (53) |
| 676245220L6 | DEPT OF PUBLIC HEALT | (53.85) | 344.64 | | | | (398.49) | | (54) |
| 48543547100 | ROBERTS FUNERAL HOME | (54.00) | | | | | (54.00) | | (54) |
| 122046 | LOUISE LEVESQUE | (70.00) | (70.00) | | | | | | (70) |
| 74719 | STEVEN MASON | (84.00) | (84.00) | | | | | | (84) |
| 74416 | TRYPHENA BLAKE | (88.00) | (44.00) | (44.00) | | | | | (88) |
| 133037 | VAN NGUYEN | (88.00) | (88.00) | | | | | | (88) |
| 67924470000 | MACDONALD ROCKWELL & | (89.70) | (89.70) | | | | | | (90) |
| 73349 | TOM CHOATE | (95.50) | (95.50) | | | | | | (96) |
| 133979 | TUFTS UNIVERSITY | (100.00) | (100.00) | | | | | | (100) |
| 68747 | JOHN HIGGINS | (101.43) | (101.43) | | | | | | (101) |
| 133343 | VISIT SAVANNAH | (120.01) | (120.01) | | | | | | (120) |
| 7524546400 | JAMAICA PLAIN REALTY | (132.00) | (132.00) | | | | | | (132) |
| 122134 | EL ORIENTAL DE CUBA | (144.00) | (144.00) | | | | | | (144) |
| 122394 | SERENA RISTORANTE | (144.00) | (144.00) | | | | | | (144) |
| 37487714L0 | HAMPDEN COUNTY JUVEN | (153.00) | | | | | (153.00) | | (153) |
| 61844 | WANDA COTE | (168.00) | (168.00) | | | | | | (168) |
| 173488550001 | COMMONWEALTH OF MASS | (178.50) | | | | | (178.50) | | (179) |
| 84397 | COASTAL CARRIERS | (181.51) | (181.51) | | | | | | (182) |
| 123345 | HOMETOWN COLLECTIBLE | (202.96) | (202.96) | | | | | | (203) |
| 135620 | KITCHEN MAGIC | (207.88) | | | | | (207.88) | | (208) |
| 0825025900 | NICKERSON FUNERAL HO | (214.10) | | | | | (214.10) | | (214) |
| 673714486L0 | AECOM | (215.40) | | | | | (215.40) | | (215) |
| 127856 | ANGELA ABREU | (244.00) | (244.00) | | | | | | (244) |
| 66498 | WESLEY TEODORO | (244.00) | (244.00) | | | | | | (244) |
| 133762 | JOAO PAULO GONCALVES | (244.00) | (244.00) | | | | | | (244) |
| 44344 | PHILLIP MALONSON | (250.00) | (250.00) | | | | | | (250) |
| 84904 | TWELVE STEP EDUCATIO | (250.00) | (250.00) | | | | | | (250) |
| 130454 | ANDREOZZI CONSTRUCTI | (265.23) | | | | | (265.23) | | (265) |
| 131411 | GENNARO'S EATERY | (288.00) | (288.00) | | | | | | (288) |
| 61277 | DORCHESTER DOOR & WI | (300.00) | (300.00) | | | | | | (300) |
| K1N377130 | NEWS AMERICA MKTG | (304.50) | 3,419.05 | | (0.04) | (0.03) | (3,723.48) | | (305) |
| 7L041370 | BETHEL INN & COUNTRY | (308.00) | | | | | (308.00) | | (308) |
| 132560 | MEGAMATES | (309.27) | | | (9.86) | | (299.41) | | (309) |
| 617734666600 | ACE TICKET | (316.47) | (316.47) | | | | | | (316) |
| 133966 | DICAPRI PIZZERIA | (334.80) | (334.80) | | | | | | (335) |
| 131568 | PRECISION AD PLACEME | (344.82) | (344.82) | | | | | | (345) |
| 972843181300 | DEEPTHI RAJA ATTY AT | (374.75) | | | | | (374.75) | | (375) |
| 67684 | YEON KIM | (394.76) | (394.76) | | | | | | (395) |
| 130773 | STEVE ROSENBLUM | (405.72) | (405.72) | | | | | | (406) |
| 6174455227700 | WALDWIN GROUP | (413.95) | (413.95) | | | | | | (414) |
| 120673 | CHUCHRAN AUTO PARTS | (448.00) | (448.00) | | | | | | (448) |

Boston Herald
Advertising Aging
As of October 29, 2017
APA Schedule 2.1.7

| Acct# | Name | Total | 10/01/17 | 09/01/17 | 08/01/17 | 07/01/17 | +07/01/17 | Reserved | NET |
|---|---|---|---|---|---|---|---|---|---|
| 114558 | FELIPE PINHEIRRO | (448.00) | (448.00) | - | - | - | - | - | (448) |
| 693772537700 | SHERWOOD FOREST | (475.00) | (475.00) | - | - | - | - | - | (475) |
| 206380565MS | MICROSOFT | (522.44) | (522.44) | - | - | - | - | - | (522) |
| 047630121201 | BYK ADVERTISING INC. | (563.76) | (563.76) | - | - | - | - | - | (564) |
| 220837 | SALADORE CJD | (571.42) | - | - | - | - | (571.42) | - | (571) |
| 203 | SPOLIDORO PLUMBING | (579.18) | (579.18) | - | - | - | - | - | (579) |
| 200810 | DICK GORDON SPORTS | (579.80) | (579.80) | - | - | - | - | - | (580) |
| 689743200 | PROPHETT-CHAPMAN-COL | (593.70) | (593.70) | - | - | - | - | - | (594) |
| 239 | MASS MARITIME ACADEM | (705.50) | (705.50) | - | - | - | - | - | (706) |
| 132562 | LIVELINKS | (893.39) | (864.92) | - | (28.47) | - | - | - | (893) |
| 728073386 | ROBERT S. MCKITTRICK | (931.20) | (931.20) | - | - | - | - | - | (931) |
| 2563880 | DREW BRADY COMPANY I | (1,000.00) | (1,000.00) | - | - | - | - | - | (1,000) |
| 23576 | NORTHEAST MENS CLINI | (1,020.00) | (1,020.00) | - | - | - | - | - | (1,020) |
| 203567 | BAY FERRIES LIMITED | (2,000.00) | - | - | - | (2,000.00) | - | - | (2,000) |
| 731616640L0 | GREYSTONE MGMT SOLUT | (2,132.46) | (2,132.46) | - | - | - | - | - | (2,132) |
| 74821360L0 | RICH MAY | (2,229.39) | (2,229.39) | - | - | - | - | - | (2,229) |
| 72272755L0 | ATTY KIRK P ROTHEMIC | (3,683.34) | (3,683.34) | - | - | - | - | - | (3,683) |
| | **Grand Totals** | **1,054,351.92** | **658,631.22** | **336,982.40** | **66,024.60** | **(1,937.53)** | **(5,349)** | **(36,660)** | **1,017,692** |

# Boston Herald
## Circulation Aging
### As of October 29, 2017

## APA Schedule 2.1.7

**BALANCE DUE TOTAL: $1,843,964.19**

**Weekly**
**Office is Blank**

| Freq | Account | Account Name | Balance | Current | Per2 | Per3 | Per4 | Per4Plus |
|---|---|---|---|---|---|---|---|---|
| WE | 457009999 | GLOBE CITY /DOUG GLADDING/CIRC DEPT | 560,047.73 | 85,571.04 | 88,333.52 | 84,299.48 | 90,008.84 | 211,834.85 |
| WE | 01755 | RSI RANDOPLH | 151,520.91 | 28,680.80 | 28,655.77 | 26,196.38 | 28,647.19 | 39,340.77 |
| WE | 01530 | NORTH SHORE NEWS | 125,548.57 | 15,496.20 | 16,060.33 | 15,063.65 | 16,036.02 | 62,892.37 |
| WE | 457019999 | GLOBE CITY II /DOUG GLADDING/CIRC DEPT | 103,467.71 | 13,535.51 | 15,350.55 | 15,098.52 | 14,562.11 | 44,921.02 |
| WE | 01040 | HOLYOKE NEWS | 82,968.92 | 10,253.82 | 10,027.88 | 9,477.66 | 9,953.62 | 43,256.01 |
| WE | 00850 | SHORELINE NEWS | 72,366.73 | 12,608.19 | 11,061.45 | 12,679.80 | 12,060.30 | 23,956.99 |
| WE | 00720 | DANVERS NEWS -1ST | 67,270.81 | 8,571.42 | 8,148.14 | 8,100.80 | 8,552.12 | 33,898.33 |
| WE | 01360 | LEOMINSTER - COUNTRY | 67,137.20 | 11,178.31 | 10,847.78 | 10,868.02 | 11,091.80 | 23,151.29 |
| WE | 00840 | NEW BEDFORD TIMES | 53,070.28 | 3,682.58 | 3,739.97 | 3,376.02 | 3,783.51 | 38,488.20 |
| WE | 01370 | LEOMINSTER- SUBURBAN | 46,960.35 | 7,317.31 | 7,274.41 | 7,332.33 | 7,378.80 | 17,657.50 |
| WE | 01750 | PROFILE NEWS | 44,163.62 | 9,263.97 | 9,271.92 | 9,153.99 | 9,590.48 | 6,883.26 |
| WE | 00855 | PROVIDENCE JNRLPO#315-3273355 | 41,655.37 | 8,455.82 | 8,483.17 | 5,550.68 | 7,898.28 | 11,267.42 |
| WE | 01757 | RSI FRANKLIN | 40,354.03 | 4,980.26 | 4,916.70 | 5,156.18 | 5,069.67 | 20,231.22 |
| WE | 01320 | LEOMINSTER/ MANCHESTER | 39,750.98 | 5,012.15 | 5,022.16 | 5,019.30 | 5,045.76 | 19,651.61 |
| WE | 01753 | RSI TWO | 37,641.61 | 5,993.60 | 5,988.54 | 6,402.66 | 6,182.18 | 13,074.63 |
| WE | 01756 | RSI TAUNTON | 36,293.40 | 8,585.72 | 8,857.42 | 9,043.32 | 8,860.28 | 946.66 |
| WE | 01350 | NORTHEAST NEWS DIST | 35,718.66 | 15,005.71 | 15,013.57 | 5,699.37 | | |
| WE | 013509851 | NORTHEAST /BILLERICA | 32,181.55 | 3,858.86 | 3,921.78 | 3,746.60 | 3,898.90 | 16,755.41 |
| WE | 01754 | RSI THREE | 28,832.02 | 5,523.39 | 5,161.34 | 5,013.61 | 5,514.74 | 7,618.94 |
| WE | 01060 | HUDSON RPM | 25,692.67 | 4,946.37 | 5,487.63 | 5,013.61 | 5,278.85 | 4,966.21 |
| WE | 01550 | NORTH SHORE NEWS | 25,450.42 | 4,350.06 | 4,425.85 | 4,299.47 | 4,879.16 | 7,495.88 |
| WE | 01351 | NORTHEAST NEWS DIST | 23,424.51 | 6,506.50 | 6,389.24 | 6,284.85 | 4,243.92 | |
| WE | 01758 | RSI ATTLEBORO | 18,286.47 | 1,784.21 | 1,684.05 | 1,762.52 | 1,794.03 | 11,261.66 |
| WE | 01380 | LEOMINSTER II | 17,490.34 | 6,416.18 | 6,198.99 | 3,981.32 | 893.85 | |
| WE | 01759 | RSI 4 | 15,767.24 | 3,072.36 | 3,106.68 | 3,131.70 | 3,171.03 | 3,285.47 |
| WE | 016409991 | PITTSFIELD NEWSDLRS | 8,919.69 | 2,112.83 | 2,260.12 | 2,101.15 | 2,313.03 | 132.56 |
| WE | 01960 | WHITE MOUNTAIN NEWS | 8,839.57 | 1,716.72 | 1,754.61 | 1,733.92 | 1,873.30 | 1,761.02 |
| WE | 467429999 | LEOMINSTER - HD | 8,251.97 | 1,409.40 | 1,409.40 | 1,409.40 | 1,409.40 | 2,614.37 |
| WE | 01752 | RSI ONE | 8,251.74 | 2,051.21 | 2,085.35 | 2,160.63 | 1,954.55 | |
| WE | 496009999 | HAWKERS /DOUG GLADDING/ CIRC DEPT | 7,865.25 | 1,628.40 | 1,809.98 | 1,324.26 | 1,726.76 | 1,375.85 |
| WE | 01290 | KOPPLEMANN, HP | 4,430.13 | 810.10 | 821.54 | 824.99 | 802.95 | 1,170.55 |
| WE | 01062 | CONCORD MONITOR | 3,196.14 | 1,225.70 | 519.75 | 1,450.69 | | |
| WE | 197389999 | HOTALINGS NEWS AGENCY | 1,147.61 | 268.13 | 268.13 | 268.13 | | 343.22 |
| | | | **1,843,964.19** | **301,862.83** | **304,127.72** | **285,249.34** | **282,787.46** | **689,936.84** |

**CREDIT HOLD TOTAL: ($4,848.57)**

**Weekly**
**Office is Blank**

| Freq | Account | Account Name | Balance | Current | Per2 | Per3 | Per4 | Per4Plus |
|---|---|---|---|---|---|---|---|---|
| WE | 00635 | BURLINGTON NEWS/WATERBURY | (297.28) | (297.28) | - | - | - | - |
| WE | 00856 | PRO-JO LONDON /PO 315-3273355 | (467.98) | (467.98) | - | - | - | - |
| WE | 492089999 | HERALD ANGELS NEWSPAPERS IN EDUCATION | (814.60) | (814.60) | - | - | - | - |
| WE | 497009999 | HOUSE ACCOUNT | (3,268.71) | (3,268.71) | - | - | - | - |

Herald Interactive
Advertising Aging
As of October 29, 2017

APA Schedule 2.1.7

| Acct# | Name | Total | 10/01/17 | 09/01/17 | 08/01/17 | 07/01/17 | +07/01/17 | Reserved | NET |
|---|---|---|---|---|---|---|---|---|---|
| 304099 | UNDERTONE | 51,888 | 15,562 | 17,048 | 19,278 | - | - | - | 51,888 |
| 304091 | AMAZON / A9.COM | 50,569 | 21,294 | 13,774 | 15,501 | - | - | - | 50,569 |
| 110738 | GOOGLE | 40,000 | 40,000 | | | | | | 40,000 |
| 304329 | OS4 MEDIA LLC | 32,629 | 10,673 | 11,456 | 10,500 | | (0) | | 32,629 |
| 304630 | APPNEXUS | 28,041 | 10,146 | 10,395 | 7,500 | | | | 28,041 |
| 304102 | RUBICON PROJECT | 27,061 | 10,246 | 12,515 | 4,300 | | (0) | | 27,061 |
| 301530 | PUBMATIC | 19,209 | 7,419 | 5,290 | 6,500 | | | | 19,209 |
| 303720 | CENTRO/DUNKIN DONUTS | 15,538 | | 15,538 | | | | | 15,538 |
| 301409 | SALEM STATE UNIVERSI | 14,000 | 11,381 | 2,619 | | | | | 14,000 |
| 302177 | CONNELLY/MASS STATE | 12,000 | 4,600 | 7,400 | | | | | 12,000 |
| 304912 | OPENX | 10,780 | 9,280 | 1,500 | | | | | 10,780 |
| 304464 | DISTRICT M INC | 8,420 | 4,464 | 3,506 | 450 | | | | 8,420 |
| 304088 | ACCESS TO MEDIA | 7,528 | | 1,995 | 5,532 | | | | 7,528 |
| 302966 | UNDERTONE/RAYMOUR&FL | 4,505 | 2,166 | 1,773 | 565 | | | | 4,505 |
| 303538 | CITY OF BOSTON | 2,976 | 1,636 | 1,340 | | | | | 2,976 |
| 304419 | RAGGED MOUNTAIN | 2,100 | | 2,100 | | | | | 2,100 |
| 302128 | VERMONT DEPT. OF TOU | 1,985 | 1,985 | | | | | | 1,985 |
| 304516 | MAKING MODERN | 1,550 | 1,550 | | | | | | 1,550 |
| 304515 | REFLECTIONS MEDICAL | 1,500 | 1,500 | | | | | | 1,500 |
| 302146 | UMASS LOWELL | 1,500 | | 1,500 | | | | | 1,500 |
| 403327 | BROOKLINE BANK | 1,250 | | 1,250 | | | | | 1,250 |
| 304961 | NOVUS/MASS DENTAL SO | 1,100 | 1,100 | | | | | | 1,100 |
| 304514 | ARLINGTON CATHOLIC H | 799 | 799 | | | | | | 799 |
| 304327 | BOSTON CONVENTION MA | 500 | | 500 | | | | | 500 |
| 304724 | AUTHENTIC CARIBBEAN | 225 | | | | 225 | | | 225 |
| 304944 | WILLARD STREET INN | 163 | 163 | | | | | | 163 |
| 302930 | GAMUT MEDIA | - | | | | | | | |
| 304283 | OLAN INTERNATIONAL L | (3,000) | | | | | (3,000) | | (3,000) |
| 304960 | NEXT MILLENNIUM | (8,976) | | (8,976) | | | | | (8,976) |
| OTHER | NDN | 29,000 | | | | | 29,000 | (29,000) | - |
| OTHER | FLIP | 8,968 | | | | | 8,968 | | 8,968 |
| | Grand Totals | 363,807 | 155,964 | 102,524 | 70,126 | 225 | 34,968 | (29,000) | 334,807 |

Schedule 2.1.8

Other items included in Purchased Assets

See attached.

# HERALD MEDIA
# CONSOLIDATED FIXED ASSETS
## Summary
## As of October 29, 2017
### Schedule 2.1.8

|  |  | GROSS ASSET | ACCUMULATED DEPRECIATION | NET ASSET VALUE |
|---|---|---|---|---|
| BOSTON HERALD | Included | 4,997,197.75 | (4,714,261.54) | 282,936.21 |
|  | Excluded | 35,738.25 | (35,738.25) | - |
|  | Net | 5,032,936.00 | (4,749,999.79) | 282,936.21 |
| HERALD INTERACTIVE |  | 314,437.57 | (269,323.27) | 45,114.30 |
| TOTAL |  | 5,347,373.57 | (5,019,323.06) | 328,050.51 |

Boston Herald Fixed Asset Listing

Schedule 2.1.8

| System No. | Description | G/L Account Number | In Svc Date | Method | Remai Life | Acquired Value | Run Through Date | Accum Depreciation | Net Value |
|---|---|---|---|---|---|---|---|---|---|
| 000507 | Business System - Software | 000-120075 | 07/07/99 | SLMM | 05 00 | 143,577.00 | 10/31/17 | 143,577.00 | 100.00% |
| 000509 | PPI Advert. Mgmt Sys - Sftwr | 000-120075 | 11/05/99 | SLMM | 05 00 | 595,746.00 | 10/31/17 | 595,746.00 | 100.00% |
| 000541 | Cobolt networking Web Cache | 000-120070 | 02/13/01 | SLMM | 03 00 | 3,950.00 | 10/31/17 | 3,950.00 | 100.00% |
| 000552 | Printer for AD Layout | 000-120070 | 05/15/01 | SLMM | 03 00 | 1,995.00 | 10/31/17 | 1,995.00 | 100.00% |
| 000577 | Lawson Crystal Enterprise - ldwr | 000-120070 | 05/19/02 | SLMM | 03 00 | 5,955.00 | 10/31/17 | 5,955.00 | 100.00% |
| 000594 | 3 Cobalt cubes/ servers | 000-120070 | 02/16/03 | SLMM | 03 00 | 6,116.00 | 10/31/17 | 6,116.00 | 100.00% |
| 000603 | Edgeeapture Circ Credit Card System | 000-120075 | 01/27/01 | SLMM | 03 00 | 5,240.00 | 10/31/17 | 5,240.00 | 100.00% |
| 000604 | Xpance advt tracking system | 000-120075 | 01/27/01 | SLMM | 03 00 | 74,081.00 | 10/31/17 | 74,081.00 | 100.00% |
| 000606 | NTI SC Circ Source Code | 000-120075 | 04/27/01 | SLMM | 03 00 | 20,000.00 | 10/31/17 | 20,000.00 | 100.00% |
| 000607 | Edgeepurce cc sys to multituser | 000-120075 | 11/23/01 | SLMM | 03 00 | 16,134.00 | 10/31/17 | 16,134.00 | 100.00% |
| 000608 | Class pagination install & training | 000-120075 | 12/23/01 | SLMM | 03 00 | 5,370.00 | 10/31/17 | 5,370.00 | 100.00% |
| 000609 | PPI Product pricing enhancements | 000-120075 | 12/23/01 | SLMM | 03 00 | 4,500.00 | 10/31/17 | 4,500.00 | 100.00% |
| 000610 | Xpance advt tracking system | 000-120075 | 01/22/02 | SLMM | 03 00 | 22,257.00 | 10/31/17 | 22,257.00 | 100.00% |
| 000611 | Multi paper Dist | 000-120075 | 04/22/02 | SLMM | 03 00 | 59,261.00 | 10/31/17 | 59,261.00 | 100.00% |
| 000612 | Advert Late Notice Program | 000-120075 | 01/22/02 | SLMM | 03 00 | 5,000.00 | 10/31/17 | 5,000.00 | 100.00% |
| 000613 | FPO - Page Pairing software | 000-120075 | 05/22/02 | SLMM | 03 00 | 24,352.00 | 10/31/17 | 24,352.00 | 100.00% |
| 000616 | Lawson Crystal Enterprise - sftw | 000-120075 | 05/22/02 | SLMM | 03 00 | 18,638.00 | 10/31/17 | 18,638.00 | 100.00% |
| 000617 | DBA Analyzer & optimization Program | 000-120075 | 06/21/02 | SLMM | 03 00 | 7,530.00 | 10/31/17 | 7,530.00 | 100.00% |
| 000619 | Circ voice response unit (VRU) | 000-120075 | 08/20/02 | SLMM | 03 00 | 38,100.00 | 10/31/17 | 38,100.00 | 100.00% |
| 000673 | 100 VENDING MACHINES | 000-120065 | 05/05/01 | SLMM | 03 00 | 44,426.00 | 10/31/17 | 44,426.00 | 100.00% |
| 000680 | ADOBE PHOTO SHOP LICENSES | 000-120075 | 07/01/03 | SLMM | 03 00 | 26,396.63 | 10/31/17 | 26,396.63 | 100.00% |
| 000684 | 8 EDITORIAL PCs | 000-120070 | 10/01/03 | SLMM | 03 00 | 7,452.34 | 10/31/17 | 7,452.34 | 100.00% |
| 000685 | NIKOR D1H DIGITAL CAMERA | 000-120070 | 10/01/03 | SLMM | 03 00 | 3,358.95 | 10/31/17 | 3,358.95 | 100.00% |
| 000689 | 2EOS-1D PRO DIGITAL CAMERAS | 000-120070 | 11/01/03 | SLMM | 03 00 | 6,297.90 | 10/31/17 | 6,297.90 | 100.00% |
| 000698 | NIKON D2H DIGITAL CAMERAS | 000-120070 | 02/01/04 | SLMM | 03 00 | 10,520.78 | 10/31/17 | 10,520.78 | 100.00% |
| 000701 | CANON DIGITAL CAMERA & LENSES | 000-120070 | 03/01/04 | SLMM | 03 00 | 4,093.93 | 10/31/17 | 4,093.93 | 100.00% |
| 000707 | 2 CANON DIGITAL EOS-1D CAMERAS | 000-120070 | 05/01/04 | SLMM | 03 00 | 7,557.90 | 10/31/17 | 7,557.90 | 100.00% |
| 000724 | Adjust Unisys/PPI Advert system | 000-120070 | 07/01/04 | RemVI | 01 00 | (21,666.90) | 10/31/17 | (21,666.90) | 100.00% |
| 000735 | Circ Single Copy Server Upgrade | 000-120070 | 01/07/05 | SLMM | 03 00 | 42,712.00 | 10/31/17 | 42,712.00 | 100.00% |
| 000736 | Circ Single Copy Server Upgrade | 000-120070 | 02/03/05 | SLMM | 03 00 | 9,694.00 | 10/31/17 | 9,694.00 | 100.00% |
| 000746 | 100 VENDING MACHINES | 000-120065 | 10/04/04 | SLMM | 03 00 | 41,952.00 | 10/31/17 | 41,952.00 | 100.00% |
| 000756 | Best Fixed Asset System | 000-120075 | 11/01/05 | SLMM | 03 00 | 6,811.65 | 10/31/17 | 6,811.65 | 100.00% |
| 000764 | Onevision Postscript System | 000-120075 | 12/01/05 | SLMM | 03 00 | 3,919.87 | 10/31/17 | 3,919.87 | 100.00% |
| 000765 | Intellimue System | 000-120075 | 01/02/06 | SLMM | 03 00 | 19,998.00 | 10/31/17 | 19,998.00 | 100.00% |
| 000766 | APAC Circulation HD Customer Service Software | 000-120075 | 01/02/06 | SLMM | 03 00 | 66,471.39 | 10/31/17 | 66,471.39 | 100.00% |
| 000778 | Lawson Personnel Module | 000-120070 | 06/01/06 | SLMM | 03 00 | 64,440.00 | 10/31/17 | 64,440.00 | 100.00% |
| 000781 | Accounting and HR Server | 000-120070 | 06/01/06 | SLMM | 03 00 | 2,813.95 | 10/31/17 | 2,813.95 | 100.00% |
| 000786 | Page Pairing System | 000-120070 | 12/01/06 | SLMM | 03 00 | 48,484.40 | 10/31/17 | 48,484.40 | 100.00% |
| 000787 | New Servers | 000-120070 | 12/01/06 | SLMM | 03 00 | 19,615.31 | 10/31/17 | 19,615.31 | 100.00% |
| 000789 | Page Pairing System | 000-120070 | 01/01/07 | SLMM | 03 00 | 106,231.96 | 10/31/17 | 106,231.96 | 100.00% |
| 000802 | Sybase IWS for Media (Data Warehouse) | 000-120075 | 11/01/07 | SLMM | 03 00 | 90,921.12 | 10/31/17 | 90,921.12 | 100.00% |
| 000802 | Kronos Time & Attendance System | 000-120075 | 03/15/08 | SLMM | 03 00 | 123,808.08 | 10/31/17 | 123,808.08 | 100.00% |
| 000803 | Large Format Epson Scanner | 000-120070 | 05/01/08 | SLMM | 03 00 | 2,433.93 | 10/31/17 | 2,433.93 | 100.00% |
| 000804 | Lawson Foundation - Accounting System | 000-120070 | 05/01/08 | SLMM | 03 00 | 25,200.00 | 10/31/17 | 25,200.00 | 100.00% |
| 000814 | Xerox Color Printer for Pre-Press Design | 000-120070 | 01/15/09 | SLMM | 03 00 | 4,512.83 | 10/31/17 | 4,512.83 | 100.00% |
| 000815 | Sony SR-350 | 000-120070 | 07/01/09 | SLMM | 03 00 | 2,016.12 | 10/31/17 | 2,016.12 | 100.00% |
| 000822 | 4 LX.PCC02.001 | 000-120075 | 05/11/10 | SLMM | 03 00 | 3,430.81 | 10/31/17 | 3,430.81 | 100.00% |
| 000832 | Editorial System - Software | 000-120075 | 02/01/11 | SLMM | 03 00 | 729,542.09 | 10/31/17 | 729,542.09 | 100.00% |

# Boston Herald Fixed Asset Listing

## Schedule 2.1.8

| System No. | Description | G/L Account Number | In Svc Date | Method | Remai Life | Acquired Value | Run Through Date | Accum Depreciation | Net Value |  |
|---|---|---|---|---|---|---|---|---|---|---|
| 000833 | Editorial Systems - Hardware | 000-1220/70 | 02/01/11 | SLMM | 03 00 | 326,603.35 | 10/31/17 | 326,603.35 | - | 100.00% |
| 000834 | Konica Copy Machine BIZHUB 420 | 000-1220/70 | 04/15/11 | SLMM | 03 00 | 1,822.75 | 10/31/17 | 1,822.75 | - | 100.00% |
| 000835 | Konica Copy Machine - BIZHUB 420 | 000-1220/70 | 04/15/11 | SLMM | 03 00 | 1,344.63 | 10/31/17 | 1,344.63 | - | 100.00% |
| 000836 | Konica Copy Machine - BIZHUB 500 | 000-1220/70 | 04/15/11 | SLMM | 03 00 | 2,412.86 | 10/31/17 | 2,412.86 | - | 100.00% |
| 000837 | Konica Copy Machine - BIZHUB 421 | 000-1220/70 | 04/15/11 | SLMM | 03 00 | 1,344.63 | 10/31/17 | 1,344.63 | - | 100.00% |
| 000842 | Camera 70-200MM F2.8G | 000-1220/70 | 08/01/11 | SLMM | 03 00 | 2,619.04 | 10/31/17 | 2,619.04 | - | 100.00% |
| 000843 | Camera EF 500MM F/4.00L IS USM LENS | 000-1220/70 | 10/01/11 | SLMM | 03 00 | 4,810.15 | 10/31/17 | 4,810.15 | - | 100.00% |
| 000844 | 1 Frigidaire Dishwasher | 000-1250/50 | 02/01/12 | SLMM | 05 00 | 836.44 | 10/31/17 | 836.44 | - | 100.00% |
| 000845 | 5 Frigidaire Refrigerators | 000-1250/50 | 02/01/12 | SLMM | 05 00 | 10,598.43 | 10/31/17 | 10,598.43 | - | 100.00% |
| 000846 | 3 GE Microwaves | 000-1250/50 | 02/01/12 | SLMM | 05 00 | 474.94 | 10/31/17 | 474.94 | - | 100.00% |
| 000847 | 18 HDTVs | 000-1250/50 | 02/01/12 | SLMM | 05 00 | 15,010.14 | 10/31/17 | 15,010.14 | - | 100.00% |
| 000848 | Advertising System | 000-1220/70 | 02/01/12 | SLMM | 03 00 | 207,216.54 | 10/31/17 | 207,216.54 | - | 100.00% |
| 000849 | Apple MBP | 000-1220/70 | 02/01/12 | SLMM | 03 00 | 2,029.98 | 10/31/17 | 2,029.98 | - | 100.00% |
| 000850 | Mercury Elite Qx2 | 000-1220/75 | 02/01/12 | SLMM | 03 00 | 4,799.96 | 10/31/17 | 4,799.96 | - | 100.00% |
| 000851 | Apple MBP | 000-1220/70 | 02/01/12 | SLMM | 03 00 | 1,593.74 | 10/31/17 | 1,593.74 | - | 100.00% |
| 000852 | Hard Drive & Memory Upgrade | 000-1220/70 | 03/01/12 | SLMM | 03 00 | 1,019.99 | 10/31/17 | 1,019.99 | - | 100.00% |
| 000853 | EOS-1D MARK IV 16MP HD VIDE | 000-1220/70 | 03/01/12 | SLMM | 03 00 | 2,944.90 | 10/31/17 | 2,944.90 | - | 100.00% |
| 000854 | NIKON - N20701 SERIAL #3217916 | 000-1220/70 | 03/01/12 | SLMM | 03 00 | 1,329.90 | 10/31/17 | 1,329.90 | - | 100.00% |
| 000855 | NIKON - NT21276 SERIAL #20154161 | 000-1220/70 | 03/01/12 | SLMM | 03 00 | 2,456.62 | 10/31/17 | 2,456.62 | - | 100.00% |
| 000856 | Cisco Phone System | 000-1220/70 | 05/01/12 | SLMM | 03 00 | 213,566.79 | 10/31/17 | 213,566.79 | - | 100.00% |
| 000858 | APC Solution and Storage | 000-1220/70 | 05/01/12 | SLMM | 03 00 | 123,582.34 | 10/31/17 | 123,582.34 | - | 100.00% |
| 000859 | MS Office 2010 | 000-1220/75 | 05/01/12 | SLMM | 03 00 | 1,192.05 | 10/31/17 | 1,192.05 | - | 100.00% |
| 000860 | 39 WorkStation PCs | 000-1220/70 | 05/01/12 | SLMM | 03 00 | 5,384.73 | 10/31/17 | 5,384.73 | - | 100.00% |
| 000861 | PP1 Upgrades | 000-1220/75 | 05/01/12 | SLMM | 03 00 | 7,469.00 | 10/31/17 | 7,469.00 | - | 100.00% |
| 000862 | Acer AS-5250 | 000-1220/70 | 05/01/12 | SLMM | 03 00 | 23,895.63 | 10/31/17 | 23,895.63 | - | 100.00% |
| 000863 | Editorial ADB System | 000-1220/70 | 05/01/12 | SLMM | 03 00 | 6,449.38 | 10/31/17 | 6,449.38 | - | 100.00% |
| 000864 | Apple MAC Mini - Editorial Relocation | 000-1220/70 | 05/01/12 | SLMM | 03 00 | 4,846.04 | 10/31/17 | 4,846.04 | - | 100.00% |
| 000865 | Apple MBP | 000-1220/70 | 05/01/12 | SLMM | 03 00 | 2,122.22 | 10/31/17 | 2,122.22 | - | 100.00% |
| 000866 | Apple MAC Mini | 000-1220/70 | 05/01/12 | SLMM | 03 00 | 2,576.84 | 10/31/17 | 2,576.84 | - | 100.00% |
| 000867 | Apple 2G IPAD & PS VC | 000-1220/70 | 05/01/12 | SLMM | 03 00 | 2,693.44 | 10/31/17 | 2,693.44 | - | 100.00% |
| 000868 | 70 Fargo St. Lease Improvement | 000-1220/13 | 02/01/12 | SLMM | 10 02 | 590,073.44 | 10/31/17 | 333,730.06 | 256,343.38 | 56.56% |
| 000869 | Office Furniture | 000-1250/50 | 02/01/12 | SLMM | 03 00 | 613,399.26 | 10/31/17 | 613,399.26 | - | 100.00% |
| 000870 | Cisco Phone System | 000-1220/70 | 07/01/12 | SLMM | 03 00 | 10,147.21 | 10/31/17 | 10,147.21 | - | 100.00% |
| 000871 | Digital SLR Body S#3029826 | 000-1220/70 | 08/01/12 | SLMM | 03 04 | 3,200.40 | 10/31/17 | 3,200.40 | - | 100.00% |
| 000872 | Apple Laptop 15.4" | 000-1220/70 | 08/01/12 | SLMM | 03 00 | 2,184.00 | 10/31/17 | 2,184.00 | - | 100.00% |
| 000873 | EOS-5D MARK III BODY Serial #042033008074 | 000-1220/70 | 08/01/12 | SLMM | 03 00 | 3,717.69 | 10/31/17 | 3,717.69 | - | 100.00% |
| 000874 | Office Furniture | 000-1250/50 | 09/01/12 | SLMM | 05 00 | 1,596.00 | 10/31/17 | 1,596.00 | - | 100.00% |
| 000875 | Apple 85W Magsafe Adapter | 000-1220/70 | 10/01/12 | SLMM | 03 00 | 5,920.03 | 10/31/17 | 5,920.03 | - | 100.00% |
| 000876 | Acer AS5749-6492 | 000-1220/70 | 10/01/12 | SLMM | 03 00 | 480.70 | 10/31/17 | 480.70 | - | 100.00% |
| 000877 | Apple MAC MINI 2.3 GHZ 500GB 2GB | 000-1220/70 | 10/01/12 | SLMM | 03 00 | 880.24 | 10/31/17 | 880.24 | - | 100.00% |
| 000878 | MS NBL Office STD2010 | 000-1220/75 | 10/01/12 | SLMM | 03 00 | 2,661.09 | 10/31/17 | 2,661.09 | - | 100.00% |
| 000879 | Shell & Core MEP/FP Engineer System | 000-1220/13 | 10/01/12 | SLMM | 09 04 | 23,555.00 | 10/31/17 | 12,829.06 | 10,725.94 | 54.46% |
| 000880 | Digital Camera - EOS - 1D Mark IV Body | 000-1220/70 | 11/01/12 | SLMM | 03 00 | 3,993.31 | 10/31/17 | 3,993.31 | - | 100.00% |
| 000881 | Digital Camera - EF 24-70MM F/2.8L II USM | 000-1220/70 | 11/01/12 | SLMM | 03 00 | 2,530.69 | 10/31/17 | 2,530.69 | - | 100.00% |
| 000882 | 2 Acer AS5749-9492 | 000-1220/70 | 12/01/12 | SLMM | 03 00 | 976.77 | 10/31/17 | 976.77 | - | 100.00% |
| 000883 | Apple Computers | 000-1220/70 | 02/01/13 | SLMM | 03 00 | 7,154.10 | 10/31/17 | 7,154.10 | - | 100.00% |
| 000884 | Canon Camera - EC2791 EOS-1D X 18MP | 000-1220/70 | 02/01/13 | SLMM | 03 00 | 3,529.44 | 10/31/17 | 3,529.44 | - | 100.00% |
| 000885 | Storage Cabinets | 000-1250/50 | 05/01/13 | SLMM | 05 00 | 7,576.00 | 10/31/17 | 6,818.39 | 757.61 | 90.00% |

Boston Herald Fixed Asset Listing

*Schedule 2.1.8*

| System No. | Description | G/L Account Number | In Svc Date | Method | Remai Life | Acquired Value | Run Through Date | Accum Depreciation | Net Value |
|---|---|---|---|---|---|---|---|---|---|
| 000886 | Nikon 400MM Lens | 000-1220/70 | 05/01/13 | SLMM | 03 00 | 6,000.00 | 10/31/17 | 6,000.00 | - | 100.00% |
| 000887 | Nikon D800 FX Digital SLR Body | 000-1220/70 | 05/01/13 | SLMM | 03 00 | 3,187.45 | 10/31/17 | 3,187.45 | - | 100.00% |
| 000888 | Smoke Detectors, Raise Lights | 32013 | 06/01/13 | SLMM | 08 09 | 8,627.00 | 10/31/17 | 4,354.56 | 4,272.44 | 50.48% |
| 000889 | 7 Acer Computers | 000-1220/70 | 06/01/13 | SLMM | 03 00 | 4,429.15 | 10/31/17 | 4,429.15 | - | 100.00% |
| 000890 | 2 OWC Mercury Elit HWRAID | 000-1220/70 | 06/01/13 | SLMM | 03 00 | 2,895.98 | 10/31/17 | 2,895.98 | - | 100.00% |
| 000891 | Canon EOS-1D X 18MP | 000-1220/70 | 06/01/13 | SLMM | 03 00 | 6,447.79 | 10/31/17 | 6,447.79 | - | 100.00% |
| 000892 | Lens - 70-200MM | 000-1220/70 | 09/01/13 | SLMM | 03 00 | 2,598.55 | 10/31/17 | 2,598.55 | - | 100.00% |
| 000893 | Apple MacBook | 000-1220/70 | 09/01/13 | SLMM | 03 00 | 1,698.94 | 10/31/17 | 1,698.94 | - | 100.00% |
| 000894 | AVL Flash Pro | 000-1220/75 | 10/01/13 | SLMM | 03 00 | 1,243.92 | 10/31/17 | 1,243.92 | - | 100.00% |
| 000895 | 2 Acer Aspire V3 B960 | 000-1220/70 | 10/01/13 | SLMM | 03 00 | 948.38 | 10/31/17 | 948.38 | - | 100.00% |
| 000896 | 2 Acer Aspire | 000-1220/70 | 10/01/13 | SLMM | 03 00 | 928.89 | 10/31/17 | 928.89 | - | 100.00% |
| 000897 | Nikon D800 FX Digital SLR | 000-1220/70 | 11/01/13 | SLMM | 03 00 | 2,035.19 | 10/31/17 | 2,035.19 | - | 100.00% |
| 000898 | Canon EOS-1Dx18MP | 01/01/14 | | SLMM | 03 00 | 6,023.94 | 10/31/17 | 6,023.94 | - | 100.00% |
| 000899 | Canon Refurbished EFI Lens | 000-1220/70 | 02/01/14 | SLMM | 03 00 | 2,984.26 | 10/31/17 | 2,984.26 | - | 100.00% |
| 5 | Apple Mac Mini 2.5 500GB 4GB | 000-1220/70 | 02/01/14 | SLMM | 03 00 | 4,598.39 | 10/31/17 | 4,598.39 | - | 100.00% |
| 000900 | Backup Storage | 000-1220/70 | 07/01/14 | SLMM | 03 00 | 3,159.98 | 10/31/17 | 3,159.98 | - | 100.00% |
| 000901 | Konica Copy Machine - BIZHUB552 | 000-1220/70 | 10/01/14 | SLMM | 03 00 | 2,215.81 | 10/31/17 | 2,215.81 | - | 100.00% |
| 000902 | Konica Copy Machine - BIZHUB552 | 000-1220/70 | 10/01/14 | SLMM | 03 00 | 2,215.81 | 10/31/17 | 2,215.81 | - | 100.00% |
| 000903 | Konica Copy Machine - BIZHUB423 | 000-1220/70 | 10/01/14 | SLMM | 03 00 | 2,215.81 | 10/31/17 | 2,215.81 | - | 100.00% |
| 000904 | Konica Copy Machine - BIZHUB423 | 000-1220/70 | 10/01/14 | SLMM | 03 00 | 2,215.81 | 10/31/17 | 2,215.81 | - | 100.00% |
| 000905 | Konica Copy Machine - BIZHUB423 | 000-1220/70 | 10/01/14 | SLMM | 05 00 | 2,215.81 | 10/31/17 | 2,215.81 | - | 100.00% |
| 000906 | Konica Copy Machine - BIZHUB423 | 000-1220/70 | 10/01/14 | SLMM | 05 00 | 2,215.81 | 10/31/17 | 2,215.81 | - | 100.00% |
| 000907 | Apple Mac Pro | 000-1220/70 | 10/01/14 | SLMM | 03 00 | 3,342.43 | 10/31/17 | 3,342.43 | - | 100.00% |
| 000908 | Digital Camera - D810 | 000-1220/70 | 10/01/14 | SLMM | 03 00 | 3,296.95 | 10/31/17 | 3,296.95 | - | 100.00% |
| 000909 | EOC 5D Mark III Kit | 000-1220/70 | 10/01/14 | SLMM | 03 00 | 3,399.00 | 10/31/17 | 3,399.00 | - | 100.00% |
| 000910 | Digital Camera AF-S NIKKOR 70-200MM | 000-1220/70 | 12/01/14 | SLMM | 03 00 | 2,296.95 | 10/31/17 | 2,296.95 | - | 100.00% |
| 000911 | Nikkor 70-200mm Lenses | 000-1220/70 | 12/01/14 | SLMM | 03 00 | 2,499.00 | 10/31/17 | 2,499.00 | - | 100.00% |
| 000912 | Used Nikon D4s Body | 000-1220/70 | 08/01/15 | SLMM | 03 00 | 2,499.95 | 10/31/17 | 2,499.95 | - | 100.00% |
| 000913 | EF70-100MM Lens | 000-1220/70 | 08/01/15 | SLMM | 03 00 | 2,135.89 | 10/31/17 | 2,135.89 | - | 100.00% |
| 000914 | NZ4040 D4 Body | 000-1220/70 | 08/01/15 | SLMM | 03 00 | 6,383.54 | 10/31/17 | 6,383.54 | - | 100.00% |
| 000915 | Nikon 80-4000MM Lens | 000-1220/70 | 08/01/15 | SLMM | 03 00 | 2,903.75 | 10/31/17 | 2,903.75 | - | 100.00% |
| 000916 | Refurbished MacBook Pro 15" | 000-1220/70 | 09/01/15 | SLMM | 03 00 | 1,231.00 | 10/31/17 | 1,231.00 | - | 100.00% |
| 000917 | Used Nikon D3s Body | 000-1220/70 | 10/01/15 | SLMM | 03 00 | 2,200.00 | 10/31/17 | 2,200.00 | - | 100.00% |
| 000918 | Used Canon EF 300/4 L IS Lens | 000-1220/70 | 11/01/15 | SLMM | 03 00 | 1,043.99 | 10/31/17 | 1,043.99 | - | 100.00% |
| 000919 | Canon EOS-1-D X DSLR Camera | 000-1220/70 | 11/01/15 | SLMM | 03 00 | 4,599.99 | 10/31/17 | 4,599.99 | - | 100.00% |
| 000920 | Refurbished MacBook Pro | 000-1220/70 | 11/01/15 | SLMM | 03 00 | 861.69 | 10/31/17 | 861.69 | - | 100.00% |
| 000921 | Refurbished MacBook Prp Retina | 000-1220/70 | 11/01/15 | SLMM | 03 00 | 1,298.38 | 10/31/17 | 1,298.38 | - | 100.00% |
| 000922 | Modular SVCS Bttery | 000-1220/70 | 04/01/16 | SLMM | 05 00 | 8,533.25 | 10/31/17 | 4,503.67 | 4,029.58 | 52.78% |
| 000923 | Cannon 1D X Digital Camera Body | 000-1220/70 | 05/01/16 | SLMM | 03 00 | 3,809.00 | 10/31/17 | 3,809.00 | - | 100.00% |
| 000924 | Apple Refurbished 13.3 Inch MacBook | 000-1220/70 | 06/01/16 | SLMM | 03 00 | 1,624.56 | 10/31/17 | 1,624.56 | - | 100.00% |
| 000925 | Canon EF 16-35mm f/2.8L II USM Lens | 000-1220/70 | 07/01/16 | SLMM | 03 00 | 1,449.00 | 10/31/17 | 1,449.00 | - | 100.00% |
| 000926 | Canon 400/2.8 L IS USM AF- Used | 000-1220/70 | 07/01/16 | SLMM | 03 00 | 6,299.95 | 10/31/17 | 2,799.97 | 3,499.98 | 44.44% |
| 000927 | Apple MBP 13.3/2.9GHZ | 000-1220/70 | 09/01/16 | SLMM | 03 00 | 1,988.19 | 10/31/17 | 1,988.19 | - | 100.00% |
| 000928 | Canon Camera EF 24-70mm | 000-1220/70 | 09/01/16 | SLMM | 03 00 | 1,614.15 | 10/31/17 | 1,614.15 | - | 100.00% |
| 000929 | Apple MBP 13.3 2.7GHZ | 000-1220/70 | 10/01/16 | SLMM | 03 00 | 1,456.34 | 10/31/17 | 1,456.34 | - | 100.00% |
| 000930 | ACER VX2640G | 000-1220/70 | 10/01/16 | SLMM | 03 00 | 1,705.38 | 10/31/17 | 1,705.38 | - | 100.00% |
| 000931 | Apple MacBook 1866MHz | 000-1220/70 | 11/01/16 | SLMM | 03 00 | 2,160.44 | 10/31/17 | 2,160.44 | - | 100.00% |
| 000932 | Canon EOS-1D X DSLR Camera | 000-1220/70 | 12/01/16 | SLMM | 03 00 | 3,699.95 | 10/31/17 | 3,699.95 | - | 100.00% |
| 000933 | Canon EOS 1DX | 000-1220/70 | 12/01/16 | SLMM | 03 00 | 1,010.89 | 10/31/17 | 1,010.89 | - | 100.00% |

# Boston Herald Fixed Asset Listing

## Schedule 2.1.8

| System No. | Description | G/L Account Number | In Svc Date | Method | Remai Life | Acquired Value | Run Through Date | Accum Depreciation | Net Value | |
|---|---|---|---|---|---|---|---|---|---|---|
| 000934 | Canon EOS 1DX | 000-122070 | 12/01/16 | SLMM | 03 00 | 1,010.89 | 10/31/17 | 1,010.89 | - | 100.00% |
| 000935 | Canon EF800 5.6L | 000-122070 | 01/01/17 | SLMM | 03 00 | 1,792.66 | 10/31/17 | 497.96 | 1,294.70 | 27.78% |
| 000936 | Apple MBP13 with Apple App Machk | 000-122070 | 02/01/17 | SLMM | 03 00 | 2,267.62 | 10/31/17 | 2,267.62 | - | 100.00% |
| 000937 | Apple MBP 13 with Apple App Machk | 000-122070 | 02/01/17 | SLMM | 03 00 | 1,966.99 | 10/31/17 | 1,966.99 | - | 100.00% |
| 000938 | Refurbished MP Tower | 000-122070 | 02/16/17 | SLMM | 03 00 | 837.25 | 10/31/17 | 837.25 | - | 100.00% |
| 000939 | 2 OWC Mercury Elite | 000-122070 | 04/01/17 | SLMM | 03 00 | 2,498.37 | 10/31/17 | 485.79 | 2,012.58 | 19.44% |
| 000940 | Apple Logic Board | 000-122070 | 04/01/17 | SLMM | 03 00 | 409.00 | 10/31/17 | 409.00 | - | 100.00% |
| 000941 | Acer Computer | 000-122070 | 04/01/17 | SLMM | 03 00 | 1,645.10 | 10/31/17 | 1,645.10 | - | 100.00% |
| 000942 | Acer Computer | 000-122070 | 04/01/17 | SLMM | 03 00 | 837.74 | 10/31/17 | 837.74 | - | 100.00% |
| 000943 | Nikon D4S Digital SRL Camera & 70-200mm Lens | 000-122070 | 05/01/17 | SLMM | 03 00 | 5,698.00 | 10/31/17 | 5,698.00 | - | 100.00% |
| 000944 | Canon Refurbished Lens | 000-122070 | 06/01/17 | SLMM | 03 00 | 4,142.90 | 10/31/17 | 4,142.90 | - | 100.00% |
| SUB-TOTAL ASSETS ASSUMED | | | | | | 4,997,197.75 | | 4,714,261.54 | 282,936.21 | |
| | | | | | | | | | | |
| 000808 | 2003 Mercedes-Benz SL500 | 000-122066 | 09/01/08 | SLMM | 03 00 | 35,738.25 | 10/31/17 | 35,738.25 | - | 100.00% |
| TOTAL VEHICLES EXCLUDED | Sub-Total | | | | | 35,738.25 | | 35,738.25 | | |
| GRAND TOTAL | TOTAL | | | | | 5,032,936.00 | | 4,785,738.04 | 282,936.21 | |

Herald Interactive Fixed Asset Listing

*Schedule 2.1.8*

| System No. | Description | G/L Account Number | In Svc Date | Method | Remai Life | Acquired Value | Run Through Date | Accum Depreciation | Net Value |
|---|---|---|---|---|---|---|---|---|---|
| 000032 | CDW Computer Centers - Server Addition | 800-120070 | 04/01/04 SLMM | 00 00 | 17,273.66 | 10/31/17 | 17,273.66 | - | 100.00% |
| 000033 | Herald Interactive Laptops | 800-120070 | 06/01/04 SLMM | 00 00 | 320.00 | 10/31/17 | 320.00 | - | 100.00% |
| 000034 | Herald Interactive Laptops | 800-120070 | 06/01/04 SLMM | 00 00 | 3,667.13 | 10/31/17 | 3,667.13 | - | 100.00% |
| 000036 | Accunet - Router Switch | 800-120070 | 09/01/05 SLMM | 00 00 | 12,587.96 | 10/31/17 | 12,587.96 | - | 100.00% |
| 000040 | CDW Computer Centers Inc | 800-120075 | 12/01/01 SLMM | 00 00 | 10,255.68 | 10/31/17 | 10,255.68 | - | 100.00% |
| 000041 | CDW Computer Centers Inc | 800-120075 | 12/01/01 SLMM | 00 00 | 64.95 | 10/31/17 | 64.95 | - | 100.00% |
| 000048 | Wireless Entrasys Router | 800-120070 | 12/01/06 SLMM | 00 00 | 15,078.24 | 10/31/17 | 15,078.24 | - | 100.00% |
| 000049 | APC Units | 800-120070 | 12/01/06 SLMM | 00 00 | 5,968.59 | 10/31/17 | 5,968.59 | - | 100.00% |
| 000054 | Servers to Boost BH.com Hosting Power | 800-120070 | 11/01/07 SLMM | 00 00 | 8,844.74 | 10/31/17 | 8,844.74 | - | 100.00% |
| 000055 | HP SB DL380 | 800-120070 | 06/01/09 SLMM | 00 00 | 3,622.89 | 10/31/17 | 3,622.89 | - | 100.00% |
| 000056 | HP SB DL380 | 800-120070 | 06/01/09 SLMM | 00 00 | 3,067.31 | 10/31/17 | 3,067.31 | - | 100.00% |
| 000057 | 2 ACER LX.PCC02.001 | 800-120070 | 03/01/10 SLMM | 00 00 | 1,715.94 | 10/31/17 | 1,715.94 | - | 100.00% |
| 000058 | HD AVCHD CAMCORDER | 800-120070 | 09/01/10 SLMM | 00 00 | 20,561.50 | 10/31/17 | 20,561.50 | - | 100.00% |
| 000059 | DL380 G7 E5640 SFF SBY | 800-120070 | 03/01/11 SLMM | 00 00 | 10,692.00 | 10/31/17 | 10,692.00 | - | 100.00% |
| 000060 | SLS-7000 | 800-120070 | 04/01/11 SLMM | 00 00 | 3,634.77 | 10/31/17 | 3,634.77 | - | 100.00% |
| 000061 | Cannon EOS 5D Mark II Body | 800-120070 | 08/01/11 SLMM | 00 00 | 9,841.94 | 10/31/17 | 9,841.94 | - | 100.00% |
| 000062 | Canon XF100 HD Camcorder | 800-120070 | 08/01/11 SLMM | 00 00 | 2,939.02 | 10/31/17 | 2,939.02 | - | 100.00% |
| 000063 | Apple IMac Computer | 800-120070 | 09/01/11 SLMM | 00 00 | 2,783.75 | 10/31/17 | 2,783.75 | - | 100.00% |
| 000065 | Canon XF100 HD Camcorder | 800-120070 | 10/01/12 SLMM | 00 00 | 3,616.77 | 10/31/17 | 3,616.77 | - | 100.00% |
| 000066 | Apple MBP 15.4IN | 800-120070 | 10/01/12 SLMM | 00 00 | 2,556.39 | 10/31/17 | 2,556.39 | - | 100.00% |
| 000067 | 2 Apple MacBook Pro MD318LL/A 15.4 Inch Laptop | 800-120070 | 10/01/12 SLMM | 00 00 | 3,066.34 | 10/31/17 | 3,066.34 | - | 100.00% |
| 000068 | 2 Panasonic AG-HMC40 Camcorder | 800-120070 | 12/01/12 SLMM | 00 00 | 3,632.70 | 10/31/17 | 3,632.70 | - | 100.00% |
| 000069 | 2 Sennheiser G3 Combo | 800-120070 | 12/01/12 SLMM | 00 00 | 1,567.90 | 10/31/17 | 1,567.90 | - | 100.00% |
| 000070 | Radio Studio Equipment | 800-120070 | 09/01/13 SLMM | 00 00 | 18,158.68 | 10/31/17 | 18,158.68 | - | 100.00% |
| 000071 | Radio Studio Furniture | 800-120050 | 09/01/13 SLMM | 00 10 | 5,727.99 | 10/31/17 | 4,773.33 | 954.66 | 83.33% |
| 000072 | 3 Ignition Task Stools | 800-120050 | 11/01/13 SLMM | 00 02 | 1,128.15 | 10/31/17 | 902.52 | 225.63 | 80.00% |
| 000074 | Manfrotto MVH502A Tripod | 800-120050 | 11/01/13 SLMM | 01 00 | 1,097.98 | 10/31/17 | 878.40 | 219.58 | 80.00% |
| 000075 | Radio Studio Equipment | 800-120070 | 11/01/13 SLMM | 00 00 | 13,114.47 | 10/31/17 | 13,114.47 | - | 100.00% |
| 000076 | Cannon 70-300MM Lens | 800-120070 | 03/01/14 SLMM | 00 00 | 1,664.90 | 10/31/17 | 1,664.90 | - | 100.00% |
| 000077 | Portable IP/POTS Stereo Audio Codec | 800-120070 | 12/11/14 SLMM | 00 00 | 5,397.50 | 10/31/17 | 5,247.57 | 149.93 | 97.22% |
| 000078 | CANNON 16-35MM LENS | 800-120070 | 01/01/15 SLMM | 00 02 | 1,362.24 | 10/31/17 | 1,286.56 | 75.68 | 94.44% |
| 000079 | Canon EOS C300 | 800-120070 | 09/01/15 SLMM | 00 10 | 6,999.00 | 10/31/17 | 5,054.83 | 1,944.17 | 72.22% |
| 000080 | Web Site Design | 800-120075 | 12/01/15 SLMM | 01 00 | 108,239.49 | 10/31/17 | 69,153.01 | 39,086.48 | 63.89% |
| 000081 | Canon XF100 HD Camcorder | 800-120070 | 05/01/16 SLMM | 01 06 | 1,999.00 | 10/31/17 | 999.50 | 999.50 | 50.00% |
| 000082 | Canon XF100 HD Camcorder | 800-120070 | 11/01/16 SLMM | 02 00 | 2,188.00 | 10/31/17 | 729.33 | 1,458.67 | 33.33% |
| | Total | | | | | 314,437.57 | | 269,323.27 | 45,114.30 |

Schedule 2.1.9

Real Property Lease

Tenant:        HERALD MEDIA, INC., a Delaware corporation
Landlord:      RP BEAL ONE OWNER, LLC,
               c/o Meritage Properties LLC
               2 Overhill Road, Suite 425
               Scarsdale, NY 10583

Premises:      70 Fargo Street, South Boston, Massachusetts (the "Building")

An area of approximately 25,408 rentable square feet on the fifth (5th) floor of the Building and an area of approximately 25,346 rentable square feet on the sixth (6th) floor of the Building,

Schedule 2.1.10

Contracts

See Schedule 2.1.9 and attached.

12/6/2017

Brown Rudnick LLP Secure File Sharing

paul.hartnett91@gmail.com (Guest) | Settings | Help | Sign out

# File Manager    Send File

## Transfers

Inbox

Sent Items

My Files

## workspaces

View: All | Managed | Favorites

Herald 034242-0001

  Contracts

    Boston Herald

    Herald Interactive

  DIP Related Documents

  Gatehouse Diligence Bat:

  GH APA

    1.1.36 Motor Vehicles

    2.1.7 Receivables

    2.1.8 Fixed Assets

    2.1.9 Real Property Le

    2.1.10 Contracts-ALL

      Boston Herald

      Herald Interactive

  6.7.1 Material Agreem

  6.8.1 Employees

  6.8.2 Employee Benef

  Insurance

  Pleadings

  Press Releases

## Boston Herald

Herald 034242-0001 > GH APA > 2.1.10 Contracts-ALL > **Boston Herald**

Select All, None [0]

| Send | Delete | Add File |
| --- | --- | --- |

| | Sort By: Date | Options |
| --- | --- | --- |
| ☐ | HMI TeleReach Agreement - 20130919 F .....pdf (636.7KB) | Dec 06, 2017 13:46:05  by dave.soares@....ld.com |
| ☐ | HMI RSI Executed Copy_Signed by JM_1 .....pdf (1.4MB) | Dec 06, 2017 13:46:04  by dave.soares@....ld.com |
| ☐ | HMI Newsycle DTI Agreement.pdf (84.7KB) | Dec 06, 2017 13:46:03  by dave.soares@....ld.com |
| ☐ | HMI Newsycle eMail - April 2017 NEW .....pdf (107.5KB) | Dec 06, 2017 13:46:03  by dave.soares@....ld.com |
| ☐ | HMI NewsBank License Agreement Execu .....pdf (849.6KB) | Dec 06, 2017 13:46:02  by dave.soares@....ld.com |
| ☐ | HMI Monster ManualLowRes 2015-12-23.pdf (2.3MB) | Dec 06, 2017 13:46:01  by dave.soares@....ld.com |
| ☐ | HMI Monster Member Adopting Agreemen .....pdf (123.3KB) | Dec 06, 2017 13:46:01  by dave.soares@....ld.com |
| ☐ | HMI Monster Member Adopting Agreemen .....pdf (71.7KB) | Dec 06, 2017 13:46:01  by dave.soares@....ld.com |
| ☐ | HMI Monster LMC MSA executed with ex .....pdf (1.7MB) | Dec 06, 2017 13:45:59  by dave.soares@....ld.com |
| ☐ | HMI McClatchy Tribune Wire Service A .....pdf (181.7KB) | Dec 06, 2017 13:45:58  by dave.soares@....ld.com |
| ☐ | HMI McClatchy Tribune Amendment for .....pdf (58.2KB) | Dec 06, 2017 13:45:57  by dave.soares@....ld.com |
| ☐ | HMI McClatchy Tribune Content Agency .....pdf (88.1KB) | Dec 06, 2017 13:45:57  by dave.soares@....ld.com |
| ☐ | HMI McClatchy Tribune Direct Agreeme .....pdf (115.2KB) | Dec 06, 2017 13:45:57  by dave.soares@....ld.com |
| ☐ | HMI HeraldMedia MediaRadar Contract .....pdf (720.2KB) | Dec 06, 2017 13:45:56  by dave.soares@....ld.com |
| ☐ | HMI HeraldMedia MediaRadar Contract .....pdf (275.3KB) | Dec 06, 2017 13:45:56  by dave.soares@....ld.com |
| ☐ | HMI 451D Office Lease Shorenstein Ch .....pdf (769.6KB) | Dec 06, 2017 13:45:55  by dave.soares@....ld.com |
| ☐ | HMI 451D Office Lease Seaport Boston .....pdf (2.1MB) | Dec 06, 2017 13:45:54  by dave.soares@....ld.com |
| ☐ | HMI 451D Office Lease Seaport Boston .....pdf (1.9MB) | Dec 06, 2017 13:45:53  by dave.soares@....ld.com |
| ☐ | HMHI Compensation Agreement 2017.pdf (191.7KB) | Dec 06, 2017 13:45:51  by dave.soares@....ld.com |

Brown Rudnick LLP Secure File Sharing

HMHI USI Claims Management Services ….pdf (336.8KB)

Dec 06, 2017 13:45:51 by dave.soares@...ld.com

View per page: 20 ◆

Showing 1-20 of 113

©2000-2017 Accellion, Inc. All Rights Reserved.

12/6/2017

Brown Rudnick LLP Secure File Sharing

paul.hartnett91@gmail.com (Guest) | Settings | Help | Sign out

# File Manager    Send File

## Transfers

Inbox

Sent Items

My Files

## Boston Herald

Herald 034242-0001 > GH APA > 2.1.10 Contracts-ALL > **Boston Herald**

Select All, None [0]

**Send    Delete    Add File**

## workspaces
View: All | Managed | Favorites

Herald 034242-0001

Contracts

Boston Herald

Herald Interactive

DIP Related Documents

Gatehouse Diligence Bat

GH APA

1.1.36 Motor Vehicles

2.1.7 Receivables

2.1.8 Fixed Assets

2.1.9 Real Property Le

2.1.10 Contracts-ALL

Boston Herald

Herald Interactive

6.7.1 Material Agreem

6.8.1 Employees

6.8.2 Employee Benef

Insurance

Pleadings

Press Releases

| Sort By: Date | | Options |
|---|---|---|
| ☐ BH Windstream Fiber and Telephone Se ....pdf (1.8MB) | Dec 06, 2017 13:45:50 | by dave.soares@...ld.com |
| ☐ BH Windstream Manual Amendment to Ag ... pdf (125.2KB) | Dec 06, 2017 13:45:50 | by dave.soares@...ld.com |
| ☐ desktop.ini (0.1KB) | Dec 06, 2017 13:45:50 | by dave.soares@...ld.com |
| ☐ BH Web Hosting and Development Agree ....pdf (1.7MB) | Dec 06, 2017 13:45:48 | by dave.soares@...ld.com |
| ☐ BH White Sands invoice 20170417.pdf (183.4KB) | Dec 06, 2017 13:45:48 | by dave.soares@...ld.com |
| ☐ BH Vary Tech Xerox 7400DT PagePack R ....pdf (43.8KB) | Dec 06, 2017 13:45:47 | by dave.soares@...ld.com |
| ☐ BH WB MAson 2010 Agreement - Office ....pdf (1.9MB) | Dec 06, 2017 13:45:46 | by dave.soares@...ld.com |
| ☐ BH Vio_Adsend Boston Herald Service ....pdf (825.2KB) | Dec 06, 2017 13:45:46 | by dave.soares@...ld.com. |
| ☐ BH UTMC Service Agreement 8 29 13.pdf (106.3KB) | Dec 06, 2017 13:45:44 | by dave.soares@...ld.com |
| ☐ BH Vary Tech Xerox 7400DT Contract A ....pdf (176.2KB) | Dec 06, 2017 13:45:44 | by dave.soares@...ld.com |
| ☐ BH Thomson West MGLA 2006.pdf (420.6KB) | Dec 06, 2017 13:45:43 | by dave.soares@...ld.com |
| ☐ BH Towerwall SAFE-112-000-01890-3-L ....pdf (124.7KB) | Dec 06, 2017 13:45:43 | by dave.soares@...ld.com |
| ☐ BH Towerwall SuperCom Gold_Maintenan ...pdf (126KB) | Dec 06, 2017 13:45:43 | by dave.soares@...ld.com |
| ☐ BH Sybase 201706 - IQ & IWS.pdf (54.3KB) | Dec 06, 2017 13:45:42 | by dave.soares@...ld.com |
| ☐ BH Sybase 201709 ASE for PPI.pdf (53.7KB) | Dec 06, 2017 13:45:42 | by dave.soares@...ld.com |
| ☐ BH TD BankNorth - Board Room Contrac ....pdf (73.4KB) | Dec 06, 2017 13:45:42 | by dave.soares@...ld.com |
| ☐ BH Sheffield Cartage Agreement FINAL ....pdf (862.6KB) | Dec 06, 2017 13:45:41 | by dave.soares@...ld.com |
| ☐ BH Shoom Tearsheets - 20130501.pdf (352.7KB) | Dec 06, 2017 13:45:41 | by dave.soares@...ld.com |
| ☐ BH Sungard Avantgard Software Servic ....pdf (197.5KB) | Dec 06, 2017 13:45:41 | by dave.soares@...ld.com |

Brown Rudnick LLP Secure File Sharing

https://accellion.brownrudnick.com/courier/web/1000/@ec6i3ad0f69c56766e5928a1fc98f111/wmWs.html

BH Rutter Managed Support 2017-2018.pdf (306.7KB)

Dec. 06, 2017 13:45:40  by dave.soares@...ld.com

View per page:   20  ◆    Showing 21-40 of 113

©2000-2017 Accellion, Inc. All Rights Reserved.

12/6/2017

Brown Rudnick LLP Secure File Sharing

**paul.hartnett1@gmail.com (Guest)** | Settings | Help | Sign out

# File Manager    Send File

## Transfers
Inbox
Sent Items
My Files

## workspaces
View: All | Managed | Favorites

Herald 034242-0001
  Contracts
  Boston Herald
  Herald Interactive
DIP Related Documents
Gatehouse Diligence Bat
GH APA
  1.1.36 Motor Vehicles
  2.1.7 Receivables
  2.1.8 Fixed Assets
  2.1.9 Real Property Le
  2.1.10 Contracts-ALL
  Boston Herald
  Herald Interactive
  6.7.1 Material Agreem
  6.8.1 Employees
  6.8.2 Employee Benef
Insurance
Pleadings
Press Releases

### Boston Herald

Herald 034242-0001 > GH APA > 2.1.10 Contracts-ALL > **Boston Herald**

Select All, None [0]

**Send    Delete    Add File**

| Sort By: Date | |
|---|---|
| ☐ BH Rutter VM Support 20170607.pdf (57.6KB) | Dec 06, 2017 13:45:40  by dave.soares@...ld.com |
| ☐ BH PCF Herald Agreement - Amendment ....pdf (120.7KB) | Dec 06, 2017 13:45:39  by dave.soares@...ld.com |
| ☐ BH Postage meter & Insert Extension ....pdf (173.4KB) | Dec 06, 2017 13:45:39  by dave.soares@...ld.com |
| ☐ BH Price Increase Effective 20170901.pdf (39KB) | Dec 06, 2017 13:45:39  by dave.soares@...ld.com |
| ☐ BH PCF Agreement 20070619.pdf (890.4KB) | Dec 06, 2017 13:45:38  by dave.soares@...ld.com |
| ☐ BH OSG Billing Agreement - 20150211 ....pdf (785.2KB) | Dec 06, 2017 13:45:37  by dave.soares@...ld.com |
| ☐ BH PCF 2nd Amendment extention.pdf (82.5KB) | Dec 06, 2017 13:45:37  by dave.soares@...ld.com |
| ☐ BH Onix Google Apps and Postini - Ex ....pdf (1.7MB) | Dec 06, 2017 13:45:36  by dave.soares@...ld.com |
| ☐ BH Northwood Software Support Agreem ....pdf (82.1KB) | Dec 06, 2017 13:45:35  by dave.soares@...ld.com |
| ☐ BH NPS LLC Signed Extensions 2011-20 ....pdf (270.2KB) | Dec 06, 2017 13:45:35  by dave.soares@...ld.com |
| ☐ BH NIEOnline Agreement Final Execute ....pdf (668KB) | Dec 06, 2017 13:45:34  by dave.soares@...ld.com |
| ☐ BH Norel Service 2017-05 Service Agr ....pdf (41.1KB) | Dec 06, 2017 13:45:34  by dave.soares@...ld.com |
| ☐ BH Morcor Xpance Addendum - 20170221.pdf (39.1KB) | Dec 06, 2017 13:45:33  by dave.soares@...ld.com |
| ☐ BH Nielson Fully Signed Amendment Bo ....pdf (834.9KB) | Dec 06, 2017 13:45:33  by dave.soares@...ld.com |
| ☐ BH LexisNexis Schedule A 20170501.pdf (766.3KB) | Dec 06, 2017 13:45:32  by dave.soares@...ld.com |
| ☐ BH Major Account Agreement 2009-Sept.pdf (64.2KB) | Dec 06, 2017 13:45:32  by dave.soares@...ld.com |
| ☐ BH Morcor Support & Maintenance Agre ....pdf (310.7KB) | Dec 06, 2017 13:45:32  by dave.soares@...ld.com |
| ☐ BH LexisNexis Amendment_1_ 2011.06.0 ....pdf (459.5KB) | Dec 06, 2017 13:45:31  by dave.soares@...ld.com |
| ☐ BH LexisNexis Amendment_2_ 2012.05.0 ....pdf (60.7KB) | Dec 06, 2017 13:45:31  by dave.soares@...ld.com |

https://accellion.brownrudnick.com/courier/web/1000@/ec6f3ad0f69c567f66e5928a1fc98f111/wmWs.html

Brown Rudnick LLP Secure File Sharing

Dec 06, 2017 13:45:30 by dave.soares@...ld.com

BH Lexis-Nexis - Original.pdf (281.9KB)

View per page: 20 ◆ Showing 41-60 of 113

©2000-2017 Accellion, Inc. All Rights Reserved.

**paul.hartnett1@gmail.com (Guest)** | Settings | Help | Sign out

## File Manager    Send File

### Transfers

Inbox

Sent Items

My Files

### workspaces

View: All | Managed | Favorites

Herald 034242-0001

Contracts

Boston Herald

Herald Interactive

DIP Related Documents

Gatehouse Diligence Bat

GH APA

1.1.36 Motor Vehicles

2.1.7 Receivables

2.1.8 Fixed Assets

2.1.9 Real Property Le

2.1.10 Contracts-ALL

**Boston Herald**

Herald Interactive

6.7.1 Material Agreem

6.8.1 Employees

6.8.2 Employee Benef

Insurance

Pleadings

Press Releases

### Boston Herald

Herald 034242-0001 > GH APA > 2.1.10 Contracts-ALL > **Boston Herald**

Select All, None [0]

| Send | Delete | Add File |
| --- | --- | --- |

**Sort By: Date**

| | | Options |
| --- | --- | --- |
| ☐ BH LexisNexis Amendment 2011 - Execu ....pdf (69.3KB) | Dec 06, 2017 13:45:30  by dave.soares@...ld.com | |
| ☐ BH Konica Color Copier Lease - 20150 ....pdf (979.9KB) | Dec 06, 2017 13:45:29  by dave.soares@...ld.com | |
| ☐ BH Kronos Service Quote 20170404-201 ....pdf (169.3KB) | Dec 06, 2017 13:45:29  by dave.soares@...ld.com | |
| ☐ BH Google Contract - EXECUTED 2017-0 ....pdf (342.5KB) | Dec 06, 2017 13:45:28  by dave.soares@...ld.com | |
| ☐ BH JM Service Liebert System Maint A....pdf (68.1KB) | Dec 06, 2017 13:45:28  by dave.soares@...ld.com | |
| ☐ BH Globe Newspaper Co Print Agreemen ....pdf (3.1MB) | Dec 06, 2017 13:45:27  by dave.soares@...ld.com | |
| ☐ BH Globe Newspaper Co Insert Service ....pdf (932.6KB) | Dec 06, 2017 13:45:25  by dave.soares@...ld.com | |
| ☐ BH Globe Newspaper Co Amended Distri ....pdf (1.7MB) | Dec 06, 2017 13:45:24  by dave.soares@...ld.com | |
| ☐ BH Factiva Dow Jones Reuters Agreeme ....pdf (273.2KB) | Dec 06, 2017 13:45:23  by dave.soares@...ld.com | |
| ☐ BH Federal Express 2009 Contract ver ....pdf (137.9KB) | Dec 06, 2017 13:45:23  by dave.soares@...ld.com | |
| ☐ BH EdgilEvolve Merchant Credit Card ....pdf (1.2MB) | Dec 06, 2017 13:45:22  by dave.soares@...ld.com | |
| ☐ BH Election Change Amendment_Two Yea ....pdf (171.5KB) | Dec 06, 2017 13:45:22  by dave.soares@...ld.com | |
| ☐ BH Edgil PayWay Credit Card Agreemen ....pdf (587.7KB) | Dec 06, 2017 13:45:21  by dave.soares@...ld.com | |
| ☐ BH Edgil EdgCapture Software License ....pdf (1.3MB) | Dec 06, 2017 13:45:20  by dave.soares@...ld.com | |
| ☐ BH Edgil Central Payment Mechant App ....pdf (843.6KB) | Dec 06, 2017 13:45:19  by dave.soares@...ld.com | |
| ☐ BH Edgil ADV CentralPAY MerchantAppl ....pdf (1.6MB) | Dec 06, 2017 13:45:18  by dave.soares@...ld.com | |
| ☐ BH Document Shredding Contract 2013- ....pdf (423.2KB) | Dec 06, 2017 13:45:17  by dave.soares@...ld.com | |
| ☐ BH Edgil - Payway Amendment for Acco ....pdf (55.6KB) | Dec 06, 2017 13:45:17  by dave.soares@...ld.com | |
| ☐ BH Distribution - RSI Shoreline Adde ....pdf (254.9KB) | Dec 06, 2017 13:45:16  by dave.soares@...ld.com | |

Brown Rudnick LLP Secure File Sharing

BH Distribution - RSI Shoreline Exte ... pdf (73.8KB)

Dec. 06, 2017 13:45:16 by dave.soares@....d.com

View per page: 20 ◆

Showing 61-80 of 113

©2000-2017 Accellion, Inc. All Rights Reserved.

# File Manager    Send File

## Transfers

Inbox

Sent Items

My Files

## workspaces

View: All | Managed | Favorites

Herald 034242-0001

  Contracts

  Boston Herald

  Herald Interactive

DIP Related Documents

Gatehouse Diligence Bat

GH APA

  1.1.36 Motor Vehicles

  2.1.7 Receivables

  2.1.6 Fixed Assets

  2.1.9 Real Property, Le

  2.1.10 Contracts-ALL

    Boston Herald

    Herald Interactive

  6.7.1 Material Agreem

  6.8.1 Employees

  6.8.2 Employee Benef

Insurance

Pleadings

Press Releases

## Boston Herald

Herald 034242-0001 > GH APA > 2.1.10 Contracts-ALL > **Boston Herald**

Select: All, None [0]

**Send    Delete    Add File**

| Sort By: Date | | Options |
|---|---|---|
| ☐ BH Distribution - RSI Randolph Adden ....pdf (253.6KB) | Dec 06, 2017 13:45:15 | by dave.soares@....ld.com |
| ☐ BH Distribution - RSI Randolph.pdf (933.1KB) | Dec 06, 2017 13:45:15 | by dave.soares@....ld.com |
| ☐ BH Distribution - RSI Profile Extens ....pdf (2.1MB) | Dec 06, 2017 13:45:14 | by dave.soares@....ld.com |
| ☐ BH Distribution - RSI Randolph Adden ....pdf (73.7KB) | Dec 06, 2017 13:45:14 | by dave.soares@....ld.com |
| ☐ BH Distribution - RSI Profile Addend ....pdf (248.9KB) | Dec 06, 2017 13:45:12 | by dave.soares@....ld.com |
| ☐ BH Distribution - NBST 2009.pdf (951.4KB) | Dec 06, 2017 13:45:11 | by dave.soares@....ld.com |
| ☐ BH Distribution - Providence Journal ....pdf (829.5KB) | Dec 06, 2017 13:45:11 | by dave.soares@....ld.com |
| ☐ BH Distribution - RSI Shoreline.pdf (927.3KB) | Dec 06, 2017 13:45:10 | by dave.soares@....ld.com |
| ☐ BH Cummins Northeast 2016-12-13 Main ...pdf (216.6KB) | Dec 06, 2017 13:45:09 | by dave.soares@....ld.com |
| ☐ BH Delaware North Board Room Contrac ...pdf (73.4KB) | Dec 06, 2017 13:45:09 | by dave.soares@....ld.com |
| ☐ BH City of Boston SHARE_00000000000 ....pdf (69KB) | Dec 06, 2017 13:45:08 | by dave.soares@....ld.com |
| ☐ BH ConRes HP Equipment Renewal - 201 ....pdf (33.9KB) | Dec 06, 2017 13:45:08 | by dave.soares@....ld.com |
| ☐ BH Continuant Cisco SmartNet 2017-02 ....pdf (71.8KB) | Dec 06, 2017 13:45:08 | by dave.soares@....ld.com |
| ☐ BH CT Price Engagement Agreement 200 ....pdf (78.3KB) | Dec 06, 2017 13:45:08 | by dave.soares@....ld.com |
| ☐ BH City of Boston Executed Forms 201 ....pdf (777.6KB) | Dec 06, 2017 13:45:07 | by dave.soares@....ld.com |
| ☐ BH Capital Lease Circulation Auto - ....pdf (761.5KB) | Dec 06, 2017 13:45:06 | by dave.soares@....ld.com |
| ☐ BH Carat Media Services Agreement- ....pdf (549.8KB) | Dec 06, 2017 13:45:06 | by dave.soares@....ld.com |
| ☐ BH City of Boston Executed Forms 201 ....pdf (95.5KB) | Dec 06, 2017 13:45:06 | by dave.soares@....ld.com |
| ☐ BH Capital Lease Circulation Auto - ....pdf (761.5KB) | Dec 06, 2017 13:45:05 | by dave.soares@....ld.com |

Brown Rudnick LLP Secure File Sharing

Dec 06, 2017 13:45:04 by dave.soares@...ld.com

BH BurellesLuce 2017 Extension.pdf (554.1KB)

View per page: 20 ▲

Showing 81-100 of 113

©2000-2017 Accellion, Inc. All Rights Reserved.

# File Manager    Send File

## Transfers

Inbox

Sent Items

My Files

## workspaces

View: All | Managed | Favorites

Herald 034242-0001

   Contracts

      Boston Herald

      Herald Interactive

  DIP Related Documents

  Gatehouse Diligence Bat

  GH APA

    1.1.36 Motor Vehicles

    2.1.7 Receivables

    2.1.8 Fixed Assets

    2.1.9 Real Property Le

    2.1.10 Contracts-ALL

      Boston Herald

      Herald Interactive

  6.7.1 Material Agreem

  6.8.1 Employees

  6.8.2 Employee Benef

    Insurance

    Pleadings

    Press Releases

## Boston Herald

Herald 034242-0001 > GH APA > 2.1.10 Contracts-ALL > **Boston Herald**

Select: All, None [0]

**Send**    **Delete**    **Add File**

Sort By: Date

| | | Options |
|---|---|---|
| ☐ BH BurellesLuce Agreement 20050713.pdf (318.1KB) | Dec 06, 2017 13:45:04 | by dave.soares@...ld.com |
| ☐ BH Brainworks Subscription Services ....pdf (2MB) | Dec 06, 2017 13:45:03 | by dave.soares@...ld.com |
| ☐ BH Brainworks Boston Herald SaaS Add ....pdf (1.3MB) | Dec 06, 2017 13:45:02 | by dave.soares@...ld.com |
| ☐ BH Boston Herald DB ServAgr042009 - ....pdf (1.5MB) | Dec 06, 2017 13:45:01 | by dave.soares@...ld.com |
| ☐ BH Boston Herald - Proposal (rev 12 ....pdf (262.3KB) | Dec 06, 2017 13:44:59 | by dave.soares@...ld.com |
| ☐ BH Amalee ISD Cloud Agreement - 2013 ....pdf (79.6KB) | Dec 06, 2017 13:44:58 | by dave.soares@...ld.com |
| ☐ BH Atlas Water System 1-1-14 thru 12 ....pdf (118.5KB) | Dec 06, 2017 13:44:58 | by dave.soares@...ld.com |
| ☐ BH Bankrate Executed Contract.pdf (138.3KB) | Dec 06, 2017 13:44:58 | by dave.soares@...ld.com |
| ☐ BH AGFA Atkitex Software Maintenance ....pdf (9.6MB) | Dec 06, 2017 13:44:57 | by dave.soares@...ld.com |
| ☐ BH AdPerfect_2012_classified online ....pdf (4.8MB) | Dec 06, 2017 13:44:51 | by dave.soares@...ld.com |
| ☐ BH ADP Major Accounts Agreement.pdf (2MB) | Dec 06, 2017 13:44:47 | by dave.soares@...ld.com |
| ☐ BH 2017 Onix Google Apps Quote.pdf (79.6KB) | Dec 06, 2017 13:44:45 | by dave.soares@...ld.com |
| ☐ BH 20170420 ConRes Oracle Support Re ....xlsx (99.6KB) | Dec 06, 2017 13:44:45 | by dave.soares@...ld.com |

View per page: 20 ◀▶    Showing 101-113 of 113

# File Manager      Send File

**Transfers**
Inbox
Sent Items
My Files

**workspaces**
View: All | Managed | Favorites

Herald 034242-0001
  Contracts
  DIP Related Documents
  Gatehouse Diligence Batc
  GH APA
    1.1.36 Motor Vehicles
    2.1.7 Receivables
    2.1.8 Fixed Assets
    2.1.9 Real Property Le
    2.1.10 Contracts-ALL
  Boston Herald
  Herald Interactive
  6.7.1 Material Agreem
  6.8.1 Employees
  6.8.2 Employee Benef
  Insurance
  Pleadings
  Press Releases

## Herald Interactive

...rald 034242-0001 > GH APA > 2.1.10 Contracts-ALL > **Herald Interactive**

Select: All, None [0]

**Send   Delete   Add File**

| Sort By: Date | Options |
| --- | --- |
| ☐ HMI Tribune Content Agency License E ....pdf (401KB) | Dec 06, 2017 13:44:44  by dave.soares@...ld.com |
| ☐ HMI Outbrain_DA_07 18 13.pdf (1.4MB) | Dec 06, 2017 13:44:43  by dave.soares@...ld.com |
| ☐ HMI SendToNews Agreement 20140312 Fl ....pdf (170.6KB) | Dec 06, 2017 13:44:43  by dave.soares@...ld.com |
| ☐ HMI McClatchy TMS Agreement - EXECUT ....pdf (448.2KB) | Dec 06, 2017 13:44:42  by dave.soares@...ld.com |
| ☐ HMI LMC Google Master GSA (12-FEB-20 ....pdf (18.4MB) | Dec 06, 2017 13:44:41  by dave.soares@...ld.com |
| ☐ HMI LMC Amendment to Strategic Allia ....pdf (42.7KB) | Dec 06, 2017 13:44:28  by dave.soares@...ld.com |
| ☐ HMI Legacy Obits Agreement 2009 - ex ....pdf (1.6MB) | Dec 06, 2017 13:44:27  by dave.soares@...ld.com |
| ☐ HMI LMC Amended and Restated Consort ....pdf (49KB) | Dec 06, 2017 13:44:27  by dave.soares@...ld.com |
| ☐ HMI Content Provider Agreement_Execu ....pdf (1.1MB) | Dec 06, 2017 13:44:26  by dave.soares@...ld.com |
| ☐ HMI BlueKai 20131003 EXECUTED.pdf (1.1MB) | Dec 06, 2017 13:44:25  by dave.soares@...ld.com |
| ☐ HMI comScore Service Agreement 2016 ....pdf (233.3KB) | Dec 06, 2017 13:44:25  by dave.soares@...ld.com |
| ☐ HMI ZergNet Tier Agreement EXECUTED 1 ....pdf (654.3KB) | Dec 06, 2017 13:44:24  by dave.soares@...ld.com |
| ☐ HMI YieldMo EXECUTED-2015006.pdf (1.7MB) | Dec 06, 2017 13:44:23  by dave.soares@...ld.com |
| ☐ HI Tunein MOU_FINAL_10_04_2013.pdf (3.4MB) | Dec 06, 2017 13:44:22  by dave.soares@...ld.com |
| ☐ HI TaG MSA 20150520 - Executed.pdf (498.8KB) | Dec 06, 2017 13:44:19  by dave.soares@...ld.com |
| ☐ HI TaG updated SOW_12_06_2016.pdf (332.5KB) | Dec 06, 2017 13:44:19  by dave.soares@...ld.com |
| ☐ HI ScribbleLive - 20140930.pdf (682.8KB) | Dec 06, 2017 13:44:18  by dave.soares@...ld.com |
| ☐ HI SocialFlow_Contract_Final_04_19_2 ....pdf (661.5KB) | Dec 06, 2017 13:44:18  by dave.soares@...ld.com |
| ☐ HI Rubicon Project Master Terms and ....pdf (330.4KB) | Dec 06, 2017 13:44:17  by dave.soares@...ld.com |

12/6/2017

Brown Rudnick LLP Secure File Sharing

☐ HI Rubicon_Seller Order Form_Signed ....pdf (567.9KB)    Dec 06, 2017 13.44.17 by dave.soares@....ld.com

View per page: 20 ◆    Showing 1-20 of 48

©2000-2017 Accellion, Inc. All Rights Reserved.

12/6/2017

Brown Rudnick LLP Secure File Sharing

paul.hartnett91@gmail.com (Guest) | Settings | Help | Sign out

# File Manager    Send File

## Transfers

Inbox

Sent Items

My Files

## workspaces

View: All | Managed | Favorites

Herald 034242-0001

Contracts

DIP Related Documents

Gatehouse Diligence Bat

GH APA

1.1.36 Motor Vehicles

2.1.7 Receivables

2.1.8 Fixed Assets

2.1.9 Real Property Le

2.1.10 Contracts-ALL

Boston Herald

**Herald Interactive**

6.7.1 Material Agreem

6.8.1 Employees

6.8.2 Employee Benef

Insurance

Pleadings

Press Releases

### Herald Interactive

...rald 034242-0001 > GH APA > 2.1.10 Contracts-ALL > **Herald Interactive**

Select: All, None [0]

| Send | Delete | Add File | | | Options |
|---|---|---|---|---|---|
| Sort By: Date | | | | | |
| ☐ HI RSS NEWSFEED REV SHARE AGREEMENT ......pdf (539.9KB) | | | Dec 06, 2017 13:44:16 by dave.soares@...ld.com | | |
| ☐ HI PubMatic Publisher Service Agreem ......pdf (1.4MB) | | | Dec 06, 2017 13:44:15 by dave.soares@...ld.com | | |
| ☐ HI PubMatic_Amend - 05_20_2014_Signe ......pdf (65.8KB) | | | Dec 06, 2017 13:44:14 by dave.soares@...ld.com | | |
| ☐ HI Nativo PublisherAgreement (4.4.20 ......pdf (1.7MB) | | | Dec 06, 2017 13:44:14 by dave.soares@...ld.com | | |
| ☐ HI OS4 Media Agreement Executed 2017 ......pdf (97.3KB) | | | Dec 06, 2017 13:44:14 by dave.soares@...ld.com | | |
| ☐ HI Native Module Agreement_Final Exe ......pdf (562.6KB) | | | Dec 06, 2017 13:44:13 by dave.soares@...ld.com | | |
| ☐ HI JW Player Order Platform Executed ......pdf (426.5KB) | | | Dec 06, 2017 13:44:12 by dave.soares@...ld.com | | |
| ☐ HI Gracenote - FINAL - 06.30.17.pdf (1.2MB) | | | Dec 06, 2017 13:44:11 by dave.soares@...ld.com | | |
| ☐ HI FinancialContentServices_Final Du ......pdf (379.8KB) | | | Dec 06, 2017 13:44:10 by dave.soares@...ld.com | | |
| ☐ HI Google Contract - EXECUTED 2017-0 ......pdf (342.5KB) | | | Dec 06, 2017 13:44:10 by dave.soares@...ld.com | | |
| ☐ HI District M Contract.pdf (382.7KB) | | | Dec 06, 2017 13:44:09 by dave.soares@...ld.com | | |
| ☐ HI DoApp 2010 Contract.pdf (673.6KB) | | | Dec 06, 2017 13:44:09 by dave.soares@...ld.com | | |
| ☐ HI Backbone Internet Radio Agreement ......pdf (363.4KB) | | | Dec 06, 2017 13:44:08 by dave.soares@...ld.com | | |
| ☐ HI Connatix-executed 2017-06-01.pdf (736.7KB) | | | Dec 06, 2017 13:44:08 by dave.soares@...ld.com | | |
| ☐ HI Adventiv MSA & T&C - 20150826 FIN ......pdf (5MB) | | | Dec 06, 2017 13:44:07 by dave.soares@...ld.com | | |
| ☐ HI Amazon A9 Executed pdf (308.2KB) | | | Dec 06, 2017 13:44:07 by dave.soares@...ld.com | | |
| ☐ desktop.ini (0.1KB) | | | Dec 06, 2017 13:44:03 by dave.soares@...ld.com | | |
| ☐ HI Adperfect Revinet Service Agreeme ......pdf (766.7KB) | | | Dec 06, 2017 13:44:03 by dave.soares@...ld.com | | |
| ☐ BHHI NDN News Distribution Network & ......pdf (12.2MB) | | | Dec 06, 2017 13:44:02 by dave.soares@...ld.com | | |

1/2

https://accellion.brownrudnick.com/courier/web1000@ec63ad0f69c567f66c59281f1c9ff111/wmWs.html

Brown Rudnick LLP Secure File Sharing

BH_2016 Pantheon Renewal Order Form_....pdf (648.6KB)    Dec 06, 2017 13:44:02 by dave.soares@....ld.com

View per page: 20    Showing 21-40 of 48

©2000-2017 Accellion, Inc. All Rights Reserved.

12/6/2017

Brown Rudnick LLP Secure File Sharing

paul.hartnett91@gmail.com (Guest) | Settings | Help | Sign out

# File Manager     Send File

## Transfers

Inbox

Sent Items

My Files

## workspaces

View: All | Managed | Favorites

Herald 034242-0001

Contracts

DIP Related Documents

Gatehouse Diligence Bat

GH APA

1.1.36 Motor Vehicles

2.1.7 Receivables

2.1.8 Fixed Assets

2.1.9 Real Property Le

2.1.10 Contracts-ALL

Boston Herald

Herald Interactive

6.7.1 Material Agreem

6.8.1 Employees

6.8.2 Employee Benef

Insurance

Pleadings

Press Releases

## Herald Interactive

...rald 034242-0001 > GH APA > 2.1.10 Contracts-ALL > **Herald Interactive**

Select: All, None [0]

**Send     Delete     Add File**

Sort By: Date

| | | Options |
|---|---|---|
| ☐ BHHI NDN Amendment to News Distribut .....pdf (1.4MB) | Dec 06, 2017 13:43:53  by dave.soares@....ld.com | |
| ☐ BH OpenX.pdf (461.3KB) | Dec 06, 2017 13:43:52  by dave.soares@....ld.com | |
| ☐ BH Pantheon Executed.pdf (648.6KB) | Dec 06, 2017 13:43:52  by dave.soares@....ld.com | |
| ☐ BH Google Doubleclick Order Form FES .....pdf (298.2KB) | Dec 06, 2017 13:43:51  by dave.soares@....ld.com | |
| ☐ BH Invisibly Agreement 20170929.pdf (262.2KB) | Dec 06, 2017 13:43:51  by dave.soares@....ld.com | |
| ☐ BH Google Doubleclick FESA_Signed 7_.....pdf (1.2MB) | Dec 06, 2017 13:43:50  by dave.soares@....ld.com | |
| ☐ BH Associate Press Internet Suppleme .....pdf (579.1KB) | Dec 06, 2017 13:43:49  by dave.soares@....ld.com | |
| ☐ BH Google DFP Order Form FESA Signed.....pdf (299.8KB) | Dec 06, 2017 13:43:49  by dave.soares@....ld.com | |

View per page: [ 20 ▾ ]     Showing 41-48 of 48

## SCHEDULE 2.1.18

## PREPAID EXPENSES

| Account Name | Amount | Description |
|---|---|---|
| PREPAID SERVICE CONTRACTS | 161.1 | Prepaid business agreement |
| HPHC/BCBS MEDICAL INSURANCE PPD | 127.0 | Medical insurance |
| OTHER CURR ASSET - CIRCULATION DEPOS | 126.1 | Circulation Deposits for PCF and OSG agreements |
| LIBEL & EXCESS LIBEL INS | 116.1 | Corporate insurance |
| WORKERS' COMPENSATION INS. | 102.8 | Corporate insurance |
| FIDUCIARY & CRIME INS | 59.4 | Corporate insurance |
| GLOBE/DRIVER REIMBURSEMENT | 59.1 | Globe reimbursement for Herald drivers per agreement |
| GILLETTE STADIUM - PATRIOTS TICKETS | 46.0 | N.E. Patriots tickets |
| TD BANKNORTH GARDEN | 30.9 | Barter agreement with Bruins |
| OTHER CURR ASSET - CREDIT CARD AR | 27.3 | Credit Card processing timing of payments |
| PROPERTY- 70 FARGO ST. INS | 23.8 | Corporate insurance |
| AUTO/TRUCK INSURANCE | 8.9 | Corporate insurance |
| GENERAL LIABILITY INSURANCE | 8.3 | Corporate insurance |
| BOSTON CHAMBER OF COMMERCE | 5.8 | |
| STAMPS MAIL CAGE | 5.7 | Postage for mail machine |
| MASS. NEWSPAPER PUBLISHERS ASN | 1.6 | |
| GUAR DEP-POSTAGE DUE | 0.2 | |
| **TOTAL** | **910** * | |

* (In thousands)

Schedule 2.2

Other Excluded Assets

See attached.

OTHER EXCLUDED ASSETS

| Account Name | Amount | Description |
|---|---|---|
| *1. Prepaids:* | | |
| SELF-INSURANCE LOSSES | 44.0 | Self Insurance Workers Comp (pre - 2006) |
| | - | |
| TOTAL | 44.0 | |
| | | |
| *2. Fixed Assets* | | |
| VEHICLES | 35.7 | 2003 Mercedes Benz |
| | - | |
| TOTAL | 35.7 | |
| | | |
| *3. Long Term Assets* | | |
| SELF-INSURANCE LOSSES | 176.1 | Self Insurance Workers Comp (pre - 2006) |
| SELF-INSURANCE CASH ESCROW (AIG) | 10.0 | Self Insurance Workers Comp (pre - 2006) |
| CASH DEPOSIT - TPC BOSTON | 25.0 | |
| CASH DEPOSIT - GILLETTE - N.E. PATRIOTS | 60.0 | |
| TOTAL | 85.0 | |

Schedule 3.3.2.

Notes as to the preparation of the historical consolidated audited financial statements of
Sellers – Variance with GAAP

None.

Schedule 4.3.5

Required Seller Waivers, Consents And Approvals

None.

Schedule 4.4.6

Required Buyer Waivers, Consents And Approvals

None.

## Schedule 6.2

## Jurisdiction of Sellers' Incorporation and Good Standing

Each of the Sellers is a corporation duly incorporated and in good standing in the State of Delaware and each is qualified to do business and in good standing in the Commonwealth of Massachusetts.

Schedule 6.3.1

Sellers Consents, Waivers, Approvals, Orders And Authorizations

None.

Schedule 6.3.2

Sellers' Filings With Governmental Authorities

None.

Schedule 6.4.1

Exceptions to Good, Valid And Marketable Title to Personal Property

None.

Schedule 6.5

Litigation and Judgments, Orders or Decrees

Consolidated Freelancer Copyright Infringement:  Following the Supreme Court's decision in Tasini vs New York Times, several class action copyright infringement lawsuits were filed by named freelancers and others against certain commercial databases (including Factiva and Reed Elsevier) and certain print publishers (including the New York Times, Dow Jones and Copley Press). The freelancers claimed that, while they had given permission for their works to be published in print by the publishers, they had not consented to publishers' licensing of their works to commercial databases for the electronic distribution.  Because publishers (a) were the parties who dealt directly with the freelancers and (b) had indemnification obligations embedded in their license agreements with the commercial databases, they actively participated in the settlement negotiations that, in 2005, resulted in an Initial Settlement Agreement between the class action plaintiffs and the named databases and publishers. In connection with that Agreement and subject to its final approval by the court, certain publishers, entered into a Database/Participating Publisher Implementing Agreement ("DB/PPA") with the databases. The Initial Settlement Agreement was overturned by the Second Circuit in 2007 as beyond the district court's jurisdiction. The Supreme Court unanimously reversed that decision, but, on remand, the Second Circuit again struck down the settlement, this time on the theory that the authors with unregistered copyrights needed separate representation in the settlement negotiations.

Since the Second Circuit's decision in 2011, the class action plaintiffs and the named databases and publishers engaged in extensive settlement negotiations and, in late 2013, again reached a settlement. As before, the Revised Settlement Agreement ("RSA") between the class action plaintiffs and the named databases and publishers is subject to court approval. The RSA has been submitted to the district court for preliminary approval and a hearing was set for January 22, 2014. In connection with the RSA, Herald Media, along with a number of other publishers, has agreed to participate in an implementing agreement with the databases.  The revised DB/PPA obligates Participating Publishers to pay valid claims for works they published (at the rates set in the RSA) and transfers to them the benefits of the release provided by the class action plaintiffs and the non-exclusive right to continued use of the works. The amount paid per article will, in general, depend on whether the article was (1) properly registered with the Copyright Office before publication, (2) registered with the Copyright Office after publication or (3) not registered (so-called A, B and C Claims).  Claims were initially identified in the initial settlement claims process as Category A, B or C claims, but the amount to be paid on any particular claim remains subject to additional review and possible reclassification.  Given the current status of efforts to resolve these claims and the contemplated claims administration process, the value of any particular claim for which a participating publisher will ultimately be responsible is as yet undetermined.

In connection with the Initial Settlement Agreement, the claims administrator presented 5,541 claims from 59 claimants with a total value of $168,064 against the Herald Media. Herald Media originally contested $14,660 of the claims with the administrator and has confirmed the remaining balance of $153,404. Subsequently, in April 2017 Herald Media agreed to terms with one (1) claimant, Michael Schuman, in order to resolve $1,108 in claims, Herald Media agreed to settle those objections for $700. Herald Media is awaiting further instructions from defense counsel on the remaining status of all other objected claims.

Schedule 6.6

Registered Intellectual Property; Intellectual Property Licenses

Summary

All Registered Intellectual Property is held by either Boston Herald, Inc. or Herald Interactive Inc., as noted below.  No IP is held by either Herald Media, Inc. or Herald Media Holdings, Inc.

**Registered US Trademarks**

| Owner | Trademark | Reg. No. | Status | Notes |
|---|---|---|---|---|
| Boston Herald, Inc. | SOMEBODY'S GOT TO SAY IT | 2487547 | Live | |
| Boston Herald, Inc. | BOSTON HERALD | 2294163 | Live | |
| | | | | |
| Herald Interactive Inc. | HOMEFIND | 2593360 | Live | |
| Herald Interactive Inc. | JOBFIND | 2315509 | Live | |
| Herald Interactive Inc. | CARFIND | 2601455 | Live | |
| | | | | |
| Herald Media, Inc. | *NONE* | | | |
| | | | | |
| Herald Media Holdings, Inc. | *NONE* | | | |

**Registered US Copyrights**

| No. | Owner Name (as listed at the USCO) | Title | Copyright No. | Date |
|---|---|---|---|---|
| 1. | Boston Herald | Boston Herald. | TX0007750610 | 2012 |
| 2. | Boston Herald | Boston herald. | CSN0102979 | 2006 |
| 3. | Boston Herald | Boston Herald. [Published: 2012-09-01 to 2012-09-30. Issues: September 2012] | TX0007695492 | 2012 |
| 4. | Boston Herald | Boston Herald. [Published: 2012-10-01 to 2012-10-31. Issues: October 2012] | TX0007903108 | 2012 |

| 5. | Boston Herald | Boston Herald. [Published: 2012-11-01 to 2012-11-30. Issues: November 2012] | TX0007903094 | 2012 |
|----|---------------|---------------------------------------------------------------------------|--------------|------|
| 6. | Boston Herald | Boston Herald. [Published: 2012-12-01 to 2012-12-31. Issues: December 2012] | TX0007726333 | 2012 |
| 7. | Boston Herald | Boston Herald. [Published: 2013-01-01 to 2013-01-31. Issues: January 2013] | TX0007806721 | 2013 |
| 8. | Boston Herald | Boston Herald. [Published: 2013-02-01 to 2013-02-28. Issues: February 2013] | TX0007742883 | 2013 |
| 9. | Boston Herald | Boston Herald. [Published: 2013-03-01 to 2013-03-31. Issues: March 2013] | TX0007746660 | 2013 |
| 10. | Boston Herald | Boston Herald. [Published: 2013-05-01 to 2013-05-31. Issues: May 2013] | TX0007811703 | 2013 |
| 11. | Boston Herald | Boston Herald. [Published: 2013-07-01 to 2013-07-31. Issues: July 2013] | TX0007834328 | 2013 |
| 12. | Boston Herald | Boston Herald. [Published: 2013-08-01 to 2013-08-31. Issues: August 2013] | TX0007901135 | 2013 |
| 13. | Boston Herald | Boston Herald. [Published: 2013-09-01 to 2013-09-30. Issues: September 2013] | TX0008065726 | 2013 |
| 14. | Boston Herald | Boston Herald. [Published: 2013-10-01 to 2013-10-31. Issues: October 2013] | TX0007901396 | 2013 |
| 15. | Boston Herald | Boston Herald. [Published: 2013-11-01 to 2013-11-30. Issues: | TX0007900479 | 2013 |

| | | November 2013] | | |
|---|---|---|---|---|
| 16. | Boston Herald | Boston Herald. [Published: 2013-12-01 to 2013-12-31. Issues: December 2013] | TX0007966412 | 2013 |
| 17. | Boston Herald | Boston Herald. [Published: 2014-02-01 to 2014-02-28. Issues: February 2014] | TX0007886895 | 2014 |
| 18. | Boston Herald | Boston Herald. [Published: 2014-03-01 to 2014-03-31. Issues: March 2014] | TX0008156415 | 2014 |
| 19. | Boston Herald | Boston Herald. [Published: 2014-04-01 to 2014-04-30. Issues: April 2014] | TX0007966426 | 2014 |
| 20. | Boston Herald | Boston Herald. [Published: 2014-06-01 to 2014-06-30. Issues: June 2014] | TX0008156045 | 2014 |
| 21. | Boston Herald | Boston Herald. [Published: 2014-07-01 to 2014-07-31. Issues: July 2014] | TX0008156283 | 2014 |
| 22. | Boston Herald | Boston Herald. [Published: 2014-08-01 to 2014-08-31. Issues: August 2014] | TX0008063505 | 2014 |
| 23. | Boston Herald | Boston Herald. [Published: 2014-09-01 to 2014-09-30. Issues: September 2014] | TX0008080620 | 2014 |
| 24. | Boston Herald | Boston Herald. [Published: 2014-10-01 to 2014-10-31. Issues: October 2014] | TX0008153797 | 2014 |
| 25. | Boston Herald | Boston Herald. [Published: 2014-11-01 to 2014-11-30. Issues: November 2014] | TX0008154564 | 2014 |

| 26. | Boston Herald | Boston Herald. [Published: 2014-12-01 to 2014-12-31. Issues: December 2014] | TX0008153863 | 2014 |
|---|---|---|---|---|
| 27. | Boston Herald | Boston Herald. [Published: 2015-01-01 to 2015-01-31. Issues: January 2015] | TX0008174112 | 2015 |
| 28. | Boston Herald | Boston Herald. [Published: 2015-02-01 to 2015-02-28. Issues: February 2015] | TX0008162680 | 2015 |
| 29. | Boston Herald | Boston Herald. [Published: 2015-03-01 to 2015-03-31. Issues: March 2015] | TX0008183009 | 2015 |
| 30. | Boston Herald | Boston Herald. [Published: 2015-04-01 to 2015-04-30. Issues: April 2015] | TX0008182772 | 2015 |
| 31. | Boston Herald, Inc. | Bobby Orr's goal that won Stanley Cup & 70 other titles. | V3541D256 | 2006 |
| 32. | Boston Herald, Inc. | Bobby Orr's goal that won Stanley Cup & 72 other titles. | V3515D658 | 2004 |
| 33. | Boston Herald, Inc. | Bobby Orr's goal that won Stanley Cup & 72 other titles. | V3515D658 | 2004 |
| 34. | Boston Herald, Inc. | Bobby Orr's goal that won Stanley Cup; photo. By Boston Record American. | RE0000852965 | 2001 |
| 35. | Boston Herald, Inc. | Boston herald. | CSN0102979 | 2012 |
| 36. | Boston Herald, Inc. | Boston herald. | CSN0102979 | 2011 |
| 37. | Boston Herald, Inc. | Boston herald. | CSN0102979 | 2010 |
| 38. | Boston Herald, Inc. | Boston herald. | CSN0102979 | 2009 |

| | | | | |
|---|---|---|---|---|
| 39. | Boston Herald, Inc. | Boston herald. | CSN0102979 | 2008 |
| 40. | Boston Herald, Inc. | Boston herald. | CSN0102979 | 2007 |
| 41. | Boston Herald, Inc. | Boston herald. | CSN0102979 | 2005 |
| 42. | Boston Herald, Inc. | Boston herald. | CSN0102979 | 2004 |
| 43. | Boston Herald, Inc. | Boston herald. | CSN0102979 | 2003 |
| 44. | Boston Herald, Inc. | Boston herald. | CSN0102979 | 2002 |
| 45. | Boston Herald, Inc. | Boston herald. | CSN0102979 | 2001 |
| 46. | Boston Herald, Inc. | Boston herald. | CSN0102979 | 2000 |
| 47. | Boston Herald, Inc. | Boston herald. | CSN0102979 | 1999 |
| 48. | Boston Herald, Inc. | Boston herald. | CSN0102979 | 1998 |
| 49. | Boston Herald, Inc. | Boston herald. | CSN0102979 | 1997 |
| 50. | Boston Herald, Inc. | Boston herald. | CSN0102979 | 1996 |
| 51. | Boston Herald, Inc. | Boston herald. | CSN0102979 | 1995 |
| 52. | Boston Herald, Inc. | Boston herald. | CSN0102979 | 1994 |
| 53. | Boston Herald, Inc. | Good stogie / by Michael Fein. | VA0000860415 | 1997 |
| | | | | |
| | Herald Interactive Inc. | *NONE* | | |
| | Herald Media, Inc. | *NONE* | | |
| | Herald Media Holdings, Inc. | *NONE* | | |

**Domain Names**

| Owner | Domain Name | Creation Date | Registrar |
|---|---|---|---|
| Boston Herald, Inc. | hubblog.com | 2002-08-08 | DYNAMIC NETWORK SERVICES, INC |
| Boston Herald, Inc. | thehubblog.com | 2002-08-09 | DYNAMIC NETWORK SERVICES, INC |
| | | | |
| Herald Interactive Inc. | bestaroundboston.com | 2000-04-24 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | bhforklift.com | 2012-07-13 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | bhrld.us | 2016-04-22 | NETWORK SOLUTIONS, LLC |
| Herald Interactive Inc. | bhstylize.com | 2012-07-13 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | bostonheraldcars.com | 2009-01-27 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | bostonheraldlive.com | 2013-03-26 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | bostonheraldsq.com | 2010-06-09 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | bostonheraldsquare.com | 2010-06-09 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | bostonherald.com | 2002-10-01 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | bostonhomesguide.com | 2006-03-08 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | bostonscene.com | 1997-11-18 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | bostontoday.com | 1997-07-18 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | businesstoday.com | 1997-02-25 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | buyheraldphotos.com | 2010-02-01 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | carfind.com | 1997-12-03 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | halfpriceboston.com | 2009-11-03 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | heraldinteractive.com | 2001-05-16 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | heraldlive.com | 2005-08-10 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | heraldmedia.com | 1999-02-25 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | heraldsquareonline.com | 2010-06-09 | NETWORK SOLUTIONS, LLC. |

| Herald Interactive Inc. | heraldu.com | 2012-05-14 | NETWORK SOLUTIONS, LLC. |
|---|---|---|---|
| Herald Interactive Inc. | heraldweather.com | 2013-09-23 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | hiasys.com | 2001-02-07 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | jobfind.com | 1996-11-26 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | jobsmart.com | 1996-04-16 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | nesnow.com | 1999-09-28 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | newenglandsnow.com | 1999-09-28 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | trackgals.com | 2003-04-15 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | womensbusinessboston.com | 2001-06-22 | NETWORK SOLUTIONS, LLC. |
|  |  |  |  |
| Herald Media, Inc. | *NONE* |  |  |
| Herald Media Holdings, Inc. | *NONE* |  |  |

**Domain Names**

| Owner | Domain Name | Creation Date | Registrar |
|---|---|---|---|
| Boston Herald, Inc. | hubblog.com | 2002-08-08 | DYNAMIC NETWORK SERVICES, INC |
| Boston Herald, Inc. | thehubblog.com | 2002-08-09 | DYNAMIC NETWORK SERVICES, INC |
| | | | |
| Herald Interactive Inc. | bestaroundboston.com | 2000-04-24 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | bhforklift.com | 2012-07-13 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | bhrld.us | 2016-04-22 | NETWORK SOLUTIONS, LLC |
| Herald Interactive Inc. | bhstylize.com | 2012-07-13 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | bostonheraldcars.com | 2009-01-27 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | bostonheraldlive.com | 2013-03-26 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | bostonheraldsq.com | 2010-06-09 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | bostonheraldsquare.com | 2010-06-09 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | bostonherlad.com | 2002-10-01 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | bostonhomesguide.com | 2006-03-08 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | bostonscene.com | 1997-11-18 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | bostontoday.com | 1997-07-18 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | businesstoday.com | 1997-02-25 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | buyheraldphotos.com | 2010-02-01 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | carfind.com | 1997-12-03 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | halfpriceboston.com | 2009-11-03 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | heraldinteractive.com | 2001-05-16 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | heraldlive.com | 2005-08-10 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | heraldmedia.com | 1999-02-25 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | heraldsquareonline.com | 2010-06-09 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | heraldu.com | 2012-05-14 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | heraldweather.com | 2013-09-23 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | hiasys.com | 2001-02-07 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | jobfind.com | 1996-11-26 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | jobsmart.com | 1996-04-16 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | nesnow.com | 1999-09-28 | NETWORK SOLUTIONS, LLC. |

| Herald Interactive Inc. | newenglandsnow.com | 1999-09-28 | NETWORK SOLUTIONS, LLC. |
|---|---|---|---|
| Herald Interactive Inc. | trackgals.com | 2003-04-15 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | womensbusinessboston.com | 2001-06-22 | NETWORK SOLUTIONS, LLC. |
| | | | |
| Herald Media, Inc. | *NONE* | | |
| Herald Media Holdings, Inc. | *NONE* | | |

Schedule 6.7.1

Material Agreements

See attached.

**Herald Media Holdings, Inc.**

**Licenses for News Content**

Licensee

BurellesLuce

Lexis-Nexis

McClatchy Tribune Information Services

NewsBank

# Herald Media Holdings, Inc.
## Licenses & Material Contract List

| Debtor | Contract Party | Type | Folder | Description of Agreement | Cure Cost |
|---|---|---|---|---|---|
| HMH | Herald Media Holdings, Inc. | | | | |
| HMI | Herald Media, Inc. | | | | |
| BH | Boston Herald, Inc. | | | | |
| HI | Herald Interactive, Inc. | | | | |
| | **Licenses:** | | | | |
| BH | BURRELLESLUCE | License | BH | Revenue share for Herald news content | |
| HMI | NEWSBANK, INC | License | BH | License agreement for news content to library and government markets | |
| BH | LEXIS-NEXIS | License | BH | License agreement for news content | |
| HMI | MCCLATCHY TRIBUNE SERVICES | License | BH | License agreement for news content | |
| | **Material Contracts:** | | | | |
| BH | BOSTON GLOBE | | BH | Print, Inserting & Distribution on newspaper | |
| BH | 451 D STREET, LLC | | BH | Office lease for 451 D Street | |
| BH | PCF, INC. | | BH | Newspaper delivery to subscribers | |
| BH | Newspaper Direct / PressReader | Revenue | BH | eEdition host for replica & content reseller to cruise ships & hotels | |
| BH | THE BOSTON GLOBE | | BH | Bulk distribution/hauling services | |
| HMH | ARTHUR J GALLAGHER & CO. OF | | BH | General business insurance broker | |
| BH | ASSOCIATED PRESS | | BH & HI | Print & online editorial content license | |
| HMI | OUTBRAIN, INC. | Revenue | HI | Sponsored content. Revenue share | |
| HMI | REIMBURSEMENT SPECIALISTS, INC | | BH | Health plan PFA administrator | |
| HI | THIRD AND GROVE LLC | | HI | Web dev and design for bostonherald.com | |
| HMI | COMSCORE, INC. | | HI | Audience analytics for digital only | |
| HI | DOAPP | Revenue | HI | Content delivery for news apps. Revenue share model | |
| HI | OS4 MEDIA, LLC | Revenue | HI | Programtic / Demand activation for non-guarantee ad inventory | |
| HI | THE RUBICON PROJECT, INC | Revenue | HI | Online programmatic advertising | |
| HMI | TRIBUNE CONTENT AGENCY | | HI | Print & online editorial content license | |
| HMI | TELEREACH, INC. | | BH | Customer support for home delivery subscribers | |
| HMI | SENTONEWS INC. | Revenue | HI | PGA Golf news content aggregator | |
| BH | NIELSEN AUDIO, INC. | | BH | Subscription to readership demographics for marketing | |
| HI | NEWSMAX MEDIA | Revenue | HI | Sponsored content provider | |
| BH | GOOGLE INC. | | HI | DFP Premium and AdX Services. Ad serving | |
| BH | BRAINWORKS SOFTWARE, LLC | | BH | Cloud based circulation management system | |
| HI | CONATIX | Revenue | HI | Native advertising / sponsored articles | |
| HI | PUBMATIC, INC. | Revenue | HI | Online programmatic advertising | |
| HMI | NEWSCYCLE SOLUTIONS, INC. | | BH | Support for editorial content management system | |

Schedule 6.7.2

Executory Contracts and Unexpired Leases

See Schedules 2.1.19 and 2.1.10

Schedule 6.8.2

Employee Benefit Plans; Defaults or Funding Deficiencies; Withdrawal Liabilities

See attached.

# Herald Media Holdings, Inc.
## Summary of Employee Benefits
### SCHEDULE 6.8.2

**Boston Herald (Non-Union):**

| Benefit | Paid By | Description |
|---|---|---|
| Medical Insurance | Company & Employee | See attached sheet |
| Dental Insurance | Company | See attached sheet |
| Eye Care | Company | Employees are eligible for an eye exam and basic glasses (frame and lenses) excluding contacts from a Davis Vision network provider every 24 months. |
| Term Life Insurance | Company | 2 times base salary up to a maximum benefit of $400,000. |
| Voluntary Life Insurance | Employee | Employees may elect to purchase additional Life insurance. The cost for this insurance is borne by the employee. |
| Sick Leave | Company | Sick day allowance based on length of service with a maximum benefit for 25+ years of service of 20 weeks at full pay, 5 weeks at 2/3rds pay and 6 weeks at 1/2 pay |
| Long Term Disability | Company | After disability of 180 days, pays 60% of monthly covered earnings up to a maximum benefit of $10,500 per month for duration of disability or up to SS retirement age, whichever is less. |
| Flex. Spending Account | Employee | Available for health and dependent care. |
| Commuter Benefits | Employee | Available for parking and/or transit expense. |
| DB Pension Plan | Company | In December 2005 this DB Plan was amended to freeze future benefit accruals. |
| 401k Plan | Employee | Employee may contribute up to 15% of salary upon hire, subject to the IRS limit. |
| 401K Match | Company | After 1 year of service, Company will match 50% of the first 6% pretax and/or Roth of employee's 401K contribution. |
| Employee Assistance Program | Company | The Company makes available to all employees by telephone and in-person services to confidentially assist them and/or their immediate family members in resolving personal problems or situations that do or might adversely affect them. The services are provided through employees and affiliates of Empathia/Life Matters, which are conveniently located throughout the Boston area and the United States. The Company pays for this benefit including initial contact and up to 3 visits with an Empathia/Life Matters affiliate. |

# Herald Media Holdings, Inc.
## Summary of Employee Benefits
### SCHEDULE 6.8.2

**Boston Herald Editorial & Commercial Guild Unions:**

| Benefit | Paid By | Description |
|---|---|---|
| Medical Insurance | Company & Employee | See attached sheet |
| Dental Insurance | Employee | See attached sheet |
| Eye Care | Company | Employees are eligible for an eye exam and basic glasses (frame and lenses) excluding contacts from a Davis Vision network provider every 24 months. |
| Sick Leave | Company | Sick day allowance based on length of service with a maximum benefit of 25 or more years of service of 12 weeks at full pay, 8 weeks at 2/3rds pay and 6 weeks at 1/2 pay. |
| Flex. Spending Account | Employee | Available for health and dependent care. |
| Commuter Benefit | Employee | Available for parking and/or transit expense. |
| Multiemployer Pension Plan - Editorial Employees | Company & Employee | Payment of $5.00 (by Company) and $0.7962 (by Employee via payroll diversion) for each shift worked (up to a maximum of 5 per week) to The Newspaper Guild International Pension Fund. |
| Herald DB Pension Plan - Commercial Employees | Company & Employees | Company pays actuarial determined minimum contributions, which includes the $5.30 for each shift worked (up to a maximum of 5 per week) per the union contract.  The employees' contribution includes a 5% pay reduction (from contract wages) and 5 unpaid furlough days per calendar year. In May 2008, this Plan was amended to temporarily freeze future benefit accruals. |
| 401k Plan | Employee | Employee may contribute up to 25% of salary upon hire, subject to the IRS limit. |
| Employee Assistance Program | Company | Same as Boston Herald Non-Union above. |
| Dismissal & Alternate Benefit | Company | Severance pay - see union contracts for calculation |

# Herald Media Holdings, Inc.
## Summary of Employee Benefits
### SCHEDULE 6.8.2

**Boston Herald Teamsters Local 25 Union:**

| Benefit | Paid By | Description |
|---------|---------|-------------|
| Medical Insurance | Company & Employee | See attached sheet. |
| Dental Insurance | Employee | See attached sheet. |
| Eye Care | Employee | Employees are eligible for an eye exam and basic glasses (frame and lenses) excluding contacts from a Davis Vision network provider every 24 months. |
| Health & Welfare Fund | Company | In addition to Medical and Dental contributions (below), the Company currently pays $0.94 per shift worked (max of 5 shifts per week) to the Health & Welfare Fund. In turn, the Health & Welfare Fund pays the Herald a portion of the Medical insurance. The Fund also has a self-funded $10,000 death benefit. |
| Sick Leave | Company | 5 days per year |
| Short Term Disability | Company & Employee | After 7-day disability period, pays a benefit of $250 per week for duration of disability or 26 weeks, whichever is less. |
| Flex. Spending Account | Employee | Available for health and dependent care. |
| Multiemployer Pension Plan | Company | Payment of $8.94 per hour worked (up to a maximum of 40 hours per week) to the New England Teamsters & Trucking Industry Pension Fund. |
| 401k Plan | Employee | Employee may contribute up to 25% of salary upon hire, subject to the IRS limit. |
| Employee Assistance Program | Company | Same as Boston Herald Non-Union above. |

Herald Media Holdings, Inc.
Summary of Employee Benefits
*SCHEDULE 6.8.2*

**Boston Herald Typographers Union:**

| Benefit | Paid By | Description |
|---|---|---|
| Medical Insurance | Company & Employee | See attached sheet. In addition, see notes to Health & Welfare Fund below. |
| Eye Care | Company | Employees are eligible for an eye exam and basic glasses (frame and lenses) excluding contacts from a Davis Vision network provider every 24 months. |
| Health & Welfare Fund | N/A | Surplus funds in the Health & Welfare Fund are used to offset a portion of the medical insurance costs. There are no Employee or Employer contributions to this plan. |
| Sick Leave | Company | 5 days per year. |
| Flex. Spending Account | Employee | Available for health and dependent care. |
| Commuter Benefit | Employee | Available for parking and/or transit expenses. |
| Multiemployer Pension Plan | Company | Payment of $25.00 per shift worked (up to a maximum of 5 per week) to the CWA ITU Negotiated Pension Plan. |
| 401k Plan | Employee | Employee may contribute up to 25% of salary upon hire, subject to the IRS limit. |
| Employee Assistance Program | Company | Same as Boston Herald Non-Union above. |

**Herald Media Holdings, Inc.**
**Summary of Employee Benefits**
*SCHEDULE 6.8.2*

## Herald Interactive (all Non-Union):

| Benefit | Paid By | Description |
|---|---|---|
| Medical Insurance | Company & Employee | See attached sheet. In addition, see notes to Health & Welfare Fund below. |
| Dental Insurance | Company & Employee | See attached sheet |
| Eye Care | Company | Employees are eligible for an eye exam and basic glasses (frame and lenses) excluding contacts from a Davis Vision network provider every 24 months. |
| Term Life Insurance | Company | 2 times base salary up to a maximum benefit of $400,000. |
| Voluntary Life Insurance | Employee | Employees may elect to purchase additional Life Insurance. The cost for this insurance is borne by the employee. |
| Sick/Personal Leave | Company | Annual allowance of 5 paid days |
| Short Term Disability | Company | After a 7-day disability period, pays 60% of weekly earnings up to a maximum benefit of $1,500 per week for duration of disability or 26 weeks, whichever is less. |
| Long Term Disability | Company | After an absence of 26 weeks, pays 60% of base salary up to a maximum benefit of $10,500 per month for duration of disability or up to SS retirement age, whichever is less. |
| Flex. Spending Account | Employee | Available for health and dependent care. |
| Commuter Benefits | Employee | Available for parking and/or transit expense |
| 401k Plan | Employee | Employee may contribute up to 15% of salary upon hire, subject to the IRS limit. |
| 401K Match | Company | After 1 year of service, Company will match 50% of the first 6% pre tax and/or Roth of employee's 401K contribution. |
| Employee Assistance Program | Company | Same as Boston Herald Non-Union above. |

# Herald Media Holdings, Inc.
## Employee Benefit Plans - Defaults or Funding Deficiencies
### Schedule 6.8.2

| Plan Name | Missed Contributions / Payments | |
| --- | --- | --- |
| | Date | Amount |
| **Funded Defined Benefit Plans:** | | |
| Boston Herald Pension & Retirement Plan | September 15, 2017 | $ 323,426 |
| Boston Herald Pension & Retirement Plan | October 13, 2017 | $ 198,851 |
| **Multi-employer Withdrawal Liabilities:** | | |
| GCIU-Employer Retirement Fund   (1) | November 2017 | $ 17,253 |
| Boston Newspaper Retirement Fund | November 2017 | $ 30,495 |
| CWA/ITU Negotiated Pension Plan | November 2017 | $ 100,494 |
| Graphic Communications Conference of the International Brotherhood of Teamsters National Pension Fund | November 2017 | $ 3,051 |

Herald Copy of PER_05 Personnel - Retirement: Severance Plans

# Herald Media Holdings, Inc.
## Employee Retirement & Dismissal Benefits
### Accrual Balances as of July 2, 2017 & Fiscal 2018 Minimum Contributions / Contractual Payments

| Plan Name | Document Folder | Employee Group | 07/02/17 Accrual | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Pension & 401k:** | | | | | | | | | | | | | | | | |
| **Funded Defined Benefit Plans:** | | | | | | | | | | | | | | | | |
| Boston Herald Pension & Retirement Plan | BH Non-Union Pension | Management (non-union) | $ 8,650 | $ 114 | $ - | $ 324 | $ 187 | $ - | $ - | $ 187 | $ - | $ - | $ 208 | $ - | $ - | $ 1,020 |
| Boston Herald, Inc. Guild Commercial Retirement Plan | BH Commercial Guilt Pension | Commercial Unit | 4,335 | 94 | | 74 | 102 | 8 | 5 | 99 | | 5 | 114 | 5 | | 521 |
| **Unfunded Contractual Plans:** | | | | | | | | | | | | | | | | |
| News Group Boston, Inc. Guild and Editorial Employees' Dismissal Pay and Death Benefit Plan | BH Guild Dismissal | Guild - Editorial & Commercial | 2,697 | 12 | 13 | 12 | 13 | 12 | 13 | 12 | 13 | 12 | 13 | 13 | | 150 |
| Boston Herald Direct Plan | BH Direct Retirement | Retirees (Union employees) | 430 | 6 | 6 | 6 | 5 | 6 | 5 | 6 | | 6 | 6 | 6 | | 67 |
| **Matching Contribution to 401k:** | | | | | | | | | | | | | | | | |
| | | Management (non-union) | - | 22 | 13 | 13 | 13 | 18 | 14 | 27 | 17 | 16 | 20 | 16 | | 205 |
| **Active Multi-employer Pension Plans:** | | | | | | | | | | | | | | | | |
| The Newspaper Guild of Greater Boston, Editorial Unit | N/A | Editorial Guild | - | 8 | 9 | 7 | 8 | 9 | 8 | 8 | 10 | 8 | 8 | 7 | | 100 |
| NE Teamsters & Trucking Industry Pension Fund | N/A | Teamsters Local 25 | - | 32 | 40 | 32 | 30 | 38 | 30 | 31 | 41 | 33 | 41 | 33 | | 414 |
| New York Typographical Union, CWA Local 14156 | N/A | Typographers | - | 1 | 1 | 1 | 1 | 2 | 1 | 1 | 1 | 1 | 1 | 1 | | 13 |
| **Multi-employer Withdrawal Liabilities:** | | | | | | | | | | | | | | | | |
| GCIU-Employer Retirement Fund (1) | BH Multiemployer Pension Withdrawal | Pressmen | 2,406 | 17 | 17 | 17 | 18 | 17 | 17 | 17 | 18 | 17 | 17 | 18 | | 207 |
| Boston Newspaper Retirement Fund | BH Multiemployer Pension Withdrawal | Pressmen | 2,281 | | 30 | | | 31 | | | 30 | | | 31 | | 122 |
| CWA/ITU Negotiated Pension Plan | BH Multiemployer Pension Withdrawal | Typographers | 3,902 | | 100 | 104 | | 101 | 105 | | 100 | 104 | 101 | | | 715 |
| Graphic Communications Conference of the International Brotherhood of Teamsters' National Pension Fund | BH Multiemployer Pension Withdrawal | Engravers | 284 | 3 | 3 | 3 | 3 | 3 | 4 | 3 | 3 | 3 | 3 | 3 | | 37 |
| **Total Pension & Related** | | | $ 24,965 | $ 309 | $ 236 | $ 593 | $ 380 | $ 245 | $ 202 | $ 391 | $ 243 | $ 205 | $ 418 | $ 247 | $ 102 | $ 3,571 |

[1] The present value of the withdrawal liability for the GCIU Employer Retirement Fund exceeds the remaining 20 year payment limitation. The above liability is simply the sum of the remaining payments.

Schedule 6.8.3

Collective Bargaining Agreements; Employee Labor Unions or Organizations

See attached.

# Herald Media Holdings, Inc.

## List of Collective Bargaining Agreements

### Schedule 6.8.3

| Collective Bargaining Units | Agreements |
|---|---|
| The Newspaper Guild of Greater Boston, Boston Herald Commercial Unit | Collective Bargaining Agreement dated June 3, 2012 through June 2, 2014 |
| The Newspaper Guild of Greater Boston, Boston Herald Commercial Unit | Posted Conditions Notice dated March 10, 2016 |
| The Newspaper Guild of Greater Boston, Boston Herald Editorial Unit | Collective Bargaining Agreement dated October 2, 2015 through October 1, 2017 |
| *Guilds – Editorial and Commercial* | Memorandum of Agreement for Medical Insurance executed December 15, 2016 |
| Teamsters Local 25 | Collective Bargaining Agreement dated February 3, 2012 through February 2, 2014 |
| Teamsters Local 25 | Memo of Agreement– TPA executed January 23, 2015 |
| Teamsters Local 25 | Triparte Agreement between Boston Herald, Teamsters & Boston Globe executed February 4, 2015 |
| Teamsters Local 25 | Memorandum of Agreement for Medical Insurance executed December 9, 2016 |
| New York Typographical Union, CWA Local 14156 | Collective Bargaining Agreement dated October 31, 2005 through October 30, 2015 |
| New York Typographical Union, CWA Local 14156 | Memorandum of Agreement Extension of CBA from October 31, 2015 through  October 30, 2018 |
| New York Typographical Union, CWA Local 14156 | Memorandum of Agreement for Medical Insurance executed December 12, 2016 |

Schedule 6.8.4

Labor Unions or Organizations Seeking Certification as a Collective Bargaining Representative; Organizing Activity

None.

Schedule 6.8.6

Seller Non-compliance with Contracts or Collective Bargaining Agreements

See Schedule 6.8.2

Schedule 6.8.7

Charges, Complaints, Investigations or Allegations before Administrative Agencies;
Administrative Complaints, or Lawsuits or Pending Grievances or Arbitration under any
Collective Bargaining Agreements

None.

Schedule 6.8.8

Retired Employees, Officers, or Directors Of Seller, or Dependents, Receiving Benefits
or Scheduled to Receive Benefits

See attached.

# Herald Media Holdings, Inc.
## Retired Employees Receiving Benefits
## Schedule 6.8.8

| Obligations | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Amount | As of Date | Plan Name | Employee Group | Contact | Street Address 2 | City | State | Postal Code |
| **Monthly Payment** | | | | | | | | |
| 711.53 | | Boston Herald Direct Plan | Retirees (Union employees) | Alice Coleman | 918 North Main St., #7 | Laconia | NH | 03246 |
| 2,449.85 | | Boston Herald Direct Plan | Retirees (Union employees) | Francis Ochs | 40 Westwind Rd | Dorchester | MA | 02125 |
| 325.00 | Due before | Boston Herald Direct Plan | Retirees (Union employees) | James Oliver | 11 Byron Ave | Methuen | MA | 01844 |
| 325.00 | middle of | Boston Herald Direct Plan | Retirees (Union employees) | Joseph Pietruszewski | 805 Little Town Road | Port Orange | FL | 32127 |
| 325.00 | each month | Boston Herald Direct Plan | Retirees (Union employees) | Ralph H. Dyer Jr | 19309 Arrowhead Lane | North Fort Myers | FL | 33903 |
| 541.67 | | Boston Herald Direct Plan | Retirees (Union employees) | Richard J. White | 7 Paul Ave | Salem | MA | 01970 |
| 325.00 | | Boston Herald Direct Plan | Retirees (Union employees) | Richard Stone | 7 Lincoln Drive | Londonderry | NH | 03053 |
| 541.67 | | Boston Herald Direct Plan | Retirees (Union employees) | Steven G. Astrofsky | 6 Hillcrest Rd | Canton | MA | 02201 |
| **Monthly Pmt to BCBS** | | Boston Herald Medex (Group 50111 0662-000) | Retire Medex Three | See list of 2 retirees below | Blue Cross of Massachusetts PO Box 9145 | North Quincy | MA | 02171 |
| 495.06 | Due by 1st | Boston Herald Medex | Retire Medex Three | O'Sullivan, John | | | | |
| 495.06 | of month | Boston Herald Medex | Retire Medex Three | Walraven, Gerard M | 8 May Avenue | Middleboro | MA | 02346 |
| 6,534.84 | | | | | | | | |

Schedule 6.11.1

Environmental Permits

None.

Schedule 6.12

Financial Statements for the years ending December 31 in each of the years for 2014, 2015 and 2016

**Herald Media Holdings, Inc.**
**Consolidated Balance Sheet**
**June 29, 2014**

| | June 29, 2014 | June 30, 2013 |
|---|---|---|
| **Assets** | | |
| Current Assets: | | |
| Cash, including short-term investments | 8,523,235 | 8,535,883 |
| Cash, restricted | - | - |
| Accounts receivable | 3,686,784 | 4,126,929 |
| Allowance for Doubtful Accounts | (741,614) | (832,906) |
| Note Receivable - Current Portion | - | - |
| Inventories, at cost | - | - |
| Prepaid expenses and other current assets | 1,992,925 | 983,568 |
| Prepaid income taxes | 39,108 | - |
| Deferred taxes, net | - | - |
| Other current assets | - | - |
| **Total Current Assets** | 13,500,438 | 12,813,474 |
| | | |
| Property, plant and equipment, at cost | | |
| Land and improvements | - | - |
| Buildings and improvements | 622,255 | 622,255 |
| Machinery and equipment | 4,655,846 | 4,669,959 |
| Construction in process | 3,160 | 9,187 |
| | 5,281,261 | 5,301,401 |
| Less: Accumulated depreciation | (4,234,894) | (3,642,840) |
| Net property, plant and equipment | 1,046,367 | 1,658,561 |
| | | |
| Other assets: | | |
| Other Long Term Assets | 479,002 | 929,102 |
| Notes Receivable | - | - |
| Investments in Subsidiaries @ Cost | - | - |
| Deferred Taxes | - | - |
| Other: Publishing rights & Deferred Costs | | |
| less accumulated amortization | - | - |
| Goodwill / Excess of cost over net assets acq | - | - |
| **Total Other Assets** | 479,002 | 929,102 |
| | | |
| **Total Assets** | 15,025,807 | 15,401,137 |
| | | |
| **Liabilities and Shareholders' Equity** | | |
| Current Liabilities: | | |
| AP Trade | 1,455,155 | 1,149,172 |
| Accrued expenses: | | |
| Accounts payable & Accrued Exp | 837,065 | 1,090,683 |
| Salaries, Wages and vacation | 1,986,473 | 2,036,552 |
| Interest | - | - |
| Federal and state income taxes | - | 25,007 |
| Taxes other than federal income taxes | 26,014 | 28,214 |
| Current Portion: | | |
| Pension and Severance Liabilities | 3,641,198 | 2,861,126 |
| Other (Insurance gross-up) | 85,762 | 208,971 |
| Deferred income | 1,226,047 | 1,159,745 |
| Current portion of long - term financing | 52,447 | 69,930 |
| | - | - |
| **Total current liabilities** | 9,310,161 | 8,629,400 |
| | | |
| Intercompany Payables | - | - |
| | | |
| Non-current liabilities: | | |
| Long term financing | - | 34,965 |
| Excess of Acquired Net assets over cost | - | - |
| Pension & Severance Liab. | 21,311,411 | 19,634,606 |
| Deferred Taxes | - | - |
| Other long-term liabilities | 2,019,646 | 2,699,775 |
| Preferred Stock | - | - |
| **Total Non-current liabilities** | 23,331,057 | 22,369,346 |
| | | |
| Shareholders' Equity | | |
| Common Stock | 2,000 | 2,000 |
| Additional paid in capital | - | - |
| Retained Earnings (Beg Balance) | 18,032 | (745,360) |
| Retained Earnings (AOCI) | (13,367,570) | (15,617,640) |
| Retained Earnings (Current Year) | (4,267,873) | 763,391 |
| | | |
| **Total Shareholders' Equity** | (17,615,411) | (15,597,609) |
| | | |
| **Total Liabilities & Shareholders' Equity** | 15,025,807 | 15,401,137 |
| | - | - |

### Herald Media Holdings, Inc.
#### Consolidated Statement of Income
#### For the Twelve Months Ending June 29, 2014

| | Consolidated | |
|---|---|---|
| | June 29, 2014 | June 30, 2013 |
| **Operating Revenues:** | | |
| Advertising | 14,320,957 | 16,525,377 |
| Circulation | 25,956,144 | 28,977,667 |
| Online | 4,021,630 | 3,694,770 |
| Other | 85,716 | 52,096 |
| **Total Operating Revenue** | 44,384,447 | 49,249,910 |
| **Operating Costs:** | | |
| Production | 6,679,307 | 10,432,441 |
| Editorial | 10,852,134 | 10,988,215 |
| Circulation | 5,618,124 | 6,673,982 |
| Advertising | 4,835,988 | 4,937,250 |
| Promotion & Publicity | 298,259 | 252,174 |
| General & Administrative | 14,643,726 | 14,166,775 |
| Reorganization costs | 5,009,716 | 172,892 |
| **Total Operating Costs** | 47,937,254 | 47,623,729 |
| Earnings before interest, taxes, depreciation & amortization | (3,552,807) | 1,626,181 |
| Depreciation | 659,591 | 807,136 |
| Amortization of publishing rights, titles & benefits | 6,136 | 6,136 |
| *Operating profit / (loss)* | (4,218,534) | 812,909 |
| Other Income (Expense): | | |
| Loss on debt extinguishment | - | - |
| Dividend income | - | - |
| Miscellaneous Income / (Expense) | - | 7 |
| Gain or (Loss) on disposal of equipment | - | - |
| Interest expense | (5,017) | (17,258) |
| Interest income | 6 | 46 |
| Forgivenesss of Debt/Pref stock dividend exp | - | - |
| Other, net | (5,011) | (17,205) |
| Earnings before income tax | (4,223,545) | 795,704 |
| Income Taxes | 44,328 | 32,313 |
| Deferred Income Taxes | - | - |
| **Net Income / (Loss)** | (4,267,873) | 763,391 |

**Herald Media Holdings, Inc.**
**Consolidated Balance Sheet**
**June 28, 2015**

| | June 28, 2015 | June 29, 2014 |
|---|---|---|
| **Assets** | | |
| Current Assets: | | |
| Cash, including short-term investments | 8,152,587 | 8,523,235 |
| Cash, restricted | 240,682 | - |
| Accounts receivable | 3,378,269 | 3,686,784 |
| Allowance for Doubtful Accounts | (684,786) | (741,614) |
| Note Receivable - Current Portion | - | - |
| Inventories, at cost | | |
| Prepaid expenses and other current assets | 861,440 | 1,992,925 |
| Prepaid income taxes | 13,205 | 39,108 |
| Deferred taxes, net | - | - |
| Other current assets | - | - |
| | | |
| *Total Current Assets* | 11,961,397 | 13,500,438 |
| | | |
| Property, plant and equipment, at cost | | |
| Land and improvements | - | - |
| Buildings and improvements | 622,255 | 622,255 |
| Machinery and equipment | 4,691,678 | 4,655,846 |
| Construction in process | 15,523 | 3,160 |
| | 5,329,456 | 5,281,261 |
| Less: Accumulated depreciation | (4,622,051) | (4,234,894) |
| | | |
| *Net property, plant and equipment* | 707,405 | 1,046,367 |
| | | |
| Other assets: | | |
| Other Long Term Assets | 612,496 | 479,002 |
| Notes Receivable | - | - |
| Investments in Subsidiaries @ Cost | - | - |
| Deferred Taxes | - | - |
| Other: Publishing rights & Deferred Costs | | |
| less accumulated amortization | - | - |
| Goodwill / Excess of cost over net assets acq | | |
| *Total Other Assets* | 612,496 | 479,002 |
| | | |
| **Total Assets** | 13,281,298 | 15,025,807 |
| | | |
| **Liabilities and Shareholders' Equity** | | |
| Current Liabilities: | | |
| AP Trade | 1,346,876 | 1,455,155 |
| Accrued expenses: | | |
| Accounts payable & Accrued Exp | 888,690 | 837,065 |
| Salaries, Wages and vacation | 2,000,869 | 1,986,473 |
| Interest | - | - |
| Federal and state income taxes | - | - |
| Taxes other than federal income taxes | (417) | 26,014 |
| Current Portion: | | |
| Pension and Severance Liabilities | 3,920,415 | 3,641,198 |
| Other (Insurance gross-up) | 121,584 | 85,762 |
| Deferred income | 1,046,479 | 1,226,047 |
| Current portion of long - term financing | - | 52,447 |
| | - | |
| | | |
| *Total current liabilities* | 9,324,496 | 9,310,161 |
| | | |
| Intercompany Payables | - | - |
| | | |
| Non-current liabilities: | | |
| Long term financing | - | - |
| Excess of Acquired Net assets over cost | - | - |
| Pension & Severance Liab | 24,303,768 | 21,311,411 |
| Deferred Taxes | - | - |
| Other long-term liabilities | 2,073,189 | 2,019,646 |
| Preferred Stock | - | - |
| *Total Non-current liabilities* | 26,376,957 | 23,331,057 |
| | | |
| Shareholders' Equity | | |
| Common Stock | 2,000 | 2,000 |
| Additional paid in capital | - | - |
| Retained Earnings (Beg Balance) | (4,249,841) | 18,032 |
| Retained Earnings (AOCI) | (17,739,118) | (13,367,570) |
| Retained Earnings (Current Year) | (433,196) | (4,267,873) |
| | | |
| *Total Shareholders' Equity* | (22,420,155) | (17,615,411) |
| | | |
| **Total Liabilities & Shareholders' Equity** | 13,281,298 | 15,025,807 |
| | - | - |

### Herald Media Holdings, Inc.
### Consolidated Statement of Income
### For the Twelve Months Ending June 28, 2015

|  | Consolidated | |
| --- | --- | --- |
|  | June 28, 2015 | June 29, 2014 |
| **Operating Revenues:** | | |
| Advertising | 12,363,895 | 14,320,957 |
| Circulation | 24,846,890 | 25,956,144 |
| Online | 4,322,035 | 4,021,630 |
| Other | 52,370 | 85,716 |
| **Total Operating Revenue** | 41,585,190 | 44,384,447 |
| **Operating Costs:** | | |
| Production | 6,268,172 | 6,679,307 |
| Editorial | 11,194,921 | 10,852,134 |
| Circulation | 5,024,257 | 5,618,124 |
| Advertising | 4,453,966 | 4,835,988 |
| Promotion & Publicity | 276,942 | 298,259 |
| General & Administrative | 13,466,415 | 14,643,726 |
| Reorganization costs | 934,980 | 5,009,716 |
| **Total Operating Costs** | 41,619,653 | 47,937,254 |
| *Earnings before interest, taxes, depreciation & amortization* | (34,463) | (3,552,807) |
| Depreciation | 387,157 | 659,591 |
| Amortization of publishing rights, titles & benefits | 6,136 | 6,136 |
| *Operating profit / (loss)* | (427,756) | (4,218,534) |
| **Other Income (Expense):** | | |
| Loss on debt extinguishment | - | - |
| Dividend income | - | - |
| Miscellaneous Income / (Expense) | - | - |
| Gain or (Loss) on disposal of equipment | - | - |
| Interest expense | (5,167) | (5,017) |
| Interest income | - | 6 |
| Forgiveness of Debt/Pref stock dividend exp | - | - |
| Other, net | (5,167) | (5,011) |
| Earnings before income tax | (432,923) | (4,223,545) |
| Income Taxes | 273 | 44,328 |
| Deferred Income Taxes | - | - |
| *Net Income / (Loss)* | (433,196) | (4,267,873) |

**Herald Media Holdings, Inc.**
**Consolidated Balance Sheet**
**July 3, 2016**

| | July 03, 2016 | June 28, 2015 |
|---|---|---|
| **Assets** | | |
| Current Assets: | | |
| Cash, including short-term investments | 6,154,255 | 8,152,587 |
| Cash, restricted | 159,151 | 240,682 |
| Accounts receivable | 2,989,489 | 3,378,269 |
| Allowance for Doubtful Accounts | (416,988) | (684,786) |
| Note Receivable - Current Portion | - | - |
| Inventories, at cost | | |
| Prepaid expenses and other current assets | 839,290 | 861,440 |
| Prepaid income taxes | 12,218 | 13,205 |
| Deferred taxes, net | - | |
| Other current assets | - | |
| | | |
| *Total Current Assets* | 9,737,415 | 11,961,397 |
| | | |
| Property, plant and equipment, at cost | | |
| Land and improvements | - | - |
| Buildings and improvements | 672,255 | 672,255 |
| Machinery and equipment | 4,720,952 | 4,691,678 |
| Construction in process | 7,749 | 15,523 |
| | 5,350,956 | 5,329,456 |
| Less: Accumulated depreciation | (4,761,832) | (4,622,051) |
| | | |
| *Net property, plant and equipment* | 589,124 | 707,405 |
| | | |
| Other assets: | | |
| Other Long Term Assets | 519,258 | 612,496 |
| Notes Receivable | - | - |
| Investments in Subsidiaries @ Cost | - | - |
| Deferred Taxes | - | - |
| Other: Publishing rights & Deferred Costs | | |
| less accumulated amortization | - | - |
| Goodwill / Excess of cost over net assets acq | - | - |
| *Total Other Assets* | 519,258 | 612,496 |
| | | |
| **Total Assets** | 10,845,797 | 13,281,298 |
| | | |
| **Liabilities and Shareholders' Equity** | | |
| Current Liabilities: | | |
| AP Trade | 506,348 | 1,346,876 |
| Accrued expenses: | | |
| Accounts payable & Accrued Exp | 766,281 | 888,690 |
| Salaries, Wages and vacation | 2,460,304 | 2,000,860 |
| Interest | - | |
| Federal and state income taxes | - | |
| Taxes other than federal income taxes | 209,287 | (417) |
| Current Portion: | | |
| Pension and Severance Liabilities | 4,007,190 | 3,920,415 |
| Other (Insurance gross-up) | 97,574 | 121,584 |
| Deferred income | 924,865 | 1,046,479 |
| Current portion of long - term financing | | |
| | - | - |
| | - | - |
| *Total current liabilities* | 8,971,849 | 9,324,496 |
| | | |
| Intercompany Payables | - | - |
| | | |
| Non-current liabilities: | | |
| Long term financing | - | - |
| Excess of Acquired Net assets over cost | | |
| Pension & Severance Liab | 25,469,094 | 24,303,768 |
| Deferred Taxes | - | |
| Other long-term liabilities | 1,849,760 | 2,073,189 |
| Preferred Stock | - | |
| *Total Non-current liabilities* | 27,318,854 | 26,376,957 |
| | | |
| Shareholders' Equity | | |
| Common Stock | 143 | 2,000 |
| Additional paid in capital | 6,096 | |
| Retained Earnings (Beg Balance) | (4,683,037) | (4,249,841) |
| Retained Earnings (AOCI) | (18,783,642) | (17,739,118) |
| Retained Earnings (Current Year) | (1,984,466) | (433,196) |
| | | |
| *Total Shareholders' Equity* | (25,444,906) | (22,420,155) |
| | | |
| **Total Liabilities & Shareholders' Equity** | 10,845,797 | 13,281,298 |

**Herald Media Holdings, Inc.**

**Consolidated Statement of Income**

For the Twelve Months Ending July 03, 2016

| | Consolidated | |
|---|---|---|
| | July 03, 2016 | June 28, 2015 |
| **Operating Revenues:** | | |
| Advertising | 11,338,422 | 12,363,895 |
| Circulation | 23,073,844 | 24,846,890 |
| Online | 3,921,903 | 4,322,035 |
| Other | 424,422 | 52,370 |
| *Total Operating Revenue* | 38,758,591 | 41,585,190 |
| **Operating Costs:** | | |
| Production | 5,850,666 | 6,268,172 |
| Editorial | 11,191,132 | 11,194,921 |
| Circulation | 3,841,051 | 5,024,257 |
| Advertising | 4,322,413 | 4,453,966 |
| Promotion & Publicity | 267,719 | 276,942 |
| General & Administrative | 14,408,006 | 13,466,415 |
| Reorganization costs | 585,357 | 934,980 |
| *Total Operating Costs* | 40,466,344 | 41,619,653 |
| *Earnings before interest, taxes, depreciation & amortization* | (1,707,753) | (34,463) |
| Depreciation | 266,870 | 387,157 |
| Amortization of publishing rights, titles & benefits | 6,136 | 6,136 |
| *Operating profit / (loss)* | (1,980,759) | (427,756) |
| **Other Income (Expense):** | | |
| Loss on debt extinguishment | - | - |
| Dividend income | - | - |
| Miscellaneous Income / (Expense) | 1,500 | - |
| Gain or (Loss) on disposal of equipment | - | - |
| Interest expense | (5,207) | (5,167) |
| Interest income | - | - |
| Forgiveness of Debt/Pref stock dividend exp | - | - |
| Other, net | (3,707) | (5,167) |
| Earnings before income tax | (1,984,466) | (432,923) |
| **Income Taxes** | - | 273 |
| Deferred Income Taxes | - | - |
| *Net Income / (Loss)* | (1,984,466) | (433,196) |

Schedule 7.3.1

Buyer's Consents, Waivers, Approvals, Orders And Authorizations

None.

Schedule 7.3.2

Buyer's Filings With Governmental Authorities

None.

Schedule 9.3.1

Employees to whom such Offers of Employment have been extended.

To be delivered to later than fifteen (15) Business Days prior to the Closing Date.