**<u>EXHIBIT B</u>**

**Blackline of Asset Purchase Agreement**

**ASSET PURCHASE AGREEMENT**

**Dated as of ~~December 7, 2017~~January _____, 2018**

**by and among**

**BOSTON HERALD, INC., HERALD INTERACTIVE INC., HERALD MEDIA, INC.,**

**and**

**HERALD MEDIA HOLDINGS, INC.,**

**as SELLERS,**

**and**

**~~GATEHOUSE~~REVOLUTION MEDIA ~~MASSACHUSETTS I, INC.~~GROUP LLC, as BUYER**

## TABLE OF CONTENTS

**Page**

Article I DEFINITIONS: AND RULES OF CONSTRUCTION ................................................ 1

Section 1.1      Definitions ................................................................................ 1
Section 1.2      Rules of Construction. ................................................................ 7

Article II TRANSFER OF ASSETS ........................................................................... 7

Section 2.1      Purchase and Sale of the Purchased Assets ..................................... 7
Section 2.2      Excluded Assets. ....................................................................... 10
Section 2.3      Instruments of Transfer. .............................................................. 10

Article III CONSIDERATION .................................................................................. 10

Section 3.1      Purchase Price. .......................................................................... 10
Section 3.2      Assumed Liabilities; Excluded Liabilities. ....................................... 11
Section 3.3      Determination of Net Working Capital .......................................... 12

Article IV CLOSING TRANSACTIONS. ..................................................................... 11

Section 4.1      Closing. ................................................................................. 11 14
Section 4.2      Closing Date. ........................................................................... 11 14
Section 4.3      Sellers' Deliveries to Buyer at Closing. .......................................... 12 14
Section 4.4      Buyer's Deliveries to Sellers at Closing. ......................................... 13 15
Section 4.5      Prorations ............................................................................... 13 16
Section 4.6      Transfer Taxes. ........................................................................ 14 16
Section 4.7      Possession .............................................................................. 14 16

Article V CONDITIONS PRECEDENT TO CLOSING ..................................................... 14 16

Section 5.1      Conditions to Sellers' Obligations. ................................................ 14 16
Section 5.2      Conditions to Buyer's Obligations ................................................. 15 17
Section 5.3      Waiver .................................................................................... 15 17
Section 5.4      Termination ............................................................................. 15 17

Article VI  SELLERS' REPRESENTATIONS AND WARRANTIES ........................................ 16 18
Section 6.1      Validity of Agreement ................................................................ 16 18
Section 6.2      Organization, Standing and Power ................................................ 16 18
Section 6.3      No Violation; Third Party Consents ............................................... 17 18
Section 6.4      Title to Purchased Assets ........................................................... 17 19
Section 6.5      No Litigation ........................................................................... 18 19
Section 6.6      Intellectual Property ................................................................. 18 19
Section 6.7      Material Agreements and Licenses ................................................ 18 20
Section 6.8      Employee Matters .................................................................... 18 20
Section 6.9      Permits and Licenses ................................................................ 19 21
Section 6.10     Brokers ................................................................................. 19 21
Section 6.11     Environmental  Matters. ............................................................ 21

Section 6.12          Financial Statements................................................................22

Article VII BUYER'S REPRESENTATIONS AND WARRANTIES ..........................1922

Section 7.1          Validity of Agreement ..........................................................1922
Section 7.2          Organization, Standing and Power .......................................1922
Section 7.3          No Violation; Third Party Consents ......................................1922
Section 7.4          Financing ..............................................................................2023
Section 7.5          "As Is" Transaction ..............................................................2023

Article VIII BROKERS ..............................................................................................2124

Section 8.1          Brokers ..................................................................................21

Article IX CONDUCT PRIOR TO CLOSING ...........................................................2124

Section 9.1          Conduct Prior to Closing ........................................21Access to
Section 9.2          Preservation of the Purchased Assets Pending Closing .......2124
Section 9.3          Transferred Employees .........................................................2124
Section 9.4          Bankruptcy Court Approvals .................................................2125

Article X REIMBURSEMENT AND INDEMNIFICATION .......................................2629

Section 10.1         Reimbursement and Indemnification of Buyer .....................2629
Section 10.2         Terms of Deposit; Indemnification of Sellers ......................2630

Article XI MISCELLANEOUS ..................................................................................5431

Section 11.1         Post-Closing Reasonable Access to Records and Certain Personnel .....2731
Section 11.2         Notices ..................................................................................2832
Section 11.3         Entire Agreement .................................................................2833
Section 11.4         Amendment ...........................................................................2933
Section 11.5         Closing Date ..........................................................................2933
Section 11.6         Severability ...........................................................................2933
Section 11.7         Further Assurances ...............................................................2933
Section 11.8         Waiver ....................................................................................2933
Section 11.9         Payment of Fees and Expenses ............................................2933
Section 11.10        No Survival ............................................................................2933
Section 11.11        No Assignment; No Third Party Beneficiaries .....................2934
Section 11.12        Binding Effect .......................................................................3034
Section 11.13        Applicable Law and Jurisdiction ..........................................3034
Section 11.14        Counterparts ..........................................................................3034
Section 11.15        Confidentiality; Publicity .....................................................3034

**Exhibits**

Exhibit A – Form of Assignment and Assumption Agreement
Exhibit B – Form of Assignment of Proprietary Rights
Exhibit C – Form of Bill of Sale
Exhibit D – Form of Officer's Certificate (Sellers)
Exhibit E – Form of Sale Approval Order
Exhibit F – Form of Assignment of Lease
Exhibit G – Form of Officer's Certificate (Buyer)
Exhibit H – Form of Sale Procedures Order
Exhibit I – Principal Terms and Conditions of DIP Agreement

**Schedules**

Schedule 1.1.74 – Subscription Liabilities
Schedule 2.1.1 – Media Assets – Publications
Schedule 2.1.7 – Receivables
Schedule 2.1.8 – Personal Property
Schedule 2.1.9 – Real Property Leases
Schedule 2.1.10 – Contracts
Schedule 2.1.18 – Prepaid Expenses
Schedule 2.2 – Excluded Assets
Schedule 3.2.1 – Severance Liabilities
Schedule 3.3.2 – Historical Audited Financial Statements
Schedule 4.3.5 – Waivers/Consents (Seller)
Schedule 4.4.6 – Waivers/Consents (Buyer)
Schedule 6.2 – Organization
Schedule 6.3.1 – Consents/Approvals (Seller)
Schedule 6.3.2 – Governmental Filings (Seller)
Schedule 6.4.1 – Personal Property Title Exceptions
Schedule 6.5 – Litigation
Schedule 6.6 – Intellectual Property
Schedule 6.7.1 – Material Agreements
Schedule 6.8.2 – Employee Benefit Plans
Schedule 6.8.3 – Collective Bargaining Agreements
Schedule 6.8.4 – Labor Unions or Organizations
Schedule 6.8.6 – Material Compliance with Contracts and Collective Bargaining Agreements
Schedule 6.8.7 – Disclosure of Administrative Agency Investigations
Schedule 6.8.8 – Retired Employee Benefits
Schedule 6.11.1 – Environmental Permits
Schedule 6.12. – 2014, 2015, and 2016 Financial Statements
Schedule 7.3.1 – Consents/Approvals (Buyer)
Schedule 7.3.2 – Governmental Filings (Buyer)
Schedule 9.3.1 – Governmental Filings (Buyer)

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is made and entered into as of this ~~7th~~ ___day of ~~December, 2017,~~January, 2018, by and among ~~GATEHOUSE~~REVOLUTION MEDIA ~~MASSACHUSETTS I, INC.~~GROUP LLC ("Buyer"), and, BOSTON HERALD, INC., HERALD INTERACTIVE, INC., HERALD MEDIA, INC., and HERALD MEDIA HOLDINGS, INC. (each, individually, a "Seller", and, collectively, "Sellers").

## RECITALS

WHEREAS, Sellers own and operate a media business (the "Business"), which business includes the publication, sale and distribution of the Boston Herald newspaper and related website, digital news and sports apps, and an internet radio platform (collectively, the "Media Assets") and other business ventures related thereto;

WHEREAS, as promptly as practicable following the execution and delivery hereof (but in no event more than three (3) Business Day(s) after the date of this Agreement), each of Sellers plans on filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (as defined herein) commencing cases (collectively, the "Bankruptcy Case") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), and Sellers will request that their cases be jointly administered by the Bankruptcy Court;

WHEREAS, Buyer desires to purchase from Sellers and Sellers desire to sell to Buyer the Purchased Assets all upon the terms and subject to the conditions set forth herein and with the approval of the Bankruptcy Court pursuant to the Bankruptcy Code;

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    Definitions and Rules of Construction.

    1.1    Definitions.

        1.1.1    "Affiliate" means, with respect to any Person, (a) any other Person directly or indirectly Controlling, Controlled by or under common Control with, such Person, (b) any other Person that owns or Controls 10% or more of any class of equity securities (including any equity securities issuable upon the exercise of any option or convertible security) of such Person or any of its Affiliates, or (c) any director, partner, member, officer, manager, agent, employee or relative of such Person.

        1.1.2    "Agreement" has the meaning set forth in the preamble.

        1.1.3    "Assignment and Assumption Agreement" has the meaning set forth in Section 3.2.

        1.1.4    "Assignment of Proprietary Rights" has the meaning set forth in Section 4.3.2.

        1.1.5    "Assumed Liabilities" has the meaning set forth in Section 3.2.

1.1.6    "Auction" has the meaning set forth in Section 9.4.1.

1.1.7    "Bankruptcy Case" has the meaning set forth in the recitals.

1.1.8    "Bankruptcy Code" means the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. as the same may be amended from time to time.

1.1.9    "Bankruptcy Court" has the meaning set forth in the recitals.

1.1.10   "Bill of Sale" has the meaning set forth in Section 4.3.3.

1.1.11   ~~"Break-Up Fee" has the meaning set forth in Section 9.4.1.~~ Intentionally Omitted.

1.1.12   "Business" has the meaning set forth in the recitals.

1.1.13   "Business Day" means any day other than a Saturday, Sunday, Federal holiday or other day that banks in the State of New York are required or permitted by Law to be closed.

1.1.14   "Buyer" has the meaning set forth in the preamble.

1.1.15   "Buyer Indemnitees" has the meaning set forth in Section 10.1.

1.1.16   "Closing" has the meaning set forth in Section 4.1.

1.1.17   "Closing Balance Sheet" has the meaning set forth in Section 3.3.2.

1.1.18   "Closing Date" has the meaning set forth in Section 4.2.

1.1.19   "Closing Net Working Capital Amount" has the meaning set forth in Section 3.3.2.

1.1.20   "Closing Statement" has the meaning set forth in Section 3.3.2

1.1.21   "Collective Bargaining Agreement" shall mean any oral or written agreement with any union, works council, or other Person purporting to act as exclusive bargaining representative of any Employees with respect to wages, hours, or other terms and conditions of employment.

1.1.22   "Contracts" has the meaning set forth in Section 2.1.10.

1.1.23   "Control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with") means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

1.1.24   "Copyrights" has the meaning set forth in Section 2.1.4.

1.1.25   "Cure Amounts" has the meaning set forth in Section 3.1.3.

1.1.26   "DIP Agreement" has the meaning set forth in Section 9.4.4.

- 3 -

1.1.27  "DIP Loan" has the meaning set forth in Section 9.4.4.

1.1.28  "Employees" has the meaning set forth in Section 6.8.1.

1.1.29  "Employee Benefit Plan" has the meaning set forth in Section 6.8.2

1.1.30  "Encumbrance" means any lien (statutory or otherwise), claim, hypothecation, Liability, security interest, interest, mortgage, pledge, restriction, charge, instrument, preference, priority, security agreement, easement, covenant, encroachment, option, right of recovery, Tax (including foreign, federal, state and local Tax), or encumbrance, of any kind or nature (including without limitation (a) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (b) any assignment or deposit arrangement in the nature of a security device, and (c) any leasehold interest or other right, in favor of a third party, to use any portion of the Purchased Assets), whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or nonmaterial, known or unknown.

1.1.31  "Estimated Closing Balance Sheet" has the meaning set forth in Section 3.3.1.

1.1.32  "Estimated Net Working Capital Amount" has the meaning set forth in Section 3.3.1.

1.1.33  "Excluded Assets" has the meaning set forth in Section 2.2.

1.1.34  "Excluded Liabilities" has the meaning set forth in Section 3.2.

1.1.35  "Expense Reimbursement Amount" has the meaning set forth in Section 9.4.1.

1.1.36  "Final Order" shall mean that an Order entered by the Bankruptcy Court has not been reversed or stayed, and as to which Order no appeal or motion, petition, or writ seeking reversal, reconsideration, reargument, rehearing, certiorari, amendment, modification, stay or similar relief is pending, and the time to file any such appeal, motion, petition or writ has expired.

1.1.37  "GAAP" shall mean United States generally accepted accounting principles as in effect from time to time, consistently applied

1.1.38  "Governmental Authority" means any U.S. federal, state, foreign or local government, any court, tribunal, administrative agency or commission, or any other governmental, enforcement or other regulatory authority, body or agency, with jurisdiction over the matter in question.

1.1.39  "Independent CPA" has the meaning set forth in Section 3.1.4.

1.1.40  "Intellectual Property" means all Copyrights (as defined in Section 2.1.4), all Trademarks (as defined in Section 2.1.16), all trade secrets, customer lists, know how, commercial, marketing and other information, data and material of the kind normally considered to be confidential or proprietary in nature, including without limitation computer source code, financial information, customer lists, product documentation, lead lists, know-how and trade secrets, and all items of intangible personal property commonly referred to as intellectual property and all rights therein,

- 4 -

whether common law, statutory or otherwise, domestic and foreign, and all registrations and registration applications for any such rights owned by Sellers.

1.1.41 "Internal Revenue Code" means the Internal Revenue Code of 1986, as amended, any successor statute thereto and the rules and regulations promulgated thereunder.

1.1.42 "Law" means all federal, state, local and foreign laws, statutes, ordinances, rules or regulations, legally binding administrative policies or guidance documents, orders, injunctions, decrees and administrative rulings promulgated by any court or other Governmental Authority.

1.1.43 "Liability" means any indebtedness, obligation or other liability (whether absolute, accrued, matured, contingent, known or unknown, fixed or otherwise, or whether due or to become due), including, without limitation, any fine, penalty, judgment, award or settlement respecting any judicial, administrative or arbitration proceeding, damage, loss, claim or demand with respect to any Law or governmental order.

1.1.44 "Material Adverse Effect" means any change or effect that is or would reasonably be expected to be materially adverse to the Business (including, without limitation, changes in relationships with customers and suppliers), assets, operations, financial condition or results of operations of the Business, taken as a whole, except for any such changes or effects resulting directly or indirectly from (i) the financial condition of any of Sellers, (ii) the Bankruptcy Case or matters related thereto, (iii) the transactions contemplated by this Agreement, (iv) the announcement or other disclosure of the transactions contemplated by this Agreement or (v) an event or circumstance or series of events or circumstances affecting (A) the Business generally or the particular segments thereof in which the Business operates in any location in which the Business operates or (B) the United States economy generally.

1.1.45 "Media Assets" has the meaning set forth in Schedule 2.1.1.

1.1.46 [Intentionally Omitted.]

1.1.47 "New Plans" has the meaning set forth in Section 9.3.1.

1.1.48 "NWC Date" has the meaning set forth in Section 3.3.1.

1.1.49 "Outside Date" has the meaning set forth in Section 4.2.

1.1.50 "Permitted Encumbrances" means (a) any Assumed Liability, and (b) Encumbrances for Taxes which are not yet due and payable.

1.1.51 "Person" means a natural person, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, any other business entity, or a governmental entity (or any department, agency, or political subdivision thereof).

1.1.52 "Petition Date" - means the date on which the Bankruptcy Case is commenced.

1.1.53 "PTO" has the meaning set forth in Section 3.2.

- 5 -

1.1.54   "Purchased Assets" has the meaning set forth in Section 2.1.

1.1.55   "Purchase Price" has the meaning set forth in Section 3.1.1.

1.1.56   "Purchase Price Allocation" has the meaning set forth in Section 3.1.4.

1.1.57   "Purchase Price Deposit" has the meaning set forth in Section 3.1.2.

1.1.58   "Purchased Avoidance Actions" has the meaning set forth in Section 2.1.21

1.1.59   "Real Property Leases" has the meaning set forth in Section 2.1.9.

1.1.60   "Receivables" has the meaning set forth in Section 2.1.7.

1.1.61   "Rejected Contracts" shall mean any contracts or agreements to which any one or more Sellers is a party that are not assumed and assigned to Buyer under Section 2.1.10 hereof.

1.1.62   "Resolution Period" has the meaning set forth in Section 3.3.7.

1.1.63   "Review Period" has the meaning set forth in Section 3.3.3.

1.1.64   "Sale Approval Hearing" has the meaning set forth in Section 9.4.1.

1.1.65   "Sale Approval Order" has the meaning set forth in Section 4.3.6.

1.1.66   "Sale Motion" means that certain Debtors' Motion for Orders: (A)(I) Approving Auction Procedures and Related Bid Protections; (II) Scheduling a Hearing to Consider the Sale of the Debtors' Assets; and (B) Authorizing and Approving (I) the Sale of the Debtors' Assets Free and Clear of Liens, Claims, and Encumbrances; (II) the Assumption of Certain Executory Contracts and Unexpired Leases; and (III) Granting Related Relief which Sellers will file with the Bankruptcy Court within three (3) Business Days of the Petition Date and which shall be in form and substance reasonably acceptable to Buyer.

1.1.67   "Sale Procedures" means the sale procedures approved by the Bankruptcy Court.

1.1.68   "Sale Procedures Order" has the meaning set forth in Section 4.4.6.

1.1.69   "Section 365 Contracts" has the meaning set forth in Section 9.4.2.

1.1.70   "Seller Claim" has the meaning set forth in Section 10.2.1.

1.1.71   "Seller Indemnitees" has the meaning set forth in Section 10.2.

1.1.72   "Sellers" has the meaning set forth in the preamble.

1.1.73   "Sellers' Knowledge" shall mean the actual knowledge of Patrick J. Purcell or Jeffrey W. Magram.

- 6 -

1.1.74 "Subscription Liabilities" shall mean the liabilities of Sellers for prepaid subscriptions as set forth on Schedule 1.1.74.

1.1.75 ~~1.1.74~~ "Success Fee" shall mean any success fee payable pursuant to and as defined in the Application for Order Authorizing the Retention and Employment of Dirks Van Essen & Murray as of the Petition Date, as Investment Banker to the Debtors Pursuant to Bankruptcy Code Sections 327, 328, 330 and 331, Fed. R. Bankr. P. 2014(a) and 2016, and Local Bankruptcy Rules 2014-1 and 2016-1, to be filed by Sellers within three (3) Business Days of the Petition Date.

1.1.76 ~~1.1.75~~ "Tax" means any federal, state, county, provincial, local or foreign income, gross receipts, sales, use, ad valorem, employment, severance, transfer, gains, profits, excise, franchise, property, capital stock, premium, minimum and alternative minimum or other taxes, fees, levies, duties, assessments or charges of any kind or nature whatsoever imposed by any Governmental Authority (whether payable directly or by withholding), together with any interest, penalties (civil or criminal), additions to or additional amounts imposed by, any Governmental Authority with respect thereto.

1.1.77 ~~1.1.76~~ "Trademarks" has the meaning set forth in Section 2.1.16.

1.1.78 ~~1.1.77~~ "Transferred Employees" has the meaning set forth in Section 9.3.1.

## 1.2    Rules of Construction.

1.2.1    When the context in which words are used in this Agreement indicates that such is the intent, words used in the singular shall have a comparable meaning when used in the plural, and vice versa; pronouns stated in the masculine, feminine or neuter shall include each other gender.

1.2.2    The Section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the Parties and shall not in any way affect the meaning or interpretation of this Agreement.

1.2.3    The term "including" is not limiting and means "including, without limitation."

1.2.4    Unless otherwise expressly provided herein, (i) references to agreements (including this Agreement) and other contractual instruments shall be deemed to include all subsequent amendments and other modifications thereto, (ii) references to any statute or regulation shall be construed as including all statutory and regulatory provisions amending, replacing, supplementing or interpreting such statute or regulation, except that for purposes of determining the accuracy of any representation, such reference shall only be to such statute or regulation as in effect on the date the representation was made and (iii) references to "Sections," "Schedules" or "Exhibits" are to sections, schedules or exhibits, as applicable, of this Agreement.

1.2.5    Unless otherwise expressly provided herein, "dollars" or "$" means the currency of the U.S. that, as at the time of payment, is legal tender for the payment of public and private debts.

1.2.6    This Agreement is between financially sophisticated and knowledgeable parties and is entered into by such parties in reliance upon the economic and legal bargains contained herein. The language used in this Agreement has been negotiated by the parties and their representatives and shall be interpreted and construed in a fair and impartial manner without regard to such factors as the party who prepared, or caused the preparation of, this Agreement or the relative bargaining power of the parties.

2.    Transfer of Assets.

2.1    Purchase and Sale of Assets. On the Closing Date, in consideration of the Purchase Price and the covenants, representations and obligations of Buyer hereunder, and subject to the conditions hereinafter set forth, Sellers shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Sellers free and clear of all Encumbrances (other than Permitted Encumbrances) to the extent permitted under Sections 105(a), 363 and 365 of the Bankruptcy Code as of the Closing Date, all of Sellers' right, title and interest in and to the Business and all of Sellers' right, title and interest in the assets used or held for use in connection with, or otherwise related to, the Business, wherever located, excluding, however, the Excluded Assets (collectively, the "Purchased Assets"), including the following (in each case to the extent transferable):

2.1.1    Media Assets. All of Sellers' right, title and interest in the publications published by Sellers, including without limitation the publications referred to in Schedule 2.1.1, and all of Sellers' rights to prepare, publish, sell and distribute such publications and any other publications, extensions (including website and social media domain names and content) or spinoffs derived from such publications or related thereto in all languages (collectively, the "Publications");

2.1.2    Inventories. All inventories of back and current issues of the Publications; editorial material, work in process, finished goods, manuscripts, notes and drafts, graphic artwork, cuts, images, photographs and negatives owned by Sellers; promotional materials, inserts, and direct mail materials owned by Sellers; stationery, supplies, purchase orders, forms, labels, shipping materials and catalogs owned by Sellers; and all lists owned by Sellers of contributors, authors, correspondents, reviewers, photographers, illustrators and editors who contribute or have contributed to any of the Publications or otherwise to the Business;

2.1.3    Circulation Information. All circulation, delivery and mailing lists and carrier routes maintained by Sellers, all data related to such lists, all circulation readership studies, audience surveys and research owned by Sellers, and all other mailing lists, together with all records, reports and tapes of computer data owned by Sellers;

2.1.4    Copyrights. All of Sellers' right, title and interest in any copyrights (the "Copyrights"), whether registered or unregistered, in published works and unpublished works, and pending applications to register the same, including all copyrights covering each issue of each of the Publications, and the contents and components thereof;

2.1.5    Advertising Materials. All lists, files, books and records of Sellers to the extent they relate to the advertisers of, for or in any of the Publications, including, but not limited to, rate cards, verification cards, advertising insertion orders, specimen copies of all advertisements carried in any of the Publications, and copies of current price lists, discount lists, catalogs, public relations materials, sales correspondence, call reports, call books and sales promotion lists;

- 8 -

2.1.6    _Advertising and other Revenue Generating Agreements_. All of Sellers' agreements for advertising contracts, space reservations, insertion orders and all lists of, files, books and records of Sellers related thereto, including prospect lists for advertising in any of the Publications;

2.1.7    _Receivables_. All accounts and other amounts receivable and all Sellers' other rights to payment, causes of action, claims and rights of recovery to the extent they relate to the Publications or the Business, whether arising or accruing prior to, on or after the Closing Date, whether in respect of advertising, subscriptions, mailing lists or newsstand orders or otherwise, including those accounts and other amounts receivable set forth on Schedule 2.1.7 to be delivered at the Closing (which such Schedule 2.1.7 shall be updated at Closing) (collectively, the "Receivables");

2.1.8    _Personal Property_. All fixed and tangible personal property, including furniture, fixtures and equipment of Sellers (in addition to property otherwise identified in this Section 2.1), and including those items identified in Schedule 2.1.8;

2.1.9    _Leases_. All rights, title and interest under those real property leases described on Schedule 2.1.9 2.1.9, as it may be updated from time to time in Buyer's sole discretion at any time prior to the Sale Approval Hearing (collectively, the "Real Property Leases") and all leasehold improvements and fixtures on the premises leased pursuant to the Real Property Leases set forth on Schedule 2.1.9;

2.1.10    _Contracts_. Those contracts, agreements and leases to which any Seller is or Sellers are a party, which are specifically identified in Schedule 2.1.10, as it may be updated from time to time in Buyer's sole discretion at any time prior to the Sale Approval Hearing (the "Contracts"). All Contracts, agreements and leases not included in the Purchased Assets, specifically including but not limited to any Collective Bargaining Agreement and the agreements with the Boston Globe for printing, insertion and distribution (collectively, the "Globe Agreements"), shall be collectively referred to as the "Rejected Contracts";

2.1.11    _Books and Records_. All other books (except for Sellers' corporate minute books and similar legal records of corporate existence and affairs, as opposed to their business operations), financial and personnel records, invoices, shipping records, supplier lists and other documents, records, data files and service manuals owned by Sellers;

2.1.12    _Software_. All of Sellers' right, title and interest in and to all computer software and programs used in the conduct of the Business and any rights thereto, except those that by their terms are not transferable;

2.1.13    _Claims_. All claims, causes of action, rights of recovery and rights of set-off of any kind (including, without limitation, rights under and pursuant to all warranties, representations and guarantees made by suppliers of products, materials or equipment, or components thereof) of Sellers related to the Purchased Assets or the Business;

2.1.14    _Goodwill_. The goodwill of or pertaining to the Business, Purchased Assets and Publications;

2.1.15    _Insurance Claims and Proceeds_. Except for Sellers' policies of director and officer liability insurance, all claims under insurance policies, and all proceeds from claims under such insurance policies;

- 9 -

2.1.16    Trademarks. All of Sellers' right, title and interest in and to all trademarks, service marks, logos, trademark registrations or applications, service mark registrations or applications, trade names, domain names and brand names owned and used by Sellers in connection with any of the Purchased Assets, Publications and the Business (collectively, the "Trademarks") and the goodwill related thereto;

2.1.17    Subscriber Information. The names and addresses of all Subscribers to any of the Publications, all data to the extent it relates to such subscribers, and all rights to own, manage, use and rent the names and addresses of all subscribers to any of the Publications to the full extent that such information and data could be used by Sellers;

2.1.18    Prepaid Expenses. All security deposits, prepaid expenses and charges paid by Sellers or their Affiliates prior to the Closing Date in respect of the Purchased Assets or the Business and pertaining to periods after the Closing Date, including those described on Schedule 2.1.18;

2.1.19    Other Intangibles. All telephone numbers, websites and URLs owned, licensed or otherwise used by Sellers in connection with the Business;

2.1.20    Warranties.  All currently effective warranties and guaranties, if any, given to any Seller by any contractor, supplier or manufacturer which has provided or is providing services or goods in connection with the Purchased Assets or the Business; and

2.1.21    Purchased Avoidance Actions. All avoidance claims or causes of action available to Sellers or their estates under chapter 5 of the Bankruptcy Code, including Sections 544, 545, 547, 548, 549, 550 and 553, or similar state laws, against customers or other counterparties to the Contracts or the Real Property Leases or against Transferred Employees to the extent such avoidance claims or causes of action relate to any Contract, Real Property Lease or seek relief as to any Transferred Employee (collectively, "Purchased Avoidance Actions").

2.2    Excluded Assets. Anything in this Agreement to the contrary notwithstanding, the Purchased Assets shall not include the following (collectively, the "Excluded Assets"): (i) any cash, cash collateralizing letters of credit, bank or other financial accounts of Sellers and all rights, claims and causes of action relating to any of the foregoing; (ii) all preference, and fraudulent conveyance claims of Sellers or their estates arising under part V of the Bankruptcy Code or similar state laws (other than Purchased Avoidance Actions); (iii) Sellers' rights under this Agreement and all cash and non-cash consideration payable or deliverable to Sellers pursuant to the terms and provisions hereof; (iv) insurance proceeds, claims and causes of action with respect to or arising in connection with (A) any contract which is not included within the Purchased Assets including but not limited to the Collective Bargaining Agreements and the Globe Agreements and all other Rejected Contracts, (B) any item of tangible or intangible property not included within the Purchased Assets, or (C) any Excluded Liability; (v) any tax attribute of Sellers, including any right to any tax refund or net operating loss; (vi) any professional retainer paid by Sellers, (vii) any intercompany obligations owing to Sellers (other than obligations owing to Sellers from the non-debtor subsidiary), (viii) any and all of Sellers' right, title and interest in and to any and all real property (other than with respect to the Real Property Leases), (ix) Sellers' policies of directors and officers liability insurance and all premiums, claims and rights thereunder or relating thereto: (x) Sellers' corporate records, journals, ledgers and books of original entry, all of Sellers' internal audit, evaluation and assessment reports, all of Sellers' tax records and all of those documents and other records which any of Sellers may be required to maintain by Law, or may be maintained by any of Sellers with respect to its Employee Benefit Plans, or with respect to other Excluded Assets; and (xi) any other item set forth on Schedule 2.2 hereof.

-10-

2.3     Instruments of Transfer. The sale, assignment, transfer, conveyance and delivery of the Purchased Assets to Buyer and the assumption of the Assumed Liabilities provided herein by Buyer shall be made by assignments, bills of sale, and other instruments of assignment, transfer and conveyance provided for herein and such other instruments as may reasonably be requested by Buyer or Sellers in each case naming the appropriate Seller or Sellers to which such instrument pertains. None of the foregoing documents shall amend or expand in any way the obligations imposed or rights conferred by this Agreement upon Sellers or Buyer.

3.     Consideration.

3.1     Purchase Price.

3.1.1     The total aggregate consideration for the Purchased Assets shall be the sum of: (a) ~~Four~~Three Million ~~Five Hundred Thousand~~ Dollars ($~~4,500,000.00~~3,000,000.00), (the "Purchase Price"), (b) the Closing Net Working Capital Amount (as determined in accordance with Section 3.3 below), (c)  the Assumed Liabilities, and (d) the Cure Amounts; less the amount of the Subscription Liabilities as of the Closing Date.

3.1.2     As of the date hereof, Buyer has deposited into escrow with Sellers an earnest money deposit (the "Purchase Price Deposit") in the amount of ~~Four~~Five Hundred ~~Fifty~~ Thousand Dollars ($~~450,000~~500,000.00) as security for the performance of Buyer's obligations under this Agreement.  The Purchase Price Deposit shall be kept in a segregated account not used for any other purpose (and Buyer shall have information access to such account) and shall be applied against the Purchase Price at Closing.  Except as set forth in Section 10.2.1, if this Agreement shall be terminated pursuant to Section 5.4, the Purchase Price Deposit, together with any interest earned thereon, shall be delivered to Buyer.

3.1.3     On the Closing Date, Buyer shall (i) pay the Purchase Price (less the Purchase Price Deposit) and the Estimated Net Working Capital Amount (as determined in accordance with Section 3.3) to Sellers by wire transfer in immediately available funds and (ii) deliver to Sellers in accordance with such instructions provided by Sellers to Buyer prior to the Closing Date, by wire transfer in immediately available funds, all cure amounts owing under any of the Contracts and Real Property Leases as of the Closing Date pursuant to an order of the Bankruptcy Court to be paid as a condition to Sellers' assignment to Buyer of any Contracts and Real Property Leases (collectively, the "Cure Amounts").

3.1.4     (a) Buyer shall prepare and deliver to Sellers within 60 calendar days after the Closing Date a schedule setting forth the allocation of the Purchase Price and any other relevant items among the Purchased Assets for all Tax purposes (the "Purchase Price Allocation").   The allocation shall be considered final and binding on the parties, unless, within 30 calendar days after the delivery of the Purchase Price Allocation by Buyer, Sellers notify Buyer that they have a good faith objection to the allocation set forth in the Allocation Schedule.  If Sellers timely make such an objection, Buyer and Sellers shall work in good faith to resolve such dispute within 20 calendar days form the date Sellers deliver the objection to Buyer.  In the event that Buyer and Sellers are unable to resolve such dispute within the 20 calendar day period, the issue(s) in dispute will be submitted to an independent accounting firm, Gray, Gray & Gray, LLP (the "Independent CPA") for resolution.  The determination of the independent accounting firm shall be final, binding, and conclusive on the parties.  Buyer, on the one hand, and Sellers, on the other hand, shall each bear fifty (50%) of the fees and expenses of the independent accounting firm.  In the event of any adjustments to the Purchase Price, the parties hereto shall cooperate to adjust the Purchase Price Allocation.

-11-

(b) Buyer and Sellers each shall report all Taxes and file all Tax Returns (including amended Tax Returns and claims for refund) consistent with the Purchase Price Allocation, and shall take no position contrary thereto or inconsistent therewith (including, in any audits or examinations by any taxing authority or any other proceedings), unless, and then only to the extent, required by a final determination.  Buyer and Sellers shall exchange completed and executed forms with respect to the allocation (including Internal Revenue Service Form 8594 and any comparable forms required to be filed for state or local Tax purposes) at least 30 calendar days prior to the due date for filing such forms and shall cooperate in the filing of any forms (including Form 8594) with respect to such Purchase Price Allocation, including any amendments to such forms required with respect to any adjustment to the Purchase Price, pursuant to this Agreement.  Notwithstanding any other provisions of this Agreement, the foregoing agreement shall survive the Closing Date without limitation.

            3.1.5  Buyer will set aside ten percent (10%) of its common stock for employees of Buyer, to be distributed in accordance with a plan adopted by Buyer within six (6) months of the Closing.

    3.2    Assumed Liabilities; Excluded Liabilities.

        3.2.1    Effective as of the Closing Date, Buyer shall assume and perform (and indemnify and hold Sellers harmless against in accordance with Section 10.2): (a) an amount not to exceed the greater of: (i) ~~Five~~Seven Hundred and Fifty Thousand Dollars ($~~500,000.00) and (ii)~~750,000.00) less the total accrued paid time off ("PTO") owed by the Sellers to Transferred Employees (which will be offered to such Transferred Employees under Buyer's employee policies and procedures) or (ii) the total accrued PTO owed by the Sellers to Transferred Employees (which will be offered to such Transferred Employees under Buyer's employee policies and procedures) (such greater amount, the "Accrued Amount"); (b) all liabilities and obligations arising or related to the ownership, use and operation of the Purchased Assets and accruing on or after the Closing Date and all liabilities and obligations for which Buyer is responsible pursuant to Section 4.4; (c) all liabilities and obligations arising and accruing on or after the Closing Date to Transferred Employees as a result of such Transferred Employees' employment with Buyer; ~~and~~ (d) any Liabilities for severance payments owed to Employees as set forth on Schedule 3.2.1 but in no event in excess of $2,000,000 (the "Severance Liabilities") with such amount paid to the Seller at Closing in full satisfaction of Buyer's assumption obligation; (e) all liabilities and obligations accruing on or after the Closing Date under the Contracts and Real Property Leases; and (f) the Subscription Liabilities (collectively, "Assumed Liabilities"), and shall execute and deliver an assignment and assumption agreement substantially in the form annexed hereto as Exhibit A with respect thereto (the "Assignment and Assumption Agreement").

        3.2.2    Buyer shall not assume or be obligated to pay, perform, discharge or in any way be responsible for any Liabilities other than the Assumed Liabilities, and specifically shall not assume or be obligated to perform or otherwise be responsible for any obligations under any Collective Bargaining Agreement ~~or the Globe Agreements~~, any liabilities under any pension plan (including without limitation any past, present or future withdrawal liability under any such plan) or other Employee Benefit Plan of the Sellers, ~~any Liabilities for severance/retention,~~ any Liabilities for PTO in excess of the Accrued Amount or any Liabilities incurred pursuant to any DIP Agreement (collectively, the "Excluded Liabilities").  Employee Benefit Plans and any Liabilities relating thereto (including, but not limited to, withdrawal liability under any multiemployer plan within the meaning of Section 3(37) of ERISA) are Excluded Liabilities. Buyer shall cooperate in all reasonable respects in connection with proceedings to obtain an Order of the Bankruptcy Court to assign all Contracts and Real Property Leases to Buyer and otherwise gain approval for the transactions contemplated by this Agreement, including reasonable efforts to demonstrate that Buyer provides "adequate assurance of Buyer's future

-12-

performance" of such Contracts and Real Property Leases to the full extent required for assignment thereof required by the Bankruptcy Code.

### 3.3    Determination of Net Working Capital.

3.3.1    At least two (2) business days prior to the Closing, Sellers will furnish to Buyer (A) a certificate (the "Estimated Closing Balance Sheet") setting forth a good faith estimate of the Closing Net Working Capital Amount (the "Estimated Net Working Capital Amount") as of the Sunday immediately preceding the Closing Date (the "NWC Date").

3.3.2    Not later than sixty (60) days after the Closing Date, Sellers shall prepare and deliver to Buyer (a) a balance sheet (the "Closing Balance Sheet") which shall reflect the net book value of both the current assets included among the Purchased Assets and the current liabilities (other than accrued PTO being assumed pursuant to Section 3.23.2.1(a) above) included among the Assumed Liabilities as of the NWC Date; and (b) a statement (the "Closing Statement") indicating the difference between the net book value of the current assets included among the Purchased Assets as of the NWC Date and the net book value of the current liabilities (other than  the Accrued Amount being assumed pursuant to Section 3.2(a) above)  included among the Assumed Liabilities as of the NWC Date (the "Closing Net Working Capital Amount"). The Closing Balance Sheet and the Closing Statement shall be prepared in accordance with GAAP and, to the extent not inconsistent with GAAP, on a basis consistent with the preparation of the historical consolidated audited financial statements of Sellers as set forth in Schedule 3.3.2.

3.3.3    Following receipt of the Closing Balance Sheet and the Closing Statement, Buyer will be afforded a period of twenty (20) calendar days (the "Review Period") to review the Closing Balance Sheet, and the Closing Statement.  During such Review Period, Buyer and Buyer's accountants will be afforded reasonable access to the records, work papers, trial balances and similar materials prepared by Sellers or Sellers' accountants in connection with the preparation or certification of the Closing Balance Sheet and Closing Statement.  At or before the end of the Review Period, Buyer will either (a) accept the Closing Balance Sheet and the Closing Statement, in their entirety, in which case the Closing Net Working Capital Amount will be deemed to be as set forth on the Closing Statement and the Closing Balance Sheet and Closing Statement shall become final, binding and conclusive on Sellers and Buyer, or (b) deliver to Sellers a written notice in accordance with Section 3.3.7 disputing the Closing Balance Sheet and the Closing Statement.

3.3.4    In the event that the Closing Net Working Capital Amount is greater than the Estimated Net Working Capital Amount, then within ten (10) days following the later of (a) the date the Closing Balance Sheet and the Closing Statement are accepted by Buyer or (b) the final, binding and conclusive determination of any dispute with respect to the Closing Balance Sheet, or the Closing Statement as provided in Section 3.3.7, Buyer shall pay to Sellers by federal funds wire transfer in immediately available funds an amount equal to such excess.

3.3.5    In the event that the Closing Net Working Capital Amount is less than the Estimated Net Working Capital Amount, then within ten (10) days following the later of (a) the date the Closing Balance Sheet and the Closing Statement are accepted by Buyer or (b) the final, binding and conclusive determination of any dispute with respect to the Closing Balance Sheet or the Closing Statement as provided in Section 3.3.7, Sellers shall repay to Buyer by federal funds wire transfer in immediately available funds an amount equal to such shortage.

3.3.6    In the event that the Closing Net Working Capital is equal to the Estimated Net Working Capital Amount, then there shall be no post closing adjustment pursuant to this Section 3.3.

3.3.7    In the event that any dispute shall arise as to the manner of preparation or the accuracy of the Closing Balance Sheet or the Closing Statement prior to the expiration of the Review Period, Buyer shall provide Sellers with written notice of each disputed item.  In the event of such a dispute, Buyer and Sellers shall attempt to reconcile in good faith their differences as to such items within twenty (20) calendar days (the "Resolution Period") of Sellers' receipt of such notice, and any resolution by them as to any disputed items shall be final, binding and conclusive on Buyer and Sellers.  If Buyer and Sellers are unable to reach a resolution with such effect within the Resolution Period, Buyer and Sellers shall submit the dispute to the Independent CPA.  The determination of such dispute by the Independent CPA shall be final, binding and conclusive on the parties.  The fees and expenses of the Independent CPA shall be split and assessed by the Independent CPA equally between Buyer, on the one hand, and Sellers, on the other.

4.    Closing Transactions.

4.1    Closing. The closing of the transactions provided for herein (the "Closing") shall take place at the offices of Brown Rudnick LLP, One Financial Center, Boston MA 02111 or in such other manner to which the parties agree.

4.2    Closing Date. The Closing shall be held within five Business Days after satisfaction or waiver of the conditions to closing contained in Section 5 (the "Closing Date") but in no event later than March 28, 2018 (the "Outside Date"); provided, however, that the Outside Date shall automatically be extended at Sellers' election for consecutive 30-day periods, not to exceed an aggregate period of six months from the initial Outside Date, if the only conditions remaining to be satisfied are specified in any of Sections 5.1.4, 5.1.5 and 5.2.3. In the event the conditions to Closing (other than the conditions specified in Sections 5.1.4, 5.1.5 and 5.2.3) have not been satisfied or waived on or before the Outside Date, then any party who is not in default hereunder may terminate this Agreement by delivering to the other party written notice of termination. Alternatively, the parties may mutually agree to an extended Outside Date. Until this Agreement is either terminated or the transactions contemplated hereby have been consummated, the parties shall diligently continue to work to satisfy all conditions to Closing.  The Closing shall be effective at 11:59 p.m. Eastern Time on the Closing Date.

4.3    Sellers' Deliveries to Buyer at Closing. On the Closing Date, subject to satisfaction of the conditions precedent set forth in Section 5.1, Sellers shall make the following deliveries to Buyer:

4.3.1    An Assignment and Assumption Agreement duly executed by Sellers;

4.3.2    An Assignment of Proprietary Rights, substantially in the form annexed hereto as Exhibit B, duly executed by Sellers (the "Assignment of Proprietary Rights");

4.3.3    A Bill of Sale in substantially the form annexed hereto as Exhibit C, duly executed by Sellers (the "Bill of Sale");

4.3.4    An officer's certificate from each Seller, substantially in the form attached hereto as Exhibit D, duly executed by an authorized officer of such Seller, which shall certify as to (a) the satisfaction of the conditions set forth in Section 5.2, (b) each Seller's non- foreign status, in

-14-

compliance with the requirements of Section 1445 of the Internal Revenue Code, and (c) the resolutions adopted by the Board of Directors or such other governing body or manager of each Seller evidencing its authorization to execute and deliver this Agreement and the ancillary agreements contemplated hereunder, and the consummation of the transactions contemplated hereby and thereby;

4.3.5    Copies of the waivers, consents and approvals set forth on Schedule 4.3.5 if such consents and approvals are required to be obtained by Sellers to validly transfer and assign any Contract, Real Property Lease or business license in accordance with its terms after giving effect to the relevant provisions of the Bankruptcy Code, the Sale Procedures Order and the Sale Approval Order;

4.3.6    A copy of the Sale Approval Order in the form attached as Exhibit E (the "Sale Approval Order"), which Sale Approval Order shall provide that it shall be effective immediately upon entry pursuant to Rule 7062 and 9014 of the Federal Rules of Bankruptcy Procedure, and that no automatic stay of execution, pursuant to Rule 62(a) of the Federal Rules of Civil Procedure, or Rule 6004(g) or 6006(d) of the Federal Rules of Bankruptcy Procedure shall apply with respect the Sale Approval Order;

4.3.7    An assignment of lease with respect to the real property located at Seaport Center, Suite 600, 70 Fargo Street, Boston, Massachusetts, in substantially the form annexed hereto as Exhibit F, duly executed by the applicable Seller;

4.3.8    All passwords and other similar information necessary to ensure that Buyer has full access to and ability to use all Media Assets and Intellectual Property; and

4.3.9    Such other documents related to the transactions contemplated by this Agreement that Buyer may reasonably request; and

4.3.10    All other assets required by this Agreement, including, without limitation, as provided in Section 4.7.

4.4    Buyer's Deliveries to Sellers at Closing. On the Closing Date, subject to satisfaction of the conditions precedent set forth in Section 5.2, Buyer shall make or cause to be made the following deliveries to Sellers:

4.4.1    The Purchase Price to be delivered to Sellers at the Closing in accordance with Section 3.1.1 (provided, however, that the Cure Amounts shall be delivered as directed by the Bankruptcy Court and);.

4.4.2    The Assignment and Assumption Agreement duly executed by Buyer;

4.4.3    The Assignment of Proprietary Rights Agreement duly executed by Buyer;

4.4.4    An officer's certificate, substantially in the form attached hereto as Exhibit G, duly executed by Buyer, which shall certify as to (a) the satisfaction of the conditions set forth in Section 5.1, and (b) the resolutions adopted by the Board of Directors (or members or managers, as applicable) of Buyer evidencing its authorization to execute and deliver this Agreement and the ancillary

-15-

agreements contemplated hereunder, and the consummation of the transactions contemplated hereby and thereby;

4.4.5    All other instruments and certificates of assumption, novation and release as Sellers may reasonably request in order to effectively make Buyer responsible for all Assumed Liabilities and release Sellers therefrom to the fullest extent permitted under applicable Law;

4.4.6    Copies of the waivers, consents and approvals set forth on Schedule 4.4.6 if such consents and approvals are required to be obtained by Buyer after giving effect to the relevant provisions of the Bankruptcy Code, a Sales Procedures Order substantially in the form attached hereto as Exhibit H (the "Sale Procedures Order") and the Sale Approval Order;

4.4.7    Such other documents related to the transactions contemplated by this Agreement that Sellers may reasonably request.

4.5    Prorations. Post-petition rent, utilities, current taxes (other than income taxes) and other similar post-petition items of expense (including, without limitation, any prepaid insurance under the Contracts and Real Property Leases) relating to or attributable to the Purchased Assets or Assumed Liabilities, shall be prorated between Sellers and Buyer as of the Closing Date so that Sellers shall bear such post-petition costs and expenses for the period up to the Closing Date and Buyer shall bear such costs and expenses for the period from and including the Closing Date. All Assumed Liabilities shall be paid in full or otherwise satisfied by Buyer.  Post-petition rent shall be prorated on the basis of a thirty (30) day month.

4.6    Transfer Taxes. Intentionally deleted.

4.7    Possession. Right to possession of the Purchased Assets shall transfer to Buyer on the Closing Date. Sellers shall transfer and deliver to Buyer on the Closing Date such keys, lock and safe combinations and other similar items as Buyer shall require to obtain immediate and full occupation and control of Purchased Assets, and shall also make available to Buyer at Sellers' then existing locations all documents in Sellers' possession that are required to be transferred to Buyer by this Agreement.

5.    Conditions Precedent to Closing.

5.1    Conditions to Sellers' Obligations. Sellers' obligation to make the deliveries of Sellers set forth in Section 4.3 on the Closing Date, and otherwise to close the transaction, shall be subject to the satisfaction or waiver by Sellers of each of the following conditions on or prior to the Closing Date:

5.1.1    All of the representations and warranties of Buyer contained in Section 7 shall continue to be true and correct as of the Closing Date in all material respects, all covenants and obligations to be performed by Buyer on or prior to the Closing Date shall have been performed in all material respects, and Buyer shall have certified the foregoing to Sellers in writing;

5.1.2    Buyer shall have delivered to Sellers the items set forth in Section 4.4;

5.1.3    Sellers shall have received the total Purchase Price in immediately available funds;

5.1.4    No action, suit or other proceedings shall be pending before any court, tribunal or other Governmental Authority seeking or threatening to restrain or prohibit the consummation of the transactions contemplated by this Agreement, or seeking to obtain damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any Law, decree or regulation of any Governmental Authority having appropriate jurisdiction; and

5.1.5    The Bankruptcy Court shall have entered the Sale Approval Order not later than [March 16, 2018] in form and content reasonably satisfactory to Buyer and in accordance with Section 9.4.2 below; and provided, further, that neither the Sale Procedures Order nor the Sale Approval Order shall have been amended, modified or supplemented without the written consent of Buyer, and no stay shall be in effect with respect to either order.

5.2    Conditions to Buyer's Obligations. Buyer's obligation to make the deliveries of Buyer set forth in Section 4.4 on the Closing Date, and otherwise to close the transaction, shall be subject to the satisfaction or waiver by Buyer of each of the following conditions on or prior to the Closing Date:

5.2.1    All of the representations and warranties of Sellers contained in Section 6 shall continue to be true and correct on the Closing Date in all material respects, all covenants and obligations to be performed by Sellers on or prior to the Closing Date shall have been performed in all material respects, and Sellers shall have certified the foregoing to Buyer in writing;

5.2.2    Sellers shall have delivered to Buyer the items set forth in Section 4.3;

5.2.3    No action, suit or other proceedings shall be pending before any court, tribunal or other Governmental Authority seeking or threatening to restrain or prohibit the consummation of the transactions contemplated by this Agreement, or seeking to obtain damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any Law, decree or regulation of any Governmental Authority having appropriate jurisdiction;

5.2.4    ~~On the Closing Date there shall not be existing a Material Adverse Effect;~~Intentionally Omitted.

5.2.5    Sellers shall have released (in form, substance and manner satisfactory to Buyer) all Employees to be hired by Buyer from any competitive or other contractual provision which would restrict or prohibit such Employee from working or performing services for Buyer in any manner;

5.2.6    The Bankruptcy Court shall have entered the Sale Approval Order substantially in the form attached as Exhibit E and submitted to the Bankruptcy Court in accordance with Section 9.4.2 below; and provided, further, that each of the Sale Procedures Order and the Sale Approval Order shall be entered as a Final Order without having been amended, modified or supplemented without the written consent of Buyer, and no stay shall be in effect with respect to either order; and

5.3    Waiver. Nothing in Section 5.1, Section 5.2 or any other section of this Agreement shall preclude Sellers or Buyer from consummating the transactions contemplated herein if either Buyer or Sellers waive, by written notice to the other, any condition to its or their respective obligation to close the transactions hereunder.

5.4    Termination. This Agreement and the transactions contemplated hereby may be terminated and abandoned:

-17-

5.4.1    by either Sellers or Buyer at any time prior to the Closing with the written consent of the other party hereto and the prior approval of the Bankruptcy Court;

5.4.2    unless the Closing has not occurred as a result of a breach of this Agreement by the party seeking such termination, by either Sellers or Buyer, if the Closing has not occurred on or prior to the Outside Date;

5.4.3    by either Sellers or Buyer if any Governmental Authority with jurisdiction over such matters shall have issued a final and nonappealable governmental order permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement; provided, however, that neither Sellers nor Buyer may terminate this Agreement pursuant to this Section 5.4.3 unless the party seeking to terminate this Agreement has used commercially reasonable efforts to oppose any such governmental order or to have such governmental order vacated or made inapplicable to the transactions contemplated by this Agreement;

5.4.4    by Sellers (provided that no Seller nor any Affiliate thereof is in breach of any of the representations, warranties, covenants or other agreements contained herein), but only if Buyer shall have breached, in any material respect, any representation or warranty or any covenant or other agreement to be performed by it contained herein, and such breach is incapable of being cured or is not cured within twenty (20) days of receipt of written notice to cure from Sellers;

5.4.5    by Buyer (provided that Buyer or any Affiliate thereof is not in breach of any of the representations, warranties, covenants or other agreements contained herein), but only if Sellers shall have breached, in any material respect, any representation or warranty or any covenant or other agreement to be performed by them contained herein, and such breach is incapable of being cured or is not cured within twenty (20) days of receipt of written notice to cure from Buyer.

5.4.6    Notwithstanding anything in this Section 5.4.6 to the contrary, by either Buyer or Sellers, if the Bankruptcy Court has issued an order approving the sale of any or all of the Purchased Assets to another party in accordance with the Procedure Order; or if Sellers have effected some other alternate transaction, with the approval of the Bankruptcy Court, including a plan of reorganization or liquidation (including a Chapter 7 liquidation), resulting in the disposition to someone other than Buyer of any or all of the Purchased Assets.

6.    Sellers' Representations and Warranties. Each Seller hereby makes the following representations and warranties on behalf of itself to Buyer:

6.1    Validity of Agreement. Upon obtaining the Sale Approval Order, all action on the part of such Seller necessary for the authorization, execution, delivery and performance of this Agreement by such Seller, including, but not limited to, the performance of such Seller's obligations hereunder, will have been duly taken, and this Agreement, when executed and delivered by Sellers, shall constitute the valid and binding obligation of such Seller enforceable in accordance with its terms.

6.2    Organization, Standing and Power. Such Seller is duly organized or incorporated, as applicable, validly existing and in good standing under the Law of the jurisdiction set forth opposite such Seller's name on Schedule 6.2. Subject to the applicable provisions of the Bankruptcy Code, such Seller has all requisite power and authority to own, lease and operate its properties, to carry on its business as now being conducted and, subject to Sellers' obtaining the Sale Procedures Order and the Sale Approval Order, to execute, deliver and perform this Agreement and all writings relating hereto.

-18-

6.3    No Violation; Third Party Consents.

6.3.1    Assuming the receipt of all necessary approvals of the Bankruptcy Court and assuming that all consents, waivers, approvals, orders and authorizations set forth in Schedule 6.3.1 have been obtained and all registrations, qualifications, designations, declarations or filings with any Governmental Authorities set forth in Schedule 6.3.2 have been made, the execution and delivery by such Seller of this Agreement and the ancillary agreements contemplated hereunder, the performance by such Seller of its obligations hereunder and thereunder, and the consummation by such Seller of the transactions contemplated hereby and thereby, will not conflict with or violate, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, give rise to any right of termination, amendment, modification, acceleration or cancellation of any obligation or loss of any benefit under, result in the creation of any Encumbrance on any of the Purchased Assets pursuant to, or require such Seller to obtain any consent, waiver, approval or action of, make any filing with, or give any notice to any Person as a result of or under, the terms and provisions of (a) the Certificate of Incorporation, Certificate of Formation, Bylaws or Limited Liability Company Agreement, as applicable, of Seller, (b) any currently enforceable Contract and Real Property Lease to which such Seller is a party or by which any of the Purchased Assets are bound or (c) any Law applicable to such Seller or any of the Purchased Assets, or any governmental order by which such Seller or any of the Purchased Assets is in any way bound or obligated, except, in the case of clauses (b) and (c) of this Section 6.3.1, as would not have a ~~material adverse effect~~Material Adverse Effect on the ability of Sellers to perform (i) their obligations under this Agreement or to consummate on a timely basis the transactions contemplated hereby, or (ii) the obligations under any ancillary agreement contemplated hereunder or to consummate on a timely basis the transactions contemplated thereby.

6.3.2    No consent, waiver, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any Governmental Authority is required on the part of such Seller in connection with (x) the execution and delivery by such Seller of this Agreement, the performance by such Seller of its obligations hereunder, and the consummation by such Seller of the transactions contemplated hereby, or (y) the execution and delivery by such Seller of the ancillary agreements contemplated hereunder, the performance by such Seller of its obligations contemplated thereby, and the consummation by such Seller of the transactions contemplated thereby, except (a) as set forth in Schedule 6.3.2, (b) all applicable approvals of the Bankruptcy Court, and (c) where the failure to obtain such consent, waiver, approval, order or authorization, or to make such registration, qualification, designation, declaration or filing, would not, as of the date hereof, give rise to a Material Adverse Effect.

6.4    Title to Purchased Assets.

6.4.1    Personal Property. Except as disclosed in Schedule 6.4.1, as of the date hereof, Sellers have good, valid and marketable title to the Purchased Assets (other than the Real Property), free and clear of all Encumbrances, except for Permitted Encumbrances and those Encumbrances that will be removed, released or otherwise rendered unenforceable at or prior to Closing.

6.4.2    Transfer Free and Clear. Upon the sale of the Purchased Assets on the Closing Date, Buyer shall be the owner thereof free and clear of all Encumbrances (other than Permitted Encumbrances) and other liabilities, other than Assumed Liabilities as permitted under Section 363 of the Bankruptcy Code.

6.5    No Litigation. Except for the Bankruptcy Case and as may be set forth in Schedule 6.5, there is no action, suit or proceeding at Law or in equity by any Person, or any arbitration or any administrative or other proceeding, or to Sellers' Knowledge, any investigation by, any

-19-

Governmental Authority, pending or threatened with respect to such Seller, any of the officers or directors of such Seller (in their capacities as such) or such Seller's properties or rights, which could have a Material Adverse Effect. Such Seller is not subject to any judgment, order or decree entered in any lawsuit, proceeding or arbitration, other than any of the same that were disclosed in <u>Schedule 6.5</u> or that arose from or were related to the Bankruptcy Case.

6.6    <u>Intellectual Property</u>. Sellers are the exclusive owners of the Intellectual Property free and clear of any Encumbrances <u>(other than Permitted Encumbrances)</u>. Sellers own or have a valid and enforceable license to use all Intellectual Property necessary or material for the conduct of the Business as and where conducted on the Closing Date and to Sellers' Knowledge, the Business does not infringe upon the intellectual property rights of any third person. No application to register, or any registration of, Sellers' Intellectual Property used in the Business has lapsed, expired or been abandoned or canceled, or is subject to any injunction, judgment, order, decree, ruling or charge or is subject to any pending or threatened oppositions, cancellations, interferences or other proceedings before the United States Patent and Trademark Office, the Trademark Trials and Appeals Board, the United States Copyright Office or in any comparable regulatory authority of a foreign jurisdiction. <u>Schedule 6.6</u> includes a true and complete list of all registered Intellectual Property. Seller has taken all commercially reasonable steps necessary to maintain the validity of the Intellectual Property, including paying all necessary fees and making all necessary filings with the appropriate government entity. Except as set forth at <u>Schedule 6.6</u>, Seller has not licensed any Intellectual Property to any person.

6.7    <u>Material Agreements and Licenses</u>. <u>Schedule 6.7.1</u> contains a list of the currently existing agreements to which a Seller or more than one Seller is a party, which agreements are material to the operation of the Business. For purposes of this Section 6.7 only, "material agreements" means contracts and agreements to which a Seller is a party or by which it is bound and which has involved payments or liabilities in excess of Fifty-Five Thousand Dollars ($55,000) during the last twelve (12) months. Sellers own or possess all right, title and interest in and to all material business licenses which are necessary as of the date hereof to conduct the Business substantially as currently conducted. Not later than fifteen (15) Business Days prior to the Closing, the Sellers shall supplement <u>Schedule 6.7.2</u><u>6.7.1</u> to include a list of all the currently existing executory contracts and unexpired leases, whether or not material agreements, and the associated cure (past due/default) amount for each such contract and lease.

6.8    <u>Employee Matters</u>.

6.8.1    <u>Employees</u>. In order to facilitate Buyer's interviews of Sellers' Employees as contemplated in Section 9.1 hereof, no later than December 31, 2017, Sellers shall provide Buyer with a true and complete list of the names, home addresses and current annual base compensation rates of all permanent salaried and hourly employees currently employed in connection with the operation of the Business as of November 20, 2017 (the "<u>Employees</u>"). Whether or not Buyer offers employment to any Employee, or any Employee becomes an employee of Buyer, and whether or not Sellers terminate the employment of any Employee prior to the Closing Date or any other time, Sellers shall be solely responsible for any liabilities or obligations resulting from such Employees' employment with Sellers and separation from employment by Sellers, and Buyer shall not assume or be assessed any such liability, except only as otherwise expressly set forth in Section 3.2.1 in connection with the Accrued Amount <u>and the Severance Liabilities</u>.

6.8.2    <u>Employee Benefits</u>. Set forth on <u>Schedule 6.8.2</u> hereto is a true and complete list of each "employee benefit plan", as defined in Section 3(3) of ERISA, that is subject to ERISA and that Sellers or any of their Affiliates maintain or contribute to, or are required to contribute

-20-

to, by for the benefit of any Employees or former Employees of the Business, any other employee benefit plan, program, policy, promise or arrangement of any kind that Sellers or any of their ERISA Affiliates maintains or contributes to, or with respect to which any of Sellers or their Affiliates may have Liability, in each case with respect to any Employee or former  Employee of the Business ("Employee Benefit Plan").  Except as set forth in Schedule 6.8.2, Sellers are not in default of any obligations under any Employee Benefit Plan, and there is no funding deficiency under any Employee Benefit Plan within the meaning of the Internal Revenue Code or ERISA.  Within the three (3) year period prior to the Closing Date, no Seller has maintained, sponsored or contributed to any multiemployer plan, as that term is defined in ERISA, nor have they incurred any material liability, including without limitation, withdrawal liability, with respect to any such plan, except as set forth in Schedule 6.8.2.

6.8.3    Except as set forth in Schedule 6.8.3, no Seller is a party to any Collective Bargaining Agreement and there are no labor unions or organizations representing any employee of any Seller.

6.8.4    Except as set forth in Schedule 6.8.4, there are no labor unions or organizations that have filed a petition with the NLRB or any other Government Entity seeking certification as the collective bargaining representative of any employee of any Seller, and to the Sellers' Knowledge, no labor union or organization is engaged in any organizing activity with respect to any employee of any Seller.

6.8.5    No labor union or other organization has made any claim that any Seller jointly employs the employees of any third party.

6.8.6    Except as set forth on Schedule 6.8.6, Seller is presently in compliance with in all material respects all applicable contracts and Collective Bargaining Agreements.

6.8.7    Except as set forth on Schedule 6.8.7, no Seller is under investigation and is not a defendant or respondent or potential defendant or respondent and there are no charges, complaints, investigations or allegations pending of which any Seller has notice or to Sellers' Knowledge is threated, before any administrative agency, including but not limited to the NLRB, the DOL, the EEOC, and OFCCP, or any other government entity, administrative complaints, or lawsuits or pending grievances or arbitration under any Collective Bargaining Agreement alleging that any Seller is not in compliance with any Collective Bargaining Agreement or applicable laws and regulations regarding labor, employment, occupational safety and health or other rights of any employees.

6.8.8    Except as set forth in Schedule 6.8.8, there are no retired employees, officers, or directors of either Seller, or their dependents, receiving benefits or scheduled to receive benefits from any Seller in the future.

6.8.9    Except as set forth in Schedule 3.2.1, there are no severance or similar obligations to employees.

6.8.10    Except as set forth in Schedule 1.1.74, there are no other liabilities for prepaid subscriptions or similar obligations.

6.9    Permits and Licenses. Sellers are conducting the Business and its operations in compliance with all business licenses, in all material respects, and all such licenses are in full force and effect and no suspension or cancellation of any of them is threatened.

-21-

6.10    <u>Brokers</u>. No person has acted as a broker on behalf of any Seller in connection with the consummation of the transaction contemplated by this Agreement other than Dirks, Van Essen & Murray. Sellers shall solely be responsible for the Success Fee, any other brokerage fees, commissions and/or expenses due to Dirks, Van Essen & Murray in connection with the negotiation and execution of this Agreement and the consummation of the transactions contemplated hereby.

6.11    <u>Environmental Matters</u>.

Sellers are in compliance in all material respects with all applicable environmental laws, Sellers possess all environmental permits required under any environmental laws for the conduct of the Business, are in compliance in all material respects with the terms and conditions thereof, and all such permits are in full force and effect and contain no restrictions on the transfer of any such permit to a subsequent owner or operator of the Business.  <u>Schedule 6.11.1</u> sets forth a complete list of all such environmental permits.

There are no claims under any environmental laws pending or, to Sellers' Knowledge, threatened against or by any Seller, or affecting any Seller or any of the Business or Purchased Assets, and no Seller has received no communication from any government entity or other person alleging any material liability under any environmental law.

Within five (5) days of the date of this Agreement, Sellers will make available to Buyer all material written environmental assessments, audits, investigations, studies, reports or other documents (including written correspondence with government entities) in its possession or control relating to all properties currently owned or leased by any Seller.

6.12    <u>Financial Statements</u>.  Sellers' year-end financial statements for the fiscal years for 2014, 2015 and 2016 (the "<u>Financial Statements</u>") are set forth on <u>Schedule 6.12</u> hereto.  The Financial Statements have been prepared in accordance with GAAP applied on a consistent basis throughout the period involved.  The Financial Statements are based on the books and records of the Business, and fairly represent in all material respects the financial condition of Sellers as of the respective dates they were prepared and the results of the operation of the Business for the periods indicated.

7.    <u>Buyer's Representations and Warranties</u>. Buyer hereby makes the following representations and warranties to Sellers:

7.1    <u>Validity of Agreement</u>. All action on the part of Buyer necessary for the authorization, execution, delivery and performance of this Agreement by Buyer, including, but not limited to, the performance of Buyer's obligations hereunder, has been duly taken. This Agreement, when executed and delivered by Buyer, shall constitute the valid and binding obligation of Buyer enforceable in accordance with its terms, except to the extent that enforceability thereof may be limited by general equitable principles or the operation of bankruptcy, insolvency, reorganization, moratorium or similar Law.

7.2    <u>Organization, Standing and Power</u>. Buyer is a ~~corporation~~<u>limited liability company</u> duly organized, validly existing and in good standing under the Law of the State of Delaware. Buyer has all requisite ~~corporate~~<u>limited liability company</u> power and authority to own, lease and operate its properties, to carry on its business as now being conducted and to execute, deliver and perform this Agreement and all writings relating hereto.

7.3    <u>No Violation; Third Party Consents</u>.

-22-

7.3.1    Assuming that all consents, waivers, approvals, orders and authorizations set forth in <u>Schedule 7.3.1</u> have been obtained and all registrations, qualifications, designations, declarations or filings with any Governmental Authorities set forth in <u>Schedule 7.3.2</u> have been made, the execution and delivery by Buyer of this Agreement and the ancillary agreements contemplated hereunder, the performance by Buyer of its obligations hereunder and thereunder, and the consummation by Buyer of the transactions contemplated hereby and thereby, will not conflict with or violate, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, give rise to any right of termination, amendment, modification, acceleration or cancellation of any obligation or loss of any benefit under, result in the creation of any Encumbrance on any of the assets or properties of Buyer pursuant to, or require Buyer to obtain any consent, waiver, approval or action of, make any filing with, or give any notice to any Person as a result of or under, (a) the terms or provisions of the ~~organizational documents~~<u>certificate of formation or operating agreement</u> of Buyer, (b) any currently enforceable contract to which Buyer is a party or is bound or (c) any Law applicable to Buyer or any governmental order by which Buyer is in any way bound or obligated, except, in the case of clauses (b) and (c) of this Section 7.3.1, as would not have a ~~material adverse effect~~<u>Material Adverse Effect</u> on the ability of Buyer to perform its obligations under this Agreement and the ancillary agreements contemplated hereunder, or to consummate on a timely basis the transactions contemplated hereby or thereby.

7.3.2    No consent, waiver, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any Governmental Authority is required on the part of Buyer in connection with the execution and delivery by Buyer of this Agreement and the ancillary agreements contemplated hereunder, the performance by Buyer of its obligations hereunder and thereunder, and the consummation by Buyer of the transactions contemplated hereby and thereby, except (a) as set forth in <u>Schedule 7.3.2</u> and (b) where the failure to obtain such consent, waiver, approval, order or authorization, or to make such registration, qualification, designation, declaration or filing, would not have a material adverse effect on the ability of Buyer to perform its obligations under this Agreement and the ancillary agreements contemplated hereunder, or to consummate on a timely basis the transactions contemplated hereby or thereby.

7.4    <u>Financing</u>. Buyer has sufficient funds available to consummate the transactions contemplated hereby, and without limiting the conditions to Buyer's obligations set forth herein. THERE IS NO FINANCING CONTINGENCY WITH RESPECT TO BUYER'S OBLIGATIONS IN CONNECTION WITH THIS TRANSACTION.

7.5    "AS IS" Transaction. BUYER HEREBY ACKNOWLEDGES AND AGREES THAT EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS INCLUDING, WITHOUT LIMITATION, INCOME TO BE DERIVED OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE PURCHASED ASSETS, SELLERS' HISTORICAL FINANCIAL OR OPERATIONAL PERFORMANCE, THE PHYSICAL CONDITION OF ANY OF THE PURCHASED ASSETS OR THE SUBJECT OF ANY CONTRACT OR REAL PROPERTY LEASE TO BE ASSUMED BY BUYER AT THE CLOSING, THE ENVIRONMENTAL CONDITION OR OTHER MATTERS RELATING TO THE PHYSICAL CONDITION OF ANY SUCH REAL PROPERTY OR IMPROVEMENTS, THE ZONING OF ANY SUCH REAL PROPERTY OR IMPROVEMENTS, THE VALUE OF THE PROPERTY (OR ANY PORTION THEREOF), THE TRANSFERABILITY OF THE PURCHASED ASSETS, THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES, THE TITLE OF THE PURCHASED ASSETS (OR ANY PORTION THEREOF), THE MERCHANTABILITY OR FITNESS OF THE PURCHASED ASSETS FOR ANY

-23-

PARTICULAR PURPOSE OR ANY OTHER MATTER OR THING RELATING TO THE PURCHASED ASSETS.

WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLERS HEREBY DISCLAIM ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY OF THE PURCHASED ASSETS. BUYER FURTHER ACKNOWLEDGES THAT BUYER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE PURCHASED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE PURCHASED ASSETS AS BUYER DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE PURCHASED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN SECTION 6, BUYER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. ACCORDINGLY, BUYER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

8.      Brokers. All negotiations relative to this Agreement and the transactions contemplated hereby have been carried out by Buyer directly with Sellers or with Dirks, Van Essen & Murray without the intervention of any Person on behalf of Buyer in such manner as to give rise to any valid claim by any Person against Sellers for a finder's fee, brokerage commission or similar payment. Buyer shall be exclusively obligated to resolve or pay any claim made by any broker, finder or similar person claiming by or through Buyer or under a purported arrangement with Buyer.

9.      Conduct Prior to Closing.

9.1     Access to Records and the Purchased Assets of Sellers. From and after the date of this Agreement until the Closing Date, (a) Sellers shall, upon reasonable advance notice, afford to Buyer's officers, independent public accountants, counsel, lenders, consultants and other representatives reasonable access during normal business hours to the Purchased Assets and all records pertaining to the Purchased Assets or the Business, and (b), but only after January 1, 2018, Sellers shall facilitate Buyer's interviews of Sellers' Employees to permit Buyer to evaluate whether or not to make offers of employment to those persons. Buyer, however, shall not be entitled to have access to any materials containing privileged communications or information about Employees, disclosure of which might violate an Employee's reasonable expectation of privacy, but Sellers shall sufficiently identify such information to Buyer to enable Buyer to determine to its reasonable satisfaction the materiality of such information.

9.2     Preservation of the Purchased Assets Pending Closing. Unless Buyer otherwise consents, during the period prior to the Closing Date, subject to the orders and direction of the Bankruptcy Court, Sellers shall, taking into account Sellers' financial situation and the current operating status of the Purchased Assets, use commercially reasonable efforts to maintain and preserve the Purchased Assets, except as otherwise may be appropriate in the operation of the Business in the ordinary course of business, including the borrowing and the repayment of funds in connection with the operation of the Business pursuant to the DIP Agreement. Prior to the Closing, Sellers shall not settle, compromise, or modify any Receivables, and shall not seek collection of Receivables except in a manner consistent with Sellers' ordinary course of business and subject to the orders and direction of the Bankruptcy Court.

9.3     Transferred Employees.

9.3.1    9.3.1 Not later than fifteen (15) Business Days prior to the Closing Date, Buyer shall provide offers of employment, on such terms as Buyer may elect, to be effective as of the Closing Date if accepted by midnight on the day before the Closing Date, to approximately 175 Employees of Sellers and shall provide Sellers with a list of those Employees to whom such offers of employment have been extended.  Such list shall be appended to this Agreement as Schedule 9.3.1.  Those Employees who accept such offer of employment, with Buyer before the Closing Date are referred to as "Transferred Employees."  Nothing in this Section 9.3, expressed or implied, shall confer upon any of the Employees any right to employment or continued employment for any specified period, of any nature or kind whatsoever under or by reason of this Agreement.  It is further understood that Buyer may put conditions and restrictions on the use of PTO assumed hereunder in accordance with Buyer policies.

9.3.2    9.3.2 From and after the Closing, Buyer shall, provide all Transferred Employees with credit for service with Sellers earned prior to the Closing for eligibility and vesting purposes in each case under any benefit or compensation plan, program, agreement or arrangement in which the Transferred Employees participate on or after the Closing (collectively, the "New Plans"), except as would result in a duplication of benefits and except for equity incentive plans. In addition, Buyer shall cause to be waived all pre-existing condition exclusions and actively at-work requirements and similar limitations, eligibility waiting periods and evidence of insurability requirements under any New Plans to the extent waived or satisfied by a Transferred Employee under any comparable Employee Benefit Plan as of the date on which commencement of participation in such New Plan begins.

9.3.3    9.3.3 Except as prohibited by applicable Law, Sellers shall provide to Buyer all information reasonably necessary to permit Buyer to perform its obligations under this Section 9.3, including such information as may be reasonably requested by Buyer following the Closing.

9.4    Bankruptcy Court Approvals.

9.4.1    Commencement of Bankruptcy Cases; Bankruptcy Court Approval of Sale Procedures.  Within three (3) Business Days of the Petition Date, Sellers shall file a motion with the Bankruptcy Court requesting the entry of Sale Procedures Order and a hearing to be held on such proposed Sale Procedures on or before January 5, ____, 2018, which order shall provide, among other things, in form and content reasonably satisfactory to Buyer:

(i)    fix the  time and date and location of a hearing (the "Sale Approval Hearing") to approve Sellers' consummation of this Agreement (and Sellers shall request the same to be no more than seven (7) days after the Auction);

(ii)    fix the time and date of an auction (the "Auction") preceding the Approval Hearing to be held at the Boston offices of Brown Rudnick LLP, at which higher and better offers to purchase the Purchased Assets may be presented to Sellers (and Sellers shall request the Auction to be conducted within thirty to forty (30 to 40) days after the Bankruptcy Court enters the Sale Procedures Order);

(iii)    establish bidding procedures reasonably acceptable to Buyer;

(iv)    provide that if Buyer is not the successful bidder to purchase the Purchased Assets at the Auction, and the offer of a third party offer accepted at the Auction is subsequently

-25-

approved by the Bankruptcy Court and closes as provided by its terms, then Buyer will be entitled to receive from Sellers, without deduction or offset of any nature, Buyer's reasonable and necessary due diligence and legal expenses (not to exceed $100,000 in the aggregate) (the "Expense Reimbursement Amount") incurred in connection with its bid, including all fees and expenses incurred prior to the Petition Date, plus a flat fee payment (not dependent on amounts actually expended or incurred by Buyer) in immediately available funds in the amount of $200,000 (the "Break Up Fee"), without any deduction or offset of any nature, which payments shall be made to Buyer concurrently with the consummation of such third party sale;

(v)  provide that (a) Buyer's claim to payment of the Break Up Fee and Expense Reimbursement Amount shall be entitled to superpriority administrative expense treatment in the Bankruptcy Case, senior to all other superpriority claims and administrative expenses, other than (x) superpriority claims granted to the DIP Lender, and (y) administrative expense claims included within the "Carve-out" in the Order to which the DIP Lender's claims are subject; and (b) that the funds with which such expenses and the Break Up Fee are paid shall not be subject to any pre-petition or post-petition lien that may be asserted by or held by any entity against Sellers or the Purchased Assets, other than liens granted to the DIP Lender under the DIP Agreement;

(vi)  provide that a prospective purchaser will not be permitted to bid at the Auction unless such party has been deemed "financially qualified" by Sellers, in accordance with objective criteria set forth in the Sale Procedures Order which at a minimum shall require any such prospective purchaser to provide documentation establishing that such prospective purchaser has sufficient cash on hand or a binding financial commitment from an established financial institution to ensure such prospective purchaser's ability to meet its commitments pursuant to its bid;

(vii)  provide that no prospective purchaser who bids for the Purchased Assets at the Auction shall be entitled to purchase the Purchased Assets unless such prospective purchaser submits to Sellers in writing three Business Days prior to the Auction a bid at least equal to $100,000, in addition to the Break Up Fee and the Expense Reimbursement Amount, greater than the consideration set forth in this Agreement (including all cash, non-cash consideration and assumed liabilities) for the initial bid, and then $100,000 greater for any additional incremental bid, accompanied by a commitment to proceed to a closing on contractual terms which are in the aggregate at least as favorable to Sellers as those set forth in this Agreement and a cash deposit in the amount of $450,000500,000;

(viii)  establish a deadline of  5:00 p.m. two (2) Business Days before the Auction by which competing bids must be submitted, and providing that neither Sellers nor the Bankruptcy Court will consider, or be required to consider, any bid submitted after such deadline;

(ix)  establish a deadline  of 24 hours before the scheduled start of the Auction by which Sellers must determine and inform Buyer and all other parties who submitted a bid whether any competing bid has been deemed qualified to participate in the Auction;

(x)  provide that any holder of an allowed secured claim that is authorized to credit bid under Section 363(k) of the Bankruptcy Code must agree in writing to pay at the Closing, if it is the successful bidder, an amount in cash equal to the Break Up Fee, the Expense Reimbursement Amount and the Success Fee (in addition to the amount of its credit bid);

(xi)  require Sellers to provide to Buyer, upon Sellers' receipt thereof, a copy of any bid received by it, except not including any materials related to such bidder which Sellers are prohibited

-26-

from disclosing by the terms of a valid confidentiality agreement and also not including any financial or proprietary information submitted by such bidder;

(xii)    providing that the Sale Procedures Order shall be effective immediately upon entry; and

(xiii)    contain such other provisions as are reasonably acceptable to Buyer.

The Sale Procedures Order shall not have been amended, modified, or supplemented without the written consent of Buyer.  Should overbidding take place, Buyer shall have the right, but not the obligation, to participate in the overbidding and to be approved as the overbidder at the Sale Approval Hearing based upon any such overbid, provided, however, that Buyer shall receive a credit against any additional incremental bid in an amount equal to the ~~Break-Up Fee and the~~ Expense Reimbursement Amount, such that the amount of any competing bid shall at all times exceed the amount of Buyer's bid by at least the total of ~~the Break-Up Fee plus~~ the Expense Reimbursement Amount plus $100,000.  Sellers shall use reasonable efforts to obtain the Sale Procedures Order in form and content as provided for herein or otherwise reasonably satisfactory to Buyer.  Sellers' obligations to consummate the transactions contemplated herein which Buyer and Sellers may hereafter enter into shall be conditioned upon the Bankruptcy Court's entry of the Sale Procedures Order with terms consistent with those provide for in this Section 9.4.1, including without limitation, approval of the ~~Break-Up Fee and~~ the Expense Reimbursement Amount, and such Order being a Final Order.

9.4.2    <u>Bankruptcy Court's Approval of Sale</u>. Contemporaneously with the filing of the motion with the Bankruptcy Court requesting the entry of the Sale Procedures Order as described in Section 9.4.1, Sellers shall file a motion with the Bankruptcy Court (the "Sale Motion") requesting entry of the Sale Approval Order which order shall, among other things:

(i)    determine that this Agreement was proposed by Buyer and Sellers in good faith and represents the highest and best offer for the Purchased Assets and should be approved;

(ii)    determine that Buyer is a good faith purchaser under and entitled to the protections of Section 363(m) of the Bankruptcy Code, and that the provisions of Section 363(n) of the Bankruptcy Code have not been violated by Buyer;

(iii)    (A) approve the sale of all of the Purchased Assets to Buyer free and clear of any and all Encumbrances (other than Permitted Encumbrances) of any nature whatsoever, whether known or unknown, pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code (except as otherwise expressly agreed by Buyer under this Agreement); (B) authorize Sellers pursuant to Sections 105(a), 363(b) and 363(f) of the Bankruptcy Code to convey to Buyer all of its right, title, and interest in and to all of the Purchased Assets free and clear of any such Encumbrances (other than Permitted Encumbrances); and (C) provide that all Encumbrances (other than Permitted Encumbrances) with respect to the Purchased Assets shall attach solely to the proceeds of the sale under Section 363 of the Bankruptcy Code;

(iv)    authorize each Seller to execute, deliver, perform, consummate, and implement this Agreement and all additional instruments and documents, that may be reasonably necessary or desirable to implement the foregoing;

(v)    require each Seller (or any trustee(s) in bankruptcy that may be appointed for Sellers) to deliver to Buyer any Purchased Asset which comes into the possession, custody or control of

-27-

Sellers or such trustee(s), and to cooperate with Buyer in compelling or obtaining the turnover or deliver to Buyer of any Purchased Assets;

(vi)     reserve and retain jurisdiction in the Bankruptcy Court to interpret, enforce and effectuate the Sale Approval Order and this Agreement, and to resolve any disputes arising thereunder or hereunder upon motion by any party;

(vii)     provide that the Sale Approval Order is self-executing and effective immediately upon entry, and waive the stays under Rules 6004(h) and 6006(g) of the Federal Rules of Bankruptcy Procedure;

(viii)     approve the assumption by Sellers and assignment to Buyer of the assignment of the explicitly assumed pre-petition Contracts and Real Property Leases (collectively, the "Section 365 Contracts") pursuant to Sections 363 and 365 of the Bankruptcy Code, and orders Buyer, as part of the Purchase Price as provided in Sections 3.1.1 and 3.1.2, to pay any Cure Amounts, payable to the other parties to the Section 365 Contracts as a condition to such assignment;

(ix)     approve the rejection of the Rejected Contracts pursuant to Section 365 and 1113 and 1114 (as applicable) of the Bankruptcy Code;

(x)     establish a deadline by which each Non-debtor party to a Rejected Contract must file a proof of claim for damages arising by reason of the rejection;

(xi)     provide that Buyer does not assume, and shall have no costs, expenses, liability or obligations of any nature whatsoever for, or with respect to, any liability or obligation of any Seller of any nature whatsoever that is not expressly assumed by Buyer in writing pursuant to this Agreement and the Sale Approval Order;

(xii)     require any Person(s) having notice or knowledge of the Sale Approval Order and who is in possession of any property of a Seller that constitutes a Purchased Asset to immediately deliver such property to Buyer and account to Buyer for such property (other than possessory lienholders);

(xiii)     enjoin, prohibit and restrain any Person(s) having notice or knowledge of the Sale Approval Order from possessing or using any Purchased Assets without the prior written consent of Buyer (other than possessory lienholders), exercising any control or dominion over any Purchased Assets without the prior written consent of Buyer, or interfering with the Closing or with the rights of Buyer or its successors under this Agreement or under the Sale Approval Order with respect to the acquisition, use, exploitation and/or further disposition of the Purchased Assets, and/or from commencing, continuing or otherwise pursuing or enforcing any remedy, claim, cause of action or encumbrance against Buyer related thereto;

(xiv)     determine that Buyer does not constitute a successor to any Seller or the bankruptcy estate of any Seller, provide that Buyer shall not incur any liability as a successor to Sellers or the Business (other than the Assumed Liabilities) and determine that Buyer is not a successor to Sellers or otherwise liable for any of the Excluded Liabilities; and

(xv)     contain such other provisions as are reasonably satisfactory to Buyer.

Following the filing of the Sale Motion, Sellers shall use reasonable efforts to obtain entry of the Sale Approval Order. The Sale Approval Order shall not have been amended, modified, or supplemented without the written consent of Buyer.

Sellers' obligations to consummate the transactions contemplated herein which Buyer and Sellers may hereafter enter into shall be conditioned upon the Bankruptcy Court's entry of the Sale Approval Order in form and content satisfactory to Buyer, and such Order being a Final Order on or before March 28, 2018.

9.4.3    Notices of Sale. Sellers shall have used their best efforts to send adequate notice of the Sale Approval Hearing to all holders of Encumbrances with respect to the Purchased Assets, all counter-parties to the Contracts and the Rejected Contracts, and all counter-parties to any other contracts or obligations of Sellers that will not be assumed by Buyer. Such efforts shall include, without limitation: (i) compliance with Rules 2002(a)(2), 6004, and 6006 of the Federal Rules of Bankruptcy Procedure and all related Local Bankruptcy Rules of the Bankruptcy Court; (ii) notice to all Governmental Authorities as is required to comply with the Federal Rules of Bankruptcy Procedure and applicable local laws relating to the issuance or transfer of any governmental licenses or permits or the issuance of any required license or permit from a Governmental Authority; (iii) notice to all Employees and former employees and others receiving any benefits under any pension or Employee Benefit Plan; (iv) notice to all known creditors of any of the Sellers; and (v) publication, at Sellers' sole expense, not less than once in the journal, *Editor and Publisher,* or such other publication as the parties may mutually agree, of notice of the Sale Approval Hearing, in form and content reasonably satisfactory to Buyer and Sellers and approved by the Bankruptcy Court, which shall include particularized notice of the proposed sale of the Purchased Assets free and clear of all Encumbrances other than Permitted Encumbrances, and giving notice, and the opportunity for holders of any Encumbrances with respect to the Purchased Assets to appear and be heard.

9.4.4    DIP Agreement. At Sellers' request, Buyer has agreed to provide Sellers with a post-Petition Date loan (a "DIP Loan") up to a maximum principal amount of Five Hundred Thousand Dollars ($500,000.00), under a DIP Agreement (the "DIP Agreement"), the principal terms and conditions for which are set forth in the attached Exhibit I. On or at any time after the Petition Date, Sellers may file a motion seeking entry of an order authorizing the Sellers to enter into and perform their obligations under the DIP Agreement, which motion and order shall be in form and substance reasonably acceptable to Buyer. In the event that the Bankruptcy Court does not approve the DIP Loan or the DIP Agreement for any reason, (i) all other terms of this Agreement shall continue in full force and effect and shall be binding on the Parties in all respects, and (ii) in such event, neither Sellers nor Buyer shall have any obligations relating to the DIP Loan or the DIP Agreement.

9.4.5    No Successor Liability. The parties intend that, upon Closing, Buyer shall not be deemed to: (a) be the successor of or successor employer to Sellers for any purpose or under any theory, including as described under COBRA and applicable regulations thereunder, including with respect to any collective bargaining agreement and any Employee Benefit Plans, (b) have, de facto or otherwise, merged with or into Sellers; (c) be a mere continuation or substantial continuation of Sellers, the Business, or Sellers' enterprise(s); or (d) be liable for any acts or omissions of Sellers in the conduct of the Business or arising under or related to the Purchased Assets or the Assumed Liabilities. Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, the parties intend that Buyer shall not be liable for any Encumbrances against any Seller or any of its Affiliates, and that Buyer shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date or whether fixed or contingent, existing or hereafter arising, with respect to the Business, the Purchased Assets or any Liabilities of any Seller arising on or prior to

-29-

the Closing Date. The parties agree that a provision substantially in the form of, and with comparable effect to, this Section 9.4.4 shall be reflected in the Sale Approval Order.

9.4.6    Sellers' Additional Bankruptcy Procedure Covenants. Sellers, at their sole expense, shall promptly make any filings, take all actions, and use their commercially reasonable efforts to obtain any and all other approvals and orders necessary or appropriate for consummation of the sale of the Purchased Assets, subject to its obligations to comply with any order of the Bankruptcy Court. In the event an appeal is taken, or a stay pending appeal is requested, from any of the foregoing orders of the Bankruptcy Court, Sellers shall immediately notify Buyer of such appeal or stay request and, upon Buyer's request, shall provide to Buyer within three Business Days after Sellers' receipt thereof a copy of the related notice of appeal or order of stay. Sellers shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from any of such orders.

10.    Reimbursement and Indemnification.

10.1    Reimbursement and Indemnification of Buyer. If Buyer terminates this Agreement pursuant to Section 5.4.5, Sellers, jointly and severally, hereby agree to reimburse Buyer for the Expense Reimbursement Amount. Sellers, jointly and severally, also hereby agree defend, indemnify, and hold harmless Buyer, each of its Affiliates, and each of their respective officers, directors, stockholders, employees, representatives, agents, successors and assigns (individually, and collectively, the "Buyer Indemnitees") against and in respect of losses, liabilities, damages, actions, suits, proceedings, claims, demands, orders, assessments, amounts paid in settlement (if approved by Sellers as provided below), fines, costs or deficiencies, including, without limitation, interest, penalties and attorneys fees and costs, including the cost of seeking to enforce this indemnity to the extent such enforcement is successful, caused by or resulting or arising from, or otherwise with respect to the Excluded Liabilities.    Notwithstanding anything to the contrary herein, since the representations, warranties and covenants of Sellers under this Agreement will lapse and be of no further force or effect after the Closing, Sellers shall not have any liability or obligation under this Section 10.1 with respect to any breach or asserted breach by Sellers of any representation, warranty or covenant under this Agreement following the Closing Date.

10.1.1    Notification of Circumstance Giving Rise to Claim for Indemnification by Buyer Indemnitees. Buyer and Buyer Indemnitees hereby agree that promptly after any of them becomes aware of any circumstance which may reasonably be expected to become the subject matter of a claim for indemnification to be made by any of them against Sellers (a "Buyer Claim"), they will advise Sellers of such circumstance, and that they will afford Sellers from time to time, such information as Sellers shall reasonably request in connection therewith. Buyer shall have the right to employ separate counsel in any action brought in respect of any matter that is or may be the subject of a Buyer Claim hereunder, and shall have the right to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of Buyer. Buyer shall have exclusive control and discretion in the conduct of the defense of any such matter. Sellers shall not be required to make any indemnification hereunder with respect to any amounts paid in settlement except to the extent that Sellers have approved the terms thereof.

10.2    Terms of Deposit; Indemnification of Sellers.

10.2.1    If Sellers terminate this Agreement pursuant to Section 5.4.4, the Purchase Price Deposit shall be retained by Sellers as liquidated damages and not as a penalty. If, however, this Agreement is terminated for any other reason, including without limitation, because a sale to a competing bidder is approved by the Bankruptcy Court, the Purchase Price Deposit shall be returned

-30-

to Buyer in its entirety, together with any interest earned thereon, within three (3) Business Days of such termination.

10.2.2    Notwithstanding any provisions of this Agreement to the contrary, Sellers acknowledge and agree that Sellers' sole and exclusive remedy against Buyer for any claim or cause of action arising in connection with this Agreement shall be limited to the Purchase Price Deposit plus recovery of actual damages suffered by Buyer in an amount not to exceed (a) one million dollars ($1,000,000.00) less (b) the amount of the Purchase Price Deposit.

10.2.3    Buyer also hereby agrees to defend, indemnify, and hold harmless Sellers and each of their representatives, agents, successors and assigns (individually, and collectively, the "Seller Indemnitees") against and in respect of any and all losses, liabilities, damages, actions, suits, proceedings, claims, demands, orders, assessments, amounts paid in settlement (if approved by Buyer as provided below), fines, costs or deficiencies, including, without limitation, interest, penalties and attorneys fees and costs, including the cost of seeking to enforce this indemnity to the extent such enforcement is successful, caused by or resulting or arising from, or otherwise with respect to the Assumed Liabilities.   Notwithstanding anything to the contrary herein, since the representations, warranties and covenants of Buyer under this Agreement will lapse and be of no further force or effect after the Closing, Buyer shall not have any liability or obligation under this Section 10.2 with respect to any breach or asserted breach by Buyer of any representation, warranty or covenant under this Agreement following the Closing Date.

10.2.4    Notification of Circumstance Giving Rise to Claim for Indemnification by a Seller Indemnitee. Sellers and the Seller Indemnitees hereby agree that promptly after any of them becomes aware of any circumstance which might reasonably be expected to become the subject matter of a claim for indemnification to be made by any of them against Buyer Indemnitees under this Agreement (a "Seller Claim"), they will advise Buyer of such circumstance, and that they will afford Buyer, from time to time, such information as Buyer shall reasonably request in connection therewith. Each Seller shall have the right to employ separate counsel in any action brought in respect of any matter that is or may be the subject of a Seller Claim, and shall have the right to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Seller. Sellers shall have exclusive control and discretion in the conduct of the defense of any such matter. Buyer shall not be required to make any indemnification hereunder with respect to any amounts paid in settlement except to the extent that Buyer has approved the terms thereof.

11.    Miscellaneous.

11.1    Post-Closing Reasonable Access to Records and Certain Personnel.

11.1.1    Access to Buyer. Subsequent to the Closing Date, so long as the Bankruptcy Case is pending, and following reasonable written request by Sellers to Buyer, (i) Buyer shall permit Sellers' counsel and other professionals employed in the Bankruptcy Case reasonable access to the financial and other books and records relating to the Purchased Assets, the Excluded Assets or the Business (whether in documentary or data form) for the purpose of (a) performing its undertakings and obligations under this Agreement and (b) the continuing administration of the Bankruptcy Case (including, without limitation, the pursuit of any reserved avoidance, preference or similar action), which access shall include (x) the right of such professionals to use computer hardware and software systems included among the Purchased Assets to access data that may constitute Purchased Assets or Excluded Assets in furtherance of the purposes described above, or (y) the right of such professionals to copy, at Sellers' expense, such documents and records as they may request in furtherance of the purposes

-31-

described above, and Buyer's copying and delivering to Sellers or their professionals such documents or records as they may request (but only to the extent Sellers or their professionals furnish Buyer with reasonably detailed written descriptions of the materials to be so copied and Sellers reimburse Buyer for the reasonable costs and expenses thereof), (ii) Buyer shall provide Sellers and such professionals (at no cost to Sellers) with reasonable access to senior members of management of the Business during regular business hours to assist Sellers in the continuing administration of the Bankruptcy Case, provided that such access does not unreasonably interfere with Buyer's business operations, and (iii) Buyer shall  (A) retain all books and records with respect to the Business for at least forty-eight (48) months and thereafter  (B) give Sellers reasonable written notice prior to destroying or discarding any such books and records and in such case, if Sellers so request, Buyer shall allow Sellers to take possession of such books and records.

      11.1.2    <u>Access to Sellers</u>. Subsequent to the Closing Date, so long as the Bankruptcy Case is pending and following reasonable written request by Buyer to Sellers (i) Sellers shall permit Buyer's management personnel reasonable access to the financial and other books and records relating to the Purchased Assets, or the Business (whether in documentary or data form) for the purpose of assisting Buyer in the operation of the Business, which access shall include (a) the right of such personnel to copy, at Buyer's expense, such documents and records as they may request in furtherance of the purposes described above, and (b) Sellers' copying and delivering to Buyer or its personnel such documents or records as they may request, but only to the extent Buyer or its personnel furnishes Sellers with reasonably detailed written descriptions of the materials to be so copied and Buyer reimburses Sellers for the reasonable costs and expenses thereof, (ii) Sellers shall provide Buyer and such personnel (at no cost to Buyer) with reasonable access to senior members of management of Sellers during regular business hours to assist Buyer in the operation of the Business, provided that such access does not unreasonably interfere with Sellers' operations and shall be provided only if and so long as such personnel are retained and employed by Sellers, and (iii) Sellers shall either (A) retain all books and records with respect to the Business or (B) give Buyer reasonable written notice prior to destroying or discarding any such books and records and in such case, if Buyer so requests, Sellers shall allow Buyer to take possession of such books and records.

      11.2    <u>Notices</u>. Unless otherwise provided herein, any notice, tender, or delivery to be given hereunder by either party to the other may be effected by personal delivery in writing or by electronic-mail or facsimile, or by overnight package delivery service or registered or certified mail, postage prepaid, return receipt requested, and shall be deemed communicated as of the date delivered. Mailed notices shall be addressed as set forth below, but each party may change its address by written notice in accordance with this paragraph.

              To Sellers:          Boston Herald, Inc.
                               Seaport Center
                               70 Fargo Street, Suite 600
                               Boston, Massachusetts 02210
                               Attn: Patrick J. Purcell
                               Email: ppurcell@bostonherald.com
                               Fax: (617) 619-6551

              With copies to:      Brown Rudnick LLP
                               One Financial Center
                               Boston, Massachusetts 02111
                               Attn:   William R. Baldiga, Esq.

-32-

                              Email:  WBaldiga@brownrudnick.com
                              Fax: (617) 289-0583

              And             Paul J. Hartnett, Jr.
                              One Raeburn Terrace
                              Newton, Massachusetts 02461
                              Email:  paul.hartnett91@gmail.com
                              Fax: (617)964-7001

To Buyer:        ~~GateHouse~~ Revolution Media ~~Massachusetts I, Inc.~~Group LLC

                 ~~175 Sully's Trail~~
                 ~~Pittsford, New York 14534~~
                 ~~Attn:  Polly Grunfeld Sack~~
                 ~~Email: psack@gatehousemedia.com~~
                 ~~Fax: (585) 248-2631~~
                 1999 Ave of the Stars, Suite 3430
                 Los Angeles, CA 90067

With a copy to:  ~~Thacker Robinson Zinz LPA~~Young Conaway Stargatt & Taylor LLP

                 Attn: ~~Lynn Rowe Larsen~~Robert Brady, Esq.
                 ~~2330 One Cleveland Center~~1000 North King Street
                 ~~1375 E. 9th St.~~Wilmington, DE 19801
                 ~~Cleveland, Ohio  44114~~
                 Email: ~~llarsen@trzlaw~~rbrady@ycst.com
                 Telephone: (~~216~~302) ~~456-3840~~571-6690

        11.3    Entire Agreement. This Agreement and the documents to be executed pursuant
hereto among the parties contain the entire agreement between the parties relating to the sale of the
Purchased Assets.

        11.4    Amendment. This Agreement may be modified, amended or supplemented only
by a written instrument duly executed by all the parties hereto; provided, however, that prior to the
Closing Date, Buyer shall have the unilateral right to: (a) add to or delete from Schedule 2.1.9 such Real
Property Leases as Buyer determines; and (b) add to or delete from Schedule 2.1.10, such Contracts as
Buyer determines.

        11.5    Closing Date. All actions to be taken at the Closing pursuant to this Agreement
shall be deemed to have occurred simultaneously, and no act, document or transaction shall be deemed to
have been taken, delivered or effected until all such actions, documents and transactions have been
taken, delivered or effected.

        11.6    Severability. If in any jurisdiction any term or provision hereof is determined to
be invalid or unenforceable, (a) the remaining terms and provisions hereof shall be unimpaired, (b) any
such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such
provision in any other jurisdiction, and (c) the invalid or unenforceable term or provision shall, for
purposes of such jurisdiction, be deemed replaced by a term or provision that is valid and enforceable
and that comes closest to expressing the intention of the invalid or unenforceable term or provision.

                                    -33-

11.7    <u>Further Assurances</u>. The parties hereto will execute, acknowledge and deliver any further assurance, documents and instruments reasonably requested by any other party hereto for the purpose of giving effect to the transactions contemplated herein. After the Closing, if Sellers receive any payment on account of any Receivables conveyed under this Agreement, Sellers shall remit the proceeds of such payment, without any deduction or offset of any nature, to Buyers within five (5) Business Days after receipt. The proceeds of such receipts shall be deemed to be held in trust by Sellers for the sole benefit of Buyer, and such proceeds shall not constitute property of Sellers' estate(s) under the Bankruptcy Code.

11.8    <u>Waiver</u>. No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of other provisions, whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver shall be binding unless executed in writing by the party making the waiver.

11.9    <u>Payment of Fees and Expenses</u>. Except as expressly provided herein, each party to this Agreement shall be responsible for, and shall pay, all of its own fees and expenses, including those of its counsel, incurred in the negotiation, preparation and consummation of this Agreement and the transactions contemplated hereby.

11.10    <u>No Survival</u>. The respective representations and warranties of Sellers and Buyer set forth in Sections 6 and 7 hereof shall not survive the Closing, and, upon the Closing, shall be of no force or effect whatsoever, and the covenants and agreements of Sellers and Buyer herein, or in any certificates or other documents delivered prior to or at the Closing, shall not survive the Closing, provided, however that Sellers' indemnity obligations under Section 10.1 of this Agreement and Buyer's indemnity obligations under Section 10.2 of this Agreement shall survive closing.

11.11    <u>No Assignment; No Third Party Beneficiaries</u>. Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned or delegated by Sellers or Buyer without the prior written consent of the other parties hereto and any purported assignment or delegation in violation hereof shall be null and void; <u>provided</u> that Buyer may assign any of its rights and obligations hereunder to any one or more Persons which are Affiliates of Buyer in its sole discretion. This Agreement is not intended to, and shall not, confer upon any other Person except the parties hereto any rights or remedies hereunder.

11.12    <u>Binding Effect</u>. This Agreement shall inure to the benefit of, and be binding upon, the parties and their respective heirs, legal representatives, successors and permitted assigns. Nothing in this Agreement, express or implied, is intended to or shall confer upon any Person other than the parties, and their respective heirs, legal representatives, successors and permitted assigns, any rights, remedies, obligations or liabilities under, in connection with or by reason of this Agreement.

11.13    <u>Applicable Law and Jurisdiction</u>. This Agreement shall be governed by and construed in accordance with the Law of the State of Delaware without regard to the Law of the conflicts of Law of such State. THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO (i) THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT OR ANY ANCILLARY DOCUMENT EXECUTED PURSUANT HERETO; AND/OR (ii) THE PURCHASED ASSETS AND/OR THE ASSUMED LIABILITIES, AND THE PARTIES EXPRESSLY CONSENT TO AND AGREE NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION.

11.14    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same document. Delivery of an executed copy hereof by facsimile or email shall for all purposes be agreed to constitute such delivery of an executed copy.

11.15    Confidentiality; Publicity.

11.15.1    Subject to Section 9.4 and the requirements of the Bankruptcy Code and the Bankruptcy Court and except as otherwise explicitly provided in this Agreement, from the date hereof until the earlier of Closing Date or the date on which this Agreement is terminated, Buyer agrees that it shall, and shall cause its employees, officers, directors and Affiliates to, keep confidential all information (whether written or otherwise) provided to it by Sellers or Sellers' agents and representatives, except that Buyer may provide such information to its financial advisors, legal counsel and other consultants assisting Buyer, provided that such advisors, counsel and consultants agree to become bound by the terms of this Section 11.15.1. In the event this Agreement is terminated prior to Closing, Buyer shall return to Sellers all information provided to it by or on behalf of Sellers or shall provide Sellers with evidence reasonably satisfactory to Sellers that Buyer has destroyed such information. Buyer's obligations under this Section 11.15.1 shall not extend to information which (a) has been in the possession of or known by Buyer on a non-confidential basis prior to the receipt thereof from Sellers or its agents or representatives, (b) has become generally available to the public other than as a result of disclosure by Buyer or its agents or representatives, (c) has become available to Buyer on a non-confidential basis from a third party not prohibited from making such disclosure to Buyer, or (d) is required to be disclosed to comply with any applicable Law, provided that before Buyer makes such disclosure that Buyer use reasonable efforts to give Sellers prompt notice of the requirement or request for disclosure and use reasonable efforts to cooperate with Sellers in securing a protective order or other arrangement to limit disclosure of such confidential information only to parties agreeing to be bound by the terms of the protective order or other arrangement.

11.15.2    From and after the date hereof, Sellers shall not, without the prior written consent of Buyer, and Buyer shall not (and shall cause its Affiliates not to) without the prior written consent of Sellers, issue or permit to be issued any media, newspaper, wire service, trade journal or any other public statement, in each case concerning the transactions contemplated herein, without the approval of the other party, except as otherwise provided herein or as may be required by applicable Law, stock exchange rule or other applicable disclosure obligations, in which case the issuing party shall provide the other party, in writing, no less than one Business Day prior to such proposed statement, the content of the proposed statement and an opportunity to comment on the statement.

*[Signature page follows]*

-35-

IN WITNESS WHEREOF, the parties hereto have executed this Asset Purchase Agreement as of the day and year first above written.

BUYER:

~~GATEHOUSE~~**REVOLUTION** **MEDIA** ~~MASSACHUSETTS I, INC.~~**GROUP LLC**

By: _____
    Name:
    Title:

SELLERS:

BOSTON HERALD, INC.                HERALD MEDIA HOLDINGS, INC.

By: _____    ~~By:~~
_____             By: _____
    Name:                    Name:
    Title:                    Title:

HERALD INTERACTIVE, INC.           HERALD MEDIA, INC.

By: _____    ~~By:~~
_____             By: _____
    Name:                    Name:
    Title:                    Title:

~~62934825 v1~~

01:22693204.2 ~~06018~~

Document comparison by Workshare Compare on Tuesday, January 02, 2018 8:48:42 AM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://WORKSITE02/YCST01/22703271/1 |
| Description | #22703271v1<YCST01> - Herald - Gatehouse APA (Original) |
| Document 2 ID | interwovenSite://WORKSITE02/YCST01/22693204/3 |
| Description | #22693204v3<YCST01> - Herald/Revolution -  APA |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 149 |
| Deletions | 131 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 280 |