# **EXHIBIT B**

## **APA**

11661449.1

**ASSET PURCHASE AGREEMENT**

Dated as of February 13, 2018

by and among

**BOSTON HERALD, INC., HERALD INTERACTIVE INC., HERALD MEDIA, INC.,**

and

**HERALD MEDIA HOLDINGS, INC.,**

as SELLERS,

and

**MNG-BH ACQUISITION LLC, as BUYER**

and

**MEDIANEWS GROUP, INC., as BUYER GUARANTOR**

114333589

## TABLE OF CONTENTS

Page

Article I  DEFINITIONS; CONSTRUCTION........................................................................................1
Section 1.1          Definitions...................................................................................................1
Section 1.2          Rules of Construction. ................................................................................6

Article II  TRANSFER OF ASSETS ...................................................................................................7
Section 2.1          Purchase and Sale of the Purchased Assets................................................7
Section 2.2          Excluded Assets. ........................................................................................9
Section 2.3          Instruments of Transfer...............................................................................9

Article III  CONSIDERATION ........................................................................................................10
Section 3.1          Purchase Price............................................................................................10
Section 3.2          Assumed Liabilities; Excluded Liabilities. ...............................................11
Section 3.3          Determination of Net Working Capital.......................................................11

Article IV  CLOSING TRANSACTIONS; ........................................................................................13
Section 4.1          Closing. ......................................................................................................13
Section 4.2          Closing Date...............................................................................................13
Section 4.3          Sellers' Deliveries to Buyer at Closing......................................................13
Section 4.4          Buyer's Deliveries to Sellers at Closing. ..................................................14
Section 4.5          Prorations ...................................................................................................14
Section 4.6          Transfer Taxes. ..........................................................................................15
Section 4.7          Possession ..................................................................................................15

Article V  CONDITIONS PRECEDENT TO CLOSING ...................................................................15
Section 5.1          Conditions to Sellers' Obligations. ...........................................................15
Section 5.2          Conditions to Buyer's Obligations.............................................................15
Section 5.3          Waiver.........................................................................................................16
Section 5.4          Termination.................................................................................................16

Article VI  SELLERS' REPRESENTATIONS AND WARRANTIES................................................17
Section 6.1          Validity of Agreement ...............................................................................17
Section 6.2          Organization, Standing and Power.............................................................17
Section 6.3          No Violation; Third Party Consents...........................................................17
Section 6.4          Title to Purchased Assets ...........................................................................18
Section 6.5          No Litigation...............................................................................................18
Section 6.6          Intellectual Property...................................................................................18
Section 6.7          Material Agreements and Licenses.............................................................18
Section 6.8          Employee Matters.......................................................................................19
Section 6.9          Permits and Licenses..................................................................................20
Section 6.10         Brokers........................................................................................................20
Section 6.11         Environmental Matters................................................................................20
Section 6.12         Financial Statements ..................................................................................21

Article VII  BUYER'S REPRESENTATIONS AND WARRANTIES ...............................................21
Section 7.1          Validity of Agreement ...............................................................................21
Section 7.2          Organization, Standing and Power.............................................................21
Section 7.3          No Violation; Third Party Consents...........................................................21
Section 7.4          Financing.....................................................................................................22
Section 7.5          "As Is" Transaction....................................................................................22

Article VIII  BROKERS ............................................................................................................23
Section 8.1          Brokers..........................................................................................................23

Article IX  CONDUCT PRIOR TO CLOSING ..........................................................................23
Section 9.1          Conduct Prior to Closing...............................................................................23
Section 9.2          Preservation of the Purchased Assets Pending Closing .................................23
Section 9.3          Buyer Employees ...........................................................................................23
Section 9.4          Bankruptcy Court Approvals .........................................................................24

Article X  INDEMNIFICATION ................................................................................................27
Section 10.1        Indemnification of Buyer...............................................................................27
Section 10.2        Indemnification of Sellers..............................................................................28

Article XI  MISCELLANEOUS ..................................................................................................28
Section 11.1        Buyer Guaranty ..............................................................................................28
Section 11.2        Post-Closing Reasonable Access to Records and Certain Personnel............29
Section 11.3        Notices ............................................................................................................30
Section 11.4        Entire Agreement............................................................................................31
Section 11.5        Amendment.....................................................................................................31
Section 11.6        Closing Date....................................................................................................31
Section 11.7        Severability .....................................................................................................31
Section 11.8        Further Assurances..........................................................................................32
Section 11.9        Waiver..............................................................................................................32
Section 11.10      Payment of Fees and Expenses ......................................................................32
Section 11.11      No Survival .....................................................................................................32
Section 11.12      No Assignment; No Third Party Beneficiaries ..............................................32
Section 11.13      Binding Effect.................................................................................................32
Section 11.14      Applicable Law and Jurisdiction....................................................................32
Section 11.15      Counterparts....................................................................................................33
Section 11.16      Confidentiality; Publicity ...............................................................................33

Exhibits

Exhibit A – Form of Assignment and Assumption Agreement
Exhibit B – Form of Assignment of Proprietary Rights
Exhibit C – Form of Bill of Sale
Exhibit D – Form of Officer's Certificate (Sellers)
Exhibit E – Form of Sale Approval Order
Exhibit F – [Intentionally Omitted.]
Exhibit G – Form of Officer's Certificate (Buyer)
Exhibit H – Form of Sale Procedures Order

Schedules

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is made and entered into as of this 13th day of February, 2018, by and among (1) **MNG-BH ACQUISITION LLC** ("Buyer"), (2) solely for the purposes of its obligations under Section 11.1 of this Agreement, **MEDIANEWS GROUP, INC.** ("Buyer Guarantor"), and (3) **BOSTON HERALD, INC.**, **HERALD INTERACTIVE INC.**, **HERALD MEDIA, INC.**, and **HERALD MEDIA HOLDINGS, INC.** (each, individually, a "Seller", and collectively, "Sellers").

## RECITALS

WHEREAS, Sellers own and operate a media business (the "Business"), which business includes the publication, sale and distribution of the Boston Herald newspaper and related website, digital news and sports apps, and an internet radio platform (collectively, the "Media Assets") and other business ventures related thereto;

WHEREAS, as promptly as practicable following the execution and delivery hereof (but in no event more than three (3) Business Day(s) after the date of this Agreement), each of Sellers plans on filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (as defined herein) commencing cases (collectively, the "Bankruptcy Case") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), and Sellers will request that their cases be jointly administered by the Bankruptcy Court;

WHEREAS, Buyer desires to purchase from Sellers, and Sellers desire to sell to Buyer, the Purchased Assets all upon the terms and subject to the conditions set forth herein and with the approval of the Bankruptcy Court pursuant to the Bankruptcy Code;

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.     Definitions and Rules of Construction.

    1.1     Definitions.

        1.1.1   "Adverse Interests" has the meaning set forth in the Sale Approval Order.

        1.1.2   "Affiliate" means, with respect to any Person, (a) any other Person directly or indirectly Controlling, Controlled by or under common Control with, such Person, (b) any other Person that owns or Controls 10% or more of any class of equity securities (including any equity securities issuable upon the exercise of any option or convertible security) of such Person or any of its Affiliates, or (c) any director, partner, member, officer, manager, agent, employee or relative of such Person.

        1.1.3   "Agreement" has the meaning set forth in the preamble.

        1.1.4   "Assignment and Assumption Agreement" has the meaning set forth in Section 3.2.1.

        1.1.5   "Assignment of Proprietary Rights" has the meaning set forth in Section 4.3.2.

        1.1.6   "Assumed Contracts" has the meaning set forth in Section 2.1.10.

1.1.7   "Assumed Liabilities" has the meaning set forth in Section 3.2.1.

1.1.8   "Bankruptcy Case" has the meaning set forth in the recitals.

1.1.9   "Bankruptcy Code" means the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. as the same may be amended from time to time.

1.1.10   "Bankruptcy Court" has the meaning set forth in the recitals.

1.1.11   "Bill of Sale" has the meaning set forth in Section 4.3.3.

1.1.12   [Intentionally Omitted.]

1.1.13   "Business" has the meaning set forth in the recitals.

1.1.14   "Business Day" means any day other than a Saturday, Sunday, Federal holiday or other day that banks in the State of New York are required or permitted by Law to be closed.

1.1.15   "Buyer" has the meaning set forth in the preamble.

1.1.16   "Buyer Claim" has the meaning set forth in Section 10.1.1.

1.1.17   "Buyer Employees" has the meaning set forth in Section 9.3.1.

1.1.18   "Buyer Guarantor" shall have the meaning ascribed to such term in the preamble.

1.1.19   "Buyer Indemnitees" has the meaning set forth in Section 10.1.

1.1.20   "Buyer Liabilities" has the meaning set forth in Section 11.1.1.

1.1.21   "Closing" has the meaning set forth in Section 4.1.

1.1.22   "Closing Balance Sheet" has the meaning set forth in Section 3.3.2.

1.1.23   "Closing Date" has the meaning set forth in Section 4.2.

1.1.24   "Closing Net Working Capital Amount" has the meaning set forth in Section 3.3.2.

1.1.25   "Closing Statement" has the meaning set forth in Section 3.3.2.

1.1.26   "Collective Bargaining Agreement" shall mean any oral or written contract, agreement, or understanding with any union, works council, labor organization, or other Person purporting to act as a representative of any Employees with respect to wages, hours, or other terms and conditions of employment.

1.1.27   "Control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with") means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

1.1.28   "Copyrights" has the meaning set forth in Section 2.1.4.

1.1.29 "Cure Amounts" has the meaning set forth in <u>Section 3.1.3</u>.

1.1.30 "CWA Section 1113/1114 Order" means the Agreed Order (I) Authorizing Rejection of Collective Bargaining Agreements and (II) Modifying Retiree Benefit Obligations Pursuant to Sections 1113(c) and 1114(g) of the Bankruptcy Code dated February 1, 2018 [Docket No. 213].

1.1.31 "DIP Agreement" means the DIP Agreement dated December of 2017, by and among Sellers and the DIP Lender, pursuant to which the DIP Lender agreed to provide Sellers with a loan up a maximum principal amount of Five Hundred Thousand Dollars ($500,000).

1.1.32 "DIP Lender" means Gatehouse Media Massachusetts I, Inc.

1.1.33 "Employees" means all of the employees of Sellers on the date of execution of this Agreement, as well as any additional persons who become employees of Sellers during the period of time from the date of execution of this Agreement through and including the Closing Date.

1.1.34 "Employee Benefit Plan" has the meaning set forth in <u>Section 6.8.2</u>.

1.1.35 "Encumbrance" means any lien (statutory or otherwise), claim, hypothecation, Liability, security interest, interest, mortgage, pledge, restriction, charge, instrument, preference, priority, security agreement, easement, covenant, encroachment, option, right of recovery, Tax (including foreign, federal, state and local Tax), or encumbrance, of any kind or nature (including, without limitation, (a) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (b) any assignment or deposit arrangement in the nature of a security device, and (c) any leasehold interest or other right, in favor of a third party, to use any portion of the Purchased Assets), whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

1.1.36 "Estimated Closing Balance Sheet" has the meaning set forth in <u>Section 3.3.1</u>.

1.1.37 "Estimated Net Working Capital Amount" has the meaning set forth in <u>Section 3.3.1</u>.

1.1.38 "Excluded Assets" has the meaning set forth in <u>Section 2.2</u>.

1.1.39 "Excluded Liabilities" has the meaning set forth in <u>Section 3.2</u>.

1.1.40 "Final Order" shall mean that an Order entered by the Bankruptcy Court has not been reversed or stayed, and as to which Order no appeal or motion, petition, or writ seeking reversal, reconsideration, reargument, rehearing, certiorari, amendment, modification, stay or similar relief is pending, and the time to file any such appeal, motion, petition or writ has expired.

1.1.41 "Financial Statements" has the meaning set forth in <u>Section 6.12</u>.

1.1.42 "GAAP" shall mean United States generally accepted accounting principles as in effect from time to time, consistently applied.

1.1.43 "Governmental Authority" means any U.S. federal, state, foreign or local government, any court, tribunal, administrative agency or commission, or any other governmental, enforcement or other regulatory authority, body or agency, with jurisdiction over the matter in question.

1.1.44 "Guaranty" shall have the meaning ascribed to such term in Section 11.1.

1.1.45 "Independent CPA" has the meaning set forth in Section 3.1.4(a).

1.1.46 "Intellectual Property" means all Copyrights (as defined in Section 2.1.4), all Trademarks (as defined in Section 2.1.16), all trade secrets, customer lists, know how, commercial, marketing and other information, data and material of the kind normally considered to be confidential or proprietary in nature, including  without limitation computer source code, financial information, customer lists, product documentation, lead lists, know-how and trade secrets, and all items of intangible personal property commonly referred to as intellectual property and all rights therein, whether common law, statutory or otherwise, domestic and foreign, and all registrations and registration applications for any such rights owned by Sellers.

1.1.47 "Internal Revenue Code" means the Internal Revenue Code of 1986, as amended, any successor statute thereto and the rules and regulations promulgated thereunder.

1.1.48 "Law" means all federal, state, local and foreign laws, statutes, ordinances, rules or regulations, legally binding administrative policies or guidance documents, orders, injunctions, decrees and administrative rulings promulgated by any court or other Governmental Authority.

1.1.49 "Liability" means any indebtedness, obligation or other liability (whether absolute, accrued, matured, contingent, known or unknown, fixed or otherwise, or whether due or to become due), including, without limitation, any fine, penalty, judgment, award or settlement respecting any judicial, administrative or arbitration proceeding, damage, loss, claim or demand with respect to any Law or governmental order.

1.1.50 "Material Adverse Effect" means any change or effect that is or would reasonably be expected to be materially adverse to the Business (including, without limitation, changes in relationships with customers and suppliers), assets, operations, financial condition or results of operations of the Business, taken as a whole, except for any such changes or effects resulting directly or indirectly from (i) the financial condition of any of Sellers, (ii) the Bankruptcy Case or matters related thereto, (iii) the transactions contemplated by this Agreement, (iv) the announcement or other disclosure of the transactions contemplated by this Agreement or (v) an event or circumstance or series of events or circumstances affecting (A) the Business generally or the particular segments thereof in which the Business operates in any location in which the Business operates or (B) the United States economy generally.

1.1.51 "Media Assets" has the meaning set forth in the recitals.

1.1.52 [Intentionally Omitted.]

1.1.53 "Multiemployer Plan" has the meaning set forth in Section 3.2.2.

1.1.54 "Net Purchase Price" has the meaning set forth in Section 3.1.3.

1.1.55 "New Plans" has the meaning set forth in Section 9.3.2.

1.1.56 "NWC Date" has the meaning set forth in Section 3.3.1.

1.1.57 "Outside Date" has the meaning set forth in Section 4.2.

1.1.58 "Permitted Encumbrances" means (a) any Assumed Liability, and (b) Encumbrances for Taxes which are not yet due and payable.

1.1.59 "Person" means a natural person, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, any other business entity, or a governmental entity (or any department, agency, or political subdivision thereof).

1.1.60 "Petition Date" means the date on which the Bankruptcy Case is commenced.

1.1.61 "Post-petition Contract Obligations" has the meaning set forth in Section 3.1.3.

1.1.62 "Publications" has the meaning set forth in Section 2.1.1.

1.1.63 "Purchased Assets" has the meaning set forth in Section 2.1.

1.1.64 "Purchase Price" has the meaning set forth in Section 3.1.1.

1.1.65 "Purchase Price Allocation" has the meaning set forth in Section 3.1.4.

1.1.66 "Purchase Price Deposit" has the meaning set forth in Section 3.1.2.

1.1.67 "Purchased Avoidance Actions" has the meaning set forth in Section 2.1.21.

1.1.68 "Receivables" has the meaning set forth in Section 2.1.7.

1.1.69 "Rejected Contracts" shall mean any contracts or agreements to which any one or more Sellers is a party that are not assumed and assigned to Buyer under Section 2.1.10 hereof.

1.1.70 "Resolution Period" has the meaning set forth in Section 3.3.7.

1.1.71 "Review Period" has the meaning set forth in Section 3.3.3.

1.1.72 "Sale Approval Order" has the meaning set forth in Section 4.3.6.

1.1.73 "Sale Motion" means that certain Debtors' Motion for Orders: (A)(I) Approving Auction Procedures and Related Bid Protections; (II) Scheduling a Hearing to Consider the Sale of the Debtors' Assets; and (B) Authorizing and Approving (I) the Sale of the Debtors' Assets Free and Clear of Liens, Claims, and Encumbrances; (II) the Assumption of Certain Executory Contracts and Unexpired Leases; and (III) Granting Related Relief which Sellers filed with the Bankruptcy Court on December 8, 2017 [Docket No. 13].

1.1.74 "Sale Procedures" means the sale procedures approved by the Bankruptcy Court.

1.1.75 "Sale Procedures Order" has the meaning set forth in Section 4.4.6.

1.1.76 "Section 365 Contracts" has the meaning set forth in Section 9.4.2(viii).

1.1.77 "Section 1113/1114 Motion" means the Motion of Debtors and Debtors in Possession for an Entry of an Order Pursuant to Sections 105(A), 363(B), 365(A), 1113(c) and 1114(g) of the Bankruptcy Code to (I) Reject Collective Bargaining Agreements and (II) Modify Retiree Benefit Obligations, Nunc Pro Tunc to December 29,2017 [Docket No. 100].

1.1.78   "Seller Claim" has the meaning set forth in Section 10.2.4.

1.1.79   "Seller Indemnitees" has the meaning set forth in Section 10.2.3.

1.1.80   "Sellers" has the meaning set forth in the preamble.

1.1.81   "Sellers' Knowledge" shall mean the actual knowledge of Patrick J. Purcell or Jeffrey W. Magram.

1.1.82   "Subscription Liabilities" shall mean the liabilities of Sellers for the prepaid subscriptions set forth on Schedule 1.1.82.

1.1.83   "Success Fee" shall mean any success fee payable pursuant to and as defined in the Application for Order Authorizing the Retention and Employment of Dirks Van Essen & Murray as of the Petition Date, as Investment Banker to the Debtors Pursuant to Bankruptcy Code Sections 327, 328, 330 and 331, Fed. R. Bankr. P. 2014(a) and 2016, and Local Bankruptcy Rules 2014-1 and 2016-1, to be filed by Sellers within three (3) Business Days of the Petition Date.

1.1.84   "Tax" means any federal, state, county, provincial, local or foreign income, gross receipts, sales, use, ad valorem, employment, severance, transfer, gains, profits, excise, franchise, property, capital stock, premium, minimum and alternative minimum or other taxes, fees, levies, duties, assessments or charges of any kind or nature whatsoever imposed by any Governmental Authority (whether payable directly or by withholding), together with any interest, penalties (civil or criminal), additions to or additional amounts imposed by, any Governmental Authority with respect thereto.

1.1.85   "Trademarks" has the meaning set forth in Section 2.1.16.

1.1.86   "WARN Act" has the meaning set forth in Section 9.3.4.

1.1.87   "Wire Transfer Amount" has the meaning set forth in Section 3.1.3.

1.2   Rules of Construction.

1.2.1   When the context in which words are used in this Agreement indicates that such is the intent, words used in the singular shall have a comparable meaning when used in the plural, and vice versa; pronouns stated in the masculine, feminine or neuter shall include each other gender.

1.2.2   The Section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the Parties and shall not in any way affect the meaning or interpretation of this Agreement.

1.2.3   The term "including" is not limiting and means "including, without limitation."

1.2.4   Unless otherwise expressly provided herein, (i) references to agreements (including this Agreement) and other contractual instruments shall be deemed to include all subsequent amendments and other modifications thereto, (ii) references to any statute or regulation shall be construed as including all statutory and regulatory provisions amending, replacing, supplementing or interpreting such statute or regulation, except that for purposes of determining the accuracy of any representation, such reference shall only be to such statute or regulation as in effect on the date the representation was made and (iii) references to "Sections," "Schedules" or "Exhibits" are to sections, schedules or exhibits, as applicable, of this Agreement.

1.2.5    Unless otherwise expressly provided herein, "dollars" or "$" means the currency of the U.S. that, as at the time of payment, is legal tender for the payment of public and private debts.

1.2.6    This Agreement is between financially sophisticated and knowledgeable parties and is entered into by such parties in reliance upon the economic and legal bargains contained herein. The language used in this Agreement has been negotiated by the parties and their representatives and shall be interpreted and construed in a fair and impartial manner without regard to such factors as the party who prepared, or caused the preparation of, this Agreement or the relative bargaining power of the parties.

2.    Transfer of Assets.

2.1    Purchase and Sale of Assets.  On the Closing Date, in consideration of the Purchase Price and the covenants, representations and obligations of Buyer hereunder, and subject to the conditions hereinafter set forth, Sellers shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Sellers free and clear of all Adverse Interests (other than Permitted Encumbrances) to the extent permitted under Sections 105(a), 363 and 365 of the Bankruptcy Code as of the Closing Date, all of Sellers' right, title and interest in and to the Business and all of Sellers' right, title and interest in the assets used or held for use in connection with, or otherwise related to, the Business, wherever located, excluding, however, the Excluded Assets (collectively, the "Purchased Assets"), including the following (in each case to the extent transferable):

2.1.1    Media Assets.  All of Sellers' right, title and interest in the publications published by Sellers, including without limitation the publications referred to in Schedule 2.1.1, and all of Sellers' rights to prepare, publish, sell and distribute such publications and any other publications, extensions (including website and social media domain names and content) or spinoffs derived from such publications or related thereto in all languages (collectively, the "Publications");

2.1.2    Inventories.  All inventories of back and current issues of the Publications; editorial material, work in process, finished goods, manuscripts, notes and drafts, graphic artwork, cuts, photographs and negatives owned by Sellers; promotional materials, inserts, and direct mail materials owned by Sellers; stationery, supplies, purchase orders, forms, labels, shipping materials and catalogs owned by Sellers; and all lists owned by Sellers of contributors, authors, correspondents, reviewers, photographers, illustrators and editors who contribute or have contributed to any of the Publications or otherwise to the Business;

2.1.3    Circulation Information.  All circulation, delivery and mailing lists and carrier routes maintained by Sellers, all data related to such lists, all circulation readership studies, audience surveys and research owned by Sellers, and all other mailing lists, together with all records, reports and tapes of computer data owned by Sellers;

2.1.4    Copyrights. All of Sellers' right, title and interest in any copyrights (the "Copyrights"), whether registered or unregistered, in published works and unpublished works, and pending applications to register the same, including all copyrights covering each issue of each of the Publications, and the contents and components thereof;

2.1.5    Advertising Materials.  All lists, files, books and records of Sellers to the extent they relate to the advertisers of, for or in any of the Publications, including, but not limited to, rate cards, verification cards, advertising insertion orders, specimen copies of all advertisements carried in any of the Publications, and copies of current price lists, discount lists, catalogs, public relations materials, sales correspondence, call reports, call books and sales promotion lists;

2.1.6    Advertising and other Revenue Generating Agreements. All of Sellers' agreements for advertising contracts, space reservations, insertion orders and all lists of, files, books and records of Sellers related thereto, including prospect lists for advertising in any of the Publications;

2.1.7    Receivables. All accounts and other amounts receivable and all Sellers' other rights to payment, causes of action, claims and rights of recovery to the extent they relate to the Publications or the Business, whether arising or accruing prior to, on or after the Closing Date, whether in respect of advertising, subscriptions, mailing lists or newsstand orders or otherwise, including those accounts and other amounts receivable set forth on Schedule 2.1.7 to be delivered at the Closing (which Schedule 2.1.7 shall be updated at Closing) (collectively, the "Receivables");

2.1.8    Personal Property. All fixed and tangible personal property, including furniture, fixtures and equipment of Sellers (in addition to property otherwise identified in this Section 2.1), and including those items identified in Schedule 2.1.8;

2.1.9    [Intentionally omitted.];

2.1.10    Contracts. Those contracts, agreements and leases to which any Seller is or Sellers are a party which are specifically identified in Schedule 2.1.10(a), as it may be updated from time to time at any time by adding or removing contracts, agreements and leases prior to Closing in accordance with Section 11.5 by filing an amended Schedule 2.1.10(a) or Schedule 2.1.10(b), as applicable, with the Bankruptcy Court (the "Assumed Contracts"). Each of the contracts, agreements and leases set forth on Schedule 2.1.10(b), together with all other contracts, agreements and leases not expressly included in the Purchased Assets (and specifically including but not limited to any Collective Bargaining Agreement and the real property lease with 451 D Street, LLC) shall be collectively referred to as the "Rejected Contracts" and shall not be assumed;

2.1.11    Books and Records. All other books (except for Sellers' corporate minute books and similar legal records of corporate existence and affairs, as opposed to their business operations), financial records, invoices, shipping records, supplier lists and other documents, records, data files and service manuals owned by Sellers, excluding any personnel records of Employees which shall not be Purchased Assets;

2.1.12    Software. All of Sellers' right, title and interest in and to all computer software and programs used in the conduct of the Business and any rights thereto, except those that by their terms are not transferable;

2.1.13    Claims. All claims, causes of action, rights of recovery and rights of set-off of any kind (including, without limitation, rights under and pursuant to all warranties, representations and guarantees made by suppliers of products, materials or equipment, or components thereof) of Sellers related to the Purchased Assets or the Business, other than any such claims or causes of action relating to the GoLocalProv article that was published online on February 5, 2018;

2.1.14    Goodwill. The goodwill of or pertaining to the Business, Purchased Assets and Publications;

2.1.15    Insurance Claims and Proceeds. Except for Sellers' policies of director and officer liability insurance, all claims under insurance policies, and all proceeds from claims under such insurance policies;

2.1.16  Trademarks.  All of Sellers' right, title and interest in and to all trademarks, service marks, logos, trademark registrations or applications, service mark registrations or applications, trade names, domain names and brand names owned and used by Sellers in connection with any of the Purchased Assets, Publications and the Business (collectively, the "Trademarks") and the goodwill related thereto;

2.1.17  Subscriber Information.  The names and addresses of all Subscribers to any of the Publications, all data to the extent it relates to such subscribers, and all rights to own, manage, use and rent the names and addresses of all subscribers to any of the Publications to the full extent that such information and data could be used by Sellers;

2.1.18  Prepaid Expenses.  All security deposits, prepaid expenses and charges paid by Sellers or their Affiliates prior to the Closing Date in respect of the Purchased Assets or the Business and pertaining to periods after the Closing Date, including those described on Schedule 2.1.18;

2.1.19  Other Intangibles.  All telephone numbers, websites and URLs owned, licensed or otherwise used by Sellers in connection with the Business;

2.1.20  Warranties.  All currently effective warranties and guaranties, if any, given to any Seller by any contractor, supplier or manufacturer which has provided or is providing services or goods in connection with the Purchased Assets or the Business; and

2.1.21  Purchased Avoidance Actions.  All avoidance claims or causes of action available to Sellers or their estates under chapter 5 of the Bankruptcy Code, including Sections 544, 545, 547, 548, 549, 550 and 553, or similar state laws, against customers or other counterparties to the Assumed Contracts or against Buyer Employees to the extent such avoidance claims or causes of action relate to any Assumed Contract or seek relief as to any such Buyer Employee (collectively, "Purchased Avoidance Actions"); provided, however, the Purchased Avoidance Actions shall not include any such avoidance claims or causes of action against insiders of the Sellers as defined in the Bankruptcy Code.

2.2     Excluded Assets.  Anything in this Agreement to the contrary notwithstanding, the Purchased Assets shall not include the following (collectively, the "Excluded Assets"): (i) any cash, cash collateralizing letters of credit, bank or other financial accounts of Sellers and all rights, claims and causes of action relating to any of the foregoing; (ii) all preference, fraudulent conveyance claims of Sellers or their estates arising under part V of the Bankruptcy Code or similar state laws (other than Purchased Avoidance Actions); (iii) Sellers' rights under this Agreement and all cash and non-cash consideration payable or deliverable to Sellers pursuant to the terms and provisions hereof; (iv) insurance proceeds, claims and causes of action with respect to or arising in connection with (A) any contract which is not included within the Purchased Assets including but not limited to the Collective Bargaining Agreements and all other Rejected Contracts, (B) any item of tangible or intangible property not included within the Purchased Assets, or (C) any Excluded Liability; (v) any tax attribute of Sellers, including any right to any tax refund or net operating loss; (vi) any professional retainer paid by Sellers; (vii) any intercompany obligations owing to Sellers; (viii) any and all of Sellers' right, title and interest in and to any and all real property; (ix) Sellers' policies of directors and officers liability insurance and all premiums, claims and rights thereunder or relating thereto; (x) Sellers' corporate records, journals, ledgers and books of original entry, all of Sellers' internal audit, evaluation and assessment reports, all of Sellers' tax records and all of those documents and other records which any of Sellers may be required to maintain by Law, or may be maintained by any of Sellers with respect to its Employees, Employee Benefit Plans, or with respect to other Excluded Assets; (xi) the Rejected Contracts; and (xii) any other item set forth on Schedule 2.2 hereof.

2.3     Instruments of Transfer.  The sale, assignment, transfer, conveyance and delivery of the Purchased Assets to Buyer and the assumption of the Assumed Liabilities provided herein by Buyer shall be made by assignments, bills of sale, and other instruments of assignment, transfer and conveyance provided for herein and such other instruments as may reasonably be requested by Buyer or Sellers in each case naming the appropriate Seller or Sellers to which such instrument pertains.  None of the foregoing documents shall amend or expand in any way the obligations imposed or rights conferred by this Agreement upon Sellers or Buyer.

3.     Consideration.

3.1     Purchase Price.

3.1.1     The total aggregate consideration for the Purchased Assets shall be (a) $9.6 million plus $1.0 million earmarked to pay Employees in accordance with the terms of paragraph 9(b) of the CWA Section 1113/1114 Order (the "Purchase Price"), (b) the Closing Net Working Capital Amount (as determined in accordance with Section 3.3 below), (c) the Assumed Liabilities, and (d) the Cure Amounts.

3.1.2     As of the date hereof, Buyer has deposited into escrow with Sellers an earnest money deposit (the "Purchase Price Deposit") in the amount of Six-Hundred and Ten-Thousand Dollars ($610,000.00) as security for the performance of Buyer's obligations under this Agreement.   The Purchase Price Deposit shall be kept in a segregated account not used for any other purpose (and Buyer shall have information access to such account) and shall be applied against the Purchase Price at Closing. Except as set forth in Section 10.2.1, if this Agreement shall be terminated pursuant to Section 5.4, the Purchase Price Deposit, together with any interest earned thereon, shall be promptly delivered to Buyer.

3.1.3     On the Closing Date, Buyer shall (i) pay the Purchase Price (less the Purchase Price Deposit) and the Estimated Net Working Capital Amount (as determined in accordance with Section 3.3) (the "Net Purchase Price") to Sellers by wire transfer (the "Wire Transfer Amount") in immediately available funds and (ii) deliver to Sellers in accordance with such instructions provided by Sellers to Buyer prior to the Closing Date, by wire transfer in immediately available funds, all cure amounts owing under any of the Assumed Contracts as of the Closing Date pursuant to an order of the Bankruptcy Court to be paid as a condition to Sellers' assignment to Buyer of any Assumed Contracts but excluding any amounts due and owing under any Assumed Contracts relating to the period from the Petition Date through the Closing Date which are Sellers' obligations (the "Post-petition Contract Obligations") (collectively, the "Cure Amounts").  On the Closing Date, Sellers shall pay all such Post-petition Contract Obligations to the counterparties to such Assumed Contracts.  If the Estimated Working Capital amount is negative, such amount shall be subtracted from the Net Purchase Price in order to determine the Wire Transfer Amount.

3.1.4     (a)  Buyer shall prepare and deliver to Sellers within 60 calendar days after the Closing Date a schedule setting forth the allocation of the Purchase Price and any other relevant items among the Purchased Assets for all Tax purposes (the "Purchase Price Allocation").  The allocation shall be considered final and binding on the parties, unless, within 30 calendar days after the delivery of the Purchase Price Allocation by Buyer, Sellers notify Buyer that they have a good faith objection to the allocation set forth in the Allocation Schedule.  If Sellers timely make such an objection, Buyer and Sellers shall work in good faith to resolve such dispute within 20 calendar days from the date Sellers deliver the objection to Buyer.  In the event that Buyer and Sellers are unable to resolve such dispute within the 20 calendar day period, the issue(s) in dispute will be submitted to an independent accounting firm, Gray, Gray & Gray, LLP (the "Independent CPA") for resolution.  The determination of the independent accounting firm shall be final, binding, and conclusive on the parties.  Buyer, on the one

hand, and Sellers, on the other hand, shall each bear fifty percent (50%) of the fees and expenses of the independent accounting firm. In the event of any adjustments to the Purchase Price, the parties hereto shall cooperate to adjust the Purchase Price Allocation.

(b)    Buyer and Sellers each shall report all Taxes and file all Tax Returns (including amended Tax Returns and claims for refund) consistent with the Purchase Price Allocation, and shall take no position contrary thereto or inconsistent therewith (including, in any audits or examinations by any taxing authority or any other proceedings), unless, and then only to the extent, required by a final determination. Buyer and Sellers shall exchange completed and executed forms with respect to the allocation (including Internal Revenue Service Form 8594 and any comparable forms required to be filed for state or local Tax purposes) at least 30 calendar days prior to the due date for filing such forms and shall cooperate in the filing of any forms (including Form 8594) with respect to such Purchase Price Allocation, including any amendments to such forms required with respect to any adjustment to the Purchase Price, pursuant to this Agreement. Notwithstanding any other provisions of this Agreement, the foregoing agreement shall survive the Closing Date without limitation.

3.2    Assumed Liabilities; Excluded Liabilities.

3.2.1    Effective as of the Closing Date, Buyer shall assume and perform (and indemnify and hold Sellers harmless against in accordance with Section 10.2): (a) all liabilities and obligations arising out of or related to the ownership, use and operation of the Purchased Assets and accruing after the Closing Date and all liabilities and obligations for which Buyer is responsible pursuant to Section 4.5; (b) all liabilities and obligations arising and accruing after the Closing Date with respect to the Buyer Employees as a result of such Buyer Employees' employment with Buyer; (c) all liabilities and obligations accruing after the Closing Date under the Assumed Contracts listed on Schedule 2.1.10(a) as such schedule may be amended in accordance with Section 2.1.10; (d) the Subscription Liabilities (collectively, "Assumed Liabilities"), and shall execute and deliver an assignment and assumption agreement substantially in the form annexed hereto as Exhibit A with respect thereto; and (e) all post-petition accounts payable incurred in the ordinary course of the Business, excluding (i) payables to Globe Newspaper Company, Inc. or its Affiliates; (ii) payables for insurance; (iii) payables for audit expense; and (iv) any bankruptcy related costs including professional fees(the "Assignment and Assumption Agreement").

3.2.2    Buyer shall not assume or be obligated to pay, perform, discharge or in any way be responsible for any Liabilities other than the Assumed Liabilities, and specifically shall not assume or be obligated to perform or otherwise be responsible for any obligations or Liabilities under any Rejected Contracts, Collective Bargaining Agreement, employment agreement, consulting or contractor agreements, any Liabilities under any pension plan (including without limitation any past, present or future withdrawal liability under any such plan) or other Employee Benefit Plan of the Sellers, any Liabilities for workers' compensation, severance, termination, WARN, and/or retention, any Liabilities for vacation, sick leave, personal days, or other forms of paid time off, any Liabilities accruing, arising out of, or relating to any federal, state or local investigations of, or claims or actions against, any Seller or any Employee, agent, vendor or representative of any Seller arising out of actions prior to or on the Closing Date (other than rights of setoff or recoupment claims), any Liabilities incurred pursuant to the DIP Agreement, (collectively, the "Excluded Liabilities"). Employee Benefit Plans and any Liabilities relating thereto (including, but not limited to, withdrawal liability under any multiemployer plan, as defined under Sections 3(37) and 4001(a)(3) of ERISA "Multiemployer Plan") are Excluded Liabilities. Buyer shall cooperate in all reasonable respects in connection with proceedings to obtain an Order of the Bankruptcy Court to assign all Assumed Contracts to Buyer and otherwise gain approval for the transactions contemplated by this Agreement, including reasonable efforts to demonstrate that Buyer

provides "adequate assurance of Buyer's future performance" of such Assumed Contracts to the full extent required for assignment thereof required by the Bankruptcy Code.

      3.3    Determination of Net Working Capital.

        3.3.1    At least two (2) business days prior to the Closing, Sellers will furnish to Buyer (A) a certificate (the "Estimated Closing Balance Sheet") setting forth a good faith estimate of the Closing Net Working Capital Amount (the "Estimated Net Working Capital Amount") as of the Sunday immediately preceding the Closing Date (the "NWC Date").

        3.3.2    Not later than sixty (60) days after the Closing Date, Sellers shall prepare and deliver to Buyer (a) a balance sheet (the "Closing Balance Sheet") which shall reflect the net book value of both the current assets included among the Purchased Assets and the current liabilities included among the Assumed Liabilities as of the NWC Date; and (b) a statement (the "Closing Statement") indicating the difference between the net book value of the current assets included among the Purchased Assets as of the NWC Date and the net book value of the current liabilities (other than  the Accrued Amount being assumed pursuant to Section 3.2(a) above) included among the Assumed Liabilities as of the NWC Date (the "Closing Net Working Capital Amount").  The Closing Balance Sheet and the Closing Statement shall be prepared in accordance with GAAP and, to the extent not inconsistent with GAAP, on a basis consistent with the preparation of the historical consolidated audited financial statements of Sellers as set forth in Schedule 3.3.2.

        3.3.3    Following receipt of the Closing Balance Sheet and the Closing Statement, Buyer will be afforded a period of twenty (20) calendar days (the "Review Period") to review the Closing Balance Sheet, and the Closing Statement.  During such Review Period, Buyer and Buyer's accountants will be afforded reasonable access to the records, work papers, trial balances and similar materials prepared by Sellers or Sellers' accountants in connection with the preparation or certification of the Closing Balance Sheet and Closing Statement.  At or before the end of the Review Period, Buyer will either (a) accept the Closing Balance Sheet and the Closing Statement, in their entirety, in which case the Closing Net Working Capital Amount will be deemed to be as set forth on the Closing Statement and the Closing Balance Sheet and Closing Statement shall become final, binding and conclusive on Sellers and Buyer, or (b) deliver to Sellers a written notice in accordance with Section 3.3.7 disputing the Closing Balance Sheet and the Closing Statement.

        3.3.4    In the event that the Closing Net Working Capital Amount is greater than the Estimated Net Working Capital Amount, then within ten (10) days following the later of (a) the date the Closing Balance Sheet and the Closing Statement are accepted by Buyer or (b) the final, binding and conclusive determination of any dispute with respect to the Closing Balance Sheet, or the Closing Statement as provided in Section 3.3.7, Buyer shall pay to Sellers by federal funds wire transfer in immediately available funds an amount equal to such excess.

        3.3.5    In the event that the Closing Net Working Capital Amount is less than the Estimated Net Working Capital Amount, then within ten (10) days following the later of (a) the date the Closing Balance Sheet and the Closing Statement are accepted by Buyer or (b) the final, binding and conclusive determination of any dispute with respect to the Closing Balance Sheet or the Closing Statement as provided in Section 3.3.7, Sellers shall repay to Buyer by federal funds wire transfer in immediately available funds an amount equal to such shortage.

        3.3.6    In the event that the Closing Net Working Capital is equal to the Estimated Net Working Capital Amount, then there shall be no post-closing adjustment pursuant to this Section 3.3.

3.3.7  In the event that any dispute shall arise as to the manner of preparation or the accuracy of the Closing Balance Sheet or the Closing Statement prior to the expiration of the Review Period, Buyer shall provide Sellers with written notice of each disputed item. In the event of such a dispute, Buyer and Sellers shall attempt to reconcile in good faith their differences as to such items within twenty (20) calendar days (the "Resolution Period") of Sellers' receipt of such notice, and any resolution by them as to any disputed items shall be final, binding and conclusive on Buyer and Sellers. If Buyer and Sellers are unable to reach a resolution with such effect within the Resolution Period, Buyer and Sellers shall submit the dispute to the Independent CPA. The determination of such dispute by the Independent CPA shall be final, binding and conclusive on the parties. The fees and expenses of the Independent CPA shall be split and assessed by the Independent CPA equally between Buyer, on the one hand, and Sellers, on the other.

4.     Closing Transactions.

4.1     Closing. The closing of the transactions provided for herein (the "Closing") shall take place at the offices of Brown Rudnick LLP, One Financial Center, Boston MA 02111 or in such other manner to which the parties agree.

4.2     Closing Date. The Closing shall be held within five Business Days after satisfaction or waiver of the conditions to closing contained in Section 5 (the "Closing Date") but in no event later than March 28, 2018 (the "Outside Date"); provided, however, that the Outside Date shall automatically be extended at Sellers' election for consecutive 30-day periods, not to exceed an aggregate period of six months from the initial Outside Date, if the only conditions remaining to be satisfied are specified in any of Sections 5.1.4, 5.1.5 and 5.2.3. In the event the conditions to Closing (other than the conditions specified in Sections 5.1.4, 5.1.5 and 5.2.3) have not been satisfied or waived on or before the Outside Date, then any party who is not in default hereunder may terminate this Agreement by delivering to the other party written notice of termination. Alternatively, the parties may mutually agree to an extended Outside Date. Until this Agreement is either terminated or the transactions contemplated hereby have been consummated, the parties shall diligently continue to work to satisfy all conditions to Closing. The Closing shall be effective at 12:01 a.m. Eastern Time on the Closing Date.

4.3     Sellers' Deliveries to Buyer at Closing. On the Closing Date, subject to satisfaction of the conditions precedent set forth in Section 5.1, Sellers shall make the following deliveries to Buyer:

4.3.1  An Assignment and Assumption Agreement duly executed by Sellers;

4.3.2  An Assignment of Proprietary Rights, substantially in the form annexed hereto as Exhibit B, duly executed by Sellers (the "Assignment of Proprietary Rights");

4.3.3  A Bill of Sale in substantially the form annexed hereto as Exhibit C, duly executed by Sellers (the "Bill of Sale");

4.3.4  An officer's certificate from each Seller, substantially in the form attached hereto as Exhibit D, duly executed by an authorized officer of such Seller, which shall certify as to (a) the satisfaction of the conditions set forth in Section 5.2, (b) each Seller's non-foreign status, in compliance with the requirements of Section 1445 of the Internal Revenue Code, and (c) the resolutions adopted by the Board of Directors or such other governing body or manager of each Seller evidencing its authorization to execute and deliver this Agreement and the ancillary agreements contemplated hereunder, and the consummation of the transactions contemplated hereby and thereby;

4.3.5   Copies of the waivers, consents and approvals set forth on Schedule 4.3.5 if such consents and approvals are required to be obtained by Sellers to validly transfer and assign any Contract or business license in accordance with its terms after giving effect to the relevant provisions of the Bankruptcy Code, the Sale Procedures Order and the Sale Approval Order;

4.3.6   A copy of the Sale Approval Order in the form attached as Exhibit E (the "Sale Approval Order"), which Sale Approval Order shall provide that it shall be effective immediately upon entry pursuant to Rule 7062 and 9014 of the Federal Rules of Bankruptcy Procedure, and that no automatic stay of execution, pursuant to Rule 62(a) of the Federal Rules of Civil Procedure, or Rule 6004(g) or 6006(d) of the Federal Rules of Bankruptcy Procedure shall apply with respect the Sale Approval Order;

4.3.7   [Intentionally Omitted].

4.3.8   All passwords and other similar information necessary to ensure that Buyer has full access to and ability to use all Media Assets and Intellectual Property; and

4.3.9   Such other documents related to the transactions contemplated by this Agreement that Buyer may reasonably request.

4.4   Buyer's Deliveries to Sellers at Closing.  On the Closing Date, subject to satisfaction of the conditions precedent set forth in Section 5.2, Buyer shall make or cause to be made the following deliveries to Sellers:

4.4.1   The Purchase Price to be delivered to Sellers at the Closing in accordance with Section 3.1.1 (provided, however, that the Cure Amounts shall be delivered as directed by the Bankruptcy Court);

4.4.2   The Assignment and Assumption Agreement duly executed by Buyer;

4.4.3   The Assignment of Proprietary Rights Agreement duly executed by Buyer;

4.4.4   An officer's certificate, substantially in the form attached hereto as Exhibit G, duly executed by Buyer, which shall certify as to (a) the satisfaction of the conditions set forth in Section 5.1, and (b) the resolutions adopted by the Board of Directors (or members or managers, as applicable) of Buyer evidencing its authorization to execute and deliver this Agreement and the ancillary agreements contemplated hereunder, and the consummation of the transactions contemplated hereby and thereby;

4.4.5   All other instruments and certificates of assumption, novation and release as Sellers may reasonably request in order to effectively make Buyer responsible for all Assumed Liabilities and release Sellers therefrom to the fullest extent permitted under applicable Law;

4.4.6   Copies of the waivers, consents and approvals set forth on Schedule 4.4.6 if such consents and approvals are required to be obtained by Buyer after giving effect to the relevant provisions of the Bankruptcy Code, a Sales Procedures Order substantially in the form attached hereto as Exhibit H (the "Sale Procedures Order") and the Sale Approval Order;

4.4.7   Such other documents related to the transactions contemplated by this Agreement that Sellers may reasonably request.

4.5     Prorations.  Post-petition rent, utilities, current taxes (other than income taxes) and other similar post-petition items of expense (including, without limitation, any prepaid insurance under the Assumed Contracts) relating to or attributable to the Purchased Assets or Assumed Liabilities, shall be prorated between Sellers and Buyer as of the Closing Date so that Sellers shall bear such post-petition costs and expenses for the period up to the Closing Date and Buyer shall bear such costs and expenses for the period from and including the Closing Date.  All Assumed Liabilities shall be paid in full or otherwise satisfied by Buyer.  Post-petition rent shall be prorated on the basis of a thirty (30) day month.

4.6     Transfer Taxes.  [Intentionally deleted.]

4.7     Possession.  Right to possession of the Purchased Assets shall transfer to Buyer on the Closing Date.  Sellers shall transfer and deliver to Buyer on the Closing Date such keys, lock and safe combinations and other similar items as Buyer shall require to obtain immediate and full occupation and control of Purchased Assets, and shall also make available to Buyer at Sellers' then existing locations all documents in Sellers' possession that are required to be transferred to Buyer by this Agreement.

5.     Conditions Precedent to Closing.

5.1     Conditions to Sellers' Obligations.  Sellers' obligation to make the deliveries of Sellers set forth in Section 4.3 on the Closing Date, and otherwise to close the transaction, shall be subject to the satisfaction or waiver by Sellers of each of the following conditions on or prior to the Closing Date:

5.1.1     All of the representations and warranties of Buyer contained in Section 7 shall continue to be true and correct as of the Closing Date in all material respects, all covenants and obligations to be performed by Buyer on or prior to the Closing Date shall have been performed in all material respects, and Buyer shall have certified the foregoing to Sellers in writing;

5.1.2     Buyer shall have delivered to Sellers the items set forth in Section 4.4;

5.1.3     Sellers shall have received the total Purchase Price in immediately available funds;

5.1.4     No action, suit or other proceedings shall be pending before any court, tribunal or other Governmental Authority seeking or threatening to restrain or prohibit the consummation of the transactions contemplated by this Agreement, or seeking to obtain damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any Law, decree or regulation of any Governmental Authority having appropriate jurisdiction; and

5.1.5     The Bankruptcy Court shall have entered the Sale Approval Order not later than March 16, 2018 in form and content satisfactory to Buyer and in accordance with Section 9.4.2 below; and provided, further, that neither the Sale Procedures Order nor the Sale Approval Order shall have been amended, modified or supplemented without the written consent of Buyer, and no stay shall be in effect with respect to either order.

5.2     Conditions to Buyer's Obligations.  Buyer's obligation to make the deliveries of Buyer set forth in Section 4.4 on the Closing Date, and otherwise to close the transaction, shall be subject to the satisfaction or waiver by Buyer of each of the following conditions on or prior to the Closing Date:

5.2.1     All of the representations and warranties of Sellers contained in Section 6 shall continue to be true and correct on the Closing Date in all material respects, all covenants and obligations

to be performed by Sellers on or prior to the Closing Date shall have been performed in all material respects, and Sellers shall have certified the foregoing to Buyer in writing;

5.2.2    Sellers shall have delivered to Buyer the items set forth in <u>Section 4.3</u>;

5.2.3    No action, suit or other proceedings shall be pending before any court, tribunal or other Governmental Authority seeking or threatening to restrain or prohibit the consummation of the transactions contemplated by this Agreement, or seeking to obtain damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any Law, decree or regulation of any Governmental Authority having appropriate jurisdiction;

5.2.4    Prior to the entry to the Sale Approval Order, the Bankruptcy Court shall have entered orders granting the relief sought by the Sellers in the Section 1113/1114 Motion;

5.2.5    [Intentionally Omitted];

5.2.6    Sellers shall have released (in form, substance and manner satisfactory to Buyer) all Buyer Employees from any competitive or other contractual provision which would restrict or prohibit such Employee from working or performing services for Buyer in any manner;

5.2.7    The Bankruptcy Court shall have entered the Sale Approval Order substantially in the form attached as <u>Exhibit E</u> with any modifications to the form attached as <u>Exhibit E</u> acceptable to Buyer and submitted to the Bankruptcy Court in accordance with <u>Section 9.4.2</u> below; and <u>provided</u>, <u>further</u>, that each of the Sale Procedures Order and the Sale Approval Order shall be entered as a Final Order without having been amended, modified or supplemented without the written consent of Buyer, and no stay shall be in effect with respect to either order; and

5.3    <u>Waiver</u>. Nothing in <u>Section 5.1</u>, <u>Section 5.2</u> or any other section of this Agreement shall preclude Sellers or Buyer from consummating the transactions contemplated herein if either Buyer or Sellers waive, by written notice to the other, any condition to its or their respective obligation to close the transactions hereunder.

5.4    <u>Termination</u>. This Agreement and the transactions contemplated hereby may be terminated and abandoned:

5.4.1    by either Sellers or Buyer at any time prior to the Closing with the written consent of the other party hereto and the prior approval of the Bankruptcy Court;

5.4.2    unless the Closing has not occurred as a result of a breach of this Agreement by the party seeking such termination, by either Sellers or Buyer, if the Closing has not occurred on or prior to the Outside Date;

5.4.3    by either Sellers or Buyer if any Governmental Authority with jurisdiction over such matters shall have issued a final and nonappealable governmental order permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement; provided, however, that neither Sellers nor Buyer may terminate this Agreement pursuant to this <u>Section 5.4.3</u> unless the party seeking to terminate this Agreement has used commercially reasonable efforts to oppose any such governmental order or to have such governmental order vacated or made inapplicable to the transactions contemplated by this Agreement;

5.4.4    by Sellers (provided, that no Seller nor any Affiliate thereof is in breach of any of the representations, warranties, covenants or other agreements contained herein), but only if Buyer shall have breached, in any material respect, any representation or warranty or any covenant or other agreement to be performed by it contained herein, and such breach is incapable of being cured or is not cured within twenty (20) days of receipt of written notice to cure from Sellers;

5.4.5    by Buyer (provided, that Buyer or any Affiliate thereof is not in breach of any of the representations, warranties, covenants or other agreements contained herein), but only if Sellers shall have breached, in any material respect, any representation or warranty or any covenant or other agreement to be performed by them contained herein, and such breach is incapable of being cured or is not cured within twenty (20) days of receipt of written notice to cure from Buyer.

5.4.6    Notwithstanding anything in this Section 5.4.6 to the contrary, by either Buyer or Sellers, if the Bankruptcy Court has issued an order approving the sale of any or all of the Purchased Assets to another party in accordance with the Sale Procedures Order; or if Sellers have effected some other alternate transaction, with the approval of the Bankruptcy Court, including a plan of reorganization or liquidation (including a Chapter 7 liquidation), resulting in the disposition to someone other than Buyer of any or all of the Purchased Assets.

6.    Sellers' Representations and Warranties.  Each Seller hereby makes the following representations and warranties on behalf of itself to Buyer:

6.1    Validity of Agreement.  Upon obtaining the Sale Approval Order, all action on the part of such Seller necessary for the authorization, execution, delivery and performance of this Agreement by such Seller, including, but not limited to, the performance of such Seller's obligations hereunder, will have been duly taken, and this Agreement, when executed and delivered by Sellers, shall constitute the valid and binding obligation of such Seller enforceable in accordance with its terms.

6.2    Organization, Standing and Power.  Such Seller is duly organized or incorporated, as applicable, validly existing and in good standing under the Law of the jurisdiction set forth opposite such Seller's name on Schedule 6.2.  Subject to the applicable provisions of the Bankruptcy Code, such Seller has all requisite power and authority to own, lease and operate its properties, to carry on its business as now being conducted and, subject to Sellers' obtaining the Sale Procedures Order and the Sale Approval Order, to execute, deliver and perform this Agreement and all writings relating hereto.

6.3    No Violation; Third Party Consents.

6.3.1    Assuming the receipt of all necessary approvals of the Bankruptcy Court and assuming that all consents, waivers, approvals, orders and authorizations set forth in Schedule 6.3.1 have been obtained and all registrations, qualifications, designations, declarations or filings with any Governmental Authorities set forth in Schedule 6.3.2 have been made, the execution and delivery by such Seller of this Agreement and the ancillary agreements contemplated hereunder, the performance by such Seller of its obligations hereunder and thereunder, and the consummation by such Seller of the transactions contemplated hereby and thereby, will not conflict with or violate, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, give rise to any right of termination, amendment, modification, acceleration or cancellation of any obligation or loss of any benefit under, result in the creation of any Encumbrance on any of the Purchased Assets pursuant to, or require such Seller to obtain any consent, waiver, approval or action of, make any filing with, or give any notice to any Person as a result of or under, the terms and provisions of (a) the Certificate of Incorporation, Certificate of Formation, Bylaws or Limited Liability Company Agreement, as applicable, of Seller, (b) any currently enforceable contract, agreement or understanding to which such

-17-

Seller is a party or by which any of the Purchased Assets are bound or (c) any Law applicable to such Seller or any of the Purchased Assets, or any governmental order by which such Seller or any of the Purchased Assets is in any way bound or obligated, except, in the case of clauses (b) and (c) of this Section 6.3.1, as would not have a material adverse effect on the ability of Sellers to perform (i) their obligations under this Agreement or to consummate on a timely basis the transactions contemplated hereby, or (ii) the obligations under any ancillary agreement contemplated hereunder or to consummate on a timely basis the transactions contemplated thereby.

6.3.2    No consent, waiver, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any Governmental Authority is required on the part of such Seller in connection with (x) the execution and delivery by such Seller of this Agreement, the performance by such Seller of its obligations hereunder, and the consummation by such Seller of the transactions contemplated hereby, or (y) the execution and delivery by such Seller of the ancillary agreements contemplated hereunder, the performance by such Seller of its obligations contemplated thereby, and the consummation by such Seller of the transactions contemplated thereby, except (a) as set forth in Schedule 6.3.2, (b) all applicable approvals of the Bankruptcy Court, and (c) where the failure to obtain such consent, waiver, approval, order or authorization, or to make such registration, qualification, designation, declaration or filing, would not, as of the date hereof, give rise to a Material Adverse Effect.

6.4    Title to Purchased Assets.

6.4.1    Personal Property.    Except as disclosed in Schedule 6.4.1, as of the date hereof, Sellers have good, valid and marketable title to the Purchased Assets (other than the Real Property), free and clear of all Encumbrances, except for Permitted Encumbrances and those Encumbrances that will be removed, released or otherwise rendered unenforceable at or prior to Closing.

6.4.2    Transfer Free and Clear.    Upon the sale of the Purchased Assets on the Closing Date, Buyer shall be the owner thereof free and clear of all Adverse Interests(other than Permitted Encumbrances)) as permitted under Section 363 of the Bankruptcy Code.

6.5    No Litigation.    Except for the Bankruptcy Case and as may be set forth in Schedule 6.5, there is no action, suit or proceeding at Law or in equity by any Person, or any arbitration or any administrative or other proceeding, or to Sellers' Knowledge, any investigation by, any Governmental Authority, pending or threatened with respect to such Seller, any of the officers or directors of such Seller (in their capacities as such) or such Seller's properties or rights, which could have a Material Adverse Effect. Such Seller is not subject to any judgment, order or decree entered in any lawsuit, proceeding or arbitration, other than any of the same that were disclosed in Schedule 6.5 or that arose from or were related to the Bankruptcy Case.

6.6    Intellectual Property.    Sellers are the exclusive owners of the Intellectual Property free and clear of any Encumbrances. Sellers own or have a valid and enforceable license to use all Intellectual Property necessary or material for the conduct of the Business as and where conducted on the Closing Date and to Sellers' Knowledge, the Business does not infringe upon the intellectual property rights of any third person. No application to register, or any registration of, Sellers' Intellectual Property used in the Business has lapsed, expired or been abandoned or canceled, or is subject to any injunction, judgment, order, decree, ruling or charge or is subject to any pending or threatened oppositions, cancellations, interferences or other proceedings before the United States Patent and Trademark Office, the Trademark Trials and Appeals Board, the United States Copyright Office or in any comparable regulatory authority of a foreign jurisdiction. Schedule 6.6 includes a true and complete list of all registered Intellectual Property. Seller has taken all commercially reasonable steps necessary to maintain the validity of the Intellectual Property, including paying all necessary fees and making all necessary filings with the

appropriate government entity. Except as set forth in Schedule 6.6, Seller has not licensed any Intellectual Property to any person.

6.7     Material Agreements and Licenses.  Schedule 6.7.1 contains a list of the currently existing agreements to which a Seller or more than one Seller is a party, which agreements are material to the operation of the Business.  For purposes of this Section 6.7 only, "material agreements" means contracts and agreements to which a Seller is a party or by which it is bound and which has involved payments or liabilities in excess of Fifty-Five Thousand Dollars ($55,000) during the last twelve (12) months.  Sellers own or possess all right, title and interest in and to all material business licenses which are necessary as of the date hereof to conduct the Business substantially as currently conducted.  Not later than fifteen (15) Business Days prior to the Closing, the Sellers shall supplement Schedule 6.7.1 to include a list of all the currently existing executory contracts and unexpired leases, whether or not material agreements, and the associated cure (past due/default) amount for each such contract and lease.

6.8     Employee Matters.

6.8.1     Employees.  In order to facilitate Buyer's interviews of Sellers' Employees as contemplated in Section 9.1 hereof, no later than the date which is one Business Day after the date of the execution of this Agreement, Sellers shall provide Buyer with a true and complete list of the names, home addresses and current annual base compensation rates of all permanent salaried and hourly Employees currently employed in connection with the operation of the Business as of the date of the execution of this Agreement.  Sellers shall be solely responsible for any and all liabilities or obligations resulting from such Employees' employment with Sellers and separation from employment by Sellers, and Buyer shall not assume or be assessed any such liability.

6.8.2     Employee Benefits.  Set forth on Schedule 6.8.2 hereto is a true and complete list of each "employee benefit plan", as defined in Section 3(3) of ERISA, that is subject to ERISA and that Sellers or any of their Affiliates maintain or contribute to, or are required to contribute to, for the benefit of any Employees or former Employees of the Business, any other employee benefit plan, program, policy, promise or arrangement of any kind that Sellers or any of their ERISA Affiliates, as determined under Section 414(b) of Internal Revenue Code, maintains or contributes to, or with respect to which any of Sellers or their Affiliates may have Liability, in each case with respect to any Employee or former Employee of the Business ("Employee Benefit Plan").  Except as set forth in Schedule 6.8.2, Sellers are not in default of any obligations under any Employee Benefit Plan, and there is no funding deficiency under any Employee Benefit Plan within the meaning of the Internal Revenue Code or ERISA.  Within the six (6) year period prior to the Closing Date, no Seller has maintained, sponsored or contributed to any Multiemployer Plan, nor have they incurred any material liability, including without limitation, withdrawal liability or mass withdrawal liability, with respect to any such plan, except as set forth in Schedule 6.8.2.

6.8.3     Except as set forth in Schedule 6.8.3, no Seller is a party to any Collective Bargaining Agreement and there are no labor unions, works councils, or other organizations representing any Employees.

6.8.4     Except as set forth in Schedule 6.8.4, (a) no labor union, works council, or other organization or group of Employees or former employees of Sellers have organized any Employees for purposes of collective bargaining, sought to bargain collectively with any of the Sellers, made a demand for recognition as an employee representative for purposes of collective bargaining or filed a petition with the NLRB or any other Government Entity seeking certification as the collective bargaining representative of any Employees; (b) no Collective Bargaining Agreement is currently being negotiated by any of the Sellers, other than pursuant to procedures established in connection with the Bankruptcy

Case; (c) to the Sellers' Knowledge, no labor union, works council, or other organization is engaged in any organizing activity with respect to any employee of any Seller; and (d) in the past three (3) years, there have been no strikes, lockouts, slowdowns, work stoppages, boycotts, handbilling, picketing, walkouts, demonstrations, leafletting, sit-ins, sick-outs, or other material forms of organized labor disruption with respect to any of the Sellers.

6.8.5    No labor union or other organization has made any claim that any Seller jointly employs the employees of any third party.

6.8.6    Except as set forth on Schedule 6.8.6, Seller is presently in compliance with in all material respects with all applicable contracts and Collective Bargaining Agreements.

6.8.7    Except as set forth on Schedule 6.8.7, (a) no Seller is under investigation and no Seller is a defendant or respondent or potential defendant or respondent, and there are no charges, complaints, lawsuits, grievances, investigations, hearings, proceedings or allegations pending, or to Sellers' Knowledge, threatened, before any Governmental Authority on behalf of any applicant for employment, any current or former Employee, any person alleging to be a current or former Employee, any representative, agent, consultant, independent contractor, subcontractor or leased employee or volunteer alleging a violation of any labor or employment Laws, breach of any Collective Bargaining Agreement or express or implied contract of employment, wrongful termination of employment or any other discriminatory, wrongful or tortious conduct in connection with the employment relationship; (b) within the past three (3) years, Sellers have been in compliance with any and all applicable Laws regarding labor, employment, occupational safety and health or other rights of any employees, including but not limited to all Laws relating to employment practices; hiring, promotion, assignment, and termination of employees; discrimination; equal employment opportunities; disability; labor relations; wages and hours; classification of employees and independent contractors; payment of wages; immigration; workers' compensation; employee benefits; background and credit checks; working conditions; occupational safety and health; family and medical leave; and data privacy and data protection; and (c) each of the Employees has all work permits, immigration permits, visas or other authorizations required by any Law for such Employee.

6.8.8    Except as set forth in Schedule 6.8.8, there are no Employees, retired employees, officers, or directors of either Sellers, or their dependents, receiving retiree benefits or scheduled to receive retiree benefits from any Seller in the future.

6.8.9    Except as set forth in Schedule 1.1.82, there are no other liabilities for prepaid subscriptions or similar obligations.

6.9    Permits and Licenses.    Sellers are conducting the Business and its operations in compliance with all business licenses, in all material respects, and all such licenses are in full force and effect and no suspension or cancellation of any of them is threatened.

6.10    Brokers.    No person has acted as a broker on behalf of any Seller in connection with the consummation of the transaction contemplated by this Agreement other than Dirks, Van Essen & Murray. Sellers shall solely be responsible for the Success Fee, any other brokerage fees, commissions and/or expenses due to Dirks, Van Essen & Murray in connection with the negotiation and execution of this Agreement and the consummation of the transactions contemplated hereby.

6.11    Environmental Matters.

6.11.1 Sellers are in compliance in all material respects with all applicable environmental laws, Sellers possess all environmental permits required under any environmental laws for the conduct of the Business, are in compliance in all material respects with the terms and conditions thereof, and all such permits are in full force and effect and contain no restrictions on the transfer of any such permit to a subsequent owner or operator of the Business. Schedule 6.11.1 sets forth a complete list of all such environmental permits.

6.11.2 There are no claims under any environmental laws pending or, to Sellers' Knowledge, threatened against or by any Seller, or affecting any Seller or any of the Business or Purchased Assets, and no Seller has received any communication from any government entity or other person alleging any material liability under any environmental law.

6.11.3 Within five (5) days of the date of this Agreement, Sellers will make available to Buyer all material written environmental assessments, audits, investigations, studies, reports or other documents (including written correspondence with government entities) in its possession or control relating to all properties currently owned or leased by any Seller.

6.12    Financial Statements. Sellers' year-end financial statements for the fiscal years for 2014, 2015 and 2016 (the "Financial Statements") are set forth on Schedule 6.12 hereto. The Financial Statements have been prepared in accordance with GAAP applied on a consistent basis throughout the period involved. The Financial Statements are based on the books and records of the Business, and fairly represent in all material respects the financial condition of Sellers as of the respective dates they were prepared and the results of the operation of the Business for the periods indicated.

7.    Buyer's Representations and Warranties. Buyer hereby makes the following representations and warranties to Sellers:

7.1    Validity of Agreement. All action on the part of Buyer necessary for the authorization, execution, delivery and performance of this Agreement by Buyer, including, but not limited to, the performance of Buyer's obligations hereunder, has been duly taken. This Agreement, when executed and delivered by Buyer, shall constitute the valid and binding obligation of Buyer enforceable in accordance with its terms, except to the extent that enforceability thereof may be limited by general equitable principles or the operation of bankruptcy, insolvency, reorganization, moratorium or similar Law.

7.2    Organization, Standing and Power. Buyer is a limited liability company duly organized, validly existing and in good standing under the Law of the State of Delaware. Buyer has all requisite limited liability company power and authority to own, lease and operate its properties, to carry on its business as now being conducted and to execute, deliver and perform this Agreement and all writings relating hereto.

7.3    No Violation; Third Party Consents.

7.3.1    Assuming that all consents, waivers, approvals, orders and authorizations set forth in Schedule 7.3.1 have been obtained and all registrations, qualifications, designations, declarations or filings with any Governmental Authorities set forth in Schedule 7.3.2 have been made, the execution and delivery by Buyer of this Agreement and the ancillary agreements contemplated hereunder, the performance by Buyer of its obligations hereunder and thereunder, and the consummation by Buyer of the transactions contemplated hereby and thereby, will not conflict with or violate, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, give rise

to any right of termination, amendment, modification, acceleration or cancellation of any obligation or loss of any benefit under, result in the creation of any Encumbrance on any of the assets or properties of Buyer pursuant to, or require Buyer to obtain any consent, waiver, approval or action of, make any filing with, or give any notice to any Person as a result of or under, (a) the terms or provisions of the organizational documents of Buyer, (b) any currently enforceable contract to which Buyer is a party or is bound or (c) any Law applicable to Buyer or any governmental order by which Buyer is in any way bound or obligated, except, in the case of clauses (b) and (c) of this Section 7.3.1, as would not have a material adverse effect on the ability of Buyer to perform its obligations under this Agreement and the ancillary agreements contemplated hereunder, or to consummate on a timely basis the transactions contemplated hereby or thereby.

7.3.2   No consent, waiver, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any Governmental Authority is required on the part of Buyer in connection with the execution and delivery by Buyer of this Agreement and the ancillary agreements contemplated hereunder, the performance by Buyer of its obligations hereunder and thereunder, and the consummation by Buyer of the transactions contemplated hereby and thereby, except (a) as set forth in Schedule 7.3.2 and (b) where the failure to obtain such consent, waiver, approval, order or authorization, or to make such registration, qualification, designation, declaration or filing, would not have a material adverse effect on the ability of Buyer to perform its obligations under this Agreement and the ancillary agreements contemplated hereunder, or to consummate on a timely basis the transactions contemplated hereby or thereby.

7.4   Financing. Buyer has sufficient funds available to consummate the transactions contemplated hereby, and without limiting the conditions to Buyer's obligations set forth herein. THERE IS NO FINANCING CONTINGENCY WITH RESPECT TO BUYER'S OBLIGATIONS IN CONNECTION WITH THIS TRANSACTION.

7.5   "AS IS" Transaction. BUYER HEREBY ACKNOWLEDGES AND AGREES THAT EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS INCLUDING, WITHOUT LIMITATION, INCOME TO BE DERIVED OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE PURCHASED ASSETS, SELLERS' HISTORICAL FINANCIAL OR OPERATIONAL PERFORMANCE, THE PHYSICAL CONDITION OF ANY OF THE PURCHASED ASSETS OR THE SUBJECT OF ANY CONTRACT TO BE ASSUMED BY BUYER AT THE CLOSING, THE ENVIRONMENTAL CONDITION OR OTHER MATTERS RELATING TO THE PHYSICAL CONDITION OF ANY SUCH REAL PROPERTY OR IMPROVEMENTS, THE ZONING OF ANY SUCH REAL PROPERTY OR IMPROVEMENTS, THE VALUE OF THE PROPERTY (OR ANY PORTION THEREOF), THE TRANSFERABILITY OF THE PURCHASED ASSETS, THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES, THE TITLE OF THE PURCHASED ASSETS (OR ANY PORTION THEREOF), THE MERCHANTABILITY OR FITNESS OF THE PURCHASED ASSETS FOR ANY PARTICULAR PURPOSE OR ANY OTHER MATTER OR THING RELATING TO THE PURCHASED ASSETS.

WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLERS HEREBY DISCLAIM ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY OF THE PURCHASED ASSETS. BUYER FURTHER ACKNOWLEDGES THAT BUYER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE PURCHASED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE PURCHASED ASSETS AS BUYER DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING

WITH ITS ACQUISITION OF THE PURCHASED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN SECTION 6, BUYER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. ACCORDINGLY, BUYER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

8.      Brokers.  All negotiations relative to this Agreement and the transactions contemplated hereby have been carried out by Buyer directly with Sellers or with Dirks, Van Essen & Murray without the intervention of any Person on behalf of Buyer in such manner as to give rise to any valid claim by any Person against Sellers for a finder's fee, brokerage commission or similar payment. Buyer shall be exclusively obligated to resolve or pay any claim made by any broker, finder or similar person claiming by or through Buyer or under a purported arrangement with Buyer.

9.      Conduct Prior to Closing.

        9.1      Access to Records and the Purchased Assets of Sellers.  From and after the date of this Agreement until the Closing Date, (a) Sellers shall, upon reasonable advance notice, afford to Buyer's officers, independent public accountants, counsel, lenders, consultants and other representatives reasonable access during normal business hours to the Purchased Assets and all records pertaining to the Purchased Assets or the Business, and (b) Sellers shall facilitate  Buyer's interviews of Sellers' Employees to permit Buyer to evaluate whether or not to make offers of employment to those persons. Buyer, however, shall not be entitled to have access to any materials containing privileged communications or information about Employees, disclosure of which is prohibited by Law, but Sellers shall sufficiently identify such information to Buyer, to the extent permitted by Law, to enable Buyer to determine to its reasonable satisfaction the materiality of such information.

        9.2      Preservation of the Purchased Assets Pending Closing.  Unless Buyer otherwise consents, during the period prior to the Closing Date, subject to the orders and direction of the Bankruptcy Court, Sellers shall, taking into account Sellers' financial situation and the current operating status of the Purchased Assets, use commercially reasonable efforts to maintain and preserve the Purchased Assets, except as otherwise may be appropriate in the operation of the Business in the ordinary course of business, including the borrowing and the repayment of funds in connection with the operation of the Business pursuant to the DIP Agreement.  Prior to the Closing, Sellers shall not settle, compromise, or modify any Receivables, and shall not seek collection of Receivables except in a manner consistent with Sellers' ordinary course of business and subject to the orders and direction of the Bankruptcy Court.

        9.3      Buyer Employees .

        9.3.1      Prior to the Closing Date, Buyer shall set initial terms and conditions of employment, including wages, benefits, job duties and responsibilities and work assignment. Buyer shall determine to which Employees to offer employment, in its sole discretion.  Only Employees who are offered and accept such offers of employment with Buyer based on the initial terms and conditions set by Buyer and then actually commence employment with Buyer will become "Buyer Employees" after the Closing.  Buyer will make offers of employment to a minimum of 175 Employees by no later than one day prior to the Closing Date.  Sellers shall terminate, or shall cause to be terminated, the employment of all Employees employed in connection with the operation of the Business prior to the Closing Date. Nothing in this Section 9.3, expressed or implied, shall confer upon any of the Employees any right to employment or continued employment for any specified period, of any nature or kind whatsoever under or by reason of this Agreement.  Except as described in the remaining sentences of this Section 9.3.1, the employment of each such Buyer Employee with Buyer will commence immediately after the Closing Date.  In the case of any individual who is offered employment by Buyer and accepts such offer, but who

is absent from active employment and receiving short-term disability or workers' compensation benefits, the employment of such individual with Buyer would commence upon his or her return to active work, and such individual would become a Buyer employee as of such date.

9.3.2     From and after the Closing, Buyer shall, provide all Buyer Employees with credit for service with Sellers earned prior to the Closing for eligibility and vesting purposes in each case under any benefit or compensation plan, program, agreement or arrangement in which the Buyer Employees participate on or after the Closing (collectively, the "New Plans"), except as would result in a duplication of benefits and except for equity incentive plans.  In addition, Buyer shall cause to be waived all pre-existing condition exclusions and actively at-work requirements and similar limitations, eligibility waiting periods and evidence of insurability requirements under any New Plans to the extent waived or satisfied by a Buyer Employee under any comparable Employee Benefit Plan as of the date on which commencement of participation in such New Plan begins.

9.3.3     Except as prohibited by applicable Law, Sellers shall provide to Buyer all information reasonably necessary to permit Buyer to perform its obligations under this Section 9.3, including such information as may be reasonably requested by Buyer following the Closing.

9.3.4     With respect to Buyer Employees, Buyer will have full responsibility under the Worker Adjustment and Retraining Notification Act of 1988, and including any similar state or local Law (the "WARN Act") relating to any act or omission of Buyer after the Closing Date.  Sellers will have full responsibility under the WARN Act for all Liabilities relating to any act or omission of Sellers with respect to the Employees prior to and on the Closing Date, including any such Liabilities that result from Employees' separation of employment from Sellers and/or Employees not becoming Buyer Employees pursuant to this Section 9.3.  Unless otherwise agreed to by Sellers and Buyer, Sellers agree to issue, consistent with applicable Law, WARN Act notices, in a form acceptable to Buyer, to the Employees and all other parties required to receive notice under the WARN Act.

9.3.5     Buyer does not accept or assume any Collective Bargaining Agreements to which any Seller is a party or subject, and expressly declines to be bound by or accept the terms of such Collective Bargaining Agreements.  Buyer shall not be obligated to, and does not, accept or adopt any wage rates, employee benefits, employee policies, or any other terms or conditions of employment.

9.3.6     All provisions contained in this Agreement with respect to employee benefit plans or compensation of Buyer Employees are included for the sole benefit of the respective parties hereto.  Nothing contained herein (a) shall confer upon any former, current, or future employee of Sellers or Buyer, or any legal representative or beneficiary thereof, any rights or remedies, including any right to employment or continued employment, of any nature, for any specified period; (b) shall cause the employment status of any former, present or future Employee to be other than terminable at will; or (c) shall confer any third party beneficiary rights upon any Buyer Employee or any dependent, beneficiary, heirs or assigns thereof.

9.4     Bankruptcy Court Approvals.

9.4.1     [Intentionally Omitted.]

9.4.2     Bankruptcy Court's Approval of Sale.  Contemporaneously with the execution and delivery of this Agreement by Sellers, pursuant to the Sale Motion, Sellers shall seek entry of the Sale Approval Order which order shall, among other things:

(i)        determine that this Agreement was proposed by Buyer and Sellers in good faith and represents the highest and best offer for the Purchased Assets and should be approved;

(ii)       determine that Buyer is a good faith purchaser under and entitled to the protections of Section 363(m) of the Bankruptcy Code, and that the provisions of Section 363(n) of the Bankruptcy Code have not been violated by Buyer;

(iii)      (A) approve the sale of all of the Purchased Assets to Buyer free and clear of any and all Adverse Interests of any nature whatsoever, whether known or unknown, pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code (except as otherwise expressly agreed by Buyer under this Agreement); (B) authorize Sellers pursuant to Sections 105(a), 363(b) and 363(f) of the Bankruptcy Code to convey to Buyer all of its right, title, and interest in and to all of the Purchased Assets free and clear of any such Adverse Interests; and (C) provide that all Adverse Interests with respect to the Purchased Assets shall attach solely to the proceeds of the sale under Section 363 of the Bankruptcy Code;

(iv)      authorize each Seller to execute, deliver, perform, consummate, and implement this Agreement and all additional instruments and documents, that may be reasonably necessary or desirable to implement the foregoing;

(v)       require each Seller (or any trustee(s) in bankruptcy that may be appointed for Sellers) to deliver to Buyer any Purchased Asset which comes into the possession, custody or control of Sellers or such trustee(s), and to cooperate with Buyer in compelling or obtaining the turnover or deliver to Buyer of any Purchased Assets;

(vi)      reserve and retain jurisdiction in the Bankruptcy Court to interpret, enforce and effectuate the Sale Approval Order and this Agreement, and to resolve any disputes arising thereunder or hereunder upon motion by any party;

(vii)     provide that the Sale Approval Order is self-executing and effective immediately upon entry, and waive the stays under Rules 6004(h) and 6006(g) of the Federal Rules of Bankruptcy Procedure;

(viii)    approve the assumption by Sellers and assignment to Buyer of the assignment of the explicitly assumed pre-petition Assumed Contracts (collectively, the "Section 365 Contracts") pursuant to Sections 363 and 365 of the Bankruptcy Code, and orders Buyer, as part of the Purchase Price as provided in Sections 3.1.1 and 3.1.2, to pay any Cure Amounts, payable to the other parties to the Section 365 Contracts as a condition to such assignment;

(ix)      approve the rejection of the Rejected Contracts pursuant to Section 365 and 1113 and 1114 (as applicable) of the Bankruptcy Code;

(x)       establish a deadline by which each Non-debtor party to a Rejected Contract must file a proof of claim for damages arising by reason of the rejection;

(xi)      provide that Buyer does not assume, and shall have no costs, expenses, liability or obligations of any nature whatsoever for, or with respect to, any liability or obligation of any Seller of any nature whatsoever that is not expressly assumed by Buyer in writing pursuant to this Agreement and the Sale Approval Order;

(xii)   require any Person(s) having notice or knowledge of the Sale Approval Order and who is in possession of any property of a Seller that constitutes a Purchased Asset to immediately deliver such property to Buyer and account to Buyer for such property (other than possessory lienholders);

(xiii)   enjoin, prohibit and restrain any Person(s) having notice or knowledge of the Sale Approval Order from possessing or using any Purchased Assets without the prior written consent of Buyer (other than possessory lienholders), exercising any control or dominion over any Purchased Assets without the prior written consent of Buyer, or interfering with the Closing or with the rights of Buyer or its successors under this Agreement or under the Sale Approval Order with respect to the acquisition, use, exploitation and/or further disposition of the Purchased Assets, and/or from commencing, continuing or otherwise pursuing or enforcing any remedy, claim, cause of action or encumbrance against Buyer related thereto;

(xiv)   determine that Buyer does not constitute a successor to any Seller or the bankruptcy estate of any Seller, provide that Buyer shall not incur any liability as a successor to Sellers or the Business (other than the Assumed Liabilities) and determine that Buyer is not a successor to Sellers or otherwise liable for any of the Excluded Liabilities; and

(xv)   contain such other provisions as are reasonably satisfactory to Buyer.

Sellers shall use reasonable efforts to obtain entry of the Sale Approval Order. The Sale Approval Order shall not have been amended, modified, or supplemented without the written consent of Buyer.

Sellers' obligations to consummate the transactions contemplated herein which Buyer and Sellers may hereafter enter into shall be conditioned upon the Bankruptcy Court's entry of the Sale Approval Order in form and content satisfactory to Buyer, and such Order being a Final Order on or before March 28, 2018.

9.4.3   Notices of Sale. Sellers shall have used their best efforts to send adequate notice of the Sale Approval Hearing to all holders of Encumbrances with respect to the Purchased Assets, all counter-parties to the Assumed Contracts and the Rejected Contracts, and all counter-parties to any other contracts or obligations of Sellers that will not be assumed by Buyer. Such efforts shall include, without limitation: (i) compliance with Rules 2002(a)(2), 6004, and 6006 of the Federal Rules of Bankruptcy Procedure and all related Local Bankruptcy Rules of the Bankruptcy Court; (ii) notice to all Governmental Authorities as is required to comply with the Federal Rules of Bankruptcy Procedure and applicable local laws relating to the issuance or transfer of any governmental licenses or permits or the issuance of any required license or permit from a Governmental Authority; (iii) notice to all Employees and former employees and others receiving any benefits under any pension or Employee Benefit Plan; (iv) notice to all known creditors of any of the Sellers; and (v) publication, at Sellers' sole expense, not less than once in the journal, *Editor and Publisher,* or such other publication as the parties may mutually agree, of notice of the Sale Approval Hearing, in form and content reasonably satisfactory to Buyer and Sellers and approved by the Bankruptcy Court, which shall include particularized notice of the proposed sale of the Purchased Assets free and clear of all Adverse Interests other than Permitted Encumbrances, and giving notice, and the opportunity for holders of any Adverse Interests with respect to the Purchased Assets to appear and be heard.

9.4.4   No Successor Liability. The parties intend that, upon Closing, Buyer shall not be deemed to: (a) be the successor of or successor employer to Sellers for any purpose or under any theory, including as described under COBRA and applicable regulations thereunder, including with respect to any

Collective Bargaining Agreement and any Employee Benefit Plans; (b) have, de facto or otherwise, merged with or into Sellers; (c) be a mere continuation or substantial continuation of Sellers, the Business, or Sellers' enterprise(s); or (d) be liable for any acts or omissions of Sellers in the conduct of the Business or arising under or related to the Purchased Assets or the Assumed Liabilities.  Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement and the Sale Approval Order, the parties intend that Buyer shall not be liable for any Adverse Interests against any Seller or any of its Affiliates, and that Buyer shall no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date or whether fixed or contingent, existing or hereafter arising, with respect to the Business, the Purchased Assets or any Liabilities of any Seller arising on or prior to the Closing Date.  The parties agree that a provision to effectuate this Section 9.4.4 shall be reflected in the Sale Approval Order.

9.4.5    Sellers' Additional Bankruptcy Procedure Covenants.  Sellers, at their sole expense, shall promptly make any filings, take all actions, and use their commercially reasonable efforts to obtain any and all other approvals and orders necessary or appropriate for consummation of the sale of the Purchased Assets, subject to its obligations to comply with any order of the Bankruptcy Court. In the event an appeal is taken, or a stay pending appeal is requested, from any of the foregoing orders of the Bankruptcy Court, Sellers shall immediately notify Buyer of such appeal or stay request and, upon Buyer's request, shall provide to Buyer within three Business Days after Sellers' receipt thereof a copy of the related notice of appeal or order of stay.  Sellers shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from any of such orders.

10.    Indemnification.

10.1    Indemnification of Buyer.  Sellers, jointly and severally, also hereby agree defend, indemnify, and hold harmless Buyer, each of its Affiliates, and each of their respective officers, directors, stockholders, employees, representatives, agents, successors and assigns (individually, and collectively, the "Buyer Indemnitees") against and in respect of with losses, liabilities, damages, actions, suits, proceedings, claims, demands, orders, assessments, amounts paid in settlement (if approved by Sellers as provided below), fines, costs or deficiencies, including, without limitation, interest, penalties and attorneys' fees and costs, including the cost of seeking to enforce this indemnity to the extent such enforcement is successful, caused by or resulting or arising from, or otherwise with respect to the Excluded Liabilities.  Notwithstanding anything to the contrary herein, since the representations, warranties and covenants of Sellers under this Agreement will lapse and be of no further force or effect after the Closing, Sellers shall not have any liability or obligation under this Section 10.1 with respect to any breach or asserted breach by Sellers of any representation, warranty or covenant under this Agreement following the Closing Date.

10.1.1    Notification of Circumstance Giving Rise to Claim for Indemnification by Buyer Indemnitees.  Buyer and Buyer Indemnitees hereby agree that promptly after any of them becomes aware of any circumstance which might reasonably be expected to become the subject matter of a claim for indemnification to be made by any of them against Sellers (a "Buyer Claim"), they will advise Sellers of such circumstance, and that they will afford Sellers from time to time, such information as Sellers shall reasonably request in connection therewith.  Buyer shall have the right to employ separate counsel in any action brought in respect of any matter that is or may be the subject of a Buyer Claim hereunder, and shall have the right to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of Buyer.  Buyer shall have exclusive control and discretion in the conduct of the defense of any such matter.  Sellers shall not be required to make any indemnification hereunder with respect to any amounts paid in settlement except to the extent that Sellers have approved the terms thereof.

10.2    Terms of Deposit; Indemnification of Sellers.

10.2.1  If Sellers terminate this Agreement pursuant to Section 5.4.4, the Purchase Price Deposit shall be retained by Sellers as liquidated damages and not as a penalty.  If, however, this Agreement is terminated for any other reason, including without limitation, because a sale to a competing bidder is approved by the Bankruptcy Court, the Purchase Price Deposit shall be returned to Buyer in its entirety, together with any interest earned thereon, within three (3) Business Days of such termination.

10.2.2  Notwithstanding any provisions of this Agreement to the contrary, Sellers acknowledge and agree that Sellers' sole and exclusive remedy against Buyer for any claim or cause of action arising in connection with this Agreement shall be limited to the Purchase Price Deposit plus recovery of actual damages suffered by Buyer in an amount not to exceed (a) one million dollars ($1,000,000.00) less (b) the amount of the Purchase Price Deposit.

10.2.3  Buyer also hereby agrees to defend, indemnify, and hold harmless Sellers and each of their representatives, agents, successors and assigns (individually, and collectively, the "Seller Indemnitees") against and in respect of any and all losses, liabilities, damages, actions, suits, proceedings, claims, demands, orders, assessments, amounts paid in settlement (if approved by Buyer as provided below), fines, costs or deficiencies, including, without limitation, interest, penalties and attorneys' fees and costs, including the cost of seeking to enforce this indemnity to the extent such enforcement is successful, caused by or resulting or arising from, or otherwise with respect to the Assumed Liabilities. Notwithstanding anything to the contrary herein, since the representations, warranties and covenants of Buyer under this Agreement will lapse and be of no further force or effect after the Closing, Buyer shall not have any liability or obligation under this Section 10.2.3 with respect to any breach or asserted breach by Buyer of any representation, warranty or covenant under this Agreement following the Closing Date.

10.2.4  Notification of Circumstance Giving Rise to Claim for Indemnification by a Seller Indemnitee.  Sellers and the Seller Indemnitees hereby agree that promptly after any of them becomes aware of any circumstance which might reasonably be expected to become the subject matter of a claim for indemnification to be made by any of them against Buyer Indemnitees under this Agreement (a "Seller Claim"), they will advise Buyer of such circumstance, and that they will afford Buyer, from time to time, such information as Buyer shall reasonably request in connection therewith.  Each Seller shall have the right to employ separate counsel in any action brought in respect of any matter that is or may be the subject of a Seller Claim, and shall have the right to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Seller.  Sellers shall have exclusive control and discretion in the conduct of the defense of any such matter.  Buyer shall not be required to make any indemnification hereunder with respect to any amounts paid in settlement except to the extent that Buyer has approved the terms thereof.

11.    Miscellaneous.

11.1    Buyer Guaranty.

11.1.1  Buyer Guarantor hereby unconditionally and irrevocably guarantees (the "Guaranty") to Sellers the due and punctual payment and performance by Buyer of all covenants, agreements, financial obligations and liabilities arising under or pursuant to this Agreement (including payment of the Purchase Price), whether direct or indirect, absolute or contingent, now or hereafter existing or due or to become due, in each case as and when the payment or performance of the same shall become due (collectively, the "Buyer Liabilities").  Sellers acknowledge and agree that they will not be entitled to make demand under this Section 11.1 unless and until it has first made demand for such payment against Buyer.  Sellers shall provide to Buyer Guarantor a copy of any notice sent to Buyer

under this Agreement simultaneously with, and in the same manner as, the sending of such notice. Buyer Guarantor and its successors do not waive any defenses that Buyer would have under the terms of this Agreement. This Guaranty shall automatically terminate in all respects upon termination of this Agreement; provided, however, that in the event this Agreement is terminated, this Guaranty shall survive solely with respect to Buyer Liabilities remaining at the time of, or by the express terms of this Agreement which are to survive, the termination of this Agreement.

11.1.2 Buyer Guarantor hereby makes the following representations and warranties to Sellers:

(i)    Validity of Agreement. All action on the part of Buyer Guarantor necessary for the authorization, execution, delivery and performance its obligations under the Guaranty by Buyer Guarantor, has been duly taken. The Guaranty shall constitute the valid and binding obligation of Buyer Guarantor, enforceable in accordance with its terms, except to the extent that enforceability thereof may be limited by general equitable principles or the operation of bankruptcy, insolvency, reorganization, moratorium or similar Law.

(ii)    Organization, Standing and Power. Buyer Guarantor is a corporation duly organized, validly existing and in good standing under the Law of the State of Delaware. Buyer Guarantor has all requisite corporate power and authority to own, lease and operate its properties, to carry on its business as now being conducted and to execute, deliver and perform the Guaranty and all writings relating hereto.

(iii)    No Violation; Third Party Consents.

(a)    The execution and delivery by Buyer Guarantor of this Agreement, the performance by Buyer Guarantor of its obligations hereunder, and the consummation by Buyer Guarantor of the Guaranty contemplated hereby, will not conflict with or violate, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, give rise to any right of termination, amendment, modification, acceleration or cancellation of any obligation or loss of any benefit under, result in the creation of any Encumbrance on any of the assets or properties of Buyer Guarantor pursuant to, or require Buyer Guarantor to obtain any consent, waiver, approval or action of, make any filing with, or give any notice to any Person as a result of or under, (a) the terms or provisions of the organizational documents of Buyer Guarantor, (b) any currently enforceable contract to which Buyer Guarantor is a party or is bound or (c) any Law applicable to Buyer Guarantor or any governmental order by which Buyer Guarantor is in any way bound or obligated.

(b)    No consent, waiver, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any Governmental Authority is required on the part of Buyer Guarantor in connection with the execution and delivery by Buyer Guarantor of this Agreement, the performance by Buyer Guarantor of its obligations under the Guaranty, and the consummation by Buyer Guarantor of the transactions contemplated thereby.

11.2    Post-Closing Reasonable Access to Records and Certain Personnel.

11.2.1 Access to Buyer. Subsequent to the Closing Date, so long as the Bankruptcy Case is pending, and following reasonable written request by Sellers to Buyer, (i) Buyer shall permit Sellers' counsel and other professionals employed in the Bankruptcy Case reasonable access to the financial and other books and records relating to the Purchased Assets, the Excluded Assets or the Business (whether in documentary or data form) for the purpose of (a) performing its undertakings and obligations under this Agreement and (b) the continuing administration of the Bankruptcy Case

(including, without limitation, the pursuit of any reserved avoidance, preference or similar action), which access shall include (x) the right of such professionals to use computer hardware and software systems included among the Purchased Assets to access data that may constitute Purchased Assets or Excluded Assets in furtherance of the purposes described above, or (y) the right of such professionals to copy, at Sellers' expense, such documents and records as they may request in furtherance of the purposes described above, and Buyer's copying and delivering to Sellers or their professionals such documents or records as they may request (but only to the extent Sellers or their professionals furnish Buyer with reasonably detailed written descriptions of the materials to be so copied and Sellers reimburse Buyer for the reasonable costs and expenses thereof), (ii) Buyer shall provide Sellers and such professionals (at no cost to Sellers) with reasonable access to senior members of management of the Business during regular business hours to assist Sellers in the continuing administration of the Bankruptcy Case, provided, that such access does not unreasonably interfere with Buyer's business operations, and (iii) Buyer shall (A) retain all books and records with respect to the Business for at least forty-eight (48) months and thereafter (B) give Sellers reasonable written notice prior to destroying or discarding any such books and records and in such case, if Sellers so request, Buyer shall allow Sellers to take possession of such books and records.

      11.2.2  Access to Sellers.  Subsequent to the Closing Date, so long as the Bankruptcy Case is pending and following reasonable written request by Buyer to Sellers (i) Sellers shall permit Buyer's management personnel reasonable access to the financial and other books and records relating to the Purchased Assets, or the Business (whether in documentary or data form) for the purpose of assisting Buyer in the operation of the Business, which access shall include (a) the right of such personnel to copy, at Buyer's expense, such documents and records as they may request in furtherance of the purposes described above, and (b) Sellers' copying and delivering to Buyer or its personnel such documents or records as they may request, but only to the extent Buyer or its personnel furnishes Sellers with reasonably detailed written descriptions of the materials to be so copied and Buyer reimburses Sellers for the reasonable costs and expenses thereof, (ii) Sellers shall provide Buyer and such personnel (at no cost to Buyer) with reasonable access to senior members of management of Sellers during regular business hours to assist Buyer in the operation of the Business, provided, that such access does not unreasonably interfere with Sellers' operations and shall be provided only if and so long as such personnel are retained and employed by Sellers, and (iii) Sellers shall either (A) retain all books and records with respect to the Business or (B) give Buyer reasonable written notice prior to destroying or discarding any such books and records and in such case, if Buyer so requests, Sellers shall allow Buyer to take possession of such books and records.

      11.3    Notices.  Unless otherwise provided herein, any notice, tender, or delivery to be given hereunder by either party to the other may be effected by personal delivery in writing or by electronic-mail or facsimile, or by overnight package delivery service or registered or certified mail, postage prepaid, return receipt requested, and shall be deemed communicated as of the date delivered.  Mailed notices shall be addressed as set forth below, but each party may change its address by written notice in accordance with this paragraph.

        To Sellers:      Boston Herald, Inc.
                      Seaport Center
                      70 Fargo Street, Suite 600
                      Boston, Massachusetts 02210
                      Attn: Patrick J. Purcell
                      Email: ppurcell@bostonherald.com
                      Fax: (617) 619-6551

With copies to: Brown Rudnick LLP
      One Financial Center
      Boston, Massachusetts 02111
      Attn:  William R. Baldiga, Esq.
      Email:  WBaldiga@brownrudnick.com
      Fax: (617) 289-0583

      and

      Paul J. Hartnett, Jr.
      One Raeburn Terrace
      Newton, Massachusetts 02461
      Email:  paul.hartnett91@gmail.com
      Fax: (617)964-7001

To Buyer and
Buyer Guarantor: c/o MediaNews Group, Inc.
      4 North 2nd Street, Suite #800
      San Jose, California 95113
      Attn: Marshall Anstandig
      Email: manstandig@bayareanewsgroup.com

With a copy to: Akin Gump Strauss Hauer & Feld LLP
      One Bryant Park
      New York, New York 10036
      Attn: David D'Urso, Esq. and Lisa Beckerman, Esq.
      Email: ddurso@akingump.com and lbeckerman@akingump.com
      Telephone: (212) 872-1010 and (212) 872-8012

  11.4 Entire Agreement. This Agreement and the documents to be executed pursuant hereto among the parties contain the entire agreement between the parties relating to the sale of the Purchased Assets.

  11.5 Amendment. This Agreement may be modified, amended or supplemented only by a written instrument duly executed by all the parties hereto; provided, however, that prior to the Closing Date, Buyer shall have the unilateral right to: add or delete from Schedules 2.1.10(a) and (b), as applicable, such Assumed Contracts and Rejected Contracts, respectively, as Buyer determines.

  11.6 Closing Date. All actions to be taken at the Closing pursuant to this Agreement shall be deemed to have occurred simultaneously, and no act, document or transaction shall be deemed to have been taken, delivered or effected until all such actions, documents and transactions have been taken, delivered or effected.

  11.7 Severability. If in any jurisdiction any term or provision hereof is determined to be invalid or unenforceable, (a) the remaining terms and provisions hereof shall be unimpaired, (b) any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction, and (c) the invalid or unenforceable term or provision shall, for purposes of such jurisdiction, be deemed replaced by a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision.

11.8    Further Assurances. The parties hereto will execute, acknowledge and deliver any further assurance, documents and instruments reasonably requested by any other party hereto for the purpose of giving effect to the transactions contemplated herein. After the Closing, if Sellers receive any payment on account of any Receivables conveyed under this Agreement, Sellers shall remit the proceeds of such payment, without any deduction or offset of any nature, to Buyers within five (5) Business Days after receipt. The proceeds of such receipts shall be deemed to be held in trust by Sellers for the sole benefit of Buyer, and such proceeds shall not constitute property of Sellers' estate(s) under the Bankruptcy Code.

11.9    Waiver. No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of other provisions, whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver shall be binding unless executed in writing by the party making the waiver.

11.10    Payment of Fees and Expenses. Except as expressly provided herein, each party to this Agreement shall be responsible for, and shall pay, all of its own fees and expenses, including those of its counsel, incurred in the negotiation, preparation and consummation of this Agreement and the transactions contemplated hereby.

11.11    No Survival. The respective representations and warranties of Sellers and Buyer set forth in Sections 6 and 7 hereof shall not survive the Closing, and, upon the Closing, shall be of no force or effect whatsoever, and the covenants and agreements of Sellers and Buyer herein shall not survive the Closing; provided, however, that (i) Sellers' indemnity obligations under Section 10.1 of this Agreement and Buyer's indemnity obligations under Section 10.2 of this Agreement shall survive closing and (ii) the covenants in Sections 3.1.4, 3.3, 11.2, 11.8 and 11.16.2 shall survive the Closing.

11.12    No Assignment; No Third Party Beneficiaries. Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned or delegated by Sellers or Buyer without the prior written consent of the other parties hereto and any purported assignment or delegation in violation hereof shall be null and void; provided, that Buyer may assign any of its rights and obligations hereunder to any one or more Persons which are Affiliates of Buyer in its sole discretion. This Agreement is not intended to, and shall not, confer upon any other Person except the parties hereto any rights or remedies hereunder.

11.13    Binding Effect. This Agreement shall inure to the benefit of, and be binding upon, the parties and their respective heirs, legal representatives, successors and permitted assigns. Nothing in this Agreement, express or implied, is intended to or shall confer upon any Person other than the parties, the Buyer Indemnitees and the Seller Indemnitees and their respective heirs, legal representatives, successors and permitted assigns, any rights, remedies, obligations or liabilities under, in connection with or by reason of this Agreement.

11.14    Applicable Law and Jurisdiction. This Agreement shall be governed by and construed in accordance with the Law of the State of Delaware without regard to the Law of the conflicts of Law of such State. THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO (i) THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT OR ANY ANCILLARY DOCUMENT EXECUTED PURSUANT HERETO; AND/OR (ii) THE PURCHASED ASSETS AND/OR THE ASSUMED LIABILITIES, AND THE PARTIES EXPRESSLY CONSENT TO AND AGREE NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION.

11.15    Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same document.  Delivery of an executed copy hereof by facsimile or email shall for all purposes be agreed to constitute such delivery of an executed copy.

11.16    Confidentiality; Publicity.

11.16.1 Subject to Section 9.4 and the requirements of the Bankruptcy Code and the Bankruptcy Court and except as otherwise explicitly provided in this Agreement, from the date hereof until the earlier of Closing Date or the date on which this Agreement is terminated, Buyer agrees that it shall, and shall cause its employees, officers, directors and Affiliates to, keep confidential all information (whether written or otherwise) provided to it by Sellers or Sellers' agents and representatives, except that Buyer may provide such information to its financial advisors, legal counsel and other consultants assisting Buyer; provided, that such advisors, counsel and consultants agree to become bound by the terms of this Section 11.16.1.  In the event this Agreement is terminated prior to Closing, Buyer shall return to Sellers all information provided to it by or on behalf of Sellers or shall provide Sellers with evidence reasonably satisfactory to Sellers that Buyer has destroyed such information.  Buyer's obligations under this Section 11.16.1 shall not extend to information which (a) has been in the possession of or known by Buyer on a non-confidential basis prior to the receipt thereof from Sellers or its agents or representatives, (b) has become generally available to the public other than as a result of disclosure by Buyer or its agents or representatives, (c) has become available to Buyer on a non-confidential basis from a third party not prohibited from making such disclosure to Buyer, or (d) is required to be disclosed to comply with any applicable Law; provided, that before Buyer makes such disclosure that Buyer use reasonable efforts to give Sellers prompt notice of the requirement or request for disclosure and use reasonable efforts to cooperate with Sellers in securing a protective order or other arrangement to limit disclosure of such confidential information only to parties agreeing to be bound by the terms of the protective order or other arrangement.

11.16.2 From and after the date hereof, Sellers shall not, without the prior written consent of Buyer, and Buyer shall not (and shall cause its Affiliates not to) without the prior written consent of Sellers, issue or permit to be issued any media, newspaper, wire service, trade journal or any other public statement, in each case concerning the transactions contemplated herein, without the approval of the other party, except as otherwise provided herein or as may be required by applicable Law, stock exchange rule or other applicable disclosure obligations, in which case the issuing party shall provide the other party, in writing, no less than one Business Day prior to such proposed statement, the content of the proposed statement and an opportunity to comment on the statement.

*[Signature page follows]*

IN WITNESS WHEREOF, the parties hereto have executed this Asset Purchase Agreement as of the day and year first above written.

**BUYER:**

**MNG-BH ACQUISITION LLC.**

By: _____
    Name: Marshall Anstandig
    Title: Vice President & General Counsel


Solely with respect to <u>Section 11.1</u> of this Agreement:

**BUYER GUARANTOR:**

**MEDIANEWS GROUP, INC.**

By: _____
    Name: Marshall Anstandig
    Title: Vice President & General Counsel


**SELLERS:**

**BOSTON HERALD, INC.**

By: _____
    Name: Patrick J. Purcell
    Title: President

**HERALD INTERACTIVE, INC.**

By: _____
    Name: Patrick J. Purcell
    Title: President

**HERALD MEDIA HOLDINGS, INC.**

By: _____
    Name: Patrick J. Purcell
    Title: President

**HERALD MEDIA, INC.**

By: _____
    Name: Patrick J. Purcell
    Title: President

## SCHEDULES TO ASSET PURCHASE AGREEMENT

These Schedules to Asset Purchase Agreement are provided, and should be read, in connection with the provisions of that certain Asset Purchase Agreement dated as of February 13, 2018 (the "Agreement") by and among Boston Herald, Inc., Herald Interactive Inc., Herald Media Inc., and Herald Media Holdings, Inc., as Sellers, MNG-BH Acquisition LLC, as Buyer, and MediaNews Group, Inc., as Buyer Guarantor. These Schedules are arranged in sections and subsections corresponding to the numbered sections and subsections contained in the Agreement. However, the disclosures in any section or subsection of these Schedules shall also qualify other sections or subsection of the Agreement to the extent that it is reasonably evident from a reading of the disclosure that such disclosure also qualifies or applies to such other section or subsection, the absence of a specific cross-reference notwithstanding.

All capitalized terms used in these Schedules and not otherwise defined herein shall have the same respective meanings as those terms as defined in the Agreement.

<u>Schedule 1.1.82</u>
<u>Subscription Liabilities</u>

Subscription liabilities as of December 31, 2017 totaled $908,670.

**Schedule 2.1.1**
**Media Assets-Publications**

1.  Boston Herald print and digital newspaper.
2.  Boston Herald Radio.
3.  Publications on Bostonherald.com.
4.  Content disseminated on Boston Herald news and sports apps and on the Boston Herald social media pages.

Schedule 2.1.7
Receivables

See attached.

**Herald Media Holdings, Inc.**
**Consolidated Aging Summary**
**As of October 29, 2017**
**APA Schedule 2.1.7**

| | | | Gross | Specific Reserve | General Reserve | Net | |
|---|---|---|---|---|---|---|---|
| Boston Herald | Print | Advertising | 1,054,351.92 | (36,659.60) | (58,309.07) | 959,383.25 | |
| Boston Herald | Print | Advertising not yet Charged | 48,974.90 | | | 48,974.90 | Classified advt not billed until expiration |
| Boston Herald | Print | Circulation | 1,839,115.52 | | (334,019.61) | 1,505,096.01 | Includes bad debt and returns reserves |
| Herald Interactive | Digital | Advertising | 363,806.95 | (29,000.00) | (39,020.15) | 295,786.80 | |
| Payment | Print | Credit Card in process | (5,557.15) | | - | (5,657.15) | Timing of credit card payment |
| Variance | | Misc | (1,078.92) | - | - | (1,078.92) | |
| Total | | | 3,299,513.32 | (65,659.60) | (431,348.83) | 2,802,504.89 | |

Boston Herald
Advertising Aging
**As of October 29, 2017**
APA Schedule 2.1.7

| Acct# | Name | Total | 10/01/17 | 09/01/17 | 08/01/17 | 07/01/17 | +7/01/17 | Reserved | NET |
|---|---|---|---|---|---|---|---|---|---|
| 781843480014 | QUIRK AUTO DEALERSHIP | 45,540.00 | 45,540.00 | | | | | | 45,540 |
| 617731010008 | HERB CHAMBERS DODGE | 45,300.00 | 21,600.00 | 23,700.00 | | | | | 45,300 |
| 03472 | WEINSTEIN COMPANY | 36,659.60 | | 21,684.23 | 14,975.37 | | | (36,659.60) | |
| 73679333 | COMM OF MASS TREASUR | 31,786.25 | 25,250.00 | 6,536.25 | | | | | 31,786 |
| 132184 | KOHLS | 25,568.79 | 8,101.78 | 7,581.14 | 9,885.87 | | | | 25,569 |
| 75580500L0 | HARMON LAW OFFICES P | 23,302.69 | 23,302.69 | | | | | | 23,303 |
| 33925 | METLIFE | 18,000.00 | 18,000.00 | | | | | | 18,000 |
| 1762720004 | SUBARU OF NEW ENGLAND | 16,575.00 | 7,800.00 | 8,775.00 | | | | | 16,575 |
| 3293 | MICHAELS STORES | 15,972.41 | 8,307.96 | 7,664.45 | | | | | 15,972 |
| 7732 | MATTRESS FIRM BEDQUA | 14,560.52 | 10,500.00 | 7,000.00 | (2,939.48) | | | | 14,561 |
| 6174220003PM | PRIDE MOTOR GROUP | 13,250.00 | 10,400.00 | 2,850.00 | | | | | 13,250 |
| 129583 | TARGET STORES | 12,596.82 | 6,318.90 | 5,018.24 | 1,259.68 | | | | 12,597 |
| 11935221201 | LAWLESS CHRYSLER JEEP | 12,300.00 | 4,300.00 | 8,000.00 | | | | | 12,300 |
| 54391 | BAYSTATE AUCTION CO. | 12,052.80 | 12,052.80 | | | | | | 12,053 |
| 0352 | WALGREENS | 11,544.98 | 5,804.82 | 4,572.73 | 1,167.43 | | | | 11,545 |
| 178922880007 | KELLY INFINITI | 11,000.00 | 11,000.00 | | | | | | 11,000 |
| 125851 | CVS PHARMACY | 10,991.02 | 6,142.94 | 4,848.08 | | | | | 10,991 |
| 617964000500 | COMMONWEALTH AUCTION | 10,912.00 | 10,912.00 | | | | | | 10,912 |
| 4011528302500 | LANDMARK AUCTION CO. | 10,810.80 | 6,879.60 | 3,931.20 | | | | | 10,811 |
| 176354777L0 | INSPECTIONAL SERVICE | 9,829.42 | 9,829.42 | | | | | | 9,829 |
| 0174220003LC | LIBERTY CHEVROLET | 9,690.00 | 4,845.00 | 4,845.00 | | | | | 9,690 |
| 79737543L0 | MASSDOT HIGHWAY | 9,466.83 | 3,274.08 | 6,192.75 | | | | | 9,467 |
| 129969 | MIRACLE EAR | 9,000.00 | 5,000.00 | 4,000.00 | | | | | 9,000 |
| R409725 | SEARS PREPRINT | 8,888.52 | 3,051.72 | 2,418.89 | 3,417.91 | | | | 8,889 |
| 617227655300 | PAUL E SAPERSTEIN CO | 8,862.75 | 8,862.75 | | | | | | 8,863 |
| 873507700 | SULLIVAN COMPANIES | 8,854.00 | 5,334.30 | 3,519.70 | | | | | 8,854 |
| 781391895001 | GRAVA CHRYSLER/JEEP/ | 8,800.00 | 8,800.00 | | | | | | 8,800 |
| 9782561500L0 | KORDE & ASSOCIATES | 8,594.46 | 8,594.46 | | | | | | 8,594 |
| 133042 | MACROMARK | 8,417.61 | 1,870.58 | 3,741.16 | 2,805.87 | - | - | - | 8,418 |
| 212587316400 | ADNET | 8,155.40 | 3,878.10 | 4,277.30 | | | | | 8,155 |
| 35433 | MOHEGAN SUN | 8,100.00 | | 4,050.00 | 4,050.00 | | | | 8,100 |
| 133050 | MODELL'S | 7,931.92 | | 2,000.00 | 5,931.92 | | | | 7,932 |
| 25845 | JUDGE ROTENBERG EDUC | 7,854.73 | 7,854.73 | | | | | | 7,855 |
| 5085411238PP | PARKER PROF'L DS | 7,711.01 | 3,725.96 | 3,985.05 | | | | | 7,711 |
| 781762420001 | JACK MADDEN FORD | 7,700.00 | 3,500.00 | 4,200.00 | | | | | 7,700 |
| 6179735681L0 | MASSPORT CAPITAL ACC | 7,560.54 | 5,557.32 | 2,003.22 | | | | | 7,561 |
| 6174220003MM | MICHAUD MITSUBISHI | 7,500.00 | 3,200.00 | 4,300.00 | | | | | 7,500 |
| 125106 | CITYOF LYNN | 7,500.00 | 3,000.00 | 4,500.00 | | | | | 7,500 |
| 212228940017 | GREYHOUND LINES INC. | 7,248.75 | 5,385.00 | 1,863.75 | | | | | 7,249 |
| 6174220003CJ | PRIORITY CHRYSLER JEEP | 7,200.00 | 4,500.00 | 2,700.00 | | | | | 7,200 |
| 617783130002 | BOSTON VOLKSWAGEN | 7,000.00 | 7,000.00 | | | | | | 7,000 |
| 125130 | NATIONAL WHOLESALE L. | 6,829.08 | 2,276.36 | 2,276.36 | 2,276.36 | | | | 6,829 |

**Boston Herald**
**Advertising Aging**
**As of October 29, 2017**

### APA Schedule 2.1.7

| Acct# | Name | Total | 10/01/17 | 09/01/17 | 08/01/17 | 07/01/17 | +07/01/17 | Reserved | Net |
|---|---|---|---|---|---|---|---|---|---|
| R247040 | MACY'S | 6,465.35 | 6,465.35 | - | - | - | - | - | 6,465 |
| 130570 | DICK'S SPORTING GOOD | 6,447.69 | 2,547.20 | 3,056.00 | 844.49 | - | - | - | 6,448 |
| 181935700001 | COLONIAL CADILLAC | 6,300.00 | 2,100.00 | 4,200.00 | - | - | - | - | 6,300 |
| 133919 | AETNA INC | 6,255.98 | 6,255.98 | - | - | - | - | - | 6,256 |
| R438420 | SULLIVAN TIRE COMPANY | 6,000.00 | 6,000.00 | - | - | - | - | - | 6,000 |
| 6178541257L0 | MASS HOUSING FINANCE | 5,895.50 | 1,475.49 | 4,420.01 | - | - | - | - | 5,896 |
| 410836718000 | DRUG ENFORCEMENT AGE | 5,800.00 | 5,800.00 | - | - | - | - | - | 5,800 |
| 81395530000 | COLONIAL NISSAN / ME | 5,800.00 | 5,800.00 | - | - | - | - | - | 5,800 |
| 126270 | WINDOW WORLD | 5,775.00 | 2,970.00 | 2,805.00 | - | - | - | - | 5,775 |
| 124630 | RAGGED MOUNTAIN RESO | 5,746.30 | 3,046.30 | 2,700.00 | - | - | - | - | 5,746 |
| 131850 | SYNCHRONY BANK | 5,600.00 | 1,400.00 | 2,800.00 | 1,400.00 | - | - | - | 5,600 |
| 133388 | DIRECT FEDERAL CREDI | 5,512.50 | 5,512.50 | - | - | - | - | - | 5,513 |
| 7731010015 | HERB CHAMBERS KIA | 5,500.00 | 2,400.00 | 3,100.00 | - | - | - | - | 5,500 |
| 781237355304 | COLONIAL BUICK PONTI | 5,400.00 | 5,400.00 | - | - | - | - | - | 5,400 |
| 55437 | DELL COMPUTER | 5,239.24 | 2,000.44 | 2,159.20 | 1,079.60 | - | - | - | 5,239 |
| 127065 | VISIT FLORIDA | 5,000.00 | 5,000.00 | - | - | - | - | - | 5,000 |
| 6179694646L0 | DEPT OF SOCIAL SERVI | 4,950.00 | 4,950.00 | - | - | - | - | - | 4,950 |
| 617381900000 | HONDA CARS OF BOSTON | 4,925.00 | 1,400.00 | 3,525.00 | - | - | - | - | 4,925 |
| 6176353880LI | DEPT NEIGHBORHOOD DE | 4,868.04 | 4,868.04 | - | - | - | - | - | 4,868 |
| 133835 | AARP | 4,800.00 | 2,400.00 | 2,400.00 | - | - | - | - | 4,800 |
| 133897 | AMAZON CORPORATE LLC | 4,750.00 | - | 4,750.00 | - | - | - | - | 4,750 |
| 1813318300GD | GOOD BROTHERS DODGE | 4,719.60 | 4,719.60 | - | - | - | - | - | 4,720 |
| 133299 | MCKINNONS MARKET-DAV | 4,660.00 | 1,080.00 | 3,580.00 | - | - | - | - | 4,660 |
| 401944460000 | IRVING SHECTMAN CO | 4,633.20 | 4,633.20 | - | - | - | - | - | 4,633 |
| 133492 | DULUTH TRADING COMPA | 4,500.00 | - | 4,500.00 | - | - | - | - | 4,500 |
| L080430 | CENTURY BANK | 4,500.00 | 2,250.00 | 2,250.00 | - | - | - | - | 4,500 |
| 113240 | AMERICAN CONSUMER SH | 4,405.01 | - | 4,405.01 | - | - | - | - | 4,405 |
| 453 | USADWEB LLC | 4,367.58 | 4,367.58 | - | - | - | - | - | 4,368 |
| D6N124035 | VALASSIS PREPRINTS | 4,351.91 | 4,480.00 | - | - | - | (128.09) | - | 4,352 |
| 131208 | MASSPORT | 4,260.00 | 4,260.00 | - | - | - | - | - | 4,260 |
| 7083835320FE | FED EX GROUND | 4,250.00 | 2,125.00 | 2,125.00 | - | - | - | - | 4,250 |
| 113623203000 | SPAULDING REHAB HOSP | 4,250.00 | 1,275.00 | 2,975.00 | - | - | - | - | 4,250 |
| 127733 | FOCUS FEATURES | 4,237.79 | 1,883.46 | 2,354.33 | - | - | - | - | 4,238 |
| 2783712242L0 | GUAETTA & BENSON | 4,156.50 | 4,156.50 | - | - | - | - | - | 4,157 |
| 508541123827 | WINGATE/SRC | 4,038.75 | - | 3,888.75 | 150.00 | - | - | - | 4,039 |
| 129059 | LUMBER LIQUIDATORS | 4,000.00 | 1,000.00 | 1,000.00 | 2,000.00 | - | - | - | 4,000 |
| 781935221202 | LAWLESS RAM | 4,000.00 | - | 4,000.00 | - | - | - | - | 4,000 |
| 7818435000L0 | MARCUS ERRICO EMMER | 3,831.97 | - | 3,831.97 | - | - | - | - | 3,832 |
| R292310 | MCKINNONS BUTCHER SH | 3,800.00 | 1,800.00 | 2,000.00 | - | - | - | - | 3,800 |
| 133953 | CONVENTION & VISITOR | 3,750.00 | 3,750.00 | - | - | - | - | - | 3,750 |
| 6172426000L0 | MASS WATER RESOURCES | 3,661.80 | 3,661.80 | - | - | - | - | - | 3,662 |
| 128747 | METRO CREDIT UNION | 3,600.00 | 1,800.00 | 1,800.00 | - | - | - | - | 3,600 |

Boston Herald
Advertising Aging
As of October 29, 2017
APA Schedule 2.1.7

| Acct# | Name | Total | 10/01/17 | 09/01/17 | 08/01/17 | 07/01/17 | +07/01/17 | Reserved | NET |
|---|---|---|---|---|---|---|---|---|---|
| 6179737543L2 | MASS DEPT OF TRANSPO | 3,575.64 | | 1,981.68 | 1,593.96 | - | - | - | 3,576 |
| 6172275660L0 | MICHIENZIE & SAWIN L | 3,457.17 | 3,457.17 | - | - | - | - | - | 3,457 |
| 133628 | PHRMA | 3,368.50 | | 3,368.50 | - | - | - | - | 3,369 |
| 133890 | VIOTREN | 3,308.19 | 1,102.73 | 2,205.46 | - | - | - | - | 3,308 |
| 6179691381L0 | BARR & COLE ATTORNE | 3,263.31 | 3,263.31 | | - | - | - | - | 3,263 |
| 81356909000 | HELPING HANDS OF AME | 3,234.00 | 3,234.00 | | - | - | - | - | 3,234 |
| 617864590002 | CAMBRIDGE HONDA / CH | 3,200.00 | 1,600.00 | 1,600.00 | - | - | - | - | 3,200 |
| 44918600086 | BETH ISRAEL -NEEDHA | 3,193.69 | 1,133.33 | 1,030.18 | 1,030.18 | - | - | - | 3,194 |
| 6177989700L0 | BOSTON WATER & SEWER | 3,090.99 | 3,090.99 | | - | - | - | - | 3,091 |
| C08L435002 | SUFFOLK DOWNS | 3,000.00 | | 750.00 | 2,250.00 | - | - | - | 3,000 |
| 617731010005 | HERB CHAMBERS COMPAN | 3,000.00 | 1,800.00 | 1,200.00 | - | - | - | - | 3,000 |
| 09594 | BROADWAY IN BOSTON | 3,000.00 | | 3,000.00 | - | - | - | - | 3,000 |
| 132225 | MATTRESS SUPERSTORE | 3,000.00 | | 3,000.00 | - | - | - | - | 3,000 |
| MR8N303350 | MOHEGAN SUN | 2,849.89 | 1,518.75 | 1,518.75 | - | - | (187.61) | | 2,850 |
| 617569604400 | CENTURY 21/MARIO REA | 2,700.00 | 2,700.00 | | | - | - | | 2,700 |
| 107717 | SIGMA MECHANICAL SER | 2,658.10 | 396.72 | 2,261.38 | - | - | - | - | 2,658 |
| 6174490895L0 | PRESERVE AFFORDABLE | 2,627.88 | 2,627.88 | | - | - | - | - | 2,628 |
| 6117436882900 | AVENUE AUCTION SALES | 2,574.00 | 2,574.00 | | - | - | - | - | 2,574 |
| 4012721400L0 | SHECHTMAN HALPERIN S | 2,520.18 | | 2,520.18 | - | - | - | - | 2,520 |
| 6176662600L0 | FRANK N DARDENO LAW | 2,520.18 | | 2,520.18 | - | - | - | - | 2,520 |
| 133969 | MACY'S | 2,500.00 | 2,500.00 | - | - | - | - | - | 2,500 |
| 129382 | MASS STATE LOTTERY | 2,500.00 | - | 2,500.00 | - | - | - | - | 2,500 |
| 617269160000 | JOHN F O'BRIEN FUNER | 2,450.70 | 2,450.70 | | - | - | - | - | 2,451 |
| 131024 | LAFORCE REALTY | 2,417.50 | 450.00 | 1,967.50 | - | - | - | - | 2,418 |
| 781475520007 | COLONIAL VOLKSWAGEN | 2,400.00 | 1,200.00 | 1,200.00 | - | - | - | - | 2,400 |
| 781393989900 | KNEELAND CONSTRUCTIO | 2,368.00 | 1,184.00 | 1,184.00 | - | - | - | - | 2,368 |
| 781843378300 | ARBOUR HEALTH SYSTEM | 2,287.50 | 500.00 | 787.50 | 1,000.00 | - | - | - | 2,288 |
| 781599120008 | PRIDE MOTOR GROUP-KI | 2,000.00 | 1,000.00 | 1,000.00 | - | - | - | - | 2,000 |
| 5088720900 | AMERICAN AUCTIONS | 1,918.80 | 959.40 | 959.40 | - | - | - | - | 1,919 |
| 7813208050L0 | NEW ENGLAND NEWSPAPE | 1,915.20 | - | - | - | - | 1,915.20 | - | 1,915 |
| 617265984000 | JAMES A. MURPHY & SO | 1,890.40 | 1,343.50 | 546.90 | - | - | - | - | 1,890 |
| 181248 | BANECARE MANAGEMENT | 1,823.34 | 911.67 | 911.67 | - | - | - | - | 1,823 |
| 8554777869L0 | STOX POSTING & PUBL | 1,816.54 | 1,816.54 | - | - | - | - | - | 1,817 |
| 508839700100 | NORTHEAST HOME AND E | 1,800.00 | 1,800.00 | - | - | - | - | - | 1,800 |
| 617963190001 | TOWNE AUCTION | 1,778.40 | 1,778.40 | - | - | - | - | - | 1,778 |
| 6175986700L0 | DONOGHUE BARRETI & S | 1,755.12 | 1,755.12 | - | - | - | - | - | 1,755 |
| 133657 | BOSTON BREAKERS | 1,750.00 | - | 1,000.00 | 750.00 | - | - | - | 1,750 |
| 978396609000 | NORTH READING SUBARU | 1,693.93 | 1,693.93 | - | - | - | - | - | 1,694 |
| 7819444900 | AUSTIN PREPATORY SCH | 1,687.50 | 1,687.50 | - | - | - | - | - | 1,688 |
| 6176354505L0 | CITY OF BOSTON | 1,647.81 | 818.52 | 829.29 | - | - | - | - | 1,648 |
| 617854125.7L1 | MASS HOUSING FINANCE | 1,637.04 | - | 1,637.04 | - | - | - | - | 1,637 |
| 129015 | BEST BUY | 1,633.58 | - | - | 1,633.58 | - | - | - | 1,634 |

Boston Herald
Advertising Aging
As of October 29, 2017
APA Schedule 2.1.7

| Acct# | Name | Total | 10/01/17 | 09/01/17 | 08/01/17 | 07/01/17 | +07/01/17 | Reserved | NET |
|---|---|---|---|---|---|---|---|---|---|
| 128180 | SEAGATE HOSPITALITY | 1,620.00 | 1,620.00 | | | | | | 1,620 |
| 21282111430S | OPTUM SERVICES INC | 1,618.21 | 1,618.21 | | | | | | 1,618 |
| 6174220003LM | LIBERTY MAZDA | 1,615.00 | | 1,615.00 | | | | | 1,615 |
| 617348855002 | COMMONWEALTH OF MASS | 1,608.32 | 1,608.32 | | | | | | 1,608 |
| 132242 | DOLLAR TREE STORE | 1,567.97 | 1,567.97 | | | | | | 1,568 |
| 781438049001 | STONEHAM FORD | 1,550.00 | 1,550.00 | | | | | | 1,550 |
| 132619 | THE HOME DEPOT | 1,544.00 | 1,544.00 | | | | | | 1,544 |
| 4149186000TP | TAKEDA PHARMACEUTICA | 1,541.76 | | 1,541.76 | | | | | 1,542 |
| 133232 | BIG Y FOODS INC | 1,500.00 | 1,500.00 | | | | | | 1,500 |
| 133907 | STATE LINE PET SUPPL | 1,500.00 | 1,500.00 | | | | | | 1,500 |
| 617300424700 | WGBH | 1,500.00 | 1,500.00 | | | | | | 1,500 |
| 133957 | HOLLISTER STAFFING | 1,500.00 | 1,500.00 | | | | | | 1,500 |
| 68127 | BOURNEWOOD HEALTH SY | 1,500.00 | 1,500.00 | | | | | | 1,500 |
| 133956 | NESN | 1,500.00 | 1,500.00 | | | | | | 1,500 |
| 133950 | WEGMANS FOOD MARKETS | 1,500.00 | 1,500.00 | | | | | | 1,500 |
| 133959 | BROOKLINE BANK | 1,500.00 | 1,500.00 | | | | | | 1,500 |
| 133958 | SALEM FIVE | 1,500.00 | 1,500.00 | | | | | | 1,500 |
| 508362817100 | JJ MANNING | 1,474.20 | 982.80 | 491.40 | | | | | 1,474 |
| 978454918900 | HARKINS REAL ESTATE | 1,450.80 | 795.60 | 655.20 | | | | | 1,451 |
| 6177192260L0 | BACK BAY DEVELOPMENT | 1,443.18 | 1,443.18 | | | | | | 1,443 |
| 6175413900L0 | MADISON PARK DEVELOP | 1,421.64 | 1,421.64 | | | | | | 1,422 |
| 133048 | FOXWOODS RESORT CASI | 1,420.00 | 710.00 | 710.00 | | | | | 1,420 |
| 6035980096L0 | FIRSTLIGHT FIBER | 1.400.10 | | 1,400.10 | | | | | 1,400 |
| 781762590002 | CADILLAC OF NORWOOD | 1,400.00 | 1,400.00 | | | | | | 1,400 |
| 133932 | PARTY CITY | 1,397.90 | 1,397.90 | | | | | | 1,398 |
| 7819825456L0 | CLOUGH HARBOUR & ASS | 1,378.56 | 1,378.56 | | | | | | 1,379 |
| 212821114311 | DICKS SPORTING GOODS | 1,375.00 | | | 1,375.00 | | | | 1,375 |
| 413733523800 | AARON POSNIK & COMPA | 1,358.00 | 679.00 | 679.00 | | | | | 1,358 |
| 617696118000 | TRAVERSE REAL ESTATE | 1,358.00 | 1,358.00 | | | | | | 1,358 |
| 617926515500 | MOODY STREET FINANCI | 1,354.16 | 1,354.16 | | | | | | 1,354 |
| 2122289400AB | ACADEMY BUS | 1,338.75 | 1,338.75 | | | | | | 1,339 |
| 4149186000TA | TARGET | 1,338.75 | 1,338.75 | | | | | | 1,339 |
| 132905 | EAST CAMBRIDGE SAVIN | 1,300.00 | 1,800.00 | | (500.00) | | | | 1,300 |
| 401274003307 | KEOLIS COMMUTER SERV | 1,275.00 | 1,275.00 | | | | | | 1,275 |
| 781878888801 | MIDWAY AUTO | 1,275.00 | 1,275.00 | | | | | | 1,275 |
| 781292479000 | THE BOSTON CONSORTIU | 1,250.00 | 1,250.00 | | | | | | 1,250 |
| 133817 | VNA CARE | 1,250.00 | | | 1,250.00 | | | | 1,250 |
| 124768 | MUSEUM OF FINE ARTS | 1,250.00 | 1,250.00 | | | | | | 1,250 |
| 131402 | COMMONWEALTH OF MASS | 1,250.00 | 1,250.00 | | | | | | 1,250 |
| 6172612261L0 | HINES | 1,249.32 | 1,249.32 | | | | | | 1,249 |
| 7813263961L0 | JDMD OWNER LLC | 1,206.24 | | 1,206.24 | | | | | 1,206 |
| 121474 | AGGANIS ARENA AT BOS | 1,200.00 | 1,200.00 | | | | | | 1,200 |

Boston Herald
Advertising Aging
As of October 29, 2017
APA Schedule 2.1.7

| Acct# | Name | Total | 10/01/17 | 09/01/17 | 08/01/17 | 07/01/17 | +07/01/17 | Reserved | NET |
|---|---|---|---|---|---|---|---|---|---|
| 132832 | IMPLANT DENTISTRY OF | 1,200.00 | 600.00 | 600.00 | | | | | 1,200 |
| 128853 | WHEELS FOR WISHES | 1,160.00 | 1,160.00 | | | | | | 1,160 |
| 6175684274L0 | EAST BOSTON SAVINGS | 1,152.00 | 1,152.00 | | | | | | 1,152 |
| 132725 | MURRAY PAVING | 1,150.00 | | 1,150.00 | | | | | 1,150 |
| 2129292200NF | NATIONAL UNION FIRE | 1,146.82 | 458.74 | 688.08 | | | | | 1,147 |
| 4149186000SL | SUN LIFE FINANCIAL | 1,146.82 | | | 1,146.82 | | | | 1,147 |
| 617625432000 | GEORGE L DOHERTY FUN | 1,136.80 | 1,136.80 | | | | | | 1,137 |
| 6176353880L0 | DEPT NEIGHBORHOOD DE | 1,130.85 | | 1,130.85 | | | | | 1,131 |
| 105264 | HANNAH KRISPIN LAW O | 1,129.32 | 704.58 | 424.74 | | | | | 1,129 |
| 133647 | NEURO QUELUMACROMAR | 1,102.73 | | 1,102.73 | | | | | 1,103 |
| T293430 | WANG CENTER PERFORMI | 1,100.00 | 1,100.00 | | | | | | 1,100 |
| 617731445500 | STANLEY J PAINE | 1,088.10 | 1,088.10 | | | | | | 1,088 |
| 6174512770L0 | METROPOLITAN AREA PL | 1,077.00 | 1,077.00 | | | | | | 1,077 |
| 617284337600 | PAUL BUONFIGLIO FUNE | 1,073.70 | 390.60 | 683.10 | | | | | 1,074 |
| 5085411238AG | AIR GAS | 1,070.29 | | 1,070.29 | | | | | 1,070 |
| 6177887450L0 | COMM OF MASS - LAND | 1,069.82 | 775.44 | 294.38 | | | | | 1,070 |
| 617282556400 J | OHN J O'CONNOR & SO | 1,050.90 | 1,050.90 | | | | | | 1,051 |
| 133858 | BLUE DIAMOND REAL ES | 1,050.00 | | 1,050.00 | | | | | 1,050 |
| 781380370000 | FRANK RONNE & ASSOC | 1,047.60 | 1,047.60 | | | | | | 1,048 |
| 7815921600L0 | QROE PRESERVATION DE | 1,012.38 | | 1,012.38 | | | | | 1,012 |
| 617786901600 | NE TRACTOR TRAILERS | 1,003.94 | 1,003.94 | | | | | | 1,004 |
| 133602 | ACCENTURE FEDERAL SE | 1,000.00 | 1,000.00 | | | | | | 1,000 |
| 133872 | NEW HAMPSHIRE MOTOR | 1,000.00 | | 1,000.00 | | | | | 1,000 |
| 119736 | OLD TOWN TROLLEY | 1,000.00 | 1,000.00 | | | | | | 1,000 |
| 617731010009 | HERB CHAMBERS TOYOTA | 1,000.00 | 1,000.00 | | | | | | 1,000 |
| 617731010012 | HERB CHAMBERS HYUNDA | 1,000.00 | 500.00 | 500.00 | | | | | 1,000 |
| 617731010002 | HERB CHAMBERS FORD | 1,000.00 | 1,000.00 | | | | | | 1,000 |
| 133960 | MASS CONVENTION CENT | 1,000.00 | 1,000.00 | | | | | | 1,000 |
| 133930 | SONIC | 1,000.00 | 1,000.00 | | | | | | 1,000 |
| 781224370002 | 128 SAAB VOLVO | 1,000.00 | 1,000.00 | | | | | | 1,000 |
| 123862 | EASTERN SHED COMPANY | 1,000.00 | 1,000.00 | | | | | | 1,000 |
| 603624181800 | JAMES ST JEAN AUCTIO | 982.80 | 982.80 | | | | | | 983 |
| 6177790005L0 | SIMPLY SELF STORAGE | 969.30 | 646.20 | 323.10 | | | | | 969 |
| 133882 | FONTBONNE ACADEMY | 937.50 | 937.50 | | | | | | 938 |
| 6173424000L1 | FOLEY & LARDNER LLP | 909.87 | | | 909.87 | | | | 910 |
| 133894 | INCYTE | 906.78 | 906.78 | | | | | | 907 |
| 83183 | FAMILY LIVES | 905.16 | 905.16 | | | | | | 905 |
| 5086983034L0 | WESTON & SAMPSON | 904.68 | | 904.68 | | | | | 905 |
| 29893 | THE SAGE SCHOOL | 900.00 | 900.00 | | | | | | 900 |
| 124359 | SACRED HEART | 900.00 | 900.00 | | | | | | 900 |
| 132102 | BU SCHOOL OF MEDICIN | 896.00 | 896.00 | | | | | | 896 |
| 978649788300 | ANIE PUBLISHING CORP | 894.70 | 577.30 | 317.40 | | | | | 895 |

Boston Herald
Advertising Aging
As of October 29, 2017
APA Schedule 2.1.7

| Acct# | Name | Total | 10/01/17 | 09/01/17 | 08/01/17 | 07/01/17 | +07/01/17 | Reserved | NET |
|---|---|---|---|---|---|---|---|---|---|
| 61730S3500L0 | DEPT PUBLIC UTILITIE | 893.91 | | 893.91 | | | | | 894 |
| 4149186000MP | MILLENNIUM PHARMACEU | 891.95 | 891.95 | | | | | | 892 |
| 6174827211L0 | KROKIDAS & BLUESTEIN | 884.74 | 884.74 | | | | | | 885 |
| N171190 | HOTLINE LISTS | 878.71 | 175.00 | 703.71 | | | | | 879 |
| AN5T452140 | TWENTIETH CENTURY FO | 877.20 | | 877.20 | | | | | 877 |
| 781963419900 | CARTWRIGHT FUNERAL H | 867.00 | 867.00 | | | | | | 867 |
| 131817 | PETCO | 862.01 | 862.01 | | | | | | 862 |
| 6177847480L0 | AXIS ENGINEERING GRO | 861.60 | 861.60 | | | | | | 862 |
| 133886 | THE ROXBURY LATIN SC | 843.75 | 843.75 | | | | | | 844 |
| 27810 | CATHOLIC MEMORIAL | 843.00 | 843.00 | | | | | | 843 |
| 126203 | RAYMOUR & FLANIGAN | 838.84 | 418.97 | 418.97 | 0.90 | | | | 839 |
| 6177224301L0 | BOSTON REDEVELOPMENT | 818.52 | 818.52 | | | | | | 819 |
| 508836390000 | AUCTION MARKETING GR | 814.80 | 814.80 | | | | | | 815 |
| 13397 | COMFORT SIT & SLEEP | 800.00 | | 800.00 | | | | | 800 |
| 133496 | ADVOCATES | 787.50 | | 787.50 | | | | | 788 |
| 9785316722VN | VNA CARE NETWORK | 787.50 | | 787.50 | | | | | 788 |
| 9786579714L0 | GCG ASSOCIATES INC. | 786.21 | | 786.21 | | | | | 786 |
| 5086976211L0 | CLARK- BALBONI & GI | 775.44 | 775.44 | | | | | | 775 |
| 617348855004 | COMMONWEALTH OF MASS | 775.44 | 1,550.88 | | (775.44) | | | | 775 |
| 6178681420L0 | MCPHAIL ASSOCIATES I | 764.67 | 764.67 | | | | | | 765 |
| 45280 | PAN & ASSOCIATES | 764.54 | 764.54 | | | | | | 765 |
| 617269193000 | JOS CASPER & SONS FU | 754.20 | 754.20 | | | | | | 754 |
| 129667 | NEW ENGLAND BALLISTI | 750.00 | 750.00 | | | | | | 750 |
| 130170 | KRAFT SOCCER LLC | 750.00 | | 750.00 | | | | | 750 |
| 617635960001 | BOSTON PUBLIC SCHOOL | 750.00 | 750.00 | | | | | | 750 |
| 617889272300 | FRANK A WELSH & SONS | 726.30 | 726.30 | | | | | | 726 |
| 123735 | FOODS PLUS | 720.00 | 720.00 | | | | | | 720 |
| 978365433100 | GEORGE HILL ORCHARDS | 720.00 | 360.00 | 360.00 | | | | | 720 |
| 781762048200 | KRAW-KORNACKFUNERAL | 710.70 | 710.70 | | | | | | 711 |
| 131680 | DISCOVER ALASKA | 701.48 | | 350.74 | 350.74 | | | | 701 |
| 617876781500 | DONOVAN AUFIERO FUNE | 695.80 | 695.80 | | | | | | 696 |
| 508430105000 | DANIEL P MCLAUGHLIN | 690.30 | 690.30 | | | | | | 690 |
| 781396770000 | GAFFEY FUNERAL SERVI | 687.70 | 504.10 | 183.60 | | | | | 688 |
| 6177274003L0 | COMM OF MASS DCAM | 678.51 | 678.51 | | | | | | 679 |
| 7815751911L0 | MBTA | 678.51 | 678.51 | | | | | | 679 |
| 6174664187L0 | CITY OF CHELSEA | 667.74 | 667.74 | | | | | | 668 |
| 6175575900L0 | ROBINSON & COLE | 667.74 | 667.74 | | | | | | 668 |
| 617242150900 | FRANK H CARR FUNERAL | 664.20 | 664.20 | | | | | | 664 |
| 6179241770L0 | VANASSE HANGEN BRUST | 656.97 | 441.57 | 215.40 | | | | | 657 |
| 978744521100 | TACHE AUCTIONS & SAL | 655.20 | 655.20 | | | | | | 655 |
| 617561473300 | J.M. MECHANICAL SERV | 653.44 | 653.44 | | | | | | 653 |
| 133328 | ST. ANTHONY SHRINE | 650.00 | 650.00 | | | | | | 650 |

Boston Herald
Advertising Aging
As of October 29, 2017
APA Schedule 2.1.7

| Acct# | Name | Total | 10/01/17 | 09/01/17 | 08/01/17 | 07/01/17 | +07/01/17 | Reserved | NET |
|-------|------|-------|----------|----------|----------|----------|-----------|----------|-----|
| 781933040000 | LYNCH-CANTILLON FUNE | 648.30 | 648.30 | | | | | | 648 |
| 6177424500L0 | WINN DEVELOPMENT | 624.66 | 624.66 | | | | | | 625 |
| 6177994475L0 | RELATED BEAL | 624.66 | | | 624.66 | | | | 625 |
| 7819630322L0 | MARATHON MOVING COMP | 624.66 | | 624.66 | | | | | 625 |
| 781284775600 | VERTUCCIO FUNERAL HO | 613.00 | 613.00 | | | | | | 613 |
| 781235410000 | GEORGE F DOHERTY FUN | 609.40 | 609.40 | | | | | | 609 |
| 6173384343L0 | BIG NIGHT ENTERTAINM | 603.12 | | | 603.12 | | | | 603 |
| 6176354904L1 | CITY OF BOSTON/PUBLI | 603.12 | | 603.12 | | | | | 603 |
| 6176520670L0 | HAYCON BUILDING LLC | 603.12 | | 603.12 | | | | | 603 |
| 6177275600L0 | DEPT OF MENTAL HEAL T | 603.12 | 603.12 | | | | | | 603 |
| 54113 | ISABELLA STEWART GAR | 600.00 | | 600.00 | | | | | 600 |
| 131255 | LEAF GUARD | 600.00 | 600.00 | | | | | | 600 |
| 781721274000 | OLYMPIC SYSTEMS CORP | 600.00 | | 600.00 | | | | | 600 |
| 133856 | STELIOS FAMILY RESTA | 600.00 | | 600.00 | | | | | 600 |
| 133566 | PEABODY ESSEX MUSEUM | 600.00 | | 600.00 | | | | | 600 |
| 101103 | SHELBURNE FARM | 600.00 | 600.00 | | | | | | 600 |
| 6174188259L0 | NEIGHBORHOOD OF AFFO | 581.58 | 581.58 | | | | | | 582 |
| 7812218400L0 | SIENA ENGINEERING | 581.58 | 581.58 | | | | | | 582 |
| 5084000292L0 | NATIONAL GRID | 581.58 | | | 581.58 | | | | 582 |
| 6176245672L0 | DEPT OF PUBLIC HEAL T | 576.00 | | 576.00 | | | | | 576 |
| 6176354904L0 | CITY OF BOSTON/PUBLI | 576.00 | 288.00 | 288.00 | | | | | 576 |
| 2122289400PP | PAYPAL INC. | 572.96 | 572.96 | | | | | | 573 |
| 617323860000 | W J GORMLEY FUNERAL | 567.30 | 567.30 | | | | | | 567 |
| 617569099000 | RUGGIERO MAZZARELLA | 565.90 | 565.90 | | | | | | 566 |
| 617445815000 | J.B. JOHNSON FUNERAL | 562.80 | 429.90 | 132.90 | | | | | 563 |
| 6174360300L0 | KEOHANE COMPANY | 560.04 | | | 560.04 | | | | 560 |
| 781843480013 | QUIRK PREOWNED | 560.00 | 560.00 | | | | | | 560 |
| 617277830000 | LEVINE CHAPELS | 558.40 | 558.40 | | | | | | 558 |
| 508675789400 | GEORGE A COLLIAS | 549.80 | 549.80 | | | | | | 550 |
| 508842640000 | ZEKOS GROUP | 543.20 | 543.20 | | | | | | 543 |
| 8022410195L0 | OFFICE OF VERMONT A. | 538.50 | | 538.50 | | | | | 539 |
| 2129292200MC | MCKINSEY & CO | 535.19 | 535.19 | | | | | | 535 |
| 6173577044L0 | FORT POINT ASSOCIATE | 527.73 | 527.73 | | | | | | 528 |
| 133935 | CLASSIC PIZZA | 524.70 | 524.70 | | | | | | 525 |
| AN5T401590 | SONY THEATRES | 522.55 | 522.55 | | | | | | 523 |
| 6173105294L0 | GREENBERG TRAURIG LL | 516.96 | 516.96 | | | | | | 517 |
| 9788977100L0 | EPSILON ASSOCIATES | 516.96 | 516.96 | | | | | | 517 |
| 617387312000 | CAFASSO FUNERAL HOME | 507.60 | 507.60 | | | | | | 508 |
| 617282115000 | J. FREEMAN | 506.16 | 506.16 | | | | | | 506 |
| 16782 | CRUISE TRAVEL OUTLET | 500.00 | 500.00 | | | | | | 500 |
| 133949 | THE GREATER BOSTON F | 500.00 | 500.00 | | | | | | 500 |
| R426470 | SPORTS ETC. | 500.00 | 500.00 | | | | | | 500 |

Boston Herald
Advertising Aging
As of October 29, 2017
APA Schedule 2.1.7

| Acct# | Name | Total | 10/01/17 | 09/01/17 | 08/01/17 | 07/01/17 | +07/01/17 | Reserved | NET |
|-------|------|-------|----------|----------|----------|----------|-----------|----------|-----|
| 617731010019 | HERB CHAMBERS LAND R | 500.00 | | 500.00 | | | | | 500 |
| 617731010003 | HERB CHAMBERS HONDA | 500.00 | | 500.00 | | | | | 500 |
| 617731010024 | HERB CHAMBERS LEXUS | 500.00 | 500.00 | | | | | | 500 |
| 130831 | NEUROMODULATION LAB | 500.00 | 500.00 | | | | | | 500 |
| 133909 | CAMBRIDGE SDA CHURCH | 500.00 | 500.00 | | | | | | 500 |
| 127840 | STOWE AREA ASSOCIATI | 500.00 | | 500.00 | | | | | 500 |
| 133142 | OTIC'S CONES POINT | 500.00 | | 500.00 | | | | | 500 |
| 133974 | SMUGGLERS NOTCH RESO | 500.00 | | 500.00 | | | | | 500 |
| 133141 | KILLINGTON RESORT | 500.00 | | 500.00 | | | | | 500 |
| 133861 | BENNINGTON CENTER FO | 500.00 | | 500.00 | | | | | 500 |
| 133123 | SOUTHERN VERMONT COL | 500.00 | | 500.00 | | | | | 500 |
| 133863 | THE SKINNY PANCAKE | 500.00 | | 500.00 | | | | | 500 |
| 130029 | STOWEFLAKE MOUNTAIN | 500.00 | | 500.00 | | | | | 500 |
| 132287 | STOWE MOUNTAIN LODGE | 500.00 | | 500.00 | | | | | 500 |
| CR2N178500 | FRANCISCAN MISSION | 500.00 | | 500.00 | | | | | 500 |
| 85025 | CAPTAIN MARDEN'S SEA | 499.65 | 499.65 | | | | | | 500 |
| 508746503300 | J MICHAEL DUNPHY | 491.40 | 491.40 | | | | | | 491 |
| 6178259687L0 | CHEVY AUTO BODY INC | 484.65 | 484.65 | | | | | | 485 |
| 123968 | STOWE FARM | 480.00 | 360.00 | 120.00 | | | | | 480 |
| 617427082800 | RIDLEY MEMORIAL INC. | 476.70 | 476.70 | | | | | | 477 |
| 617427562500 | RILEY FUNERAL HOME | 476.70 | 164.10 | 312.60 | | | | | 477 |
| 6177223234L0 | MASS BAY TRANS AUTHO | 466.70 | 466.70 | | | | | | 467 |
| 4135890141L0 | MASS MUNICIPAL WHOLE | 463.11 | 236.94 | 226.17 | | | | | 463 |
| 2129292200TE | TEL EPION INC | 458.74 | 458.74 | | | | | | 459 |
| 6175222424L1 | JACKSON SQ PARTNERS | 452.34 | 452.34 | | | | | | 452 |
| 6179737543L4 | MASS DOT | 452.34 | 452.34 | | | | | | 452 |
| 133975 | AMERICAN COLLECTIBLE | 450.00 | 450.00 | | | | | | 450 |
| 133324 | NEW ENGLAND PHILHARM | 450.00 | | 450.00 | | | | | 450 |
| 978256647200 | HARVEY ROBBINS PRODU | 450.00 | 450.00 | | | | | | 450 |
| 2129292200AI | AIG PC GLOBAL SERVIC | 445.99 | | 445.99 | | | | | 446 |
| 5084224444 | WEITBRECHT AUCTIONEE | 443.20 | 443.20 | | | | | | 443 |
| 6175741485L0 | SCD DRYDOCK 01 LLC | 441.57 | | | 441.57 | | | | 442 |
| 617567095500 | DIPIETRO & VAZZA FUN | 433.50 | | | 433.50 | | | | 434 |
| 6174821776L0 | GOULSTON & STORRS | 430.80 | | | 430.80 | | | | 431 |
| 91537 | ELITE ENTERTAINMENT | 425.00 | 425.00 | | | | | | 425 |
| 617387418000 | SALVATORE ROCCO & SO | 424.80 | 319.80 | 105.00 | | | | | 425 |
| 617567091000 | MAGRATH FUNERAL HOME | 417.90 | 417.90 | | | | | | 418 |
| 508653434200 | EVERETI & SON FUNERA | 413.70 | 413.70 | | | | | | 414 |
| 617536411000 | BOSTON HARBORSIDE HO | 410.10 | 410.10 | | | | | | 410 |
| 781272005000 | ED V SULLIVAN FUNERA | 410.10 | 410.10 | | | | | | 410 |
| R100230 | COMMERCIAL LOBSTER | 400.00 | 400.00 | | | | | | 400 |
| 133900 | BERKSHIRE HATHAWAY | 400.00 | | 400.00 | | | | | 400 |

**Boston Herald**
**Advertising Aging**
**As of October 29, 2017**
**APA Schedule 2.1.7**

| Acct# | Name | Total | 10/01/17 | 09/01/17 | 08/01/17 | 07/01/17 | +07/01/17 | Reserved | NET |
|---|---|---|---|---|---|---|---|---|---|
| 978369595200 | VERRILL FARM | 400.00 | 400.00 | - | - | - | - | - | 400 |
| 129761 | HERB CHAMBERS CJD OF | 396.00 | - | - | 396.00 | - | - | - | 396 |
| 129762 | HERB CHAMBERS OF MIL | 396.00 | - | - | 396.00 | - | - | - | 396 |
| 129755 | CENTRALCJD | 396.00 | - | - | 396.00 | - | - | - | 396 |
| 207838340500 | KELLY E RIOUY | 395.00 | 395.00 | - | - | - | - | - | 395 |
| 617298343201 | GEORGE LOPES FUNERAL | 382.80 | - | 382.80 | - | - | - | - | 383 |
| 5086538007L0 | IRWIN ENGINEERS | 376.95 | - | - | - | - | - | - | 377 |
| 132428 | MASS GENERAL HOSPITA | 375.00 | 375.00 | - | - | - | - | - | 375 |
| 978356344200 | WHITTIER-PORTER FUNE | 370.80 | - | - | 370.80 | - | - | - | 371 |
| 6179648090L0 | WILSON- MARINO & BON | 370.00 | - | - | - | - | - | - | 370 |
| 82949 | GABRIEL'S AUCTION/AP | 362.70 | 362.70 | - | - | - | - | - | 363 |
| 43895 | D L SAUNDERS REAL ES | 360.00 | 120.00 | 240.00 | - | - | - | - | 360 |
| 133638 | LAER REALTY | 360.00 | 120.00 | 240.00 | - | - | - | - | 360 |
| 508746223100 | DAVIS FUNERAL & CREM | 355.20 | 355.20 | - | - | - | - | - | 355 |
| 781233030000 | PORCELLA FUNERAL HOM | 351.60 | 351.60 | - | - | - | - | - | 352 |
| 781322083400 | WEIR FUNERAL HOME | 351.60 | 351.60 | - | - | - | - | - | 352 |
| 6174791000 | FLAVIN & FLAVIN | 345.00 | 345.00 | - | - | - | - | - | 345 |
| 132383 | DARRYL'S CORNER BAR | 336.00 | - | 336.00 | - | - | - | - | 336 |
| 9785578150L0 | WOODARD & CURRAN INC | 333.87 | - | - | 333.87 | - | - | - | 334 |
| 781944028400 | DOUGLASS FUNERAL HOM | 332.10 | - | - | - | - | - | - | 332 |
| 617325046100 | FOLSOM FUNERAL HOME | 328.20 | 328.20 | - | - | - | - | - | 328 |
| 781438013500 | ANDERSON-BRYANT FUNE | 328.20 | 328.20 | - | - | - | - | - | 328 |
| 6175471171L0 | MIDDLESEX SHERIFF'S | 327.60 | 327.60 | - | - | - | - | - | 328 |
| 978250154000 | THE JUMPP CO | 327.60 | 327.60 | - | - | - | - | - | 328 |
| 617524086100 | BRADY & FALLON FUNER | 320.40 | 320.40 | - | - | - | - | - | 320 |
| 617782100000 | LEHMAN-REEN-MCNAMARA | 313.20 | 313.20 | - | - | - | - | - | 313 |
| 13215 | TEWKSBURY FUNERAL HO | 308.40 | 308.40 | - | - | - | - | - | 308 |
| 133963 | NEWTON ROOFING RESID | 308.22 | 308.22 | - | - | - | - | - | 308 |
| 30514 | LAW OFFICES OF WEI J | 304.82 | 304.82 | - | - | - | - | - | 305 |
| 133866 | LYRIC STAGE COMPANY | 300.00 | - | 300.00 | - | - | - | - | 300 |
| 133964 | TUFTS UNIV SCHOOL OF | 300.00 | - | - | - | - | - | - | 300 |
| 781828721600 | SHARON MEMORIAL PARK | 300.00 | - | - | - | - | - | - | 300 |
| 617876404700 | A. J. SPEARS FUNERAL | 297.00 | - | - | - | - | - | - | 297 |
| 781447017000 | BLANCHARD FUNERAL HO | 293.70 | 293.70 | - | - | - | - | - | 294 |
| 508428570400 | JOHN LAWRENCE FUNERA | 288.90 | 288.90 | - | - | - | - | - | 289 |
| 132169 | HIMALAYAN BISTRO | 288.00 | - | 144.00 | 144.00 | - | - | - | 288 |
| 61 7423454585 | BANKRATE LLC | 286.76 | - | - | 286.80 | - | (0.04) | - | 287 |
| 2122289400TT | TTEC CONSULTING INC. | 280.36 | 280.36 | - | - | - | - | - | 280 |
| 781933670200 | PREFERRED ELECTRICAL | 280.33 | - | 280.33 | - | - | - | - | 280 |
| 6172827165L0 | A & B TOWING | 280.02 | - | 280.02 | - | - | - | - | 280 |
| 133223 | MICHELLE VARANO | 280.00 | 280.00 | - | - | - | - | - | 280 |
| 133829 | PHYSICIANS MUTUAL | 275.68 2 | - | - | 275.68 | - | - | | 276 |

Boston Herald
Advertising Aging
As of October 29, 2017
APA Schedule 2.1.7

| Acct# | Name | Total | 10/01/17 | 09/01/17 | 08/01/17 | 07/01/17 | +07/01/17 | Reserved | NET |
|---|---|---|---|---|---|---|---|---|---|
| 133801 | AMERICAN ADHESIVES C | 271.00 | 271.00 | - | - | - | - | - | 271 |
| 617876896400 | ROGERS FUNERAL HOME | 265.80 | 265.80 | - | - | - | - | - | 266 |
| 508385711600 | DOANE SEAL & AMES FU | 261.60 | 261.60 | - | - | - | - | - | 262 |
| 781878092000 | SULLIVAN FUNERAL HOM | 261.60 | 261.60 | - | - | - | - | - | 262 |
| 5088752657L0 | CDW CONSULTANTS INC | 258.48 | 258.48 | - | - | - | - | - | 258 |
| 617343560OL0 | BOSTON POLICE DEPART | 258.48 | | 258.48 | | | | | 258 |
| 32840 | SHEET METAL WORKERS | 241.50 | 241.50 | - | - | - | - | - | 242 |
| 40096 | COLDWELL BANKER HUNN | 240.00 | 120.00 | 120.00 | | | | | 240 |
| 131342 | PAUL KENNEDY | 240.00 | 240.00 | - | - | - | - | - | 240 |
| 5082958005L0 | ATLANTIC BOATS INC | 236.94 | 236.94 | - | - | - | - | - | 237 |
| 6174511300L0 | DIV SUMNER STREET LL | 236.94 | - | 236.94 | - | - | - | - | 237 |
| 9784655400L0 | HUGHES ENVIRONMENTAL | 236.94 | - | 236.94 | - | - | - | - | 237 |
| 6034245530 | GEORGE R. RIVET FUNE | 234.30 | 234.30 | - | - | - | - | - | 234 |
| 7706672040L0 | ENVIRONMENTAL CORP O | 229.76 | 229.76 | - | - | - | - | - | 230 |
| 6174511018L0 | KYLE ZICK LANDSCAPE | 226.17 | 226.17 | - | - | - | - | - | 226 |
| 6175678200L0 | COASTAL MARINE MGMT | 226.17 | 226.17 | - | - | - | - | - | 226 |
| 6177277824L0 | DEPT OF HOUSING & C | 226.17 | - | 226.17 | - | - | - | - | 226 |
| 6177775304L0 | CHUGANI VENTURES | 226.17 | - | 226.17 | - | - | - | - | 226 |
| 6178964386L0 | BSCGROUP | 226.17 | 226.17 | - | - | - | - | - | 226 |
| 7814418247L0 | EVERSOURCE ENERGY | 226.17 | 226.17 | - | - | - | - | - | 226 |
| 133520 | JOHN L REED | 225.00 | 225.00 | - | - | - | - | - | 225 |
| 133130 | ROCCOS CUCINA AND BA | 225.00 | 225.00 | - | - | - | - | - | 225 |
| 23634 | ST. MICHAEL CEMETERY | 225.00 | 225.00 | - | - | - | - | - | 225 |
| 133860 | FOWLER HOUSE CAFE | 225.00 | 225.00 | - | - | - | - | - | 225 |
| 617436515001 | INTERNATIONAL BROTHE | 219.22 | 219.22 | - | - | - | - | - | 219 |
| 781963207400 | HURLEY FUNERAL HOME | 218.70 | 218.70 | - | - | - | - | - | 219 |
| 978531047200 | CONWAY- CAHILL - BRO | 218.70 | 218.70 | - | - | - | - | - | 219 |
| 6173732240L0 | NORTHEASTERN UNIVERS | 215.40 | - | - | 215.40 | - | - | - | 215 |
| 132999 | O'NEILL FUNERAL HOME | 214.80 | - | 214.80 | - | - | - | - | 215 |
| 978851741100 | FARMER & DEE FUNERAL | 214.80 | 214.80 | - | - | - | - | - | 215 |
| 79977 | NEW ENGLAND SPORTS T | 202.86 | 202.86 | - | - | - | - | - | 203 |
| 36302 | BOSTON CATHOLIC CEME | 200.00 | 200.00 | - | - | - | - | - | 200 |
| 617924383800 | STANTON FUNERAL HOME | 196.30 | 203.10 | - | (6.80) | - | - | - | 196 |
| 978777790000 | C R LYONS & SONS FUN | 195.30 | 195.30 | - | - | - | - | - | 195 |
| 5087862230L0 | TETRA TECH INC | 193.86 | 193.86 | - | - | - | - | - | 194 |
| 617244203400 | EATON & MACKAY FUNER | 187.50 | 187.50 | - | - | - | - | - | 188 |
| 781843187800 | CARTWRIGHT-VENUTI FU | 187.50 | 187.50 | - | - | - | - | - | 188 |
| 133444 | MARGARET VARKAS | 180.00 | 180.00 | - | - | - | - | - | 180 |
| 121406 | EDWARDS. MALLORY | 180.00 | 180.00 | - | - | - | - | - | 180 |
| 113522 | MAGGIACOMO, CARMEN | 180.00 | 180.00 | - | - | - | - | - | 180 |
| 781335004500 | MCDONALD FUNERAL HOM | 179.70 | 179.70 | - | - | - | - | - | 180 |
| 617288210000 | BOSTON FIREFIGHTERS | 178.71 | 178.71 | - | - | - | - | - | 179 |

Boston Herald
Advertising Aging
As of October 29, 2017
APA Schedule 2.1.7

| Acct# | Name | Total | 10/01/17 | 09/01/17 | 08/01/17 | 07/01/17 | +07/01/17 | Reserved | NET |
|---|---|---|---|---|---|---|---|---|---|
| 617924344500 | DEVITO FUNERAL HOME | 175.80 | 175.80 | - | - | - | - | - | 176 |
| 781324868000 | A J SPADAFORA FUNERA | 175.80 | 175.80 | - | - | - | - | - | 176 |
| 6177272795L0 | COMMONWEALTH OF MASS | 172.32 | 172.32 | - | - | - | - | - | 172 |
| 4015283502L0 | DEPT OF CHILDREN YOU | 170.00 | 170.00 | - | - | - | - | - | 170 |
| 7816861218L0 | ATTY ROBERT J. DILIB | 170.00 | 170.00 | - | - | - | - | - | 170 |
| 11907 | BRASCO & SON MEMORIA | 168.60 | 543.60 | (375.00) | - | - | - | - | 169 |
| 617696420000 | ALFRED D THOMAS FUNE | 168.00 | 168.00 | - | - | - | - | - | 168 |
| 617889290000 | TORF FUNERAL SERVICE | 168.00 | 168.00 | - | - | - | - | - | 168 |
| 617323930000 | IUOE LOCAL4 | 164.22 | 164.22 | - | - | - | - | - | 164 |
| 978667993400 | SWEENEY FUNERAL HOME | 160.20 | 160.20 | - | - | - | - | - | 160 |
| 508473022500 | EDWARDS FUNERAL HOME | 156.30 | 156.30 | - | - | - | - | - | 156 |
| 781665194900 | GATELY FUNERAL HOME | 156.30 | 156.30 | - | - | - | - | - | 156 |
| 508583727200 | WAITI FUNERAL HOME | 152.40 | 152.40 | - | - | - | - | - | 152 |
| 617298801100 | JAMES W DOLAN FUNERA | 152.40 | 152.40 | - | - | - | - | - | 152 |
| 2035782200L0 | WEBSTER BANK | 150.78 | 150.78 | - | - | - | - | - | 151 |
| 617323369000 | W C CANNIFF & SONS I | 150.00 | 150.00 | - | - | - | - | - | 150 |
| 132190 | CEDAR GROVE GARDENS | 150.00 | 150.00 | - | - | - | - | - | 150 |
| 53762 | PATRICIA DAHL | 150.00 | 150.00 | - | - | - | - | - | 150 |
| 781326007400 | HOLDEN DUNN IRVINE & | 148.50 | 148.50 | - | - | - | - | - | 149 |
| 617288741000 | ROOFERS UNION LOCAL | 135.24 | 135.24 | - | - | - | - | - | 135 |
| 617825550000 | CARL MICCI & CO | 126.00 | 126.00 | - | - | - | - | - | 126 |
| 617268085500 | SPENCER FUNERAL HOME | 121.20 | 121.20 | - | - | - | - | - | 121 |
| 14053 | GRANITE STATE MORTGA | 120.00 | - | 120.00 | - | - | - | - | 120 |
| 125468 | CASTONGUAY, PAULINE | 120.00 | - | - | - | - | - | - | 120 |
| 133961 | JP GALLAGHER CONSTRU | 120.00 | 120.00 | - | - | - | - | - | 120 |
| 781843278200 | LAURIA REAL ESTATE | 120.00 | 120.00 | - | - | - | - | - | 120 |
| 23453 | HASSEY LANDSCAPING | 118.72 | - | - | - | - | 118.72 | - | 119 |
| 6177288700L0 | BOARD OF BAR OVERSEE | 114.88 | - | - | - | - | - | - | 115 |
| 131779 | BRIGHAM & WOMENS HOS | 112.00 | 112.00 | - | - | - | - | - | 112 |
| 133853 | BONAPITA | 112.00 | - | 112.00 | - | - | - | - | 112 |
| 6177374100L0 | FAN PIER DEVELOPMENT | 107.70 | - | 107.70 | - | - | - | - | 108 |
| 132803 | GREATER BOSTON MANAG | 104.50 | - | - | - | 104.50 | - | - | 105 |
| 6177224302L0 | BOSTON CIVIC DESIGN | 100.52 | 100.52 | - | - | - | - | - | 101 |
| 7818495555L0 | MASS STATE LOTTERY C | 100.52 | 100.52 | - | - | - | - | - | 101 |
| 5083896300L0 | COMM OF MASSACHUSETI | 93.34 | - | 93.34 | - | - | - | - | 93 |
| 617423454547 | BANKRATE LLC | 93.12 | - | - | 93.12 | - | - | - | 93 |
| 617479444001 | GIGGLES COMEDY CLUB | 65.00 | 300.00 | - | (235.00) | - | - | - | 85 |
| 6173486204L0 | ABCD INC- LAVETTE SE | 50.26 | 50.26 | - | - | - | - | - | 50 |
| 781270685900 | LITCHFIELD COMPANY | 48.00 | 48.00 | - | - | - | - | - | 48 |
| 133917 | JP KNIT AND STITCH | 45.00 | 45.00 | - | - | - | - | - | 45 |
| 133914 | PHILLIPS ACADEMY | 45.00 | 45.00 | - | - | - | - | - | 45 |
| 516374228211 | INGENIERIA DE SOFTWA | - | - | - | - | - | - | - | - |

Boston Herald
Advertising Aging
As of October 29, 2017
APA Schedule 2.1.7

| Acct# | Name | Total | 10/01/17 | 09/01/17 | 08/01/17 | 07/01/17 | +07/01/17 | Reserved | NET |
|---|---|---|---|---|---|---|---|---|---|
| 5163742282MM | MEDIAMATH INC | - | - | - | - | - | - | - | - |
| 617330807200 | COLLIER'S INTERNATIO | - | - | - | - | - | - | - | - |
| 617364239801 | BAY STATE SCHOOL OF | - | - | - | - | - | - | - | - |
| 6175310830L0 | DEWBERRY | - | - | - | - | - | - | - | - |
| 6176261250L | COMMONWEALTH OF MASS | - | - | - | - | - | - | - | - |
| 6176354968L | BOSTON PUBLIC WORKS | - | - | - | - | - | - | - | - |
| 6176359135L | BOSTON SCHOOL COMMIT | - | - | - | - | - | - | - | - |
| 6177224300L | BOSTON REDEVELOPMENT | - | - | - | - | - | - | - | - |
| 61 7773355100 | KEOHANE FUNERAL HOME | - | - | - | - | - | - | - | - |
| 6178594599L0 | JOAN C. GREEN ATTY A | - | - | - | - | - | - | - | - |
| 617965055000 | ASSET PROTECTION GRO | - | - | - | - | - | - | - | - |
| 6179652692L0 | HARVCO AUCTIONEERS | - | - | - | - | - | - | - | - |
| 6179798408L0 | MASS GAMING COMMISSI | - | - | - | - | - | - | - | - |
| 6179848100L0 | CLIFTON LARSON ALLEN | - | - | - | - | - | - | - | - |
| 650638056528 | ORACLE | - | - | - | - | - | - | - | - |
| 36484 | A L. PRIME ENERGY | - | - | - | - | - | - | - | - |
| 16480 | FOLSOM FUNERAL SERVI | - | - | - | - | - | - | - | - |
| 781396920000 | DELLO RUSSO FUNERAL | - | - | - | - | - | - | - | - |
| 781749031000 | PYNE FUNERAL HOME | - | - | - | - | - | - | - | - |
| 8577707822L0 | WYNN DESIGN & DEVELO | - | - | - | - | - | - | - | - |
| 8606772868L0 | BENDETI & MCHUGH PC | - | - | - | - | - | - | - | - |
| 9145976930L0 | CBRE INC | - | - | - | - | - | - | - | - |
| 978538973700 | MICHAEL PURCELL | - | - | - | - | - | - | - | - |
| 6176354170L0 | LICENSE BOARD | (5.00) | - | (5.00) | - | - | - | - | (5) |
| 99964 | ANN RODWELL | (10.00) | - | - | (10.00) | - | - | - | (10) |
| 603474589300 | ROBERT T. ROSIE | (30.00) | (30.00) | - | - | - | - | - | (30) |
| 126426 | GEORGE MCLAUGHLIN | (30.00) | (30.00) | - | - | - | - | - | (30) |
| 133951 | EDOUARDO ROGRIGUES | (42.00) | (42.00 | - | - | - | - | - | (42) |
| 31605 | HANSON, CYNTHIA | (42.00) | (42.00) | - | - | - | - | - | (42) |
| 92255 | MONIQUE LEMAY | (42.00) | (42.00) | - | - | - | - | - | (42) |
| 133916 | JAMES CRAIG | (42.00) | (42.00) | - | - | - | - | - | (42) |
| 133955 | CORT DIXON | (42.00) | (42.00) | - | - | - | - | - | (42) |
| 133777 | JENNA JOHNSON | (42.00) | - | - | - | (42.00) | - | - | (42) |
| 132723 | ROBERTA STAVROS | (42.00) | (42.00) | - | - | - | - | - | (42) |
| 508746216200 | CARTMELL FUNERAL HOM | (42.70) | - | - | - | - | (42.70) | - | (43) |
| 617522353400 | NANCY DOHERTY | (44.00) | (44.00) | - | - | - | - | - | (44) |
| 133943 | LYNNE R. JENKINS | (44.00) | (44.00) | - | - | - | - | - | (44) |
| 125822 | NICOLE JONES | (44.00) | (44.00) | - | - | - | - | - | (44) |
| 125849 | WOGHIREN, OSAZEE | (44.00) | (44.00) | - | - | - | - | - | (44) |
| 9788515580 | COMPETITIVE EDGE REA | (45.00) | 315.00 | - | - | - | (360.00) | - | (45) |
| 508278777500 | SONDRA BRETNA | (53.00) | (53.00) | - | - | - | - | - | (53) |
| 133977 | SAMMELO | (53.00) | (53.00) | - | - | - | - | - | (53) |

Boston Herald
Advertising Aging
As of October 29, 2017
APA Schedule 2.1.7

| Acct# | Name | Total | 10/01/17 | 09/01/17 | 08/01/17 | 07/01/17 | +07/01/17 | Reserved | NET |
|---|---|---|---|---|---|---|---|---|---|
| 133965 | CRYSTAL PERKINS | (53.00) | (53.00) | - | - | - | - | - | (53) |
| 6176245220L6 | DEPT OF PUBLIC HEAL T | (53.85) | 344.64 | - | - | - | (398.49) | - | (54) |
| 508543547100 | ROBERTS FUNERAL HOME | (54.00) | - | - | - | - | (54.00) | - | (54) |
| 132046 | LOUISE LEVESQUE | (70.00) | (70.00) | - | - | - | - | - | (70) |
| 56719 | STEVEN MASON | (84.00) | (84.00) | - | - | - | - | - | (84) |
| 13416 | TRYPHENA BLAKE | (88.00) | (44.00) | (44.00) | - | - | - | - | (88) |
| 133037 | VAN NGUYEN | (88.00) | (88.00) | - | - | - | - | - | (88) |
| 617924470000 | MACDONALD ROCKWELL & | (89.70) | (89.70) | - | - | - | - | - | (90) |
| 36349 | TOM CHOATE | (95.50) | (95.50) | - | - | - | - | - | (96) |
| 133979 | TUFTS UNIVERSITY | (100.00) | (100.00) | - | - | - | - | - | (100) |
| 36747 | JOHN HIGGINS | (101.43) | (101.43) | - | - | - | - | - | (101) |
| 133343 | VISIT SAVANNAH | (120.01) | (120.01) | - | - | - | - | - | (120) |
| 617524546400 | JAMAICA PLAIN REALTY | (132.00) | (132.00) | - | - | - | - | - | (132) |
| 132134 | EL ORIENTAL DE CUBA | (144.00) | (144.00) | - | - | - | - | - | (144) |
| 132394 S | ERENA RISTORANTE | (144.00) | (144.00) | - | - | - | - | - | (144) |
| 4137487714L0 | HAMPDEN COUNTY JUVEN | (153.00) | - | - | - | - | (153.00) | - | (153) |
| 99844 | WANDA COTE | (168.00) | (168.00) | - | - | - | - | - | (168) |
| 617348855001 | COMMONWEALTH OF MASS | (178.50) | - | - | - | - | - | - | (179) |
| 98397 | COASTAL CARRIERS | (181.51) | (181.51) | - | - | - | - | - | (182) |
| 125620 | HOMETOWN COLLECTIBLE | (202.96) | (202.96) | - | - | - | - | - | (203) |
| 132345 | KITCHEN MAGIC | (207.88) | - | - | - | - | - | - | (208) |
| 508255025900 | NICKERSON FUNERAL HO | (214.10) | - | - | - | - | - | - | (214) |
| 6173714486L0 | AECOM | (215.40) | - | - | - | - | (215.40) | - | (215) |
| 127856 | ANGELA ABREU | (244.00) | (244.00) | - | - | - | - | - | (244) |
| 116498 | WESLEY TEODORO | (244.00) | (244.00) | - | - | - | - | - | (244) |
| 133762 | JOAO PAULO GONCALVES | (244.00) | (244.00) | - | - | - | - | - | (244) |
| 90344 | PHILLIP MALONSON | (250.00) | (250.00) | - | - | - | - | - | (250) |
| 90904 | TWELVE STEP EDUCATIO | (250.00) | (250.00) | - | - | - | - | - | (250) |
| 130454 | ANDREOZZI CONSTRUCTI | (265.23) | - | - | - | - | (265.23) | - | (265) |
| 131411 | GENNARO'S EATERY | (288.00) | (288.00) | - | - | - | - | - | (288) |
| 68277 | DORCHESTER DOOR & WI | (300.00) | (300.00) | - | - | - | - | - | (300) |
| NK1N377130 | NEWS AMERICA MKTG | (304.50) | 3,419.05 | - | (0.04) | (0.03) | (3,723.48) | - | (305) |
| BI7L041 370 | BETHEL INN & COUNTRY | (308.00) | - | - | - | - | (308.00) | - | (308) |
| 132560 | MEGAMATES | (309.27) | (299.41) | - | (9.86) | - | - | - | (309) |
| 617734666600 | ACE TICKET | (316.47) | (316.47) | - | - | - | - | - | (316) |
| 133966 | DICAPRI PIZZERIA | (334.80) | (334.80) | - | - | - | - | - | (335) |
| 131568 | PRECISION AD PLACE ME | (344.82) | (344.82) | - | - | - | - | - | (345) |
| 972643181300 | DEEPTHI RAJA ATTY AT | (374.75) | - | - | - | - | (374.75) | - | (375) |
| 67684 | YEON KIM | (394.76) | (394.76) | - | - | - | - | - | (395) |
| 130773 | STEVE ROSENBLUM | (405.72) | (405.72) | - | - | - | - | - | (406) |
| 617445522700 | WALDWIN GROUP | (413.95) | (413.95) | - | - | - | - | - | (414) |
| 120673 | CHUCHRAN AUTO PARTS | (448.00) | (448.00) | - | - | - | - | - | (448) |

## Boston Herald
## Advertising Aging
## As of October 29, 2017
## APA Schedule 2.1.7

| Acct# | Name | Total | 10/01/17 | 09/01/17 | 08/01/17 | 07/01/17 | +07/01/17 | Reserved | NET |
|---|---|---|---|---|---|---|---|---|---|
| 114558 | FELIPE PINHEIRRO | (448.00) | (448.00) | - | - | - | - | - | (448) |
| 603772537700 | SHERWOOD FOREST | (475.00) | (475.00) | - | - | - | - | - | (475) |
| 6506380565 | MS MICROSOFT | (522.44) | (522.44) | - | - | - | - | - | (522) |
| 310476301201 | BYK ADVERTISING INC. | (563.76) | (563.76) | - | - | - | - | - | (564) |
| 130837 | SALADORE CJD | (571.42) | | - | - | - | (571.42) | - | (571) |
| 49203 | SPOLIDORO PLUMBING | (579.18) | (579.18) | - | - | - | - | - | (579) |
| 100810 | DICK GORDON SPORTS | (579.80) | (579.80) | - | - | - | - | - | (580) |
| 508697433200 | PROPHETT -CHAPMAN-COL | (593.70) | (593.70) | - | - | - | - | - | (594) |
| 91239 | MASS MARITIME ACADEM | (705.50) | (705.50) | - | - | - | - | - | (706) |
| 132562 | LIVE LINKS | (893.39) | (864.92) | - | (28.47) | - | - | - | (893) |
| 9788073386 | ROBERT S. MCKITTRICK | (931.20) | (931.20) | - | - | - | - | - | (931) |
| 133880 | DREW BRADY COMPANY I | (1,000.00) | (1,000.00) | - | - | - | - | - | (1,000) |
| 133576 | NORTHEAST MENS CLINI | (1,020.00) | (1,020.00) | - | - | - | - | - | (1,020) |
| 133567 | BAY FERRIES LIMITED | (2,000.00) | | - | - | (2,000.00) | - | - | (2,000) |
| 6173161664L0 | GREYSTONE MGMT SOLUT | (2,132.46) | (2,132.46) | - | - | - | - | - | (2,132) |
| 6174821360L0 | RICH MAY | (2,229.39) | (2,229.39) | - | - | - | - | - | (2,229) |
| 6172272755L0 | ATTY KIRK P ROTHEMIC | (3,683.34) | (3,683.34) | - | - | - | - | - | (3,683) |
| | Grand Totals | 1,054,531.92 | 658,631.22 | 336,982.40 | 66,024.60 | (1,937.53) | (5,349) | (36,660) | 1,017,692 |

**Boston Herald**
**Circulation Aging**
**As of October 29, 2017**
**APA Schedule 2.1.7**

BALANCE DUE TOTAL: $1,843,964.19

Weekly
Office is

| Blank | Acct# | Account Name | Balance | Current | Per2 | Per3 | Per4 | Per4Plus |
|-------|-------|--------------|---------|---------|------|------|------|----------|
| WE | 01530 | NORTH SHORE NEWS | 125,548.57 | 15,496.20 | 16,060.33 | 15,063.65 | 16,036.02 | 62,892.37 |
| WE | 01040 | HOLYOKE NEWS | 82,968.92 | 10,253.82 | 10,027.88 | 9,477.69 | 9,953.52 | 43,256.01 |
| WE | 00720 | DANVERS NEWS -1ST | 67,270.81 | 8,571.42 | 8,148.14 | 8,100.80 | 8,552.12 | 33,898.33 |
| WE | 01360 | LEOMINSTER * COUNTRY | 53,070.28 | 11,178.31 | 10,647.78 | 10,868.00 | 11,091.80 | 23,351.31 |
| WE | 00840 | NEW BEDFORD TIMES | 46,960.35 | 3,682.58 | 3,739.97 | 3,376.02 | 3,783.51 | 38,488.20 |
| WE | 01370 | LEOMINSTER- SUBURBAN | 41,655.37 | 7,317.31 | 7,274.41 | 7,332.33 | 7,378.80 | 17,657.50 |
| WE | 00855 | PROVIDENCE JNRL/PO#315-3273355 | 39,750.98 | 8,455.82 | 8,483.17 | 7,506.68 | 5,942.28 | 11,267.42 |
| WE | 01320 | LEOMINSTER/ MANCHESTER | 35,718.65 | 5,012.15 | 5,022.16 | 5,019.30 | 5,045.76 | 19,651.61 |
| WE | 01350 | NORTHEAST NEWS DIST | 32,181.55 | 15,005.71 | 15,013.57 | 5,699.37 | - | - |
| WE | 013509851 | NORTHEAST /BILLERICA | 25,692.67 | 3,858.80 | 3,921.78 | 3,746.60 | 3,898.90 | 16,755.41 |
| WE | 01060 | HUDSON RPM | 25,450.42 | 4,946.37 | 5,487.63 | 5,013.61 | 5,278.85 | 4,966.21 |
| WE | 01550 | NORTH SHORE NEWS | 23,424.51 | 4,350.06 | 4,425.85 | 4,299.47 | 4,879.16 | 7,495.88 |
| WE | 01351 | NORTHEAST NEWS DIST | 17,490.34 | 6,506.50 | 6,389.24 | 6,284.85 | 4,243.92 | |
| WE | 01380 | LEOMINSTER II | 8,919.69 | 6,416.18 | 6,198.99 | 3,981.32 | 893.85 | - |
| WE | 016409991 | PITTSFIELD NEWSDLRS | 8,839.57 | 2,112.83 | 2,260.12 | 2,101.15 | 2,313.03 | 132.56 |
| WE | 01960 | WHITE MOUNTAIN NEWS | 8,251.97 | 1,716.72 | 1,754.61 | 1,733.92 | 1,873.30 | 1,761.02 |
| WE | 467429999 | LEOMINSTER- HD | 4,430.13 | 1,409.40 | 1,409.40 | 1,409.40 | 1,409.40 | 2,614.37 |
| WE | 01290 | KOPPLEMANN. HP | 3,196.14 | 810.10 | 821 .54 | 824.99 | 802.95 | 1,170.55 |
| WE | 01062 | CONCORD MONITOR | 1,147.61 | 1,225.70 | 519.75 | 1,450.69 | - | - |
| WE | 197389999 | HOTALINGS NEWS AGENCY | | 268.13 | 268.13 | - | 268.13 | 343.22 |

CREDIT HOLD TOTAL: ($4,848.57)

Weekly
Office is
Blank

| WE | 00635 | BURLINGTON NEWS/WATERBURY | (297.28) | (297.28) | - | - | - | - |
|----|-------|---------------------------|----------|----------|---|---|---|---|
| WE | 00856 | PRO-JO LONDON /PO 315-3273355 | (467.98) | (467.98) | - | - | - | - |
| WE | 492089999 | HERALD ANGELS NEWSPAPERS IN EDUCATION | (814.60) | (814.60) | - | - | - | - |
| WE | 497009999 | HOUSE ACCOUNT | (3,268.71) | (3,268.71) | - | - | - | - |

Boston Herald
Advertising Aging
As of October 29, 2017
APA Schedule 2.1.7

| Acct# | Name | Total | 10/01/17 | 09/01/17 | 08/01/17 | 07/01/17 | +07/01/17 | Reserved | NET |
|---|---|---|---|---|---|---|---|---|---|
| H304099 | UNDERTONE | 51,888 | 15,562 | 17,048 | 19,278 | - | - | - | 51,888 |
| H304091 | AMAZON I A9.COM | 50,569 | 21,294 | 13,774 | 15,501 | - | - | - | 50,569 |
| H1 10738 | GOOGLE | 40,000 | 40,000 | - | - | - | - | - | 40,000 |
| H304329 | OS4 MEDIA LLC | 32,629 | 10,673 | 11,456 | 10,500 | - | (0) | - | 32,629 |
| H304630 | APPNEXUS | 28,041 | 10,146 | 10,395 | 7,500 | (0) | - | - | 28,041 |
| H304102 | RUBICON PROJECT | 27,061 | 10,246 | 12,515 | 4,300 | - | - | - | 27,061 |
| H301530 | PUBMATIC | 19,209 | 7,419 | 5,290 | 6,500 | - | - | - | 19,209 |
| H303720 | CENTRO/DUNKIN DONUTS | 15,538 | - | 15,538 | - | - | - | - | 15,538 |
| H301409 | SALEM STATE UNIVERSI | 14,000 | 11,381 | 2,619 | - | - | - | - | 14,000 |
| H302177 | CONNELLY/MASS STATE | 12,000 | 4,600 | 7,400 | - | - | - | - | 12,000 |
| H304912 | OPEN X | 10,780 | 9,280 | 1,500 | - | - | - | - | 10,780 |
| H304464 | DISTRICT M INC | 8,420 | 4,464 | 3,506 | 450 | - | - | - | 8,420 |
| H304088 | ACCESS TO MEDIA | 7,528 | - | 1,995 | 5,532 | - | - | - | 7,528 |
| H302966 | UNDERTONE/RAYMOUR&FL | 4,505 | 2,166 | 1,773 | 565 | - | - | - | 4,505 |
| H303538 | CITY OF BOSTON | 2,976 | 1,636 | 1,340 | - | - | - | - | 2,976 |
| H304419 | RAGGED MOUNTAIN | 2,100 | - | 2,100 | - | - | - | - | 2,100 |
| H302128 | VERMONT DEPT. OF TOU | 1,985 | 1,985 | - | - | - | - | - | 1,985 |
| H304516 | MAKING MODERN | 1,550 | 1,550 | - | - | - | - | - | 1,550 |
| H304515 | REFLECTIONS MEDICAL | 1,500 | 1,500 | - | - | - | - | - | 1,500 |
| H302146 | UMASS LOWELL | 1,500 | - | 1,500 | - | - | - | - | 1,500 |
| H403327 | BROOKLINE BANK | 1,250 | - | 1,250 | - | - | - | - | 1,250 |
| H304961 | NOVUS/MASS DENTAL SO | 1,100 | 1,100 | - | - | - | - | - | 1,100 |
| H304514 | ARLINGTON CATHOLIC H | 799 | 799 | - | - | - | - | - | 799 |
| H304327 | BOSTON CONVENTION MA | 500 | - | 500 | - | - | - | - | 500 |
| H304724 | AUTHENTIC CARIBBEAN | 225 | - | - | - | 225 | - | - | 225 |
| H304944 | WILLARD STREET INN | 163 | 163 | - | - | - | - | - | 163 |
| H302930 | GAMUT MEDIA | - | - | - | - | - | - | - | - |
| H304283 | CLAN INTERNATIONAL L | (3,000) | - | - | - | - | (3,000) | - | (3,000) |
| H304960 | NEXT MILLENNIUM | (8,976) | - | (8,976) | - | - | - | - | (8,976) |
| OTHER NDN | | 29,000 | - | - | - | - | 29,000 | (29,000) | - |
| OTHER FLIP | | 8,968 | - | - | - | - | 8,968 | - | 8,968 |
| **Grand Totals** | | 363,807 | 155,964 | 102,524 | 70,126 | 225 | 34,968 | (29,000) | 334,807 |

## HERALD MEDIA
### CONSOLIDATED FIXED ASSETS
### Summary
### As of October 29, 2017
### Schedule 2.1.8

| | | GROSS ASSET | ACCUMULATED DEPRECIATION | NET ASSET VALUE |
|---|---|---|---|---|
| BOSTON HERALD | Included | 4,997,197.75 | (4,714,261.54) | 282,936.21 |
| | Excluded | 35,738.25 | (35,738.25) | - |
| | Net | 5,032,936.00 | (4,749,999.79) | 282,936.21 |
| HERALD INTERACTIVE | | 314,437.57 | (269,323.27) | (45,114.30 |
| TOTAL | | 5,347,378.57 | (5,019,323.06) | 328,050.51 |

## Boston Herald Fixed Asset Listing

### Schedule 2.1.8

| System No. | Description | G/L Account Number | In Sve Date | Method | Remai Life | Acquired Value | Run Through Date | Accum Depreciation | Net Value | |
|---|---|---|---|---|---|---|---|---|---|---|
| 000507 | Business System – Software | 000-122075 | 07/07/99 | SLMM | 05 00 | 143,577.00 | 10/31/17 | 143,577.00 | - | 100.00% |
| 000509 | PPI Adven Mgau Sys-Sftwr | 000-122075 | 11/05/99 | SLMM | 05 00 | 595,746.00 | 10/31/17 | 595,746.00 | - | 100.00% |
| 000541 | Cobalt networking Web Cache | 000.122070 | 02/13/01 | SLMM | 03 00 | 3,950.00 | 10/31/17 | 3,950.00 | - | 100.00% |
| 000552 | Printer for AD Layout | 000-122070 | 05/15/01 | SLMM | 03 00 | 1,995.00 | 10/31/17 | 1,995.00 | - | 100.00% |
| 000577 | Lawson Crystal Enterprise- hdwr | 000-122070 | 05/19/02 | SLMM | 03 00 | 5,953.00 | 10/31/17 | 5,953.00 | - | 100.00% |
| 000594 | 3 Cobalt cubes/ servcers | 000-122070 | 02/16/03 | SLMM | 03 00 | 6,116.00 | 10/31/17 | 6,116.00 | - | 100.00% |
| 000603 | Edcapture Circ Credit Card System | 000-122075 | 01/27/01 | SLMM | 03 00 | 5,240.00 | 10/31/17 | 5,240.00 | - | 100.00% |
| 000604 | Xpance advt tracking system | 000-122075 | 01/27/01 | SLMM | 03 00 | 74,081.00 | 10/31/17 | 74,081.00 | - | 100.00% |
| 000606 | NTI SC Circ Source Code | 000-122075 | 04/27101 | SLMM | 03 00 | 20,000.00 | 10/31/17 | 20,000.00 | - | 100.00% |
| 000607 | Edgcapture cc sys to multiuser | 000-122075 | 11/23/01 | SLMM | 03 00 | 16,134.00 | 10/31/17 | 16,134.00 | - | 100.00% |
| 000608 | Class pagination install & training | 000-122075 | 12/23/01 | SLMM | 03 00 | 5,370.00 | 10/31/17 | 5,370.00 | - | 100.00% |
| 000609 | PPI Product pricing enhancements | 000-122075 | 12/23/01 | SLMM | 03 00 | 4,500.00 | 10/31/17 | 4,500.00 | - | 100.00% |
| 000610 | Xpance advt tracking system | 000-122075 | 01/22/02 | SLMM | 03 00 | 22,257.00 | 10/31/17 | 22,257.00 | - | 100.00% |
| 000611 | Multi paper Dist | 000-122075 | 04/22/02 | SLMM | 03 00 | 59,261.00 | 10/31/17 | 59,261.00 | - | 100.00% |
| 000612 | Advert Late Notice Program | 000-122075 | 01/22/02 | SLMM | 03 00 | 5,000.00 | 10/31/17 | 5,000.00 | - | 100.00% |
| 000613 | FPO - Page Pairing software | 000-122075 | 05//22/02 | SLMM | 03 00 | 24,352.00 | 10/31/17 | 24,352.00 | - | 100.00% |
| 000616 | Lawson Crystal Enterprise- sftw | 000-122075 | 05//22/02 | SLMM | 03 00 | 18,638.00 | 10/31/17 | 18,638.00 | - | 100.00% |
| 000617 | DBA Analyzer & optimization Program | 000-122075 | 06/21/02 | SLMM | 03 00 | 7,530.00 | 10/31/17 | 7,530.00 | - | 100.00% |
| 000619 | Circ voice response unit (VRU) | 000-122075 | 08/20/02 | SLMM | 03 00 | 38,100.00 | 10/31/17 | 38,100.00 | - | 100.00% |
| 000673 | 100 VENDING MACHINES | 000-122065 | 05/05/01 | SLMM | 03 00 | 44,426.00 | 10/31/17 | 44,426.00 | - | 100.00% |
| 000680 | ADOBE PHOTO SHOP LICENSES | 000-122075 | 07/01/03 | SLMM | 03 00 | 26,396.63 | 10/31/17 | 26,396.63 | - | 100.00% |
| 000684 | 8 EDITORIAL PCs | 000-122070 | 10/01/03 | SLMM | 03 00 | 7,452.34 | 10/31/17 | 7,452.34 | - | 100.00% |
| 000685 | NIKOR DJH DIGITAL CAMERA | 000-122070 | 10/01/03 | SLMM | 03 00 | 3,358.95 | 10/31/17 | 3,358.95 | - | 100.00% |
| 000689 | 2EOS-1D PRO DIGITAL CAMERAS | 000-122070 | 11/01/03 | SLMM | 03 00 | 6,297.90 | 10/31/17 | 6,297.90 | - | 100.00% |
| 000698 | NIKON D2H DIGITALCAMERAS | 000-122070 | 02/01/04 | SLMM | 03 00 | 10,520.78 | 10/31/17 | 10,520.78 | - | 100.00% |
| 000701 | CANON DIGITAL CAMERA & LENSES | 000-122070 | 03/01/04 | SLMM | 03 00 | 4,093.93 | 10/31/17 | 4,093.93 | - | 100.00% |
| 000707 | 2 CANON DIGITAL EOS-1D CAMERAS | 000-122070 | 05/01/04 | SLMM | 03 00 | 7,557.90 | 10/31/17 | 7,557.90 | - | 100.00% |
| 000724 | Adjust Unisys/PPI Advert system | 000-122075 | 07/01/04 | SLMM | 03 00 | (21,666.00) | 10/31/17 | (21,666.00) | - | 100.00% |
| 000735 | Circ Single Copy Server Upgrade | 000-122070 | 01/07/05 | SLMM | 03 00 | 42,712.00 | 10/31/17 | 42,712.00 | - | 100.00% |
| 000736 | Circ Single Copy Server Upgrade | 000-122070 | 02/03/05 | SLMM | 03 00 | 9,694.00 | 10/31/17 | 9,694.00 | - | 100.00% |
| 000746 | 100 VENDING MACHINES | 000-122065 | 10/04/04 | SLMM | 03 00 | 41,952.00 | 10/31/17 | 41,952.00 | - | 100.00% |
| 000756 | Best Fixed Asset System | 000-122075 | 11/01/05 | SLMM | 03 00 | 6,811.65 | 10/31/17 | 6,811.65 | - | 100.00% |
| 000764 | Onevision Postscript System | 000-122075 | 12101/05 | SLMM | 03 00 | 3,919.87 | 10/31/17 | 3,919.87 | - | 100.00% |
| 000765 | Intellitune System | 000-122075 | 01/02/06 | SLMM | 03 00 | 19,998.00 | 10/31/17 | 19,998.00 | - | 100.00% |
| 000766 | APAC Circulation HD Customer Service Software | 000-122075 | 01/02/06 | SLMM | 03 00 | 66,471.39 | 10/31/17 | 66,471.39 | - | 100.00% |
| 000778 | Lawson Personnel Module | 000-122075 | 06/01/06 | SLMM | 03 00 | 64,440.00 | 10/31/17 | 64,440.00 | - | 100.00% |
| 000781 | Accounting and HR Server | 000-122070 | 06/01/06 | SLMM | 03 00 | 2,813.95 | 10/31/17 | 2,813.95 | - | 100.00% |
| 000786 | Page Pairing System | 000-122070 | 12/01/06 | SLMM | 03 00 | 48,484.40 | 10/31/17 | 48,484.40 | - | 100.00% |
| 000787 | New Servers | 000-122070 | 12/01/06 | SLMM | 03 00 | 19,615.31 | 10/31/17 | 19,615.31 | - | 100.00% |
| 000789 | Page Pairing System | 000-122070 | 01/01/07 | SLMM | 03 00 | 106,231.96 | 10/31/17 | 106,231.96 | - | 100.00% |
| 000799 | Sybase IWS for Media (Data Warehouse) | 000-122075 | 11/01/07 | SLMM | 03 00 | 90,921.12 | 10/31/17 | 90,921.12 | - | 100.00% |
| 000802 | Kronos Time & Attendance System | 000-122075 | 03/15/08 | SLMM | 03 00 | 123,808.08 | 10/31/17 | 123,808.08 | - | 100.00% |
| 000803 | Large Format Epson Scanner | 000-122070 | 05/01/08 | SLMM | 03 00 | 2,433.93 | 10/31/17 | 2,433.93 | - | 100.00% |
| 000804 | Lawson Foundation- Accounting System | 000-122075 | 05/01/08 | SLMM | 03 00 | 25,200.00 | 10/31/17 | 25,200.00 | - | 100.00% |
| 000814 | Xerox Color Printer for Pre-Press Design | 000-122070 | 01/15/09 | SLMM | 03 00 | 4,512.83 | 10/31/17 | 4,512.83 | - | 100.00% |
| 000815 | SonySR-390 | 000-122070 | 07/01/09 | SLMM | 03 00 | 2,016.12 | 10/31/17 | 2,016.12 | - | 100.00% |
| 000822 | 4 LX.PCC02.001 | 000-122070 | 03/01/10 | SLMM | 03 00 | 3,430.81 | 10/31/17 | 3,430.81 | - | 100.00% |
| 000832 | Editorial System- Software | 000-122075 | 02/01/11 | SLMM | 03 00 | 729,541.09 | 10/31/17 | 729,542.09 | - | 100.00% |

## Boston Herald Fixed Asset Listing

### Schedule 2.1.8

| System No. | Description | G/L Account Number | In Sve Date | Method | Remai Life | Acquired Value | Run Through Date | Accum Depreciation | Net Value | |
|---|---|---|---|---|---|---|---|---|---|---|
| 000833 | Editorial System – Hardware | 000-122070 | 02/01/11 | SLMM | 03 00 | 326,603.35 | 10/31/17 | 326,603.35 | – | 100.00% |
| 000834 | Konica Copy Machine - BIZHUB 420 | 000-122070 | 04/15/11 | SLMM | 03 00 | 1,822.75 | 10/31/17 | 1,822.75 | – | 100.00% |
| 000835 | Konica Copy Machine - BIZHUB 420 | 000-122070 | 04/15/11 | SLMM | 03 00 | 1,344.63 | 10/31/17 | 1,344.63 | – | 100.00% |
| 000836 | Konica Copy Machine- BIZHUB 500 | 000-122070 | 04/15/11 | SLMM | 03 00 | 2,412.86 | 10/31/17 | 2,412.86 | – | 100.00% |
| 000837 | Konica Copy Machine- BIZHUB 421 | 000-122070 | 04/15/11 | SLMM | 03 00 | 1,344.63 | 10/31/17 | 1,344.63 | – | 100.00% |
| 000842 | Camera 70-200MM F2.8G | 000-122070 | 08/01/11 | SLMM | 03 00 | 2,619.04 | 10/31/17 | 2,619.04 | – | 100.00% |
| 000843 | Camera EF 500MM F/4.00L IS USM LENS | 000-122070 | 10/01/11 | SLMM | 0300 | 4,810.15 | 10/31/17 | 4,810.15 | – | 100.00% |
| 000844 | 1 Frigidaire Dishwasher | 000-122050 | 02/01/12 | SLMM | 05 00 | 836.44 | 10/31/17 | 836.44 | – | 100.00% |
| 000845 | 5 Frigidaire Refrigerators | 000-122050 | 02/01/12 | SLMM | 05 00 | 10,598.43 | 10/31/17 | 10,598.43 | – | 100.00% |
| 000846 | 3 GE Microwaves | 000-122050 | 02/01/12 | SLMM | 05 00 | 474.94 | 10/31/17 | 474.94 | – | 100.00% |
| 000847 | 18 HDTVs | 000-112050 | 02/01/12 | SLMM | 05 00 | 15,010.14 | 10/31/17 | 15,010.14 | – | 100.00% |
| 000848 | Advertising System | 000-122075 | 02/01/12 | SLMM | 03 00 | 207,116.54 | 10/31/17 | 207,216.54 | – | 100.00% |
| 000849 | Apple MBP | 000-122070 | 02/01/12 | SLMM | 03 00 | 2,029.98 | 10/31/17 | 2,029.98 | – | 100.00% |
| 000850 | Mercury Elite Qx2. | 000-122070 | 02/01/12 | SLMM | 03 00 | 4,799.96 | 10/31/17 | 4,799.96 | – | 100.00% |
| 000851 | Apple MBP | 000-122070 | 02/01/12 | SLMM | 03 00 | 1,593.74 | 10/31/17 | 1,593.74 | – | 100.00% |
| 000852 | Hard Drive & Memory Upgrade | 000-122070 | 02/01/12 | SLMM | 03 00 | 1,019.99 | 10/31/17 | 1,019.99 | – | 100.00% |
| 000853 | EOS-1D MARK IV 16MP HD VIDE | 000-122070 | 03/01/12 | SLMM | 03 00 | 2,944.90 | 10/31/17 | 2,944.90 | – | 100.00% |
| 000854 | NIKON- NZ0701 SERIAL #3217916 | 000-122070 | 03/01/12 | SLMM | 03 00 | 1,329.90 | 10/31/17 | 1,329.90 | – | 100.00% |
| 000855 | NIKON- NT21276 SERIAL #20154161 | 000-122070 | 03/01/12 | SLMM | 03 00 | 2,456.62 | 10/31/17 | 2,456.62 | – | 100.00% |
| 000856 | Cisco Phone System | 000-122070 | 02/01/12 | SLMM | 03 00 | 213,566.79 | 10/31/17 | 213,566.79 | – | 100.00% |
| 000858 | APC Solution and Storage | 000-122070 | 05/01/12 | SLMM | 03 00 | 123,582.34 | 10/31/17 | 123,582.34 | – | 100.00% |
| 000859 | MS Office 2010 | 000-122075 | 05/01/12 | SLMM | 03 00 | 1,192.05 | 10/31/17 | 1,192.05 | – | 100.00% |
| 000860 | 39 WorkStation PCs | 000-122070 | 05/01/12 | SLMM | 03 00 | 5,384.73 | 10/31/17 | 5,384.73 | – | 100.00% |
| 000861 | PPI Upgrades | 000-122075 | 05/01/12 | SLMM | 03 00 | 23,895.63 | 10/31/17 | 23,895.63 | – | 100.00% |
| 000862 | Acer AS-5250 | 000-122070 | 05/01/12 | SLMM | 03 00 | 7,469.00 | 10/31/17 | 7,469.00 | – | 100.00% |
| 000863 | Editorial ADB System | 000-122070 | 05/01/12 | SLMM | 03 00 | 6,449.38 | 10/31/17 | 6,449.38 | – | 100.00% |
| 000864 | Apple MAC Mini - Editorial Relocation | 000-122070 | 05/01/12 | SLMM | 03 00 | 4,846.04 | 10/31/17 | 4,846.04 | – | 100.00% |
| 000865 | Apple MBP | 000-122070 | 05/01/12 | SLMM | 03 00 | 2,122.22 | 10/31/17 | 2,122.22 | – | 100.00% |
| 000866 | Apple MAC Mini | 000-122070 | 05/01/12 | SLMM | 03 00 | 2,576.84 | 10/31/17 | 2,576.84 | – | 100.00% |
| 000867 | Apple 2G IPAD & PS.VC | 000-122070 | 05/01/12 | SLMM | 03 00 | 2,693.44 | 10/31/17 | 2,693.44 | – | 100.00% |
| 000868 | 70 Fargo St. Lease Improvement | 000-122013 | 02/01/12 | SLMM | 10 02 | 590,073.44 | 10/31/17 | 333,730.06 | 256,243.38 | 56.56% |
| 000869 | Office Furniture | 000-122050 | 02/01/12 | SLMM | 05 00 | 613,399.26 | 10/31/17 | 613,399.26 | – | 100.00% |
| 000870 | Cisco Phone System | 000-122070 | 07/01/12 | SLMM | 03 00 | 10,147.21 | 10/31/17 | 10,147.21 | – | 100.00% |
| 000871 | Digital SLR Body S#3029826 | 000-122070 | 08/01/12 | SLMM | 03 00 | 3,200.40 | 10/31/17 | 3,200.40 | – | 100.00% |
| 000872 | Apple laptop 15.4" | 000-122070 | 08/01/12 | SLMM | 03 00 | 2,184.00 | 10/31/17 | 2,184.00 | – | 100.00% |
| 000873 | BOS-SD MARK III BODY Serial #042033008074 | 000-122070 | 08/01/12 | SLMM | 03 00 | 3,717.69 | 10/31/17 | 3,717.69 | – | 100.00% |
| 000874 | Office Furniture | 000-122050 | 09/01/12 | SLMM | 05 00 | 1,596.00 | 10/31/17 | 1,596.00 | – | 100.00% |
| 000875 | Apple 85W Magsafe Adapter | 000-122070 | 10/01/12 | SLMM | 03 00 | 5,920.03 | 10/31/17 | 5,920.03 | – | 100.00% |
| 000876 | Acer AS5749-6492 | 000-122070 | 10/01/12 | SLMM | 03 00 | 480.70 | 10/31/17 | 480.70 | – | 100.00% |
| 000877 | Apple MAC MiNi 2.3 GHZ 500GB 2GB | 000-122070 | 10/01/12 | SLMM | 03 00 | 880.24 | 10/31/17 | 880.24 | – | 100.00% |
| 000878 | MS NBL Office STD2010 | 000-122075 | 10/01/12 | SLMM | 03 00 | 2,661.09 | 10/31/17 | 2,661.09 | – | 100.00% |
| 000879 | Shell& Core MEP/FP Engineer System | 000-122013 | 10/01/12 | SLMM | 09 04 | 23,555.00 | 10/31/17 | 12,829.06 | 10,725.94 | 54.46% |
| 000880 | Digital Camera - EOS - ID Mark IV Body | 000-122070 | 11/01/12 | SLMM | 03 00 | 3,993.31 | 10/31/17 | 3,993.31 | – | 100.00% |
| 000881 | Digital Camera- EF 24-70MM F/28L II USM | 000-122070 | 11/01/12 | SLMM | 03 00 | 2,520.69 | 10/31/17 | 2,520.69 | – | 100.00% |
| 000882 | 2 Acer AS5749-9492 | 000-122070 | 12/01/12 | SLMM | 03 00 | 976.77 | 10/31/17 | 976.77 | – | 100.00% |
| 000883 | Apple Computers | 000-122070 | 02/01/13 | SLMM | 03 00 | 7,154.10 | 10/31/17 | 7,154.10 | – | 100.00% |
| 000884 | Canon Camera - EC2791 EOS-1D X 1 8MP | 000-122070 | 02/01/13 | SLMM | 03 00 | 3,529.44 | 10/31/17 | 3,529.44 | – | 100.00% |
| 000885 | Storage Cabinets | 000-122050 | 05/01/13 | SLMM | 05 00 | 7,576.00 | 10/31/17 | 6,818.39 | – | 100.00% |

## Boston Herald Fixed Asset Listing

### Schedule 2.1.8

| System No. | Description | G/L Account Number | In Sve Date | Method | Remai Life | Acquired Value | Run Through Date | Accum Depreciation | Net Value | |
|---|---|---|---|---|---|---|---|---|---|---|
| 000886 | Nikon 400MM Lens | 000-122070 | 05/01/13 | SLMM | 03 00 | 6,000.00 | 10/31/17 | 6,000.00 | - | 100.00% |
| 000887 | Nikon D800 FX Digital SLR Body | 000-122070 | 05/01/13 | SLMM | 03 00 | 3,187.45 | 10/31/17 | 3,187.45 | - | 100.00% |
| 000888 | Smoke Detectors, Raise Lights | 000-122013 | 06/01/13 | SLMM | 08 09 | 8,627.00 | 10/31/17 | 4,354.56 | 4,272.44 | 50.48% |
| 000889 | 7 Acer Computers | 000-122070 | 06/10/13 | SLMM | 03 00 | 4,429.15 | 10/31/17 | 4,429.15 | - | 100.00% |
| 000890 | 2 OWC Mercury Elit HWRAID | 000-122070 | 06/01/13 | SLMM | 03 00 | 2,895.98 | 10/31/17 | 2,895.98 | - | 100.00% |
| 000891 | Canon EOS-ID X 18MP | 000-122070 | 06/01/13 | SLMM | 03 00 | 6,447.79 | 10/31/17 | 6,447.79 | - | 100.00% |
| 000892 | Lens - 70-200MM | 000-122070 | 09/01/13 | SLMM | 03 00 | 2,598.55 | 10/31/17 | 2,598.55 | - | 100.00% |
| 000893 | Apple MacBook | 000-122070 | 09/01/13 | SLMM | 03 00 | 1,698.94 | 10/31/17 | 1,698.94 | - | 100.00% |
| 000894 | AVL Plash Pro | 000-122070 | 10/01/13 | SLMM | 03 00 | 1,243.92 | 10/31/17 | 1,243.92 | - | 100.00% |
| 000895 | 2 Acer Aspire V3 B960 | 000-122070 | 10/01/13 | SLMM | 03 00 | 948.38 | 10/31/17 | 948.38 | - | 100.00% |
| 000896 | 2 Acer Aspire | 000-122070 | 10/01/13 | SLMM | 03 00 | 928.89 | 10/31/17 | 928.89 | - | 100.00% |
| 000897 | Nikon D800 FX Digital SLR | 000-122070 | 11/01/13 | SLMM | 03 00 | 2,984.26 | 10/31/17 | 2,984.16 | - | 100.00% |
| 000898 | Canon EOS-1Dx18MP | 000-122070 | 01/01/14 | SLMM | 03 00 | 6,023.94 | 10/31/17 | 6,023.94 | - | 100.00% |
| 000899 | Canon Refurbished EF Lens | 000-122070 | 02/01/14 | SLMM | 03 00 | 2,035.19 | 10/31/17 | 2,035.19 | - | 100.00% |
| 000900 | 5 Apple Mac Mini 2.5 500GB 4GB | 000-122070 | 02/01/14 | SLMM | 03 00 | 4,598.39 | 10/31/17 | 4,598.39 | - | 100.00% |
| 000901 | Backup Storage | 000-122070 | 07/01/14 | SLMM | 03 00 | 3,159.98 | 10/31/17 | 3,159.98 | - | 100.00% |
| 000902 | Konica Copy Machine - BIZHUB552 | 000-122070 | 10/01/14 | SLMM | 03 00 | 2,215.81 | 10/31/17 | 2,215.81 | - | 100.00% |
| 000903 | Konica Copy Machine - BIZHUB552 | 000-122070 | 10/01/14 | SLMM | 03 00 | 2,215.81 | 10/31/17 | 2,215.81 | - | 100.00% |
| 000904 | Konica Copy Machine - BIZHUB423 | 000-122070 | 10/01/14 | SLMM | 03 00 | 2,215.81 | 10/31/17 | 2,215.81 | - | 100.00% |
| 000905 | Konica Copy Machine - BIZHUB423 | 000-122070 | 10/01/14 | SLMM | 03 00 | 2,215.81 | 10/31/17 | 2,215.81 | - | 100.00% |
| 000906 | Konica Copy Machine - BIZHUB423 | 000-122070 | 10/01/14 | SLMM | 03 00 | 2,215.81 | 10/31/17 | 2,215.81 | - | 100.00% |
| 000907 | Apple Mac Pro | 000-122070 | 10/01/14 | SLMM | 03 00 | 3,342.43 | 10/31/17 | 3,342.43 | - | 100.00% |
| 000908 | Digital Camera - D810 | 000-122070 | 10/01/14 | SLMM | 03 00 | 3,296.95 | 10/31/17 | 3,296.95 | - | 100.00% |
| 000909 | EOC 5D Mark III Kit | 000-122070 | 10/01/14 | SLMM | 03 00 | 3,399.00 | 10/31/17 | 3,399.00 | - | 100.00% |
| 000910 | Digital Camera AF-S NIKKOR 70-200MM | 000-122070 | 10/01/14 | SLMM | 03 00 | 2,296.95 | 10/31/17 | 2,296.95 | - | 100.00% |
| 000911 | Nikkor 70-200mm Lenses | 000-122070 | 12/01/14 | SLMM | 03 00 | 2,499.00 | 10/31/17 | 2,499.00 | - | 100.00% |
| 000912 | Used Nikon D4s Body | 000-122070 | 08/01/15 | SLMM | 03 00 | 2,499.95 | 10/31/17 | 2,499.95 | - | 100.00% |
| 000913 | EF70-10MM Lens | 000-122070 | 08/01/15 | SLMM | 03 00 | 2,135.89 | 10/31/17 | 2,135.89 | - | 100.00% |
| 000914 | NZ24040D04 Body | 000-122070 | 08/01/15 | SLMM | 03 00 | 6,383.54 | 10/31/17 | 6,383.54 | - | 100.00% |
| 000915 | Nikon 80-400MM Lens | 000-122070 | 08/01/15 | SLMM | 03 00 | 2,903.75 | 10/31/17 | 2,903.75 | - | 100.00% |
| 000916 | Refurbished MacBook Pro 15" | 000-122070 | 09/01/15 | SLMM | 03 00 | 1,231.00 | 10/31/17 | 1,231.00 | - | 100.00% |
| 000917 | Used Nikon D3s Body | 000-122070 | 10/01/15 | SLMM | 03 00 | 2,200.00 | 10/31/17 | 2,200.00 | - | 100.00% |
| 000918 | Used Cannon EF 300/4 L IS Lens | 000-122070 | 11/01/15 | SLMM | 03 00 | 1,043.99 | 10/31/17 | 1,043.99 | - | 100.00% |
| 000919 | Cannon EOS- LD x DSLR Camera | 000-122070 | 11/01/15 | SLMM | 03 00 | 4,599.99 | 10/31/17 | 4,599.99 | - | 100.00% |
| 000920 | Refurbished MacBook Pro | 000-122070 | 11/01/15 | SLMM | 03 00 | 861.69 | 10/31/17 | 861.69 | - | 100.00% |
| 000921 | Refurbished MacBook Pro Retina | 000-122070 | 11/01/15 | SLMM | 03 00 | 1,298.38 | 10/31/17 | 1,298.38 | - | 100.00% |
| 000922 | Modular SVCS Battery | 000-122070 | 04/01/16 | SLMM | 03 00 | 8,533.25 | 10/31/17 | 4,503.67 | 4,029.58 | 52.78% |
| 000923 | Cannon 1D X Digital Camera Body | 000-122070 | 05/10/116 | SLMM | 03 00 | 3,809.00 | 10/31/17 | 3,809.00 | - | 100.00% |
| 000924 | Apple Refurbished 13.3 Inch MacBook | 000-122070 | 06/01/16 | SLMM | 03 00 | 1,624.56 | 10/31/17 | 1,624.56 | - | 100.00% |
| 000925 | CanonEF 16-35mm f/2.8L II IUSM Lens | 000-122070 | 07/01/16 | SLMM | 03 00 | 1,449.00 | 10/31/17 | 1,449.00 | - | 100.00% |
| 000926 | Canon 400/2.8 L IS USM AF- Used | 000-122070 | 07/01/16 | SLMM | 03 00 | 6,299.95 | 10/31/17 | 2,799.97 | 3,499.98 | 44.44% |
| 000927 | Apple MBP 13.3/2.9GHZ | 000-122070 | 09/02/16 | SLMM | 03 00 | 1,988.19 | 10/31/17 | 1,988.19 | - | 100.00% |
| 000928 | Canon Camera EF 24-70mm | 000-122070 | 09/01/16 | SLMM | 03 00 | 1,614.15 | 10/31/17 | 1,614.15 | - | 100.00% |
| 000929 | Apple MBP 13.3 2.7GHZ | 000-122070 | 10/01/16 | SLMM | 03 00 | 1,456.34 | 10/31/17 | 1,456.34 | - | 100.00% |
| 000930 | ACER VX2640G | 000-122070 | 10/01/16 | SLMM | 03 00 | 1,705.38 | 10/31/17 | 1,705.38 | - | 100.00% |
| 000931 | Apple MacBook J866MHz | 000-122070 | 11/01/16 | SLMM | 03 00 | 2,160.44 | 10/31/17 | 2,160.44 | - | 100.00% |
| 000932 | Canon EOS-1D X DSLR Camera | 000-122070 | 12/01/16 | SLMM | 03 00 | 3,699.95 | 10/31/17 | 3,699.95 | - | 100.00% |
| 000933 | Canon EOS IDX | 000-122070 | 12/01/16 | SLMM | 03 00 | 1,010.89 | 10/31/17 | 1,010.89 | - | 100.00% |

## Boston Herald Fixed Asset Listing

*Schedule 2.1.8*

| System No. | Description | G/L Account Number | In Sve Date | Method | Remai Life | Acquired Value | Run Through Date | Accum Depreciation | Net Value | |
|---|---|---|---|---|---|---|---|---|---|---|
| 000934 | Canon EOS 1DX | 000-122070 | 12/01/16 | SLMM | 03 00 | 1,010.89 | 10/31/17 | 1,010.89 | – | 100.00% |
| 000935 | Canon EF800 5.6L | 000-122070 | 01/01/17 | SLMM | 03 00 | 1,792.66 | 10/31/17 | 497.96 | 1,294.70 | 27.78% |
| 000936 | Apple MBP 13 wiih Apple App Macbk | 000-122070 | 02/01/17 | SLMM | 03 00 | 2,267.62 | 10/31/17 | 2,267.62 | – | 100.00% |
| 000937 | Apple MBP 13 with Apple App Macbk | 000-122070 | 02/01/17 | SLMM | 03 00 | 1,966.99 | 10/31/17 | 1,966.99 | – | 100.00% |
| 000938 | Refurbished MP Tower | 000-122070 | 02/16/17 | SLMM | 03 00 | 837.25 | 10/31/17 | 837.25 | – | 100.00% |
| 000939 | 2 OWC Mercury Elite | 000-122070 | 04/01/17 | SLMM | 03 00 | 2,498.37 | 10/31/17 | 485.79 | 2,012.58 | 19.44% |
| 000940 | Apple Logic Board | 000-122070 | 04/01/17 | SLMM | 03 00 | 409.00 | 10/31/17 | 409.00 | – | 100.00% |
| 000941 | Acer Computer | 000-122070 | 04/01/17 | SLMM | 03 00 | 1,645.10 | 10/31/17 | 1,645.10 | – | 100.00% |
| 000942 | Acer Computer | 000-122070 | 04/01/17 | SLMM | 03 00 | 837.74 | 10/31/17 | 837.74 | – | 100.00% |
| 000943 | Nikon D4S Digital SRL Camero & 70-200mm Lens | 000-122070 | 05/01/17 | SLMM | 03 00 | 5,698.00 | 10/31/17 | 5,698.00 | – | 100.00% |
| 000944 | Canon Refurbished Lens | 000-122070 | 06/01/17 | SLMM | 03 00 | 4,142.90 | 10/31/17 | 4,142.90 | – | 100.00% |
| SUB-TOTAL ASSETS ASSUMED | | Sub-Total | | | | 4,997,197.75 | | 4,714,16.54 | 282,936.21 | |
| | | | | | | | | | | |
| 0000808 | 2003 Mercedes-Benz SL500 | 000-122066 | 09/01/08 | SLMM | 03 00 | 35,738.25 | 10/31/17 | 35,738.25 | – | 100.00% |
| TOTAL VEHICLES EXCLUDED | | Sub-Total | | | | 35,738.25 | | 35,738.25 | | |
| | | | | | | | | | | |
| GRAND TOTAL | | | | | | 5,032,936.00 | | 4,785,738.04 | 282,936.21 | |

### Boston Interacive Fixed Asset Listing

*Schedule 2.1.8*

| System No. | Description | G/L Account Number | In Sve Date | Method | Remai Life | Acquired Value | Run Through Date | Accum Depreciation | Net Value | |
|---|---|---|---|---|---|---|---|---|---|---|
| 000032 | CDW Computer Centers - Server Addition | 800-122070 | 04/01/04 | SLMM | 00 00 | 17,273.66 | 10/31/17 | 17,273.66 | - | 100.00% |
| 000033 | Herald Interactive Laptops | 800-122070 | 06/01/04 | SLMM | 00 00 | 320.00 | 10/31/17 | 320.00 | - | 100.00% |
| 000034 | Herald Interactive Laptops | 800-122070 | 06/01/04 | SLMM | 00 00 | 3,667.13 | 10/31/17 | 3,667.13 | - | 100.00% |
| 000036 | Accunet- Router Switcb | 800-122070 | 09/01/05 | SLMM | 00 00 | 12,587.96 | 10/31/17 | 12,587.96 | - | 100.00% |
| 000040 | CDW Computer Centers Inc | 800-122075 | 12/01/01 | SLMM | 00 00 | 10,255.68 | 10/31/17 | 10,255.68 | - | 100.00% |
| 000041 | CDW Computer Centers Inc | 800-122075 | 12/01/01 | SLMM | 00 00 | 64.95 | 10/31/17 | 64.95 | - | 100.00% |
| 000048 | Wireless Entrasys Router | 800-122070 | 12/01/06 | SLMM | 00 00 | 15,078.24 | 10/31/17 | 15,078.24 | - | 100.00% |
| 000049 | APC Units | 800-122070 | 12/01/06 | SLMM | 00 00 | 5,968.59 | 10/31/17 | 5,968.59 | - | 100.00% |
| 000054 | Servers to Boost BH.com Hosting Power | 800-122070 | 11/01/07 | SLMM | 00 00 | 8,844.74 | 10/31/17 | 8,844.74 | - | 100.00% |
| 000055 | HP SB DL385 | 800-122070 | 06/01/09 | SLMM | 00 00 | 3,622.89 | 10/31/17 | 3,622.89 | - | 100.00% |
| 000056 | HP SB DL380 | 800-122070 | 06/01/09 | SLMM | 00 00 | 3,067.31 | 10/31/17 | 3,067.31 | - | 100.00% |
| 000057 | 2 ACER LX.PCC02.001 | 800-122070 | 03/01/10 | SLMM | 00 00 | 1,715.94 | 10/31/17 | 1,715.94 | - | 100.00% |
| 000058 | HD AVCHD CAMCORDER | 800-122070 | 09101/10 | SLMM | 00 00 | 20,561.50 | 10/31/17 | 20,561.50 | - | 100.00% |
| 000059 | DL380 G7 E5640 SFF SBY | 800-122070 | 03/01/11 | SLMM | 00 00 | 10,692.00 | 10/31/17 | 10,692.00 | - | 100.00% |
| 000060 | SLS-7000 | 800-122070 | 04/01/11 | SLMM | 00 00 | 3,634.77 | 10/31/17 | 3,634.77 | - | 100.00% |
| 000061 | Cannon EOS 50 Mark II Body | 800-122070 | 08/01/11 | SLMM | 00 00 | 9,841.94 | 10/31/17 | 9,841.94 | - | 100.00% |
| 000062 | Cannon  XFI00 HD Camcorder | 800-122070 | 08/01/11 | SLMM | 00 00 | 2,939.02 | 10/31/17 | 2,939.02 | - | 100.00% |
| 000063 | Apple iMac Computer | 800-122070 | 09/01/11 | SLMM | 00 00 | 2,783.75 | 10/31/17 | 2,783.75 | - | 100.00% |
| 000065 | Cannon XFI00 HD Camcorder | 800-122070 | 10/01/12 | SLMM | 00 00 | 3,616.77 | 10/31/17 | 3,616.77 | - | 100.00% |
| 000066 | Apple MBP 15.4IN | 800-122070 | 10/01/12 | SLMM | 00 00 | 2,556.39 | 10/31/17 | 2,556.39 | - | 100.00% |
| 000067 | 2 Apple MacBook Pro MD318LL/A 15.4 Inch Laptop | 800-122070 | 10/01/12 | SLMM | 00 00 | 3,066.34 | 10/31/17 | 3,066.34 | - | 100.00% |
| 000068 | 2 Panasonic AG-HMC40 Camcorder | 800-122070 | 12/01/12 | SLMM | 00 00 | 3,632.70 | 10/31/17 | 3,632.70 | - | 100.00% |
| 000069 | 2 Sennheiser G3 Combo | 800-122070 | 12/01/12 | SLMM | 00 00 | 1,567.90 | 10/31/17 | 1,567.90 | - | 100.00% |
| 000070 | Radio Studio Equipment | 800-122070 | 09/01/13 | SLMM | 00 00 | 18,158.68 | 10/31/17 | 18,158.68 | - | 100.00% |
| 000071 | Radio Studio Furniture | 800-122050 | 09/01/13 | SLMM | 00 10 | 5,727.99 | 10/31/17 | 4,773.33 | 954.66 | 83.33% |
| 000072 | 3 Ignition Task Stools | 800-122050 | 11/01/13 | SLMM | 10 00 | 1,128.15 | 10/31/17 | 902.52 | 225.63 | 800.00% |
| 000074 | Manfrotto MVH502A Tripod | 800-122050 | 11/01/13 | SLMM | 01 00 | 1,097.98 | 10/31/17 | 878.40 | 219.58 | 100.00% |
| 000075 | Radio Studio Equipment | 800-122070 | 11/01/13 | SLMM | 00 00 | 13,114.47 | 10/31/17 | 13,114.47 | - | 100.00% |
| 000076 | Cannon 70-300MM Lens | 800-122070 | 03/01/14 | SLMM | 00 00 | 1,664.90 | 10/31/17 | 1,664.90 | - | 100.00% |
| 000077 | Portable IP/POTS Stereo Audio Codec | 800-122070 | 12/11/14 | SLMM | 00 01 | 5,397.50 | 10/31/17 | 5,247.57 | 149.93 | 97.22% |
| 000078 | CANNON 16-35MM LENS | 800-112070 | 01/01/15 | SLMM | 00 02 | 1,362.24 | 10/31/17 | 1,286.56 | 75.68 | 94.44% |
| 000079 | Cannon EOS C300 | 800-122070 | 09/01/15 | SLMM | 00 10 | 6,999.00 | 10/31/17 | 5,054.83 | 1,944.17 | 72.22% |
| 000080 | Web SiteDesign | 800-122075 | 12/01/15 | SLMM | 01 01 | 108,239.49 | 10/31/17 | 69,153.01 | 39,086.48 | 63.89% |
| 000081 | Canon XF100 HD Camcorder | 800-122070 | 05/01/16 | SLMM | 01 06 | 1,999.00 | 10/31/17 | 999.50 | 999.50 | 50.00% |
| 000082 | Canon XF100 HD Camcorder | 800-122070 | 11/01/16 | SLMM | 02 00 | 2,188.00 | 10/31/17 | 729.33 | 1,458.67 | 33.33% |
| | Total | | | | | 314,437.57 | | 269,323.27 | 45,114.30 | |

## Schedule 2.1.10(a)

## Assumed Contracts

| Vendor Name | Counter Party | Description |
|---|---|---|
| Algonquin Acquisition Company<br>c/o RSI d/b/a Profile News<br>75 York Ave.<br>Randolph, MA 02368 | Boston Herald Inc. | Distributor Agreement |
| Algonquin Acquisition Company<br>c/o RSI d/b/a Profile News<br>75 York Ave.<br>Randolph, MA 02368 | Boston Herald Inc. | Distributor Agreement Addendum 1 |
| Algonquin Acquisition Company<br>c/o RSI d/b/a Profile News<br>75 York Ave.<br>Randolph, MA 02368 | Boston Herald Inc. | Distributor Agreement Addendum 2 |
| Amalee Innovative Systems Design, Inc.<br>222 Brunswick Boulevard<br>Pointe-Claire, Quebec Canada H9R 1A6 | Boston Herald Inc. | Chatterbox |
| Iron Mountain Information Mgt., Inc.<br>745 Atlantic Avenue<br>Boston, MA  02111 | Boston Herald | Document shredding |
| Telereach, Inc.<br>90 Whiting Street<br>Plainville, CT  06062 | Herald Media, Inc. | Contact center |
| Nielsen | Boston Herald, Inc. | Demographics subscription |
| Time Inc.<br>225 Liberty Street<br>New York, NY  10281 | Herald Media, Inc. | Content Provider Agreement |
| Boston Globe Media Partners LLC<br>135 Morrissey Blvd.<br>Boston, MA 02125 | Herald Media, Inc. | Amended distributor agreement |
| Cape Cod Times<br>319 Main Street<br>P.O. Box 550<br>Hyannis, MA  02601-0550 | COULD NOT LOCATE THIS AGREEMENT | Distributor Agreement |
| News Distribution Network, Inc.<br>3445 Peachtree Road, Suite 1000<br>Atlanta, GA  30326 | Boston Herald | Distribution and Platform Services Agreement |
| Publishers Circulation Fulfillment, Inc.<br>22 West Pennsylvania Avenue, Suite 505<br>Towson, MD  21204-0000 | Boston Herald, Inc. | Delivery Services Agreement |

| Vendor Name | Counter Party | Description |
|---|---|---|
| The Providence Journal Company<br>75 Fountain Street<br>Providence, RI  02902 | Boston Herald, Inc. | Distribution Agreement |
| The Sheffield Cartage Company<br>P.O. Box 549<br>Chicopee, MA  O1013 | Boston Herald | Distribution Agreement |
| The Standard Times<br>25 Elm Street<br>New Bedford, MA  02740 | Boston Herald, Inc. | Distributor Agreement |
| A9.Com, Inc.<br>130 Lytton Ave. Suite 300<br>Palo Alto, CA 94301 | Herald Interactive, Inc. | Internet advertising agreement |
| AGFA<br>200 Ballardvale Street<br>Wilmington, MA 01887 | Boston Herald Direct | Arkitex software support |
| AppNexus<br>28 W. 23rd Street, 4th Floor<br>NY, NY 10010 | Herald Interactive, Inc. | Exchange Agreement |
| Blue Kai Inc.<br>20883 Stevens Creek Blvd., Ste 200<br>Cupertino, CA 95014 | Herald Media, Inc. | Data use agreement |
| Connatix Native Exchange Inc.<br>1 Little 12th Street<br>New York, NY  10014 | Herald Interactive, Inc. | Advertising Agreement |
| Doubleclick Inc.<br>111 Eighth Avenue, Floor 10<br>New York, NY  10011-5210 | Boston Herald Inc. | DFP Audience Management Service |
| Flipp Corporation<br>Bloor Islington Place, East Tower<br>3250 Bloor Street West,Suite 1200<br>Toronto, Ontario Canada  M8X 2X9 | Herald Interactive, Inc. | Native Module Agreement |
| Google Inc. Dept. 33654<br>P.O. Box 39000<br>San Francisco, CA  94139 | Boston Herald Inc. via LMC | Service Agreement (DFP Premium and AdX Services) |
| Legacy.com, Inc.<br>820 Davis Street, Suite 210<br>Evanston, IL  60201 | Herald Media, Incorporated | Agreement<br>(on-line platform for obituaries) |
| Monster Worldwide, Inc.<br>P.O. Box 416803<br>Boston, MA  02241-6803 | Herald Media, Inc. | Services Agreement |

| Vendor Name | Counter Party | Description |
|---|---|---|
| Nativo, Inc.<br>200 N. Sepulveda Boulevard 4th Floor<br>El Segundo, CA 90245 | Herald Interactive, Inc. | Premium Publisher Service Agreement |
| OpenX Technologies, Inc.<br>888 East Walnut Street<br>Pasadena, CA 91101 | Boston Herald Inc. | Ad Exchange Supply Agreement |
| Outbrain, Inc.<br>39 West 13th Street, 3rd Floor<br>New York, NY 10011 | Herald Media Inc. | Distribution Agreement |
| Scribble Technologies Inc.<br>488 Wellington Street West, Suite 200<br>Toronto, Ontario Canada M5V 1E3 | Herald Interactive | Media Agreement |
| Sendtonews Video Incorporated<br>1111 Wharf Street<br>Victoria, British Columbia Canada V8W 1T7 | Herald Media, Incorporated | License Agreement for Media |
| SportsDirect Inc. d/b/a Gracenote<br>211 Horseshoe Lake Drive<br>Halifax, Nova Scotia Canada B35 0B9 | Herald Interactive, Inc. | Licensed Date Agreement |
| The Rubicon Project, Inc.<br>12181 Bluff Creek Drive, 4th Floor<br>Los Angeles, CA 90094 | Herald Interactive, Inc. | Online Advertising Agreement |
| Backbone Networks Corporation<br>200 Friberg Pkwy. Ste 3003<br>Westborough, MA 01581 | Herald Interactive, Inc. | Internet radio broadcasting services agreement |
| Bankrate Inc.<br>47 Madison Ave., Ste 430<br>NY, NY 10022 | Boston Herald | License agreeement for mortgage rates |
| Delaware North Companies, Inc.<br>100 Legends Way<br>Boston, MA 02114 | Boston Herald | Premium Seating License Agreement (TD BankNorth) |
| Factiva<br>Route 1 at Ridge Road<br>Monmouth Junction, NJ 08852 | Boston Herald, Inc. | Subscription Agreement (global news and business information services) |
| FinancialContent Services, Inc.<br>195 Glenn Way, Suite 250<br>San Carlos, CA 94070 | Herald Interactive, Inc. | Subscription Agreement |
| LexisNexis Risk Solutions<br>28330 Network Place<br>Chicago, IL 60673-1283 | Boston Herald | License Agreement (Accurint search database) |

| Vendor Name | Counter Party | Description |
|---|---|---|
| Newsmaxmedia<br>560 Village Boulevard, Suite 120<br>West Palm Beach, FL 33409 | Herald interactive Inc. | Newsfeed Agreement |
| Pubmatic, Inc.<br>901 Marshall Street, Suite 100<br>Redwood City, CA 94063 | Herald Interactive | Media Agreement |
| The Associated Press<br>1100 13th Street, NW<br>Washington, DC 20005 | Boston Herald Interactive | Internet Supplemental Services Agreement |
| Tribune Content Agency, LLC<br>435 N. Michigan Avenue, Suite 1400<br>Chicago, IL 60611 | Herald Media Incorporated | Licensed Content Agreement |
| Tribune Media Services, Inc.<br>435 N. Michigan Avenue<br>Chicago, IL 60611 | Herald Media Inc. | Subscriber Agreement for MCT News and MCT Direct Photos |
| Tuneln, Inc.<br>270 University Avenue<br>Palo Alto, CA 94301 | Herald Interactive, Inc. | Service Agreement (online streaming radio) |
| Amalee Innovative Systems Design, Inc.<br>222 Brunswick Boulevard<br>Pointe-Claire, Quebec Canada H9R 1A6 | Boston Herald Inc. | Software Service Agreement |
| Brainworks Software, Inc.<br>100 South Main Street<br>Sayville, NY 11782 | Boston Herald | Support Agreement (cloud based circulation management system) |
| Edgil - Central Payments<br>2350 Kerner Boulevard, Suite 300<br>San Rafael, CA 94901 | Boston Herald | Merchant Processing Agreement |
| Edgil Associates, Inc.<br>15 Tyngsboro Road<br>North Chelmsford, MA 01863 | Boston Herald | Software License Agreement |
| Edgil Evolve<br>222 Rosewood Drive<br>Danvers, MA O1923 | Boston Herald Inc.- Cir | PayWay Subscription and Services Agreement |
| Morcor Solutions Inc.<br>232 Dundas Street West, Suite 201<br>Napanee, Ontario Canada K7A 2A8 | Boston Herald | Support and Maintenance Agreement (Xpance) |
| Onix Networking Corporation<br>18519 Detroit Avenue<br>Lakewood, OH 44107 | Boston Herald | Gmail License and Support Agreement |

| Vendor Name | Counter Party | Description |
|---|---|---|
| Online Publications, Inc.<br>55 E. Long Lake Road, #416<br>Troy, MI 48085 | Boston Herald, Inc | Service Agreement (closed based solution for NIE Website) |
| Pantheon Systems, Inc.<br>717 California Street, 3rd Floor<br>San Francisco, CA 94108 | Boston Herald | Web Hosting Agreement |
| SunGard AvantGard LLC<br>701 San Marco Boulevard, Suite 1100<br>Jacksonville, FL 32207 | Boston Herald | Software Support Services Agreement |
| Sybase, Inc.<br>One Sybase Drive<br>Dublin, CA 94568 | The Boston Herald | License Agreement |
| Towerwall, Inc.<br>615 Concord Street<br>Framingham, MA 01702 | Boston Herald | License Agreement for SafeEnd software |
| White Sands Technology, Inc.<br>P.O. Box 9033<br>Calabasas, CA 91372 | Boston Herald | Maintenance and Support Agreement for ProActive DBA |
| Windstream/PAETEC<br>P.O. Box 9001013<br>Louisville, KY 40290-1013 | The Boston Herald | Internet and Firewall Provider Service Agreement |
| Capital Lease Group, Ltd.<br>145 Manley Street<br>Brockton, MA 02303-1317 | Boston Herald | Auto Lease |
| Atlas Water Systems<br>301 Second Ave.<br>Waltham, MA 02451 | Boston Herald | Water service rental agreement |
| Cummins Northeast LLC<br>100 Allied Drive<br>Dedham, MA 02026 | Boston Herald Inc. | Maintenance Agreement (power generator) |
| Newsbank, Inc.<br>5801 Pelican Bay Boulevard Suite 600<br>Naples, FL 34108 | Herald Media, Inc. | License Agreement (news content to library and government markets) |
| Newscycle Solutions, Inc.<br>P.O. Box 851306<br>Minneapolis, MN 55485-1306 | Boston Herald | Systems Procurement Agreement |
| J.M. Service Company LLC<br>P.O. Box 850369<br>Braintree, MA 02185 | Boston Herald | Maintenance Agreement for Liebert Cooling System |

| Vendor Name | Counter Party | Description |
|---|---|---|
| Norel Service Company Inc.<br>230 Second Avenue, Suite 2<br>Waltham, MA 02451 | Boston Herald Inc. | Service Agreement (maintenance for sprinkler preaction system) |
| Northwood Publishing Systems, Inc.<br>9 Kyle Road<br>Merrimack, NH 03054 | Boston Herald | Classpage Support Agreement (classified pagination system) |
| The Boston Globe<br>135 Morrissey Boulevard<br>Boston, MA 02125 | Herald Media, Inc. | Inserting Services Agreement |
| The Boston Globe<br>135 Morrissey Boulevard<br>Boston, MA 02125 | Herald Media, Inc. | Printing Agreement |
| Vio, Inc.<br>307 Seventh Avenue, Suite 1803<br>New York, NY 10001 | Boston Herald, Inc. | Publisher Service Agreement (advertiser delivery system) |
| | | |

### Schedule 2.1.10(b)

### Rejected Contracts

| Vendor Name | Counter Party | Description |
|---|---|---|
| AdPerfect Dynamic Advertising Solutions 601 Sixth Street, Suite 400 New Westminster, British Columbia Canada V3L 3C1 | Boston Herald Inc. | Classifieds |
| Fedex P.O. Box 371461 Pittsburgh, PA 15250-1461 | Boston Herald | Small Freight |
| Konica Minolta Business Solutions U.S.A. 100 Williams Drive Ramsey, NJ 07446 | Boston Herald Inc. | Copier service agreement |
| Output Services Group, Inc. 100 W. Forest Ave., Suite G Englewood, NJ 07631 | Boston Herald Inc. | Print and Mail Fulfillment Services Agreement |
| Sourcecorp BPS 575 University Avenue Norwood, MA 02062 | Boston Herald | Document scanning for A/P |
| Pitney Bowes Global Financial P.O. Box 371887 Pittsburgh, PA 15250-7887 | Boston Herald | Lease Agreement for Postage Machines |
| 7Hops.com aka ZergNet 443 Park Ave. South, 5th Floor NY, NY 10016 | Herald Interactive, Inc. | Paid traffic agreement (sponsored content) |
| Adventive Inc. 732 Cascade Dr. Rochester, NY 14614 | Herald Interactive, Inc. | Digital ad production services agreement |
| Burrelle's Information Services, LLC 75 East Northfield Road Livingston, NJ 07039 | Boston Herald | License Agreement |
| Carat USA, Inc. 150 East 42nd Street New York, NY 10017 | Boston Herald Inc. | Media Agreement |
| City of Boston Auditing Department One City Hall, Room M-4 Boston, MA 02201 | Boston Herald Inc. | Contract for Revenue Forms Advertising |
| Clear Channel Broadcasting, Inc. 32 Avenue of the Americas, 3rd Floor New York, NY 10013 | Herald Interactive, Inc. | Internet Channel Service Agreement |
| ComScore, Inc. 11950 Democracy Drive | Herald Media, Inc. | Service Agreement (audience analytics) |

| Vendor Name | Counter Party | Description |
|---|---|---|
| Suite 600<br>Reston, VA  20190 | | |
| DoApp, Inc.<br>3908 Huntington Lane NW<br>Rochester, MN  55901 | Herald Interactive, Inc. | License and Service Agreement |
| Invisibly, Inc.<br>c/o James McKelvey<br>4240 Duncan Avenue<br>Saint Louis, MO  63110 | Boston Herald Inc. | Revenue Share Agreement |
| JW Player/Longtail Ad Solutions, Inc.<br>2 Park Avenue, 10th Floor, North<br>New York, NY  10016 | Herald Interactive, Inc. | Online Video Player Agreement |
| Media Management Technologies, Inc.<br>P.O. Box 693<br>Palm Beach, FL  33480 | Herald Interactive Inc. | Revenue Service Agreement |
| MediaRadar, Inc.<br>252 West 37th Street, Suite 1001<br>New York, NY  10018 | Herald Media, Inc. | Agreement (database of multi-media<br>ad spending by advertiser) |
| Metro Creative Graphics, Inc.<br>519 Eighth Avenue<br>New York, NY  10018 | Boston Herald | Agreement for Image Library for Ad production |
| NewspaperDirect Inc. dba Press Reader<br>200-13111 Vanier Place<br>Richmond, British Columbia Canada  V6V 231 | Boston Herald Inc. | Web Hosting and Development Agreement |
| OS4Media LLC<br>15105 John J. Delaney Drive K<br>Charlotte, NC  28277-2847 | Herald Interactive, Inc. | Yieldlift Services Agreement |
| Shoom, Inc.<br>6345 Balboa Boulevard, Suite 247<br>Encino, CA  91316 | Boston Herald | Service Agreement (E-tearsheets for<br>advertising) |
| SocialFlow, Inc.<br>52 Vanderbilt Avenue, Floor 12<br>New York, NY  10017 | Herald Interactive, Inc. | Service Agreement (social distribution) |
| The Local Media Consortium<br>1299 Pennsylvania Avenue NW, Suite 700<br>Washington, DC  20004-2400 | No Name Found. | Services Agreement (digital buying group) |
| Third and Grove LLC<br>One Broadway, 14th Floor<br>Cambridge, MA  02142 | Boston Herald | Services Agreement |

| Vendor Name | Counter Party | Description |
|---|---|---|
| Yieldmo, Inc.<br>218 West 18th Street, 2nd Floor<br>New York, NY 10011 | Herald Interactive, Inc. | Mobile Online Advertising Agreement |
| District M Inc.<br>730-5455 avenue de Gaspe<br>Montreal, Quebec Canada H2T 3B3 | Herald Interactive, Inc. | Publisher Agreement |
| Arthur J. Gallagher & Co.<br>250 Park Ave. 3rd Floor<br>NY, NY 10177 | Herald Media Holdings, Inc. | General business insurance broker agreement |
| New York Life Investment Management LLC<br>690 Canton Street, #100<br>Westwood, MA 02090 | Boston Herald Inc. | Service Agreement (administrative and actuarial functions) |
| USI Insurance Services, LLC<br>5 Bedford Farms Drive, Suite 200<br>Bedford, NH 03110 | Herald Media Holdings | Claims Management Services Agreement |
| The Newspaper Guild of Greater Boston-<br>Commercial Unit TNG-CWA 31032<br>47 Willard Street<br>Quincy, MA 02169 | Boston Herald Inc. | Collective Bargaining Agreement |
| ADP Roseland Inc.<br>One ADP Blvd.<br>Roseland, NJ 07068 | Boston Herald Interactive | Payroll, benefits admin |
| Kronos Incorporated<br>297 Billerica Road<br>Chelmsford, MA O1824 | Boston Herald | Support Agreement (time and attendance system) |
| Reimbursement Specialists, Inc.<br>93 Longwater Circle<br>Norwell, MA 02061 | Herald Media, Inc. | Group Health Plan Master Services Agreement |
| Unemployment Tax Management<br>P.O. Box 4074<br>Wakefield, MA 01880-5374 | Boston Herald, Inc. | Unemployment Compensation Service Agreement |
| Continental Resources, Inc.<br>175 Middlesex Turnpike<br>Bedford. MA 01730 | Boston Herald | Computer Hardware Support Agreement |
| Continuant<br>5050 20th Street<br>East Tacoma, WA 98424 | Boston Herald | Support Agreement (telephone and network software) |
| OneVision, Inc.<br>100 Brickstone Square, Suite 208<br>Andover, MA 01810 | Boston Herald, Inc. | Software Support Agreement |

| Vendor Name | Counter Party | Description |
|---|---|---|
| Rutter Networking Technologies, Inc.<br>10 High Street<br>Andover, MA O1810 | Boston Herald | Support Agreement (networking) |
| 451 D Street, LLC<br>c/o Lincoln Property Company<br>70 Fargo Street, Suite 102A<br>Boston, MA 02210 | Herald Media Incorporated | Office lease |
| International Brotherhood of Teamsters<br>Local Union #25<br>544 Main Street<br>Charlestown, MA 02129 | Boston Herald | Collective Bargaining Agreement |
| New York Typographical Union CWA Local 14156<br>831 S. Nevada Avenue Suite 120<br>Colorado Springs, CO 80903 | Boston Herald Inc. | Collective Bargaining Agreement |
| The Newspaper Guild of Greater Boston - Editorial Unit<br>501 3rd Street N.W., 6th Floor<br>Washington, DC 20001 | Boston Herald, Inc | Collective Bargaining Agreement |
| NPSLLC<br>Gillette Stadium<br>One Patriot Place<br>Foxboro, MA 02035 | Boston Herald Inc. | Club Seat License Agreement (Gillette Stadium) |
| Vary Technologies Inc. aka Varytek<br>170 West Road, Suite 4<br>Portsmouth, NH 03801 | The Boston Herald | Service Agreement for Color Printer |
| Verizon Wireless<br>One Verizon Way<br>Basking Ridge, NJ 07920 | Boston Herald Inc. | Service Agreement (cellphone service provider) |
| W.B. Mason Co., Inc.<br>647 Summer Street<br>Boston, MA 02210 | Boston Herald, Inc. | Office Supplies Agreement |

All other contracts not set forth on Schedule 2.1.10(a).

SCHEDULE 2.1.18

PREPAID EXPENSES

| Account Name | Amount | Description |
|---|---|---|
| PREPAID SERVICE CONTRACTS | 161.1 | Prepaid business agreement |
| OTHER CURR ASSET- CIRCULATION DEPOS | 126.1 | Circulation Deposits for PCF and OSG agreements |
| TD BANKNORTH GARDEN | 30.9 | Barter agreement with Bruins |
| OTHER CURR ASSET- CREDIT CARD AR | 27.3 | Credit Card processing timing of payments |
| BOSTON CHAMBER OF COMMERCE | 5.8 | |
| STAMPS MAIL CAGE | 5.7 | Postage for mail machine |
| MASS. NEWSPAPER PUBLISHERS ASN | 1.6 | |
| GUAR DEP-POSTAGE DUE | 0.2 | |
| TOTAL | 358.7* | |

\*    In Thousands

<u>Schedule 2.2</u>
<u>Other Excluded Assets</u>

1. All receivables owed by the Boston Globe and its subsidiaries and affiliates to Sellers, including but not limited to receivables for the accounts set forth below.

Boston Globe and subsidiaries

Circulation Receivables

| Acct # | Account Name |
|--------|--------------|
| 457009999 | GLOBE CITY/DOUG GLADDING/CIRC DEPT |
| 457019999 | GLOBE CITY II/DOUG GLADDING/CIRC DEPT |
| 496009999 | HAWKERS/DOUG GLADDING/CIRC DEPT |
| 01759 | RSI 4 |
| 01758 | RSI ATTLEBORO |
| 01757 | RSI FRANKLIN |
| 01752 | RSI ONE |
| 01755 | RSI RANDOLPH |
| 01756 | RSI TAUNTON |
| 01754 | RSI THREE |
| 01753 | RSI TWO |
| 00850 | SHORELINE NEWS |
| 01750 | PROFILE NEWS |

**OTHER RECEIVABLES**

| GL ACCT# | Account Name |
|----------|--------------|
| 107420-0 | GLOBE/DRIVER REIMBURSEMENT |

2. License to Buy Season tickets to New England Patriots.

3. TPC Country Club Golf Membership.

4. The assets on the following pages.

<u>Insurance Prepaids</u>

HPHC/BCBS Medical Insurance PPD
Libel & Excess Libel Ins.
Workers' Compensation Ins.
Fiduciary & Crime Ins.
Property – 70 Fargo St. Ins.
Auto/Truck Insurance
General Liability Insurance

## OTHER EXCLUDED ASSETS

| Account Name | Amount | Description |
|---|---|---|
| 1.  *Prepaids* | | |
| SELF-INSURANCE LOSSES | 44.0 | Self Insurance Workers Comp (pre-2006) |
| TOTAL | 44.0 | |
| | | |
| 2.  *Fixed Assets* | | |
| VEHICLES | 35.7 | 2003 Mercedes Benz |
| TOTAL | 35.7 | |
| | | |
| 3.  *Long Term Assets* | | |
| SELF-INSURANCE LOSSES | 176.1 | Self Insurance Workers Comp (pre-2006) |
| SELF-INSURANCE CASH ESCROW (AIG) | 10.0 | Self Insurance Workers Comp (pre-2006) |
| CASH DEPOSIT – TPC BOSTON | 25.0 | |
| CASH DEPOSIT – GILLETTE – N.E. PATRIOTS | 60.0 | |
| TOTAL | 85.0 | |

**Schedule 3.3.2**

**Notes as to the preparation of the historical consolidated audited financial statements of Sellers-Variance with GAAP**

None.

## Schedule 4.3.5

### Required Seller Waivers, Consents And Approvals

None.

Schedule 4.4.6

Required Buyer Waivers, Consents And Approvals

None.

## Schedule 6.2

### Jurisdiction of Sellers' Incorporation and Good Standing

Each of the Sellers is a corporation duly incorporated and in good standing in the State of Delaware and each is qualified to do business and in good standing in the Commonwealth of Massachusetts.

Schedule 6.3.1

**Sellers Consents, Waivers, Approvals, Orders And Authorizations**

None.

## Schedule 6.3.2

### Sellers' Filings With Governmental Authorities

None.

## Schedule 6.4.1

### Exceptions to Good, Valid And Marketable Title to Personal Property

None.

## Schedule 6.5

### Litigation and Judgments, Orders or Decrees

Consolidated Freelancer Copyright Infringement: Following the Supreme Court's decision in Tasini vs New York Times, several class action copyright infringement lawsuits were filed by named freelancers and others against certain commercial databases (including Factiva and Reed Elsevier) and certain print publishers (including the New York Times, Dow Jones and Copley Press). The freelancers claimed that, while they had given permission for their works to be published in print by the publishers, they had not consented to publishers' licensing of their works to commercial databases for the electronic distribution. Because publishers (a) were the parties who dealt directly with the freelancers and (b) had indemnification obligations embedded in their license agreements with the commercial databases, they actively participated in the settlement negotiations that, in 2005, resulted in an Initial Settlement Agreement between the class action plaintiffs and the named databases and publishers. In connection with that Agreement and subject to its final approval by the court, certain publishers entered into a Database/Participating Publisher Implementing Agreement ("DB/PPA") with the databases. The Initial Settlement Agreement was overturned by the Second Circuit in 2007 as beyond the district court's jurisdiction. The Supreme Court unanimously reversed that decision, but, on remand, the Second Circuit again struck down the settlement, this time on the theory that the authors with unregistered copyrights needed separate representation in the settlement negotiations.

Since the Second Circuit's decision in 2011, the class action plaintiffs and the named databases and publishers engaged in extensive settlement negotiations and, in late 2013, again reached a settlement. As before, the Revised Settlement Agreement ("RSA") between the class action plaintiffs and the named databases and publishers is subject to court approval. The RSA has been submitted to the district court for preliminary approval and a hearing was set for January 22, 2014. In connection with the RSA, Herald Media, along with a number of other publishers, has agreed to participate in an implementing agreement with the databases. The revised DB/PPA obligates Participating Publishers to pay valid claims for works they published (at the rates set in the RSA) and transfers to them the benefits of the release provided by the class action plaintiffs and the non-exclusive right to continued use of the works. The amount paid per article will, in general, depend on whether the article was (1) properly registered with the Copyright Office before publication, (2) registered with the Copyright Office after publication or (3) not registered (so-called A, B and C Claims). Claims were initially identified in the initial settlement claims process as Category A, B or C claims, but the amount to be paid on any particular claim remains subject to additional review and possible reclassification. Given the current status of efforts to resolve these chums and the contemplated claims administration process, the value of any particular claim for which a participating publisher will ultimately be responsible is as yet undetermined.

In connection with the Initial Settlement Agreement, the claims administrator presented 5,541 claims from 59 claimants with a total value of $168,064 against the Herald Media. Herald Media originally contested $14,660 of the claims with the administrator and has confirmed the remaining balance of $153,404. Subsequently, in April 2017 Herald Media agreed to terms with one (1) claimant, Michael Schuman, in order to resolve $1,108 in claims, Herald Media agreed to settle those objections for $700. Herald Media is awaiting further instructions from defense counsel on the remaining status of all other objected claims.

## Schedule 6.6

### Registered Intellectual Property; Intellectual Property Licenses

#### Summary

All Registered Intellectual Property is held by either Boston Herald, Inc. or Herald Interactive Inc., as noted below.  No IP is held by either Herald Media, Inc. or Herald Media Holdings, Inc.

#### Registered US Trademarks

| Owner | Trademark | Reg. No. | Status | Notes |
|---|---|---|---|---|
| Boston Herald, Inc. | SOMEBODY'S GOT TO SAY IT | 2487547 | Live | |
| Boston Herald, Inc. | BOSTON HERALD | 2294163 | Live | |
| | | | | |
| Herald Interactive Inc. | HOMEFIND | 2593360 | Live | |
| Herald Interactive Inc. | JOBFIND | 2315509 | Live | |
| Herald Interactive Inc. | CARFIND | 2601455 | Live | |
| | | | | |
| Herald Media, Inc. | NONE | | | |
| | | | | |
| Herald Media Holdings, Inc. | NONE | | | |

**Registered US Copyrights**

| No. | Owner Name (as listed at the USCO) | Title | Copyright No. | Date |
|---|---|---|---|---|
| 1. | Boston Herald | Boston Herald. | TX0007750610 | 2012 |
| 2. | Boston Herald | Boston Herald. | CSN0102979 | 2006 |
| 3. | Boston Herald | Boston Herald. [Published: 2012-09-01 to 2012-09-30. Issues: September 2012] | TX0007695492 | 2012 |
| 4. | Boston Herald | Boston Herald. [Published: 2012-10-01 to 2012-10-31. Issues: October 2012] | TX0007903108 | 2012 |
| 5. | Boston Herald | Boston Herald. [Published: 2012-11-01 to 2012-11-31. Issues: November 2012] | TX0007903094 | 2012 |
| 6. | Boston Herald | Boston Herald. [Published: 2012-12-01 to 2012-12-31. Issues: December 2012] | TX0007726333 | 2012 |
| 7. | Boston Herald | Boston Herald. [Published: 2013-01-01 to 2013-01-31. Issues: January 2013] | TX0007806721 | 2013 |
| 8. | Boston Herald | Boston Herald. [Published: 2013-02-01 to 2013-02-28. Issues: February 2013] | TX0007742883 | 2013 |
| 9. | Boston Herald | Boston Herald. [Published: 2013-03-01 to 2013-03-31. Issues: March 2013] | TX0007746660 | 2013 |
| 10. | Boston Herald | Boston Herald. [Published: 2013-05-01 to 2013-05-31. Issues: May 2013] | TX0007811703 | 2013 |
| 11. | Boston Herald | Boston Herald. [Published: 2013-07-01 to 2013-07-31. Issues: July 2013] | TX0007834328 | 2013 |
| 12. | Boston Herald | Boston Herald. [Published: 2013-08-01 to 2013-08-31. Issues: August 2013] | TX0007901135 | 2013 |
| 13. | Boston Herald | Boston Herald. [Published: 2013-09-01 to 2013-09-30. Issues: September 2013] | TX0008065726 | 2013 |
| 14. | Boston Herald | Boston Herald. [Published: 2013-10-01 to 2013-10-31. Issues: October 2013] | TX0007901396 | 2013 |
| 15. | Boston Herald | Boston Herald. [Published: 2013-11-01 to 2013-11-30. Issues: November 2013] | TX0007900479 | 2013 |
| 16. | Boston Herald | Boston Herald. [Published: 2013-12-01 to 2013-12-31. Issues: December 2013] | TX0007966412 | 2013 |

| No. | Owner Name (as listed at the USCO) | Title | Copyright No. | Date |
|-----|-----|-----|-----|-----|
| 17. | Boston Herald | Boston Herald. [Published: 2014-11-01 to 2014-11-31. Issues: November 2014] | TX0007886895 | 2014 |
| 18. | Boston Herald | Boston Herald. [Published: 2014-12-01 to 2014-12-31. Issues: December 2014] | TX0008156415 | 2014 |
| 19. | Boston Herald | Boston Herald. [Published: 2014-09-01 to 2014-09-30. Issues: September 2014] | TX0007966426 | 2014 |
| 20. | Boston Herald | Boston Herald. [Published: 2014-10-01 to 2014-10-31. Issues: October 2014] | TX0008156045 | 2014 |
| 21. | Boston Herald | Boston Herald. [Published: 2014-11-01 to 2014-11-31. Issues: November 2014] | TX0008156283 | 2014 |
| 22. | Boston Herald | Boston Herald. [Published: 2014-12-01 to 2014-12-31. Issues: December 2014] | TX0008063505 | 2014 |
| 23. | Boston Herald | Boston Herald. [Published: 2014-09-01 to 2014-09-30. Issues: September 2014] | TX0008080620 | 2014 |
| 24. | Boston Herald | Boston Herald. [Published: 2014-10-01 to 2014-10-31. Issues: October 2014] | TX0008153797 | 2014 |
| 25. | Boston Herald | Boston Herald. [Published: 2014-11-01 to 2014-11-31. Issues: November 2014] | TX0008154564 | 2014 |
| 26. | Boston Herald | Boston Herald. [Published: 2014-09-01 to 2014-09-30. Issues: September 2014] | TX0008153863 | 2014 |
| 27. | Boston Herald | Boston Herald. [Published: 2015-10-01 to 2015-10-31. Issues: October 2015] | TX0008174112 | 2015 |
| 28. | Boston Herald | Boston Herald. [Published: 2015-11-01 to 2015-11-31. Issues: November 2015] | TX0008162680 | 2015 |
| 29. | Boston Herald | Boston Herald. [Published: 2015-12-01 to 2015-12-31. Issues: December 2015] | TX0008183009 | 2015 |
| 30. | Boston Herald | Boston Herald. [Published: 2015-09-01 to 2015-09-30. Issues: September 2015] | TX0008182772 | 2015 |
| 31. | Boston Herald | Bobby Orr's goal that won Stanley Cup & 72 other titles. | V3541D256 | 2006 |
| 32. | Boston Herald | Bobby Orr's goal that won Stanley Cup & 72 other titles. | V3515D658 | 2004 |
| 33. | Boston Herald | Bobby Orr's goal that won Stanley Cup & 72 other titles. | V3515D658 | 2004 |

| No. | Owner Name (as listed at the USCO) | Title | Copyright No. | Date |
|---|---|---|---|---|
| 34. | Boston Herald | Bobby Orr's goal that won Stanley Cup; photo. By Boston Record American. | RE0000852965 | 2001 |
| 35. | Boston Herald, Inc. | Boston herald. | CSN0102979 | 2012 |
| 36. | Boston Herald, Inc. | Boston herald. | CSN0102979 | 2011 |
| 37. | Boston Herald, Inc. | Boston herald. | CSN0102979 | 2010 |
| 38. | Boston Herald, Inc. | Boston herald. | CSN0102979 | 2009 |
| 39. | Boston Herald, Inc. | Boston herald. | CSN0102979 | 2008 |
| 40. | Boston Herald, Inc. | Boston herald. | CSN0102979 | 2007 |
| 41. | Boston Herald, Inc. | Boston herald. | CSN0102979 | 2005 |
| 42. | Boston Herald, Inc. | Boston herald. | CSN0102979 | 2004 |
| 43. | Boston Herald, Inc. | Boston herald. | CSN0102979 | 2003 |
| 44. | Boston Herald, Inc. | Boston herald. | CSN0102979 | 2002 |
| 45. | Boston Herald, Inc. | Boston herald. | CSN0102979 | 2001 |
| 46. | Boston Herald, Inc. | Boston herald. | CSN0102979 | 2000 |
| 47. | Boston Herald, Inc. | Boston herald. | CSN0102979 | 1999 |
| 48. | Boston Herald, Inc. | Boston herald. | CSN0102979 | 1998 |
| 49. | Boston Herald, Inc. | Boston herald. | CSN0102979 | 1997 |
| 50. | Boston Herald, Inc. | Boston herald. | CSN0102979 | 1996 |
| 51. | Boston Herald, Inc. | Boston herald. | CSN0102979 | 1995 |
| 52. | Boston Herald, Inc. | Boston herald. | CSN0102979 | 1994 |
| 53. | Boston Herald, Inc. | Google stogie / by Michael Fein. | VA0000860415 | 1997 |
|  | Herald Interactive Inc. | *NONE* |  |  |
|  | Herald Media, Inc. | *NONE* |  |  |
|  | Herald Media Holdings, Inc. | *NONE* |  |  |

**Domain Names**

| Owner | Domain Name | Creation Date | Registrar |
|---|---|---|---|
| Boston Herald, Inc. | hubblog.com | 2002-08-08 | DYNAMIC NETWORK SERVICES, INC. |
| Boston Herald, Inc. | thehubblog.com | 2002-08-09 | DYNAMIC NETWORK SERVICES, INC. |
| | | | |
| Herald Interactive Inc. | bestaroundboston.com | 2000-04-24 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | bhforklift.com | 2012-07-13 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | bhrld.us | 2016-04-22 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | bhstylize.com | 2012-07-13 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | bostonheraldcars.com | 2009-01-27 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | bostonheraldlive.com | 2013-03-26 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | bostonheraldsq.com | 2010-06-09 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | bostonheraldsquare.com | 2010-06-09 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | bostonherald.com | 2002-10-01 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | bostonhomesguide.com | 2006-03-08 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | bostonscene.com | 1997-11-18 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | bostontoday.com | 1997-07-18 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | businesstoday.com | 1997-02-25 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | buyheraldphotos.com | 2010-02-01 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | carfind.com | 1997-12-03 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | halfpriceboston.com | 2009-11-03 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | heraldinteractive.com | 2001-05-16 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | heraldlive.com | 2005-08-10 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | heraldmedia.com | 1999-02-25 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | heraldsquareonline.com | 2010-06-09 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | heraldu.com | 2012-05-14 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | heraldweather.com | 2013-09-23 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | hiasys.com | 2001-02-07 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | jobfind.com | 1996-11-26 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | jobsmart.com | 1996-04-16 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | nesnow.com | 1999-09-28 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | newenglandsnow.com | 1999-09-28 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | trackgals.com | 2003-04-15 | NETWORK SOLUTIONS, LLC. |
| Herald Interactive Inc. | womensbusinessboston.com | 2001-06-22 | NETWORK SOLUTIONS, LLC. |
| | | | |
| Herald Media, Inc. | NONE | | |
| Herald Media Holdings, Inc. | NONE | | |

## Schedule 6.7.1

### Material Agreements

See attached.

**Herald Media Holdings, Inc.**

**Licenses for News Content**

<u>Licensee</u>

BurellesLuce

Lexis-Nexis

McClatchy Tribune Information Services

NewsBank

## Herald Media Holdings, Inc.
### Licenses & Material Contract List

| HMI | Herald Media Holdings, Inc. | | | | |
|-----|------------------------------|--|--|--|--|
| HMI | Herald Media, Inc. | | | | |
| BH | Boston Herald, Inc. | | | | |
| HI | Herald Interactive, Inc. | | | | |

| Debtor | Contract Party | Type | Folder | Description of Agreement | Cure Cost |
|--------|----------------|------|--------|--------------------------|-----------|
| | **Licences:** | | | | |
| BH | BURRELLESLUCE | License | BH | Revenue share for Herald news content | |
| HMI | NEWSBANK, INC | License | BH | License agreement for news content to library and government markets | |
| BH | LEXIS-NEXIS | License | BH | License agreement for news content | |
| HMI | MCCLATCHY TRIBUNE SERVICES | License | BH | License agreement for news content | |
| | | | | | |
| | **Material Contracts:** | | | | |
| BH | BOSTON GLOBE | | BH | Print, Inserting & Distribution on newspaper | |
| BH | 451 D STREET, LLC | | BH | Office lease for 451 D Street | |
| BH | PCF, INC. | | BH | Newspaper delivery to subscribers | |
| BH | Newspaper Direct / PressReader | Revenue | BH | eEdition host for replica & content reseller to cruise ships & hotels | |
| BH | THE BOSTON GLOBE | | BH | Bulk distribution/hauling services | |
| HMHI | ARTHUR J GALLAGHER & CO. OF | | BH | General business insurance broker | |
| BH | ASSOCIATED PRESS | | BH & HI | Print & online editorial content license | |
| HMI | OUTBRA.IN, INC. | Revenue | HI | Sponsored content. Revenue share | |
| HMI | REIMBURSEMENT SPECIALISTS, INC | | BH | Health plan PF A administrator | |
| HI | THIRD AND GROVE LLC | | HI | Web dev and design for bostonherald.com | |
| HMI | COMSCORE, INC. | | HI | Audience analytics for digital only | |
| HI | DOAPP | Revenue | HI | Content delivery for news apps. Revenue share model | |
| HI | OS4 MEDIA, LLC | Revenue | Hi | Programitic / Demand activation for non-guarantee ad inventory | |
| HI | THE RUBICON PROJECT, INC | Revenue | Hi | Online progammatic advertising | |
| HMI | TRIBUNE CONTENT AGENCY | | HI | Print & online editorial content license | |
| HMI | TELEREACH, INC. | | BH | Customer support for home delivery subscribers | |
| HMI | SENTONEWS INC. | Revenue | HI | PGA Golf news content aggregator | |
| BH | NIELSEN AUDIO, INC. | | BH | Subscription to readership demographics for marketing | |
| HI | NEWSMAX MEDIA | Revenue | HI | Sponsored content provider | |
| BH | GOOGLE INC. | | HI | DFP Premium and AdX Services. Ad serving | |
| BH | BRAINWORKS SOFTWARE, LLC | | BH | Cloud based circulation management system | |
| HI | CONATIX | Revenue | HI | Native advertising / sponsored articles | |
| HI | PUBMATIC, INC. | Revenue | HI | Online progammatic advertising | |
| HMI | NEWSCYCLE SOLUTIONS, INC. | | BH | Support for editorial content management system | |

## Schedule 6.7.1

### Executory Contracts and Unexpired Leases

See Schedules 2.1.10(a) and 2.1.10(b)

## Schedule 6.8.2

### Employee Benefit Plans; Defaults or Funding Deficiencies: Withdrawal Liabilities

See attached.

## Herald Media Holdings, Inc.

## Summary of Employee Benefits

### SCHEDULE 6.8.2

| Benefit | Paid By | Description |
|---------|---------|-------------|
| **Boston Herald (Non-Union):** | | |
| Medical Insurance | Company & Employee | See attached sheet |
| Dental Insurance | Company | See attached sheet |
| Eye Care | Company | Employees are eligible for an eye exam and basic glasses (frame and lenses) excluding contacts from a Davis Vision network provider every 24 months. |
| Term Life Insurance | Company | 2 times base salary up to a maximum benefit of $400,000. |
| Voluntary Life Insurance | Employee | Employees may elect to purchase additional Life insurance. The cost for this insurance is borne by the employee. |
| Sick Leave | Company | Sick day allowance based on length of service with a maximum benefit for 25+ years of service of 20 weeks at full pay, 5 weeks at ⅔ pay and 6 weeks at ½ pay. |
| Long Term Disability | Company | After disability of 180 days, pays 60% of monthly covered earnings up to a maximum benefit of $10,500 per month for duration of disability or up to SS retirement age, whichever is less. |
| Flex. Spending Account | Employee | Available for health and dependent care. |
| Commuter Benefits | Employee | Available for parking and/or transit expense. |
| DB Pension Plan | Employee | In December 2005 this DB Plan was amended to freeze future benefit accruals. |
| 401k Plan | Employee | Employee may contribute up to 15% of salary upon hire, subject to the IRS limit. |
| 401k Match | Company | After 1 year of service, Company will match 50% of the first 6% pretax and/or Roth of employee's 401k contribution. |
| Employee Assistance Program | Company | The Company makes available to all employees by telephone and in-person services to confidentially assist them and/or their immediate family members in resolving personal problems or situations that do or might adversely affect them. The services are provided through employees and affiliates of Empathia/Life Matters, which are conveniently located throughout the Boston area and the United States. The Company pays for this benefit including initial contact and up to 3 visits with an Empathia/Life Matters affiliate. |

## Herald Media Holdings, Inc.

## Summary of Employee Benefits

### SCHEDULE 6.8.2

| Benefit | Paid By | Description |
|---|---|---|
| **Boston Herald Editorial & Commercial Guild Unions:** | | |
| Medical Insurance | Company & Employee | See attached sheet |
| Dental Insurance | Employee | See attached sheet |
| Eye Care | Company | Employees are eligible for an eye exam and basic glasses (frame and lenses) excluding contacts from a Davis Vision network provider every 24 months. |
| Sick Leave | Company | Sick day allowance based on length of service with a maximum benefit of 25 or more years of service of 12 weeks at full pay, 8 weeks at ⅔ pay and 6 weeks at ½ pay. |
| Flex. Spending Account | Employee | Available for health and dependent care. |
| Commuter Benefit | Employee | Available for parking and/or transit expense. |
| Multiemployer Pension Plan- Editorial Employees | Company & Employee | Payment of $5.00 (by Company) and $0.7962 (by Employee via payroll diversion) for each shift worked (up to a maximum of 5 per week) to The Newspaper Guild International Pension Fund. |
| Herald DB Pension Plan - Commercial Employees | Company & Employees | Company pays actuarial determined minimum contributions, which includes the $5.30 for each shift worked (up to a maximum of 5 per week) per the union contract. The employees' contribution includes a 5% pay reduction (from contract wages) and 5 unpaid furlough days per calendar year. In May 2008, this Plan was amended to temporarily freeze future benefit accruals. |
| 401k Plan | Employee | Employee may contribute up to 25% of salary upon hire, subject to the IRS limit. |
| Employee Assistance Program | Company | Same as Boston Herald Non-Union above. |
| Dismissal & Alternate Benefit | Company | Severance pay - see union contracts for calculation. |

Herald Media Holdings, Inc.

Summary of Employee Benefits

SCHEDULE 6.8.2

| Benefit | Paid By | Description |
|---|---|---|
| **Boston Herald Teamsters Local 25 Union:** | | |
| Medical Insurance | Company & Employee | See attached sheet |
| Dental Insurance | Employee | See attached sheet |
| Eye Care | Employee | Employees are eligible for an eye exam and basic glasses (frame and lenses) excluding contacts from a Davis Vision network provider every 24 months. |
| Health & Welfare Fund | Company | In addition to Medical and Dental contributions (below), the Company currently pays $0.94 per shift worked (max of 5 shifts per week) to the Health & Welfare Fund. In turn, the Health & Welfare Fund pays the Herald a portion of the Medical insurance. The Fund also has a self-funded $10,000 death benefit. |
| Sick Leave | Company | 5 days per year |
| Short Term Disability | Company & Employee | After 7-day disability period, pays a benefit of $250 per week for duration of disability or 26 weeks, whichever is less. |
| Flex. Spending Account | Employee | Available for health and dependent care. |
| Multiemployer Pension Plan | Company | Payment of $8.94 per hour worked (up to a maximum of 40 hours per week) to the New England Teamsters & Trucking Industry Pension Fund. |
| 401k Plan | Employee | Employee may contribute up to 25% of salary upon hire, subject to the IRS limit. |
| Employee Assistance Program | Company | Same as Boston Herald Non-Union above. |

**Herald Media Holdings, Inc.**

**Summary of Employee Benefits**

**SCHEDULE 6.8.2**

| Benefit | Paid By | Description |
| --- | --- | --- |
| **Boston Herald Typographers Union:** | | |
| Medical Insurance | Company & Employee | See attached sheet. In addition, see notes to Health & Welfare Fund below. |
| Eye Care | Employee | Employees are eligible for an eye exam and basic glasses (frame and lenses) excluding contacts from a Davis Vision network provider every 24 months. |
| Health & Welfare Fund | N/A | Surplus funds in the Health & Welfare Fund are used to offset a portion of the medical insurance costs.  There are no Employee or Employer contributions to this plan. |
| Sick Leave | Company | 5 days per year |
| Flex. Spending Account | Employee | Available for health and dependent care. |
| Commuter Benefit | Employee | Available for parking and/or transit expenses. |
| Multiemployer Pension Plan | Company | Payment of $25.00 per shift worked (up to a maximum of 5 per week) to the CWA ITU Negotiated Pension Plan. |
| 401k Plan | Employee | Employee may contribute up to 25% of salary upon hire, subject to the IRS limit. |
| Employee Assistance Program | Company | Same as Boston Herald Non-Union above. |

## Herald Media Holdings, Inc.

## Summary of Employee Benefits

### SCHEDULE 6.8.2

| Benefit | Paid By | Description |
|---|---|---|
| **Herald Interactive (all Non-Union):** | | |
| Medical Insurance | Company & Employee | See attached sheet. In addition, see notes to Health & Welfare Fund below. |
| Dental Insurance | Company & Employee | See attached sheet |
| Eye Care | Company | Employees are eligible for an eye exam and basic glasses (frame and lenses) excluding contacts from a Davis Vision network provider every 24 months. |
| Term Life Insurance | Company | 2 times base salary up to a maximum benefit of $400,000. |
| Voluntary Life Insurance | Employee | Employees may elect to purchase additional Life insurance. The cost for this insurance is borne by the employee. |
| Sick/Personal Leave | Company | Annual allowance of 5 paid days. |
| Short Term Disability | Company | After a 7-day disability period, pays 60% of weekly earnings up to a maximum benefit of $1,500 per week for duration of disability or 26 weeks, whichever is less. |
| Long Term Disability | Company | After an absence of 26 weeks, pays 60% of base salary up to a maximum benefit of $10,500 per month for duration of disability or up to SS retirement age, whichever is less. |
| Flex. Spending Account | Employee | Available for health and dependent care. |
| Commuter Benefits | Employee | Available for parking and/or transit expense. |
| 401k Plan | Employee | Employee may contribute up to 15% of salary upon hire, subject to the IRS limit. |
| 401K Match | Company | After 1 year of service, Company will match 50% of the first 6% pre tax and/or Roth of employee's 401K contribution. |
| Employee Assistance Program | Company | Same as Boston Herald Non-Union above. |

Herald Media Holdings, Inc.

Employee Benefit Plans - Defaults or Funding Deficiences
**Schedule 6.8.2**

Missed Contributions / Payments

| Plan Name | Date | Amount |
|---|---|---|
| **Funded Defined Benefit Plans**: | | |
| Boston Herald Pension & Retirement Plan | September 15,2017 | $ 323,426 |
| Boston Herald Pension & Retirement Plan | October 13,2017 | $ 198,851 |
| | | |
| **Multi-employer Withdrawal Liabilities**: | | |
| GCIU-Employer Retirement Fund (1) | November 2017 | $ 17,253 |
| Boston Newspaper Retirement Fund | November 2017 | $ 30,495 |
| CWA/ITU Negotiated Pension Plan | November 2017 | $ 100,494 |
| Graphic Communications Conference of the International Brotherhood of Teamsters National Pension Fund | November 2017 | $ 3,051 |

## EXHIBIT A

## FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

This ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is made as of this _____ day of _____, 2018, by and among MNG-BH ACQUISITION LLC ("Assignee"), and BOSTON HERALD, INC., HERALD INTERACTIVE INC., HERALD MEDIA, INC., and HERALD MEDIA HOLDINGS, INC. (each, individually, a "Assignor", and, collectively, "Assignors"). Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed thereto in the Asset Purchase Agreement (as hereinafter defined).

WHEREAS, Assignors, Assignee and MediaNews Group, Inc., as Buyer Guarantor, have executed and delivered an Asset Purchase Agreement dated as of February 13, 2018 (the "Asset Purchase Agreement") pursuant to which Assignee will purchase Assignors' publishing business, which business includes the preparation, publication, sale and distribution of each of the Publications (as defined therein) and other business ventures related thereto; and

WHEREAS, pursuant to the Asset Purchase Agreement, Assignors have agreed to assign certain rights and obligations to Assignee, and Assignee has agreed to assume certain rights and obligations of Assignors, as set forth in the Asset Purchase Agreement;

NOW, THEREFORE, for and in consideration of the premises and the mutual covenants contained herein, and for other good and valuable consideration, the receipt, adequacy and legal sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, do hereby agree as follows:

1.      Assignment and Assumption. Effective on the date hereof (the "Effective Date"), subject to the terms, conditions and limitations set forth in the Asset Purchase Agreement, Assignors hereby assign, sell, transfer and set over (collectively, the "Assignment") to Assignee all of the Purchased Assets. Assignee hereby accepts the Assignment and assumes and agrees to observe and perform all of the duties, obligations, terms, provisions and covenants and to pay and discharge all of the liabilities and obligations of Assignors comprising the Assumed Liabilities to be observed, performed, paid, or discharged from and after the Effective Date.

2.      Terms of the Asset Purchase Agreement. The terms of the Asset Purchase Agreement, including but not limited to Assignors' representations, warranties, covenants, agreements and indemnities relating to the Assumed Liabilities, are incorporated herein by this reference. Assignors and Assignee acknowledge and agree that the terms and conditions contained in the Asset Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Asset Purchase Agreement and the terms hereof, the terms of the Asset Purchase Agreement shall govern.

3.      Further Actions. Each of the parties hereto covenants and agrees, at its own expense, to execute and deliver, at the request of the other party hereto, such further instruments and to take such other action as such other party may reasonably request to more effectively consummate the assignments and assumptions contemplated by this Agreement.

4.    <u>Counterparts</u>. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. The parties acknowledge and agree that executed signature pages delivered by facsimile or electronic mail shall for all purposes constitute original signature pages.

5.    <u>Governing Law and Jurisdiction</u>. This Agreement shall be governed by and construed in accordance with the Laws of the State of Delaware without regard to the Law of the conflicts of Law of such State. THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO (i) THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT OR ANY ANCILLARY DOCUMENT EXECUTED PURSUANT HERETO; AND/OR (ii) THE PURCHASED ASSETS AND/OR ASSUMED LIABILITIES, AND THE PARTIES EXPRESSLY CONSENT TO AND AGREE NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION.

6.    <u>No Assignment; No Third Party Beneficiaries</u>. Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned or delegated by Assignors nor Assignee without the prior written consent of the other parties hereto and any purported assignment or delegation in violation hereof shall be null and void; provided that Assignee may assign any of its rights and obligations hereunder to any one or more persons that are under the Control (as defined in the Asset Purchase Agreement) of Assignee without any such assignment releasing Assignee from any of its obligations under this Agreement. This Agreement is not intended to, and shall not, confer upon any other person except the parties hereto any rights or remedies hereunder.

7.    <u>Entire Agreement</u>. This Agreement together with the Asset Purchase Agreement contains the entire agreement and understanding of the parties with respect to the subject matter hereof, and supersedes all prior agreements, negotiations, representations and proposals, written and oral, relating thereto.

[<em>Signature page follows</em>]

114349920 v3

IN WITNESS WHEREOF, Assignors and Assignee have executed this Assignment and Assumption Agreement as of the date first above written.

**ASSIGNEE:**

**MNG-BH ACQUISITION LLC.**

By: _____
    Name:
    Title:

**ASSIGNORS:**

**BOSTON HERALD, INC.**

By: _____
    Name:
    Title:

**HERALD INTERACTIVE, INC.**

By: _____
    Name:
    Title:

**HERALD MEDIA, INC.**

By: _____
    Name:
    Title:

**HERALD MEDIA HOLDINGS, INC.**

By: _____
    Name:
    Title:

114349920 v3

**EXHIBIT B**

**FORM OF
ASSIGNMENT OF PROPRIETARY RIGHTS AGREEMENT**

_____, 2018

THIS ASSIGNMENT OF PROPRIETARY RIGHTS AGREEMENT (this "Assignment Agreement") is entered into by and among MNG-BH ACQUISITION LLC. ("Assignee"), and BOSTON HERALD, INC., HERALD INTERACTIVE INC., HERALD MEDIA, INC., and HERALD MEDIA HOLDINGS, INC. (each, individually, a "Assignor", and, collectively, "Assignors") and is effective as of the date set forth above. Capitalized terms used but not otherwise defined shall have the meanings ascribed to them in the Asset Purchase Agreement (as defined below).

WHEREAS, Assignors have entered into an Asset Purchase Agreement (the "Asset Purchase Agreement") dated February 13, 2018 with Assignee and MediaNews Group, Inc., as Buyer Guarantor, pursuant to which Assignee will purchase Assignor's publishing business, which business includes the preparation, publication, sale and distribution of each of the Publications and other business ventures related thereto;

WHEREAS, Assignors are the record owners of all right, title and interest in and to the trademark registrations set forth on the attached Attachment 1 and the copyright registrations set forth on the attached Attachment 2;

WHEREAS, Assignors desire and have agreed to assign all Intellectual Property owned by them to Assignee; and

WHEREAS, Assignee desires and has agreed to accept such assignment;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged:

Assignors hereby sell, assign, transfer and convey to Assignee, its successors, legal representatives and assigns, all of Assignors' right, title, and interest in and to the Intellectual Property and to the goodwill related thereto, forever and throughout the world, including without limitation, the right to petition, sue or otherwise seek and recover damages, profits and any other remedy (monetary, injunctive, declaratory or other), for any past, present or future infringement, dilution, conversion or misappropriation of, or other injury, offense, violation, breach of duty or wrong in relation to any of the Intellectual Property and the goodwill related thereto, or any license, agreement, contract or other matter relating thereto, worldwide and forever. The foregoing assignment includes all of Assignors' right, title, and interest in and to the trademark registrations set forth on Attachment 1 and the copyright registrations set forth on Attachment 2.

Assignors for themselves, their successors and assigns agree to execute and deliver, or cause to be executed and delivered, to Assignee or Assignee's legal representatives, any other or additional assignments, powers and other appropriate documentation, and to take all additional actions, necessary to effectuate, validate and record the assignment set forth herein, including.

without limitation, to execute one or more further assignments in a form acceptable for recordation in the United States Patent & Trademark Office, the United States Copyright Office and in any foreign intellectual property offices in which the assignment may be recorded.

This Assignment Agreement and the covenants and agreements contained herein shall be binding upon Assignors, their survivors and assigns and shall inure to the benefit of Assignee, its successors and assigns.

This Assignment Agreement does not limit the rights, obligations, representations, warranties and/or indemnifications provided in the Asset Purchase Agreement. Notwithstanding anything to the contrary set forth herein, if there is any conflict between the terms and conditions of this Assignment Agreement and the terms and conditions of the Asset Purchase Agreement, the terms of the Asset Purchase Agreement shall control.

This Assignment Agreement shall be governed by, construed and enforced in accordance with the laws of the State of New York (without application of principles of conflict of laws) and the federal laws of the United States.

This Assignment Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

[Signature Page Attached]

114349921 v3

**ASSIGNEE:**

**MNG-BH ACQUISITION LLC**

By: _____

     Name:
     Title:

**ASSIGNORS:**

**BOSTON HERALD, INC.**

By: _____

     Name:
     Title:

**HERALD INTERACTIVE, INC.**

By: _____

     Name:
     Title:

**HERALD MEDIA, INC.**

By: _____

     Name:
     Title:

**HERALD MEDIA HOLDINGS, INC.**

By: _____

     Name:
     Title:

3

## ATTACHMENT 1

## TRADEMARK REGISTRATIONS

### REGISTERED TRADEMARKS

| Mark | Reg. No. | Jurisdiction | Registration date |
|------|----------|--------------|-------------------|
|      |          |              |                   |

4

114349921 v3

## ATTACHMENT 2

## COPYRIGHT REGISTRATIONS

See attached.

114349921 v3

## EXHIBIT C

## FORM OF BILL OF SALE

This BILL OF SALE (the "Bill of Sale"), dated as of _____, 2018, is by and among MNG-BH ACQUISITION LLC ("Buyer"), and BOSTON HERALD, INC., HERALD INTERACTIVE INC., HERALD MEDIA, INC., and HERALD MEDIA HOLDINGS, INC. (each, individually, a "Seller", and, collectively, "Sellers").

## WITNESSETH

WHEREAS, pursuant to that certain Asset Purchase Agreement, dated as of February 13, 2018 (the "Asset Purchase Agreement"), by and among Sellers, Buyer and MediaNews Group, Inc., as Buyer Guarantor, Sellers have agreed to sell, convey, transfer, assign and deliver all of their respective right, title and interest in and to the Purchased Assets, as identified and described in the Asset Purchase Agreement, to Buyer, and Buyer has agreed to purchase and acquire such Purchased Assets from the Sellers, all as more fully described in the Asset Purchase Agreement;

WHEREAS, the Asset Purchase Agreement and the transactions contemplated thereby were duly authorized and approval by an order of the United States Bankruptcy Court for the _____, entered on _____, 2018 ("Sale Approval Order") in the jointly-administered cases for the Sellers under the caption _____, Case No. _____(____), the terms of which order are incorporated herein by reference; and

WHEREAS, pursuant to the Asset Purchase Agreement, Sellers and Buyer have agreed to enter into this Bill of Sale pursuant to which the Purchased Assets will be conveyed to Buyer in accordance with the Asset Purchase Agreement and the Sale Approval Order;

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.      Defined Terms.  Capitalized terms which are used but not defined in this Bill of Sale shall have the meanings ascribed to such terms in the Asset Purchase Agreement and the Sale Approval Order if not otherwise defined in the Asset Purchase Agreement.  This is the "Bill of Sale" referred to in the Asset Purchase Agreement.

2.      Assignment.   Subject to the terms and conditions of the Asset Purchase Agreement and the Sale Approval Order, for, and in consideration of the payment of the Purchase Price, the receipt and sufficiency of which are hereby acknowledged, Sellers do hereby sell, convey, transfer, assign and deliver to Buyer all of the Sellers' respective right, title and interest in and to all of the Purchased Assets, and Buyer does hereby purchase and accept from Sellers the conveyance, transfer, assignment and delivery of all of the Sellers' respective right, title and interest in and to all of the Purchased Assets.

3.       Condition of the Assets.  Except as set forth in the Asset Purchase Agreement, Sellers do not make any express or implied representations, statements, warranties or conditions of any kind or nature whatsoever concerning the Purchased Assets being sold, conveyed, transferred, assigned and delivered hereunder.

4.       Binding Effect; Assignment.  This Bill of Sale and all of the provisions hereof shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

5.       Governing Law.  This Bill of Sale shall be governed by and construed in accordance with the Laws of the State of New York without regard to the Law of the conflicts of Law of such State.   THE  BANKRUPTCY  COURT  SHALL  HAVE  EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO (i) THE INTERPRETATION AND ENFORCEMENT OF THIS BILL OF SALE OR ANY ANCILLARY DOCUMENT EXECUTED PURSUANT HERETO; AND/OR (ii) THE PURCHASED ASSETS AND/OR ASSUMED LIABILITIES, AND THE PARTIES EXPRESSLY CONSENT TO AND AGREE NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION.

6.       Construction.  This Bill of Sale is delivered pursuant to and is subject to the Asset Purchase Agreement and the Sale Approval Order.  In the event of any conflict between the terms of the Asset Purchase Agreement and the terms of this Bill of Sale, the terms of the Asset Purchase Agreement and the Sale Approval Order shall prevail.

7.       No Assignment; No Third Party Beneficiaries.  Neither this Bill of Sale nor any of the rights, interests or obligations hereunder may be assigned or delegated by Sellers nor Buyer without the prior written consent of the other parties hereto and any purported assignment or delegation in violation hereof shall be null and void; provided that Buyer may assign any of its rights and obligations hereunder to any one or more persons that are under the Control (as defined in the Asset Purchase Agreement) of Buyer without any such assignment releasing Buyer from any of its obligations under this Bill of Sale.  This Bill of Sale is not intended to, and shall not, confer upon any other person except the parties hereto any rights or remedies hereunder.

8.       Counterparts.  This Bill of Sale may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  The parties acknowledge and agree that executed signature pages delivered by facsimile or electronic mail shall for all purposes constitute original signature pages.

114349924 v3

IN WITNESS WHEREOF, this Bill of Sale has been duly executed and delivered by the duly authorized officer of the parties hereto as of the date first above written.

**BUYER:**

**MNG-BH ACQUISITION LLC**

By: _____
     Name:
     Title:

**SELLERS:**

**BOSTON HERALD, INC.**                **HERALD INTERACTIVE, INC.**

By: _____    By: _____
     Name:                                       Name:
     Title:                                      Title:

**HERALD MEDIA, INC.**                 **HERALD MEDIA HOLDINGS, INC.**

By: _____    By: _____
     Name:                                       Name:
     Title:                                      Title:

3

## EXHIBIT D

## FORM OF OFFICER'S CERTIFICATE OF
## SELLER

Reference is hereby made to (x) that certain Asset Purchase Agreement, dated as of February 13, 2018 (the "Asset Purchase Agreement"), by and among (i) MNG-BH ACQUISITION LLC ("Buyer"), (ii) MEDIANEWS GROUP, INC., as Buyer Guarantor, and (iii) BOSTON HERALD, INC., HERALD INTERACTIVE INC., HERALD MEDIA, INC., and HERALD MEDIA HOLDINGS, INC. (each, individually, a "Seller", and, collectively, "Sellers") and (y) the order of the United States Bankruptcy Court for the _____, entered on _____, 2018 ("Sale Approval Order") in the jointly-administered cases for the Sellers under the caption _____, Case No. _____(____). Capitalized terms used below but not defined herein shall have the meanings ascribed to them in the Asset Purchase Agreement and the Sale Approval Order if not otherwise defined in the Asset Purchase Agreement.

This certificate is being delivered to Buyer pursuant to Section 4.3.4 of the Asset Purchase Agreement. The undersigned, solely in his capacity as a [_____] of [_____], a Seller, and not in his capacity as an individual, hereby certifies as follows:

1.    All conditions precedent contained in Section 5.1 of the Asset Purchase Agreement have been satisfied.

2.    [      ], a Seller:

(i) is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Code and U.S. Treasury Department Regulations);

(ii) is not a disregarded entity, as such term is defined in Treasury Regulation Section 1.1445-2(b)(2)(iii);

(iii) has a U.S. employer identification number, which is [•]; and

(iv) has the following address: [•].

3.    Attached hereto as Exhibit 1 are true, correct and complete resolutions adopted by Seller's directors and shareholders authorizing the execution, delivery and performance of the Asset Purchase Agreement and the other agreements, documents and instruments contemplated by the Asset Purchase Agreement and the Sale Approval Order, and the consummation of the transactions contemplated by the Asset Purchase Agreement and the Sale Approval Order; and such resolutions have not been modified, amended, rescinded or revoked and are in full force and effect as of the date hereof.

[Signature Page Follows]

114349925 v3

IN WITNESS WHEREOF, the undersigned has executed this certificate as of this ___ day of _____, 2018.

By:_____
    Name:
    Title:

114349925 v3

## EXHIBIT 1

# RESOLUTIONS ADOPTED BY SELLER'S DIRECTORS AND SHAREHOLDERS

See attached.

# EXHIBIT E

# SALE ORDER

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| *In re:* | Chapter 11 |
| HERALD MEDIA HOLDINGS, INC., *et al.*, | |
| Debtors.[1] | Case No. 17-12881 (LSS) |
| | (Jointly Administered) |
| | **RE D.I. 13 & 146** |

**ORDER (A) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE
DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES,
AND OTHER INTERESTS; (B) AUTHORIZING AND APPROVING THE DEBTORS'
PERFORMANCE UNDER THE ASSET PURCHASE AGREEMENT; (C) APPROVING
THE ASSUMPTION AND ASSIGNMENT OF CERTAIN OF THE DEBTORS'
EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO; AND
(D) GRANTING RELATED RELIEF**

This matter is before the Court on the motion (the "Motion")[2] of the above-captioned

debtors and debtors in possession (collectively, the "Debtors") for the entry of an order pursuant

to sections 105(a), 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code"),

Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (as

amended from time to time, the "Bankruptcy Rules"), and Rule 6004-1 of the Local Rules of

Bankruptcy Practice and Procedures of the Bankruptcy Court for the District of Delaware (the

"Local Rules") (i)(a) approving and authorizing certain bidding procedures in connection with

the sale of substantially all of the Debtors' assets (the "Bidding Procedures"); (b) approving and

---

[1] The Debtors in these Chapter 11 Cases and the last four digits of each Debtor's taxpayer identification number are as follows: Herald Media Holdings, Inc. (5048); Herald Media, Inc. (1468); Boston Herald, Inc. (5341) and Herald Interactive, Inc. (2359). The Debtors' headquarters are located at 70 Fargo Street, Suite 600, Boston, MA 02210.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the APA (as defined below).

authorizing the Break-Up Fee and Expense Reimbursement; (c) scheduling the related auction and hearing to consider approval of sale; (d) approving procedures related to the assumption and assignment of certain of the Debtors' executory contracts and unexpired leases; (e) approving the form and manner of notice thereof; and (f) granting related relief; and (ii)(a) authorizing the sale of such assets free and clear of liens, claims, encumbrances, and other interests, except as provided by the APA (defined below); (b) approving the assumption and assignment of certain of the Debtors' executory contracts and unexpired leases related thereto; and (c) granting related relief; the Court after conducting a hearing (the "Bid Procedures Hearing") having entered an order approving the Bidding Procedures and granting certain related relief on January 5, 2018 [Docket No. 146] (the "Sale Procedures Order"); and an auction (the "Auction") having been held on February 13, 2018 in accordance with the Sale Procedures Order; and MNG-BH Acquisition LLC (the "Buyer") having been deemed by the Debtors the Successful Bidder (as defined in the Bidding Procedures) and Gatehouse Media Massachusetts I, Inc. (the "Backup Bidder") having been deemed by the Debtors to be the Backup Bidder and required to hold their respective final Qualified Bids open until the earlier of the Closing Date or 60 days after entry of this Order, in each case pursuant to the Sale Procedures Order; and the Court having conducted a hearing on the Motion on February 16, 2018 (the "Sale Hearing") at which time all interested parties were offered an opportunity to be heard with respect to the Motion; and the Court having reviewed and considered the Motion, declarations and other evidence submitted in support thereof, the Asset Purchase Agreement, dated as of February 13, 2018 by and among the Debtors and the Buyer (as amended, supplemented or otherwise modified, together with all exhibits and annexes thereto, the "APA"),[3] the Asset Purchase Agreement, dated as of December 8, 2017 by

---

[3] A copy of the APA is attached hereto as Exhibit 1.

and among the Debtors and the Backup Bidder (as amended, supplemented or otherwise modified, including modifications on the record at the Auction, together with all exhibits and annexes thereto, the "Backup APA"),[4] the Sale Procedures Order, and the record of the Bid Procedures Hearing and the Sale Hearing; and having heard statements of counsel and the evidence presented in support of the relief requested in the Motion at the Sale Hearing; and due notice of the Motion, the APA, the Sale Procedures Order, the Auction and the Sale Hearing having been provided; and having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their stakeholders and all other parties in interest; and the Court having jurisdiction over this matter; and the legal and factual bases set forth in the Motion and at the Sale Hearing establishing just cause for the relief granted herein; and after due deliberation thereon,

THE COURT HEREBY FINDS AND DETERMINES THAT:

## I.    Jurisdiction, Final Order, Closing to Backup Bidders, and Statutory Predicates

A.    The Court has jurisdiction to hear and determine the Motion pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(a) and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated as of February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O). Venue is proper in this District and in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    This order (the "Sale Order") constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is

---

[4] The Debtors filed the Backup APA as an exhibit to D.I. 13. The Backup APA was modified on the record at the Auction and remains subject to all such modifications. A transcript of the Auction is attached hereto as Exhibit 4.

no just reason for delay in the implementation of this Sale Order, and expressly directs entry of judgment as set forth herein.

C.    The statutory predicates for the relief requested in the Motion are sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002(a)(2), 6004(a), (b), (c), (e), (f) and (h), 6006(a), (c) and (d), 9007 and 9014.

D.    The findings of fact and conclusions of law set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

E.    To the extent any of the following findings of fact constitute conclusions of law, they are hereby adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are hereby adopted as such. Any findings of fact or conclusions of law stated by the Court on the record at the Sale Hearing are hereby incorporated, to the extent they are not inconsistent herewith.

F.    In the event that the Buyer fails to consummate the Sale, any reference herein to the Buyer may be deemed a reference to the Backup Bidder. In that event, the Debtors shall be authorized to execute all documents and consummate all transactions with the Backup Bidder without further order of the Court.

G.    The Buyer will be acting in good faith pursuant to section 363(m) of the Bankruptcy Code in closing the transaction contemplated by the APA (the "Sale") at any time on or after entry of this Sale Order.

## II.    Notice of the Sale, Auction and the Cure Amounts

A.    Actual written notice of the Sale Hearing, the Auction, the Motion, the Sale, the assumption, assignment and sale of the executory contracts and unexpired leases to be assigned to the Buyer pursuant to the APA (which are identified on Exhibit 2 hereto; such executory

4

contracts and such unexpired leases, the "Assumed Contracts") provided a reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to all known interested persons and entities, including, but not limited to the following parties (the "Notice Parties"): (a) the Office of the United States Trustee for the District of Delaware; (b) the Office of the United States Attorney for the District of Delaware; (c) counsel to any statutory committee appointed in the above-captioned jointly administered chapter 11 cases (together, the "Chapter 11 Cases"), (d) the Internal Revenue Service; (e) counsel to the Debtors' prepetition and postpetition lenders, (f) counsel to the Lead Bidders; (g) all persons known by the Debtors to have expressed an interest to the Debtors in a transaction with respect to the Debtors' assets during the previous six months; (h) all entities known by the Debtors that may have a lien, claim, encumbrance, or other interest in the Debtors' assets (for which identifying information and addresses are available to the Debtors); (i) all non-Debtor parties to the Assumed Contracts; (j) all of the Debtors' known creditors, (k) all Employees and former employees and any others receiving benefits under any pension or Employee Benefit Plan; (l) the Pension Benefit Guaranty Corporation; (m) any governmental unit known to the Debtors to have a claim in these Chapter 11 Cases; (n) the Office of the Attorney General in each state in which the Debtors operate; (o) the Office of the Delaware Secretary of State; (p) all parties that have requested notice in these Chapter 11 Cases under Bankruptcy Rule 2002; (q) counsel to the CWA; (r) counsel to the Teamsters; and (s) counsel to the CWA/ITU Pension.

B.    In accordance with the provisions of the Sale Procedures Order, the Debtors have served the Cure Notice and Supplemental Cure Notice (each as defined in the Sale Procedures Order) upon the Buyer and the Contract Counterparties: (i) that the Debtors seek to assume and assign the Assumed Contracts on the Closing Date; and (ii) of the relevant cure amounts.

Pursuant to Bankruptcy Rule 6006(c), the Court finds that the service of such Cure Notice was good, sufficient and appropriate under the circumstances and no further notice need be given in respect of establishing a cure amount for the Assumed Contracts. The Contract Counterparties have had an opportunity to object to the cure amounts set forth in the Cure Notice.

C. The Debtors' Sale Notice (as defined in the Sale Procedures Order) provided all interested parties with timely and proper notice of the Motion, Sale, Sale Hearing and Auction.

D. The Cure Notice provided the Contract Counterparties with proper notice of the potential assumption and assignment of the Assumed Contracts and any cure amount relating thereto, and the procedures set forth therein with regard to any such cure amount to satisfy the provisions of section 365 of the Bankruptcy Code and Bankruptcy Rule 6006.

E. As evidenced by the affidavits of service previously filed with the Court, proper, timely, adequate, and sufficient notice of the Motion, Auction, Sale Hearing, and Sale has been provided in accordance with sections 102(1), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014. The Debtors also have complied with all obligations to provide notice of the Motion, Auction, Sale Hearing, and Sale required by the Sale Procedures Order. The notices described in paragraphs A to E of this Section II were good, sufficient and appropriate under the circumstances, and no other or further notice of the Motion, Auction, Sale Hearing, Sale, or assumption, assignment and sale of the Assumed Contracts is required.

F. The disclosures made by the Debtors concerning the Motion, APA, Auction, Sale, and Sale Hearing were good, complete and adequate.

III. **Good Faith of Buyer**

A. The Buyer is not an "insider" of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.

B.    The Buyer is purchasing the Purchased Assets in good faith and is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to the full protection of that provision, and otherwise has proceeded in good faith in all respects in connection with this proceeding in that, *inter alia*: (a) the Buyer recognized that the Debtors were free to deal with any other party interested in acquiring the Purchased Assets following and pursuant to the terms of the Sale Procedures Order, the Bidding Procedures and the APA; (b) the Buyer complied with all provisions in the Sale Procedures Order; (c) the Buyer agreed to subject its bid to the competitive bidding procedures set forth in the Sale Procedures Order; (d) all payments to be made by the Buyer and other agreements or arrangements entered into by the Buyer in connection with the Sale have been disclosed; (e) the Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction; (f) no common identity of directors or controlling stockholders exists between the Buyer and any of the Debtors; (g) the Buyer in no way caused the chapter 11 filing by the Debtors; and (h) the negotiation and execution of the APA and any other agreements or instruments related thereto were without collusion or fraud and at arms' length and in good faith.  The Buyer will be acting in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the transactions contemplated by the APA after the entry of the Sale Order.  Neither the Debtors nor the Buyer have engaged in any conduct that would cause or permit the APA to be avoided under section 363(n) of the Bankruptcy Code.

IV.    **Highest and Best Offer**

A.    Prior to selecting the Buyer as the Successful Bidder, the Debtors solicited offers to acquire the Purchased Assets from a wide variety of parties. In addition to such solicitations, the Debtors also conducted the bid and auction process in accordance with the provisions of the Sale Procedures Order and the Debtors have otherwise complied with the Sale Procedures Order in all material respects. The bid and auction process conducted pursuant to the Sale Procedures

7

Order afforded a full, fair and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Purchased Assets. Such process was duly noticed and conducted in a noncollusive, fair and good faith manner and a reasonable opportunity has been given to any interested party to make a higher and better offer for the Purchased Assets.

B.      The consideration provided by the Buyer under the APA, including the assumption of the Assumed Liabilities, constitutes the highest or best offer for the Purchased Assets, and will provide a greater recovery for the Debtors' estate than would be provided by any other available alternative. The Debtors' determination that the APA constitutes the highest and best offer for the Purchased Assets constitutes a valid and sound exercise of the Debtors' business judgment consistent with their fiduciary duties.

C.      The APA represents a fair and reasonable offer to purchase the Purchased Assets under the circumstances of these Chapter 11 Cases. No other person or entity or group of entities has offered to purchase the Purchased Assets for greater economic value to the Debtors' estate than the Buyer.

D.      Approval of the Motion, the Sale, the assumption and assignment of the Assumed Contracts, the APA and the consummation of the transactions contemplated thereby is in the best interests of the Debtors, their creditors, their estates and other parties in interest.

E.      The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the Sale prior to, and outside of, a plan of reorganization.

## V.      No Fraudulent Transfer; No Successor Liability

A.      The APA was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia (including, without limitation, the Uniform

Fraudulent Conveyance Act and the Uniform Fraudulent Transfer Act). The consideration provided by the Buyer pursuant to the APA is fair and adequate and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia (including, without limitation, the Uniform Fraudulent Conveyance Act and the Uniform Fraudulent Transfer Act).

B.    Upon the Closing, except as included in the Assumed Liabilities, the Buyer shall not, and shall not be deemed to: (i) be the successor of or successor employer (as described under COBRA (as defined below) and applicable regulations thereunder) to the Debtors, including without limitation, with respect to any Collective Bargaining Agreements and any Employee Benefit Plans, and any common law successorship liability in relation to any pension plans, including with respect to withdrawal liability, (ii) be the successor of or successor employer to the Debtors, and shall instead be, and be deemed to be, a new employer with respect to any and all federal or state unemployment laws, including any unemployment compensation or tax laws, or any other similar federal or state laws, (iii) have, de facto, or otherwise, merged or consolidated with or into Debtors, (iv) be a mere continuation or substantial continuation of Debtors or the enterprise(s) of Debtors, or (v) be liable for any acts or omissions of Debtors in the conduct of the Business or arising under or related to the Purchased Assets other than as set forth in the APA. Without limiting the generality of the foregoing, and except as otherwise provided in the APA, the parties intend that the Buyer shall not be liable for any Encumbrance or Liability (other than Assumed Liabilities and Permitted Encumbrances) against any Debtor, or any of its predecessors or Affiliates, and the Buyer shall have no successor or vicarious liability of any kind or character whatsoever, whether known or unknown as of the Closing Date, whether now existing or hereafter arising, whether asserted or unassisted, or whether fixed or contingent,

with respect to the Business, the Purchased Assets or any Liabilities of any Debtor arising prior to the Closing Date. The Buyer would not have agreed to acquire the Purchased Assets but for the foregoing protections against potential claims based upon "successor liability" theories.

C.      By virtue of the consummation of the Sale, (i) the Buyer is not a continuation of the Debtors or their respective estates, there is no continuity between the Buyer and the Debtors, there is no common identity between the Debtors and the Buyer, there is no continuity of enterprise between the Debtors and the Buyer, and the Buyer is not a mere continuation of the Debtors or their estates, (ii) the Buyer is not holding itself out to the public as a continuation of the Debtors or their respective estates and (iii) the Sale does not amount to a consolidation, merger or de facto consolidation or merger of the Buyer and the Debtors and/or the Debtors' estates. Accordingly, the Buyer, including its affiliates, successors or assigns, is not and shall not be deemed a successor to Debtors, for any purpose or under any theory, as a result of the consummation of the Sale contemplated by the APA.

D.      Pursuant to those certain orders dated February 1, 2018 [Docket Nos. 212 & 213] and that certain order dated February [___], 2018 [Docket No. _____], the Debtors have been authorized, pursuant to sections 1113 and 1114 of the Bankruptcy Code, to reject all Collective Bargaining Agreements and modify all retiree medical obligations (together, the "Labor and Legacy Obligations") to the extent necessary to comply with their obligations under the APA. The Labor and Legacy Obligations have been rejected and/or terminated as applicable to the extent required under the APA. The Buyer has purchased the Purchased Assets free and clear of the Labor and Legacy Obligations and is not and shall not be deemed to be a successor to the Debtors for any purpose, including, without limitation with respect to the Labor and Legacy Obligations.

E.    Notwithstanding the foregoing, no employee of the Debtors as of the Closing who becomes an employee of the Buyer immediately following the Closing may be considered to have experienced an employment loss for purposes of any statute or contract requiring prior notice and/or payment of severance benefits in the event of employment loss.

## VI.    Validity of Transfer

A.    The Debtors and the Buyer have full corporate power and authority to execute and deliver the APA and all other documents contemplated thereby, and no further consents or approvals are required for the Debtors or the Buyer to consummate the transactions contemplated by the APA, except as otherwise set forth in the APA.

B.    The Purchased Assets constitute property of the Debtors' estates and title thereto is presently vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code. The transfer of each of the Purchased Assets to the Buyer will be as of the Closing Date a legal, valid, and effective transfer of such assets, and vests or will vest the Buyer with all right, title, and interest of the Debtors to the Purchased Assets free and clear of all (a) Encumbrances, (b) claims, including, without limitation, all "claims" within the meaning of sections 101(5) and 102(2) of the Bankruptcy Code, (c) interests, (d) Encumbrances, and (e) Liabilities, whether imposed by agreement, understanding, law, equity or otherwise and whether known or unknown, fixed or contingent or arising prior to or subsequent to the commencement of the Chapter 11 Cases (each of the foregoing described in clauses (a), (b), (c), (d), and (e) collectively or individually, the "Adverse Interests"), except for any Permitted Encumbrances and Assumed Liabilities.

## VII.    Section 363(f) Is Satisfied

A.    The Buyer would not have entered into the APA and would not consummate the transactions contemplated thereby (by paying the cash payment and the other payments

11

contemplated by the APA and assuming the Assumed Liabilities) if the sale and transfer of the Purchased Assets to the Buyer, and the assumption, assignment, transfer and sale of the Assumed Contracts to the Buyer, were not, except as otherwise provided in the APA with respect to the Assumed Liabilities and Permitted Encumbrances, free and clear of all Adverse Interests of any kind or nature whatsoever, or if the Buyer would, or in the future could be liable for any of such Adverse Interests, including, but not limited to, Adverse Interests in respect of the following: (1) any labor or employment agreements, (2) all mortgages, deeds of trust and security interests; (3) any intercompany loans and receivables between one or more of the Debtors; (4) any pension, multiemployer plan (as such term is defined in section 3(37) or section 4001(a)(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")), health or welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of any of the Debtors or any multiemployer plan to which the Debtors have at any time contributed to or had any liability or potential liability; (5) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) ERISA, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Worker Adjustment and Retraining Act of 1988, (g) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (h) the Americans with Disabilities Act of 1990, (i) the Consolidated Omnibus Budget Reconciliation Act of 1985 (as amended, including, without limitation, the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Code and of any similar state law (collectively, "COBRA"), (j) state discrimination laws, (k) state unemployment compensation laws or any other similar state

12

laws, or (1) any other state or federal benefits or claims relating to any employment with any of the Debtors or any of their respective predecessors; (6) any liabilities arising under any environmental laws with respect to any assets owned or operated by any of the Debtors or any corporate predecessor of any of the Debtors at any time prior to the Closing Date; (7) any bulk sales or similar law; (8) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; and (9) any Excluded Liabilities. There is no better available alternative for the Purchased Assets than the Sale to the Buyer. The Sale of the Purchased Assets contemplated by the APA is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

B.      The Debtors may sell and transfer the Purchased Assets free and clear of all Adverse Interests against the Debtors, their estates or any of the Purchased Assets (except for any Assumed Liabilities and Permitted Encumbrances under the APA) because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Those holders of Adverse Interests against or in the Debtors, their estates or any of the Purchased Assets who did not object, or who withdrew their objections, to the Sale or the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of such Adverse Interests who did object fall within one or more of the other subsections of section 363(f) and are adequately protected by having their Adverse Interests, if any, in each instance against the Debtors, their estates or any of the Purchased Assets, attach to the net cash proceeds of the Sale ultimately attributable to the Purchased Assets in which such creditor or interest holder alleges an interest, in the same order of priority, with the same validity, force and effect that such creditor or interest holder had prior to the Sale, subject to any claims and defenses the Debtors and their estates may possess with respect thereto.

# VIII. Assumption and Assignment of the Assumed Contracts

A.     The assumption and assignment of the Assumed Contracts pursuant to the terms of this Sale Order is integral to the APA and is in the best interests of the Debtors and their estates, creditors, interest holders and other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtors.

B.     The amount set forth on Exhibit 2 annexed hereto are the sole amounts necessary under sections 365(b)(1)(A) and (B) and 365(f)(2)(A) of the Bankruptcy Code to cure all monetary defaults and pay all actual pecuniary losses under the Assumed Contracts (the "Cure Amounts").

C.     Pursuant to the terms of the APA and the Sale Procedures Order, the Buyer and/or the Debtors will: (i) cure and/or provide adequate assurance of cure of any defaults existing prior to the Closing Date under any of the Assumed Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code; and (ii) provide compensation or adequate assurance of compensation to any party for actual pecuniary loss to such party resulting from a default prior to the Closing Date under any of the Assumed Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code.  The Buyer has provided adequate assurance of its future performance under the relevant Assumed Contracts within the meaning of sections 365(b)(1)(C), 365(b)(3) (to the extent applicable) and 365(f)(2)(B) of the Bankruptcy Code.

D.     No default exists in the Debtors' performance under the Assumed Contracts as of the Closing Date other than the failure to pay Cure Amounts or defaults that are not required to be cured as contemplated in section 365(b)(1)(A) of the Bankruptcy Code.

E.     As of the Closing Date, each Assumed Contract will be in full force and effect against the non-Debtor party thereto in accordance with the terms of such Assumed Contract.

# IX. Compelling Circumstances for an Immediate Sale

14

A. To maximize the value of the Debtors' assets, it is essential that the Sale of the Purchased Assets occur within the time constraints set forth in the APA. The consummation of the Sale is necessary both to preserve and maximize the value of the Debtors' assets for the benefit of the Debtors, their estates, their creditors, interest holders and all other parties in interest in the Chapter 11 Cases, and to provide the means for the Debtors to maximize creditor recoveries.

B. The Sale does not constitute a sub rosa chapter 11 plan. The Sale neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates a liquidating plan of reorganization for any of the Debtors.

C. The consummation of the transaction is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363 and 365, and all of the applicable requirements of such sections have been complied with in respect of the transaction.

## NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

### General Provisions

1. The relief requested in the Motion is granted and approved, and the Sale contemplated thereby and by the APA is approved as set forth in this Sale Order.

2. This Court's findings of fact and conclusions of law, set forth in the Sale Procedures Order, are incorporated herein by reference.

3. All objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court, and all reservations of rights included therein, are hereby overruled on the merits with prejudice or the interests of such objections have been otherwise satisfied or adequately provided for.

**Approval of the APA**

4.    Pursuant to sections 105, 363(b) and 365 of the Bankruptcy Code, the Sale by the Debtors to the Buyer of the Purchased Assets and transactions related thereto, upon the closing under the APA, are authorized and approved in all respects.

5.    The APA and all other ancillary documents, and all of the terms and conditions thereof, are hereby approved as set forth herein.  The Buyer shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the APA or other Sale related document.  The automatic stay imposed under section 362 is modified solely to the extent necessary to implement the preceding sentence.

6.    Pursuant to sections 105 and 363(b) of the Bankruptcy Code, the Debtors are authorized and empowered to take any and all actions necessary or appropriate to (i) consummate the Sale of each of the Purchased Assets to the Buyer pursuant to and in accordance with the terms and conditions of the APA, (ii) close the Sale as contemplated in the APA and this Sale Order, and (iii) execute and deliver, perform under, consummate, implement and close fully the APA, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the APA and the Sale, and any other ancillary documents as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the APA.

7.    This Sale Order shall be binding in all respects upon the Debtors, including the Debtors' estates, all holders of equity interests in any Debtor, all holders of any claim(s) (whether known or unknown) against any Debtor, any holders of Adverse Interests against or on all or any portion of the Purchased Assets, all Contract Counterparties, the Buyer and all successors and assigns of the Buyer, the Purchased Assets and any trustees, if any, subsequently appointed in any of the Debtors' Chapter 11 Cases or upon a conversion to chapter 7 under the

16

Bankruptcy Code of any of the Debtors' Chapter 11 Cases. This Sale Order and the APA shall inure to the benefit of the Debtors, their estates, their creditors, the Buyer and their respective successors and assigns.

8.   Any amounts payable by the Debtors under the APA or any of the documents delivered by the Debtors in connection with the APA, including without limitation, any allowed claims for breach thereof and the purchase price adjustment amount, if any, shall be paid in the manner provided in the APA without further order of the Bankruptcy Court, shall be an allowed administrative claim in an amount equal to such payments in accordance with sections 503(b) and 507(a)(2) of the Bankruptcy Code with priority over any and all administrative expense claims other than (x) claims granted pursuant to the DIP Financing Order to the provider of debtor-in-possession financing and (y) administrative expense claims included within the "Carve- Out" in the DIP Financing Order to which the DIP Lender's claims are subject, and such claims shall not be discharged, modified or otherwise affected by any reorganization plan for the Debtors, except by written agreement with the Buyer or its successors or assigns (such agreement to be provided in the Buyer's or its successors' or assigns' respective sole discretion).

**Transfer of the Purchased Assets**

9.   Pursuant to sections 105(a), 363(b), 363(f), 365(b) and 365(f) of the Bankruptcy Code, the Debtors are authorized and directed to transfer the Purchased Assets on the Closing Date. Such Purchased Assets shall be transferred to the Buyer upon and as of the Closing Date and such transfer shall constitute a legal, valid, binding and effective transfer of such Purchased Assets and shall be free and clear of all Adverse Interests, except Assumed Liabilities and Permitted Encumbrances under the APA. Upon the Closing, the Buyer shall take title to and possession of the Purchased Assets subject only to the Assumed Liabilities and Permitted Encumbrances. Pursuant to section 363(f) of the Bankruptcy Code, the transfer of title to the

17

Purchased Assets and the Assumed Contracts shall, except for Assumed Liabilities and Permitted Encumbrances, be free and clear of all Adverse Interests; including, without limitation, in respect of the following: (i) any labor or employment agreements; (ii) any mortgages, deeds of trust and security interests; (iii) any intercompany loans and receivables between one or more of the Debtors; (iv) any pension, multiemployer plan (as such term is defined in Section 3(37) or Section 4001(a)(3) of ERISA), health or welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of any of the Debtors or any multiemployer plan to which the Debtors have at any time contributed to or had any liability or potential liability; (v) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) ERISA, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (g) the Americans with Disabilities Act of 1990, (h) COBRA, (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, or (k) any other state or federal benefits or claims relating to any employment with the Debtors or any of their predecessors; (vi) liabilities arising under any environmental laws with respect to any assets owned or operated by any of the Debtors or any corporate predecessor of any of the Debtors at any time prior to the Closing Date; (vii) any bulk sales or similar law; (viii) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; and (ix) any Excluded Liabilities. Adverse Interests shall attach solely to the net cash proceeds of the Sale with the same validity, priority, force and effect that they now have as against the Purchased Assets, subject to any claims and

18

defenses the Debtors and their estates may possess with respect thereto. On the Closing Date, contemporaneously with the transfer of the Purchased Assets to the Buyer, the Debtors will cause the indefeasible payment in full of all obligations due and owing to the DIP Lender under the DIP Financing Order from the proceeds of the Sale.

10.    The transfer of the Purchased Assets to the Buyer pursuant to the APA shall not result in (i) the Buyer having any liability or responsibility for any claim (other than Assumed Liabilities) against the Debtors or against an insider of the Debtors, or (ii) the Buyer having any liability or responsibility to the Debtors except pursuant to the APA and this Sale Order.

11.    None of the Buyer or its affiliates, successors, assigns, equity holders, employees or professionals shall have or incur any liability to, or be subject to any action by any of the Debtors or any of their estates, predecessors, successors or assigns, arising out of the negotiation, investigation, preparation, execution, delivery of the APA and the entry into and consummation of the Sale of the Purchased Assets, except as expressly provided in the APA and this Order.

12.    Except as expressly provided by the APA with respect to Assumed Liabilities and Permitted Encumbrances, all persons and entities holding Adverse Interests, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, vendors, suppliers, employees, trade creditors, litigation claimants and other persons, in all or any portion of the Purchased Assets arising under or out of, in connection with, or in any way relating to the Debtors, the Purchased Assets, the operation of the Debtors' business prior to the Closing Date or the transfer of the Purchased Assets to the Buyer, hereby are forever barred, estopped and permanently enjoined from asserting against the Buyer or its successors or assigns, their property or the Purchased Assets, such persons' or entities' Adverse Interests in and to the Purchased Assets. On the Closing Date, each creditor (and, the Buyer, on

19

behalf of each creditor) is authorized to execute such documents and take all other actions as may be deemed by the Buyer to be necessary or desirable to release liens or claims on the Purchased Assets, if any, as provided for herein, as such liens or claims may have been recorded or may otherwise exist.

13.    All persons and entities that are in possession of some or all of the Purchased Assets on the Closing Date are directed to surrender possession of such Purchased Assets to the Buyer or its assignee as of the Closing Date.

14.    A certified copy of this Sale Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel any of applicable Adverse Interests and encumbrances of record.

15.    If any person or entity which has filed statements or other documents or agreements evidencing Adverse Interests in, all or any portion of the Purchased Assets shall not have delivered to the Debtors prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary or desirable to the Buyer for the purpose of documenting the release of all Adverse Interests (other than Assumed Liabilities or Permitted Encumbrances), which the person or entity has or may assert with respect to all or any portion of the Purchased Assets, the Buyer and the Debtors are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Purchased Assets.

16.    Notwithstanding the foregoing, the Buyer and the Debtors shall – and shall, to the extent of their respective control and authority, cause their respective professionals (including John Hancock Retirement Plan Services), representatives, successors and assigns (with respect to

the Debtors, including any post-effective date trust or plan administrator) to – (i) store and preserve any documents and records of the Boston Herald, Inc. Guild Commercial Retirement Plan and the Boston Herald Pension and Retirement Plan (such plans collectively, the "Pension Plans;" such documents and records including, but not limited to, any of the Pension Plans' governing documents, actuarial documents, and personnel files of participants in either of the Pension Plans, together comprising the "Pension Plan Documents"); (ii) make such Pension Plan Documents available to the Pension Benefit Guaranty Corporation ("PBGC") for copying and inspection until the expiration of one year following the date of any agreements or court orders effectively terminating the Pension Plans and appointing PBGC as statutory trustee of the Pension Plans ("Preservation Period"); and (iii) after the Preservation Period, notify PBGC at least 30 days prior to the destruction of any Pension Plan Documents and provide the PBGC the opportunity to take possession of any Pension Plan Documents in advance of destruction. The Debtors shall incorporate into any plan of reorganization submitted to the Court language requiring continued compliance with the foregoing provision. Moreover, the foregoing provision and any actions taken pursuant thereto shall survive entry of any order which may be entered (a) confirming any plan of reorganization in the Chapter 11 Cases (and, to the extent not satisfied in full, no obligation under the foregoing provision shall be discharged by the entry of such order); converting the Chapter 11 Cases to Chapter 7 cases; (c) appointing a Chapter 11 Trustee, or (d) dismissing the Chapter 11 Cases. The foregoing provision shall continue in full force and effect notwithstanding the entry of such order until all obligations are satisfied in full.

17.    This Sale Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative

agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA.  Notwithstanding any other provision hereof, nothing in this Sale Order shall bestow any tax exemption under 11 U.S.C. § 1146(a).

18.    This Sale Order is and shall be effective as a determination that, all Encumbrances shall be, and are, without further action by any person or entity, released with respect to the Purchased Assets or the Assumed Contracts as of the Closing Date.

**Assumed and Rejected Contracts**

19.    Upon the Closing of the Sale, the Debtors are authorized and directed to reject all of the Rejected Contracts (including but not limited to any collective bargaining agreements and required modifications of retiree benefits plans, to the extent permitted by prior order of the Court).

20.    Effective upon the Closing Date, the Debtors are authorized, in accordance with sections 105(a), 363 and 365 of the Bankruptcy Code, to assume and assign the Assumed Contracts to the Buyer free and clear of all Adverse Interests, as described herein, and to execute and deliver to the Buyer such documents or other instruments as may be necessary to assign and transfer the Assigned Contracts to the Buyer. The payment (or reserve) of the applicable Cure Amounts (if any) by the Buyer or Debtors, as applicable and as required by the APA shall (a) effect a cure of all defaults existing thereunder as of the Closing Date, (b) compensate for any actual pecuniary loss to such non-Debtor party resulting from such default, and (c) together with

22

the assignment by the Debtors to and the assumption of the Assumed Contracts by the Buyer, constitute adequate assurance of future performance thereof.

21.     The requirements of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code are hereby deemed satisfied with respect to the Assumed Contracts.

22.     Pursuant to section 365(f) of the Bankruptcy Code, the assignment by the Debtors of the Assumed Contracts shall not be a default thereunder. After the payment of the relevant Cure Amounts by the Buyer or Debtors, as applicable and as required by the Asset Purchase Agreement, neither the Debtors nor the Buyer shall have any further liabilities to the Contract Counterparties other than the Buyer's obligations under the Assumed Contracts that accrue and become due and payable on or after the Closing Date.

23.     Any provisions in any Assumed Contract that prohibits or conditions the assignment of such Assumed Contract or allows the party to such Assumed Contract to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such Assumed Contract, constitute unenforceable anti-assignment provisions that are void and of no force and effect. All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Buyer of the Assumed Contracts have been satisfied. Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested with all right, title and interest of the Debtors under the Assumed Contracts.

24.     Upon the Closing and the payment of the relevant Cure Amounts, if any, by the Buyer or Debtors, as applicable, the Buyer shall be deemed to be substituted for the Debtors as a

party to the applicable Assumed Contracts and the Debtors shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability under the Assumed Contracts.

25. Upon the payment of the applicable Cure Amount, if any, by the Buyer or Debtors, as applicable, the Assumed Contracts will remain in full force and effect, and no default shall exist under the Assumed Contracts nor shall there exist any event or condition which, with the passage of time or giving of notice, or both, would constitute such a default.

26. There shall be no rent accelerations, assignment fees, increases (including advertising rates) or any other fees charged to the Buyer or the Debtors as a result of the assumption and assignment of the Assumed Contracts.

27. Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, all Contract Counterparties are forever barred and permanently enjoined from raising or asserting against the Buyer any assignment fee, default, breach or claim or pecuniary loss, or condition to assignment, arising under or related to the Assumed Contracts existing as of the Closing Date or arising by reason of the Closing.

**Other Provisions**

28. Effective upon the Closing Date and except as otherwise provided by stipulations filed with or announced to the Court with respect to a specific matter or as set forth in the APA with respect to Permitted Encumbrances and Assumed Liabilities, all persons and entities are forever prohibited and permanently enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against the Buyer, its affiliates, successors and assigns, or the Purchased Assets, with respect to any (a) Adverse Interests arising under, out of, in connection with or in any way relating to the Debtors, the Buyer, the Purchased Assets, or the operation of the Purchased Assets prior to the Closing of the Sale, or (b) successor liability, including, without

24

limitation, the following actions: (i) commencing or continuing in any manner any action or other proceeding against the Buyer, its successors or assigns, assets or properties; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Buyer, its successors or assigns, assets or properties; (iii) creating, perfecting or enforcing any Adverse Interests against the Buyer, its successors or assigns, assets or properties; (iv) asserting any setoff not validly taken pre-petition, right of subrogation or recoupment of any kind against any obligation due the Buyer or its successors or assigns; (v) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Sale Order or other orders of the Court, or the agreements or actions contemplated or taken in respect thereof; or (vi) revoking, terminating or failing or refusing to renew any license, permit or authorization to operate any of the Purchased Assets or conduct any of the businesses operated with the Purchased Assets to the extent provided in 11 U.S.C. § 525.

29.    Except for the Assumed Liabilities, Permitted Encumbrances or as otherwise expressly set forth in the APA, the Buyer shall not have any liability or other obligation of the Debtors arising under or related to any of the Purchased Assets or the APA or the transactions related thereto. Without limiting the generality of the foregoing, and except for the Assumed Liabilities or Permitted Encumbrances provided in the APA, the Buyer, including its affiliates, successors and assigns, shall not be liable for any Claims or any other Adverse Interests against the Debtors or any of its predecessors or affiliates.  Buyer shall not and shall not be deemed to: (i) be the successor of or successor employer (as described under COBRA and applicable regulations thereunder) to the Debtors, including without limitation, with respect to any Collective Bargaining Agreements and any Benefit Plans, and any common law successorship liability in relation to any pension plans, including with respect to withdrawal liability; (ii) be the

successor of or successor employer to the Debtors, and shall instead be, and be deemed to be, a new employer with respect to any and all federal or state unemployment laws, including any unemployment compensation or tax laws, or any other similar federal or state laws; (iii) have, de facto, or otherwise, merged or consolidated with or into Debtors; (iv) be a mere continuation or substantial continuation of Debtors or the enterprise(s) of Debtors; or (v) be liable for any acts or omissions of Debtors in the conduct of the Business or arising under or related to the Purchased Assets other than as set forth in the APA. Without limiting the generality of the foregoing, and except as otherwise provided in the APA, the parties intend and the Court hereby orders that the Buyer shall not be liable for any Encumbrance or Liability (other than Assumed Liabilities and Permitted Encumbrances) against any Debtor, or any of its predecessors or Affiliates, and the Buyer, including its affiliates, successors and assigns, shall have no successor or vicarious liability of any kind or character, whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, the Purchased Assets or any Liabilities of any Debtor arising prior to the Closing Date, with respect to the Debtors or any obligations of the Debtors arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of any of the Purchased Assets prior to the Closing.

30.    The transactions contemplated by the APA are undertaken by the Buyer without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including the assumption and assignment of the Assumed Contracts), unless such authorization and such Sale are duly stayed

pending such appeal. The Buyer is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

31.    Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in (i) these Chapter 11 Cases, (ii) any subsequent chapter 7 case into which any such Chapter 11 Case may be converted, or (iii) any related proceeding subsequent to entry of this Sale Order, shall conflict with or derogate from the provisions of the APA or the terms of this Sale Order.

32.    As provided in the APA, this Sale Order approves and provides for the transfer to the Buyer of all Purchased Avoidance Actions (whether under chapter 5 of the Bankruptcy Code or otherwise) of the Debtors' estates.

33.    Within one (1) Business Day of the occurrence of the Closing of the Sale, the Debtors shall file and serve a notice of same, substantially in the form attached hereto as Exhibit 3 (the "Notice of Sale Closing and Effective Date of Amendment of Case Caption"). Upon the filing of the Notice of Sale Closing and Effective Date of Amendment of Case Caption, the Debtors' case caption shall be amended to be in the form as set forth on such notice.

34.    No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale.

35.    The failure specifically to include any particular provision of the APA in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA be authorized and approved in its entirety.

36.     The APA and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court.

37.     The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order and the APA, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are a party, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale.

38.     Notwithstanding the possible applicability of Bankruptcy Rules 6004, 6006, 7062, 9014 or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable.

39.     All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

40.     To the extent that this Sale Order is inconsistent with any prior order or pleading with respect to the Motion in these Chapter 11 Cases, or is inconsistent with the APA or any related agreements, documents or other instruments, the terms of this Sale Order shall govern.

Dated: _____
Wilmington, Delaware

_____
United States Bankruptcy Judge

28

# EXHIBIT 1

APA

**EXHIBIT 2**
**Cure Amounts**
(To be attached)

**EXHIBIT 3**
Notice of Sale Closing and Effective Date of Amendment of Case Caption

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

*In re*:

HERALD MEDIA HOLDINGS, INC., et al.[1],

            Debtors

Chapter 11

Case No. 17-12881 (LSS)

(Jointly Administered)

## NOTICE OF SALE CLOSING AND EFFECTIVE DATE
## OF AMENDMENT OF CASE CAPTION

**PLEASE TAKE NOTICE** that, on _____, the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") entered the *Order (A) Authorizing the Sale of Substantially All of the Debtors ' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests; (B) Authorizing and Approving the Debtors' Performance Under the Asset Purchase Agreement; (C) Approving the Assumption and Assignment of Certain of the Debtors ' Executory Contracts and Unexpired Leases Related Thereto; and (D) Granting Related Relief* [Docket No.] (the "Sale Order"),[2] which approved the sale (the "Sale") of substantially all of the assets of the above-captioned debtors and debtors-in-possession (the "Debtors") to _____ (together with its permitted designees, successors and permitted assigns in accordance with the Asset Purchase Agreement, the "Buyer").

**PLEASE TAKE FURTHER NOTICE** that the Sale Order provided that, upon the Closing of the Sale of the Debtors' assets to the Buyer and the filing of this notice with the Bankruptcy Court, the caption for the Debtors' chapter 11 cases shall be amended as set forth below.

**PLEASE TAKE FURTHER NOTICE** that, on _____, the Closing occurred.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Sale Order, the case captions in each of the Debtors' jointly administered chapter 11 cases are amended as follows:

---

[1]    The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Herald Media Holdings, Inc. (5048); Herald Media, Inc. (1468); Boston Herald, Inc. (5341) and Herald Interactive, Inc. (2359). The Debtors' headquarters are located at 70 Fargo Street, Suite 600, Boston, MA 02210.

[2]    Unless otherwise stated, all capitalized terms not defined herein shall have the meaning set forth in the Sale Order.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT DELAWARE

|  |  |
|---|---|
| In re | Chapter 11 |
| _____, et. al.,[1] | Case No. 17-12881 (LSS) |
| Debtors. | (Jointly Administered) |

*[Rest of Page Intentionally Left Blank]*

---

[1]    The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Herald Media Holdings, Inc. (5048); Herald Media, Inc. (1468); Boston Herald, Inc. (5341) and Herald Interactive, Inc. (2359). The Debtors' headquarters are located at 70 Fargo Street, Suite 600, Boston, MA 02210.

Dated: February __, 2018
Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

Curtis S. Miller (No. 4583)
Tamara K. Minott (No. 5643)
Jose F. Bibiloni (No. 6261)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
cmiller@mnat.com
tminott@mnat.com
jbibiloni@mnat.com

and

**BROWN RUDNICK LLP**
William R. Baldiga (*pro hac vice*)
Sunni P. Beville (*pro hac vice*)
Tristan G. Axelrod (*pro hac vice*)
One Financial Center
Boston, Massachusetts 02111
(617) 856-8200
wbaldiga@brownrudnick.com
sbeville@brownrudnick.com
taxelrod@brownrudnick.com

*Co-Counsel to the Debtors*

## EXHIBIT 4

**AUCTION TRANSCRIPT**

62958162 v6

**EXHIBIT F**

**INTENTIONALLY OMITTED**

**EXHIBIT G**

## FORM OF OFFICER'S CERTIFICATE OF BUYER

Reference is hereby made to (x) that certain Asset Purchase Agreement, dated as of February 13, 2018 (the "Asset Purchase Agreement"), by and among (i) MNG-BH ACQUISITION LLC ("Buyer"), (ii) MEDIANEWS GROUP, INC., as Buyer Guarantor, and (iii) BOSTON HERALD, INC., HERALD INTERACTIVE INC., HERALD MEDIA, INC., and HERALD MEDIA HOLDINGS, INC. (each, individually, a "Seller", and, collectively, "Sellers") and (y) the order of the United States Bankruptcy Court for the_____, entered on_____, 2018 ("Sale Approval Order") in the jointly-administered cases for the Sellers under the caption _____, Case No._____(___). Capitalized terms used below but not defined herein shall have the meanings ascribed to them in the Asset Purchase Agreement and the Sale Approval Order if not otherwise defined in the Asset Purchase Agreement.

This certificate is being delivered to Seller pursuant to Section 4.3.4 of the Asset Purchase Agreement. The undersigned, solely in his capacity as a [_____] of [_____], a Buyer, and not in his capacity as an individual, hereby certifies as follows:

1.    All conditions precedent contained in Section 5.2 of the Asset Purchase Agreement have been satisfied.

2.    [        ], a Buyer, is not a foreign person (as defined in the Internal Revenue Code) for purposes of Section 1445 of the Internal Revenue Code.

3.    Attached hereto as Exhibit 1 are true, correct and complete resolutions adopted by Buyer's directors and shareholders authorizing the execution, delivery and performance of the Asset Purchase Agreement and the other agreements, documents and instruments contemplated by the Assert Purchase Agreement and the Sale Approval Order, and the consummation of the transactions contemplated by the Asset Purchase Agreement and the Sale Approval Order; and such resolutions have not been modified, amended, rescinded or revoked and are in full force and effect as of the date hereof.

[Signature Page Follows]

IN WITNESS WHEREOF, the undersigned has executed this certificate as of this _____ day of _____, 2018.

By: _____
    Name:
    Title:

# EXHIBIT 1
## RESOLUTIONS ADOPTED BY SELLER'S DIRECTORS AND SHAREHOLDERS

See attached.

**EXHIBIT H**

**SALE PROCEDURES ORDER**
**(SEE D.I. 146)**